IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

BETTY D. COOK,                              )
                                            )
          Plaintiff,                        )
                                            )
vs.                                         )
                                            )     No.: 09-cv-133-DRH
ILLINOIS DEPARTMENT OF CORRECTIONS,         )
                                            )
          Defendant.                        )

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT
OF BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Now comes Plaintiff, and for her Statement of Undisputed Material Facts In Support of Brief In Support of Plaintiff's Response to Defendant's Motion for Summary Judgment, states as follows:

1.      Plaintiff was born August 25, 1957. (Cook P80)[1].

2.      Plaintiff started working for the Defendant in 1976. (Cook P8).

3.      Plaintiff became a Correctional Counselor I in February of 2004. (Cook P18).

4.      In February of 2005, Plaintiff was promoted to Correctional Counselor II. (Cook P24).

5.      Plaintiff was forced to retire on May 31, 2008. (Cook P8).

6.      The alleged discrimination took place while Plaintiff was a Correctional Counselor II during the time period of January 2005 through the time of her forced retirement, May 31, 2008.

7.      The counseling department provided counseling to prisoners at the Centralia Correctional facility, Centralia, Illinois.

8.      When Plaintiff initially began as Counselor I, there was one (1) other Counselor I, six Counselor IIs and one (1) Counselor III. (Cook P25, 26).

9.      When she was promoted in February of 2005 to Counselor II, there were then seven (7) Counselors IIs and one (1) Counselor III. (Cook P26).

---

[1]References to "_____ P__" denotes specific deponent and deposition page(s) number.

10.     When Plaintiff started in the counseling department in February of 2004, she was 47 years of age and had the most seniority of the counseling department being twenty-eight (28) years (date of hire 1976). Gina Feazel who was Counselor II was age 38 with the least amount of seniority of five (5) years (date of hire 1999). (Feazel, P 3, 10).

11.     The entire list of counselors in February of 2004 according to seniority (oldest to youngest) were as follows (Cook P33, 34 & Plaintiff's Affidavit P2)[2]:

| Name | Counselor Title | Date of Birth | Age | Date of Hire | Seniority |
|------|----------------|---------------|-----|--------------|-----------|
| Betty Cook | Counselor I | 8/25/57 | 47 | December 14, 1976 | 28 years |
| Alan Sanner | Counselor III | 1955 | 49 | September 5, 1980 | 24 years |
| Pamela Alemond | Counselor II | 1957 | 47 | September 30, 1980 | 24 years |
| Sena Landreth | Counselor II | 1955 | 49 | July 6, 1981 | 24 years |
| Terry Loepker | Counselor II | 1960 | 44 | November 23, 1981 | 23 years |
| Anthony Ballantini | Counselor II | 1959 | 45 | August 29, 1983 | 21 years |
| Cynthia Keck | Counselor II | 1967 | 37 | July 1, 1985 | 19 years |
| Gina Feazel | Counselor II | 1966 | 38 | January 11, 1999 | 5 years |

12.     At this time, the supervisory positions in ascending chain of command were: Counselor III (Sanner); two casework supervisors; and clinical services supervisor (who was to report to assistant warden).

13.     The supervisory positions of clinical services supervisor and casework supervisor were not filled. (Sanner P20).

14.     Al Sanner who was Counselor III, was responsible for receiving inmates into the institution and had two (2) housing units of 100 inmates each. (Sanner P7 - 9).  He also was considered a lead worker, having some

---

[2]References to Plaintiff's Affidavit "P__" denotes specific page of Plaintiff's Affidavit.

supervisory duties, such as reviewing work, approving time off and some input for evaluations. (See #18 of Defendant's Brief).

15.      Seniority was a major factor in obtaining advancement from Counselor I up through casework supervisor. (Plaintiff's Affidavit P5).

16.      Because of a buy-out in 2002 when many counselors left, the remaining counselors had to see 400 or more inmates every ninety (90) days. Previously each counselor had been seeing 100 inmates every sixty (60) days. (Sanner P14). This made it stressful and difficult for each counselor. (Sanner P7, 10).

17.      Above the counseling department supervisors would be the assistant warden of programs. Ann Casey was appointed to that position in January of 2005. (Cook P26).

18.      Above Ann Casey was the warden, Bradley Robert, who became warden in January of 2005. (Robert P42). He had moved from assistant warden to warden. He had been appointed to both jobs by Governor Rod Blagojevich. (Robert P54).

19.      Warden Robert was the warden throughout the relevant time period in this lawsuit (from January 2005 through the time the Plaintiff was forced to retire on May 31, 2008).

20.      Warden Robert's credentials were the following: a high school degree (Robert P7); ordinary correctional officer from 1982 until 1991 (Robert P15); working for the Secretary of State in a drivers' license facility until 2003 (Robert P20); in 2003 appointed Assistant Warden of Operations at Centralia Correctional Center by Blagojevich (Robert P20), [having no training to become assistant warden before this (Robert P40)]; appointed warden in January of 2005 by the Blagojevich Administration (Robert P54); Democratic Precinct Committeeman beginning in 1988 and then Clinton County Chair for the Democratic Central Committee beginning in 2002 (Robert P11); friend and supporter of Democrat State Representative Kurt Grandberg (Robert P12 - 14, 58, 59).

