**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**BETTY D. COOK**,

**Plaintiff,**

**v.**

**ILLINOIS DEPARTMENT OF CORRECTIONS,**

**Defendant.**                                        **No. 09-cv-0133-DRH**

<u>**MEMORANDUM and ORDER**</u>

**HERNDON, Chief Judge:**

## I. <u>Introduction</u>

Now before the Court is Defendant's motion for summary judgment (Doc. 26).   Obviously, Plaintiff opposes the motion (Doc. 28).   Based on the pleadings, the applicable law and the following, the Court denies the motion.

On February 20, 2009, Betty D. Cook filed suit against her former employer, the Illinois Department of Corrections ("IDOC"), for age discrimination in violation of 29 U.S.C. § 621, et seq., the Age Discrimination in Employment Act of 1967 ("ADEA") (Count I) and in violation of the Illinois Human Rights Act, 775 ILCS 5/1-101, et seq., (Count II).   Cook alleges that she was forced to retire on June 1, 2008 because of her age.   Specifically, Cook alleges that because of her age Defendant refused to promote her to the position of Correctional Counselor III; made her perform Correctional Counselor III duties at the Correctional Counselor II pay level; verbally harassed her; suggested that she retire; disciplined her for things that

younger employees were not disciplined for; told others that they wanted her to retire; harassed her daily so that she would retire; and would not allow her to take a paid medical leave of absence.  On August 20, 2009, the Court dismissed with prejudice Count II of Cook's complaint (Doc. 17).

On March 26, 2010, IDOC filed its motion for summary judgment (Docs. 26 & 27).  Cook filed her response on April 29, 2010 (Doc. 28).

## II.  <u>Facts</u>[1]

Cook was born on August 25, 1957.  She started working for the IDOC at the Pontiac Correctional Center on December 4, 1976.  In 1994, Cook transferred to the Centralia Correctional Center ("Centralia").  Cook became a Correctional Counselor I in February 2004 at the age of 47.[2]  Assistant Warden of Programs, Allan Wisely, was Cook's supervisor at that time.  The counseling department provided counseling to the prisoners at Centralia.  The Counselors had to see 400 or more inmates every 90 days. In 2004, there was one other Counselor I, six Counselor IIs - Sena Landreth, Pamela Alemond, Cindy Keck, Anthony Ballantini, Terri Loepker, and Gina Feazel - and one Counselor III - Alan Sanner.[3]

In January 2005, Bradley Robert became the Warden at Centralia.

---

[1]The Court has carefully reviewed IDOC's lengthy statement of undisputed facts as well as Cook's lengthy recitation of the facts.  The Court has attempted to limit its discussion of the facts to those fact which are material to the issues in this case, based upon the applicable law.  The Court has not included unsupported speculation included in either parties' set of facts.

[2]Prior to becoming a counselor, Cook's jobs at the IDOC were clerical.

[3]As Counselor III, Sanner was responsible for receiving inmates into the institution and had two housing units of 100 inmates each.  Sanner was also considered a lead worker with supervisory duties.

Under Warden Robert were two assistant wardens: Assistant Warden of Programs, Ann Casey and Assistant Warden of Operations, Julius Flagg. Also under Warden Robert were the business administrator, Mark Beckmann and the administrative assistant, Michelle Taphorn. Taphorn's primary job was to assist Warden Robert and Beckmann's primary job was procurement and payroll supervisor.

In January 2005, Casey became Cook's supervisor. Cook was promoted to Correctional Counselor II in February 2005. At this time, there were seven Counselor IIs and one Counselor III.

In March 2006, Sanner, Ballantini and Loepker left their positions as Counselors with Centralia. Thereafter, the counseling department consisted of three Counselor IIs -Cook, Landreth and Feazel. Cook was 49; Landreth was 51 and Feazel was 40. Cook had the most seniority, 30 years and Feazel had the least seniority, 7 years. The work was divided among the remaining three Counselor IIs. Cook was given Sanner's responsibilities with the exception of the supervisory tasks. She was not compensated for the additional duties. As of this time, the Counselor III position has not been filled.

