IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS


BETTY D. COOK,                          )
                                        )
        Plaintiff,                      )
                                        )   09-cv-133-DRH
vs.                                     )   East St. Louis, Illinois
                                        )   May 26, 2011
ILLINOIS DEPARTMENT OF CORRECTIONS,)
                                        )
        Defendant.                      )



JURY TRIAL
VOLUME IV (AM SESSION)
BEFORE THE HONORABLE DAVID R. HERNDON
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.


APPEARANCES:

For the Plaintiff:          Williamson, Webster et al.
                            by MR. THOMAS O. FALB, ESQ.
                            603 Henry Street
                            Alton, Illinois 62002


For the Defendant:          Illinois Attorney General's Office
                            by MS. JOANNA BELLE GUNDERSON, AAG
                            and MS. KELLY R. CHOATE, AAG
                            500 South Second Street
                            Springfield, Illinois 62706



Court Reporter:             Daveanna Ramsey, CSR
                            U.S. District Court
                            750 Missouri Avenue
                            East St. Louis, Illinois  62201
                            (618) 482-9124



        Proceedings recorded by mechanical stenography; transcript
produced by computer.

```
        INDEX OF WITNESS EXAMINATION - VOLUME IV (AM SESSION)

                                 DX    CX   RDX  RCX

Betty Cook                       480   541
```

INDEX OF EXHIBITS

| EXHBT | DESCRIPTION | Id'D | Admt'd |
|---|---|---|---|
| Plf's 20 | (spreadsheet) | 484 | --- |
| Plf's 21 | (flow sheet) | 523 | 524 |
| Plf's 22 | (flow sheet) | 525 | --- |
| Deft's 1 | (inmate counseling summary) | 526 | --- |
| Deft's 17 | (referral for discipline) | 551 | --- |
| Deft's 20 | (ERB Hearing - chain of command) | 560 | --- |
| Deft's 22 | (grievance - inmate Cobb) | 542 | 545 |
| Deft's 23 | (grievance - one-day suspension) | 545 | 547 |
| Deft's 24 | (grievance - falsifying records) | 548 | --- |
| Deft's 47 | (grievance - chain of command) | 550 | 550 |

                 M I S C E L L A N E O U S

                                                         Page

No miscellaneous items to index.

ADJOURNMENT..........................................575

                                i.

```
 1              (Court reconvened.)

 2              (Open court, jury present.)

 3         THE COURT:  Ms. Cook, if you'll retake the stand,

 4    please.  You're still under oath, obviously.  And we were

 5    somewhere in the middle of your direct examination, I think.  I

 6    know about middle, but maybe three quarters.  I don't know.

 7    Mr. Falb knows.

 8         MR. FALB:  Were you smiling at me, Judge?

 9         THE COURT:  I was kind of smiling.  I don't know why I

10    even went there about how far along we were.

11         MR. FALB:  You don't even know why you looked at me;

12    is that right?

13         THE COURT:  I know why I looked at you.

14         MR. FALB:  Yes, Judge.

15         THE COURT:  I made a mistake in trying to figure out

16    where along direct we were at.

17              BETTY COOK, PLAINTIFF, PREVIOUSLY SWORN

18              DIRECT EXAMINATION (continued)

19    BY MR. FALB:

20    Q.  Okay.  And ma'am, you understand you're still under oath?

21    A.  Yes, I do.

22    Q.  We were at the point that you had testified concerning the

23    entry into the C.H.A.M.P.S., the computer system, where you

24    were reprimanded orally one week and then the next week you got

25    a written document; is that correct?
```

```
 1   A.   Correct.
 2   Q.   And which was, in your opinion, improper; is that correct?
 3   A.   The Union rep told me it was duplicative, double jeopardy.
 4   Q.   Now what -- before I go any further, at this point in time
 5   we're in April of 2007, which is about three months after your
 6   30-year pinning, or 30-year pin, you were going to turn age 50
 7   in August of 2007?
 8   A.   Correct.
 9   Q.   What is the significance of you receiving disciplines in
10   relation to your retirement?
11   A.   If you receive a certain amount of discipline, you could
12   put your retirement benefits and your insurance benefits in
13   jeopardy that you have earned by the number of years that you
14   have worked.
15   Q.   And if you had gotten so many days off, would you have lost
16   them completely?
17   A.   If I had enough discipline to reach the firing stage, which
18   I was at the midway point to, I could have lost not only my
19   job, my salary, but all the benefits that I had worked 32 years
20   or 30 years to acquire.
21   Q.   Okay.  And the steps of discipline at that time were what?
22   A.   Normally he would start out with a counseling session, and
23   then it would be an oral reprimand, and then a written
24   reprimand, and then it would move into days off.  And the
25   increments for the days off were, my understanding, were one,
```

1    three, five, ten, 15, 20, 25, and 29 pending discharge.

2    Q.  Okay.  And when you reached 29 days pending discharge, what

3    did that mean?

4    A.  That means that the warden and/or assistant warden, or

5    whomever the person at the facility was in charge of making out

6    discipline, could request that you, through the department,

7    that you be fired.

8    Q.  And obviously lose all your benefits?

9    A.  Absolutely.

10   Q.  Now even if you got one discipline that stuck, would that

11   affect even your ability to transfer to a different prison?

12           MS. GUNDERSON:  Objection to foundation.

13           THE COURT:  Sustained, establish --

14   Q.  (BY MR. FALB)  Ma'am, were you fully aware of the

15   disciplinary system and how it affected the ability to promote,

16   or to be transferred, or to retire?

17   A.  I was somewhat familiar with it.

18   Q.  And how were you familiar with it?

19   A.  Just from reading the literature that you get at your

20   yearly training.  I had never been disciplined before, so all I

21   did was basically read it and never really felt that I have to

22   worry about it applying to me because I never broke the rules,

23   I felt.

24   Q.  What was your understanding if you got a discipline as far

25   as your ability to promote or move to a different facility?

1   *A.*  That it would keep me from doing that for two years.

2   *Q.*  After -- and let me ask you this.  You had received, even

3   before this C.H.A.M.P.S. double discipline, the year before you

4   had talked about yesterday, you had received a discipline for

5   just going into the warden's office?

6   *A.*  Yes.

7   *Q.*  Someone asked you to go in as a witness?

8   *A.*  Yes.

9   *Q.*  What was your understanding as to what happened to that?

10  *A.*  A union grievance was filed, I was given back the one-day

11  suspension that I was given, and the Union and management

12  paperwork that I received said I was to receive a counseling.

13  The paperwork I received from the personnel office showed

14  someone had written in there and it said it was expunged.

15  *Q.*  Okay.  And you still have that document some place?

16  *A.*  I still have that document.

17  *Q.*  Okay.  Maybe in your car right now.  I don't have it here.

18  *A.*  I have it available.

19  *Q.*  Okay.  Let's move back to the Spring of 2007.  And have

20  you, for me, done a layout, a spreadsheet as to the disciplines

21  that you received?

22  *A.*  I have.

23  *Q.*  And I'm going to show you --

24       *MR. FALB:*  Your Honor, can I have this marked?  Is

25  that possible?

Cook - Direct

1              THE COURT:  Sure.

2              MR. FALB:  For the record, I've had this marked as

3   Plaintiff's Exhibit 20.

4   Q.   (BY MR. FALB)  Ma'am, is this the spreadsheet that I'm

5   showing you on the screen?

6   A.   It is.

7   Q.   And you did this for me for my benefit?

8   A.   I did.

9   Q.   Okay.  And does this show on April 11, 2007, the first

10  C.H.A.M.P.S. verbal reprimand you received?

11  A.   It does.

12  Q.   And then you later received the written reprimand on the

13  C.H.A.M.P.S., which I've underlined?

14  A.   Yes.

15  Q.   And initially -- and did you have to go to a hearing?

16  A.   I did.

17  Q.   And is that called an E --

18  A.   ERO, employee review officer hearing.

19  Q.   Is that a big thing?

20  A.   It is.

21  Q.   Is that like a little mini trial?

22  A.   It is.

23  Q.   Okay.  And at the time you went to that hearing, was it or

24  was it not stressful for you?

25  A.   Extremely stressful.

```
 1    Q.   Why?

 2    A.   First of all, I felt that I already been disciplined for

 3    what I was being sent to the review board for.  And secondly,

 4    it required me taking time away from my job and preparing for

 5    this hearing, and gathering all the data, meeting with the

 6    Union rep and everything, and it just was very stressful.

 7    Because, like I said, I felt I had been disciplined, I had

 8    moved on, I could not understand why I was getting disciplined

 9    a second time.

10    Q.   Okay.  And are you normally allowed time to prepare for a

11    hearing?

12    A.   You are allowed to request time.  And it's at management's

13    discretion whether or not it is approved or disapproved.

14    Q.   And were you -- did you request time from Assistant Warden

15    Flag?

16    A.   I did.

17    Q.   What was his response?

18    A.   He denied it.

19    Q.   And I'm -- so did you go to hearing; is that correct?

20    A.   I did.

21    Q.   And when did that hearing take place approximately?

22    A.   I don't recall without looking at my notes because it got

23    to be so many disciplines, and I just can't remember

24    everything.  The personal stuff, I can -- I refreshed myself on

25    what was going on.  I've tried to put this behind me.  I
```

1    honestly can't tell you without looking.

2    Q.   Okay.  And you have that there in your notes?

3    A.   Yes.

4    Q.   Just roughly what month was it that you went to hearing?

5    A.   I want to say the first part of May.

6    Q.   Okay.  And after you presented your case, the management

7    presented their case, did you have to wait a period of time

8    before something happened?

9    A.   Yes.

10   Q.   And during that time, did you have to serve any suspension

11   or discipline?

12   A.   Not until I was served with the packet from the results of

13   the hearing.

14   Q.   And what happened with the results of the hearing?

15   A.   I believe I was given a one-day suspension.

16   Q.   Okay.  And was that later on reduced?

17   A.   Yes.

18   Q.   Okay.  Because in fact she had disciplined you twice?

19   A.   Yes.

20   Q.   Double jeopardy?

21   A.   Yes.

22   Q.   Okay.  Did you have to serve that one-day suspension?

23   A.   I did.

24   Q.   And that was before the results came back?

25   A.   No, the results of hearing had come back, but you can't

```
 1    file a grievance until you have the final paperwork from the

 2    hearing officer.  So I was required to serve the day off and

 3    then the grievance went through the grievance process; and

 4    about three months down the road, my grievance was resolved.

 5    Q.  Okay.  And did you then receive another discipline

 6    concerning missing seeing inmates within 90 days?

 7    A.  I did.

 8    Q.  And was that -- was that on May 10, 2007?

 9    A.  That was the day that I was written up.

10    Q.  Okay.  Tell the jury just what happened.

11    A.  I had an enormous case load and I had all the specialized

12    assignments, meaning I had receiving, I had segregation, I had

13    the healthcare, which required me going to housing units more

14    often than any of the other counselors, which was a huge volume

15    of paperwork, and then see my regular case load guys on top of

16    that.  I had made all of my rounds.  I was deficient in getting

17    about a hundred of the information in the computer.  When I

18    went to my hearing, I brought in all the lists to show the

19    number of inmates that I had seen in the time frame that I was

20    written up for, and it was between, I want to say maybe in

21    excess of close to 900 inmate contacts that I made in a

22    two-week period.  And I was deficient in about 100 of those

23    getting everything in the computer because with the volume of

24    paper.  I did the very best I could.

25    Q.  Let me stop you here.  The rule was for not seeing the
```

1    inmates within 90 days.

2    A.   Correct.

3    Q.   Had you in fact seen all of the inmates within those 90

4    days?

5    A.   I made a face-to-face contact with every inmate that I was

6    required to make a contact with.

7    Q.   And the only problem was getting it entered into the

8    computer system?

9    A.   Correct.

10   Q.   And someone who was overseeing the computer system saw that

11   and reported that to Ann Casey?

12          MS. GUNDERSON:   Objection to speculation.

13          THE COURT:   Overruled.

14   Q.   (BY MR. FALB)   Is that correct?

15          THE COURT:   Answer if you know.

16          THE WITNESS:   Correct.   And Ann Casey testified to

17   that in her --

18   Q.   (BY MR. FALB)   Wait a minute.   We've already heard her

19   testimony.

20   A.   Okay.

21   Q.   And did you present this in your hearing?

22   A.   Present what?

23   Q.   The fact that you actually saw them?

24   A.   I did, and presented the paperwork, which was about this

25   high (indicating), to prove that I had done everything I was

1    supposed to do.

2    Q.   And for the record, you're showing with your fingers about

3    four to six inches of documents?

4    A.   Correct.

5    Q.   And what was the result of that hearing ultimately?

6    A.   I was given a one-day suspension for that.

7    Q.   Okay.  And was it later on -- and is it my understanding,

8    the hearing officer would have been someone underneath Warden

9    Robert; is that correct?

10   A.   That's correct.

11   Q.   And that was ultimately reduced to an oral reprimand?

12   A.   Yes.

13   Q.   And then did you then receive another discipline?

14   A.   I did.

15   Q.   And when was that?

16   A.   I would say that it was served on the June 1st, '07 date.

17   Q.   Okay.  And that was for not classifying inmates timely?

18   A.   Correct.

19   Q.   This one right here I'm circling?

20   A.   Yes.

21   Q.   Okay.  Tell the jury what happened with that.

22   A.   I was served another ERO packet based on two incident

23   reports stating that I had not classified my receiving inmates

24   in a timely manner.

25   Q.   Who served you with that?

1   A.   Warden Casey.

2   Q.   Okay.  And ultimately to get to the bottom of this was that

3   thrown out or dropped?

