```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF ILLINOIS


BETTY D. COOK,                      )
                                    )
     Plaintiff,                     )
                                    )   09-cv-133-DRH
vs.                                 )   East St. Louis, Illinois
                                    )   May 27, 2011
ILLINOIS DEPARTMENT OF CORRECTIONS,)
                                    )
     Defendant.                     )



                       JURY TRIAL
                  VOLUME V - PM SESSION
          BEFORE THE HONORABLE DAVID R. HERNDON
          CHIEF UNITED STATES DISTRICT JUDGE, and a jury.


APPEARANCES:

For the Plaintiff:        Williamson, Webster et al.
                          by MR. THOMAS O. FALB, ESQ.
                          603 Henry Street
                          Alton, Illinois  62002


For the Defendant:        Illinois Attorney General's Office
                          by MS. JOANNA BELLE GUNDERSON, AAG
                          and MS. KELLY R. CHOATE, AAG
                          500 South Second Street
                          Springfield, Illinois  62706



Court Reporter:           Daveanna Ramsey, CSR
                          U.S. District Court
                          750 Missouri Avenue
                          East St. Louis, Illinois  62201
                          (618) 482-9124



     Proceedings recorded by mechanical stenography; transcript
produced by computer.
```

1        INDEX OF WITNESS EXAMINATION - VOLUME V (PM SESSION)

2                                            __DX__  __CX__  __RDX__  __RCX__ __FRDX__

| | DX | CX | RDX | RCX | FRDX |
|---|---|---|---|---|---|
| Michelle Taphorn | 831 | 856 | 870 | 873 | 875 |
| Patricia Rensing | 877 | 879 | 889 | 891 | |
| Betty Cook | 892 | | | | |

6                        INDEX OF EXHIBITS

| EXHBT | DESCRIPTION | Id'D | Admt'd |
|---|---|---|---|
| Plf's 17 | (11/29/07 incident report) | 888 | 900 |
| Deft's 17 | (5/5 ERO hrg - referral) | 839 | --- |
| Deft's 54 | (email: Taphorn to Danner) | 864 | 865 |
| Deft's 56 | (email: Cook to Rensing) | 879 | 881 |
| Deft's 63 | (radio system document) | 849 | 850 |
| Deft's 64 | (5/12/08 radio report) | 849 | 850 |

14             M I S C E L L A N E O U S

15                                                        Page

16  Jury Instruction Conference.............................900-906

17  Renewed Rule 50 Motion by Ms. Gunderson.....................906

20  ADJOURNMENT.................................................908

25                                       **i.**

1          *(Court reconvened.)*

2          *(Open court, jury present.)*

3          <u>MICHELLE TAPHORN</u>, DEFENDANT WITNESS, SWORN

4                      DIRECT EXAMINATION

5     BY MS. CHOATE:

6     *Q.*  Hi, Michelle.

7     *A.*  Hi.

8     *Q.*  Can you state and spell your last name for the record,

9     please.

10    *A.*  Taphorn.   T-A-P-H-O-R-N.

11    *Q.*  And your first name is Michelle?

12    *A.*  Uh-huh.

13    *Q.*  Where do you work?

14    *A.*  I work at the Centralia Correctional Center.

15    *Q.*  And in what capacity?

16    *A.*  I'm the Warden's Administrative Assistant.

17    *Q.*  How long have you been a Warden's Administrative Assistant?

18    *A.*  Officially since '03, I believe; and then I did six years

19    before that.

20    *Q.*  So is Warden Robert the only warden you've worked for?

21    *A.*  No, ma'am.

22    *Q.*  Who are the others?

23    *A.*  I worked for Bob Bolen.   I worked for Ron Haus, Howard

24    Peters, and George Welborn. [all phonetic].   All five of them.

25    *Q.*  Wow.   How long have you worked for the Department of

1    Corrections?

2    A.   Twenty-nine and a half years.

3    Q.   And have you spent all that time at Centralia?

4    A.   Yes, ma'am.

5    Q.   What other positions, if any, have you held at Centralia?

6    A.   I've been in the warden's office for all but two of those

7    years.  I began in the record's office, and then I took a

8    position in the warden's office.  And although it was in

9    different titles, I was the land administrator, but that title

10   filled in for the warden's secretary and assisted her at that

11   time.  And then I went from the land administrator to the

12   warden's secretary, and then to the warden's administrative

13   assistant.

14   Q.   And what are your duties as the warden's administrative

15   assistant?

16   A.   I'm his right hand.  I do a lot of research for lawsuits,

17   grievance hearings.  I do employee review hearings.  Any kind

18   of special projects that come up, anything routine around the

19   office.

20   Q.   Okay.  You mentioned that you have some responsibility

21   relating to grievances.  Can you tell us about -- are these

22   employee grievances?

23   A.   Yes.

24   Q.   Okay.  Tell us how the employee grievance process works at

25   Centralia.

1    *A.*   Okay.  Employees file a grievance through their local

2    Union, and it's -- the process is that it's supposed to be

3    heard at step one first, which is their supervisor.  They have

4    a meeting with their supervisor.  And if it's not resolved, it

5    goes to step two, which is with the warden normally or

6    assistant warden.  In that process, I may have to get

7    background information for it or things like that.  If a

8    resolution is not reached at step two, the local has the option

9    to set it up to step three, which is in Springfield.  And if a

10   resolution isn't made there, it can go onto step four, which is

11   PR, and then arbitration after that point.

12   *Q.*   Are you still involved at all when it gets to steps three

13   and four?

14   *A.*   Yes.

15   *Q.*   And what's your involvement at that point?

16   *A.*   Getting all the background information that is needed by

17   labor relations.  Any questions they have, they field them

18   through me, and I get documents they need or the answers they

19   need.  Just whatever they need.

20   *Q.*   So you're kind of the liaison between --

21   *A.*   Right, absolutely.

22   *Q.*   You also said that you are employee review hearing officer

23   as well?

24   *A.*   Right.

25   *Q.*   And how long have you been doing that?

Direct - Taphorn

1    *A.*   Since '03.

2    *Q.*   And who were you appointed to do that by?

3    *A.*   Warden Bowen.

4    *Q.*   Are you still an employee review hearing officer?

5    *A.*   Yes.

6    *Q.*   And we talked to Mark Beckman already, so we don't need to

7    go into the whole system, but how do the review hearings or the

8    referrals come to you?

9    *A.*   The referrals come into the warden's office and the

10   secretary will schedule them for one of the employee review

11   hearing officers.  We just recently added the majors on to help

12   do them, so she will schedule them with an employee review

13   hearing officer.  And she usually just -- it's pretty routine.

14   There's a memo that tells of all the requirements like when

15   they need to provide notification for the witnesses, if they

16   need to cancel, things like that.  She will generally schedule

17   them and sign that memo.  She has signature authority for the

18   employee review hearing officers and schedules it.  At that

19   point, it's -- the hearings are held.  And I don't know how far

20   you want me to go into this.

21   *Q.*   Well one thing I kind of wondered is how is it determined

22   which hearing officer hears which employee hearing.

23   *A.*   The secretary --

24   *Q.*   Okay.

25   *A.*   -- splits them up.

Direct - Taphorn

1   Q.   Just as according to your schedule or however she wants to?

2   A.   Whose available, things like that.

3   Q.   And when you do the hearings, what do you do after you make

4   your recommendation?

5   A.   I type up the report with my recommendation and --

6   Q.   Do you type your own?

7   A.   Yeah, I type my own.

8   Q.   Okay.

9   A.   And if -- it depends.  If it's, you know, there's a

10  discipline track for like unauthorized absences, those are

11  pretty cut and dry.  If it's something out of the ordinary that

12  I need to reach out to labor relations, then I reach out to

13  them.  Or if it's something that I think they may have already

14  have a precedent setting case for the whole agency that would

15  be helpful to keep it consistent, then we reach out to them as

16  well.

17  Q.   So you don't keep that information in your office there at

18  Centralia?

19  A.   The agency?

20  Q.   Right.

21  A.   No.

22  Q.   And at some point does your recommendation go to the

23  warden?

24  A.   Yes, then the recommendation goes to the warden.

25  Q.   How does that happen?

1    A.  I walk.

2    Q.  I mean do you carry it in yourself --

3    A.  Yes.

4    Q.  -- or do you give it to someone to forward to him?  How

5    does that work in your --

6    A.  Just carry it in.

7    Q.  Just leave it for him?

8    A.  Leave it for him.

9    Q.  Do you ever discuss your recommendation with the warden

10   prior to his signing off on it one way or the other?

11   A.  I may if depending on what labor relations says after my

12   recommendations already made, just whatever they had to comment

13   on the issue.

14   Q.  Does the warden ever tell you ahead of time at the time

15   you're assigned a hearing, does the warden ever tell you what

16   way he wants you to find?

17   A.  No.

18   Q.  Who refers the employee for discipline?

19   A.  The supervisor.  A supervisor.

20   Q.  So could it be any supervisor or just does it have to be

21   their supervisor?

22   A.  It can be any supervisor.

23   Q.  But employees don't refer each other for discipline;

24   correct?

25   A.  Right.

Direct - Taphorn

1    *Q.*  We heard from Mark Beckman about a packet that you would

2    receive prior to your hearing.  Is that your experience as

3    well?

4    *A.*  Yes.

5    *Q.*  And what's in the packet?

6    *A.*  Any pertinent documentation that usually comes from the

7    supervisor with the referral.

8    *Q.*  Okay.  At some point during your hearings is the employee

9    being disciplined or referred for discipline allowed to give

10   you things as well?

11   *A.*  Yes, they may.

12   *Q.*  And when they do that, do you review those?

13   *A.*  Yes.

14   *Q.*  Do you ever do any additional investigation after you hear

15   a hearing?

16   *A.*  Yes.  There are times when you need to.

17   *Q.*  What might that entail, the additional investigation?

18   *A.*  Maybe to verify something they had given you or to verify

19   something that, you know, a supervisor had said, management's

20   testimony at the hearing.  Things like that.

21   *Q.*  We've heard of some of Betty Cook's discipline, and they

22   were hearings that Mark Beckman did.  You'd said that you

23   sometimes reach out to labor relations; correct?

24   *A.*  Yes.

25   *Q.*  Do you recall reaching out to labor relations regarding any

1   charges that had been brought against Betty Cook in 2007?

2   A.   I believe I -- we had gotten previous instructions on cases

3   dealing with falsification of documents.

4   Q.   Okay.

5   A.   And it was some time prior to that.  And I kind of recall

6   that it was something said that two hearings should be held in

7   cases where there was a falsified document.  So I reached to

8   labor relations to ask them if that was appropriate, if I was

9   interpreting that correctly.

10  Q.   And were you?

11  A.   Yes.

12  Q.   And again, that wasn't a hearing that you were involved in;

13  correct?

14  A.   No.

15  Q.   After you've done a hearing and put it in the warden's in

16  box, do you have anything else to do with it?

17  A.   No.

18  Q.   Would you necessarily know if the employee filed a

19  grievance and it went further up the chain with those?

20  A.   If they had filed a grievance based on my involvement with

21  the grievance process, yes, I would know.

22  Q.   So you mean if they filed a grievance about you, or just a

23  grievance about the finding?  I'm confused as to which one

24  you're talking about.