21.      Under Warden Robert were two (2) assistant wardens: Assistant Warden of Programs and Assistant Warden of Operations (Ann Casey, Assistant Warden of Programs, Julius Flagg, Assistant Warden of Operations). Other relevant persons under Warden Robert were the business administrator, Mark Beckmann and the administrative assistant, Michelle Taphorn. (Robert P64, 65).

22.      Robert's job was to oversee all operations of Centralia Correctional facility (Robert P68).

23.     Robert was in charge of discipline at the facility. The procedure for discipline would be that the immediate supervisor of the Plaintiff who would be Ann Casey would do a referral to the employment review board hearing officer who was either Mark Beckmann or Michelle Taphorn.  They would conduct a hearing and make a recommendation; Robert would review the recommendation and concur or not concur with the recommendation. (Robert P70).  Beckmann and Taphorn had no experience as hearing officers.  They were appointed by the warden. (Beckmann P13, Taphorn P15).  Taphorn's primary job of administrative assistant to Warden Robert was to assist Warden Robert. (Taphorn P10).  Beckmann's primary job was procurement and payroll supervisor. (Beckmann P5, 6).

24.     Mark Beckmann and Taphorn were supervised by Robert. (Robert P72, 73).  Robert had the right to overrule any of their decisions. (Robert P70).

25.     In January of 2005, Ann Casey was appointed as Assistant Warden of Programs. (Casey P30).  She was a Democrat and worked for a Democrat, Warden Robert. (Casey P33).  She had met Governor Blagojevich. (Casey P26).  The warden and assistant warden jobs were exempt positions which meant they were appointed at the pleasure of the State of Illinois Administration. (Casey P32, 33).

26.     Gina Feazel had the least seniority of anyone as a counselor. (Feazel P20, October 29, 2009 deposition).[3]  "Counselor" was a non-exempt position.

27.     Gina Feazel became a Democratic Precinct Committeeman in Clinton County in 2002 and is currently a precinct committeeman. (Feazel P6,7, October 29, 2009).

28.     At no time was Gina Feazel ever disciplined while she was a counselor. (Feazel P41, November 10, 2009).

29.     After appointed as assistant warden, Casey was hired as a consultant for Aramark making $2,500 per month and Cope, a consulting company, making $2,500 per month. (Casey P36 - 38, 47 - 50).  Eventually, Casey was asked to stop this work by the State of Illinois legal department. (Casey P41).

30.     Both companies provided services for correctional facilities. (Casey P36 - 50).

---

[3]Gina Feazel gave two depositions.

31.     Casey, Robert, Democratic Representative Grandberg all would meet at political fund raisers, meetings, Warden Robert's bar and tavern and Robert's house.  Casey, Robert, Taphorn and others would socialize on Warden Robert's boat at Lake Carlyle. (Casey P54, 65, 66, 67, 75 - 78).

32.     The previous Warden Bowden and Assistant Wisely were forced to resign. (Sanner P27, 29).

33.     Casey had spent the night at Representative Kurtis Grandberg's home and had been given the key to his house so she could reside there in order to be closer to the prison for driving purposes. (Bryan P36, 37).

34.     In October of 2005, Pam Alemond and Cynthia Keck left the counseling department to be transferred into parole.  They left because of working conditions in the counseling department under Assistant Warden Ann Casey. (Ballantini P18).

35.     In March of 2006, Allan Sanner, Anthony Ballantini and Terry Loepker retired or left for other departments because of the working conditions under Assistant Warden Casey. (Sanner P20, 24, 25; Ballantini P17; Loepker P24).

36.     Sanner, who had been Counselor III, retired; his responsibilities were given to Plaintiff except for certain supervisory tasks.  She was now performing job duties of both Counselor II and III. (Cook P31).  Plaintiff undertook these additional job duties because Casey had told her that this would lead to a permanent assignment as Counselor III. (Cook P146).

37.     After March of 2006, the only three (3) permanent counselors were:

    a.      Plaintiff Betty Cook, date of birth 1957, age 49, date of hire 12/4/76 (30 years);

    b.      Sena Landreth, date of birth 1955, age 51, date of hire 7/6/81 (25 years);

    c.      Gina Feazel, date of birth 1966, age 40, date of hire 1/11/99 (7 years).

38.     Bart Toennies, date of birth 1971 and date of seniority 1994, began as a counselor on December 16, 2006.  At Centralia, he was never counseled, criticized or disciplined. (Toennies P12).

39.     Debra Brink, date of birth 1957, date of hire 2/8/82, began work in January of 2007 as Counselor I because of her seniority.

40.     Brandon Risse, date of birth 1974, date of hire 8/16/99, began as counselor on October 16, 2007.

41.     Stacy Burton, date of birth 1968, date of hire 2/10/88, began as counselor in January of 2008.

42.     Debra Brink died on November 5, 2007.

43.     In January of 2008, Sena Landreth retired because of stress under Assistant Wardem Ann Casey. Many days she would just cry due to the stress. (Landreth P36, Sanner P37).

44.     On May 31, 2008, Plaintiff Betty Cook retired.

45.     On the date of Plaintiff's forced retirement of May 31, 2008, the following counselors were left:

| Name | Date of Birth | Age | Date of Hire/Seniority |
|------|---------------|-----|------------------------|
| Gina Feazel | 1966 | **42** | **January 11, 1999/9 years** |
| Bart Toennies | 1971 | 37 | 1981/14 years |
| Brandon Risse | 1974 | 34 | August 16, 1999/9 years |
| Stacy Burton | 1968 | 40 | February 10, 1998/10 years |

(Plaintiff's Affidavit P2).