In December 2006, Cook became eligible for retirement. She received her thirty year pin. Also, in December 2006, Bart Toennies transferred to the counseling Department as a Counselor II at Centralia. Toennies was born in 1971 and had a seniority date of 1994. Shortly thereafter, Deb Brink was promoted to a Counselor I at Centralia. From January 2007 to July 2007, there were four Counselor IIs and one Counselor I.

As to discipline of the counselors during this time, the following procedure was in place. Casey would do a referral to the employment review board hearing officer who was either Beckmann or Taphorn. Thereafter, the hearing officer would hold a hearing and make a recommendation. Warden Robert would review the recommendation and either accept or reject the recommendation.

Cook's first employee evaluation as a counselor for the period of February 1, 2004 to April 1, 2004 stated that Cook needed to improve in seven out of eight categories. For the periods of February 1, 2005 to April 1, 2005 and April 1, 2005 to June 1, 2005, Cook's job evaluations, prepared by Casey, stated that Cook met or exceeded all expectations.

In February 2006, Casey issued Cook a written discipline for abandoning her post. Cook was given a one-day suspension. This incident was later expunged.

On March 19, 2007, Cook made an entry in the Case History And Management Program ("C.H.A.M.P.") system for inmate Cobb. Casey did not approve of Cook's entry regarding the inmate. Casey immediately orally reprimanded Cook and told her not to do this again. Thereafter, Casey gave Cook a written reprimand for that C.H.A.M.P.'s entry. Cook filed a grievance claiming that this was double jeopardy as she was being discipline twice for the same incident. The incident was reduced to counseling pursuant to a grievance resolution.

On March 22, 2007, Cook filed a union grievance because she had been doing the majority of the Counselor III job for one year and she received pay for only

Counselor II work.

In April 2007, Cook failed to log contacts for more than 60 inmates on her caseload.  On May 3, 2007, Casey issued Cook a written discipline for failure to see the inmates in her caseload within the ninety day requirement.  A hearing regarding this incident was held on May 10, 2007.  Cook received a one day suspension for this incident.  Cook filed a grievance regarding this incident and it was reduced to an oral reprimand.

On April 24, 2007, Cook approved a visitor list for inmate Williams which included a victim.  Thereafter, Casey issued written discipline for this.  An employee hearing was held.  At the hearing, Cook provided evidence that there was nothing in the inmates' file to indicate that the visitor was a victim.  However, Cook was found guilty.  On June 15, 2007, Cook received a three day suspension as discipline for this incident.  Her suspension was served June 25, 26, and 27, 2007.

On May 17, 2007, Casey informed Cook that she would no longer be assigned to doing duties in the "receiving unit."

On May 21, 2007, Cook signed up for the Employee Assistance Program through Mark Aaron, the staff psychologist.  She was referred to counseling service for therapy because of stress.  Cook was suffering from headaches, high blood pressure, insomnia and stress.

Also on May 21, 2007, Casey gave Cook her annual performance evaluation for 2006 to 2007.  This evaluation was supposed to be performed in February 2007.  It included statements regarding the disciplines that Cook received

in April and May of 2007. Casey marked Cook down in four separate areas of the evaluation. According to the union and correctional rules, quarterly referrals were to be prepared if there were any deficiencies prior to the annual evaluation. This performance evaluation was later expunged pursuant to a grievance. Eventually, Assistant Warden Flagg re-performed the evaluation for Cook for the period of February 1, 2006 to February 1, 2007. That evaluation stated that Cook met all expectations and there were no criticisms.[4]

On May 22, 2007, Casey issued Cook discipline for not performing her job duties in classifying inmates in the receiving unit in a timely manner. On June 8, 2007, the allegations regarding this incident were found improper and the discipline was dropped.

On May 24, 2007, Casey and Flagg told Cook that she was not performing her duties when she put a transfer in for an inmate. Casey told Cook that she needed to learn what she was doing. Cook had not assigned an institutional number to where the inmate was being transferred.

On May 31, 2007, Casey issued Cook written discipline for arriving five minutes late on May 30, 2007. Cook filed a grievance.