4   A.   It was.

5   Q.   And why was it dropped?

6   A.   I presented the paperwork to show that I had indeed made my

7   contacts and reviewed my files and classified them.

8   Q.   And ma'am, even before June 1, 2007, had other events taken

9   place on behalf of Ann Casey toward you?

10  A.   Yes.

11  Q.   Did you in fact put in for a vacation time in July?

12  A.   I had put in for vacation time.

13  Q.   To take it in July?

14  A.   Yes.

15  Q.   Okay.  Which would have been a couple of months hence?

16  A.   Yes.

17  Q.   And when did you do that?

18  A.   January, which is required if you want to exercise your

19  contract vacation rights.

20  Q.   Okay.  And did Ann Casey do something with that?

21  A.   It had initially been approved.  And she called me in and

22  said she was going to cancel my vacation for institutional

23  needs, and other people had been going on vacation already.

24  And I said why?  And she said because I need you here, and

25  proceeded to start taking the steps to cancel my vacation.

1   Q.  As a result were that -- was she -- was her decision

2   reversed?

3   A.  Yes.

4   Q.  Did you have to grieve it?

5   A.  Yes.

6   Q.  And when you grieve something, it's like a protest; is that

7   correct?

8   A.  Correct.

9   Q.  Is that something that is stressful or not stressful?

10  A.  It is.  It was -- and I apologize.  It was getting to the

11  point that I was spending more time defending myself than doing

12  my job.

13  Q.  Did -- let me ask you this.  In -- on May 21 -- excuse me,

14  on May 17, 2007, even before this next grievance, or next

15  discipline of June 1, 2007, what happened on May 17, 2007, in

16  relation to your -- your job you were doing concerning

17  receiving?

18  A.  She elected to change my job.  And I understand management

19  has a right to assign, but she was changing it while I was

20  suppose -- it was to take effect while I was supposedly be on

21  vacation, and I said how can I possibly do that?

22  Q.  What was her response?

23  A.  She had the right to assign, and she had made a decision as

24  to how she was going to run the department.

25  Q.  On May 17, 2007, did she remove you from the receiving

1    unit?

2    A.   She did.

3    Q.   And what did she assign you to?

4    A.   A regular full case load.  I picked that up in addition to

5    the two regular houses that I had.  I picked up several more

6    houses.  And each housing unit has 100 inmates, so I picked up

7    approximately, I say, 300 or 400 more inmates than what I had.

8    Q.   The jury doesn't know anything about assignments and

9    getting new case loads.  Is that easy or difficult?

10   A.   No, it's difficult.  Because you have to review everything

11   that the prior counselor has done with the inmate so you know

12   where you're starting from.  You can't just jump in and hope

13   you know what's going on, so you have to review.

14       And with getting 300 inmates, it would take about three

15   hours to go into the computer and accurately review what you

16   needed to review to bring you up to speed so that the inmates

17   got the level of service they were supposed to get.

18   Q.   Were you the only one being changed at this time?

19   A.   The other lady that they changed me with got a new

20   assignment, also.

21   Q.   That was who?

22   A.   Sena Landreth.

23   Q.   And she's the lady that testified to the other day?

24   A.   Uh-huh.

25   Q.   And even, again before June 1, 2007, did something happen

1    to you from Ann Casey as far as your evaluation, yearly

2    evaluation?

3    *A.*   Yes.

4    *Q.*   And what was that?

5    *A.*   She called me into finalize my yearly evaluation that she

6    had started in January.  And it was a horrible evaluation.  And

7    she included the disciplines.  She reviewed me for almost a

8    16-month period, when the requirements clearly state you review

9    on it, you know, from year-to-year.  And so she had included --

10   after she had done the initial one in January, when I got the

11   final one she had added on all the discipline that I had

12   received or that I was being served and...

13   *Q.*   Okay.  And in fact, were you supposed to have what is known

14   as a quarterly evaluation if you were having problems with your

15   job?

16   *A.*   Correct.

17   *Q.*   In other words, a quarterly would have been done before the

18   annual so you could work on your deficiencies before you have

19   your annual?

20   *A.*   Correct.

21   *Q.*   So she didn't do a quarterly before this annual?

22   *A.*   I never had a quarterly done by her.

23   *Q.*   So she was not only late in doing the annual by four

24   months, but she had not even done a quarterly for you to

25   criticize you?

1    A.   Correct.

2    Q.   And then let me ask you this.  Even after this late of

3    annual evaluation, within a week or two weeks did she do a

4    quarterly evaluation?

5    A.   She did.

6              MS. GUNDERSON:  Objection to leading.

7              THE COURT:  Sustained.

8    Q.   (BY MR. FALB)  Within a week --

9              THE COURT:  The jury will disregard.

10   Q.   (BY MR. FALB)  Within a week or two weeks after your

11   annual evaluation, did you have another evaluation?

12   A.   I was called in for a quarterly evaluation.

13   Q.   And what happened -- and who called you in?

14   A.   Ann Casey.

15   Q.   And what did she do?

16   A.   She basically criticized my job again and attached a sheet

17   listing disciplines that had occurred recently.

18   Q.   Okay.  And was this, based upon your knowledge of

19   discipline and evaluations over all these almost 30 years, is

20   this proper?

21   A.   It was not in the sequence established.  And I told her I

22   felt that she was just sticking it to me.

23   Q.   And were both of these evaluations protested?

24   A.   Yes.

25   Q.   By you?

1    A.   Yes.

2    Q.   And ultimately were both evaluations changed?

3    A.   Yes.

4    Q.   Okay.  And months later?

5    A.   Yes.

6    Q.   In November?

7    A.   Yes.

8    Q.   After all the proceedings?

9    A.   Yes.

10   Q.   On May 31, 2007, did she write you up for being five

11   minutes late in getting into work?

12   A.   Yes.

13   Q.   And then on June 1, 2007, did she -- were you written up

14   for not classifying inmates in a timely manner?  We already

15   talked about that; is that correct?

16   A.   Correct.

17   Q.   And those were ultimately dropped?

18   A.   Yes.

19   Q.   Okay.  And was that because you were not guilty whatsoever?

20   A.   I was not guilty.

21   Q.   In fact you were written up on --

22   A.   Bogus charges.

23   Q.   -- directives that weren't even in effect at that time?

24   A.   Correct.

25   Q.   And then on June 1, 2007, the same date, you were

Cook - Direct

1   disciplined for something else?

2   A.   Yes.

3   Q.   And was that for a victim -- approving a victim to visit an

4   inmate?

5   A.   An alleged victim.

6   Q.   Okay.  And who wrote you up for that?

7   A.   Ann Casey.

8   Q.   Was she even present for what you were working on that day?

9   A.   Not to my knowledge.

10   Q.   Do you know how Ann Casey even found out about that?

11   A.   I can't honestly say.

12   Q.   What happened?  Just tell in substance to the jury what

13   happened in this incident.

14   A.   I received an inmate in off the transfer bus.  In reviewing

15   his file, there was very little paperwork in it.  There was a

16   paper in there alleging the violence to a victim.  Victim's

17   name was not listed on the paperwork that was in the file.

18   Based on the fact that there was not a victim's name listed,

19   when I reviewed his visiting list he had submitted, which all

20   the inmates are required to do, I could not tell who the victim

21   was, so I approved his victim -- or approved his visiting list

22   based on the fact that I did not have the name of who the

23   alleged victim was.

24   Q.   Did you go through all the resources?

25   A.   I went through every page in his file.  I requested

1   verbally of the lady in the record office who had the contact

2   with the courts to call the county to see if they could tell me

3   who the victim was.  I went through all the steps that I was

4   supposed to do before I approved that visiting slip.  I made a

5   note on my orientation inmate intake -- intake inmate list that

6   I get that he had an alleged victim, and in a few days or week

7   I needed to pull his file again to see if the paperwork had

8   been received to tell me who that victim was.  Because at that

9   time if the victim would have been listed on the visiting list,

10  I would have went back and taken the steps and filled out the

11  paperwork to deny her to visit, or her or him, or whatever,

12  excuse me, at that point I didn't know who it was.  It just

13  said he was brought in -- he was brought in as a parole

14  violator on two charges.  I believe it was domestic battery and

15  retail theft if I'm --

16  Q.  That's fine.  I'm going to move on.  Did you have -- what

17  was Casey's position?

18  A.  That the paperwork was in there.

19  Q.  And in fact was the paperwork in there?

20  A.  When she reviewed the file, but not when I reviewed it.

21  Q.  Was there a hearing that took place?

22  A.  There was.

23  Q.  Were there additional documents all of sudden in his

24  official file?

25  A.  In preparing my grievance hearing paperwork when I pulled

1    the inmate's file, there were 43 pages, and I only remember

2    that because I wrote it down, 43 pages that had been added to

3    the inmate's file since I had reviewed the file, and the record

4    office had not told me the paperwork had come in.

5    Q.   So did you receive a three-day suspension?

6    A.   I did.

7    Q.   And did you -- despite trying to explain this to the

8    hearing officer, they suspended you?

9    A.   They did.

10   Q.   And did you ultimately try to protest or grieve this?

11   A.   I did.

12   Q.   And on your sheet there, and the jury may not know this,

13   are there rules as far as time limits when a Union has to

14   grieve things?

15   A.   There are.

16   Q.   If they don't meet that --

17   A.   There are.

18   Q.   -- for whatever reason, you can't proceed?

19   A.   Correct.

20   Q.   Is that what happened here?

21   A.   Yes.

22   Q.   And then after -- I forgot to ask you, was there another

23   incident where you were transferring an inmate and on or about

24   May 24, 2007, where Assistant Warden Flag and Assistant Warden

25   Casey made some statements to you?

1   A.   There was.

2   Q.   Briefly, what happened?

3   A.   I processed an inmate from the segregation unit for

4   disciplinary transfer to a higher level facility and

5   inadvertently forgot to write down the facility name and number

6   on the paperwork, or one or the other, I can't remember if it

7   was the name or the number; and they brought it back into me

8   and told me I was not performing my job accurately and that I

9   needed to be more conscientious.  And when they gave me the

10  transfer, it was just a simple matter of writing on there the

11  number.  And they -- she, he never said a word, she proceeded

12  to tell me how poor I was at doing my job.

13  Q.   At June 1, 2007, did you have two, not one, but two,

14  employee review hearings?

15  A.   I did.

16  Q.   And that was on not completing paperwork on newly received

17  inmates timely and allowing the victim to see the inmate?

18  A.   Yes.

19  Q.   Was that stressful?

20  A.   More than you could imagine.

21  Q.   Did you ask for preparation time from your supervisor for

22  this?

23  A.   I did.

24  Q.   What happened with that request?

25  A.   I was denied.

1    Q.   On June 7, 2007, were you called into the personnel office

2    and given paperwork for your one-day suspension for not seeing

3    inmates within 90 days?

4    A.   I was called in and that date sounds right.  I would have

5    to check.

6    Q.   Did you serve that one day on June 11, 2007?

7    A.   Yeah.

8    Q.   And that was later on reversed or reduced?

9    A.   Yes.

10        MS. GUNDERSON:  Objection to leading.

11        THE COURT:  Sustained.

12   Q.   (BY MR. FALB)  And then on June 19, 2007, were you called

13   into Casey's office again concerning the results of the crime

14   victim issue?

15        MS. GUNDERSON:  Objection to leading.

16        THE COURT:  Sustained.

17   Q.   (BY MR. FALB)  Were you on or about June 19, 2007, called

18   into Casey's office?

19   A.   Yes.

20   Q.   And what was that about?

21   A.   To serve me the official results of the ERO hearing.

22   Q.   And what were the results?

23   A.   I believe it was the one for the not classifying the

24   inmates, and the charges were dropped, and I had to sign the

25   paper to show that I received my discipline.

1   *Q.*  Did she also then call you in concerning the victim charge?

2   *A.*  I don't believe it was on the same date.

3   *Q.*  Any date?

4   *A.*  In thereabouts.

5   *Q.*  Okay.  And what did that -- strike that -- when that

6   happens, are you issued something?

7   *A.*  You have to sign a paper that says you received your

8   discipline.

9   *Q.*  And beginning on June 25, 2007, did you serve your

10  three-day suspension for that?

11  *A.*  That sounds right.

12  *Q.*  And then when you got back from that suspension, that would

13  have been June 28, 2007?

14  *A.*  Yes.

15  *Q.*  On the very day you got back, did she charge you with

16  another incident?

17          *MS. GUNDERSON:*  Objection to leading.

18          *THE COURT:*  Overruled.

19          *THE WITNESS:*  Yes.

20  *Q.*  *(BY MR. FALB)*  Was that concerning "chain of command"?

21  *A.*  Yes.

22  *Q.*  And tell the jury, was this related to an earlier incident?

23  *A.*  Yes.

24  *Q.*  What incident?

25  *A.*  The one from 5/10, stating standards of conduct, not seeing

1    inmates in a 90-day time frame.

2    *Q.*  Now by this time you had already been disciplined for that?

3    *A.*  Yes.

4    *Q.*  Okay.  Chain of command discipline, tell the jury what that

5    was about.

6    *A.*  When I was preparing my documents for my ERO hearing, I

7    noticed that there were 11 inmates that when I had put the

8    information in the computer, the C.H.A.M.P.S. system, when it

9    comes up it automatically defaults to the day that -- the date

10   of the day you're working.  And in the course of everything

11   that I was required to do, and phone calls from inmates'

12   families, and phone calls from around the institution, I had

13   forgotten to go in manually and change the dates on 11 inmates

14   from today's date to the actual date that I had made the

15   contact with them.