25  A.   Either.

1    Q.   Okay.   And you're aware at some point sometimes the
2    grievance, as a result of a grievance, sometimes your
3    recommendation might be reduced; is that fair?
4    A.   Right.
5    Q.   At the time that you make your recommendation, does that
6    affect what you recommend as far as guilt or innocence on the
7    charge?
8    A.   No.
9    Q.   Now I previously, before lunch, gave you a copy of
10   Defendant's Exhibit 17, which is already in evidence, isn't
11   that correct?
12   A.   Correct.
13   Q.   And I asked you for, so we don't go through it here as we
14   had to do with Mark, to look through this document, didn't I?
15   A.   Yes.
16   Q.   Could you tell me what Defendant's Exhibit 17 is?
17   A.   It's an employee review hearing --
18   Q.   Yes.
19   A.   -- that I had heard on May 5th.   It's a referral from the
20   supervisor.
21   Q.   And what was the discipline that -- or what were the rules
22   that she was alleged to have violated?
23   A.   That she failed to make the face-to-face contacts with
24   inmates within the 90-day intervals and for failing to enter
25   the information into the C.H.A.M.P.S. system within.

```
1     Q.   Do you understand how the C.H.A.M.P.S. system works?

2     A.   Yes.

3     Q.   What is your understanding?

4     A.   It's my understanding that it's a system that they created

5     so that you could have an up-to-the-minute picture of an inmate

6     and who has helped him with things or what issues that we have

7     addressed on different things so that everybody could have the

8     full picture.

9     Q.   Is it -- why is it important that inmates be seen in 90

10    days, do you know?

11    A.   That's what the requirement is.

12    Q.   Just because it is a requirement?

13    A.   (Shook head.)

14    Q.   Yes?

15    A.   Yes.

16    Q.   Okay.  And is it also a requirement that those entries be

17    entered into C.H.A.M.P.S. at some point?

18    A.   Yes.

19    Q.   And so Defendant's Exhibit 17 is a referral, and is this a

20    referral that you heard as the hearing officer?

21    A.   Yes, ma'am.

22    Q.   And there are several documents attached to this exhibit,

23    isn't that true?

24    A.   Yes.

25    Q.   What are those documents?  Not each one, but...
```

Direct - Taphorn

1   *A.*   The back-up documentation that the supervisor submitted

2   with the referral.

3   *Q.*   Okay.  And here on this, is this your recommendation, your

4   notes of the hearing?

5   *A.*   Yes.

6   *Q.*   And you have the charge in here; correct?

7   *A.*   Yes.

8   *Q.*   You have who was present?

9   *A.*   Yes.

10  *Q.*   And at this one it was you -- Ann Casey was at this one;

11  correct?

12  *A.*   Correct.

13  *Q.*   CO Terry Walker was the ASME rep?

14  *A.*   Correct.

15  *Q.*   Oh, and here we go, I was wondering where Betty was.  And

16  Betty was also there as well, right?

17  *A.*   Yes.

18  *Q.*   Do you always read the referral?

19  *A.*   Yes.

20  *Q.*   And did Ann Casey give any statement at the hearing?

21  *A.*   Just the referral statement.

22  *Q.*   And is that uncommon or is that common?

23  *A.*   Very common.

24  *Q.*   You also have in here the employee statements.  And do you

25  take notes as you are doing the hearing?

1    A.   Shorthand.

2    Q.   Mark was having problems with that apparently.  So you do

3    take shorthand, so, okay, that's why this was really long.

4    Okay, good.

5    A.   Actually her statement on here, she gave a written

6    statement, as they do sometimes, they'll read it and then give

7    you a copy.

8    Q.   And did you incorporate that, you type it up as they gave

9    it to you?

10   A.   Yes.

11   Q.   And would you type up any other comments they made in

12   addition?

13   A.   Yes.

14   Q.   Says down here that you also have a place for an ASME

15   statement?

16   A.   Yes.

17   Q.   And the ASME person did make a statement, and I am not

18   there yet, and I apologize for making everyone dizzy.  What was

19   his statement, the gist of it?

20   A.   First of all he requested to have the hearing rescheduled,

21   which, according to the administrative directive, you have to

22   request that within 24 hours in advance.

23   Q.   And that wasn't done in this case?

24   A.   It wasn't done in this case.  And he also submitted a

25   request for documents which needed to be sent in advance.

1    Q.  And are the Union reps aware of this to your knowledge?

2    A.  Yes.  It's actually in the original memo that when they

3    schedule the hearing, it's form at the bottom, it's the second

4    to last paragraph, I think.

5    Q.  Okay.  And your recommendation is also listed here; is that

6    right?

7    A.  Right.

8    Q.  What was -- okay.  What was your recommendation for

9    Ms. Cook's hearing in that case?

10   A.  My recommendation was for a one-day suspension.

11   Q.  And what did you base that recommendation on?

12   A.  I based the recommendation on the hearing packet, the

13   referral from the supervisor, and the supporting documents, and

14   the testimony at the hearing, and whatever was presented at the

15   hearing.

16   Q.  Did you do any additional research in this case?

17   A.  Yes, I did.

18   Q.  What did you do?

19   A.  I did research on what Ms. Cook submitted at the hearing.

20   Q.  And in fact you found, I think it says you find one of the

21   charges valid?  The charges for the remaining inmates valid,

22   but you found one of them not; correct?

23   A.  Right.  Correct.

24   Q.  And this was also approved by Warden Robert, right?

25   A.  Right.

1   *Q.*  Did he -- do you recall this hearing at all?

2   *A.*  It's been a long time ago and I have done a lot of hearings

3   since then, but yes.

4   *Q.*  Do you know, and if you don't, it's been a while, but do

5   you know if you had any discussions with Warden Robert about

6   this?

7   *A.*  Not that I recall.

8   *Q.*  Did you have any discussion with Ann Casey about this?

9   *A.*  No.

10  *Q.*  And certainly did you have any discussion with Ann Casey

11  before this?

12  *A.*  No.

13  *Q.*  You've reviewed this discipline again today; correct?

14  *A.*  Correct.

15  *Q.*  And as you sit here, and after you reviewed it, do you

16  still stand by what your recommendation was in this case?

17  *A.*  Yes.

18  *Q.*  What do you do if you -- if were you to find that none of

19  the charges were warranted or were valid?

20  *A.*  I would dismiss the charges.

21  *Q.*  And you have that authority to do?

22  *A.*  Yes.

23  *Q.*  At any time during this hearing, and you said you do recall

24  it somewhat, did Betty Cook tell you that these things were

25  being done to her because of her age?

1  A.   No.

2  Q.   Was there any indication in your hearing of this, your

3  investigation, and your reviewing of the documentation that

4  Betty Cook's charges in this case were for anything other than

5  her job performance?

6  A.   No.

7  Q.   Do employees at the Centralia Correctional Center carry

8  radios?

9  A.   Yes.

10  Q.   Do all employees carry radios?

11  A.   No.

12  Q.   Which employees do?

13  A.   The radio is assigned to certain people on a daily basis,

14  and others by assignment.  For instance, correctional officers

15  mainly who are a yard officer where he'll need a radio, he will

16  check one out of the armory that day.

17  Q.   What about counselors, would they carry radios?

18  A.   Yes, counselors are assigned radios.

19  Q.   And why is that, do you know?

20  A.   So that we can get ahold of them, and safety, and

21  everything.

22  Q.   Because they're outside -- they're outside in different

23  housing units; isn't that right?

24  A.   Yes.

25  Q.   Is your job primarily in the administration building?

1    A.   Yes.

2    Q.   Are you familiar with how the radios work?

3    A.   Yes.

4    Q.   If someone was in trouble and needed to get help

5    immediately, how would they do that on the radios that are used

6    at Centralia Correctional Center?

7    A.   There is an orange button that we refer to as a panic

8    button that you press.

9    Q.   Okay.  Is there any sort of automatic panic button if the

10   radio is left on the side or horizontal?

11   A.   No.

12   Q.   Is there any way to tell -- do you know if there is any way

13   to tell if a panic button has been set off at any time?

14   A.   Yes, there's a report.

15   Q.   And where is that report generated?

16   A.   The armory.

17   Q.   Yesterday evening we asked you -- did we ask you to do

18   something?

19   A.   Yes.

20   Q.   What did we ask you to do?

21   A.   To get radio reports.

22   Q.   For what time period?

23   A.   The month of May.

24   Q.   In which year?

25   A.   2008.

1    *Q.*  And specifically did we ask you to look for something in

2    particular?

3    *A.*  For an alarm, emergency alarm.

4    *Q.*  And would that show up on this report?

5    *A.*  Yes.

6    *Q.*  Just a minute, please.  Can we have a sidebar, Your Honor?

7                    *(Sidebar conference, out of the hearing of the*

8                    *jury.)*

9            *THE COURT:*  Talk into the microphone.

10           *MR. FALB:*  Judge, this witness agreed to be cross

11   examined on some documents, looks like Defense Exhibit 63,

12   which I have never seen before.  There is no way I can prepare

13   for cross examination of this witness today.  They should have

14   produced this a long time ago.

15           *MS. CHOATE:*  We only got this information because

16   Betty Cook said on May 12th of 2008 that her radio was on it's

17   side in the bathroom, which caused an officer to have to charge

18   in there and save her.  These documents show that that is not

19   true.  And the only reason we had them even search for this was

20   because of the testimony yesterday, I believe it was yesterday,

21   and that's why we called Michelle last night.  It is to rebut

22   Ms. Cook's statements.

23           *THE COURT:*  Okay.  Well, objection is overruled.

24                   *(Sidebar ends.  Following proceedings held in*

25                   *the presence and hearing of the jury.)*

Direct - Taphorn

1    Q.   (BY MS. CHOATE)   And again, we asked you to find out some

2    information for us; is that correct?

3    A.   Correct.

4    Q.   What did you do to get this information?

5    A.   I contacted the radio officer and had him look at the

6    institution.

7    Q.   And was this last night?

8    A.   Yes.

9    Q.   At some point did you -- what did you do, did you pull some

10   records?

11   A.   Yes, we copied files from the radio program.

12   Q.   So you pulled files from the radio program.  Was there a

13   search done for any particular words to narrow down what you

14   were looking for?

15   A.   Yes.   Then we searched --

16   Q.   What were those words?

17   A.   Alarm.

18   Q.   So you put a search term alarm in; correct?

19   A.   Yes.

20   Q.   All right.   Then what happened?

21   A.   It didn't find an alarm on any of the days in May 2008.

22   Q.   And you checked for every day in May?

23   A.   Every day in May.

24   Q.   And you brought the documentation -- and let me show you

25   this first.   And I don't have another copy.   I'm showing you

Direct - Taphorn

```
 1    what's been marked as Defendant's Exhibit 64?
 2             MR. FALB:  Your Honor, could I have a copy?
 3             MS. CHOATE:  I don't have another copy.
 4             THE COURT:  Could you show it to him first.
 5    Q.   (BY MS. CHOATE)  And this is again Defendant's 64.  And
 6    what is that document?
 7    A.   This is the radio report from May 12, 2008.
 8    Q.   And is this a report that was run as a result of your
 9    looking for alarm as a search term?
10    A.   This report was run as a result of the radio transmissions
11    on this day, once this date was copied, then we did the search
12    for alarm within this document.
13    Q.   So that's the whole day?
14    A.   This is the whole day.
15    Q.   Okay.  And is the alarm anywhere in there?  Does it show up
16    that there was a transmission for an alarm --
17    A.   No.
18    Q.   -- going off?  Now I'm also showing you what's been marked
19    as Defendant's Exhibit 63.  And that's not in May of 2008, is
20    it?
21    A.   No.
22    Q.   What is that document?
23    A.   This document is a sample of what happens on the radio
24    system when the panic button is hit.
25    Q.   And why was that report generated?
```

Direct - Taphorn

1    *A.*   I just needed it for court.