46.     Because of the union rules, senior counselors would be able to apply for higher positions such as Counselor III, case work supervisor or clinical services supervisor.

47.     These positions were many times filled because of politics, not budget. Other prisons had an excess of counselors compared to Centralia. (Sanner P16)(Affidavit of Doyle Cook). The warden would make the decision to ask Springfield for additional employees.

48.     Plaintiff's job evaluation for the period of February 1, 2005 to April 1, 2005 by Casey indicated Plaintiff met or exceeded all expectations. (See Exhibit A).

49.     Plaintiff's job evaluation for the period of time of April 1, 2005 through June 1, 2005, February 2, 2005 and February 1, 2006 done by Casey showed that Plaintiff met or exceeded all expectations. (See Exhibits B, C).

50.     Plaintiff became eligible for retirement in December of 2006.  She received her thirty-year pin from Assistant Warden Casey.  Casey told Plaintiff words to the effect, 'here's your thirty-year pin, and you can retire when you are 50.'  Plaintiff interpreted this comment as demeaning... "you should go" (Cook P142).  Cook's 50th birthday was August 25, 2007.  Plaintiff told Casey she had not decided to retire.  Twenty-five (25) years of service plus fifty (50) years of age, combine to total seventy-five (75) which allowed voluntary retirement with compensation.  If one retired before age 50, there would be no monetary compensation until age sixth-two (62). (Plaintiff's Affidavit P 2).

51.     Casey gave her deposition well after the depositions of all the other witnesses.  In her deposition, Casey indicated that up to the Spring of 2007 she had spoke to Plaintiff on numerous occasions concerning Plaintiff's mistakes and did this without imposing discipline in hope that Plaintiff would improve. (See Defendant's Statement of Facts #s21, 22).  That, because Plaintiff had not improved by the Spring of 2007, Casey was left without a choice but to start imposing discipline. (See Defendant's Statement of Facts #23).  Then Casey referred Plaintiff for discipline six (6) times between April and June of 2007.

52.     That according to the Defendant, Plaintiff in a letter of January of 2007 admitted she was aware that Casey was concerned about her job performance and that Plaintiff was behind in her work. (Defendant's Exhibit19).

53.     To the contrary, the facts were that Casey never spoke with Plaintiff on any occasion concerning correcting mistakes Plaintiff had made prior to 2007. (Plaintiff's Affidavit P 2).

54.     For the first time, Casey in her deposition, mentioned that she found a backlog of grievances in a cabinet of Plaintiff's as if Plaintiff was hiding this backlog of grievances.  Casey indicated that she had talked to the Plaintiff privately about this. (Casey P151).

55.     However even Casey admitted that she did not document any of the times she attempted to correct Plaintiff prior to the Spring of 2007 nor did she document the incident where she found this backlog of grievances hiding in a cabinet. (Casey P153-157).  Casey said she talked to Plaintiff privately about the backlog of grievances. (Casey P151).

56.     The above statements of Casey were incorrect and merely an attempt to explain why she all of a sudden disciplined Plaintiff six (6) times in the Spring of 2007.

57.     According to Plaintiff, Plaintiff was never talked to by Casey concerning any problems in 2006. She was never talked to about a backlog of grievances found hidden in one of Plaintiff's cabinets. In fact, Plaintiff did have grievances in a cabinet, but these were simply every copy of a grievance filed by inmates which Plaintiff had kept. This was proper. The original grievances were filed in the appropriate place. Casey could not have complained about this because there was nothing to complain about. (Plaintiff's Affidavit Ps 2, 3).

58.     Beginning in 2007, Casey began to berate Plaintiff on the radio. All persons in the in the prison having access to radios, heard these comments. (Plaintiff's Affidavit P 4).

59.     On January 4, 2007, Casey told Plaintiff that she did not want Plaintiff training Debra Brink (Debra Brink had just started as Counselor I in the department). Casey told Plaintiff that Gina Feazel would train Debra Brink despite the fact that the previous custom would be that all counselors would train a new counselor. (Plaintiff's Affidavit P 3).

60.     In January of 2007, Casey began scrutinizing everything Plaintiff did. Casey was observed talking to other officers, inmates and would even follow Plaintiff on her job duties. (Plaintiff's Affidavit P 3).

61.     Casey started examining Plaintiff's work by looking on the computer. (Plaintiff's Affidavit P 3). Plaintiff was ordered by Casey to document her every activity and send written evidence of same to Casey. (Plaintiff's Affidavit P 3).

62.     In January of 2007, Casey held a meeting with Plaintiff concerning Plaintiff's annual job evaluation. During this meeting, Casey had no positive things to say about Plaintiff as compared to Casey's initial evaluations of Plaintiff. No written evaluation was given to Plaintiff. Casey accused Plaintiff of being the object of many complaints, that Plaintiff was worthless; that if Plaintiff could not do the job she should just leave counseling or retire. In response to this meeting, Plaintiff sent a letter to Casey (Defendant's Exhibit #19) to address Casey from criticizing her.

63.     The least senior person in the counseling department, Gina Feazel, was given supervisory access to the computer entries of each counselor and given a supervisory number to sign in for access to the CHAMPS entries. (Plaintiff's Affidavit P 3, 4).