On June 7, 2007, Cook sent an email to Deb Gordon requesting that she change information in the C.H.A.M.P. system for a list of inmates. On June 28, 2007, Casey gave Cook two additional disciplines for attempting to change an official

---

[4]This evaluation is dated November 20, 2007.

document and for going out of the chain of command.  On July 9, 2007, Cook filed a grievance for harassment and discrimination against the administration.

On July 17, 2007, Cook was given a different inmate counseling caseload.  This was the second caseload change in two months.  Also, Assistant Warden Flagg told Cook that she needed to check her caseload as there were inmates that needed to be seen.  Cook filed a grievance for excessive workload and harassment.

On July 25, 2007, an employee review hearing was held regarding the charges of attempting to change an official document and going out of the chain of command.  Cook received a five day suspension as discipline for going outside the chain of command for sending the June 7, 2007 email.  Cook's suspension was from August 20 through August 24, 2007.  Thereafter on August 9, 2007, Cook received a ten day suspension for attempting to falsify a department record when she sent the June 7, 2007 email.  Cook grieved this and the ten day suspension was expunged.

In July 2007, Casey resigned as Assistant Warden of Programs and left the IDOC's employ.  During the time between Casey's resignation and the new assistant warden appointment, Assistant Warden Flagg acted as supervisor over the counseling department.

On September 4, 2007, Cook's doctor took Cook off of work due to the hypertension and migraines.  Cook's doctor would not allow Cook to work until the stress related migraines and hypertension were controlled.  Cook was on stress leave from September 14, 2007 until November 14, 2007.  From November 14, 2007 until

May 31, 2008, Cook took daily medication for her stress.

On November 1, 2007, Ty Bates was appointed Assistant Warden of Programs. When Cook returned from her leave of absence, Warden Flagg reassigned her caseload to a different set of 400 inmates.

On November 29, 2007, Defendant's representative Pat Rensing, who served on the Third Level Grievance Committee in Springfield, Illinois told Cook that the union and management were working on her grievances of harassment and that Defendant had offered to expunge all of Plaintiff's disciplines if Cook would voluntarily retire by December 31, 2007. Cook refused.

In Cook's February 1, 2007 to March 14, 2008 employee evaluation, Assistant Warden Bates indicated that Cook met or exceeded all expectations.

In May 2008, Defendant attempted to rearranged Cook's caseload. Cook submitted her intent to retire of May 15, 2008 and retired from the IDOC on June 1, 2008.

Toennies and Feazel were never counseled, disciplined or criticized.

### III.  **Summary Judgment Standard**

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." **Fed. R. Civ. Proc. 56(c)**.  A genuine issue of material fact exists when the evidence is such that a

reasonable jury could find for the nonmovant.  ***Buscaglia v. United States,* 25 F.3d 530, 534 (7th Cir. 1994)**.  The movant in a motion for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact by specific citation to the record; if the party succeeds in doing so, the burden shifts to the nonmovant to set forth specific facts showing that there is a genuine issue of fact for trial.  **Fed. R. Civ. Proc. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)**.  In considering motions for summary judgment, a court construes all facts and draws all inferences from the record in favor of the nonmoving party.  ***Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)**.

## IV.  <u>Analysis</u>

The ADEA "prohibits employers from firing workers who are 40 or older on the basis of their age."  ***Martino v. MCI Communications Servs., Inc.,* 574 F.3d 447, 452 (7th Cir. 2009)**.  Specifically, it "provides, in relevant part, that '[i]t shall be unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'"  ***Gross v. FBL Fin. Servs., Inc.,* --- U.S. ----, ----, 129 S.Ct. 2343, 2350, 174 L.Ed.2d 119 (2009) (quoting 29 U.S .C. § 623(a)(1), with emphasis provided in *Gross* )**.  "A plaintiff suing under the ADEA may show discrimination directly or indirectly, in the latter instance through the approach established in ***McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d**

668 (1973)." *Martino*, 574 F.3d at 452. "In either case, the bottom-line question is whether the plaintiff has proved intentional discrimination." *Id.*

Ultimately, an ADEA plaintiff "must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross*, 129 S.Ct. at 2351. "In other words, proof that the plaintiff's age was a motivating factor, but not a determinative factor, in the employer's decision, will not suffice to establish the employer's liability." *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 961 (7th Cir. 2010).