16       And so always in the past it was if you had a problem, an

17   error, or whatever, you would called Deb Gordon, or email her,

18   either way, in Springfield and tell her what the problem was,

19   and they would take care of it.  And I had been required over

20   the course of the last five or six months, whenever there was a

21   problem for any of the counselors, I had made calls and stuff

22   before telling them of problems, to change them.  No one had

23   told me to stop doing what I had been doing as far as if there

24   was a problem, the record office supervisor would bring things

25   to me and say this isn't right, you need to call up there and

 1    fix it.

 2              *MS. GUNDERSON:*  Objection to hearsay.

 3              *THE COURT:*  Sustained.

 4              *THE WITNESS:*  I was just doing the job I had been

 5    doing clear up to that date.

 6    *Q.*   *(BY MR. FALB)*  Without going into conversations, had other

 7    persons in the institution, such as correctional officers,

 8    lieutenants, that type of thing, made certain requests of you

 9    concerning calling Springfield?

10    *A.*   Yes.

11    *Q.*   Had you been doing that?

12    *A.*   Yes.

13    *Q.*   And so with respect to these, the computer typos that you

14    talked about, what did you do with respect to you?

15    *A.*   I emailed Deb Gordon and said that there were 11 inmates,

16    that I had made a problem on their date, and it required only

17    changing the date by some of them maybe one, or two, or three

18    days because of how you enter your information.  And because I

19    had already been disciplined for not seeing inmates in the

20    90-day time frame, and the fact that it required Springfield to

21    change the dates, there was no way that I could have changed

22    anything myself any way; and the dates that she was changing

23    them to would not reflect on the outcome of the discipline that

24    I had already incurred.

25    *Q.*   So you had already been disciplined?

```
1    A.  Exactly.

2    Q.  What was -- why did you feel the need -- what was the

3    importance to the institution itself for making sure the dates

4    were correct?

5    A.  There are certain standards and requirements you must, you

6    know, put in everything as accurate as possible.

7    Q.  With respect to auditing, specifically?

8    A.  With respect to audits, and standards, and just in general

9    so that if anybody else pulled that up that, you know, if the

10   officer or somebody had a problem with that inmate down the

11   road, they could check and see what was going on.

12   Q.  With respect to funding for the institution, what was the

13   importance?

14   A.  For funding?

15   Q.  Or any outside auditing?

16        MS. GUNDERSON:  Objection to foundation.

17   Q.  (BY MR. FALB)  Have you done audits before?

18        THE COURT:  Sustained.

19        THE WITNESS:  I have.

20   Q.  (BY MR. FALB)  What was the importance?

21   A.  You're -- I don't want to say graded, but you're -- you

22   have to meet a certain percentage of correctness every -- every

23   year for the American Correctional Association to accredit your

24   facility, and for stuff like that.  So it's always important to

25   try to make your information correct and true.
```

1    *Q.*  So did you have a discussion and was this, as far as

2    auditing, was this for you or the whole institution?

3    *A.*  It was so that the institution would not get a hit, so to

4    speak, for not having something correct.

5    *Q.*  And in fact did you discuss what you were doing before with

6    other counselors?

7    *A.*  I did.

8    *Q.*  Did you think you were going to have any problems with

9    anyone concerning that?

10   *A.*  No because it was nothing out of the norm that I had not

11   been doing.

12   *Q.*  Okay.  So you were basically disciplined for chain of

13   command for that; is that correct?

14   *A.*  Correct.

15   *Q.*  Ultimately did you have another hearing?

16   *A.*  I did.

17   *Q.*  And did you receive a five-day suspension?

18   *A.*  I did.

19   *Q.*  And then did Ann Casey not only charge you with that, but

20   she charged you with another offense concerning those 90-day

21   visit with the inmates?

22   *A.*  Yes.

23   *Q.*  What charge was that?

24   *A.*  Because I called Springfield, she charged with me with --

25   or emailed Springfield, excuse me, she charged with altering an

 1    official document.  And it's important to note that every write
 2    up she gave me was for IDC 30218, which is standards of
 3    conduct, which is very broad, and they can charge with
 4    anything.  And by them all being standards of conduct, it was
 5    setting a pattern.  I was quickly getting to that 29-day mark
 6    by the amount of discipline they were giving me.
 7    Q.  And --
 8         MS. GUNDERSON:  Objection to foundation, speculation.
 9         THE COURT:  Overruled.
10    Q.  (BY MR. FALB)  Were you issued a ten-day suspension for
11    that?
12    A.  I was.
13    Q.  And ma'am, were you guilty of, you know, making any wrong
14    or false official document?
15    A.  No.
16    Q.  In fact, what you had done was corrected the official
17    document?
18    A.  I had attempted to correct them.  They let them stand as
19    typed in.
20    Q.  What happened to the failure to follow chain of command,
21    the attempt to alter an official document, what happened to
22    those suspensions?
23    A.  When they reached the third level step of the grievance
24    process, there was improprieties at the facility when I had my
25    hearings.  The hearing officer only read the charge for failure

1    to follow the chain of command.  He combined the two hearings

2    together because they said the exact same thing, with the

3    exception of one said -- had been typed in failure to follow

4    the chain of command and the other one was attempt to alter a

5    document.  So they combined them.  And when the third level

6    grievance committee got them, they expunged the ten-day one,

7    five-day one stood as record for discipline for both.

8    Q.  Okay.  And at any time did you feel you were at fault for

9    doing these things?

10   A.  Never.

11   Q.  And when did you finally find out these results?

12   A.  In November, around shortly after Thanksgiving time, I

13   believe.

14   Q.  Okay.  Now during the time, and we'll get to this, did you

15   in fact file protests or grievances against management for

16   harassment?

17   A.  I did.

18   Q.  Okay.  Did anyone from Springfield, human resources, come

19   down and do any kind of investigation?

20   A.  No.

21   Q.  Did you file multiple claims or protests for this?

22   A.  I filed a lot of grievances against management for these

23   problems.

24   Q.  Towards the end of May of 2007, how was all this affecting

25   you?

1    *A.* It tore me up. I was someone who always went to work, did

2    my job, gave 100 percent, and had my employer be happy with

3    what I was doing, and never had a problem. And all of this

4    started and it just, it tore me up. I couldn't function.

5    *Q.* Were there other people, such as Sena Landreth, also having

6    problems?

7    *A.* She had had problems prior to when they started all of my

8    discipline. She was having little problems going along while I

9    was getting my disciplines but not compared to what she had had

10   in 2006. It was like boom, me. And when I went on my leave of

11   absence and came back, I was told that Deb became the horse in

12   the block to get picked on. I don't know, but --

13        *MS. GUNDERSON:* Objection to speculation.

14        *THE COURT:* Sustained.

15   *Q.* *(BY MR. FALB)* Well, let me back up. Did you start seeing

16   a therapist, Mr. Monken, that testified the other day?

17   *A.* I did.

18   *Q.* And that was in May?

19   *A.* In May.

20   *Q.* Okay. And why did you go to see him?

21   *A.* Because I could not deal with the stress anymore. From the

22   time I would hit the parking lot until I would leave at night,

23   I was so stressed out wondering what's going to happen today,

24   what am I going to do to make her mad today, what is going to

25   happen.

1    She chastised me during this time -- this is unbelievable.

2    I know you're supposed to wear your radio wherever you go.   I

3    always wore mine right here (indicating).   I had to go to the

4    bathroom for an extended period of time, and I left my radio

5    sitting on my desk.   And while I was in the bathroom, she

6    obviously tried to contact me on the radio, and I didn't

7    answer; and when I got back to my desk, there was a message on

8    a pink slip that said call Ann Casey right away.   And when I

9    called Ann Casey and she said why aren't you wearing your

10   radio, and I said I was in the bathroom.   And she said well are

11   you aware of the fact that you're supposed to wear that radio

12   all the time?   And I said for what I had to do in the bathroom,

13   it was going to be an extended period of time.   And the radios

14   were set up that if they were not vertical -- if they showed

15   horizontal too long, a beeper went off in the armory, that's

16   your defense mechanism so they can tell if something has

17   happened to you.   And I would have been, pardon me, in a

18   position to where it would have set the radio off.

19   *Q.*   Okay.

20   *A.*   I told the other counselors I was going to the bathroom.

21   But that was just one incident of the kind of harassment I was

22   subjected to on a daily base.   And I got to where I was

23   physically ill by the time I would leave work.   My blood

24   pressure would be sky high.   I would be sick to my stomach.   I

25   would be having diarrhea.   I was getting to where I couldn't

Cook - Direct

1    function as a human being.

2    Q.  Okay.  And I just want to make sure we're clear, you've had

3    high blood pressure in the past?

4    A.  I have had high blood pressure.  I was diagnosed with it

5    when I was going through the depression of my mother's death.

6    Q.  That was when?

7    A.  1998.

8    Q.  Okay.  And after that episode, was it under control?

9    A.  Of my mother's death?

10   Q.  After you got over your mother's death, in that period?

11   A.  It was controlled with medication.

12   Q.  Did you finally take a vacation in July of 2007?

13   A.  The Union came to my aid and I was allowed to take the

14   vacation that I had originally requested and what had been

15   approved for.

16   Q.  Okay.  When you got back from vacation, what, if anything,

17   unusual did you find with respect to your job assignment?

18   A.  It had indeed changed.  The projected change that she said

19   at the end of June she was going to make did in fact take

20   place.  So when I came back from work --

21   Q.  Let me ask you this.  How many changes in your assignment

22   had taken place since January of 2007?

23   A.  About either four or five.  I don't remember without

24   checking my notes.

25   Q.  Okay.

1    *A.*  But I was being changed on a regular basis.

2    *Q.*  Okay.  And so when you got back, Casey was gone?

3    *A.*  Yes.

4    *Q.*  Okay.  When you got back -- what happened on that day you

5    got back in particular with the new Assistant Warden Flag?

6    *A.*  I was going from my office to the role call room to get

7    ice, and he was probably from here to the door of the

8    courtroom, and I heard what appeared to be my last name.  I

9    wasn't sure, so I continued to walk, and then I heard it again

10   louder, Cook, and I turned, and it was Warden Flag, and he was

11   flagging to me which would indicate to me he wanted to talk to

12   me.  So I went on into the role call room to get my ice, and he

13   came in there, and he's a big man, bigger than I am, so I felt

14   like he was towering over me and telling me you have inmates to

15   see, are you aware that you have inmates that are behind that

16   you need to see?  And I said, you know, this is my first day

17   back from vacation, I ran my list, I saw I had inmates to see,

18   I've already made contacts with the housing units to go see

19   those inmates.  And he continued to berate me about the fact

20   that I should have been on top of this.  And I said this is my

21   first day back from a 15-day vacation.

22   *Q.*  Okay.  Let me jump ahead.  You finished meeting with Tim

23   Monken some time like the second week of August 2007, according

24   to him?

25   *A.*  I completed the initial six visits that by the program I

1  signed up for.  The Union will pay for six visits and then you

2  have to go through your insurance carrier.

3  Q.  Okay.  Now let me ask you this.  Had you been treating with

4  a Ms. Boehning, is that right?

5  A.  Agnes Boehning.

6  Q.  And she's a nurse practitioner at your family physician's

7  office?

8  A.  She is.

9  Q.  Okay.  And we'll hear her testimony later.  Had she been

10  treating you for what you'd been going through?

11  A.  Yes.

12  Q.  Okay.  Getting you medication?

13  A.  Yes.

14  Q.  After you stopped seeing Mr. Monken, the talk therapist, on

15  or about August 17, 2007, did Warden Flag, Assistant Warden

16  Flag, give you the results of certain disciplines that had been

17  issued to you months before?

18  A.  Yes.

19  Q.  And were you given -- what were the results?

20  A.  It was the five-day and ten-day suspension.  He gave me the

21  official results of both and indicated to me and sent me

22  directly to personnel to sign for the five-day suspension.  I

23  was not given the ten-day suspension at that time, I was only

24  given the five-day suspension.

25  Q.  And when were you supposed to start the five-day

1   suspension?  Would that have been August 20th?

2   A.  Yes.

3   Q.  All right.  Tell the jury, how did that affect you?

4   A.  I was called into the warden's office on the 17th, the

5   Friday before, a little before 4:00 o'clock, and given these

6   multiple results, and it blew me away.  I could not believe

7   that with the documentation and everything that I had been

8   expected to do prior to that that I was found guilty of doing

9   my job.

10  Q.  Okay --

11  A.  I became so sick that when we left work at 4:00 o'clock, I

12  went directly to my doctor's office, and they gave me

13  medication.  By the time I got from my doctor's office to my

14  home, I could not see out of my left eye, and I was having

15  light flashes in front of my eye.  I was so sick, I barely made

16  it into the house.

17  Q.  Did the doctor or Agnes Boehning, did she require you to be

18  off work then?

19  A.  Yes.

20  Q.  And for how long?

21  A.  Indefinitely.  She told me she was never going to let me go

22  back to work.

23  Q.  Okay.  And did you in fact return to work?

24  A.  I did.

25  Q.  Okay.  And why did you return to work?  Why not just --

1    your retirement had passed, your 50th birthday, why didn't you

2    just retire?

3    A.  Two reasons:  Number one, that was not when I wanted to

4    retire.  And number two, it was a monitary thing.  They were

5    hitting me with so many suspensions, and taking so much money

6    from me, and then they denied me my paid medical leave, I

7    couldn't pay my bills.  And I begged my doctor to let me go

8    back to work.

9            MS. GUNDERSON:  Objection, vague as to they.

10           THE COURT:  Overruled.

11   Q.   (BY MR. FALB)  Okay.  And sometime you did return to work?

12   A.  I did.

13   Q.  When was that?

14   A.  November the 14th of 2007.

15   Q.  Okay.  And at some point in time was there an offer,

16   solution to all these disciplines to you made by the third

17   level grievance procedure?