2    *Q.*   So you needed to do it for court in another case?

3    *A.*   In another case.

4    *Q.*   Does that document show an example of what an alarm looks

5    like on the report?

6    *A.*   Yes.

7    *Q.*   And which page is that on?

8    *A.*   It's on Page 2.

9           *MS. CHOATE:*  Your Honor, I'd like to move Defendant's

10   63 and 64 into evidence.

11          *THE COURT:*  Same objection?

12          *MR. FALB:*  Yes.

13          *THE COURT:*  Over the objection it will be admitted.

14   *Q.*   (BY MS. CHOATE)  And I'm going to put this on the screen

15   here so that we can show the jury exactly what we're talking

16   about.  And again, this is not the May of 2008 one.  Let's talk

17   about this column here, what are these numbers?

18   *A.*   That's the time.

19   *Q.*   Okay.  And then some of these have start and end.  What

20   does that mean?

21   *A.*   That's when the microphone is keyed on a radio, start the

22   transmission.

23   *Q.*   So this is like everything, if a major is calling to the

24   lieutenant, and that just shows somethings happened between

25   these two radios?

Direct - Taphorn

1   A.   Yes.

2   Q.   Okay.   What is this?

3   A.   Alarm, emergency.

4   Q.   And what's SEC2?

5   A.   Security 2 is the program.   The radios have different

6   programs.   One is security 1 and security 2, which are the two

7   primary.   So we tested one on security 2, and I think on the

8   next page we tested one on security 1.   So it's just the --

9   Q.   Let's look on down here.   What's A20?

10  A.   A20 is the radio number.

11  Q.   And I see that there's some east and south, does that

12  designate cell houses?

13  A.   Yeah, those are radios.   For instance east 1, that's the

14  radio that's assigned to east 1, housing unit east 1.

15  Q.   Okay.   So if you can look at this report and tell who was

16  calling where and to whom?

17  A.   Yes, absolutely.

18  Q.   And how long it took?

19  A.   Right.

20  Q.   And this again was a test that you did on another -- for

21  another day?

22  A.   Yes.

23  Q.   Let's look at the next page.   And again I think you talked

24  about you did it on the other channel, right?

25  A.   Right.

1    Q.   What are these designations down here that are also

2    highlighted?   What's current?

3    A.   Once the panic button is hit, it has to be cleared.

4    Q.   Who clears it?   Does the person punching it clear it?

5    A.   It's two-fold.   The person punching it has to turn off

6    their radio and turn it back on to clear it; and it also has to

7    be cleared on the console in the armory.

8    Q.   So it would still be going if both things are not done; is

9    that right?

10   A.   Correct.

11   Q.   And so I see console canceled, does that indicate that it

12   was canceled in the armory?

13   A.   In the armory.

14   Q.   All right.   What does an arrow indicate?

15   A.   It indicates that the radio was turned on.   So it was

16   turned off and then turned back on with an arrow.

17   Q.   Okay.   And again, on Defendant's 64, none of those

18   designates who shows up for May 12th; correct?

19   A.   Correct.

20   Q.   Now I can't remember if you said, did you look at any other

21   days in the month of May of 2008?

22   A.   Every day.

23   Q.   Did these alarms show up during the month of May?

24   A.   None.

25   Q.   Have you ever heard of radios that would alarm

Direct - Taphorn

1    automatically?

2    A.  Yes.

3    Q.  Under what circumstances would that happen?

4    A.  The -- it was kind of a random conversation last night

5    while we're waiting for the reports to run.  The radio

6    officer --

7            MR. FALB:  Objection, hearsay.

8            THE COURT:  Sustained.

9    Q.  (BY MS. CHOATE)  Without saying what anybody said to you,

10   are you aware of a way to make radios do what we just talked

11   about, go off automatically?

12   A.  Yes.

13           MR. FALB:  Same objection.

14           THE COURT:  What's your objection?

15           MR. FALB:  Same objection.

16           THE COURT:  Overruled.  Just your own knowledge,

17   ma'am.

18           MS. CHOATE:  Pardon?  I'm sorry, Judge?

19           THE COURT:  Just her own knowledge.

20   Q.  (BY MS. CHOATE)  Right.  And to your knowledge, what would

21   have to be done to the radios?

22   A.  There's a specific piece that has to be installed on the

23   radio for that to happen.

24   Q.  Are those installed on the radio at Centralia?

25   A.  No.

1    *Q.*  Were they installed in 2008?

2    *A.*  No.

3    *Q.*  Do you know who Deb Brink is?

4    *A.*  Yes.

5    *Q.*  Who is Deb Brink?

6    *A.*  Deb Brink was a correctional counselor.

7    *Q.*  At some point she left --

8    *A.*  Yes.

9    *Q.*  -- the Correctional Center?  How did that happen?

10   *A.*  She passed away.

11   *Q.*  Okay.  Do you have any knowledge -- were you close with

12   Deb?

13   *A.*  Yes, she would come in and talk to me about random things.

14   She had a lot of personal issues.

15   *Q.*  Without saying what she said to you at any time, did she

16   ever talk to you about her work stressing her out?

17   *A.*  No.

18           *MR. FALB:*  Objection, hearsay, leading.

19           *THE COURT:*  Overruled.

20   *Q.*  *(BY MS. CHOATE)*  After Deb died, there's been some

21   testimony that Gina -- do you know Gina Feazel, first of all?

22   *A.*  Yes.

23   *Q.*  There has been some testimony that Gina Feazel cleared out

24   Deb's belongings.  Are you aware of how that came about?

25   *A.*  Yes.

```
 1   Q.  And what happened?

 2   A.  I ordered a meat and cheese tray and was going to take it

 3   to Deb Brink's mother and father, and I offered to take her

 4   personal belongings with me.  So Gina got them for me together

 5   in a box, and I took them when I took the meat and cheese tray

 6   because I thought they would like them.

 7   Q.  Was that the day Deb died?

 8   A.  No.

 9   Q.  Was that the next day?

10   A.  No.

11   Q.  Do you know about when that happened?

12   A.  I would say within the week.

13   Q.  When people are still bringing food?

14   A.  Right.

15   Q.  Right, okay.  Do you know anything about the employee

16   recognition pins?

17   A.  Yes.

18   Q.  Would -- first of all, what is an employee recognition pin?

19   And specifically if it has to do with years.

20   A.  It does have to do with years.

21   Q.  When would an employee get one of those pins?

22   A.  When they would reach a milestone mark, like five years, 10

23   years, 15 years.

24   Q.  How are those pins -- do you know how those pins were given

25   out in 2007, 2008?
```

Direct - Taphorn

1   *A.*  I can't recall exactly.  We used the -- the supervisors

2   would hand them out.  And then for a period when Warden Bowen

3   was there, he wanted to start handing them out at Christmas

4   parties.  And then after a couple of years of that, the

5   attendance wasn't good and they had left with more than what

6   they would give out, so they quit doing it like that, and they

7   would have the supervisors do it again.

8   *Q.*  So was there any kind of a party for each person that got a

9   pin?  I mean after -- after the Christmas party thing went

10  away?

11  *A.*  No.  Your pin is your thank you.

12  *Q.*  And that was given by the supervisor?

13  *A.*  Yes.

14        *MS. CHOATE:*  Just a moment, please.

15        *THE COURT:*  Sure.

16        *MS. CHOATE:*  Nothing further, Your Honor.

17        *THE COURT:*  Cross.

18                    CROSS EXAMINATION

19  BY MR. FALB:

20  *Q.*  Who is your supervisor, ma'am?

21  *A.*  Warden Brad Robert.

22  *Q.*  Are you his Assistant?

23  *A.*  Yes.

24  *Q.*  How long have you worked for him?

25  *A.*  Since January of 2005.

1   Q.  You do his legal research; is that correct?

2   A.  Yes.

3   Q.  You prepare for responses for the lawsuits?

4   A.  Yes.

5   Q.  I think you said you prepared the responses in this

6   lawsuit; is that right?

7   A.  Yes.

8   Q.  You prepare or -- prepare responses for grievances?

9   A.  Yes.

10  Q.  You are then doing also these hearings as far as a hearing

11  review board?

12  A.  Yes.

13  Q.  And I think you told us today that you're familiar with the

14  C.H.A.M.P.S. system?

15  A.  Yes.

16  Q.  In your deposition, did you tell us you had never ever used

17  the C.H.A.M.P.S. system?

18  A.  I have not used the C.H.A.M.P.S. system.

19        MS. CHOATE:  Objection, improper impeachment.

20  Q.  (BY MR. FALB)  Have you ever used the C.H.A.M.P.S. system,

21  ma'am?

22  A.  No.

23  Q.  Have you ever gone to a class for C.H.A.M.P.S.?

24  A.  No.

25  Q.  Have you ever watched someone use C.H.A.M.P.S.?

Cross - Taphorn

```
 1   A.   Yes.

 2   Q.   Have you ever been a counselor?

 3   A.   No.

 4   Q.   Have you ever watched what counselors do as far as

 5   entries --

 6   A.   No.

 7   Q.   -- into C.H.A.M.P.S.?  Are you more than an employee of

 8   Warden Robert?  I mean do you socialize with him outside?

 9   A.   I am his Administrative Assistant.

10   Q.   Do you socialize with him outside the workplace?

11   A.   No.

12   Q.   Assistant Warden Casey said that she would be on Warden

13   Robert's boat and you and your husband were there?

14   A.   That was after an institutional golf outing.

15   Q.   Oh, okay.

16   A.   And there was employees of Big Muddy, Vandalia, Southwest.

17   Q.   So you were or were not socializing?

18   A.   Well, I mean, yes.

19   Q.   Go to his bar?

20   A.   After an institutional golf outing.

21   Q.   You go to his bar?

22   A.   I have, yes.

23   Q.   Socialize there?

24   A.   I've gone there with other people before.  I've --

25   Q.   I'm not saying there's -- I'm not saying there is any kind
```

Cross - Taphorn

1    of thing going on between you and the Warden, but you do

2    socialize with him at his bar?

3    A.  Well, if I see him there, I'm going to say hi.

4    Q.  Now when you do these review board hearings -- first of

5    all, you don't have any qualifications to do it, do you?

6    A.  My experience.

7    Q.  Okay.  But never as a counselor or as a correction officer?

8    A.  To be an employee review hearing officer?

9    Q.  No, your experience.  Have you had any experience in those

10   areas?

11   A.  Of a counselor, did you say?

12   Q.  Yes.  Or even a correctional officer.

13   A.  No.

14   Q.  And as I understand your testimony, it's the warden -- you

15   make a recommendation and the warden either approves it or will

16   change it; is that correct?

17   A.  Correct.

18   Q.  And it's the warden that does your evaluations?

19   A.  Correct.

20   Q.  And he does it yearly or quarterly, if necessary?

21   A.  Correct.

22   Q.  And he has to approve your work; is that correct?

23   A.  Yes, sir.

24   Q.  Now I think you told me in your deposition, you correct me

25   if I'm wrong, that when you do these hearings, you believe the

Cross - Taphorn

1   testimony of the supervisors; is that correct?

2   A.  Well, yes.  I mean you have to when -- let me back up.

3   When the supervisor submits the referral, for instance if

4   somebody says that it was unauthorized absence for someone, you

5   know, for May the 5th, I will assume that the person was not at

6   work on May the 5th, so yes.