64.     Plaintiff did not observe Gina Feazel under the same scrutiny by Ann Casey. (Plaintiff's Affidavit P 3).

65.     In March of 2007, Casey brought up again whether Plaintiff was going to retire when she reached age 50. (Plaintiff's Affidavit P 4).

66.     On March 12, 2007, Plaintiff had completed approximately one year of doing the majority of the Counselor III job duties.  At this time, Plaintiff asked Casey if she was going to approve temporary assignment pay for Counselor III duties and why the Counselor III job was not posted as promised by Casey.  Casey responded by saying, "you can take a different job or you can just retire." (Cook P146 - 150).

67.     On March 22, 2007, Plaintiff filed a union grievance because she had been doing the majority of the Counselor III job for one year and that Plaintiff receive pay for Counselor III work.  (This was allowed by the union contract.)  The union also asked that the position be posted. (Plaintiff's Affidavit P4).

68.     On March 27, 2007, Casey, in an insulting manner berated Plaintiff in the counselor's office for stating the Plaintiff needed to learn who her supervisor was and that Casey would give Plaintiff information on a "need to know basis"; that Casey would show Plaintiff who the boss was.  (This event was due to the Plaintiff asking a temporary commanding officer about a certain inmate when Casey was not in the facility.)(Plaintiff's Affidavit P4).

69.     On April 11, 2007, Casey called Plaintiff into her office with a union steward to be disciplined.  Casey gave Plaintiff an employee referral which is a discipline.  In the presence of Plaintiff, the union steward told Casey twice during the meeting that Casey was not doing the paperwork and discipline correctly.  The method of discipline according to the union contract was the following: counseling, oral reprimand, written reprimand, second written reprimand, one-day suspension, three-day suspension, five-day suspension, ten-day suspension, fifteen-day suspension, twenty-day suspension, twenty-nine-day pending, meaning if you had a total of twenty-nine days off, you would be pending termination if you received one more day off.  You would further be up on review to see if you were to be fired.  A total of thirty (30) days off (thirty days during your entire employment) meant you would be automatically fired.  If fired, you would lose any rights to pension or benefits. (Plaintiff's Affidavit P 11).

70.     During this event of April 11, 2007, Casey criticized and berated Plaintiff because Plaintiff had made personal and unprofessional comments in the CHAMPS system (according to Casey).  Plaintiff responded by saying that these were not personal comments but only clinical assessments.  In the CHAMPS entry, Plaintiff had detailed her interview with a particular inmate (Daniel Cobb); telling Cobb that he needed to moderate his behavior and detailed how

Cobb spoke, that he was nobody's "punk". Plaintiff merely detailed what she told Cobb that he was "barely 5' and 100 lbs. soaking wet, and whose ass did he think he was going to kick" and he said, 'all of them'. The purpose of this entry was to alert other counselors as to details of this inmate for security purposes. This was the proper thing to do. (Plaintiff's Affidavit P 5).

71.     If Casey disapproved this entry, she could have Plaintiff simply changed the entry, but she did not. (Plaintiff's Affidavit P 5).

72.     Casey, in this occurrence, immediately gave Plaintiff an "oral reprimand" which was improper. Plaintiff should have been counseled initially. (Plaintiff's Affidavit P 5). Casey told Plaintiff to leave the meeting and not do this again. (Plaintiff's Affidavit P 5).

73.     On April 17, 2007, Casey called Plaintiff into the warden's conference room and gave Plaintiff paperwork for the same incident. This time, giving Plaintiff a written reprimand. This was improper. Plaintiff filed a grievance. (Cook P154, 157). Plaintiff claimed that this was double jeopardy, because she was being disciplined twice for the same incident. (Cook P161, Plaintiff's Affidavit P 5). Plaintiff's grievance resulted in this being reduced to "counseling". (Defendant's Exhibit20 attached to Defendant's Motion for Summary Judgment).

74.     For other people, CHAMPS entries had been allowed to be changed by Casey. (Cook P154, Landreth P14).

75.     This was not the first time Casey attempted discipline was rescinded. Casey had written Plaintiff up for abandoning her post on February 4, 2006, and Plaintiff was given a one-day suspension. This was expunged. (Plaintiff's Affidavit P10).

76.     On April 18, 2007, Plaintiff had requested union time for one hour to prepare for the CHAMPS entry hearing, but this was denied by Assistant Warden Flagg. Plaintiff grieved this. (Plaintiff's Affidavit P 6).

77.     On May 3, 2007, Casey called Plaintiff into the warden's conference room and issued written discipline for a failure of Plaintiff to see her 400 inmates within the ninety (90) days requirement. The disciplinary hearing was held on May 10, 2007. The documentation was missing to show that Plaintiff had seen certain inmates. Plaintiff provided information that she in fact saw all inmates within the ninety (90) days. Plaintiff was issued a one-day

suspension. Upon grievance, it was reduced to an oral reprimand. (Defendant's Exhibit20 attached to Defendant's Motion for Summary Judgment).

78.     Casey unilaterally changed Plaintiff's vacation which had been scheduled for the first part of July 2007 and rescheduled it for two weeks later. (Plaintiff's Affidavit P 6). Casey's response to Plaintiff's protests was "I can do it". This did not happen to any other counselor. (Plaintiff's Affidavit P 6).