A.  **Direct Method**

Under the direct method, Plaintiff must produce direct or circumstantial evidence that she was discriminated against because of her age. *See Mach v. Will Co. Sheriff*, 580 F.3d 495, 499 (7th Cir. 2009). "Direct evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009) (quoting *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005)). "Direct evidence typically requires an admission of discriminatory animus, but a plaintiff may also produce circumstantial evidence that establishes the employer's discriminatory motive through a longer chain of inferences." *Mach*, 580 F.3d at 499.

Here, IDOC argues that the direct evidence method does not apply as Cook has no direct evidence. Cook counters that she does have direct evidence and

claims that the following constitutes direct evidence of age discrimination.  First, she claims that on at least two occasions Casey asked her whether she was going to retire when she reached age 50.  Further, she claims that Feazel constantly asked her about her age and when she was going to retire.  Cook maintains that she refused to answer if and when she was going to retire and because of that Casey made her life miserable through verbal abuse, discipline, changing her work assignments and giving her low job evaluations.  Cook further asserts that when she grieved these actions, Defendant offered her expungement of her complete disciplinary record if she would voluntarily retire.  Casey testified that she does not remember asking Cook about retirement; telling Cook that she needed to know who the boss was; requiring Cook to keep a daily log; or criticizing Cook on the radio.

Reviewing these statements and instances in a light most favorable to Cook, the Court finds that the statements/incidents do seem to reference age.  The Seventh Circuit has held "that such reiterated comments may be considered by a jury to infer discrimination because they 'may reflect the employer's intention to rid itself of older workers by subtly pressuring them into retiring.'"  ***See Kaniff v. Allstate*, 121 F.3d 258, 263 (7th Cir. 1997); *See also Greenberg v. Union Camp Corp.*, 48 F.3d 22, 28-29 (1st Cir. 1995)(concluding that repeated or coercive inquiries by an employer about an employee's retirement plans can give rise to a reasonable inference of anti-age bias but that a single inquiry does not necessarily show animosity toward age); *Wilson v. Firestone Tire & Rubber Co.*,**

**932 F.2d 510, 514 (6th Cir. 1991) (finding no age discrimination when the supervisor encouraged plaintiff to take early retirement before firing him, and requiring evidence that the supervisor "took active steps to push [plaintiff] toward retirement based on an improper discriminatory motive" for a viable ADEA claim)**.  The issue turns on intent and credibility, which are questions for a jury to decide, not for the Court.  As such, the alleged statements and incidents do create issues of material fact as to whether Cook was discriminated because of her age.  Thus, Cook has submitted sufficient evidence on her direct discrimination claim.

**B. Indirect Method**

Under the indirect method, an ADEA plaintiff must establish her prima facie case, which requires her to show (1) that she is over 40; (2) that she was meeting her employer's legitimate job expectations; (3) that she suffered an adverse employment action; and (4) that similarly situated employees not in the protected class were treated more favorably.  ***Olson v. N. FS, Inc.*, 387 F.3d 632, 635 (7th Cir. 2004)**.  If the plaintiff succeeds, then the defendant may rebut the prima facie showing by proffering a legitimate, nondiscriminatory reason for the adverse employment action.  ***Atanus v. Perry*, 520 F.3d 662, 672 (7th Cir. 2008)**. If the defendant bears this burden of production, then the plaintiff must prove that the defendant's proffered reason is " 'false and only a pretext for discrimination.' " ***Id.* (quoting *Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1290 (7th Cir.1997))**. "The

main inquiry in determining pretext is whether the employer honestly acted on the stated reason rather than whether the reason for the [adverse employment action] was a correct business judgment." *Id.* **at 674 (internal quotation marks omitted).** If the plaintiff fails to rebut the "noninvidious reason for the adverse action, [then the defendant] is entitled to summary judgment.   Otherwise there must be a trial." ***Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002); accord *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006) ("If [the employer's proffered reason] is the true ground and not a pretext, the case is over.").**

Here, the parties do not dispute that Cook was a member of a protected class (age 40 or over).  However, the parties disagree as to the other elements.