18           MS. GUNDERSON:  Objection, foundation, hearsay.

19           MR. FALB:  Goes for state of mind, Your Honor.

20           THE COURT:  Yeah, overruled.

21           MS. GUNDERSON:  So not being offered for the truth?

22           MR. FALB:  It's offered to her state of mind.

23           THE COURT:  State of mind exception, overruled.

24   Q.   (BY MR. FALB)  Go ahead.

25   A.  I went back to work November the 14th.  Third level

```
 1    grievance hearings were scheduled right around Thanksgiving

 2    time whatever.  I received a call at the prison --

 3    Q.  Just state what was offered to you.

 4    A.  From the third level committee, and the words were -- the

 5    exact words to me were --

 6              MS. GUNDERSON:  Objection to hearsay.

 7              THE COURT:  Sustained.

 8    Q.  (BY MR. FALB)  What was stated to you as far as your state

 9    of mind?

10              MS. GUNDERSON:  Objection.

11              THE COURT:  You can't do it that way, sustained.

12    Q.  (BY MR. FALB)  Did you receive any information concerning

13    your disciplines and retirement?

14    A.  I did.

15    Q.  What was your understanding as to what would happen if you

16    retired at the end of the year voluntarily?

17              MS. GUNDERSON:  Objection to foundation based on

18    hearsay.

19              THE COURT:  Overruled.

20    Q.  (BY MR. FALB)  Go ahead.  You can testify.  Testify.  What

21    was your understanding?

22    A.  If you retire by December the 31st, and will put that in

23    writing, we will expunge your discipline.

24    Q.  And did you accept that?

25    A.  I did not.
```

1   Q.   Did you in fact return to work in November?

2   A.   Yes.

3   Q.   Okay.  And when you returned to work, were you given a new

4   job assignment?

5   A.   Yes.

6   Q.   What was that job assignment?

7   A.   Warden Flag reassigned me to the receiving unit.

8   Q.   Was this the same receiving unit that you had been doing

9   and removed by Assistant Warden Casey in the Spring?

10  A.   Yes.

11  Q.   Because you were doing such a lousy job?

12  A.   Yes.

13  Q.   And did Assistant Warden Flag tell you why he was

14  reassigning you to your old job, receiving?

15  A.   Yes.

16  Q.   What did he say?

17  A.   You know the job and you do it the best, so it's yours.

18  Q.   Now did you think at this point in time things would be

19  better?

20  A.   I had high hopes they would be.

21  Q.   Okay.  Did you ultimately get a new assistant warden by the

22  name of Ty Bates?

23  A.   I did.

24  Q.   Directing your attention to May of 2008, were these all of

25  the counselors?

Cook - Direct

1    A.   Yes.

2    Q.   And the supervisors were still not filled?

3    A.   That's correct.

4    Q.   It's where I have zero next to their positions.  And in

5    April or May of 2008, how were you doing?

6    A.   I was doing a little better.

7    Q.   Were you still on medication?

8    A.   I was still on medication.

9    Q.   What medications were you on?

10   A.   I was on my blood pressure medicine, I was on medication to

11   help me sleep, and I was medication to enhance the effect of

12   the blood pressure medicine, and I was on migraine medicine.

13   Q.   Okay.  And were these given to you or prescribed to you

14   while you were on your stress leave?

15   A.   Two of them were added to the initial medications that I

16   had been taking for a period of time.

17   Q.   Sure.

18   A.   But there was two medications that were added.

19   Q.   Which were?

20   A.   The beta blocker and the water pill to help my migraine and

21   blood pressure medicine be more effective.

22   Q.   Okay.  And I forgot to ask you, when you're on the stress

23   leave, did you have -- tell the jury what your symptoms were.

24   A.   There was two weeks I didn't get out of bed except to use

25   the bathroom.  I couldn't see basically.  And I couldn't eat.

1    I was only being able to sleep by medication.  I could not

2    function.  I was bedridden.

3    Q.  Did it have any affect on your hair?

4    A.  I was losing my hair faster than I could count it, so to

5    speak.  It was -- it was everywhere.

6    Q.  Were you having increased migraines?

7    A.  Yes.

8    Q.  Direct your attention to April, May of 2008.  Was there a

9    job assignment change?

10   A.  Yes.

11   Q.  And tell the jury what Ty Bates, your supervisor, said or

12   did?

13   A.  I was called to his office and he told me that he needed to

14   change my job assignment because Brandon Risse and Gina Feazel

15   were having a work problem and couldn't get along and there was

16   too much confusion in the office.  Each one was complaining

17   about the other.  And I said so why move me?  And he said

18   because I have to.  I said move one of them, and he said I

19   can't.

20   Q.  Did you ask him why he didn't discipline them?

21   A.  I did.  I said well then if you can't move them, discipline

22   them.

23   Q.  What was his response?

24   A.  He said I can't do that either.

25   Q.  Did he ever tell you why he couldn't do that?

1  A.  No.  He just repeated two or three times I can't, I can't,

2  I can't.

3  Q.  At this time you were -- Sena Landreth was gone.  All the

4  older counselors were gone; is that right?

5  A.  Yes.

6  Q.  And at this time you were not only the oldest, but had 32

7  years in; is that correct?

8  A.  Almost 32, yes.

9  Q.  When Ty Bates -- did you have any further discussion with

10 Ty Bates about this assignment change?

11 A.  Yes, it went -- we bantered it back and forth for close to

12 half an hour trying to -- I said I really don't want to change

13 jobs, I just feel like it's going to be just like it was last

14 year that I'm going to be dumped on and harassed and written

15 up.  And I said I can't do this.  I cannot do this again.

16 Q.  What did he say?

17 A.  Apologize.

18 Q.  It's okay.

19 A.  It's just really hard.  He said I have to change somebody

20 and I'm changing you.

21 Q.  And you were the most senior there?

22 A.  Yes.

23 Q.  Was he critical of you for your job?

24 A.  No.  I thought up to that point I was doing a good job, he

25 never indicated -- he never said he had a problem with me, he

 1    never disciplined me, he never followed me or chastised me on

 2    the radio.  He never did anything.  He was very supportive.

 3    Q.  So when he did that, what was your response?

 4    A.  It killed me.  Just like I am now just thinking about it.

 5    It killed me.  I asked him, I said I have to leave your office,

 6    I'm getting sick, may I go?  And I just got up and left and I

 7    went back to the administration building -- excuse me -- to

 8    where our office is and I went right to the bathroom and

 9    proceeded to be sick.  And while I was in the bathroom, Officer

10    Feaney [phonetic] came and beat on the door because my radio

11    was horizontal instead of vertical and they were making sure

12    that I was okay, which I really appreciated.  But it was

13    terribly, terribly embarrassing.

14    Q.  Did you ultimately tell Ty Bates what you were going to do?

15    A.  I told him I'll just give you what everybody wants and I'll

16    just retire.  But even with that I was not -- it took me three

17    days to write a retirement letter because I did not want to

18    retire.  I wanted to keep working.  I needed to support my

19    family.  I have a handicapped son.  My husband was hurt at work

20    and wasn't bringing in a full income.  I needed to be working.

21    Q.  Well the question is going to be asked of you, you know,

22    you could retire, you could get great benefits.

23    A.  I was only at that time 50 and a half years old.  I had

24    only been at my job for four years.  The step reigns in the

25    contract, to get to the highest level that you can retire at

1    takes seven or eight years.  The percentage that I would have

2    retired with then against what I would have retired at at full

3    pension were huge differences.

4    Q.  Okay.

5    A.  Because I could not put up with the job and it making me

6    sick, and I elected to just finally say, okay, I'll retire.

7    But I felt so bad about it.  I felt like they were just pushing

8    me out, like I was 50 years old and I was just wasted space.

9    Q.  When you got --

10   A.  I had to go level income which allows me to pull off of my

11   social security benefits.  If I didn't get the $1,300 a month

12   that I get for my social security benefits, my retirement check

13   would have been less than what I was bringing home working.

14   Q.  When you got back from your stress leave, did you meet up

15   with a person by the name of Gina Feazel?

16   A.  Yes.

17   Q.  This is in November of 2007, I'm backing up.

18   A.  Yes.

19   Q.  When you got back, did she make a statement to you

20   concerning retirement, your sick leave?

21   A.  Yes.

22   Q.  Tell the jury what Gina Feazel said.

23        MS. GUNDERSON:  Objection to hearsay.

24        MR. FALB:  Goes to the hostile work environment, Your

25   Honor.

```
1            MS. GUNDERSON:  It's still hearsay.

2            THE COURT:  Still hearsay, still sustained.

3            MR. FALB:  Can't be via even a co-employee, Your

4  Honor?

5            THE COURT:  No, hearsay, overruled -- sustained.

6  Q.   (BY MR. FALB)  Without revealing the contents of any

7  conversations, were there any statements made to you by Gina

8  Feazel when you returned to your employment in November of

9  2007?

10 A.   Yes.

11 Q.   With respect to Gina Feazel, on a daily basis did she make

12 any statements to you concerning retirement?

13            MS. GUNDERSON:  Objection, would call for hearsay, the

14 way the question is phrased.

15            THE COURT:  Yeah, I'll sustain.

16            MR. FALB:  Just one moment, Your Honor, while I look

17 at my notes.

18            THE COURT:  Sure.

19 Q.   (BY MR. FALB)  Forgot to ask you, ma'am.  Have you also

20 drawn up a chart showing the number of assignment changes you

21 had once beginning right after your 30-year pin date?

22 A.   I did.

23 Q.   And you've also drawn up --

24            MR. FALB:  Your Honor, may I have this marked?

25            THE COURT:  Sure.
```

Cook - Direct

1    *Q.   (BY MR. FALB)*   Showing you what has been marked as

2    Plaintiff's Exhibit 21.   Is this a flow sheet I asked you to

3    prepare for me, indicating the difference between your

4    assignments, Brandon -- or Bart Toennies' assignments, and Gina

5    Feazel's assignments?

6    *A.*   Yes.

7    *Q.*   Is that true and accurate after going through all the

8    assignment sheets that you have?

9    *A.*   Yes.

10            *MR. FALB:*   Your Honor, I would move to introduce this

11   exhibit.

12            *THE COURT:*   Any objection?

13            *MS. GUNDERSON:*   To the extent it's being used as

14   demonstrative, that's okay; but if it's being admitted as

15   substantive evidence, I'm concerned about all the other

16   counselors not being in it.

17            *THE COURT:*   Concerned about what?

18            *MS. GUNDERSON:*   This is a -- this only deals with

19   three counselors, there were other counselors who were there.

20   As far as a reflection of what the assignments that were ever

21   changing in the counseling department, I think there's a

22   problem of it being somewhat misleading.   If it's going to be

23   used just as a demonstrative, then that's fine, but as

24   substantive evidence --

25            *THE COURT:*   Just a summary of --

1          MR. FALB:  Yes.

2          THE COURT:  -- the -- that will be overruled,

3    admitted.

4          MR. FALB:  Thank you.

5    Q.   (BY MR. FALB)  Showing you Plaintiff's Exhibit 21.  And

6    I'm not going to go through each and every entry because the

7    jury has been sitting there a long time.  But does this show in

8    summary the assignments you had compared to Gina and Bart from

9    4/1/04 until the time you retired?

10   A.   Yes.

11   Q.   And so the jury is aware, and this may be somewhat

12   misleading, for you, what were you doing during the times that

13   you were seeing like 300 inmates in March of 2006?

14   A.   I also had the specialized assignments in addition to

15   caseload work.  So in essence I was having to see greater

16   number of inmates because the segregation and receiving unit,

17   you have to go down there three days a week.  And especially in

18   segregation, just about every time the counselor would go to

19   segregation, you have to see just about everybody because you

20   had to issue them flex pins and paper for writing instruments.

21   And so --

22   Q.   As far as inmate contacts, throughout your entire career of

23   4/1/04 until the time you retired, as compared to Gina and

24   Bart, who was working with more inmates as far as per contact

25   within 90 days?

1    A.   I was.

2    Q.   As far as assignments, who was getting more changes in

3    assignments compared to those two individuals?

4    A.   I was.

5    Q.   Is that all documented in all --

6    A.   In everything I've disclosed.

7    Q.   Showing you Plaintiff's Exhibit Number 22, and I'll show

8    this to you in a second, is that the same basic flow sheet,

9    only has got some labels --

10   A.   Yes.

11   Q.   -- indicating who did what?

12   A.   Yes.

13   Q.   Is that true -- is this exhibit true and accurate for a

14   summary of the job assignments?

15   A.   Everything on there was taken from assignment memos that

16   are available at the facility that I was given every time my

17   assignments changed and that were put out for publication for

18   everybody in the facility so they knew which counselor was to

19   go where.

20        MR. FALB:   Your Honor, I would move to introduce this

21   exhibit into evidence.

22        THE COURT:   Any objection?

23        MS. GUNDERSON:   I think we have an issue with the

24   first few lines of this exhibit that we need to explore at

25   break; other than that, from 2005 forward, I have no objection

1   to it.

2          THE COURT:  Okay.  Well, don't show it to the jury

3   yet.

4          MR. FALB:  Okay.

5   Q.   (BY MR. FALB)  Ma'am, you were -- I'm sure they're going

6   to ask you about your disciplines on cross examination, but

7   were there other instances when Gina Feazel and Bart Toennies

8   committed mistakes where they were not disciplined?

9   A.   Yes.

10          MS. GUNDERSON:  Objection, foundation.

11   Q.   (BY MR. FALB)  Were you personally familiar with this

12   based on being there and observing?

13   A.   Yeah.

14   Q.   For example, on Defendant's Exhibit Number 1 that's already

15   in evidence, what is this?