7   Q.  I mean the question was asked of you on Page 39.  Question:

8   "When Casey would make reports to you, such as here, involving

9   Betty Cook, would you automatically believe Casey?"  And your

10  answer was, "Would I automatically believe her?"  Question:

11  "Yes."  And your answer was, "When I get this referral I --

12  yes, I believe a supervisor."

13      Were those questions asked of you and did you give those

14  answers under oath?

15  A.  Yes.  Can I --

16  Q.  Were you represented by a lawyer at that time?

17  A.  Yes.

18  Q.  And have you talked to Warden Robert about this case?

19  A.  Scheduling people, and if I need clarification on documents

20  they requested, and that sort of thing.

21  Q.  Well, I mean have you talked to him about the merits of the

22  case?

23  A.  No.

24      MS. CHOATE:  I would object.  There is a privilege

25  issue here as well.

1      *THE COURT:*  Her talking to the warden?

2          *MS. CHOATE:*  She's the litigation coordinator and

3   liaison between us and them.

4          *THE COURT:*  Overruled.

5   Q.   (BY MR. FALB)  Are you the litigation coordinator?

6   A.   I am the litigation coordinator for this case, yes.

7   Q.   Are you the litigation coordinator for all the cases

8   against him?

9   A.   For the warden, yes.

10  Q.   And what's your husband do?

11  A.   My husbands retired.

12  Q.   What did he do when Betty was there?

13  A.   My husband was a Correctional Lieutenant.

14  Q.   What was his job?

15  A.   He was an Institutional Investigator.

16  Q.   He was the sole Institutional Investigator for Centralia

17  Correctional Center, wasn't he?

18  A.   Yes.

19  Q.   And any time Warden Robert needed someone, be it an

20  employee or whoever, investigated at that institution, he would

21  assign your husband to investigate that person, wouldn't he?

22          *MS. CHOATE:*  Objection, relevance, and outside the

23  scope of direct.  Her husband wasn't mentioned.

24          *THE COURT:*  Sustained.

25  Q.   (BY MR. FALB)  You said Deb Brink, she passed away; is

Cross - Taphorn

1    that correct?

2    A.  Yes.

3    Q.  And now you're telling the ladies and gentlemen of the jury

4    that she was never stressed out at work?

5    A.  She was stressed out at work, she had personal issues.

6    Q.  Are you telling the jury that her stress was because of her

7    personal issues --

8    A.  Yes.

9    Q.  -- and not because of Ann Casey?

10   A.  To my knowledge her stress was from her son.

11   Q.  You never saw her at work crying because of what was going

12   on there?

13   A.  No.

14   Q.  You didn't think the stress caught up to her and got to her

15   finally?

16   A.  No.

17   Q.  The panic button that you talked about, what you just

18   showed to us, that indicates that no one pressed a panic

19   button; is that correct?

20   A.  Correct.

21   Q.  In other words, in order to press the panic button, someone

22   has to physically press the button?

23   A.  Correct.

24   Q.  Have you ever done that?

25   A.  Yes.

Cross - Taphorn

1    Q.   Okay.  And but you were talking to someone last night and

2    you found out there was another way for the buzzer, or whatever

3    it is, the emergency thing to go on -- to go on, right?

4    A.   Not on our radios, no.

5    Q.   On someone's radios?  Is there a type of radio that has --

6    A.   Yes.

7    Q.   -- that capability?

8    A.   To my understanding, yes.

9    Q.   I assume you're not an expert at this, are you?

10   A.   No.

11   Q.   That's something that you decided to do at the request of

12   these attorneys last night?

13   A.   Yes.

14   Q.   And do you know whether the counselors or where Betty

15   worked were told that if the radio was put in a horizontal

16   position, like you're lying down on the ground, that there

17   would be an alarm emitted or someone would be contacted

18   concerning that going off?

19   A.   I know of nobody being told that.

20   Q.   Are you aware what they were told?

21   A.   I know of nobody being told that.

22   Q.   Okay.  Do you know one way or the other what they were

23   told?  I mean were you there for the teaching of the class?

24   A.   I don't know what you're asking.

25   Q.   Pardon me?

Cross - Taphorn

1    A.   I don't know what you're asking.

2    Q.   I'm asking you that when Betty got her radio, or anyone in

3    the counseling department received their radio, was there a

4    class that they were given?   Any kind of an education?

5    A.   I received some training in in-service training.

6    Q.   Do you know what they received, is my question?

7    A.   I would assume the same training as me.

8    Q.   But you weren't there, so you don't know what they were

9    told?

10   A.   I was not there.

11   Q.   How far have you gone in school?

12   A.   I have completed high school and I have some college.

13   Q.   Now you mentioned that in response to your attorney's

14   questions that at one time you reached out to labor relations

15   to determine if separate charges should be brought concerning

16   falsifying?

17   A.   Correct.

18   Q.   You said it was you that did that?

19   A.   Correct.

20   Q.   Showing you Defendant's Exhibit 54.   Do you recognize that?

21   A.   Yes.

22   Q.   What is that?

23   A.   It's the email that I sent to Kathleen Danner, our labor

24   relations rep.

25   Q.   Is that true and accurate?

Cross - Taphorn

 1   *A.*  Yes.

 2          *MR. FALB:*  Permission to publish this.

 3          *THE COURT:*  Any objection?

 4          *MS. CHOATE:*  No objection.

 5          *THE COURT:*  You may.  Are you asking to admit it into

 6   evidence?

 7          *MR. FALB:*  Yes.

 8          *THE COURT:*  Any objection to the admission?

 9          *MS. CHOATE:*  We don't.

10          *THE COURT:*  Admitted.

11          *MR. FALB:*  Thank you.

12   *Q.*  (BY MR. FALB)  Ma'am, is this a memo, an email from you to

13   labor relations?

14   *A.*  Yes, sir.

15   *Q.*  Now labor relations on the company side or the employee

16   side, this particular person?

17   *A.*  The labor relations unit is the agency.

18   *Q.*  Okay.  And here it says, is this you speaking, "Hi there.

19   I have something that A.W. Casey requested that I run by you."?

20   *A.*  Yes.

21   *Q.*  Is that Assistant Warden Casey?

22   *A.*  Yes.

23   *Q.*  We had a counselor that was recently disciplined one-day

24   suspension for not meeting the 90-day inmate contacts.  Was

25   that you that disciplined her?

 1   *A.*   I did the hearing, yes.

 2   *Q.*   "Assistant Warden Casey has two more referrals on this same

 3   counselor.  Evidently Casey was notified by Springfield that

 4   this counselor called up there to attempt to get dates changed

 5   in the computer, (I don't know why she was trying to get the

 6   dates fixed when she'd already been disciplined.  Of course she

 7   is grieving)."

 8       Is that you making that comment?

 9   *A.*   Yes.

10   *Q.*   She did one referral for attempting to falsify and one

11   referral for failure to follow the chain of command by not

12   informing her supervisor of the issue or requesting approval

13   for the changes.  She wants to know who is she, Casey?

14   *A.*   Yes.

15   *Q.*   She wants to know if two referrals is appropriate.

16   "Whatcha think?"  Is that you?

17   *A.*   Yes.

18   *Q.*   So it wasn't you asking about it, it was Casey?

19   *A.*   I'm the liaison for labor relations, so...

20   *Q.*   You were the conduit for Casey?

21   *A.*   I was the liaison for labor relations.

22   *Q.*   Doesn't this state that Casey was the one that wanted to

23   know, not you?

24   *A.*   She requested and I followed through with the request to

25   labor relations.

1    *Q.*  And were you acting like an impartial person?

2    *A.*  I wasn't acting one way or another, I was just trying to

3    get some information.

4    *Q.*  And even you, when you looked at this, you said what's

5    going on, she's trying to change the dates for these entries in

6    the computer system and she's already been disciplined by

7    you --

8         *MS. CHOATE:*  Objection to --

9    *Q.*  *(BY MR. FALB)*  -- is that true?

10        *MS. CHOATE:*  -- characterization of discipline by you.

11   *Q.*  *(BY MR. FALB)*  Well, you already found her guilty?

12   *A.*  The hearing that I did?

13   *Q.*  Yeah.

14   *A.*  I recommended one-day suspension.

15   *Q.*  And so what were you thinking when you put down, in

16   parenthesis, I don't know why she's trying to get the dates

17   fixed when she's already been disciplined?  What were you

18   thinking?

19   *A.*  I don't know what I was thinking.

20   *Q.*  Why did you put it down?

21   *A.*  I don't know.

22   *Q.*  And when you found her guilty, you found her guilty based

23   upon just looking at the C.H.A.M.P.S. entries, the dates in the

24   entries, isn't that true?

25   *A.*  I -- the information that was provided in the packet and

1    during the hearing is what I used to make my decision.

2    Q.  In the hearing, not only did the Union ask to receive all

3    the documents that they didn't have time to get them, but Betty

4    testified and gave information to you that the entries that she

5    made were late, but she had in fact seen the inmates within the

6    90 days, didn't she?

7    A.  And I believe my recommendation said that there was no --

8    Q.  Is that what she said?

9    A.  -- evidence.  I don't know.

10   Q.  You don't remember what she said?

11   A.  No, I don't remember.

12   Q.  You have that in front of you, don't you?

13   A.  No.

14   Q.  Showing you Page 585 of Defendant's Exhibit 17.  Is this

15   what -- how she responded?

16   A.  Yes.

17   Q.  And she went through the various inmates --

18   A.  Yes.

19   Q.  -- that you were questioning her about; is that correct?

20   A.  Yes.

21   Q.  And she told you that she had seen every single inmate

22   timely, didn't she?

23   A.  Yes.

24   Q.  And in all fairness to you, you just went by what the

25   computer documents said because they were too late, the actual

Cross - Taphorn

1    physical black-and-white entries, and chose to believe that

2    rather than Betty?

3    A.  I chose to believe the documentation I had.

4    Q.  You chose to believe the account of the supervisor, Ann

5    Casey?

6    A.  I chose to believe the documentation I had.

7    Q.  In fact, Ann Casey didn't have any personal knowledge of

8    this, did she?  She just produced the documents?

9    A.  I don't know.

10   Q.  And you know how many inmates my client was taking care of

11   at that time?

12   A.  No.

13   Q.  It was in excess of 400 or 500?

14   A.  I don't know.

15   Q.  If in fact my client had seen the inmates within 90 days,

16   she would have been not guilty, right?

17   A.  Right.

18   Q.  And even if she had missed the logging date or the

19   documentation date, she still would have been --

20   A.  Not guilty of seeing them within 90 days, but guilty of not

21   documenting in C.H.A.M.P.S..

22   Q.  But she wasn't charged with that, was she?

23   A.  Yes, she was.

24   Q.  Where does it say that she was charged with not

25   documenting?

Cross - Taphorn

1    A.   In Ann Casey's referral letter, I believe.

2    Q.   You didn't find her guilty of that, you found her guilty of

3    not seeing the inmates timely?

4    A.   I found the charges valid.

5    Q.   Pardon me?

6    A.   I found the charges valid.

7              MR. FALB:   Just one moment, Your Honor.

8              THE COURT:   Sure.

9              MR. FALB:   Thank you very much, Your Honor.

10             THE COURT:   Sure.   Any redirect?

11                        REDIRECT EXAMINATION

12   BY MS. CHOATE:

13   Q.   Michelle, I think you were cut off when you were asked

14   about a statement that you made in your deposition, whether you

15   would automatically believe the supervisor.   What did you mean

16   by that?