79.     On May 17, 2007, Casey told Plaintiff to report to her office and informed Cook that on May 21, 2007, she will no longer be assigned to doing duties in the "receiving unit". (This was part of the duties that Plaintiff had been doing as Counselor III since Al Sanner had retired.)(Cook P39).

80.     On May 21, 2007, because of daily stress, the multiple attempts to discipline Plaintiff, Plaintiff signed up for the Defendant's Employee Assistance Program through Mark Aaron, the staff psychologist. Plaintiff was referred to counseling service for therapy because of stress. Plaintiff was suffering from headaches, high blood pressure, insomnia and stress. (Plaintiff's Affidavit P 6).

81.     On May 21, 2007, Casey ordered Plaintiff into Casey's office and gave Plaintiff her written annual employee evaluation which had been due in February of 2007. This evaluation included statements regarding disciplines in April and May of 2007. Casey marked Plaintiff down in the evaluation in four (4) separate areas. In accordance with union and correctional rules, there were to be quarterly referrals if there were any deficiencies prior to this annual evaluation. There had been none. Casey's evaluation was later expunged. (Defendant's Statement of Facts #33, Defendant's Exhibit16 attached to Defendant's Motion for Summary Judgment).

82.     Ten (10) days later, Casey did a quarterly evaluation critical of Plaintiff, which was untimely. This was expunged. (See page 15 of Defendant's Memorandum).

83.     On May 22, 2007, Plaintiff was called into the warden's conference room by Casey and issued discipline for not performing her job duties in classifying inmates in the receiving unit in a timely manner. This was based upon some incident reports by certain individuals (Guile and Waggoner). It was discretionary with Casey whether to write Plaintiff up for this. Casey wrote Plaintiff up. It was later determined that the discipline was improper and based upon directives that had been rescinded. The discipline had to be dropped. (Plaintiff's Affidavit P 6, Cook P191).

Page 11 of 20

84.     On the same date, May 22, 2007, Casey issued written discipline on Plaintiff for allowing an inmate visiting list containing a victim of the crime. Plaintiff provided evidence that there was nothing in the inmate's file to indicate that the visitor was a victim. At the employee review hearing, Plaintiff was found guilty and given a three-day suspension. Plaintiff attempted to grieve, but the union did not follow through due to a technicality. Thus, despite Plaintiff being not guilty, she was given a three-day suspension. (Plaintiff's Affidavit P 7).

85.     On May 24, 2007, Assistant Wardens Casey and Flagg came into the counselor's office and told Plaintiff that she did not do her job duties when she put in a transfer in the computer concerning an inmate. Casey told Plaintiff that she needed to learn what she was doing. All Plaintiff had done was not assign an institutional number where the inmate was going. No discipline was issued. Plaintiff, on this date, had her first counseling session with Tim Monken, a therapist regarding her emotional distress. (Plaintiff's Affidavit P 7).

86.     May 31, 2007: Casey entered written discipline for Plaintiff arriving five (5) minutes late on May 30, 2007. Plaintiff filed a grievance. (Defendant's Exhibit 5 "Number 5" attached to Plaintiff's deposition). The union contract required counseling after being late three times within ninety (90) days. (Plaintiff's Affidavit P10).

87.     June 1, 2007: Employee review hearings took place concerning Plaintiff's violation of classifying inmates in a timely manner, (the charges were dismissed), and Plaintiff approving an inmate visiting list containing a victim (given three-day suspension). (Defendant's Exhibit 5 "Number 5" attached to Plaintiff's deposition).

88.     June 7, 2007: Plaintiff issued paperwork for suspension for the discipline concerning not making ninety (90) day contact with inmates. This had been a one-day suspension. This was reduced to a written reprimand pursuant to grievance. (Exhibit 20 attached to Defendant's Motion for Summary Judgment).

89.     June 19, 2007: Casey gave Plaintiff paperwork that she was getting a three (3)-day suspension for allowing the inmate's visiting list to have a victim. The suspension was to be served June 25, 26, and 27, 2007. (Plaintiff's Affidavit P7, 8)(Defendant's Exhibit 5 "Number 5" attached to Plaintiff's deposition).

90.     June 28, 2007: On Plaintiff's first day back after being suspended for three (3) days, Plaintiff was called into the warden's conference room by Casey and given two (2) additional disciplines: first for attempting to change an official document, the second, for going out of the chain of command. The former was for Plaintiff calling Springfield concerning the inmates that she had not documented as actually being seen within the ninety-day rule. Plaintiff was

Page 12 of 20

attempting to correct the computer entries by going through the CHAMPS computer representative in Springfield. Casey had alleged that Plaintiff was attempting to falsify the documents. Plaintiff's response was that she was attempting to correct the documents so that they were accurate. Casey also charged Plaintiff with going out of the chain of command by attempting to have the documents changed at Springfield rather than going through Casey. Plaintiff's response was that the CHAMPS manual allowed same. (Plaintiff's Affidavit P7, 8).

91.    July 9, 2007: Plaintiff filed a grievance for harassment and discrimination against the administration for all of the above abuses. (Plaintiff's Affidavit P8)(Defendant's Exhibit 5 "Number 5" attached to Plaintiff's deposition).