First, IDOC argues that Cook fails to satisfy that she was performing the legitimate business expectations of the IDOC.  The IDOC contends that from time that Cook joined the counseling department the evidence shows that she struggled to keep up with the demands of the job.  Cook counters that Casey's evaluations of Cook in the early part of 2005 show that Cook was meeting the legitimate business expectations of the job.

Based on the evidence, the Court finds that there are questions of fact as to whether Cook was meeting the legitimate expectations.   The evidence concerning her job performance is as follows.  As to her first round of evaluations in 2004 which stated that she needed improvement in 7 out of the 8 categories,

Sanner explained that this was a tough job and extremely tough because of the caseload. Wisely also testified that there was nothing unusual about this evaluation because this was a transitional period for Cook. Thereafter, Cook was promoted to Counselor II in 2005. Her February 1, 2005 to April 1, 2005 job evaluation performed by Casey indicated that she met or exceeded all expectations. As did her April 1, 2005 to June 1, 2005; February 2, 2005 and February 1, 2006 evaluations performed by Casey. In March 2006, she was given Counselor III duties. In Cook's 2006-2007 evaluation that Casey prepared, Casey marked Cook down in four areas. This evaluation was later expunged. This evaluation was redone and that evaluation stated that Cook met all expectations. Cook's February 1, 2007 to March 1, 2008 employee evaluation performed by Bates stated that Cook met or exceeded all expectations.

Casey testified that from February 2005 to April 2007, she spoke to Cook on numerous occasions to correct Cook's mistakes. Casey further testified that she tried to avoid imposing discipline as long as possible in the hopes that Cook would improve on her own. Casey also testified that by the Spring of 2007, Cook had not improved and so Casey began to impose discipline. Casey admitted that she did not document any of the times she attempted to correct Cook prior to 2007 and that she did not document the incident where she found a backlog of grievances in Cook's cabinet. Cook testified that Casey never spoke to her on any occasion concerning mistakes made prior to 2007. Clearly, there are questions of fact as to whether Cook was performing the legitimate business expectations of the IDOC.

Next, the Court finds that there are questions of fact as to whether she suffered adverse employment actions.  Cook argues that Casey attempted to make her retire by making work environment horrible and by disciplining her so that she would have to retire before she was fired.  Cook maintains that from January 2007 through November 2007, she suffered twenty-five adverse incidents and as a result of these incidents she was on a medical leave of absence due to stress.  Cook also contends that the job evaluations were adverse employment actions.

"A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." **Crady v. Liberty Nat'l Bank and Trust Co. of Ind.**, **993 F.2d 132, 136 (7th Cir. 1993)**.  The Seventh Circuit identified three categories in **Herrnreiter v. Chicago Housing Authority**, **315 F.3d 742, 744-45 (7th Cir. 2002)**, that have emerged to describe the different types of "discrimination" that can support a Title VII claim.[5] The first category of cases are those in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, such as occurs in a termination of employment.  **Id. at 744**.  Second are cases in which "a nominally lateral transfer with no change in financial terms significantly reduces the employee's

---

[5]Both Title VII and the ADEA prohibit acts of discrimination that impact an employee's "compensation, terms, conditions, or privileges of employment."  42 U.S.C. § 2000e-2(a)(1); 29 U.S.C. § 623(a)(1).

career prospects by preventing him from using the skills in which he is trained and experienced, so that the skills are likely to atrophy and his career is likely to be stunted." **Id.**   A variation of this occurs when an employee is not actually transferred, but his job is nonetheless "changed" in a way that "injures his career." **Id.**   The harm involved in this scenario is a future financial harm rather than a present harm.   **Id.** With the third type of case, the employee is not moved to a different job or the skill requirements of her present job are not altered, "but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment-an alteration that can fairly be characterized as objectively creating a hardship, the classic case being that of the employee whose desk is moved into a closet."   **Herrnreiter, 315 F.3d at 744**.