16   A.   This is an inmate counseling summary off of the

17   C.H.A.M.P.S. system that shows all of the contacts made with an

18   inmate from the day he gets to the facility until he leaves.

19   Q.   Okay.  And when -- in this particular instance, something

20   that -- was something done wrong?

21   A.   Yes.

22   Q.   What?

23   A.   Inmate Golden appeared on my work release list, he was

24   assigned to me; so when I went into review his file for work

25   release, there was a visiting list and paperwork in there

Cook - Direct

1    showing that this Kelly Hamilton was his victim.   And when I

2    pulled up his paperwork, on the visiting list it appeared to me

3    that another counselor had approved this victim to visit.   It

4    looked to me to be Gina Feazel's signature of the warden with

5    her initials.

6         *MS. GUNDERSON:*   Objection to foundation.

7    Q.   *(BY MR. FALB)*   You're personally familiar with Gina Feazel

8    and her initials and handwriting; is that correct?

9    A.   Correct.   As she was with mine.   And so I wrote an incident

10   report and I filed a grievance because I felt that if I had

11   done something wrong like this and been disciplined for, then

12   it should be fair treatment for everybody, and she should have

13   if she was indeed found to be guilty.

14   Q.   Was there also something wrong -- else wrong with that?

15   A.   Yes.   When you -- this Kelly Hamilton, who was the victim,

16   field services approved the inmate to be paroled to her home,

17   which is a big no, no.

18   Q.   And who was in field services at that time?

19   A.   Bart Toennies.

20   Q.   To your knowledge was he ever disciplined for this?

21   A.   Not to my knowledge.   And had I not caught this, and he

22   been paroled to that home and something happened, the State,

23   and the Department of Corrections, and Centralia Correctional

24   Center would have been liable.

25   Q.   Were there other instances that you were personally aware

Cook - Direct

1    of that Bart Toennies made mistakes and was not disciplined?

2    A.  Yes.

3    Q.  What?

4    A.  There was one day that he was sitting at the computer

5    entering entries in C.H.A.M.P.S., and he appeared to be, from

6    what he said verbally, he said this inmate is an asshole and

7    was typing.

8    Q.  Was there an incident where concerning quarantine of a

9    parolee coming back?

10   A.  Yes.

11          *MS. GUNDERSON:*  Objection to leading.

12          *THE COURT:*  Overruled.

13   Q.  *(BY MR. FALB)*  And which counselor was involved in having

14   parolees come back at this time?

15   A.  When parolees were brought back as violators, it was the

16   field services responsibility.

17   Q.  Who was that?

18   A.  Bart Toennies.

19   Q.  What was the requirement for quarantined parolees when they

20   come back.

21   A.  When they come back, the field services person is to talk

22   to them and have them put on a 72-hour watch in case they have

23   any drugs, or alcohol, or anything like that in their system.

24   Q.  Were you personally present when this parolee was there?

25   A.  I was in the segregation unit making my rounds when this

1   parole violator was brought back in off the street.

2   Q.  What did he appear as?

3   A.  He appeared high as a kite.  I'm sorry.

4   Q.  And what happened with his supposed quarantine for 72

5   hours?

6   A.  Nobody did the paperwork on it.  And I told the officer,

7   remember to call field services about having a parolee come

8   back in.

9   Q.  Was there another instance where Bart Toennies was involved

10  in paroling an inmate without an address?

11  A.  Yes.

12  Q.  Was that a no, no?

13  A.  That's a no, no.

14  Q.  Because when someone is let out, they -- you need to know

15  where you're going?

16  A.  Because if they're on parole, you have to keep track of

17  them.

18  Q.  Was Bart Toennies ever disciplined for any of this?

19       MS. GUNDERSON:  Objection, foundation.

20  Q.  (BY MR. FALB)  Well he testified yesterday he has never

21  been disciplined; is that correct?

22  A.  That's correct.

23  Q.  How about Gina Feazel?  To your knowledge has she done,

24  besides that one incident there, has she ever done anything

25  wrong that she was not disciplined for?

1    A.   The only thing that comes to mind is when she had the

2    problem with the inmate count and caused the institution to go

3    on a lock down for two hours while they did an ID count of

4    every inmate to make sure we had every inmate we're supposed to

5    have.

6    Q.   Is that a big deal?

7    A.   Losing an inmate to me is a huge deal.   And to the facility

8    and the state, you know, where is your inmate you're supposed

9    to be taking care of.

10   Q.   Besides you being upset, when Sena looked -- before Sena

11   Landreth retired, was she also physically, emotionally upset at

12   what was going on with her?

13   A.   Yes.

14   Q.   Deb Brink, who died in November of '07, before she died and

15   when you were working with her, was she also subject to stress?

16   A.   Yes.

17   Q.   Was she subject to crying spells?

18   A.   Yes.

19   Q.   And obviously when you were on suspension time and when you

20   were on sick leave, you did not receive pay; is that correct?

21   A.   That's correct.

22        MR. FALB:   Thank you.

23        THE COURT:   Let's take a ten-minute break, folks.

24   Same admonishments as before.

25                     (Recess taken.)

1          *(Open court, no jury.)*

2          THE COURT:  Let's go on the record before the jury

3     comes back in.  There was something on that last exhibit that

4     we needed to take up, Ms. Gunderson says.

5          MS. GUNDERSON:  Yes, Your Honor.  There was a

6     reference to assignment changes in 2004.  I was not aware of

7     any assignments memo exhibit of 2004 that had been produced,

8     and so I had a concern about where that information had come

9     from, whether it was memos that had been retained by Ms. Cook

10    and weren't produced or whether it was just based on her

11    recollection.  That was my concern with it.  I asked counsel if

12    he could clarify where it came from and maybe let me see the

13    document, because I don't remember there being a dated

14    assignment memo from 2004.  And its not my file assignment

15    memos that I pulled.  It could be wrong if he has it, you know,

16    by all means, but I haven't seen it.

17         MR. FALB:  I will have her do that over lunch.  She

18    says she's got something in the car.

19         THE COURT:  Do you know right offhand?

20         THE WITNESS:  They were assignment memos that I was

21    given while I was at work every month.

22         MS. GUNDERSON:  To the extent that they weren't

23    produced in discovery, we would object to their use here at

24    trial.

25         THE COURT:  All right.

Cook - Direct

1          MS. GUNDERSON:   Something I hadn't seen.

2          THE COURT:   Just maybe we'll look it up over lunch

3    then.

4          MR. FALB:   Judge, I have one other matter to bring to

5    the Court's attention.

6          THE COURT:   Okay.

7          MR. FALB:   Throughout her testimony you allowed

8    objections to be sustained concerning Gina Feazel's statements

9    to her about age or retirement because it was hearsay.   And I

10   think, you know, harassment situation, everything that comes to

11   her state of mind, even from co-employees, because the law is

12   co-employees can join in the harassment.   And Gina Feazel was

13   one of the actors here, and what she says goes to her state of

14   mind and goes to the part of it, the hostile work environment.

15         MS. GUNDERSON:   If I may respond?

16         THE COURT:   Sure.

17         MS. GUNDERSON:   Ms. Cook has sued the Department of

18   Corrections.   The Department, for the purpose of this suit, the

19   control for that is the warden, those are the people who have

20   supervisory authority, those are the people who are alleged

21   that the Department has acted through.   Gina Feazel is not one

22   of those people.   She's not a supervisor.   She's not acting on

23   behalf of the Department.   So for that reason, her statements

24   are not considered to be statements of the department and are

25   not considered admissions of the party opponent and be

```
 1    otherwise barred under the hearsay rule.

 2           THE COURT:  I agree.  Just a simple co-employee --

 3    hearsay statements from a co-employee wouldn't come in under

 4    any exception, including the state of mind.  I mean you're

 5    trying to make, as I understand what you're saying, Mr. Falb,

 6    is that the hostile work environment comes from the

 7    co-employee, not a supervisor, not the employer.

 8           MR. FALB:  It can come from both.  That's why we have

 9    instructions on it.

10           MS. GUNDERSON:  Well, we have instructions on hostile

11    work environment, actions through the supervisors, with a

12    tangible job action.  And in order to have a hostile work

13    environment this has to be actions from the supervisors.  If

14    we're going to bring a hostile work environment based upon

15    things other people said, that's a whole other claim that has a

16    whole other standard and would require all kinds of other

17    things.  You know, the jury instructions are on, at least the

18    ones I reviewed, Mr. Falb had the actions of the supervisors

19    listed.

20           MR. FALB:  There is a separate jury instruction for

21    co-employees and that's the only way you can make a case like

22    this is to have the statements of co-employees.  You know, I

23    don't try many of these cases, but I did one in federal court

24    and the co-employee, his statements, came in.

25           MS. GUNDERSON:  Going back to the final pretrial --
```

```
 1          MR. FALB:  Let me finish.  And the supervisor, you
 2     don't have to have a supervisor doing it.  You can have a
 3     supervisor failing to clamp down on a co-employee doing it.
 4          THE COURT:  Well I understand, but that's not -- hold
 5     on a second, let me look at your final pretrial.
 6          MR. FALB:  And my client -- this is not a surprise, my
 7     client's testified that from the very beginning.  I questioned
 8     Gina Feazel in the depositions on that from the very beginning.
 9     I even questioned her about it this week.
10          MS. GUNDERSON:  Your Honor, I suggest the issues are
11     defined by the final pretrial.
12          MR. FALB:  Your Honor, I would specifically address my
13     complaint --
14          THE COURT:  Well, your complaint doesn't matter.
15     Let's look at the final pretrial.  And we've got agreed to
16     issues of law:  One, age discrimination, certain allegation of
17     age discrimination; two, constructive discharge, in the event
18     for her age.  We don't have any issues of hostile work
19     environment.
20          MS. GUNDERSON:  I would agree.  Those aren't -- it's
21     not an issue within the final pretrial.  I've included
22     instructions because the instructions he tendered to me had
23     them in it, and we intend to have the jury instruction --
24          MR. FALB:  Number two says constructive discharge.
25          THE COURT:  The parties agree the following is an
```

1    allegation of constructive discharge due to age discrimination

2    at issue in this matter:   (A)   Whether but for her age would

3    have been forced to retire in May 2008.

4         *MR. FALB:*  Right.  That's a whole environment.  And

5    secondly, and maybe I'm stupid, but these are agreed upon

6    issues of law.  We weren't talking about, you know, I didn't

7    realize I had to set forth every issue I was going to bring up.

8    I thought these were questions that the Judge would have to

9    decide that are unusual.  And I apologize.  You know, but in

10   the interest of fairness and justice, you know, my complaint

11   alleges the Defendant, it's agents, and employees were doing

12   this on a daily basis.

13        *MS. GUNDERSON:*  I would agree with Mr. Falb to the

14   extent that as part of the elements that were required to prove

15   constructive discharge, there has to be an intolerable

16   environment proven.  And so, you know, Plaintiff's testimony

17   that whenever this conversation was in April or May of 2008,

18   the environment at that time would certainly be relevant to the

19   constructive discharge claim.  But as far as adding an

20   additional claim that due to the actions of the Department from

21   2006 onward there was a hostile work environment based upon

22   age, I don't think that's within the scope of the final

23   pretrial.  We have the age discrimination and the constructive

24   discharge.

25        *MR. FALB:*  I don't think -- the Defense wants to say,

```
 1    well, let's just talk about May of 2008 and we'll narrow it

 2    down there and see if that's constructive discharge.  That's

 3    not right.

 4            The whole totality of the circumstances.  Now she's

 5    got to relive what she went through before, and what she went

 6    through for the year previous.  And that's why she's leaving,

 7    she doesn't want to go through all the bologna, the harassment

 8    by every one.  And that's part of the whole case.

 9            MS. GUNDERSON:  And that evidence is in.  And for the

10    purpose of constructive discharge, that's something that's done

11    by the Department; and it's the Department actors and their

12    actions that are the subject of whether or not there was an

13    intolerable work environment based upon Ms. Cook.  Those actors

14    are the wardens that are at issue.  What co-employees were

15    doing is not -- does not-- they aren't supervisors for the

16    purpose of Title 7, and therefore their actions can't be part

17    of any kind of environment.

18            MR. FALB:  In every harassment case, co-employees can

19    make a hostile work environment, can make a constructive

20    discharge environment.

21            MS. GUNDERSON:  That's why we have the Ellerth [sic]

22    defense, too.

23            MR. FALB:  Well, that's fine, you can raise that

24    defense.

25            MS. GUNDERSON:  That's the defense for --
```

1           MR. FALB:  It's just not the supervisor's actions.

2     And I'm sorry, I didn't know we were going to limit things by

3     issues in the law.  I thought those were unusual issues that

4     had to be raised before the Court.

5           THE COURT:  The law is once you get to trial, the

6     final pretrial governs, not the complaint.

7           MR. FALB:  Well, I'm sorry.  Then it's my mistake,

8     Judge.  And you know, I didn't realize the federal pretrial

9     order was going to limit the evidence by agreed upon issues of

10    law.

11          Your Honor, I don't mean to interrupt the Court's

12    thinking about this, but under the heading roman numeral five,

13    agreed to issues of law, the parties agree that the following

14    represents some issues that will have to be addressed by the

15    Court.  Some of these issues, however, incorporate questions of

16    facts to be decided by a jury.

17          When I read that, I'm sorry, I didn't think there was

18    going to be even a question about this.  It says some issues.

19    I thought these were going to be unusual issues.  I didn't

20    realize that I can't go beyond these issues.

21          MS. GUNDERSON:  Well certainly parts of the elements

22    in the constructive discharge not everything is there, it's

23    just the direct allegation.  You know, obviously with age

24    discrimination you're still going to have to prove that they

25    have a somewhat similarly situated, treated differently,

1    there's a whole bunch of other rules, legal-type issues that

2    are within sort of the scope of the main counts, and those are

3    the main counts that are listed.