17   A.   When the supervisor submits the hearing, you trust that

18   they're submitting what they believe is the truth.   It doesn't

19   necessarily mean that you may find differently once you look at

20   the documents, or look at the requirements, or the testimony.

21   May not automatically mean the person was guilty or wouldn't be

22   dismissed.

23   Q.   And in fact, in Betty's case in the hearing you held, you

24   found that it wasn't valid as to one of the inmates that she

25   was charged of not seeing; correct?

1    A.   Correct.

2    Q.   If Betty Cook would have had some kind of proof other than

3    her word that she saw everybody in a timely manner, would that

4    have changed your recommendation possibly?

5    A.   If there was some type of documentation, yes.

6    Q.   In this case was there?

7    A.   No.

8    Q.   For the ones that you found against her on?

9    A.   Correct.

10   Q.   You were asked about labor relations.  Could you explain a

11   little bit what labor relations at the Department of

12   Corrections does, if you know?

13   A.   We reach out to them for any advice we need on random

14   things, any kind of, you know, anything from discipline, to

15   policy, to all sorts of things.

16   Q.   And are there attorneys, is that who you're talking to or

17   who do you talk to up there?

18   A.   I believe the assistant chief is an attorney, and the chief

19   is an attorney, but the other, not that I know of.  The other

20   reps, I don't know if they're attorneys or not.

21   Q.   But they just represent that department?

22   A.   Right.

23   Q.   Okay.  And you also talked about being a litigation

24   coordinator?

25   A.   Yes.

1    *Q.*   And you said for when the warden is sued?

2    *A.*   Uh-huh.

3    *Q.*   Yes?

4    *A.*   Yes.

5    *Q.*   And in this case the warden is not individually sued, is

6    he?

7    *A.*   No.

8    *Q.*   What does being the litigation coordinator entail as far as

9    your duties go?

10   *A.*   Everything from preparing document requests, to scheduling

11   people, to contacting people, to responding to requests.

12   *Q.*   So if our office were to want documents for a certain -- a

13   lawsuit, who would we call?

14   *A.*   You would call me.

15   *Q.*   And then you would, what?

16   *A.*   And then I would get them together.  If I had a question on

17   or needed some guidance, I would check with Warden Robert, and

18   give it my best shot.

19   *Q.*   Okay.  And part of your duties you said scheduling, would

20   that be like witness prep?

21   *A.*   Yes.

22   *Q.*   Where are witnesses generally when -- where is witness prep

23   done at Centralia?

24   *A.*   Usually in the warden's conference room.

25   *Q.*   Are there any other conference rooms at Centralia?

Redirect - Taphorn

1    A.   Well, there is a conference room in healthcare.

2    Q.   Where is healthcare located?

3    A.   Within the facility, behind the double gates.

4    Q.   So in the more secure area of the facility?

5    A.   Right.

6    Q.   Where are depositions done of employees?

7    A.   Deposition of employees are done in the conference room.

8    Q.   And is that regardless of whether say a plaintiff is

9    calling those deps?

10   A.   Yes.

11   Q.   And were some of the deps for this case done in that

12   warden's conference room?

13   A.   Yes.

14   Q.   And were these deps that were noticed up, we call them by

15   Plaintiff's counsel, deps that were taken by Plaintiff's

16   counsel?

17   A.   Yes.

18        MS. CHOATE:   I don't have anything further.   Thanks,

19   Michelle.

20        THE WITNESS:   You're welcome.

21        MR. FALB:   Just briefly.

22                    RECROSS EXAMINATION

23   BY  MR. FALB:

24   Q.   Hand you the one exhibit for the hearing, Defendant's

25   Exhibit 17.   My client did produce documents that you reviewed?

```
 1    In fact, her handwriting is on the right-hand side with an
 2    explanation next to every single inmate that you thought was
 3    late.  Do you remember that or not?
 4    A.  No.
 5    Q.  This is in the packet, right?  Well I received this Defense
 6    Exhibit 17.  Is that in fact in the packet that you got?
 7    A.  I don't recall.  I don't recall where for sure this came
 8    from.  The packet that I got with the referral was -- it didn't
 9    have any writing on it.
10    Q.  Okay.  Well did you prepare this Defendant's Exhibit for
11    these attorneys?
12    A.  Yes.
13    Q.  Where did you get it from?
14    A.  I got it from the file.
15    Q.  So does this mean at one point in time you had it?
16    A.  Yes.
17    Q.  And you chose not to believe it?
18    A.  Well, there is no dates.  There notes on there, but there
19    is no dates as to when they were seen.
20    Q.  And she testified to the dates before you?
21    A.  But they weren't documented.
22            MR. FALB:  Thank you.
23            THE COURT:  Additional direct?  I'm sorry, apparently
24    Mr. Falb is not done.  I apologize.
25            MR. FALB:  I got one question, Your Honor.
```

Recross - Taphorn

```
 1              THE COURT:  I'm sorry, I thought you were finished.
 2              MR. FALB:  I thought I was, too.
 3    Q.   (BY MR. FALB)  And just to refresh your recollection, top
 4    right hand corner is the date.
 5    A.   That's the date of the report that the report was run.
 6    Q.   Okay.
 7              MR. FALB:  Thank you.
 8                      FURTHER REDIRECT EXAMINATION
 9    BY MS. CHOATE:
10    Q.   Michelle, if Betty had given any document, including that
11    document at the hearing, would you have reviewed it?
12    A.   Yes.
13    Q.   And I think in fact you said you did some additional
14    investigation in this case, right?
15    A.   Yes.
16              MS. CHOATE:  Thank you.
17              THE COURT:  We done, Mr. Falb?
18              MR. FALB:  That's it.  Thank you.
19              THE COURT:  Ladies and gentlemen of the jury, any
20    questions?
21                   (Sidebar conference, out of the hearing of the
22                   jury.)
23              THE COURT:  The question is are there ERO hearings for
24    all write ups or just actions?  And if not, how is it decided
25    when to do a hearing and when not to do a hearing?  And the
```

1    second question is in these I guess hearings is it protocol

2    always guilty until proven innocent?

3         So, any objection?

4         *MS. CHOATE:*  I don't think that was her testimony,

5    but...

6         *MR. FALB:*  Just ask the first question.

7         *MS. CHOATE:*  Yeah, I don't know.

8         *THE COURT:*  So first question, but not the second

9    question.  Okay.

10              *(Sidebar ends.  Following proceedings held in*

11              *the presence and hearing of the jury.)*

12        *THE COURT:*  Question from the jury is:  Is there an

13   ERO hearing for all write ups or disciplinary complaints?

14        *THE WITNESS:*  Yes.  The exception might be if say a

15   supervisor refers somebody for an unauthorized absence, and

16   being up in the warden's office, if I know it was a situation

17   of maybe where they had alternate time approved by the warden

18   that the supervisor didn't have when they did do a write up, we

19   would not schedule it, we would just cancel it.

20        *THE COURT:*  Okay.  Any follow-up questions?

21        *MR. FALB:*  No, Your Honor.

22        *MS. CHOATE:*  No, Your Honor.

23        *THE COURT:*  All right.  Call your next witness.

24        *MS. GUNDERSON:*  Your Honor, we had a quick question

25   about a privilege issue that I'd like to figure out before I

```
 1    put her on the stand.
 2              THE COURT:  That the witness did?
 3              MS. GUNDERSON:  The witness did.
 4              THE COURT:  Oh, okay.  So we need to do that
 5    outside -- ladies and gentlemen, lets -- we need to take that
 6    up.  So we'll take a short break.  Same admonishments.
 7                    (Recess taken.)
 8                    (Open court, jury present.)
 9              THE COURT:  Call your witness, please.
10              MS. GUNDERSON:  Pat Rensing.
11              PATRICIA RENSING, DEFENDANT WITNESS, SWORN
12                       DIRECT EXAMINATION
13    BY MS. GUNDERSON:
14    Q.  Good afternoon, Pat.  Can you tell the jury your full name,
15    please.
16    A.  Patricia Ann Rensing.
17    Q.  Do you work?
18    A.  Yes, ma'am.
19    Q.  Where do you work?
20    A.  I work for the Illinois Department of Corrections at the
21    Pinckneyville Correctional Center.
22    Q.  And I see you have on an ASME shirt?
23    A.  Yes, ma'am.
24    Q.  Do you have any role -- what is ASME?
25    A.  ASME is the Union for the large block of state employees.
```

Direct - Rensing

```
 1    It stands for the American Federation of State, County, and
 2    Municipal Employees.
 3    Q.  Do you have any kind of a role with ASME?
 4    A.  Yes, ma'am.  ASME has what's known as a third level
 5    grievance committee.  We hear grievances on behalf of members
 6    underneath the master contract, normally on a monthly basis.
 7    And I'm elected from a body of my peers through contract
 8    delegates to serve on this committee.
 9    Q.  Do you know the Plaintiff Betty Cook?
10    A.  Yes, ma'am.
11    Q.  How do you know her?
12    A.  Betty worked at the Centralia Correctional Center while I
13    worked there, and then Betty also had grievances at the third
14    level.
15    Q.  Did you ever discuss her third level grievances with her?
16    A.  Yes, ma'am.
17    Q.  At any time did Betty make any statements to you about what
18    she wanted the resolution to be with her grievances?
19    A.  Yes.
20    Q.  What did she tell you?
21    A.  She was upset about discipline that had been served her
22    through disciplinary hearings.  And at one point we had a
23    conversation, and she was very upset, and I simply asked her, I
24    said what do you want out of this; and her response to me is I
25    want to retire with a clean record.
```

Direct - Rensing

1    *Q.*  Was that the first time that that proposal had been brought

2    to you with respect to Betty's third level grievances?

3    *A.*  Yes, ma'am.

4         *MS. GUNDERSON:*  I have no further questions.

5         *THE COURT:*  Mr. Falb.

6         *MR. FALB:*  Just one second.

7         *THE COURT:*  Sure.

8                        CROSS EXAMINATION

9    BY MR. FALB:

10   *Q.*  Mrs. Rensing, do you have any documentation concerning what

11   was going on as far as conversations with you and Betty Cook?

12   *A.*  I have none with me.

13   *Q.*  Okay.  There was a subpoena served on you by the State of

14   Illinois, the Attorney General's Office; is that correct?

15   *A.*  Well, I've never seen it.

16   *Q.*  Okay.  Let me show you what has been marked as Plaintiff's

17   Exhibit -- or Defendant's Exhibit 56.  Do you recognize that?

18   *A.*  It's an email Betty sent to me.

19   *Q.*  Okay.  Well, is this also an email from you to

20   Ms. Gunderson, the Defense attorney?

21   *A.*  Yes.

22   *Q.*  Okay.  It's an email from you to her where it's in response

23   to a subpoena, and you're sending to them, the Defense

24   attorneys, the only documents you have concerning what went on

25   five or six years ago -- or excuse me -- well, back in the fall

                        Cross - Rensing

1    of --

2             MS. GUNDERSON:   Objection to the mischaracterization

3    of the subpoena.

4             THE COURT:   The objection to the mischaracterization

5    of the subpoena, is that a --

6             MS. GUNDERSON:   The scope of what was requested.

7             THE COURT:   You didn't send her a subpoena?

8             MS. GUNDERSON:   No, she received a subpoena.

9             MR. FALB:   I've never seen a copy of it, that's why

10   I'm asking.

11            MS. GUNDERSON:   You would have.   I don't want to

12   argue.