92.    July 16, 2007: Plaintiff returned from her vacation on July 17, 2007 and was given a different inmate counseling load. This was the second time in two (2) months. This required Plaintiff to learn two (2) new caseloads that were both behind in this two (2) month period of time which required extra amount of work to accomplish necessary paperwork. (Each caseload was 400 inmates.) Further, on this date, Assistant Warden Flagg who had taken over from Casey who had resigned, told Plaintiff that she needed to check her caseload and that he had noticed that there were inmates that needed to be seen. Plaintiff filed a grievance for excessive workload and harassment.(Defendant's Exhibit 5 "Number 5" attached to Plaintiff's deposition).

93.    July 25, 2007: Employee review hearing was held concerning charges of attempting to change an official document (falsifying) and going out of the chain of command.

These two charges were from the very same allegation that Plaintiff had failed to see her 400 inmates within the ninety (90)-day period of time – Plaintiff had actually seen them, but there was lack of documentation of same. That when Plaintiff attempted to document them in the computer correctly, she was charged with attempting to change an official document (falsification) and then going out of the chain of command. (Plaintiff's Affidavit P8).

94.    August 17, 2007: Cook was called into the warden's conference room and given a five (5)-day suspension for attempting to change an official document (falsification). While Plaintiff was in the warden's conference room, Gina Feazel told Sena Landreth she was aware that Plaintiff was going to receive this suspension. (Landreth P10, 11). Plaintiff was then off August 20 through August 24, 2007 for the five-day suspension. Plaintiff became ill, sought

medical treatment and was diagnosed with stress headaches and elevated blood pressure. (Plaintiff's Affidavit P 9)(Defendant's Exhibit 5 "Number 5" attached to Plaintiff's deposition).

95.     August 20, 2007: The doctor took Plaintiff off work because of the stress.  Plaintiff gave this paperwork to Defendant stating she could not work until further notice. (Plaintiff's Affidavit P 9).

96.     September 5, 2007: While off due to stress, Plaintiff was given ten (10)-day suspension time for the aforementioned going out of the chain of command allegation. (Defendant's Exhibit 5 "Number 5" attached to Plaintiff's deposition).  Plaintiff's union failed to follow proper procedures, and Plaintiff's attempted grievance was denied. (Plaintiff's Affidavit P10).

97.     November 5, 2007: Fifty-year old counselor Debra Brink died.  Plaintiff had requested leave of absence September 4, 2007 due to stress-related headaches and hypertension.  A doctor's statement of October 15, 2007 diagnosed Plaintiff as suffering from migraines, anxiety, stress, hypertension, insomnia, depression and severe headaches. (Exhibit D, Cook personnel file page 791).

98.     Plaintiff testified in her deposition that her blood pressure during this period of time had gone up because of the stress at work; that she had migraines from the stress; the stress was causing her to make silly mistakes while at work.  Plaintiff had to have other senior counselors double check her work all the time. (Cook P 207, 208, 209).

99.     November 14, 2007 Plaintiff returned from leave of absence due to the stress and on the first day, Assistant Warden Flagg (who had taken over for Casey) reassigned her to a different set of 400 inmates.  This time she was given the same housing unit that she had been removed from in May of 2007 by Casey when Casey told her that she could not do her job correctly.  (Plaintiff's Affidavit P 9).  Once again Plaintiff would have to relearn 400 different inmates.

100.     November 29, 2007: Defendant's representative Pat Rensing, who served on the Third Level Grievance Committee in Springfield, Illinois told Plaintiff that the union and management were working on Plaintiff's grievances of harassment and the Defendant had offered to expunge all of Plaintiff's disciplines if Plaintiff would voluntarily retire by December 31, 2007.  Plaintiff refused. (Cook P100, 101).  Significantly, any record of discipline in Plaintiff's personnel file negatively effected her ability to transfer to different departments or hire outside the department.

101.    Assistant Warden Bates did an employee evaluation of Plaintiff for the period of February 1, 2007 until March 14, 2008 where Plaintiff met all expectations and there were no criticisms. (Exhibit E, Cook personnel file page 780).

102.    Prior to starting in the counseling department, Plaintiff had been a clerical person and had good evaluations. (Exhibit F, Cook personnel file pages 1037, 1043, 1050).

103.    Plaintiff admits that when she began as counselor that her first evaluations from February 1, 2004 until April 1, 2004, there was mention of needing improvement. These evaluations were by Counselor III Alan Sanner and approved by Assistant Warden Wisely. Sanner explained that this was a tough job and extraordinarily tough for Plaintiff because of the size of the caseload she was given (as compared to before 2002 caseloads). (Sanner P10, 11). Assistant Warden Wisely testified that there was nothing unusual about this because this was the transitional period. (Wisely P22).

104.    At this time, Plaintiff was a Counselor I. In 2005, she was promoted to Counselor II. In March of 2006, Plaintiff was given the majority of the duties for a Counselor III position. (Plaintiff's Affidavit P 4).

105.    Plaintiff wanted to retire on December 31, 2011 because her husband would be able to retire then. (Cook P210).

106.    In May of 2008, the Defendant attempted to once again switch Plaintiff's load of inmates, because there was a problem between Gina Feazel and Brandon Risse, a new counselor. The Assistant Warden Bates was going to pull Plaintiff out of receiving which were the housing units Plaintiff was just assigned to in November 2007 and give her a whole new caseload again. This was the fourth new job assignment since May of 2007. (Cook P140).