Again viewing the evidence in the light most favorable to Cook, the Court finds that they are questions of material fact as to whether Cook suffered adverse employment actions under the first and third categories.  Based on the record, the Court concludes that a reasonable person may find that all of the incidents combined constituted a hostile work environment and adverse employment actions. **See also Nagle, 554 F.3d at 1116 (categorizing recoverable adverse employment actions, including those that change a work environment to make it "humiliating * * * or otherwise significantly negative").**

Next, IDOC argues that Cook cannot point to a similarly situated

employee.[6]   Cook responds both Toennies and Feazel were similarly situated.

To assess whether two employees are similarly situated, "a court must look at all relevant factors, the number of which depends on the context of the case." *Radue v. Kimberly-Clark Corp.*, **219 F.3d 612, 617 (7th Cir. 2000)**. "[I]n disciplinary cases-in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason-a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct." ***Id.* (internal citations omitted)**.   Typically this involves showing that the employees shared the same supervisor, performance standards, and "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* **at 617-18**.   "The similarly situated inquiry is a flexible, common-sense one that asks, at bottom, whether 'there are enough common factors ... to allow for a meaningful comparison in order to divine whether intentional discrimination was at play.' " *Henry v. Jones*, **507 F.3d 558, 564 (7th Cir. 2008) (quoting** *Barricks v. Eli Lilly and Co.*, **481 F.3d 556, 560 (7th Cir. 2007))**.   Nevertheless, substantial similarity is all that is required, rather than complete identity. *Elkhatib v. Dunkin Donuts, Inc.*, **493 F.3d 827, 831 (7th Cir. 2007) (citing** *Humphries*

---

[6]IDOC claims that Feazel is in the protected class and the difference in age is not substantial as it is only 9 years.   In cases where the age difference between the plaintiff and the individual treated more favorably is less than ten years, "the plaintiff still may present a triable claim if [he] directs the court to evidence that [his] employer considered [his] age to be significant." *Bennington v. Caterpillar Inc.*, **275 F.3d 654, 659 (7th Cir. 2001)(quoting** *Hartley v. Wisconsin Bell, Inc.*, **124 F.3d 887, 893 (7th Cir. 1997))**.

***v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir.), cert. granted, 128 S.Ct. 30, 168 L.Ed.2d 807 (2007))**.

Here, the Court finds that there are sufficient commonalities between Cook and Toennies and Cook and Feazel for a jury to conclude that they are similarly situated. Cook maintains that Toennies and Feazel received special privileges. That both violated work rules in taking extended lunch breaks and making personal calls. She also contends that both had made improper C.H.A.M.P.. entries and that they were not disciplined for making those entries. Cook alleges that Toennies made a mistake when allowing an inmate coming off parole without quarantining him for seventy-two hours to watch for drugs and that one time he had paroled an inmate without an address. Toennies was not disciplined for these incidents. Feazel incorrectly performed a head count of the inmates in which an inmate was lost and there had to be an institutional lockdown. Feazel was not disciplined. Feazel also approved visitation by an inmate's victim and was not disciplined. Feazel also missed seeing her allotted inmates within the ninety day requirement but was not disciplined. The Court cannot say that there are no genuine issues of fact concerning whether Toennies and Feazel were similarly situated to Cook.

As to failure to promote, the IDOC contends that there was not a Counselor III job for Cook to be promoted to. IDOC contends that the Counselor III position was not posted because of budgetary reasons and this decision was made by the IDOC officials in Springfield. Defendant contends that the remaining

Counselor IIs took over Counselor III duties.  Cook responds that Casey promised her the Counselor III position and that is why Cook assumed the Counselor III duties with the exception of the supervisor duties.  Cook felt that this would lead to a permanent position.  Cook also contends that Casey refused to pay her additional money for the additional work.