4          I don't think it affects whether we add the claim or

5    not.  I don't think it affects the hearsay issue.  She still

6    isn't one of the wardens.

7          THE COURT:  As this case has progressed, has the case

8    been -- has the theory of the case all along as the case has

9    gone through discovery, and depositions have been taken, and

10   the like, that the parties have been pursuing this case as

11   though the theory has always been that the basis of the hostile

12   work environment as it were or was the source thereof was both

13   employer including upper-level management and middle-level

14   management as well as co-employees?

15         MS. GUNDERSON:  No.

16         MR. FALB:  Yes.

17         MS. GUNDERSON:  Well, in fact if you look at my

18   summary judgment motion, I don't even have hostile work

19   environment as something that was addressed, and that would

20   simply be actual discriminatory acts and the constructive

21   discharge act.

22         THE COURT:  And see that's exactly why the law

23   provides that the final pretrial governs the issues at trial so

24   that there is no -- we don't have the very issue we got right

25   now where there's no ambush in terms of what issues go before

     1    the jury.  And everybody's on the same playing field so we know

     2    exactly what the issues are.  So Mr. Falb says, yes, that's

     3    always been the Plaintiff's theory; and Ms. Gunderson, you say

     4    well, no, that's not been how we tried this case.

     5         Coincidentally I sat on a panel of the Seventh Circuit

     6    where this is just exactly what the problem was, where

     7    plaintiffs said the theory all along was one thing, the defense

     8    said the theory all along was one thing, and the final pretrial

     9    suggested that the theory was not as represented by, in that

    10    case, the plaintiff.  And the law is so well settled, at least

    11    in the Seventh Circuit, that the final pretrial governs.  And

    12    in fact, the law essentially says that; the case law

    13    essentially says that when we get to trial that the complaint

    14    in effect drops out, it's what's in the final pretrial that

    15    establishes the issues for trial.

    16         MS. GUNDERSON:  You know, I will add just so Your

    17    Honor doesn't look at this later and think I was being

    18    misleading that once I had the jury instructions from Mr. Falb

    19    and saw that there were hostile work environment instructions,

    20    did draft counter hostile work environment instructions just so

    21    that I would have what we have approved.  I also did at least

    22    look up some law and include that in my trial brief for the

    23    purpose of if it were to come to that, that stuff would be

    24    included, that my law would be there.  But prior to that, we

    25    had no notice it was going to be a hostile work environment

1    claim.

2         THE COURT:  The lawyers did the same thing in that

3    case and I questioned the defense counsel strongly in oral

4    argument why did you tender instructions along those lines, and

5    they said, well, just to make sure it was covered.

6         MS. GUNDERSON:  Yeah.

7         THE COURT:  When you were taking depositions in this

8    case --

9         MS. GUNDERSON:  The depositions evolved mostly as the

10   political and the sex stuff, but...

11        THE COURT:  You know I looked at the complaint and in

12   in the first count, the ADEA action, 7c says that Defendant,

13   through it's agents and employees, verbally harassed Plaintiff

14   because her age.  Now it doesn't distinguish or define the word

15   employee.  It's just a broad stroke of the word.

16        In 7g, it simply alleges on a daily basis Plaintiff

17   was harassed because her age and in attempt to get Plaintiff to

18   retire, and said harassment was severe and pervasive as to

19   affect Plaintiff's emotions and her ability to do her job.  So

20   the complaint doesn't help much.

21        MR. FALB:  Judge, can I add something?

22        THE COURT:  Sure.

23        MR. FALB:  I don't mean to interrupt.  They had Gina

24   Feazel testify the other day that my client was acting -- or

25   several of their witnesses saying she was going to retire at

1  age 50, and then she said something about piss or something

2  like that, or I can't remember what it was.  And that Gina

3  Feazel denied ever saying, you know, asking her about

4  retirement or anything along those lines.  They're the ones

5  that brought it up on cross examination.

6          MS. GUNDERSON:  Goes to motivation for the

7  constructive discharge claim.  You know, we took notes during

8  Gina's testimony.  I'm sure the jury -- but the jury will

9  remember it how they remember it.  I thought she said that I'm

10 sure we did talk about it.  But its about the transcript, I

11 couldn't swear to that.

12          And it certainly does go to the motivation of why she

13 retired and it goes to the constructive discharge claim.

14 Because you have to prove intolerable work environment to get

15 to constructive discharge.

16          THE COURT:  Okay.  Well, I'm not going to change my

17 ruling at this point.

18                  (Recess taken.)

19                  (Open court, jury present.)

20          THE COURT:  Proceed with cross.

21                  CROSS EXAMINATION

22 BY MS. GUNDERSON:

23 Q.  Good morning, Ms. Cook.

24 A.  Good morning.

25 Q.  I want to start with talking to you a little bit about some

Cook - Cross

1   other grievances you filed regarding your discipline, okay?

2   A.  Okay.

3   Q.  I'm going to hand you what's been marked as Defendant's

4   Exhibit 22.  Now this is the grievance that's related to the

5   C.H.A.M.P.S. entry on inmate Cobb; correct?

6   A.  Yes.

7   Q.  The first page is the actual grievance that's filed with

8   the Union; correct?

9   A.  Correct.

10  Q.  And is that your handwriting in the step two part?

11  A.  No.

12  Q.  That's the handwriting of your Union rep?

13  A.  I'm sorry.

14  Q.  It is your handwriting, right?

15  A.  Yes, down to the point where it says --

16  Q.  Union may be made whole, down to right here (indicating)?

17  A.  Down to right here (indicating).

18  Q.  Okay.  And I can't see what you're touching.  Is where my

19  arrow is, is that right?

20  A.  Uh-huh.  Yes.

21  Q.  Okay.  Now the second page of this document that I've

22  handed you, Exhibit 22, is your response that went with the

23  grievance; is that correct?

24  A.  This was the comments between my Union steward and myself

25  that he was presenting as his defense -- or the defense.

1   Q.   Okay.   These are comments that were presented with this

2   grievance; correct?

3   A.   Correct.

4   Q.   These are comments that you created; correct?

5   A.   No, ma'am.

6   Q.   Okay.   These are comments that were created by your own

7   Union representative, is that what your testimony is?

8   A.   No, ma'am.

9   Q.   Okay.   What are these?

10  A.   Was joint between my Union steward and myself when we met

11  to discuss the incident.

12  Q.   So these are comments that you participated in creating;

13  correct?

14  A.   Correct.

15  Q.   And they're comments that you would have approved before

16  they were sent off with the grievance; correct?

17  A.   Yes.

18  Q.   You certainly wouldn't want something in here that was

19  inaccurate, right?

20  A.   Correct.

21  Q.   If you turn to the third page of document that I've handed

22  you, this is a third level resolution of the grievance, third

23  level resolution; correct?

24  A.   Correct.

25  Q.   And what's written in the comment section says that the

1  written reprimand shall be reduced to counseling; correct?

2  A.  Correct.

3  Q.  And that was the result you recall coming from your

4  grievance; correct?

5  A.  Correct.

6  Q.  The discipline wasn't overturned was it, ma'am?

7  A.  At what time?

8  Q.  Okay, let me rephrase that.  As a result of this third

9  level grievance, the grievance at third level, the discipline

10  was not expunged, was it?

11  A.  I don't -- I don't know without looking at all of my

12  paperwork that I have at home in this file.

13  Q.  Okay.  Well let's look at this document here.  Right here

14  it says that it will be reduced from a written reprimand to

15  counseling, right?

16  A.  Yes.

17  Q.  It doesn't say that you will receive no discipline, does

18  it?

19  A.  They established that counseling is not discipline.

20  Q.  You would agree with me that counseling is not discipline?

21  A.  I have heard it said both ways.

22  Q.  Okay.  Would you agree with me that the Union contract

23  would define whether counseling was discipline or not?

24  A.  I would hope.

25  Q.  Okay.  The document that you have in front of you, the

1    third page of Exhibit Number 22, it doesn't say that the

2    discipline shall be expunged, does it?

3    A.   No.

4    Q.   You received counseling instead of a written reprimand,

5    right?

6    A.   Yes.

7         MS. GUNDERSON:   We move for the admission of

8    Defendant's Exhibit 22.

9         THE COURT:   Any objection?

10        MR. FALB:   No objection.

11        THE COURT:   Admitted.

12   Q.   (BY MS. GUNDERSON)   All right.  Let's talk about the next

13   one.  I'll hand you what's been marked as Defendant's Exhibit

14   Number 23.  This is the grievance related to your one-day

15   suspension; correct?  For missing your contacts?

16   A.   Yes.

17   Q.   Was that a yes?

18   A.   Yes.

19   Q.   Sorry.  Now in the section that says step two, again there

20   are comments.  Is it your handwriting from the arrow up to here

21   (indicating)?  I guess I'll be more specific.

22   A.   It is.

23   Q.   Okay.  This is the grievance that your Union filed on your

24   behalf for the -- missing the 90-day contacts; correct?

25   A.   Yes.

1    Q.  And it was grieving the one-day suspension; correct?

2    A.  Yes.

3    Q.  Let's turn to Page 2 of Exhibit 23.  This is a response to

4    the recommendation of the hearing officer; correct?

5    A.  Yes.  Yes.

6    Q.  Is this another one of the type of documents where you

7    would have worked with the Union to prepare it?

8    A.  Yes.

9    Q.  So you would have participated in the creation of this

10   document?

11   A.  Correct.

12   Q.  And you approved it before it was finalized; correct?

13   A.  Correct.

14   Q.  And before it was attached to your grievance; correct?

15   A.  Correct.

16   Q.  Go ahead and turn to the next page.  And this is another

17   one of those documents that you would have worked with the

18   Union to create for your grievance, right?

19   A.  Correct.

20   Q.  Is that a yes?

21   A.  I said correct.

22   Q.  And you would have approved it before it was sent with the

23   grievance, right?

24   A.  Yes.

25   Q.  Let's go to the third page.  Now again this is a third

1   level grievance resolution document, right?

2   A.  You said third page?

3   Q.  I'm sorry, fourth page.  Thank you.  This is the resolution

4   of the grievance; correct?

5   A.  Correct.

6   Q.  And your one-day suspension was reduced to an oral

7   reprimand; correct?

8   A.  Correct.

9   Q.  The one-day suspension was not expunged, was it, ma'am?

10  A.  I don't believe so.

11  Q.  And an oral reprimand is considered to be discipline;

12  correct?

13  A.  Correct.

14  Q.  And in fact I think under the rubric of progressive

15  discipline that you talked about earlier, an oral reprimand

16  would normally follow counseling in progressive discipline;

17  correct?

18  A.  Correct.

19          MS. GUNDERSON:  I move for the admission of Exhibit

20  23.

21          MR. FALB:  No objection.

22          THE COURT:  Admitted.

23  Q.  (BY MS. GUNDERSON)  I want to talk -- let's actually skip

24  forward to the other discipline that you received related to

25  these contacts that you missed.  I suppose it's not skipping

Cook - Cross

1    forward because it's actually my Exhibit 24.  So I'm going to

2    hand you what's been marked as Exhibit 24.  Now again this is

3    another grievance that was filed by the Union on your behalf,

4    right?

5    A.   Yes.

6    Q.   And I think it's safe to say that is not your handwriting

7    in the section that says step two, right?

8    A.   It is not my handwriting.

9    Q.   But this is the grievance that was filed because of the

10   false -- the discipline you received for falsifying records,

11   right?

12   A.   I can't say that because it shows a date when I was not at

13   work, so I have no clue.

14   Q.   Okay.  Well let's look at the contents of section -- the

15   section under step two.  You would agree with me that this is a

16   grievance about you; correct?

17   A.   Correct.

18   Q.   Because it lists your name in step two; correct?

19   A.   Correct.

20   Q.   And you would agree with me that this document says we

21   grieve that management unjustly and unfairly disciplined Betty

22   Cook by having two hearings on the same incident and issue;

23   correct?

24   A.   Correct.

25   Q.   And you would agree with me that this document also says

Cook - Cross

```
1    that you received a five-day and ten-day suspension for

2    those -- as a result of those hearings; correct?

3    A.  That's what it states.

4    Q.  Okay.  So this grievance might actually be, and I may have

5    misspoke, I think this might -- is actually for both the chain

6    of command as well as the falsification of records; correct?

7    A.  Based on what's written, I would have to say yes.

8    Q.  Okay.  And let's flip to the last page.  Now here the

9    resolution of the grievance was that the ten-day suspension was

10   expunged; correct?

11   A.  I cannot determine that.

12   Q.  Okay.  It says the suspension time shall be expunged for

13   the period of 9/6 to 9/16; correct?

14   A.  Yes.

15   Q.  You would agree with me 9/6 to 9/16 is a ten-day span of

16   time, right?

17   A.  Yes.

18   Q.  And you would agree with me that you did have a ten-day

19   suspension that was expunged; correct?

20   A.  Correct.

21   Q.  And that ten-day suspension was a result of the false --

22   the alleged falsification of records; correct?

23   A.  Yes.

24   Q.  I'm going to hand you what's been marked as Defendant's

25   Exhibit Number 47.  The first page of Exhibit 47 is a grievance
```

Cook - Cross

1    that was filed on your behalf by the Union regarding the

2    discipline you received for going outside the chain of command;

3    correct?

4    A.  Yes.

5    Q.  And am I correct again that in step two, that section, step

6    two, that's your handwriting again?

7    A.  Yes.

8    Q.  Now if you turn to the second page, it says the grievance

9    was withdrawn; correct?