13            THE COURT:   Overruled.

14   Q.   (BY MR. FALB)   Ma'am, did you receive a subpoena?

15   A.   I've never seen the subpoena.

16   Q.   Well, this is a -- can you read for the Judge and the jury

17   what your email says?

18   A.   Per the subpoena issued to me today, the following is

19   presented and commanded by you.

20   Q.   Keep going.

21   A.   The only email I can locate relative to Betty Cook, it is

22   my recollection that her grievances were handled at the ASME --

23   or IDOC ASME third level grievance committee level and I have

24   copied Aaron Gorman, contract administrator at ASME.   As I

25   explained to you, I am one member of a five-person committee,

Cross - Rensing

1    and Ms. Gorman chairs the committee on behalf of ASME.

2    Q.  So who signed it?

3    A.  Who signed what?

4    Q.  What you just read?

5    A.  I don't understand.

6    Q.  Well it says Pat Rensing there, is that you?

7    A.  Yes.

8    Q.  Did you sign that?

9    A.  Well, I mean it's just, you know, one of these emails where

10   you put it on there all the time.

11   Q.  Is that what you sent to the Defense attorneys?

12   A.  Yes, that's what I sent to her.

13   Q.  Is true and accurate?

14   A.  To the best of my knowledge.

15          MR. FALB:  Your Honor, I move to introduce this into

16   evidence, Defendant's Exhibit 56.

17          MS. GUNDERSON:  No objection.

18          THE COURT:  Admitted.

19   Q.   (BY MR. FALB)  Let's go over --

20          MR. FALB:  And if I could have this published.  Is

21   that okay, Your Honor?

22          THE COURT:  Sure.

23   Q.   (BY MR. FALB)  Okay, let's start at the top.  It says

24   Joanna Gunderson, is that the Defense attorney?  Do you see

25   that?

1    A.   Yes.

2    Q.   Okay.   And then the next it says from Patricia Rensing, is

3    that you?

4    A.   Yes.

5    Q.   Okay.   And is this an email to Ms. Gunderson from Patricia

6    Rensing?

7    A.   Yes.

8    Q.   That's you?

9    A.   Yes.

10   Q.   All right.   And you just read that, per the subpoena issued

11   to me today.   Did you receive a subpoena?

12   A.   This -- this is a different subpoena though than the one I

13   think you're talking about.   I thought you're talking about the

14   one that was for today.

15   Q.   No.   No.   I've asked you if you were issued a subpoena to

16   produce records.

17   A.   I just received a subpoena and I don't recall it.

18   Q.   Well it says March 3, 2010.   I've never seen it.   That's

19   why I'm asking.

20   A.   Right.   We have -- see we at the Department of Corrections

21   have litigation coordinators, and she would have made me a

22   copy, but this must have been the only thing I had.

23   Q.   That's what I'm trying to find out, ma'am.   And so the only

24   thing you could recover when looking at this subpoena was an

25   email that we have just below it from my client; is that

Cross - Rensing

1    correct?

2    *A.*  Well, I'm going to say it's the only email I could find.

3    *Q.*  That's what I'm trying to find out.  Did you make a search?

4    *A.*  I did the best search I know how.

5    *Q.*  I'm not criticizing you for that.

6    *A.*  Well, I'm not computer savvy.  I'm not that good at

7    searching to know how to find things.

8    *Q.*  Okay.  Whatever you did, you did your best, and this is all

9    you could find?

10   *A.*  This is the only email I could find.

11   *Q.*  All right.  And this is an email from my client dated

12   November 27, 2007; is that correct?

13   *A.*  Yes.

14   *Q.*  All right.  And it says:  "Pat, I was thinking about my

15   grievances the other night and realized I think I know why

16   management is telling you that the last suspension I served was

17   for 15 days instead of five.  They were not able to serve me

18   the 10-day suspension on ERO 7-128, renumbered 08-02, because I

19   was off work."

20       Did I read that correctly?

21   *A.*  Yes.

22   *Q.*  It says, "They had served me with a five-day suspension for

23   another one renumbered 08-01.  I was told by someone they

24   changed that paperwork from five day to read 15 days.  This

25   would be indirect relation to them combining the two hearings

Cross - Rensing

1    when they heard them and giving me separate discipline on

2    them."

3        Is that what that says?

4    A.  Yes.

5    Q.  Then talks about they took a 15 days pay from her and had

6    to change the paperwork to cover what they did.  It goes on to

7    say, "I do not have copies of the suspension papers and would

8    need to have them requested from personnel by the Union."  And

9    then she says, "I hope things are going better with hearings

10   this week, and I hope they settled my grievances and give me

11   back the 18 days of pay they owe me and take the discipline out

12   of my personnel file."

13       Is that what she said there?

14   A.  That's what she wrote.

15   Q.  And she goes and says, "Just so you know, my first day back

16   to work on 11/14/07, Assistant Warden Flag called me in to

17   correct my 201's."

18       That's her evaluations?

19   A.  Yes.

20   Q.  "That were done wrong.  He has taken care of all of them,

21   i.e., annuals and quarterly.  Thanks for that."

22       And that's where you were able to get what Casey had done

23   corrected; is that right?

24   A.  Sir --

25   Q.  If you don't remember, that's fine?

1    A.   I mean I don't recall it that clearly.

2    Q.   And I'm sorry, it's been years, and if you don't recall

3    something, that is fine.  Okay?  Just tell us.

4    A.   Yeah.

5    Q.   All right.  Then goes on to say, "However, they are still

6    allowing Gina to run the department.  Assistant Warden Bates

7    has been very decent to me so far.  Warden Robert and Michelle

8    Taphorn do not talk to me or even look at me for that matter.

9    They are still in shock I think that I want -- they are still

10   in shock I think that I went back to work.  Kim Atchison on the

11   other hand is just as "nasty" as ever.  Do you think they will

12   settle my grievances this month or will they be sent to pre

13   arb?  Hope things go well."

14        Did I read that correctly?

15   A.   Uh-huh.

16   Q.   And I understand that you do a lot of these; is that

17   correct?

18   A.   Correct.

19   Q.   All right.  And this is the only written document that goes

20   back to Betty and what you were doing, or what this third

21   grievance committee was doing, right?

22   A.   She had several grievances out there.

23   Q.   Okay.  All I'm asking is this the only written document --

24   let me ask it this way.  Is this the only written document that

25   you had as far as communications between Betty and you?

Cross - Rensing

1    A.  This is the only one that I had.

2    Q.  Okay.  And you indicated that Betty was extremely upset as

3    to what was going on; is that right?

4    A.  Yes.

5    Q.  Okay.  She was upset at the number of disciplines, the

6    number of days off; is that correct?

7    A.  Well, she was upset about the discipline.

8    Q.  Okay.

9    A.  I don't know the actual number of days off.

10   Q.  Okay.  Do you remember any of the specific conversations

11   you had with Betty or any of the other third level grievance

12   persons?

13          MS. GUNDERSON:  I'm going to object to the scope on

14   the third level grievance persons, and also as vague.

15   Q.  (BY MR. FALB)  Okay, I'll re-ask.  Do you remember any of

16   the -- you said you were only one member of the five-person

17   committee?

18   A.  Yes.

19   Q.  Okay.  I don't know anything about this.  Do you remember

20   any of the conversations you had with the committee concerning

21   Betty?

22          MS. GUNDERSON:  I'm going to object to outside the

23   scope.

24          THE COURT:  Overruled.

25   Q.  (BY MR. FALB)  Do you remember any of the conversations

Cross - Rensing

1    they had about Betty?

2              *MS. GUNDERSON:*  Objection to hearsay.

3              *THE COURT:*  Not as to remembering conversations.

4    Without talking about the conversations, just do you remember

5    the conversations.

6              *THE WITNESS:*  Well, I'm not going to remember a

7    specific conversation.

8    *Q.*   *(BY MR. FALB)*  I'm just asking.

9    *A.*   Yeah.  No, I don't recall a specific conversation.

10   *Q.*   All right.  Do you remember any specific conversations that

11   you had with Betty?

12   *A.*   The only one that I remember is there were several

13   disciplines because, see, we had several successful grievances

14   with Betty.

15   *Q.*   Okay.

16   *A.*   And from my recollection during this period of time, there

17   were numerous grievances going on.

18   *Q.*   Okay.

19   *A.*   And we got to this discipline, and she had phoned me, and I

20   called her back.  We had phone conversations because she was

21   wanting the discipline gone.

22   *Q.*   Sure.

23   *A.*   And one of the last conversations we had, I asked her, I

24   said, well, they were wanting to reduce some of the discipline,

25   and she wanted more than a reduction.  And so I asked her, I

Cross - Rensing

1   said, what do you want out of this?  Because otherwise it's not

2   satisfied at third level, there is another step that we move it

3   on known as pre-arbitration, it can go further.

4   Q.  Okay.  Okay.

5   A.  And that's when she said, she said that she wants to retire

6   with a clean record.

7   Q.  Sure.  Okay.  Let me ask you this, showing you Plaintiff's

8   Exhibit 17, which is a summary of a conversation of

9   November 29, 2007 at 2:40 p.m.

10         MS. GUNDERSON:  Objection, beyond the scope.

11         THE COURT:  I know where you're going.  May I see it?

12   Overruled.

13   Q.  (BY MR. FALB)  Ma'am, do you recognize that document?

14   A.  No.

15   Q.  Okay.  Does that document, in reading it, refresh your

16   recollection?

17   A.  This is the first time I've ever seen this document.

18   Q.  Okay.  That's all right.  You can read it.  Does it refresh

19   your recollection, is what I'm asking you, after you read it?

20         MS. GUNDERSON:  Improper foundation for refreshing

21   recollection.

22         THE COURT:  Sustained.

23         MR. FALB:  I'll lay a foundation, Your Honor.

24   Q.  (BY MR. FALB)  Ma'am, on November 29, 2007, at 2:40 p.m.,

25   or in the afternoon thereabouts, do you remember having a

Cross - Rensing

1   telephone conversation with my client?

2   A.  No.

3   Q.  Okay.  I want to show you this exhibit, Plaintiff's Exhibit

4   17.  Is that something that might refresh your recollection

5   about that conversation?

6   A.  No.

7   Q.  Have you read this?

8   A.  No.

9   Q.  You want to read it?

10  A.  No.

11          MR. FALB:  I saw that, Judge.

12          THE COURT:  Sorry.

13  Q.  (BY MR. FALB)  Do you remember my client ever indicating a

14  specific date that she wanted to retire?

15  A.  No.

16  Q.  You know when she retired?

17  A.  No.

18  Q.  Do you remember when she could have retired?

19  A.  No.

20          MR. FALB:  Thank you.

21          THE WITNESS:  Uh-huh.

22          THE COURT:  Redirect.

23                    REDIRECT EXAMINATION

24  BY MS. GUNDERSON:

25  Q.  Pat, prior to you getting the subpoena to come here today,

Cross - Rensing

1   we had talked a year or so ago, right?

2   A.   Correct.

3   Q.   And do you recall me asking you to look for any

4   correspondence you had from Ms. Cook?

5   A.   Yes.

6   Q.   And you recall me telling you that if you wanted a

7   subpoena, I would be happy to provide that to you, since they

8   were ASME communications?

9   A.   Yes.

10  Q.   Do you remember getting that subpoena?

11  A.   Yes.

12  Q.   And the email that you saw, was that produced pursuant to

13  that subpoena?

14  A.   Yes, it was.

15  Q.   Okay.  The only conversation you remember with Ms. Cook is

16  the one that she wanted to retire with a clean record, right?