107.    Plaintiff felt once again that she was being harassed because of her age in that Bates was making her change jobs once again instead of moving the younger counselors (Feazel and Risse). Plaintiff asked the assistant warden why aren't the ones causing the problem changed. Bates told her he could not do that. Plaintiff told Bates that the department would get what they wanted stating, she did not want the same situation as before, which caused her stress leave of absence. (Plaintiff's Affidavit P 9). Plaintiff retired on May 31, 2008.

108.    At all times mentioned herein, Plaintiff was a Republican. (Plaintiff's Affidavit P 9).

109.    At all times mentioned herein, Bart Toennies and Gina Feazel were never counseled, disciplined or criticized. (Feazel P41, November 10, 2009)(Toennies P12).

110.    The younger employees such as Gina Feazel and Bart Toennies were not subjected to the same treatment as Plaintiff. (Cook P194). Both had special privileges. Feazel and Toennies got along with Casey, appeared to be friends with Casey and had an open-door policy with Casey and Warden Robert. (Cook P194 - 196). Both violated work rules in frequently taking extended lunch breaks and making personal phone calls. (Plaintiff's Affidavit P4).

111.    Gina Feazel and Bart Toennies had put down improper CHAMPS entries, and they were not disciplined. (Cook P232, 233, 234).

112.    Bart Toennies made a mistake when allowing an inmate coming off parole without quarantining him for seventy-two (72) hours to watch for drugs. One time he had paroled an inmate without an address. Both times he was not disciplined. (Cook P239).

113.    On one occasion, Gina Feazel incorrectly did a head count of inmates where an inmate was lost and there had to be an institutional lockdown to find the inmate – Feazel was not disciplined for that although Sena Landreth was taken out of field services for the exact same offense. (Cook P240; Feazel P90).

114.    Gina Feazel approved visitation by an inmate's victim and was not disciplined, but Plaintiff was. (Cook P241). Plaintiff grieved this and won. (Plaintiff's Affidavit P 7).

115.    According to Sena Landreth, Gina Feazel had missed seeing her allotted inmates within the ninety-day requirement but was not disciplined. (Landreth P18).

116.    According to Sena Landreth, Gina Feazel wanted all the senior counselors to leave because they had more seniority (Landreth P23); that all the senior counselors thought they were being picked on because of the seniority. (Landreth P26). Landreth retired on January 31, 2008. (Landreth P31). She had been a Correctional Counselor II for twenty-seven and a half (27 ½) years. (Landreth P2). She had done the job of "field services" for twenty-seven (27) years and was removed from that position by Casey for "cross training". (Landreth P35, 36). Her position was given to Bart Toennies and then to Gina Feazel. However, Landreth was never given any cross training. (Landreth P36). Landreth retired because it was so stressful. There were many days that she would cry because of the stress from Casey. She felt that Casey favored Toennies and Feazel. (Landreth P36 - 40).

117.    Al Sanner testified that Ann Casey was spiteful and vengeful towards the counselors. On one occasion, Sanner walked into his office and found that, without warning, Casey had ordered his furniture removed to the chapel

so that he would conduct his work there. (Sanner P22). Sanner had observed another senior counselor, Cynthia Keck, reprimanded for bringing a drink cup into the office. (Sanner P24). The previous warden, Bowen, (prior to Robert) was walked out of the prison. (Sanner P27). This was political. Most of the senior counselors were put there under a Republican Administration. (Sanner P28).

118.   Casey would make numerous phone calls to Sanner on a daily basis; that Casey could not be reasoned with. (Sanner P30). It had crossed Sanner's mind that Casey was trying to get rid of all the senior counselors. (Sanner P37).

119.   Casey caused Sena Landreth, Pamela Alemond, Cynthia Keck, Betty Cook to cry. (Sanner P37). Casey made derogatory remarks about the counselors as being whiners. (Sanner P24). The counselors that left during the years 2005 and 2006 left because of the work atmosphere and pressure of Ann Casey; the work environment was "intolerable". (Sanner P20). The supervisory position such as Counselor III, caseworker supervisor and clinical supervisor were not filled, not because of budget, but because of politics. (Sanner P49).

120.   According to Terry Loepker, she had been a Counselor II since 1989 (Loepker P7), she felt that the work environment was stressful. (Loepker P17). Casey had stopped overtime and any temporary assignment of counselors to help their work. (Loepker P17). Sanner, Ballantini and herself left the department because of these intolerable conditions. The caseload was tripled without overtime. (Loepker P17). Casey did not get along with any counselor that had more experience than her. (Loepker P19). Loepker was criticized for coming back early from a seminar that she found was not beneficial. She came back to get the rest of her work done. Casey criticized her for going out of the chain of command for having left the seminar. (Loepker P18). According to Loepker, Cynthia Keck was suspended for bringing a cup of soda to work. Everything Cynthia Keck did was targeted. Betty Cook was "absolutely" targeted. (Loepker P20). It was Loepker's impression that Casey was trying to make people leave. Once a person had decided to be transferred, Casey would then become a different person acting as if she understood why you were going but wishing you were not. (Loepker P23). Loepker transferred to Parole because of the above but did not want to initially because she was nervous about having to wear a weapon. However she left because of the work environment. (Loepker P24). Loepker never did notice Gina Feazel being picked on by Casey like herself. (Loepker P22).