A plaintiff may establish a prima facie case of discrimination in a failure to promote case by presenting evidence that: 1) she is a member of a protected class; 2) she was qualified and applied for the position; 3) she did not receive the position; and 4) the employer gave the position to a similarly situated person outside of the protected class who was similarly or less qualified than she.  ***See Jackson v. City of Chicago*, 552 F.3d 619, 622 (7th Cir. 2009); *Fischer v. Avanade, Inc.*, 519 F.3d 393, 402 (7th Cir. 2008)**. Once a plaintiff establishes a prima facie case of discrimination, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action.  ***See Antonetti v. Abbott Labs.*, 563 F.3d 587, 591 (7th Cir. 2009)**. If the employer satisfies that burden, to avoid summary judgment, the plaintiff must establish that there is an issue of material fact as to whether the employer's proffered reasons are mere pretext for unlawful discrimination.  ***Id.***

Based on the record, the Court finds that there are questions of material fact as to whether Cook was not promoted to Counselor III due to her age.  While the IDOC maintains that the Counselor III position was never filled because of budgetary

reasons, there is sufficient evidence for the jury to find this may be pretext.  It is clear that Cook was interested in the Counselor III position and that Defendant was aware of her interest in that position.  Further,  the record reveals that Cook performed many of the duties of a Counselor III without pay for over a year.  Thus, there are questions of material fact as to why the Counselor III position was not filled and why Cook did not receive pay for the additional work.

As to constructive discharge, IDOC argues that Cook's working environment was not intolerable the last six months before she retired and therefore she cannot prove constructive discharge.  Specifically, IDOC argues that there is not a single complained of event after November 2007 and in fact, Cook claims that she had no contact with Casey after June 28, 2007.  Thus, IDOC argues that  she cannot establish that things were so intolerable when in fact things were going better for her. Cook responds that in November 2007, she had just came back from a medical leave of absence due to stress at work and she was on medication for the same.  She contends that no one expected her to return and that she had to return to work out of financial necessity.  That at time she returned, her caseload was reassigned for the third time.

Constructive discharge occurs when a plaintiff shows that she was forced to resign because her working conditions, from the standpoint of a reasonable employee, had become unbearable.  ***Fischer*, 519 F.3d at 408-09 (quoting *Equal Employment Opportunity Comm'n v. Univ. of Chicago Hosps.*, 276 F.3d 326, 331 (7th Cir. 2002))**.  Constructive discharge can take two different forms.  ***Id.* at**

**409**. Under the first approach, the plaintiff must demonstrate a discriminatory work environment even more egregious than the high standard for a hostile work environment. *Id.* Under the second approach, when an employer acts in a manner that communicates to a reasonable employee that she will be terminated, and then the plaintiff resigns, the employer's conduct may amount to a constructive discharge. *Id.* With the second approach, a constructive discharge also occurs if, based on the employer's actions, the handwriting was on the wall and the axe was about to fall. *Id.*

Based on the record, the Court finds that there are questions of material fact as to whether Cook was constructively discharged. Cook claims that she was criticized, disciplined and scrutinized by Casey and the IDOC because of her age. Further, her doctor ordered her on a medical leave of absence for hypertension and migraines allegedly due to stress from her job. When Cook returned from her medical leave, she was on medication for her stress and this medication allowed her to do her job. Once she returned from the medical leave her caseload was changed. Further, her job assignment was going to change for a fourth time in May 2008 because of problems with younger counselors. Cook maintains that Bates told her that she would have 400 new inmates to learn. At this point, Cook contends that she was faced with the "same old" experiences that had led her to take the medical leave earlier. Based on the circumstances in this case, the Court finds that questions of material fact exists as to whether a reasonable employee would find the conditions

Cook experienced so unbearable that she was forced to retire.  Thus, the Court denies IDOC's motion for summary judgment on the constructive discharge claim.

### V.  <u>Conclusion</u>

Accordingly, the Court **DENIES** IDOC's motion for summary judgment (Doc. 26).  The Court **SETS** this matter for Final Pre-Trial Conference on October 7, 2010 at 1:30 p.m.  The parties shall contact Magistrate Judge Frazier's chambers if a settlement conference will be beneficial.

**IT IS SO ORDERED.**

Signed this day 30th of August, 2010.


/s/     *David R. Herndon*

**Chief Judge**
**United States District Court**