10   A.  Correct.

11   Q.  And I think this is the one that you said that the Union

12   messed up the time frame, right?

13   A.  The third level committee said it's past the time frame.

14   Q.  Okay.  So the Union filed it late?

15   A.  Correct.

16        *MS. GUNDERSON:*  I'd move for the admission of Exhibit

17   47.

18        *MR. FALB:*  No objection.

19        *THE COURT:*  Admitted.

20   Q.  *(BY MS. GUNDERSON)*  I want to talk to you a little bit

21   about the discipline you received related to missing your

22   90-day contacts.  Now you were originally disciplined in April

23   of 2007 for missing the contacts; correct?

24   A.  Yes.

25   Q.  And that was for missing 62 contacts on your list; correct?

1    A.   Correct.

2    Q.   As a result of that -- and you did have an employee review

3    board hearing; correct?

4    A.   Yes.

5    Q.   And during that hearing you were allowed the opportunity to

6    present your side of the story; correct?

7    A.   Correct.

8    Q.   And you said that you gave them a whole bunch of documents

9    to prove that you actually seen those 62 inmates within the 90

10   days; correct?

11   A.   Correct.

12   Q.   And you also wrote a response that went along with those

13   documents to explain what the documents meant and how they

14   proved you were innocent; correct?

15   A.   Correct.

16   Q.   I'm going to hand you what's been marked as Defendant's

17   Exhibit 17.   This is the referral for your discipline regarding

18   missing your contacts; correct?

19   A.   Correct.

20   Q.   And this was a referral made by Ann Casey; correct?

21   A.   Correct.

22   Q.   And it was sent to the warrant -- the warrant -- the

23   warden; correct?

24   A.   Correct.

25   Q.   And in this she's attached a list of inmates that she

1    alleges that you missed the contacts on; correct?

2    *A.*   Correct.

3    *Q.*   And let's look at this list for just a second.  This is a

4    document that appears to be -- have been created on April 24,

5    2007; correct?

6    *A.*   Correct.

7    *Q.*   And when you look at this document, just so we can explain

8    to the jury what this is, over here, you have the inmate name

9    and the inmate number; correct?

10   *A.*   Correct.

11   *Q.*   Now every inmate at the institution is assigned an

12   individual number; correct?

13   *A.*   Correct.

14   *Q.*   And that's for the purpose of making sure that you can

15   identify them, right?

16   *A.*   Yes.

17   *Q.*   And any time there is any document created with respect to

18   that inmate, his number is going to be included there, right?

19   *A.*   Correct.

20   *Q.*   And there's no inmates at Centralia, or should be at any

21   correctional institution, that have the same number, right?

22   *A.*   They might have the same number, but they can have a

23   different letter in front of the number.  The letter indicates

24   different things.  There have been inmates with the same

25   number.

1    Q.   Okay.  When you would enter the inmates, and I'll call it

2    their -- well, it's called the Department of Corrections

3    number, right?

4    A.   Their institutional number.

5    Q.   And it would include the letter, right?

6    A.   Correct.

7    Q.   So when you would enter that into like a system to pull up

8    something about that inmate, you have to enter the letter and

9    number combination; correct?

10   A.   Yes.

11   Q.   And that letter and number combination would be different

12   for every single inmate that's ever been in D.O.C., right?

13   A.   Yes.

14   Q.   All right.  So to the left we have the inmate's name and

15   number.  In this column here that says contact -- where it says

16   contact date, that's the last date that C.H.A.M.P.S. shows that

17   that inmate was seen; correct?

18   A.   Correct.

19   Q.   And over here, it shows who the counselor is, right?

20   A.   Who the assigned counselor is on the date this report is

21   run.

22   Q.   Okay.  And you can see in this list there is at least one

23   of the inmates is assigned to Sena; correct?

24   A.   Correct.

25   Q.   And this was what was attached to your referral, and

1    there's two pages of it; correct?

2    A.   Correct.

3    Q.   And this is the list of the 62 inmates that you were

4    alleged to have missed the contacts on, right?

5    A.   Yes.

6    Q.   And there is also some additional documents that Ann Casey

7    attached to that referral, right?

8    A.   Yes.

9    Q.   This is an inmate bulletin which talks about changing the

10   contact period from 60 to 90 days, in order to give you guys

11   more time to do your job, right?

12   A.   Yes.

13   Q.   And this is a similar memo, right?

14   A.   Yes.

15   Q.   Okay.  Now after you were referred for discipline, it was

16   assigned to a hearing officer; correct?

17   A.   Yes.

18   Q.   And the hearing officer in this case was the Administrative

19   Assistant at Centralia Correctional Center, and her name is

20   Michelle Taphorn, right?

21   A.   Yes.

22   Q.   And she held a hearing; correct?

23   A.   Yes.

24   Q.   And you appeared at that hearing with a Union

25   representative; correct?

1    A.   Yes.

2    Q.   Was that Union representative Dusty Minor or was it someone

3    else?

4    A.   Someone else.

5    Q.   Dusty Minor was there, that was for inappropriate entry,

6    wasn't it?

7    A.   No, ma'am.

8    Q.   For the oral session with Ms. Casey?

9    A.   Yes.

10   Q.   Okay.  So going back to this hearing, you were there with a

11   Union rep?

12   A.   Yes.

13   Q.   There would have been someone representing management

14   there; correct?

15   A.   Yes.

16   Q.   And it probably says in here but -- and Michelle is in

17   there; correct?

18   A.   Correct.

19   Q.   And she would have heard both of your statements; correct?

20   A.   Yes.

21   Q.   And received any documents that you wanted to give her at

22   that time; correct?

23   A.   Yes.

24   Q.   And you did -- gave a statement to her at that time?

25   A.   Yes.

Cook - Cross

1    *Q.*  Now the reason that you're allowed to give documents to her

2    is to prove that you didn't do this, right?

3    *A.*  Yes.

4    *Q.*  Or to prove that it doesn't violate some of the

5    Department's rules; correct?

6    *A.*  Yes.

7    *Q.*  Now you included in your statement everything that you

8    thought was part of your defense, right?

9    *A.*  Yes.

10   *Q.*  You wanted her to have all the information, right?

11   *A.*  Yes.

12   *Q.*  And you wanted to make sure you were completely accurate,

13   right?

14   *A.*  Yes.

15   *Q.*  Because I know you testified you were very meticulous,

16   right?

17   *A.*  Yes.

18   *Q.*  So you wanted to make sure you had everything in there;

19   correct?

20   *A.*  Everything I felt was relevant.

21   *Q.*  And if it was something that you thought was relevant, you

22   absolutely would have been -- included it, right?

23   *A.*  Possibly.

24   *Q.*  And that would be true for all of your employee review

25   board hearings, wouldn't it, ma'am?

Cook - Cross

1    A.   Yes.

2    Q.   And it would probably be true for all of your grievances

3    where you filed statements; correct?

4    A.   Yes.

5    Q.   Turn to the page that's a couple of pages behind the actual

6    hearing report, and it looks like it's marked 585, but the

7    numbers are hard to read.  It starts with the first 18 inmates.

8    Are you there?

9    A.   No, ma'am.  Okay, I am now.

10   Q.   Okay.  This is the statement that you prepared and gave to

11   Michelle Taphorn during your employee review board hearing;

12   correct?

13   A.   Yes.

14   Q.   And this was your explanation to her of why you were not

15   guilty of this offense; correct?

16   A.   Correct.

17   Q.   And you say that the first 18 inmates were new arrivals and

18   that you saw them within two days; correct?

19   A.   Correct.

20   Q.   And you say the 19th inmate was assigned to another

21   counselor; correct?

22   A.   Yes.

23   Q.   But then you did see him when he came back on the 18th,

24   right?

25   A.   I did.

1    *Q.*  You said the 20th inmate on the list was assigned to

2    Counselor Landreth; correct?

3    *A.*  Yes.

4    *Q.*  You talk about inmate Stallworth here and you state when

5    you saw him, which was on the 18th; correct?

6    *A.*  Yes.

7    *Q.*  And then you say that the rest of the inmates that are

8    listed as being an S2, and you say that they're 32 of them,

9    were seen on April 9th of 2007; correct?

10   *A.*  Correct.

11   *Q.*  And you say that's the 90th day; correct?

12   *A.*  Correct.

13   *Q.*  That was your deadline to see them; correct?

14   *A.*  Correct.

15   *Q.*  And just so the jury has a reference to what we're talking

16   about with S2, all the inmates are assigned a housing unit,

17   right?

18   *A.*  Correct.

19   *Q.*  And when you look at the inmate list, that housing unit

20   appears over here, right (indicating)?

21   *A.*  Yes.

22   *Q.*  So you'll see here, some of these inmates where it says S2,

23   those would be some of the inmates that you're referring to in

24   your statement; correct?

25   *A.*  Correct.

```
 1   Q.  All right.  Flipping back to the statement, you also say

 2   that the inmates in S3, and you say they're 27 of them, right?

 3   A.  Yes.

 4   Q.  They were seen on April 18th; correct?

 5   A.  Correct.

 6   Q.  And that was also the 90th day; correct?

 7   A.  Yes.

 8   Q.  That was the last day that you could had seen them and

 9   within your contact period; correct?

10   A.  Correct.

11   Q.  Now these are the same group of inmates that you emailed

12   Springfield about a couple months later; correct?

13   A.  No, ma'am.

14   Q.  No, they're not?

15   A.  Not the whole list.

16   Q.  Okay.  There were I think you said 11?

17   A.  Correct.

18   Q.  So 11 of the inmates on this list in Exhibit 17, this list

19   we've been looking at, 11 of these guys were the subject of

20   your email to Springfield a month later, right?

21   A.  Correct.

22   Q.  Now you always had an employee review board hearing for

23   that discipline; correct?

24   A.  Correct.

25   Q.  And you prepared a statement for that one as well, right?
```

Cook - Cross

```
 1   Now when you had the hearing for the going outside the chain of
 2   command and falsification of the -- or let's talk about the
 3   falsification of the report.  You told the hearing officer, who
 4   at that time was Mark Beckman, that you are actually making the
 5   entries more accurate; correct?
 6   A.   Correct.
 7   Q.   And that the information that you had entered into
 8   C.H.A.M.P.S. about these inmates was incorrect, right?
 9   A.   Incorrect as far as the date?
10   Q.   As far as the date you had seen them; correct?
11   A.   Correct.
12   Q.   Because I think you explained to the jury that when you log
13   into C.H.A.M.P.S. it defaults to a certain date, the date that
14   you're making the entry; correct?
15   A.   Correct.
16   Q.   And so you wanted Springfield to change that date back to
17   the actual date that you had seen those inmates; correct?
18   A.   Correct.
19   Q.   And in fact -- okay, wait.  I'm going to hand you what's
20   been marked as Defendant's Exhibit 20.  This is the employee
21   review board hearing for falsification of an official record;
22   correct?
23   A.   No, ma'am.
24   Q.   Oh, I'm sorry, it's for going outside the chain of command,
25   right?
```

1    *A.*  Yes.

2    *Q.*  And those were actually the two disciplines that had to --

3    both had to do with the email you sent, right?

4    *A.*  Yes.

5    *Q.*  And they both were -- you had the same -- you had one

6    employee review board hearing for both, right?

7    *A.*  Yes.

8    *Q.*  Okay.  I want you to turn to the second page.  This is the

9    email at the bottom where it says June 7, 2007 at 12:22 p.m.

10   That's the email that you sent to Deb Gordon in Springfield,

11   that's been -- that was at issue in your discipline; correct?

12   *A.*  Yes.

13   *Q.*  And you tell Ms. Gordon that you forgot to change the date

14   to show when you actually saw them, right?

15   *A.*  Correct.

16   *Q.*  And you say that you want her to change it for you, right?

17   *A.*  Correct.

18   *Q.*  And you tell her it will not affect the 90-day contact or

19   anything like that; correct?

20   *A.*  Correct.

21   *Q.*  And these inmates that are listed here, these 11 inmates

22   are all inmates for which you were disciplined for not seeing

23   within the 90 days; correct?

24   *A.*  Correct.

25   *Q.*  Now when you had your discipline hearing for the 90-days

1   contacts, you said you had seen them, right?

2   A.  I had seen them.

3   Q.  And the dates that you're asking this to be changed to here

4   in this exhibit that, you know, is on the screen right now,

5   those are the dates that are correct, those are the actual

6   dates you saw them, right?

7   A.  Not in every instance.

8   Q.  Well, then what are they?

9   A.  Well, let me rephrase that.  I saw them within the 90 days.

10  The farthest you can back date seeing an inmate is 14 days.  So

11  she -- even when she put them in there, it would not

12  necessarily reflect correctly that I saw them within the 90

13  days.  And she would have had to go in and type in the 14-day

14  limitation and then she would have had to type in inmate was

15  actually physically seen on such-and-such date.

16  Q.  And the date -- okay.  Did you ask her to type in inmate

17  was physically seen on such-and-such a date?

18  A.  No, you can't do both things at the same time --

19  Q.  Okay.

20  A.  -- with that system.

21  Q.  So what you're asking her to do is change the date in the

22  computer that it shows that the inmate was seen, right?

23  A.  No, the date that my entry should have been made when I

24  typed it into the computer.

25  Q.  Can you look at the email that you sent to Ms. Gordon,

1   please?

2   A.   Yes.

3   Q.   It says, "Deb, I had a few inmates that I forgot to change

4   the date on when I saw them when I was inputting it into the

5   computer."  That's what you said to Ms. Gordon; correct?