17  A.   That's the main conversation that I remember with her.

18  Q.   And I think you testified that was the first time that that

19  subject had been brought up?

20  A.   Yes, that's the first time that subject was forever

21  mentioned.

22  Q.   If Ms. Cook had said that it was the Department that

23  brought up the idea that her discipline be expunged in exchange

24  for her retirement, would that be a true statement?

25  A.   No, ma'am.

```
 1              MS. GUNDERSON:  No further questions.
 2                       RECROSS EXAMINATION
 3    BY  MR. FALB:
 4    Q.  Ma'am, do you recall on November 29, 2007, at 2:40 p.m.,
 5    having a conversation with my client where you told my client
 6    that the committee was hearing my grievances 481440, 488641,
 7    488550, and the offer on the table was that if I would agree to
 8    retire by 12/31/07 and put that in writing today, management
 9    would expunge all my discipline and give me a clean record.
10         Do you recall telling my client that?
11    A.  I did not tell your client that.
12    Q.  You deny saying that?
13    A.  Yes.
14              MR. FALB:  Okay.  Thank you.
15              MS. GUNDERSON:  No further questions.
16              THE COURT:  Ladies and gentlemen of the jury, like to
17    ask a question?  Ma'am, would you like to leave the witness
18    stand?  You can step down.  Next witness.
19              MS. GUNDERSON:  Can we just have a couple of minutes
20    to make sure we have everything in before we --
21              THE COURT:  Oh, sure.  I'll let you make sure all your
22    exhibits are admitted afterwards.
23              MS. GUNDERSON:  Okay.
24              THE COURT:  You don't have to do it formally, I'll
25    give both sides time to make sure.
```

1      MS. GUNDERSON:  We have no further witnesses.

2      THE COURT:  Okay.  So you want to recall your rebuttal

3  witness?

4      MR. FALB:  Yes, Plaintiff.

5      THE COURT:  Ms. Cook, you're still under oath.

6          BETTY COOK, PLAINTIFF, PREVIOUSLY SWORN

7                    DIRECT EXAMINATION

8  BY MR. FALB:

9  Q.  Ma'am, showing you Plaintiff's Exhibit 17.

10     MS. GUNDERSON:  I'm sorry, Tom, what did you say?

11     MR. FALB:  Seventeen.

12 Q.   (BY MR. FALB)  First of all, do you recognize that

13 exhibit?

14 A.  I do.

15 Q.  Describe for the ladies and gentlemen of the jury what that

16 exhibit is.

17 A.  It's an incident report that I wrote on November the 29th

18 of 2007, after I received a call at my work station from

19 Patricia Rensing who was in Springfield serving on a third

20 level grievance committee.

21 Q.  What time did you receive it?

22 A.  At approximately 2:40 p.m. in the afternoon.

23 Q.  Did you write that incident report at that time?

24 A.  I wrote it at 3:30 on my way home and turned it into the

25 armory in an envelope for the shift commander, because after

1    3:00 o'clock that's who you turn your incident reports into.

2    Q.  Does that summarize the conversation you had with Pat

3    Rensing on the telephone?

4    A.  It certainly does.

5    Q.  Read for us what was said by Pat Rensing to you.

6         *MS. GUNDERSON:*  I'll object to hearsay.

7         *MR. FALB:*  It's impeachment, Your Honor.

8         *THE COURT:*  Overruled, you can read it.

9    Q.  *(BY MR. FALB)*  Go ahead.  You can read from the top.

10   A.  "On this date, 11/29/2007, at 2:40 p.m., this employee, and

11   in parentheses Betty Cook, received a phone call at the

12   Centralia Correctional Center from Pat Rensing.

13       Ms. Rensing was calling from Springfield, Illinois and

14   acting in the capacity of a Union representative on the third

15   level grievance hearing committee, which was meeting with

16   management during the week of November 26th through 30th, 2007.

17   Ms. Rensing informed me that the committee was hearing my

18   grievances number 481440, number 488641, number 488550; and the

19   offer on the table was that I would agree to retire by

20   12/31/07, and put that in writing today, management would

21   expunge all my discipline and give me a clean record.

22       After discussion with my husband, I declined this offer and

23   told Ms. Rensing to relay the same, no, in parentheses, to

24   management representatives at this meeting.

25       End of report, signed Betty Cook, 11/29/07, 3:30 p.m."

1   Q.  And is that truly and accurately what took place during

2   that telephone call with Ms. Rensing?

3   A.  That is exactly what took place.

4   Q.  Okay.  And I, you know, she doesn't have any documents

5   except for that one email.  And let's be fair, were there --

6   did you -- were you upset about the grievances?

7   A.  I was extremely upset about the grievances, and the

8   discipline, and the whole process of having to fight for what I

9   felt was something that had -- should have never happened in

10  the first place.

11  Q.  Okay.  And let me ask you about you heard the testimony of

12  Michelle Taphorn today about the radio?

13  A.  Correct.

14  Q.  She said in order to put on the emergency device you have

15  to press a panic button or something like that?

16  A.  Yes.

17  Q.  Tell the folks in the jury box how you were taught.

18  A.  When I was issued a radio at the Centralia Correctional

19  Facility, I was required to take training, as she stated she

20  was.  And in that training, the officer that trained me, and I

21  believe it was Lieutenant Merrell [phonetic] at the time,

22  because I received my initial radio when I worked in the

23  major's office because I worked what they consider behind the

24  admin wall of the administration building.  At that time I was

25  told that if you leave your radio horizontal --

Direct - Cook

1          *MS. GUNDERSON:*  Objection to hearsay.

2          *THE WITNESS:*  I was trained that if you leave your

3    radio horizontal --

4          *THE COURT:*  Objection is sustained.  You can't say

5    what they said.

6    *Q.*  *(BY MR. FALB)*  Okay.

7    *A.*  Sorry.

8    *Q.*  I'll rephrase it.  Did you receive training concerning the

9    radio and if it went horizontal?

10   *A.*  I did.

11   *Q.*  Okay.  Based upon that training, whether it was right,

12   wrong, or indifferent, what was your assumption if you were to

13   put the radio horizontal on the floor?

14   *A.*  My belief was it would sound, or something would beep in

15   the armory, or a light go off, or something, to let them know

16   that I was down.

17   *Q.*  Okay.  I assume you're not a radio expert?

18   *A.*  I am not.

19   *Q.*  Okay.  And I guess Ms. Taphorn was testifying -- because

20   the other day you mentioned that when you were upset, you were

21   in the bathroom, and a guard came into the woman's restroom?

22   *A.*  The door.

23   *Q.*  The door, not knocked on the door, okay.  And that lead you

24   to believe that perhaps the radio had done that?

25   *A.*  He found out somehow that I was in the bathroom throwing up

Direct - Cook

1    with my radio horizontal.

2    Q.  Well whether it was the radio doing that or the sounds from

3    you --

4    A.  Yeah.

5    Q.  -- or from anything, you don't know?

6    A.  No, I don't.  I assumed the radio.

7    Q.  That's fine.  Whether it was the radio or not is really not

8    important, is it?

9    A.  No.

10   Q.  Okay.  You heard the testimony of Mrs. Cagle today?

11   A.  Yes.

12   Q.  And unfortunately, and I'm embarrassed, but I asked a

13   question about her, whether she had any personal personality

14   differences with you.  Do you remember that?

15   A.  Yes.

16   Q.  And she said no, do you remember that?

17   A.  Yes.

18   Q.  What -- and I don't want go into detail, but was she upset

19   at you because you talked to her boyfriend?

20   A.  Yes.

21   Q.  I mean, it was an innocent thing?

22   A.  I had known him from when I worked in the major's office

23   and he had brought various things.  I mean I had contact with

24   most of the green shirts, you know?

25   Q.  Whether it's right or wrong, whatever, was she upset?

1    A.   She told me not to talk to him anymore.

2    Q.   How many times?  Were there two incidents?

3    A.   Two that I know off the top of my head.

4    Q.   And at the time did you even know that they were dating or

5    anything because he was married to someone else?

6    A.   There was loose talk around the prison, but I don't take up

7    gossip.

8              MR. FALB:  Thank you.

9              THE COURT:  Cross.

10             MS. GUNDERSON:  I have no questions.

11             THE COURT:  Okay, you can step down.  Any other

12   rebuttal testimony?

13             MR. FALB:  No.

14             THE COURT:  Okay.  No surrebuttal or anything?

15             MS. GUNDERSON:  No.

16             THE COURT:  So folks, that's all the evidence in the

17   case.  We've got a few more -- we've got most of the

18   instructions done, and we have a few more to do, and clearly

19   there isn't enough time to close today in any event.

20             So as far as you're concerned, we're going to quit for

21   the day.  We're going to stay here and finish up the other

22   instructions so that I have all the instructions done by

23   Tuesday morning.

24             So I want to repeat the admonitions I have been

25   saying, the same admonitions over and over again.  So let me go

Direct - Cook

1    over them.  Probably one of the most important ones at this

2    point is to highlight with you that you keep an open mind and

3    don't individually, over the weekend, think about the case and

4    make up your mind.  The reason for that, even though you

5    already heard all the evidence, is that the law part of the

6    case, I think, is pretty important.  Because that's, you know,

7    I'm the judge of the law, and so I kind of think that's

8    important.  But beyond that, it is significant for you to

9    listen to the instructions and the law because those are the

10   rules of what you will apply to the facts that you have been

11   hearing.

12          And you're the judges of the facts, and nobody can

13   tell you what the facts of the case are except you.  And then

14   you will apply the law that I give you to those facts.  But

15   when I say that you're the judges of the facts, what I'm

16   talking about is all 12 of you.  And so it is important for the

17   12 of you to sit down Tuesday morning and talk it out and to

18   decide collectively what the facts of the case are, and who

19   wins the case of course.

20          So if you were to think individually over the weekend,

21   well this is what I think about this case and who should win

22   and who should lose, then you're cutting out the other 11 from

23   that thought process.  That really isn't fair to your fellow

24   jurors.  And it's not fair, by the way, to the parties that

25   have been presenting this testimony to you all week.  So that's

 1   why I asked you to make sure to keep an open mind over the

 2   weekend.

 3         And of course, likewise, to keep away from talking

 4   about the case with other people so that they don't start

 5   innocently talking to you about what they think about these

 6   kinds of cases.  That in and of itself is sort of a

 7   deliberation because it gets you thinking about the case and

 8   what you might do.

 9         I asked you yesterday afternoon if we made any phone

10   calls and tried to make the arrangements for coming back

11   Tuesday, if any of you were going to have a problem.  Is

12   anybody going to have a problem coming back Tuesday?

13                    *(No response.)*

14         THE COURT:  No problems, great.  That's just super.

15   We appreciate your effort and apologize for missing our

16   judgment about how long it was going to take.  That just

17   happens.  It's not just this case.  I assure you that this is

18   not the only case that I ever had that ran over.  And it just

19   does happen.

20         So with those admonishments, folks, have a great

21   three-day weekend.  We'll see you Tuesday.  Yes, ma'am?

22         *JURY MEMBER:*  Do you feel it will be over on Tuesday?

23         *THE COURT:*  Oh, absolutely.  Yeah.  Only thing we have

24   to do is we'll start out -- first thing we'll do is read the

25   jury instructions, not all of them, but almost all of them; and

1    then you'll hear the closing arguments, which I don't know how

2    long they'll take.  I don't put limits on the lawyers.  So

3    they'll talk to you for let's say hour and a half or

4    thereabouts.  And then I'll read about three or four more

5    instructions and show the verdicts forms, and you'll get the

6    case.  All right?  Okay.