121.    According to Anthony Ballanatini, he left the department with Loepker and Sanner because they were all "tired and fed up with everything" because of Casey's actions. (Ballantini P17, 18). Ballantini had been a counselor since 2000. Pamela Alemond and Cynthia Keck left in October of 2005 for the same reason. (Ballantini P18).

124.    Regarding credibility facts, Warden Robert testified that he did not know Assistant Warden Casey was a Democrat, (Robert P45); he did not know that Casey was involved in any kind of politics. (Robert P45). He was the Democratic County Chairman for Clinton County where he oversaw the precinct committeemen and supported Blagojevich and Democratic State Representative Kurt Grandberg. (Robert P13, 14).

125.    Robert denied going to any fund raisers or ever being with Casey outside of the prison. (Robert P60 - 62).

126.    Ann Casey testified that she was a Democrat in 2005, but when she was appointed as Assistant Warden, she was not sure if Blagojevich was governor. (Casey P25). Prior to this, she had given money to help Democratic candidates. She was aware Robert was a Democrat. (Casey P33). When she became assistant warden, she also became a consultant for Aramark and Cope, two companies that provided services or goods to prisons. (Casey P47 - 50). She admitted that she had socialized with Warden Robert and Democratic Representative Grandberg at restaurants and bars including Robert's own tavern in Carlyle. (Casey P66). She also admitted she socialized with Robert at his home, on Robert's boat on Lake Carlyle with the other assistant wardens and Administrative Assistant Michelle Taphorn. (Casey P78). Casey admitted that she removed Senior Counselor Sena Landreth from field services which she had been doing for twenty (20) years. The removal was due to information that Gina Feazel had provided her. (Casey P99). Casey told Sena Landreth her removal was so that Landreth could have cross training. (Casey P101). Casey had removed Landreth from her post one day after Landreth got back from a leave of absence due to the death of Landreth's brother. (Casey P104). Gina Feazel had complained about Sena Landreth's work to Casey. (Casey P104). Casey refused to admit that she was the one that stopped overtime for the counselors; that she refused to admit that she stopped temporary assignments for counselor help. (Casey P106). Casey denied having any problems with Terry Loepker or Anthony Ballantini. She did admit disciplining Cynthia Keck for having a soda. (Casey P110). She did admit that she chose the least senior counselor, Gina Feazel, to have supervisory access to the CHAMPS computer system and relied on Gina to report late contacts with inmates in the CHAMPS system by Plaintiff. (Casey P114 - 119).

127.    Casey could not recall her moving Sanner's furniture. (Casey P122).

128.    Casey had no memory whether the counseling department was doing well initially or what changes she made. (Casey P133).

129.    Casey had no recollection of being critical of Debra Brink. (Casey P136).

130.    Casey appointed Gina Feazel as grievance officer. (Casey P139).

131.    Concerning the allegation that Plaintiff went out of the chain of command, even Casey did not know whether changes in the CHAMPS system would be in her chain of command. (Casey P178).

132.    Casey had no memory that she asked Plaintiff about retirement or telling Plaintiff that Plaintiff needed to know who the boss was; requiring Plaintiff to keep a daily log; unilaterally changing Plaintiff's vacation time; or criticizing Plaintiff on the radio. (Casey P205 - 213).

133.    Casey stated that she told other counselors simply to change their entries in the CHAMPS and did not request that of the Plaintiff. (Casey P197).

134.    Plaintiff's personnel file reflected that on September 4, 2007, Plaintiff's medical doctor took Plaintiff off work due to hypertension and migraines (Cook Personnel File P806); that Plaintiff could not work until the stress related hypertension and migraines were controlled; that the problem began on May 10, 2007. (Cook Personnel File P802).

135.    Plaintiff's stress leave was for September 14, 2007 until November 14, 2007. (Plaintiff's Affidavit P 9).

136.    From November 14, 2007 until Plaintiff's retirement of May 31, 2008, Plaintiff was on daily medication for her stress. (Plaintiff's Affidavit P 10).

137.    Plaintiff's work record (30 years) had been excellent until 2006; then Defendant attempted to destroy it to remove Plaintiff. The period of November 14, 2007 until May 31, 2008, did not erase this or the result on Plaintiff's health. When Plaintiff was told she was to receive a new assignment of 400 inmates in May of 2008, this was starting the process all over again.

138.    Plaintiff had observed the same effect in Sena Landreth and Debra Brink. Both were seen crying and subject to daily criticism from Casey (Plaintiff's Affidavit P 11).

139.     Feazel frequently made comments to Plaintiff about her age and when she was going to retire. (Cook P82).

140.     Billie Jo Bryan, a nurse at the prison, testified that Warden Robert, Casey, Representative Granberg socialized at Warden Robert's tavern as well as at restaurant and other bars (Bryan P16-32).

BETTY D. COOK, Plaintiff

BY:    s/s Thomas O. Falb
              THOMAS O. FALB - #00768804
              Williamson, Webster, Falb & Glisson
              Attorneys at Law
              603 Henry Street.
              Alton, IL 62002

## CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2010, I electronically filed the foregoing document with the Clerk of the Court using the CMECF system which will send notification of such filings to the following:

Joanna Belle Gunderson, AAG
500 South Second Street
Springfield, IL 62706
Attorney for the Defendant Illinois Department of Corrections

s/s Thomas O. Falb
THOMAS O. FALB - #00768804
Williamson, Webster, Falb & Glisson