6   A.   That's what it states.

7   Q.   And you're asking her to change those dates, right?

8   A.   Of the entry.

9   Q.   Right.  Well your -- well your email speaks for itself.

10  That's what you wrote; correct?

11  A.   Yes.

12  Q.   And when you were writing this email to Ms. Gordon, you

13  wanted her to have all the information she needed so she knew

14  what she was changing, right?

15  A.   Right.

16  Q.   So you wouldn't want her to change a date that wasn't what

17  you meant, right?

18  A.   But that -- the memos typed wrong, I can tell you that.

19  Q.   The memo you typed?

20  A.   I made a mistake.

21  Q.   Okay.  I want to look at this a little more closely.  Can

22  you get Exhibit 17 back in front of you, please.  That's the

23  one that has the list of inmates.

24  A.   Yes.

25  Q.   And this is also the one that has your statement in it

1    explaining when it was that you actually saw the inmates;

2    correct?

3    A.  Correct.

4    Q.  And actually before I get into this, I almost forgot.  In

5    this discipline, the one from missing contacts, some of the

6    documentation that you provided to Ms. Taphorn was sign-in

7    sheets for the housing units, right?

8    A.  Yes.

9    Q.  And that was to show you were in the housing units on those

10   days seeing those inmates; correct?

11   A.  Correct.

12   Q.  Let me get to one.

13   A.  It shows the dates that I made rounds.

14   Q.  Doesn't necessarily show who you saw, right?

15   A.  Correct.

16   Q.  If would just show that you were in S2 or S3 on a certain

17   date that you signed in; correct?

18   A.  Correct.

19   Q.  Because every one who signs into those housing units has

20   to -- well, every one that goes into the housing units has to

21   sign in, right?

22   A.  Yes.

23   Q.  And this is an example of one of those sheets, right?

24   A.  Correct.

25   Q.  So you'll see here, there's a -- okay, well sort of close

1  to that arrow that I put on there that says date, right?

2  Slightly to the left of the arrow?

3  A.  Yes.

4  Q.  Okay.  That's the column for the dates of the housing book

5  log sheet, right?

6  A.  Correct.

7  Q.  So in this case that's April 9, 2007; correct?

8  A.  Correct.

9  Q.  And that's one of the dates in your hearing board that you

10  said you went to S2 and saw inmates, right?

11  A.  Yes.

12  Q.  And up at the top you can see it says S2; correct?

13  A.  Correct.

14  Q.  So this is the housing log for S2 on April 9th; correct?

15  A.  Correct.

16  Q.  And your signature appears right there (indicating), right?

17  A.  Yes.

18  Q.  And it says that you were there for about 45 minutes,

19  right?

20  A.  Correct.

21  Q.  And this is some of the proof that you provided to Ms.

22  Taphorn that you were actually in S2 seeing the inmates on that

23  list on April 9th, right?

24  A.  No, ma'am.

25  Q.  It's not?  This isn't something that you provided to

Cook - Cross

1    Ms. Taphorn to help prove that you were in S2 on April 9th

2    seeing inmates?

3    A.  You said seeing those inmates.

4    Q.  Okay.

5    A.  I was in South 2 seeing the inmates that were due to be

6    seen on that date.

7    Q.  Okay.  And you would agree with me that some of the inmates

8    that you were alleged to have missed their contact were due to

9    be seen on April 9th, right?

10   A.  Some of them were.

11   Q.  And you would agree with me that you told Michelle Taphorn

12   that it was on April 9th that you actually saw those inmates,

13   right?

14   A.  I saw the inmates in my housing unit.  If they were on my

15   list to be seen, I saw them.

16   Q.  So this document, which shows that you were in that housing

17   unit on April 9th, that would have been when you were seeing

18   those inmates, right?

19   A.  Right.  I would be seeing inmates, yes.

20   Q.  And you would have been seeing the inmates that you

21   allegedly missed their contacts, right?

22   A.  They were on the list.  I don't have that list in front of

23   me, ma'am.

24   Q.  Okay.  Well, let's put it in front of you.  All right.

25   This is the list of the inmates that you were allegedly late in

Cook - Cross

1  seeing, right?

2  A.  Correct.

3  Q.  And you would agree with me at least some of these are in

4  S2, right?

5  A.  Yes.

6  Q.  I'm not good with these arrows.  Now let's look at this

7  column says when they had last been seen, right?

8  A.  Correct.

9  Q.  Now 90 days from that date would have been April 9th;

10  correct?

11  A.  Yes.

12  Q.  Which is why you had to see them by April 9th, right?

13  A.  Correct.

14  Q.  And you told Michelle that you did see them on April 9th;

15  correct?

16  A.  Correct.

17  Q.  I want to look at the entry for Sean Kessler.  He's the

18  inmate that was in S2; correct?

19  A.  Correct.

20  Q.  And so this is one of the inmates that you would have seen

21  on April 9th, right?

22  A.  Correct.

23  Q.  Can you look at Defendant's Exhibit 20.  And I'm sorry,

24  April 9th was the 90th day for him to be seen; correct?

25  A.  Correct.

1    Q.  Can you look at Exhibit 20 for me, please?

2    A.  Okay.

3    Q.  Second page.

4    A.  Okay.

5    Q.  I'm on Page 485 of Exhibit 20.  When did you tell -- what

6    date -- you told Ms. Gordon in Springfield to change the date

7    that you saw Kessler to April 12th, didn't you, ma'am?

8    A.  Yeah.

9    Q.  That would have been three days after his contact with you;

10   correct?

11   A.  Correct.

12   Q.  You told Ms. Gordon that -- okay.  Let's look at inmate

13   Villanueva.  He's at the bottom of that page.

14   A.  Okay.

15   Q.  Also an S2; correct?

16   A.  Correct.

17   Q.  And that was the housing unit that you told Michelle that

18   you saw on April 9th; correct?

19   A.  Correct.

20   Q.  You told Ms. Gordon in Springfield you saw him on -- to

21   change to April 12th; correct?

22   A.  Correct.

23   Q.  Let's look at inmate Mr. Willis.  Same thing, right?

24   A.  Uh-huh.

25   Q.  Housing unit S2?

1    A.   Right.

2    Q.   Due on April 9th?

3    A.   Correct.

4    Q.   Told Michelle Taphorn that you saw him on April 9th?

5    A.   I did see him on April 9th.

6    Q.   And you provided a sign-in sheet from the housing unit

7    showing you were there on April 9th, right?

8    A.   Correct.

9    Q.   You told Deb Gordon to change it to the 12th; correct?

10   A.   Correct.

11   Q.   Let's look at Howard.  Now we're -- now it's going to get

12   complicated.  All right, Mr. Howard.

13   A.   Yes.

14   Q.   And you all have to help the jury out a little bit, but

15   he's one of the inmates that you have listed in your email to

16   Ms. Gordon; correct?

17   A.   Correct.

18   Q.   And he's also an inmate that was in S2; correct?

19   A.   Correct.

20   Q.   He's also an inmate that had to be seen by April 9th;

21   correct?

22   A.   Correct.

23   Q.   You also told Deb Gordon to change his date to April 12th;

24   correct?

25   A.   Correct.

Cook - Cross

1    Q.   Let's go to Inmate Shenault.  Also in S2; correct?

2    A.   Correct.

3    Q.   Also due April 9th; correct?

4    A.   Correct.

5    Q.   Also told Deb Gordon to change him to April 12th; correct?

6    A.   Correct.

7    Q.   I think the last one from S2 is Mr. Dixon.  He's also an

8    inmate in S2; correct?

9    A.   Correct.

10   Q.   He was also due on April 9th; correct?

11   A.   Yes.

12   Q.   Due on April 9th, right?

13   A.   Correct.

14   Q.   Told Ms. Gordon change it to April 12th; correct?

15   A.   Correct.

16   Q.   Mr. Ramirez.  Also S2; right?

17   A.   Correct.

18   Q.   Also due April 9th; correct?

19   A.   Correct.

20   Q.   Asked to be changed to April 12th; correct?

21   A.   Correct.

22   Q.   Now let's switch to S3 and go with Mr. Savage.  Okay, now

23   Mr. Savage is in S3; correct?

24   A.   Yes.

25   Q.   And you told Ms. Taphorn in your employee review board

Cook - Cross

1    hearing for missing the contacts that you saw S3 on, what was

2    it, February 18th; correct?

3    A.  Correct.

4    Q.  And you provided a sign-in sheet for a housing unit to help

5    support that; correct?

6    A.  Correct.

7    Q.  And let's take a look at that housing unit sheet.  This is

8    the housing unit sheet for S3; correct?

9    A.  Correct.

10   Q.  Now it's actually the housing unit sheet for April 19th;

11   correct?

12   A.  Correct.

13   Q.  That's the date after you told Ms. Taphorn that you were in

14   S3; correct?

15   A.  Correct.

16   Q.  Because these inmates in S3 were actually due on the 18th

17   of April; correct?

18   A.  Correct.

19   Q.  Well let's look at the inmate.  Mr. Savage, am I right?

20   Okay.  Just so the jury remembers, the last time you had seen

21   Mr. Savage, it was January 12, 2007; correct?  I'm sorry --

22   yeah.  January 12, 2007, right?

23   A.  Sure.

24   Q.  So his 90-day contacts were due on April 12, 2007; correct?

25   And I understand --

1    *A.*  I can't remember how the computer counts it, if it counts

2    it exactly 90 days, or if it counts calendar days, or total

3    days.  So I'm not sure.

4    *Q.*  All right.  Well you've agreed with me a number of times

5    that the inmates who were due on -- who you had last seen on

6    January 9, 2007 were due on April 9, 2007; correct?

7    *A.*  By then, yes, that would definitely been 90 days.

8    *Q.*  Okay.  So you would agree with me that the inmates that you

9    saw on January 12th would have been due on April 12th; correct?

10   *A.*  No, because there is 31 days in January, and 28.  The

11   computer counts it differently.  It's not a straight

12   January 12th to April 12th.

13   *Q.*  Okay.

14   *A.*  If I remember right.  And I'm thinking that it ticks it off

15   differently, but I can't remember for sure how it counts.

16   *Q.*  Been a few years since you did counseling work, right?

17   *A.*  Yes.

18   *Q.*  Is there a reason the inmates seen on January 9th would be

19   due on April 9th, but inmates seen on January 12th would not be

20   on April 12th?  Just a three-day difference in time, right?

21   *A.*  I'm trying to remember how they did January and the short

22   month of February.  I don't know if it -- for some things it's

23   one way and for some things it's the other.

24   *Q.*  Okay.

25   *A.*  And I'm not trying to be difficult, I just don't remember.

1    Q.  Well you don't have to agree with me then when it was due.

2    We'll go with that.  And let's go back to inmate Savage.  You

3    last saw him on January 12th; correct?

4    A.  Someone last saw him on January the 12th.

5    Q.  Well that was his last contact; correct?

6    A.  But it may not have necessarily been by me, the way the

7    inmates are moved around, it just shows that he's now on my

8    case load.

9    Q.  Ma'am, at the time that he was due to be seen in April, he

10   was on your case load, right?

11   A.  Right.

12   Q.  So the person who needed to see him within 90 days was you,

13   right?

14   A.  Yes.

15   Q.  And that didn't change at all depending on who saw him

16   before, right?

17   A.  It shouldn't have.

18   Q.  All right.  And Mr. Savage, last seen January 12, 2007, you

19   told -- look at the email that you sent to Ms -- to the lady in

20   Springfield.  You told her to change the date to April 12,

21   2007; correct?

22   A.  Correct.

23   Q.  Let's go to the next one.  And we'll just stay with this

24   exhibit for a second.  You told her to change the date for

25   inmate Jones to April 12, 2007; correct?

1    A.   Yes.

2    Q.   Inmate Jones.  And I think he's the one where there is

3    multiple guys with that last name.  Yeah, okay.  All right.

4    He's here (indicating), right?  Also in S3?

5    A.   Right.

6    Q.   Also last seen on January 12, 2007; correct?

7    A.   It's what it says.

8    Q.   The last inmate on the list that you sent to Springfield

9    and asked to be changed is inmate Harris; correct?

10   A.   Correct.

11   Q.   He was last seen on January 17, 2007, right?

12   A.   Correct.

13   Q.   And you asked that his date be changed to April 17, 2007;

14   correct?

15   A.   Correct.

16   Q.   Now let's just look at your email for one last time here

17   because I want to compare it to the particular -- I want you to

18   look at the last three inmates for me:  Savage, Jones, and

19   Harris.  Okay?

20   A.   Okay.

21   Q.   You asked their dates be changed to April 12th, April 12th,

22   and April 17th; correct?

23   A.   Correct.

24   Q.   And those are all the S3 inmates that we were just talking

25   to -- about, right?

1    A.  Yes.

2    Q.  You could go back to Exhibit 17, which is your statement

3    that you gave to Ms. Taphorn at the time you're being

4    disciplined for having missed contacts.  You told Ms. Taphorn

5    that the last day they could be seen and be within the 90 days

6    was April 18th, didn't you, ma'am?

7    A.  Where?

8    Q.  Look at your screen.

9    A.  Okay, I'm sorry.  Said they were seen on 4/18, which was

10   their 90th day.

11   Q.  So that was the last day they could be seen and be within

12   the contacts; correct?

13   A.  Correct.

14   Q.  Now you would agree with me the April 12th is before

15   April 18th, right?

16   A.  Correct.

17   Q.  And that April 17th is before April 18th, right?

18   A.  Correct.

19       MS. GUNDERSON:  Your Honor, this might be a good time

20   to break for lunch because I'm done with this section.

21       THE COURT:  Okay.  We'll go ahead and break for one

22   hour.  Be in recess for one hour for lunch.

23       I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
24   Date:  8/28/12        */s/ Daveanna Ramsey*
                      Daveanna Ramsey, Official Court Reporter

25

Cook - Cross