7                       *(Jury exits the courtroom.)*

8              MR. FALB:  I would move to introduce exhibits,

9    Plaintiff's Exhibit 17 and Defendant's Exhibit 56, I think.

10             MS. CHOATE:  We had no objection to 56.  We had the

11   hearsay objection to 17.

12             THE COURT:  Yeah, they're both admitted, 17 over

13   objection.

14                       *(Recess taken.)*

15                       *(Open court, no jury.)*

16             THE COURT:  Let's go on the record.  The jury has left

17   for the evening.

18             And we've been talking about the instructions

19   informally in conference and off the record.  We're now

20   prepared to put them on the record the instructions the Court

21   will be giving.

22             The Court has already given preliminarily the Court

23   Instructions 1-6.  Read those prior -- at the start of the

24   trial, rather.  The Court will give, when we resume, Court

25   Instructions 7 and 8.  The Court instruction 7 is based on

1    Seventh Circuit Pattern 1.37.  1.37.  And then the Court

2    Instruction 8 is based on Seventh Circuit Pattern 3.01.

3         The Court was not satisfied with the instructions

4    tendered by the parties on those, so I modified some language.

5    In fact, fact of the matter is the Court Instruction 7 was not

6    tendered by either party.  1.37 pattern was not tendered by

7    either party.  Court Instruction Number 8, the 3.01, was in

8    essence Plaintiff's 19, which I modified.  It was either 18 or

9    19.  But I modified it and changed the language of had to

10   resign to, compelled to resign, and then put in the protective

11   class language of over 40 years of age.

12        Court will then also give Plaintiff's Instruction #5,

13   Plaintiff's Instruction #6, Plaintiff's Instruction #7,

14   Plaintiff's #8, Plaintiff's #9, Plaintiff's #11, Plaintiff's

15   #12, Plaintiff's #13, Plaintiff's #14, which was corrected to

16   place a semicolon in the -- or rather a colon in the correct

17   location.  Plaintiff's #15 will be given.  The Court will give

18   Plaintiff's #27, which was an instruction that the parties put

19   together by agreement.

20        The Court will give Defendant's #1, Defendant's #2,

21   Defendant's #3.  Court will give Defendant's #5, Defendant's

22   #6, Defendant's #7, Defendant's #13, Defendant's #14,

23   Defendant's #18 over Plaintiff's objection, Defendant's #22

24   over Plaintiff's objection, Defendant's #23 over Plaintiff's

25   objection, Defendant's #24 over Plaintiff's objection.  Will

 1    give Defendant's 29 and Defendant's verdict forms A, B, C, D,

 2    and the special interrogatories submitted by Defendant, all

 3    those verdict forms over Plaintiff's objection.

 4          So anybody that wishes to make a record on any

 5    instruction given or refused as indicated by my not stating I'm

 6    going to give it is free to make a record now.

 7          I'll start with Mr. Falb on behalf of the Plaintiff.

 8    Mr. Falb.

 9          MR. FALB:  Just one second, Judge.

10          THE COURT:  Sure.

11          MR. FALB:  Concerning Defendant's Instruction 18, our

12    objection is to the wording, "younger than 40 years of age."

13          We'd submit that is going to be confusing to the jury

14    because they may keep hearing that number 40 with the ages of

15    other younger counselors, such as Gina Feazel, who is actually

16    over 40 years; and the jury will not realize that under the

17    case law there can be a difference in age, even if the younger

18    one is over 40 years of age.

19          THE COURT:  Yeah, I think the instruction is correct

20    state of the law.  I don't think there's, as stated in your

21    argument, I don't think it will lead to confusion as to the

22    state of law.

23          MR. FALB:  Concerning Defendant's Exhibit or

24    Instruction #22, we would object to that because it's a

25    modification of the Pattern Instruction 3.07.  We believe the

1    Pattern Instruction should be given.

2         THE COURT:  The Pattern Instructions are not mandatory

3    to the extent that if they don't appropriately fit the case,

4    then they're certainly -- it's certainly appropriate to modify

5    the pattern.  And this modification fits the case at bar and so

6    it's an appropriate modification.

7         MR. FALB:  Concerning Defendant's Instruction 23,

8    Plaintiff objects because it's for a similar reason, it is not

9    based upon the Pattern Instruction, but it is a modified

10   instruction, and it puts in decision makers Ann Casey, Brad

11   Robert, and Ty Bates, and we don't think those specific names

12   should be placed in there.

13        THE COURT:  This particular instruction fits the

14   evidence in the case, so as there's not to be confusion by the

15   jury as to -- as to the fact that as to where they look to for

16   the evidence as to -- as to whose conduct is at issue.

17        MR. FALB:  Defendant's #24, Plaintiff objects this is

18   repetitious in that you've already told the jury that Ann

19   Casey, Brad Robert, and Ty Bates are the decision makers, and

20   now we're making the definition of them.

21        THE COURT:  Well, it's appropriate when you have a

22   word or phrase that's not something used in a common, ordinary

23   language of people, used as a word of art or phrase of art, to

24   define it for the jury.  And certainly decision maker is in the

25   context of age discrimination, employment discrimination be

1    appropriate to -- would be appropriate to define it as

2    something that is specific to employment discrimination, and

3    it's not just standard definition of a decision maker.  So it

4    begs for a definition and that's why it's appropriate to define

5    it.

6            MR. FALB:  Plaintiff objects to Verdict Form A.  We

7    believe it is confusing and the jury will be confused as to

8    whether there is one claim here for the standard discrimination

9    or two claims, one for discrimination and then for the willful

10   violation of the ADEA.

11           THE COURT:  I think it's not -- I think it's not

12   confusing.  Any others?

13           MR. FALB:  I also forgot to add that as far as the

14   verdict forms in plural, they talk about the "age over 40

15   years", and we believe that's improper for a verdict form.  It

16   should be for the Plaintiff Betty Cook and against the

17   Defendant IDOC, and without redefining the word discrimination

18   or the classification of discrimination.

19           THE COURT:  Well certainly not incorrect as the law

20   goes and it doesn't unduly emphasize it, so I don't think it's

21   improper to include it on the verdict.

22           MR. FALB:  Next as far as the special interrogatories,

23   first of all, we don't think special interrogatories are

24   necessary.  I think the general verdict form is proper.

25           Secondly, this type of special interrogatories we

 1    believe is going to be confusing and could cause a conflict in

 2    the verdicts.

 3         THE COURT:   The special interrogatories always create

 4    a danger of inconsistent verdict, but that happens.   We can

 5    voir dire the jury to figure out the problem, and that's

 6    appropriate to find out where their -- where their findings are

 7    with respect to each of the disputes at issue.

 8         MR. FALB:   And the next, Your Honor, I had some

 9    instructions that were objected to, I want to make sure that at

10    least I have my record.

11         THE COURT:   Sure.

12         MR. FALB:   Plaintiff's Instruction #17, it is the

13    definition of constructive discharge, and that was objected to.

14    And I believe the Court has given the Court Instruction on

15    this, and we resubmit this as the proper instruction as stated

16    3.01.

17         THE COURT:   The instruction that the Court gave is

18    used for language right from the case law, and I just think it

19    is a better statement of law.

20         MR. FALB:   We had submitted Plaintiff's Instruction

21    #18, Judge, and this was -- starts out Plaintiff claims that

22    she was subject to discipline, verbal comments, comments about

23    retirement, et cetera, et cetera.   I don't think the Court ever

24    ruled on that, but we are submitting that.   And I assume the

25    Court's -- they are objecting to it and you're rejecting it.

1          *THE COURT:*  Yeah, the Court is not giving it.  It's
2      duplicative and the instructions that are given adequately
3      cover the issues of law.
4          *MR. FALB:*  And then lastly Plaintiff's Instruction
5      #19, this is the standard instruction from 3.06, defines what
6      willful violation of ADEA is.  And there's an objection, and I
7      assume the Court is rejecting this instruction; is that
8      correct?
9          *THE COURT:*  Yeah.  Once again the instructions we got
10     adequately cover the subject matter.  That it?
11         *MR. FALB:*  Yes, it is, Judge.  Do you have copies of
12     these?  I want to make sure.
13         *THE COURT:*  Yeah, I'm confident we do.  We'll double
14     check and see what's on the table and make sure we got them,
15     but I'm pretty confident that we do.
16          Any objection or any record from the Defense side?
17         *MS. GUNDERSON:*  Just want to check my number really
18     quick because I was looking at something.
19          The only record that we'd like to make is with respect
20     to the Defendant's Instruction #21, which is the constructive
21     discharge claim that has been given, will be given as modified
22     by the Court, and we would submit that we believe the
23     instruction that was tendered was correct.
24         *THE COURT:*  Defendant's what?
25         *MS. GUNDERSON:*  I think it's 21.

1          *THE COURT:*  I don't show that.

2          *MS. GUNDERSON:*  The constructive discharge?

3          *THE COURT:*  I show a different number.  Let me look

4     here real quick.  Yeah, I refused your 21.

5          *MS. GUNDERSON:*  Right.

6          *THE COURT:*  That's the one that you're --

7          *MS. GUNDERSON:*  That's the one.

8          *THE COURT:*  You said given?  I thought --

9          *MS. GUNDERSON:*  Well it's going to be -- the Court is

10    giving Court's #8 --

11         *THE COURT:*  Yeah.

12         *MS. GUNDERSON:*  -- on constructive discharge.  Our

13    constructive discharge, Instruction #21, and we just submit

14    that it is a proper instruction as it was submitted.

15         *THE COURT:*  Right.  And your's included three elements

16    instead of two?

17         *MS. GUNDERSON:*  Correct.

18         *THE COURT:*  And seen some case law.  And frankly, I

19    don't think the case law supported your theory for all three of

20    those elements.  Any other record?

21         *MS. GUNDERSON:*  No, Your Honor.

22         *THE COURT:*  Okay, we're good.  Then anything else we

23    need to do on the record before we close for the day?

24         *MS. GUNDERSON:*  The Defendant would renew their Motion

25    for Directed Verdict.

 1          *THE COURT:*  Okay.  I knew there was something else.
 2          *MS. GUNDERSON:*  And we would be submitting a Rule 50
 3    Motion on Tuesday.
 4          *THE COURT:*  Okay.  All right.  Same arguments?
 5          *MS. GUNDERSON:*  Obviously there has been more evidence
 6    that has been put to the jury, and we would submit that even
 7    with the new evidence that's been given, no reasonable jury
 8    could find in favor of the Plaintiff on either the age
 9    discrimination claim or the constructive discharge claim; and
10    we will submit a written brief.
11          *THE COURT:*  Okay.  Well, I look forward to your brief.
12    And based on what I've seen and heard at this point, I think we
13    got a submissible case for the jury with credibility issues to
14    be determined by the jury, and factual issues for the jury.
15    I'll deny the motion.  Anything for the record?
16          *MR. FALB:*  How about Directed Verdict for Plaintiff,
17    Judge?
18          *THE COURT:*  Pardon me?
19          *MR. FALB:*  How about a Directed Verdict for the
20    Plaintiff?
21          *THE COURT:*  Yeah, I'll deny that, too.  Even quicker
22    than I denied the other.  Thanks, folks.  See you Tuesday
23    morning.
24          I certify that the foregoing is a correct transcript
      from the record of proceedings in the above-entitled matter.
25    Date:  8/29/12          */s/ Daveanna Ramsey*
                        Daveanna Ramsey, Official Court Reporter