Vol.I, Pg.1

1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF ILLINOIS
2

3    BETTY D. COOK,                    )
                                       )
4                    Plaintiff,        )
                                       )
5        vs.                           ) No. 09-cv-133-DRH
                                       )
6    ILLINOIS DEPARTMENT OF            )
     CORRECTIONS,                      )
7                                      ) May 23, 2011
                     Defendant.        )
8

9                    **TRANSCRIPT OF PROCEEDINGS**
                        **TRIAL DAY/VOLUME #1**
10               **BEFORE THE HONORABLE DAVID R. HERNDON**
                **CHIEF UNITED STATES DISTRICT COURT JUDGE**
11

     **APPEARANCES:**
12

     For the Plaintiff:        Thomas O. Falb, Esq.
13                             Williamson, Webster, et al.
                               603 Henry Street
14                             Alton, IL  62002
                               (618) 462-1077
15

     For the Defendant:        Joanna Belle Gunderson, Esq.
16                             Kelly R. Choate, Esq.
                               IL Attorney General
17                             500 South Second St.
                               Springfield, IL  62706
18                             (217) 782-1841

19   Court Reporter:           Laura A. Blatz, RPR, CRR, CCR(MO)
                               U.S. District Court
20                             750 Missouri Avenue
                               East St. Louis, IL  62201
21                             (618) 482-9481

22

23

24

25        Proceedings recorded by mechanical stenography;
     transcript produced by computer.

## MISCELLANEOUS INDEX

                                                        PAGE

*Plaintiff's Opening Statement*                          26
*Defendant's Opening Statement*                          42

### INDEX OF WITNESS EXAMINATION

|              | DX  | CX  | R-DX | R-CX | FR-DX |
|--------------|-----|-----|------|------|-------|
| *Gina Feazel* | 60 | 111 | 131  |      |       |

*   *   *   *

### INDEX OF EXHIBITS

| EXHIBIT   | DESCRIPTION                                          | ID'D | ADMT'D |
|-----------|-----------------------------------------------------|------|--------|
| *Plf. 11*  | Feazel evaluations                                  | 109  |        |
| *Deft. 61* | 5/18/11 CHAMPS report for Inmate Golden             | 127  | 130    |
| *Deft. 28* | Grievance documents re no discipline for other counselors | 128 | 130 |

1        *(Voir dire conducted before the following proceedings,*

2          *but not requested to be taken by the court reporter)*

3                            *   *   *   *

4        *(Reconvened)*

5        *(Jury out)*

6              *THE COURT:*  We ended, just prior to taking a break,

7    with a discussion about the admissibility of this evidence

8    relating to former Representative Grandberg and the

9    plaintiff's theory that the evidence was relevant as to his

10   relationship with Assistant Warden Ann Casey, the theory

11   being that there was this group of persons within the

12   correctional facility that were Democrats who had

13   relationships with then Representative Grandberg and were

14   friendly with Warden Robert and were friendly with other

15   corrections people; that Assistant Warden Casey admitted to

16   having a brief intimate relationship with then

17   Representative Grandberg.

18         The theory further was that because, first of all,

19   Ms. Cook was a Republican, and that given her age, that if

20   this group could get her to retire then her spot would be

21   available for a Democrat to then be promoted into, and

22   perhaps down the line I suppose it follows that a space

23   could be opened up for a Democrat to be hired.

24         The plaintiff concedes that there's no witness who

25   will testify that Representative Grandberg specifically had

 1    discussions about job actions, whether it involved hiring or

 2    firing; just that he was friends with these people, and in

 3    the case of Assistant Warden Casey, was actually an intimate

 4    paramour with her.  The defendant argues that there's no

 5    allegation of political motivation, that the only issue here

 6    is one of age discrimination, and therefore, in the first

 7    instance it's not relevant under 401 or 402, I suppose,

 8    although they didn't cite the rules, and that even if

 9    relevant on the basis of some circumstantial evidence on

10    which the jury could make a finding that under Rule 403 it's

11    evidence that is highly prejudicial to the defendant, and

12    its prejudicial impact far outweighs any probative impact on

13    the issue of age discrimination, and should be excluded for

14    that reason.

15         So the finding of the Court is that without any

16    evidence that then Representative Grandberg had any

17    conversations with anybody about any job decisions or job

18    actions, that in the first instance it's not relevant; that

19    in the second instance, even if there is a determination at

20    some point in time in this litigation that there's some

21    relevance to the age discrimination issue, which I find that

22    there's not, that under 403 the correct analysis is that

23    prejudicial effect, prejudicial impact to the defendant does

24    far exceed the probative value on the issue of age

25    discrimination because the plaintiff's unable to demonstrate

1    any connection between the friendship of -- and the paramour

2    status between Representative Grandberg and

3    Assistant Warden Casey and his relationship between Warden

4    Robert and any decision-making process with respect to the

5    plaintiff.

6         So without any evidence that connects up this

7    relationship and this political theory, Court finds, again,

8    in the first instance, no relevance under Rule 401 or 402;

9    and the second instance, on the balancing analysis under

10   403, even if relevant, the balancing analysis weighs in the

11   favor of defendant.  So Court finds in favor of the

12   defendant on the issue of this motion.

13        Has each side had an opportunity -- I'm sorry.

14   Ms. Gunderson?

15        *MS. GUNDERSON:*  I want to ask for a little bit of

16   clarification.

17             *THE COURT:*  Sure.

18        *MS. GUNDERSON:*  Does that extend to the political

19   affiliations of all the different witnesses and what their

20   involvement is in politics or is it just limited to any of

21   Kurt Grandberg's friendships and relationships?

22        *THE COURT:*  As to the political affiliation, I

23   don't see any difference between the discussion about the

24   political affiliations and anything we talked about before

25   we took the break.  There doesn't seem to be any connection

1    between any ability to connect up the issue between politics

2    and the job action taken.  There's no -- I see no

3    representation from the plaintiff they can actually make

4    that connection, so --

5                MS. GUNDERSON:  Okay.  I just want to make sure I

6    was clear.  Thank you.

7                THE COURT:  Mr. Falb?

8                MR. FALB:  Is the Court indicating that I can't

9    talk about politics at all or --

10               THE COURT:  Well --

11               MR. FALB:  I thought that's what we were dealing

12   with, Grandberg and Casey.

13               THE COURT:  Well, I took our discussion to mean

14   that it had to do with, not just Grandberg and Casey, but

15   the whole political issue.  Is that not what we were talking

16   about?

17               MS. GUNDERSON:  My argument definitely was to all

18   the politics, and in particular the more specific

19   relationship with Grandberg, but as I said when I started

20   arguing before, there's no political affiliation claim,

21   there's no link between any politics and Ms. Cook, so my --

22               THE COURT:  I took the argument to be about both

23   issues.  Maybe I -- that's what I took it to be, and I --

24               MR. FALB:  I didn't take it that way, but you know,

25   I want to make sure I abide by the Court's ruling.

 1             *THE COURT:*  I think the political issue is not
 2   relevant.  That's my finding.
 3             Now, has each side looked at the preliminary
 4   instructions?
 5             *MR. FALB:*  Yes.
 6             *THE COURT:*  Any problem with the --
 7             *MS. GUNDERSON:*  No.  No, Your Honor.
 8             *THE COURT:*  Anything else we need to talk about
 9   before we bring the jury in?  Mr. Falb?
10             *MR. FALB:*  I want to make sure I understand the
11   Court's ruling.  I can talk about favoritism and things like
12   that; you just don't want me to go into Republican versus
13   Democrat?
14             *THE COURT:*  Yeah.  I mean to the extent that you've
15   got something that's connected up to the job action, sure.
16   I mean anything that's relevant to the job action, I take it
17   that that's -- you can always talk about that.  I don't know
18   specifically what you're talking about when you say
19   "favoritism".
20             *MR. FALB:*  Well, you know, I think the evidence is
21   going to be that people being favored were precinct
22   committeemen, chairman of the Democratic party, and this was
23   the group that wanted to get their people in place, and
24   these were the younger people that were going to be promoted
25   and in place.

```
 1              THE COURT:  Well, I mean what's your evidence that
 2    it's -- that there was a political motivation?
 3              MR. FALB:  Well, the person that got all the
 4    benefits was the Democratic precinct committeeman underneath
 5    the Warden, who was the chairman of the Clinton County
 6    political party, Democratic political party.
 7              MS. GUNDERSON:  I thought there were two similarly
 8    situated people.  I actually think they're different
 9    parties.
10              MR. FALB:  Different parties?
11              MS. GUNDERSON:  Yeah, political parties.  I mean
12    there's -- the political affiliations are all over the map
13    with all the different players.  I don't think -- I think
14    Bart is Republican.
15              MR. FALB:  I'm talking about Feazel.
16              MS. GUNDERSON:  She's a Democrat, sure, but we've
17    got a mix of Republicans and Democrats.  There were people
18    brought in after Ms. Cook as she was retiring who have
19    connections to the Republican party.  It's all over the
20    place.  And I think without there being a connection to the
21    job actions that were taken by the decision-makers, it's
22    just simply not relevant.  The hearing officer, again, are
23    also different parties.  Wardens are different parties.
24              THE COURT:  So I guess the question I've got is:
25    What is the relevance of the political affiliations
```

1  vis-a-vis the age discrimination?

2         MR. FALB:  The people that were getting -- the

3  younger people that were getting benefits were the favorites

4  of that political party, and they were using the age 50 to

5  force my client out to allow these people to move up or move

6  in.  It also goes to bias.

7         THE COURT:  And what evidence do you have to make

8  that connection?  I mean on the one hand one counsel's

9  telling me that the political affiliations are across the

10 board, and you're suggesting that that's not the case.

11        MR. FALB:  Well, it is true that there are certain

12 exceptions, but for the favorites that were being placed, as

13 far as I know, they were all Democrats.

14        THE COURT:  What do you mean by "favorites being

15 placed"?

16        MR. FALB:  The younger employees that were being

17 brought in and being placed in counselor positions and being

18 placed in a position where they could advance.

19        MS. GUNDERSON:  I guess maybe we need to be clear

20 about who we're talking about.

21        THE COURT:  What names are you --

22        MR. FALB:  Gina Feazel and Bart Toennies.

23        MS. GUNDERSON:  Gina is a Democrat, I know that.

24        THE COURT:  This other person you say is a

25 Republican, and you say he's a Democrat?

```
 1          MS. CHOATE:  Looking through my notes -- see if I
 2   can find -- I thought he was too.
 3          MS. GUNDERSON:  I'm pretty sure that Brandon is a
 4   Republican.
 5          MR. FALB:  That's not my knowledge.  They're both
 6   Democrats.
 7          MS. GUNDERSON:  I mean, there's other hurdles to
 8   this political analysis too.  In order for them to be
 9   favoring the Democrats by pushing Betty Cook out, they have
10   to be -- they have to know something about her political
11   affiliation; otherwise, there's no connection with the
12   motive.  And I don't think there's -- there's just no
13   connection.
14          THE COURT:  And your evidence that they were aware
15   she's Republican is?
16          MR. FALB:  Signs in her front yard every election.
17   They know she's a Republican.
18          MS. GUNDERSON:  There were no witnesses asked in
19   any of the depositions whether they knew Betty's political
20   affiliation.
21          THE COURT:  Well, imagine my position.  Here I am
22   listening to this and I've got -- I'm hearing, Well, he's
23   Republican, he's a Democrat.  I'm hearing that they don't
24   know she's a Republican, they do know she's a Republican.
25   Am I just supposed to throw this stuff against the wall and
```

 1   hope the jury can figure it out?  I mean I'm not interested

 2   in the jury just speculating on what might or might not be

 3   the case.  I mean what is our -- what's the evidence that is

 4   being suggested?

 5        *MS. GUNDERSON:*  I think if there's evidence that

 6   there was any political motivation in the decisions of the

 7   department, if that can be established and that that's --

 8   that there's that connection to the political piece of it,

 9   you know, then I think we're moving down some path.  Whether

10   he can prove that these people were Democrats or

11   Republicans, that's his burden, but I still don't think

12   we're even getting to that point.  I don't think we're

13   getting to there being any evidence that any of these people

14   who made the decisions about Ms. Cook considered her

15   political affiliation or were trying to benefit anyone who

16   was younger and a Democrat or that their choice to benefit

17   Democrats had anything to do with age or had any -- we're

18   still in an age case, so even if there was a motivation that

19   was political, it still has to affect age in order for us to

20   get anywhere here.

21        *THE COURT:*  Are you pursuing some kind of theory,

22   Mr. Falb, that this is some sort of a mixed motive?

23        *MR. FALB:*  Well, yeah.  The ultimate motive was she

24   was turning 50, okay, and the reason why they wanted her out

25   was because of their friends and their cronies they wanted

```
 1   to put in.  These friends and cronies could only get
 2   positions unless the older person was out and she had to
 3   retire.
 4            MS. GUNDERSON:  That's not necessarily because of
 5   her age.  That's where the disconnect is.
 6            MR. FALB:  The only reason why she would have to
 7   leave is because she turned 50.  They couldn't get her out
 8   any other way.
 9            THE COURT:  The only consideration for the jury,
10   isn't it the age issue?
11            MR. FALB:  Yes.
12            MS. GUNDERSON:  Yes.  There's nothing in the
13   pretrial to suggest there's a mixed motive.  The final
14   pretrial, I should say.  It's strictly age.
15            THE COURT:  So --
16            MR. FALB:  This was addressed in the motions in
17   limine, Your Honor.
18            MS. GUNDERSON:  Where I asked to bar it, yes.
19            MR. FALB:  The Court order said:
20                 The Court addresses IDOC's motion in
21            limine.  First, IDOC moves in limine to exclude
22            evidence regarding political affiliation or
23            political activism of the parties or witnesses as
24            irrelevant.  Cook responds that this evidence is
25            relevant as the information goes to the
```

 1            *credibility of IDOC's employees and witnesses.*
 2            *The Court denies this request.  Cook's theory of*
 3            *the case encompasses both age discrimination as*
 4            *well as political influence as it relates to*
 5            *issues of age and thus this information is*
 6            *relevant.*
 7            *THE COURT:*  The Final Pretrial certainly doesn't
 8   list anything about an issue relative to any political
 9   motive; agreed?
10            *MS. GUNDERSON:*  Agree.
11            *MR. FALB:*  Agree.
12            *THE COURT:*  So by virtue of the parameters of the
13   issue set out by the Final Pretrial, we don't -- the
14   political motivation is irrelevant?
15            *MR. FALB:*  Yeah, but in the pretrial we discussed
16   credibility, Your Honor.  I didn't know in the pretrial we
17   were supposed to put an issue concerning credibility.
18            *THE COURT:*  How is this a credibility issue in
19   terms of the ultimate issue in the case?
20            *MR. FALB:*  It goes to the weight -- or the weight
21   of each witness's testimony.  They're favoring each other.
22   If they're in the same political party, they're friends,
23   they'll be testifying along the same lines.
24            *MS. GUNDERSON:*  Those are two different things
25   though.  If they're friends, it's one thing, but being in

```
 1    the same political party --

 2              THE COURT:  So now your suggestion is you bring it

 3    up in cross-examination:  Well, aren't you a Democrat, and

 4    she's a Democrat and you're just trying to help out another

 5    Democrat?  Is that where now it's going to come in, only on

 6    credibility?  I mean certainly bias is relevant, always, so

 7    if you're talking about limiting the inquiry about political

 8    affiliations and friendships on issues of credibility,

 9    that's a different -- that's a whole different issue.

10              So clearly you have a right to bring up issues of

11    bias and can explore the issue in terms of bias, but that

12    has nothing to do with bringing up, in terms of your case in

13    chief, in terms of trying to make your liability, which is

14    what I thought you were talking about a minute ago.

15              MR. FALB:  I think both.  I use it for both.

16              THE COURT:  In terms of liability, you can't

17    because it's not been made an issue in the case, which is

18    clear by the Final Pretrial.  Secondly, as far as

19    credibility in cross-examining somebody or dealing with

20    somebody on issues of bias and credibility, I think it's

21    fair game, and I don't think Ms. Gunderson argues that; am I

22    right?

23              MS. GUNDERSON:  That was the subject of my motion

24    in limine, that I didn't think it was relevant to bias, that

25    people in the same political party are not necessarily
```

 1    biased towards one another.

 2         THE COURT:  How did I rule on that?  I don't

 3    recall.

 4         MS. GUNDERSON:  You did not rule in my favor.

 5         THE COURT:  Okay.

 6         MS. GUNDERSON:  I do think bias and credibility is

 7    completely different from the liability issues or what the

 8    motivating factors were.

 9         THE COURT:  I think that's something totally

10    separate, and I think in terms of bias, that can be -- that

11    can certainly be explored.  Okay.  So are we good?

12         Now, did I explore with you the preliminary

13    instructions?  I guess I didn't, I?  Now can we have the

14    jury?  Glenn, did the jurors show up on time?

15         COURT SECURITY OFFICER:  They were there when I

16    came in the courtroom.

17    **(Off the record)**

18                           *   *   *   *

19    **(Jury in)**

20         THE COURT:  Sorry for that delay, folks.  Sometimes

21    a little slow in doing my judge-of-the-law work, so I

22    apologize for that.

23         As I said, I'm going to start out reading some

24    preliminary instructions to you, then we'll get right into

25    the opening statements.  Then after the opening statements

Jury Instructions

1    I'll read to you some stipulated facts.

2         So ladies and gentlemen of the jury, I will take a

3    few moments now to give you some initial instructions about

4    this case and about your duties as jurors.  At the end of

5    the trial I will give you further instructions.  Those

6    instructions will be in writing, and after I have read them

7    to you, they will be given to you to be taken to the jury

8    room with the verdicts for your consideration while you

9    deliberate.  I may also give you instructions during the

10   trial.  Unless I specifically tell you otherwise, all such

11   instructions, both those I give you now and those I give you

12   later, are actually binding on you and must be followed.

13        It is your absolute duty to accept the law as

14   defined in these instructions and to follow it.  Some jurors

15   find themselves surprised or upset at the law which the

16   Court gives them because it is not as the jurors expect the

17   law to be.  If that happens to you, please understand that

18   your oath requires you to follow my instructions on the law

19   just as I give them to you.  You cannot change it because it

20   is not as you expected or think it ought to be.  You must

21   follow my instructions as to the law.

22        This is a civil case brought by the plaintiff,

23   Betty D. Cook, against the defendant, Illinois Department of

24   Corrections, pursuant to the Age Discrimination in

25   Employment Act of 1967, (ADEA), 29 United States Code,

Jury Instructions

 1   Section 621, et seq.

 2         The plaintiff alleges that the defendant, starting

 3   in December 2006, began to discriminate against her because

 4   of her age, 49, in violation of the ADEA.   The plaintiff

 5   further alleges that this alleged discrimination forced her

 6   to retire on June 1, 2008.   The defendant denies the

 7   allegations.

 8         It will be your duty to decide from the evidence

 9   whether the plaintiff is entitled to a verdict against

10   defendant.   From the evidence, you will decide what the

11   facts are.   You are entitled to consider that evidence in

12   the light of your own observations and experiences in the

13   affairs of life.   You will then apply those facts to the law

14   which I give you in these and in my other instructions, and

15   in that way reach your verdict.

16         In deciding what the facts are, you may have to

17   decide what testimony you believe and what testimony you do

18   not believe.   You may believe all of what a witness says or

19   only part of it or none of it.

20         In deciding what testimony to believe, consider,

21   among other things, the ability and opportunity the witness

22   had to see, hear, or know the things that the witness

23   testified about; the witness's memory; any interest, bias,

24   or prejudice the witness may have; the witness's

25   intelligence; the manner of the witness while testifying;

Jury Instructions

 1    and the reasonableness of the witness's testimony in light

 2    of all the evidence in the case.

 3          Do not allow sympathy or prejudice to influence

 4    you.  Your eventual verdict in this case must not be based

 5    upon speculation, guess, or conjecture.  The law demands of

 6    you a just verdict unaffected by anything except the

 7    evidence, your common sense, and the law as I give it to

 8    you.

 9          You should not take anything I may say or do during

10    the trial as indicating what I think of the evidence or what

11    I think your verdict should be.

12          I have mentioned the word "evidence".  Evidence

13    includes the testimony of witnesses, documents, and other

14    things received as exhibits, any facts that may have been

15    stipulated -- that is, formally agreed to by the parties --

16    and any facts that may have been judicially noticed -- that

17    is, facts which I say you must accept as true.

18          Certain things are not evidence.  I will list those

19    things for you now:

20                One:  Statements, arguments, questions and

21                comments by lawyers are not evidence;

22                Two:  Objections are not evidence.  Lawyers

23                have a right to object when they believe

24                something is improper.  You should not be

25                influenced by the objection.  If I sustain an

                        Jury Instructions

1      objection to a question, you must ignore the

2      question and must not try to guess what the

3      answer might have been.

4        Three:  Testimony that I strike from the

5      record or tell you to disregard is not evidence

6      and must not be considered.

7        Four:  Anything you see or hear about this

8      case outside the courtroom is not evidence unless

9      I specifically tell you otherwise during the

10      trial.

11      Furthermore, a particular item of evidence is

12  sometimes received for a limited purpose only; that is, it

13  can be used by you only for one particular purpose and not

14  for any other purpose.  I shall tell you when that occurs

15  and instruct you on the purposes for which the items can and

16  cannot be used.  You should also pay particularly close

17  attention to such an instruction because it may not be

18  available to you later in writing in the jury room.

19      Finally, some of you may have heard the terms

20  "direct evidence" and "circumstantial evidence".  You are

21  instructed that you should not be concerned with those terms

22  since the law makes no distinction between the weight to be

23  given to direct and circumstantial received.

24      To insure fairness, you, as jurors, must obey the

25  following rules:

Jury Instructions

1        First, do not talk among yourselves about this

2        case or with anyone involved with it until the

3        end of the case when you go to the jury room to

4        decide your verdict.

5        Second, do not talk with anyone else about

6        this case, not even your own families or friends,

7        until the trial has ended and you have been

8        discharged as jurors.

9        Third, when you are outside the courtroom do

10       not let anyone tell you anything about the case

11       or about anyone involved with it until the trial

12       has ended and your verdict has been accepted by

13       me.  If someone should try to talk to you about

14       the case during the trial, please report it to

15       the Court Security Officer or me.

16       Fourth:  During the trial, you should not talk

17       with or speak to any of the parties, lawyers, or

18       witnesses involved in the case.  You should not

19       even pass the time of day with any of them.  It

20       is important not only that you do justice in this

21       case but that you also give the appearance of

22       doing justice.  If a person from one side of the

23       lawsuit sees you talking a person from the other

24       side, even if it is simply to pass the time of

25       day, an unwarranted and unnecessary suspicion

Jury Instructions

1        about fairness might be aroused.  If any lawyer,

2        party, or witness does not speak to you when you

3        pass in the hall, ride the elevator or the like,

4        remember it is because they are not supposed to

5        talk or visit with you either.

6            Fifth:  Do not read any news stories or

7        articles about the case or anyone involved with

8        it or listen to any radio or television reports

9        about the case or about anyone involved with it.

10           Six:  Do not do any research or make any

11       investigation about the case on your own.

12           Seventh:  Do not make up your mind during the

13       trial about what the verdict should be.  Keep an

14       open mind until after you've gone to the jury

15       room to decide the case and you and your fellow

16       jurors have discussed the evidence.

17           At the end of the trial you must make your decision

18   based on what you recall of the evidence.  You will not have

19   a written transcript to consult, and it may not be practical

20   for the court reporter to read back lengthy testimony.  You

21   must pay close attention to the testimony as it is given.

22           You have the right to take notes during the course

23   of this trial if you choose to do so.  Notepads will be

24   provided for your convenience.  Please place your name on

25   the cover of the note pad.  No one else will be allowed to

                        Jury Instructions

1    look at your notes.  You do not have to take notes.  That is

2    entirely up to you.  I have no preference one way or the

3    other.

4           You may use your notes to refresh your memory at

5    the appropriate time.  Your notes are for your use only, not

6    for any other juror's.  Do not show them to anyone at any

7    time.  That includes other jurors and it includes the time

8    when you are deliberating on your verdict.

9           You should rely on your own memory of the evidence.

10   If your notes conflict with your memory or someone else's

11   notes conflict with your memory, you are free to use your

12   own memory as evidence.  Just because a juror has taken

13   notes does not mean his or her memory of the evidence has

14   any more weight or impact than the memory of a juror who has

15   not taken notes.

16          Your notes will not leave this courtroom.  They

17   will be collected by Ms. Pannier when you leave for lunch

18   and at the close of the court day.  At the end of the trial

19   when you are discharged from further service in this case

20   the notes will be collected by Ms. Pannier.  They then will

21   be destroyed.  No one will be allowed to look at the notes

22   before they are destroyed.

23          You, as jurors, must decide this case based solely

24   on the evidence presented here within the four walls of this

25   courtroom.  This means that during the trial you must not

Jury Instructions

 1   conduct any independent research about this case, the

 2   matters in the case, and the individuals or corporations

 3   involved in the case.  In other words, you should not

 4   consult dictionaries or reference materials, search the

 5   internet, websites, blogs, or use any other electronic tools

 6   to obtain information about this case or to help you decide

 7   the case.  Please do not try to find out information from

 8   any source outside the confines of this courtroom.

 9        Until you retire to deliberate, you must not

10   discuss this case with anyone, even your fellow jurors.

11   After you retire to deliberate, you may begin discussing the

12   case with your fellow jurors, but you cannot discuss the

13   case with anyone else until you have returned a verdict and

14   the case is at an end.

15        I hope that for all of you this case is interesting

16   and noteworthy.  I know that many of you use cell phones,

17   blackberries, the internet and other tools of technology.

18   You also must not talk to anyone about this case or use

19   these tools to communicate electronically with anyone about

20   the case.  This includes your family and friends.  You may

21   not communicate with anyone about the case on your cell

22   phone, through e-mail, blackberry, I-Phone, text messaging

23   or on Twitter, through any blog or website, through any

24   internet chat room or by way of any social networking

25   websites including Facebook, MySpace, Linked In, and

                        Jury Instructions

 1    YouTube.

 2            The order of the trial's proceedings will be as

 3    follows:  In just a moment the lawyers for each of the

 4    parties will be permitted to address you in turn and make

 5    what we call their opening statements.  The plaintiff will

 6    then go forward with the calling of witnesses and the

 7    presentation of evidence during what we call the plaintiff's

 8    case in chief.  When the plaintiff finishes, by announcing

 9    "rest", the defendant will proceed with witnesses and

10    evidence, after which, within certain limitations, the

11    plaintiff may be permitted to again call witnesses or

12    present evidence during what we call the rebuttal phase of

13    the trial.  The plaintiff proceeds first and must rebut at

14    the end because the law places the burden of proof or burden

15    of persuasion upon the plaintiff, as I will further explain

16    to you as part of my final instructions.

17            From time to time during the trial I may be called

18    upon to make rulings of law on objections or motions made by

19    the lawyers.  You should not infer or conclude from any

20    ruling or other comment I may make that I have any opinions

21    on the merits of the case favoring one side or the other.

22    And if I should sustain an objection to a question that goes

23    unanswered by a witness, you should not guess or speculate

24    what the answer might have been, nor should you draw any

25    inferences or conclusions from the question itself.

                            Jury Instructions

1    During the trial it may be necessary for me to

2    confer with the lawyers from time to time out of your

3    hearing with regard to questions of law or procedure that

4    require consideration by the Court or Judge alone.  On some

5    occasions you may be excused from the courtroom for the same

6    reason.  I will try to limit these interruptions as much as

7    possible but you should remember the importance of the

8    matter you are here to determine and should be patient even

9    though the case may seem to go slowly.

10    When the evidence portion of the trial is completed

11    I will instruct you on the applicable law, and the lawyers

12    will then be given another opportunity to address you and

13    make their summations, or final arguments, in the case.  You

14    will then retire to deliberate on your verdict.

15    Now we will begin by affording the lawyers for each

16    side an opportunity to make their opening statements in

17    which they will -- they may explain the issues in the case

18    and summarize the facts they expect the evidence will show.

19    The statements that the lawyers make now, as well as the

20    arguments they present at the end of the trial, are not to

21    be considered by you either as evidence in the case or as

22    your instruction on the law.  Nevertheless, these statements

23    and arguments are intended to help you understand the issues

24    and the evidence as it comes in, as well as the positions

25    taken by both sides.

Jury Instructions

```
 1              So I ask that you now give the lawyers your close

 2       attention as I recognize them for purposes of opening

 3       statements.  First, of course, on behalf of plaintiff,

 4       Betty Cook, is Mr. Tom Falb for his opening statement.

 5       Mr. Falb?

 6                   PLAINTIFF'S OPENING STATEMENT

 7              MR. FALB:  Thank you, Your Honor.  May it please

 8       the Court.

 9              THE COURT:  It does.

10              MR. FALB:  Counsel, ladies and gentlemen of the

11       jury.  The number 50 is very important.  But for Betty

12       reaching the age of 50, we wouldn't be here.  But for Betty

13       approaching that age of 50, we wouldn't be here.

14              In the State of Illinois, with the Department of

15       Corrections, if you reach the age of 50 and if you have more

16       than 25 years of service, seniority, you can retire if you

17       want.  But there were people in that institution that wanted

18       Betty out because they wanted younger people in and younger

19       people to be able to promote.

20              Have you ever heard of a person, because of so much

21       stress in the workplace, that they start to lose their hair?

22       One eye goes blind because of severe migraine headaches?

23       Then the other one:  You've got so much stress that you're

24       vomitting, you got diarrhea, you got to stay at home in bed.

25       That's what Betty went through.  And she refused to retire
```

 1    because she wanted to work, but it got so bad she finally

 2    gave in after more than a year-and-a-half of going through

 3    this.

 4          You're going to hear evidence that the rules of the

 5    workplace for everybody is, you know what, be fair.  Be fair

 6    to everybody.  If you're older, be fair to the older person.

 7    That's why the ADEA is a law.  And it is an inducement to

 8    everybody, employees, employers, and you know what, even the

 9    State of Illinois:  Treat older people fairly.  And just

10    because they reach retirement age, you don't push them out,

11    especially age 50, which to me is young.  Let me tell you

12    about the story, first of all, the hierarchy of the State of

13    Illinois when this took place.

14          We're talking about the Department of Corrections,

15    Centralia, Illinois.  There's prisons all over the state.

16    This particular prison was run by Warden Robert.  He was

17    appointed by Governor Blagojevich.  At the time this took

18    place, Rod Blagojevich was the employer essentially.

19    Underneath him was the various directors who he appointed.

20    There were five districts with a deputy director who he

21    appointed, and Warden Robert, this gentleman here, who he

22    appointed.

23          With each prison there is a warden.  He's in charge

24    of the whole prison.  He employs about over two or 300

25    workers there, 1500 prisoners.  Underneath, have our two

Plaintiff's Opening Statement

1  assistant wardens, who are also appointed by Springfield.

2  In this case, assistant warden of operations.  Underneath

3  that branch you have security.  We have the captains,

4  lieutenants, sergeants and officers; the lowest of the

5  prison guards, the officers.

6         The other assistant warden is called the assistant

7  warden of programs, and this is where Betty fell in.  She

8  started out as a Counselor I, and I'll get into this

9  further, but these are the three types of counselors right

10 here.  What's the purpose of a counseling department?  They

11 counsel the inmates.  When they come in, they make sure, you

12 know, they get counseled, explained, you know, what prison's

13 going to be like.  This particular prison was a medium

14 security institution, but they had everybody -- rapists,

15 murderers, robbers, strong armed robbers.  You name it, they

16 had it.  And the counselors are their liaison between the

17 prison and the officers.  They would see them every 60 or 90

18 days for grievances, problems they were having, that type of

19 thing.  Prisoners have rights, if you believe that, and then

20 when they got paroled, the field services counselor would

21 make sure that they had a home, a job, that type of thing.

22 So the counselors were an important institution in each

23 prison throughout the state.

24         And let me make sure I explain to you about you

25 have -- the counselors had two supervisors, clinical

Plaintiff's Opening Statement

1    services supervisor, case work supervisor.  If they weren't

2    filled, then the assistant warden would be the supervisor

3    for the counselors.

4         Want to go over a few concepts before we get into

5    the evidence.  Seniority was by contract.  You have the

6    upper echelon of people who were appointed by the governor.

7    The career employees like Betty were by contract.  They --

8    you know, they were -- she had to have her money taken out

9    for union dues.  It was a closed shop so she almost had to

10   be a union member.  But that protected them from whatever

11   discretionary moves or judgments by a governor.  The more

12   time you spent with the State of Illinois, the more

13   seniority you had and the more opportunity you had to

14   advance.  That's just the way it was.

15        I told you about the retirement.  That's the key.

16   If you had 50 -- if you were 50 years of age, 25 years of

17   seniority, that equaled 75, that allowed you to retire with

18   benefits.  Before that, you couldn't do that.  And you could

19   keep working if you wanted.  You could build up your

20   retirement system or you can just work, like many people do.

21        This date, August 2007, is a key date.  That's when

22   Betty turned 50.  Before I go any further I want to tell you

23   about the discipline because that's going to be important in

24   this case.  There are steps in discipline:  Counseling, oral

25   reprimand, written reprimand, days off, 1, 3, 5, 10, 15,

Plaintiff's Opening Statement

1    that type of thing.  If you get disciplined with days off

2    there can be what is known as an ERH, or Employee Review

3    Hearing, in which there's a hearing in front of a hearing

4    officer who's appointed by the Warden, and that hearing

5    officer makes a determination.  That determination has to be

6    signed off by the warden.  So the warden has complete

7    control of not only who does the hearing but what happens at

8    the end of the hearing.  He also evaluates the hearing

9    officers on a yearly basis.

10          If there is a suspension, then there can be an

11    appeal to Springfield.  These things take months.  If

12    there's a hearing, an ERH hearing, it is very traumatic and

13    stressful for an employee.

14          If -- it's important to note, with suspensions, if

15    there's too much time given to an employee off, this will

16    affect an employee for the rest of her or his life.  First

17    of all, this employee could be fired.  Secondly, if you've

18    got 25 years, 30 years of service, all of your vested rights

19    are thrown out the door.

20          Let me tell you the story about Betty.  Betty was

21    born in 1957.  She started work 19 years of age.  She was 19

22    at Pontiac correctional facility.  She worked there starting

23    at the very lowest level, worked there until 1994.  At that

24    time her husband, who was a correctional officer, was

25    transferred to Centralia.  She went with him.  She started

Plaintiff's Opening Statement

 1    work at the Centralia correctional facility.  She worked,

 2    and she'll tell you and explain to you, her last job before

 3    going into counseling was for a major who was in charge of

 4    security.  Very high secure job that she had.

 5           She became a Counselor I in 2004.  I put Betty

 6    there.  And also at the same time Gina Feazel -- that's an

 7    important name for you to remember, she'll be testifying

 8    today -- who was younger than her, also became a counselor.

 9    She became Counselor II because she had more education.

10           During the first year Betty will testify, as a

11    counselor, it was totally new to her.  She didn't know some

12    of the terminology.  It took her a while to adjust.  Then

13    she became a good counselor after that.  She became a

14    Counselor II in 2005, which was a semi-automatic move up.

15    You had to do something really wrong not to move up.  But

16    she obviously went up to Counselor II, and between 2005 and

17    2006 she was a Counselor II.

18           And then in 2006 she started not only doing

19    Counselor II job duties, but Counselor III job duties, which

20    was a -- not all the duties, but it was a more of a

21    responsibility for her because of a person who had retired.

22    In 2007 she went back to Counselor II duties, and in August

23    of 2007 she turned 50.  In May of 2008 she was forced to

24    retire.  Up to 2006 she had no discipline whatsoever, all

25    those multiple years.  For 28 years she had good

                     Plaintiff's Opening Statement

1    evaluations.  You have a yearly evaluation.  I'm sorry if

2    I'm going through a lot of detail with you on this but I

3    think it's important to give you a broad outline.

4         Let's talk about, in February of 2005, just the

5    hierarchy or the tree, if you would, of where people fit in

6    as far as who were supervisors.  We're talking about

7    Centralia, Illinois, the prison.  The top man was this man

8    right here, Warden Robert.  Underneath him were two

9    assistant wardens, Ann Casey and Assistant Warden Flagg.

10   The two supervisors in the counseling department, clinical

11   and case work supervisor, were not filled.  That's why I

12   have a zero next to them.  There were no supervisors there.

13   Casey was the supervisor for the counselors at that time

14   because of the lack of supervisors below her.

15        At this time here were the counselors, and to the

16   right of each name I've got their age, and next to that

17   slash is their years of service.  For example, Mr. Sanner,

18   who was the Counselor III in February 2005, was 51 years of

19   age, had 25 years of service.  Betty Cook was 47 and had 29

20   years of service, etc., etc.  At the bottom was Gina Feazel.

21   She was 39 with six years of seniority.

22        Just to move ahead, in February -- excuse me,

23   December of '06, when the discrimination began, here's what

24   we have.  These senior counselors all left by that time.

25   Not one, but five of them.  That left Cook, Landreth,

Plaintiff's Opening Statement

 1   Feazel, and Toennies.  Cook and Landreth -- Betty Cook is

 2   Cook, my client, obviously.  They were the most senior, with

 3   30 years and 25 years respectively, and the oldest.  Now,

 4   before I get into that outline even further, let me tell you

 5   what happened in 2005 just to kind of bring you up-to-date.

 6          Here's the counselors we have in the beginning of

 7   2005.  During that year Betty had a good evaluation.  She

 8   wasn't disciplined, she was working hard.  They had lost a

 9   lot of counselors in 2002.  They went down from 15 to about

10   eight, so they had to take care of 15 or 1600 inmates just

11   with those counselors, and they had tremendous workload.  In

12   October of 2005, two senior counselors left, and then in

13   March of 2006, three more senior counselors left.  You may

14   hear their testimony and you can decide what happened as far

15   as why they were promoted or left or retired.

16          Up to December of 2006 -- that's the time when the

17   discrimination began -- Betty had good evaluations from

18   Ann Casey.  That was her direct supervisor, that assistant

19   warden right here.  In fact, by December of 2006, Betty was

20   not only doing her regular job, but she had been assigned

21   higher job duties of Counselor III because of a senior

22   counselor leaving.  Betty even, every once in a while, got a

23   compliment from Ann Casey.

24          So what happened in December of 2006?  In December

25   of 2006 -- I apologize for my handwriting.  Prior to 2006

                    Plaintiff's Opening Statement

```
 1    her evaluations were good.  She was even doing Counselor III
 2    duties.  And in December of 2006 she received her 30-year
 3    pin for working for the Department.  At that time she was
 4    going to be turning -- also at that time she was going to be
 5    turning age 50 in August of 2007, so that meant six or seven
 6    months down the road she was going to be eligible for
 7    retirement.  Plus, she had 30 years in, which was a windfall
 8    for her.  Ann Casey -- strike that.
 9         Normally the department, at the end of the year,
10    someone working that long for the department, they'd have
11    some sort of little ceremony, cake, cupcakes or whatever,
12    punch.  It didn't happen.  Betty was working alone in the
13    department.  Ann Casey came in to her and told her, Here's
14    your 30-year pin and now you can retire.  And she went out
15    and asked Betty, When you going to retire?  You're going to
16    be 50.  Betty said, I haven't made my decision to retire.
17    In fact, Betty didn't want to retire at age 50.  Her husband
18    was younger than her and he had three or four more years
19    more than her to work, and she wanted to continue to work.
20         From that point in time you will not believe what
21    happened to Betty, because they wanted her to leave in
22    August of 2007.  It started out with first verbal comments,
23    you know, When you going to retire?  Criticisms, duty
24    changes; in other words, specific duties were all of a
25    sudden taken from her.  Assignment changes.  And this is
```

Plaintiff's Opening Statement

important because when you're assigned a workload of four or

500 inmates, you just can't be assigned to a different set

of inmates because it's just -- you got to see these inmates

every 90 days.  If you don't do it, the whole institution

can be audited.  She was subject to unilateral vacation

changes.  She was subject to disciplines -- not one, not

two, not three, not four, but five or six.  And up to this

point in time, prior to Ann Casey, she had never been

disciplined.  And she was subjected to multiple disciplinary

hearings, which you'd have to prepare it.  It would be like

a mini trial, all the stress and turmoil that went with

that.  And after this mini trial that took place, you'd

receive your discipline weeks later.  Days off.

          It got so bad that in May of 2006, when Betty was

doing this work -- and at this point in time, May of 2007,

Betty started to see her own counselor, a therapist, because

she was stressed out, and Betty will tell you that when her

mom died years ago she had migraines, and she's been treated

for that; high blood pressure, she's been treated for that.

It was under control and this made everything go up.  She

started to see Mr. Monken, who was a counselor.  She saw him

five or six times.  She thought things were going to get

better.

          You do this counseling or therapist through an

employee program.  After the number of allotment of visits

Plaintiff's Opening Statement

 1   stopped, she thought she was getting better.  She then

 2   received another disciplinary action, or time off, excuse

 3   me, either five or ten days.  Just threw her for a loop.

 4   She was also seeing a nurse practitioner.  You'll see and

 5   hear her deposition, it will be on a DVD, who basically told

 6   Betty, *Quit.  This is too much for you.  It's too much*

 7   *stress.*  She gave her medications to keep down her blood

 8   pressure, medications as far as her migraines, referred her

 9   to a neurologist.  Betty was off from August I think 20th

10   until November 14th of 2007, on stress leave.

11        The first week she was off she was served with

12   papers giving her more time off.  Before she went off it got

13   so bad, like I told you, she went blind.  And I'm not

14   talking about permanent blindness; I'm talking about

15   migraines that can cause blindness in the eyes.  So she was

16   bedridden for a period of time.  I'm not trying to make a

17   big deal out of it, but when you start having a symptom like

18   that, you're vomitting, losing your hair, you're breaking

19   out, it's stress.

20        She came back despite what the nurse practitioner

21   told her to do.  She told her, *Don't go back to work, Betty.*

22   She came back to work in November.  What happened in

23   November?  She was given a new job assignment.  Ann Casey by

24   this time was gone.  They had a new Assistant Warden.  Betty

25   was on medications.  She tried to continue working and she

Plaintiff's Opening Statement

1  thought things were going to get better.  The new assistant

2  warden was Assistant Warden Bates.  But in April and

3  May 2008, once again her job assignment was changed.

4          And this is what happened at that time:  At this

5  point in time we had the counselors, in May of 2008, Cook --

6  that's my client -- Feazel, Toennies, Burton, and Risse.

7  And you'll note that my client was the oldest one there, the

8  only one there that could retire.  You'll note at the bottom

9  line here all the counselors that had left, and these were

10  all the most senior counselors that had left by then.  At

11  this time two younger counselors, Risse and Feazel, couldn't

12  get along with each other, and what happened?  She was the

13  one that was being moved so that they wouldn't -- or they

14  could get along.  They would be separated.  Betty asked the

15  assistant warden, *Why are you doing this to me?  I'm the*

16  *most senior one here.  I'm doing my job, I'm doing it*

17  *correctly.*  She hadn't been disciplined.  Her evaluations

18  were good under this new assistant warden.

19          Do you know what this Warden said, Assistant Warden

20  Bates said when she asked, *Why are you doing this*?  He said,

21  *I can't tell you.*  When she asked Assistant Warden Bates,

22  *Why didn't you discipline those two younger people*, he said,

23  *I can't tell you.  Why didn't you move them?  I can't tell*

24  *you.*  And Betty at that point threw up her hands basically

25  and said, *You're getting what you want, I'm going to retire.*

Plaintiff's Opening Statement

```
 1    At that point she left.  She was crying.  She went to the
 2    administrative building, called her husband, said, *I've had
 3    it, I can't do it any more.  I'm not going to go through
 4    what I did in the fall.  I'm on medications now.*  And she
 5    quit, she retired.
 6         Now, was Betty treated differently?  The testimony
 7    will be she was treated differently, and younger people were
 8    given special privileges.  Bart Toennies, remember that
 9    name.  He was a younger man that was brought in from
10    Lawrence correctional facility.  He was brought in ahead of
11    a more senior person, Deb Brink.  The union protested that.
12    They protested to the warden and the warden simply said, *I'm
13    not going to show you the records.*  Bart Toennies, he had
14    good evaluations where he was, but when he came here he had
15    perfect evaluations.
16         Gina Feazel, the other one, the other younger
17    person, she was given special privileges.  She had free
18    access to the warden.  She may deny that at the time she
19    testifies.  She was given special jobs.  She was a screener,
20    or a team screener I believe it is -- I may have my terms
21    wrong -- where you'd go throughout the State of Illinois and
22    screen people to be correctional officers.  She'd never been
23    a correctional officer.  She was given supervisory
24    privileges for the computer system called CHAMPS, which
25    would allow her access to every single counselor's caseload,
```

1  what they were doing, whether they were doing it correctly

2  or wrongly, and anything she found or saw, she could tell

3  supervisors.  Her evaluations were good.  She wasn't

4  disciplined, she wasn't criticized.  Bart Toennies

5  criticized, disciplined?  No.  But they weren't age 50.

6        You're going to hear the testimony of various

7  people in this case, and don't expect anyone to tell you, *We*

8  *did this because she was 50 years of age*.  That's the last

9  thing they're going to tell you in the courtroom.

10        You're going to hear the testimony of

11  Warden Robert.  Let me tell you about his qualifications.

12  He was once a correctional officer for Centralia before he

13  became assistant warden in 2003.  He never was able to get

14  above the basic correctional officer job.  He applied to

15  become sergeant.  There's all sorts of jobs above this,

16  sergeant, captain -- I don't know, major.  I don't think

17  there's any generals.  But he couldn't get above that.  He

18  left.  He left and started being a security guard for a

19  driver's license place where you bring in your license.  He

20  did title searches for cars.  I think he got a better job

21  than that later on.  And then after doing that, all of a

22  sudden he was appointed in 2003 by the Blagojevich

23  administration as assistant warden.  The next year he didn't

24  even ask.  He was moved up to a warden.  People above him

25  were just kicked out by Blagojevich.

Plaintiff's Opening Statement

1          Assistant Warden Bates and Assistant Warden Casey,

2    both appointed by the Blagojevich administration.   Those are

3    the qualifications of Warden Robert.

4    Assistant Warden Casey, she will testify by paper, meaning

5    we'll read her deposition, because she's now in New Mexico

6    and won't be here.   Her testimony will be that, *You know, I*

7    *tried to be good to Betty for the first year and I didn't*

8    *discipline her for the first year.   It was in December of*

9    *'06* -- remember what I told you -- *that I had to start*

10   *disciplining her.*

11         And we took her deposition.

12         She said*:   I even found a bunch of grievances*

13              *that she was hiding from everybody in the year*

14              *2005.*

15         I said: *Did you discipline her for that?*

16              *No.   I wanted to work with her.*

17              *Was this a big deal?*

18              *Oh, yeah, it was a tremendous deal.   I had to*

19              *tell the warden about it.*

20         That's the first time we heard about it.   Betty

21   will testify grievances -- *What's the big deal?   I keep*

22   *everything.*   It's a bunch of hog wash.   And during that year

23   that she said she was -- that Casey said she was just

24   working with Betty, you know what?   She gave Betty extra

25   duties to do.   Casey gave her compliments and memos, and

                    Plaintiff's Opening Statement

1   wasn't until December 6th -- December of '06 when she found

2   out Betty's got her 30-year pin, six or seven months down

3   the road she's going to be 50.  They had a discussion about

4   retirement.  From then on it was the worst because she --

5   Ann Casey disciplined her, criticized her over the radio.

6   She would make fun of her.  It was ridiculous.

7          I'm not going to go into the damages at this point,

8   but Betty did suffer damages, and in this type of case you

9   don't get pain and suffering; strictly damages.  I'm not

10  sure whether the judge will decide or you will decide as far

11  as back pay and that type of thing, but it's for you to know

12  that when Betty was forced to retire -- and she could have

13  retired, you know, 9, 11, 12 months before this.  She would

14  have had a very good retirement plan.  Okay.  She could have

15  had a retirement plan, if you net everything, and maybe

16  earning more than what she was working, but she wanted to

17  work because she would increase her pay scale eventually.

18  She wanted to retire at the end of 2011 or January 2012 to

19  get the ultimate out of her retirement, but she wanted to

20  work.  That's the most important thing.  She didn't want to

21  retire at age 50 or 51.

22          At the end of this case you will find that if it

23  wasn't for Betty's age, being 50, being able to retire, we

24  wouldn't be here.  If she was age 20 or 19 when she started

25  out at this stage, she'd be in the corner.  They wouldn't

Plaintiff's Opening Statement

1    try to get rid of her.  That's the case.

2          And ladies and gentlemen, I would appreciate you

3    listening to the evidence, and pay particular attention to

4    the people that testify as to whether they're telling the

5    truth because sometimes employees, when they're still

6    employed, have a tendency not to be completely truthful.

7          Thanks very much.

8          *THE COURT:*  Thanks, Mr. Falb.

9          Ms. Gunderson, your opening, please.

10                    **DEFENDANT'S OPENING STATEMENT**

11         *MS. GUNDERSON:*  Good afternoon, members of the

12   jury.  My name is Joanna Gunderson, and along with my

13   co-counsel, Kelly Choate, we represent the Department of

14   Corrections in this case.

15         Mr. Falb's last words that this was about age is

16   what this does boil down to.  This is a case about whether

17   the department discriminated, harrassed Ms. Cook because of

18   her age.  Now, there are a lot of different things that

19   happened during the time that Ms. Cook was a counselor, but

20   there are two general questions about which we are listening

21   to the evidence, most of that evidence will relate.  Those

22   two questions are, first, whether plaintiff was able to

23   perform her duties as counselor; and second, what

24   plaintiff's intentions were as far as her retirement.

25         Now, as Mr. Falb said, Betty Cook started at the

                    Defendant's Opening Statement

1    Department of Corrections in 1976, and she started in a

2    position that was called a clerk typist.  It was basically

3    like a secretarial type position, a clerical position, and

4    it was in that kind of position that she stayed for the next

5    27 years.  She accrued her seniority through the union that

6    whole time but she was always in a clerical position.  It

7    was always as a secretary in the Department of Corrections,

8    until 2004 when she got the opportunity to promote into the

9    counseling department.

10           Now, that was a great opportunity for plaintiff.

11    Afforded her a higher pay and it afforded her the

12    opportunity to get more pay increases as she got more years

13    in the Department of Corrections.

14           You will hear testimony from people who worked with

15    Ms. Cook when she became a counselor.  Listen carefully to

16    what they describe about how she was able to perform as a

17    counselor, and also look at what their ages were.  What

18    you'll find, the evidence will show, is that Ms. Cook was

19    not able to handle the counseling position.  She had trouble

20    with it from the start.  She had trouble with it when she

21    first came in learning the job, she had trouble with it

22    throughout the time that she was a counselor.  And it was a

23    hard job.  Everyone will testify, it was a hard job to grasp

24    and it was a hard job to do, and that was compounded by the

25    fact that they were short-staffed.  They still had to get

Defendant's Opening Statement

```
 1   all the work done.  They couldn't not see the inmate, they
 2   couldn't not do orientation or not do the work that had to
 3   be done before those inmates went out.  All that work still
 4   had to be done.  It had to be split between fewer numbers of
 5   people.
 6          You'll hear evidence from the different people who
 7   worked with Ms. Cook that she had problems with the job, and
 8   what the -- part of the thing that would have compounded
 9   this is that in 2005, as Mr. Falb said, she got a new
10   supervisor, Ann Casey.  Now, the evidence will show that
11   Ms. Casey and Ms. Cook did not get along.  In fact, the
12   evidence will show that Ms. Casey was not well-liked within
13   the counseling department.  Ms. Casey had other duties.  I
14   know you had a chart up here that showed you that she was
15   just over the counselor department.  She was actually over
16   several different departments within the Centralia prison.
17   Counseling was one of her specific jobs, and because there
18   were no immediate supervisors at the time Betty was a
19   counselor, Ms. Casey was the direct supervisor over the
20   counseling department.
21          Now, the evidence will show and you'll hear parts
22   of Ms. Casey's deposition that she did try to work with
23   Ms. Cook.  She tried to help her help herself.  She tried to
24   help her learn the job, help her stop making mistakes.  But
25   in early spring of 2007, Ms. Casey threw in the towel, and
```

                    Defendant's Opening Statement

```
 1   at that time she started to discipline plaintiff for

 2   mistakes she was making in her job as a counselor.

 3              Now, Mr. Falb talked a little bit about the hearing

 4   process.  The way the hearing process works is that when a

 5   supervisor refers an employee for discipline, it is assigned

 6   to a hearing officer.  That person hears the evidence on

 7   both sides and has to determine whether the person did the

 8   thing that they're alleged to have done, whether it violated

 9   rules, and what, if any, discipline is necessary.

10              What you'll find in Ms. Cook's case, she was

11   referred for discipline six times over the course of a few

12   months in 2007.  Of those six instances, one of them was

13   found to not be sustained and was thrown out.  Of the

14   others -- there was one where there were parts of it that

15   she was found to have done and parts found to be somebody

16   else, but she did incur discipline.  But the evidence will

17   show that it was discipline for things that she did while

18   she was working as a counselor, things that she made --

19   mistakes that she made she was disciplined for.  The

20   evidence will also show that there were not other counselors

21   making those same mistakes.  You will hear no evidence that

22   other counselors were doing the same sorts of things that

23   Ms. Cook got in trouble for.  You will also hear evidence

24   from the counselors that the things she did, the mistakes

25   she made, were serious.  They were things that should be
```

                    Defendant's Opening Statement

1    disciplined for.

2           Now, in July 2007, a few things changed.  By that

3    time the counseling department was very short-staffed.  And

4    you heard a little bit about other counselors being

5    transferred into the department.  The evidence will show

6    that was done in order to cure the staffing problems.  There

7    was e-mail sent out to a lot of different prisons asking for

8    help in Centralia:  *We need help.  We've got too many*

9    *inmates, not enough people to do it.  Send us some people.*

10   That's how Barton came to be at Centralia.

11          In July 2007 -- that date's significant for a

12   couple reasons.  Plaintiff was on -- had gone on vacation

13   and came back.  It was shortly before she left on her

14   medical leave of absence due to stress.  That is also the

15   date, the last date that Ann Casey ever worked for the

16   Department of Corrections.  After July 2007, Ms. Cook had no

17   contact with Ms. Casey.  She hadn't spoken to her, she

18   wasn't being supervised by her; she was gone.

19          Plaintiff returned -- or Ms. Cook returned from her

20   leave of absence in November 2007, three months later, and

21   she had a new supervisor, and she did have a new caseload,

22   but she'd been gone for three months.  Actually, what the

23   evidence will show is that they had -- a counselor died, and

24   it was right before Ms. Cook came back, so they just swapped

25   her in for that position.  That's why she had a different

                    Defendant's Opening Statement

1    caseload.  In any event, she also had a new supervisor.  The

2    evidence will show Ms. Cook didn't have problems with Bates.

3    She made no complaints to Warden Bates about how he was

4    treating her until she decided to retire in May of 2008.

5    She received no discipline.  Her caseload did not change.

6    She was in that same caseload the entire time until she

7    retired in 2008.

8         MR. FALB:  Objection.  That's not the evidence.

9         THE COURT:  I'm sorry.  I didn't hear.

10        MR. FALB:  Objection.  That will not be the

11   evidence.  It's a misstatement.

12        THE COURT:  Well, overruled.  The jury will hear

13   the evidence and make that determination.

14        MS. GUNDERSON:  Plaintiff's decision to retire in

15   2008 had nothing to do with the way they treated her.  That

16   takes us to the second question of:  What were her

17   intentions about retiring?  The evidence will show that

18   Ms. Cook took the counseling position as a retirement job,

19   and it makes sense.  She was making more money.  That would

20   increase her pension.

21         And Mr. Falb talked a little bit about the ability

22   to retire when you're 50.  Those numbers are rather

23   complicated, and I won't get into them too much now, but

24   what you'll come to find out is that a lot of people in

25   corrections do retire when they're 50.  Part of that is

Defendant's Opening Statement

1    because when they retire they actually have a greater net

2    income retired than they did working, so there's no

3    incentive to stay.  The other thing the evidence will show

4    is that Ms. Cook talked about retirement to all the

5    counselors, she talked about it to all the wardens.

6    Everyone knew she was able to retire when she was 50.

7    Everyone knew what years she had in the institution.  She

8    was ready to get out.  Did other people talk to her about

9    her retirement?  The evidence will show that was because

10   Ms. Cook was talking to them about her retirement.  Ms. Cook

11   made those issues known.

12          So it was -- there was no surprise that she chose

13   to retire in 2008.  The evidence will show that that

14   decision was not something that was forced by the

15   Department.  There will be no evidence that the department

16   forced Ms. Cook to retire.  There'll be no evidence that

17   Warden Bates did anything to force Ms. Cook to retire.

18   Indeed, between the time that Warden Bates was supervising

19   Ms. Cook, she received no discipline.  She did have good

20   evaluations.  The problems that Ms. Cook had had with

21   Ms. Casey were ten months in the past.  The evidence will

22   show that plaintiff's decision to retire in May of 2008 was

23   nothing but her own.

24          Mr. Falb talked a little bit about seniority

25   system.  Pay close attention to the correlation between

Defendant's Opening Statement

1    seniority and age.  The evidence will show that some of the

2    more senior counselors were younger than those that Ms. Cook

3    alleges.  There's no correlation to age.  Two people who are

4    the same age working at the prison could have complete

5    different seniority.  If one started at age 18 and one

6    started at age 32, there's going to be 18 years of

7    difference between their seniority.  Doesn't necessarily

8    correlate to age.  And you'll find in this case, as you hear

9    the evidence and as you look at the evidence, that the

10   evidence will show that in this case it doesn't correlate to

11   age.

12           At the end of this case, my co-counsel, Ms. Choate,

13   will stand before you, and at that time she'll ask you,

14   after having heard all the evidence and considering all the

15   evidence, that you find that the Department of Corrections

16   did not discriminate or harrass plaintiff because of her

17   age, and she will ask you to enter a verdict of not liable.

18           Thank you.

19           *THE COURT:*  Thanks, Ms. Gunderson.

20           Ladies and gentlemen, the following facts are not

21   disputed or have been agreed to or stipulated to by the

22   parties:

23               Plaintiff was born in 1957.

24               Plaintiff started working for the department

25               in 1976 at the Pontiac Correctional Center.

Jury Instructions

1          Plaintiff transferred to Centralia

2     Correctional Center in 1994.

3          Prior to becoming a counselor, plaintiff's job

4     at the department was clerical.

5          Plaintiff became a Correctional Counselor I in

6     February 2004.

7          In February 2004, there were six Correctional

8     Counselor II's at Centralia.  They were

9     Sena Landreth, S-E-N-A, L-A-N-D-R-E-T-H;

10    Pamela Alemond; Cindy Keck; Anthony Ballantini;

11    Terri, T-E-R-R-I, Loepker, L-O-E-P-K-E-R; and

12    Gina, G-I-N-A, Feazel, F-E-A-Z-E-L.

13         From February 2004-March 2006, there was one

14    Correctional Counselor III at Centralia, Alan,

15    A-L-A-N, Sanner, S-A-N-N-E-R, who was responsible

16    for a regular housing unit caseload of inmates as

17    well as orientation of new inmates, approving

18    time off requests for counselors, reviewing work

19    of counselors and providing input into the

20    performance evaluations of counselors.

21         In February 2004, plaintiff's supervisor was

22    assistant warden of programs Allan, that's

23    A-L-L-A-N, Wisely, W-I-S-E-L-Y.

24         In January 2005, Ann Casey was appointed

25    assistant warden of programs at Centralia.


                    Jury Instructions

1          In February 2005, plaintiff received a

2     promotion to Correctional Counselor II.

3          October 2005, Pam Alemond and Cynthia Keck

4     left the counseling department.

5          After Sanner, Ballantini and Loepker left on

6     March 17, 2006, the counseling department at

7     Centralia consisted of three Counselor II's,

8     which were plaintiff, Feazel, and Landreth.

9          After March 17, 2006, the work of what had

10    been six counselors was divided among the

11    remaining counselors.

12         Since March 17, 2006, there has not been a

13    Correctional Counselor III at Centralia.

14         Since March 17, 2006, there has not been a

15    posting for a Correctional Counselor III at

16    Centralia.

17         In December 2006, Bart Toennies,

18    T-O-E-N-N-I-E-S, permanently transferred to the

19    counseling department at Centralia as a

20    Counselor II.

21         In January 2007, Deb Brink promoted to

22    counselor -- sorry, promoted to Correctional

23    Counselor I at Centralia.

24         From January to July 2007, there were four

25    Counselor II's -- they were plaintiff, Feazel,

Jury Instructions

 1          Landreth, and Toennies, T-O-E-N-N-I-E-S -- and

 2     one Counselor I, who was Brink, at Centralia.

 3          Discipline that is "progressive" follows a

 4     list proscribed in the collective bargaining unit

 5     which sets forth what discipline should be

 6     imposed based upon what discipline came before.

 7          On March 19, 2007, plaintiff made an entry

 8     into the CHAMPS system, C-H-A-M-P-S system, for

 9     Inmate Cobb.

10          On May 10, 2007, plaintiff received a written

11     reprimand (reduced to counseling pursuant to a

12     grievance resolution) as discipline for making an

13     inappropriate CHAMPS entry.

14          In April 2007, plaintiff failed to log contact

15     for more than 60 -- that's 60 -- inmates on her

16     caseload.

17          On May 10, 2007, plaintiff received a one-day

18     suspension (reduced to an oral reprimand pursuant

19     to a grievance resolution) as discipline for

20     failing to see 61 inmates on her caseload within

21     the required 90 days.

22          On April 24, 2007, plaintiff approved a

23     visitor list for Inmate Williams which included

24     as a potential visitor, Molly McClendon,

25     M-c-C-L-E-N-D-O-N.


                        Jury Instructions

1        On June 15, 2007, plaintiff received a 3-day

2    suspension as discipline for approving an

3    inmate's visitor list which contained a victim of

4    that inmate as a visitor.

5        On May 8, 2007 and May 9, 2007, incident

6    reports were written which allege that plaintiff

7    was not classifying her inmates in a timely

8    manner.

9        On June 8, 2007, the allegations that

10   plaintiff was not classifying inmates in a timely

11   manner were dropped and plaintiff received no

12   discipline.

13       In May 2007, Casey performed a performance

14   evaluation of plaintiff for 2006-2007, which was

15   later expunged pursuant to a grievance.

16       On June 7, 2007, plaintiff sent an e-mail to

17   Deb Gordon requesting that she change information

18   in the CHAMPS system for a list of inmates.

19       On August 9, 2007, plaintiff received a 5-day

20   suspension as discipline for going outside the

21   chain of command when she sent the June 7, 2007

22   e-mail.

23       On August 9, 2007, plaintiff received a 10-day

24   suspension (expunged pursuant to a grievance

25   resolution) for attempting to falsify a

Jury Instructions

1   department record when she sent the June 7, 2007

2   e-mail.

3       On July 7, 2007, Ann Casey resigned as

4   assistant warden of programs and left the

5   department's employ.

6       Plaintiff had no contact with Casey after

7   June 26, 2007.

8       During the time between when Casey resigned

9   and a new assistant warden was appointed,

10  Julius Flagg, assistant warden of operations at

11  Centralia, acted as the supervisor over the

12  counseling department.

13      After Casey left, plaintiff went on a leave of

14  absence from Centralia starting August 20, 2007.

15      Plaintiff returned from leave of absence on

16  November 14, 2007.

17      On November 20, 2007, Assistant Warden

18  Julius Flagg performed a performance evaluation

19  of plaintiff for 2006-2007 as required by a

20  grievance resolution.

21      In January 2008, Stacy Burton became a

22  counselor.

23      Plaintiff submitted her intent to retire on

24  May 15, 2008.

25      Plaintiff retired from the department on

Jury Instructions

1          June 1, 2008.

2              The following were counselors at Centralia

3      Correctional Center, January 2004 through

4      June 2008 -- actually, I think it will be better

5      if I put these on the document camera:

6          Betty Cook:  Year of birth August 25, '57;

7      hired by DOC, 1976; started as counselor, 2004.

8          Alan Sanner:  Year of birth, 1955; hired by

9      DOC, 1980; started as counselor, 1993.

10         Pamela Alemond:  Year of birth, 1957; hired by

11     DOC, 1980; started as counselor in 1995.

12         Sena Landreth:  Year of birth, 1955; hired by

13     DOC, 1981; started as counselor, 1981.

14         Terri Loepker:  Year of birth, 1960; hired by

15     DOC, 1981; started as counselor, 1998.

16         Anthony Ballantini:  Year of birth, 1959;

17     hired by DOC, 1983; started as counselor, 2000.

18         Cynthia Keck:  Year of birth, 1967; hired by

19     DOC, 1985; started as counselor, 1999.

20         Gina Feazel:  Year of birth, 1966; hired by

21     DOC, 1999; started as counselor, 2004.

22         Bart Toennies:  Year of birth, 1971; hired by

23     DOC, 1994; started as counselor, 2001.

24         Deb Brink:  Year of birth, 1957; hired by DOC,

25     1982; started as counselor, 2007.

                        Jury Instructions

1          Brandon Risse:  Year of birth -- or maybe

2              that's "rise", R-I-S-S-E, "reesee".  Thank you.

3              Year of birth, 1974; hired by DOC, 1999; started

4              as counselor, 2007.

5          Stacy Burton:  Year of birth, 1968; hired by

6              DOC, 1988; started as counselor, 2008.

7          So that's all of the stipulated facts.  The last

8    thing I want to talk about -- and then we'll take an

9    afternoon break before we come back and start with the

10   testimony -- there's a process by which -- and I mentioned

11   it when we were talking during the jury selection.  There's

12   a process by which you'll be allowed to ask questions.  And

13   this is how that works:  After the lawyers are done with a

14   particular witness in asking questions, after they get done

15   with all the direct and cross-examination, if you have a

16   question -- hopefully I'll remember to do this -- I'll turn

17   to the jury and I'll say, *Are there any questions from the*

18   *jury?*  Write down your questions.  Or if any time during the

19   questioning of the lawyers you have a question, write down

20   your question.  Then when I ask if you have any questions,

21   just pass your written questions down to Katie, who's

22   sitting down here at this desk.  She'll then pass the

23   written questions up to me here at the bench.

24          The lawyers and I will have a conference at the

25   sidebar over there where I turn on what's called white

Jury Instructions

 1  noise, which is just a real scratchy, ugly, horrible noise

 2  that allows us to have a conversation about your questions.

 3  Actually turns on the microphone over there and Laura can

 4  put on her headphones here, and it happens any time we have

 5  a sidebar, whether it's about your questions, about any

 6  other legal issue that we want to have a conversation about

 7  without anybody else in the courtroom listening in on our

 8  conversation.

 9          So when we talk about your questions, just like

10  when any of the lawyers ask a question, the other lawyer can

11  make an objection to that question.  Well, when you ask a

12  question, either one of the lawyers could make an objection

13  to your question or could have an objection to your question

14  or I could have an objection to your question.  So just like

15  when a lawyer makes an objection, if I sustain an objection

16  to the question, the other lawyer just kind of takes his or

17  her lumps and goes on and keeps asking questions.  Well,

18  don't be concerned and don't dwell on the fact if your

19  question should happen to not be asked.  I always come in

20  the jury room after a case is over and do an exit interview.

21  If you want to ask me at that time, *Hey, why didn't my*

22  *question get asked*?  I'll say, *Which questions was yours?*

23  And I'll be happy to explain to you why your question didn't

24  get asked.

25          More often than not it's because it violated one of

Jury Instructions

1   our rules, quite simply.  It might be that you've asked a

2   question that would allow in irrelevant evidence or maybe it

3   has something to do with some form or other that's

4   irrelevant.  If we can tweak your question, change it around

5   just a little and get to the point to make it a proper

6   question, I'll do that.  If your question is not objected to

7   or we've tweaked it a little bit, then I will ask your

8   question to the witness.

9           Once all your questions are asked, then the lawyers

10  have a right to come back and ask follow-up questions within

11  the narrow scope of your questions.  They can't go off on

12  new tangents or anything like that, but they can ask

13  follow-up questions to your specific question.  We'll do

14  that with each and every witness that's a live witness.  We

15  can't do that obviously with deposition testimony but we can

16  do it with live witnesses.  Anybody have any questions about

17  that procedure with you asking questions?  Anybody?  No.

18          Okay.  So let's take a 15-minute break.  Same

19  admonishments that I gave you before.

20      *(Jury out)*

21      *(Break)*

22                          *   *   *   *

23      *(Reconvened)*

24      *(Jury out)*

25          *MR. FALB:*  I have to call a witness out of order,

                        Jury Instructions

 1    Gina Feazel.  She's an employee, and I would like to

 2    cross-examine her because I believe she is hostile and

 3    adverse to our position.

 4         THE COURT:  Do you dispute that she's associated

 5    with the defendant and in a way such that he should be

 6    allowed to cross-examine her?

 7         MS. GUNDERSON:  I mean she is a department

 8    employee.  I don't know that she would necessarily be

 9    hostile.  Obviously if she starts to --

10         THE COURT:  Of course, in the federal system we

11    don't call them "hostile witnesses".  If she has a close

12    enough association with the defendant then we typically let

13    them, let a party -- let a lawyer cross-examine the witness,

14    but --

15         MS. GUNDERSON:  She's not a decision-maker.  She's

16    one of the alleged similarly situated people.  You know, I

17    don't know that she would be adverse or not cooperative.

18    Obviously, if that would happen --

19         THE COURT:  Start out with a regular direct

20    examination.  Then if I perceive that she's adverse to your

21    position, I'll let you know and I'll let you switch to

22    leading questions.

23         MR. FALB:  So is that a half victory for me?

24         THE COURT:  That's a half victory for you.  Start

25    out with regular nonleading questions, and if I --

                        Jury Instructions

 1              MR. FALB:  Isn't it true that you're 20 years of

 2    age?

 3              THE COURT:  That's not exactly a nonleading

 4    question, so I'll just simply say, Mr. Falb, you can use

 5    leading questions.

 6         **(Break)**

 7                             *   *   *   *

 8         **(Jury in)**

 9              THE COURT:  Call your first witness, please.

10              MR. FALB:  Gina Feazel.

11             **GINA FEAZEL, PLAINTIFF'S WITNESS, SWORN**

12                        **DIRECT EXAMINATION**

13                      **QUESTIONS BY MR. FALB:**

14              MR. FALB:  May I proceed, Your Honor?

15              THE COURT:  Please.

16    Q.  State your full name, please.

17    A.  Gina Renee Feazel.

18    Q.  What is your age?

19    A.  44.

20    Q.  What is your date of birth?

21    A.  9/4 --

22              MS. CHOATE:  Objection to day, month because they

23    still work for the Department of Corrections and there are

24    security issues with entire date of birth being in.

25              THE COURT:  You can -- are you concerned about the

                              Direct - Feazel

 1  transcript or coming out in open court?

 2       MS. CHOATE:  I'm concerned about both.  There are

 3  security issues.  We have no objection to birth year, but as

 4  far as an inmate getting this information would be a

 5  problem.

 6       THE COURT:  Stick with just birth year.

 7       MR. FALB:  Thank you, Your Honor.

 8  Q. (By Mr. Falb)  What year were you born?

 9  A.  1966.

10  Q.  You became a counselor in the Centralia correctional

11  facility, is that correct?

12  A.  Yes.

13  Q.  And that was in January of 2004, is that correct?

14  A.  February 1st of 2004.

15  Q.  And that was at the same time as Betty Cook?

16  A.  Yes.

17  Q.  And before being a counselor you had never been a

18  counselor, is that correct?

19  A.  No, I had not.

20  Q.  You started with the Department of Corrections in what

21  year?

22  A.  1999.

23  Q.  Okay.  And then did you work continuously for the

24  Department of Corrections?

25  A.  Yes.

                        Direct - Feazel

```
 1   Q.  Okay.  And when you became a counselor in February of
 2   2004, were you 37 years of age?
 3   A.  Yes.
 4   Q.  At that time you were the youngest of the counselors?
 5   A.  No.
 6   Q.  Who was younger than you?
 7   A.  Cindy.
 8   Q.  Cindy Keck?
 9   A.  Yes.
10   Q.  One year younger?
11   A.  Yes.
12   Q.  Prior to becoming a counselor in February of 2004, did
13   you know Warden Robert?
14   A.  Yes.
15   Q.  For how many years have you known Warden Robert?
16   A.  I don't know.  I met him initially -- would have been
17   like late eighties, but then I hadn't seen him again in
18   quite awhile.  I don't know.
19   Q.  Is it your testimony that you had not seen Warden Robert
20   for quite awhile before you were in counseling, started in
21   counseling?
22   A.  Whenever he -- sometime between '01 and -- 2001 or after
23   is the next time I saw him.
24   Q.  Okay.  So in 2001 up 'til the time you got the job in
25   counseling, you had seen Warden Robert, is that correct?
```

Direct - Feazel

1    A.    Yes.

2    Q.    All right.  And he was a friend of yours, is that right?

3    A.    No.

4    Q.    What was he?

5    A.    The Democrat county chairman.

6    Q.    Okay.  Anything more than a friend -- strike that.

7          Let me ask you this:  How often would you see

8    Warden Robert during that period of time?

9    A.    I don't recall when he started at Corrections, so I

10   don't know that time period.  But from the point in '01 to

11   whenever he started, maybe a couple three times a year.

12   Q.    Prior to you becoming a counselor, what was your job for

13   Department of Corrections?

14   A.    I was the paralegal assistant in the law library.

15   Q.    So you gave -- helped prisoners research?

16   A.    I directed them, showed them the way they had to do it

17   themselves, yes.

18   Q.    How long had you been in the library?

19   A.    Since December of '99.

20   Q.    Was that your only job for the Department of

21   Corrections?

22   A.    No.

23   Q.    What was your job previous to that?

24   A.    Office Coordinator III.

25   Q.    Which is what?

                         Direct - Feazel

1  A.  In the school, in the office.

2  Q.  In the office.  Okay.  Now, have you read your

3  depositions in this case?

4  A.  Yes.

5  Q.  Have the defense attorneys given you those depositions?

6  A.  Yes.

7  Q.  You've gone over those depositions with them?

8  A.  No, I haven't gone over it with them, but I read it.

9  Q.  Have you met with the defense attorneys?

10  A.  Yes.

11  Q.  How many times have you met with them?

12  A.  Since the deposition?

13  Q.  Yes.

14  A.  Just once.

15  Q.  Even prior to the deposition you met with them, is that

16  correct?

17  A.  Once.

18  Q.  You met with them at the Department of Corrections, is

19  that correct?

20  A.  Yes.

21  Q.  And you met with them in the warden's conference room?

22  A.  Yes.

23  Q.  Now, when you became counselor, your first job was

24  assigned to grievances, is that right?

25  A.  Yes.

Direct - Feazel

 1   Q.  And you weren't assigned at a regular unit of inmates,

 2   were you?

 3   A.  I can't recall what periods of time without seeing

 4   the --

 5   Q.  Your initial job was simply grievances, right?

 6   A.  I can't -- I don't know if I had one housing unit to

 7   begin with or was given one shortly thereafter.  I don't

 8   recall the time periods.

 9   Q.  Okay.  And when you started out as a counselor did you

10   started out with Betty Cook?  Is that right?

11   A.  Yes.

12   Q.  And at that time, just to make sure the jury can

13   remember, because we've gone through a lot of names -- do

14   you see that screen in front of you?

15   A.  Yes.

16   Q.  Are those the names of the counselors that you started

17   out with?

18   A.  Yes.

19   Q.  Okay.  And you're at the bottom there, age 39, with six

20   years of experience with the State, is that correct?

21   A.  Yes.

22   Q.  And at least as far as experience, the years, you had

23   the least of all the experience, is that right?

24   A.  Yes.

25   Q.  And as far as age, you were 39, the youngest, except for

Direct - Feazel

```
 1  Mrs. Keck, now known as Mrs. Cagle?

 2  A.  Yes.

 3  Q.  And then in December of '06 -- first of all, in December

 4  of '06, were you there for Betty's 30-year pinning?

 5  A.  I don't believe so.

 6  Q.  Do you know why there was not a 30-year pinning for her

 7  at that time, any kind of --

 8          MS. CHOATE:  Objection, foundation.

 9          MR. FALB:  I'll withdraw that.

10  Q. (By Mr. Falb)  Ma'am, let me show you -- in December of '06,

11  were these the counselors?

12  A.  I don't know.

13  Q.  Well, first of all, we got you, is that right?

14  A.  What period of time was this?

15  Q.  December of '06.  Cook, Landreth, Feazel and Toennies.

16  That's when Bart Toennies just came in?

17  A.  I don't believe that's correct.

18  Q.  Who else was in there then, or who else was not in

19  there?

20  A.  Because I was thinking that Alan Sanner, Terri Loepker,

21  and Tony Ballantini didn't leave until like March of '07 or

22  something.

23  Q.  Let me refresh your recollection.  Is it possible that

24  Alan Sanner, Terri Loepker, and Tony Ballantini, the names

25  we have here, actually all three of them left in March of
```

Direct - Feazel

1    '06, and in October of '05 Alemond and Keck left?

2    A.  It's possible, but I don't know the dates.

3    Q.  Okay.  Assuming these are the counselors in December of

4    '06, it would be -- Cook would be -- Cook and Landreth would

5    have been the oldest, is that correct?

6    A.  Yes.

7    Q.  And Feazel -- that you and Toennies would be the

8    youngest, is that correct?

9    A.  Yes.

10   Q.  And Bart Toennies had just transferred in in December of

11   '06?

12   A.  I don't know when he transferred.

13   Q.  Okay.  Do you remember him working in the counseling

14   department?

15   A.  Yes.

16   Q.  Okay.  Was he TA'd there originally, meaning a temporary

17   assignment, and got a permanent job in December of '06?

18          MS. CHOATE:  Objection.  He's leading.

19          THE COURT:  Sustained.

20   Q. (By Mr. Falb)  Do you remember when Mr. Toennies became a

21   permanent counselor?

22   A.  No, I don't.

23   Q.  And when Mr. Toennies became -- or when he actually

24   became a counselor, do you remember a problem coming up

25   because Deb Brink, who was older, had more seniority, was

                          Direct - Feazel

 1  not made a counselor before Mr. Toennies?

 2  A.  I don't recall a problem.

 3  Q.  Was there a grievance by your union?

 4  A.  I don't know.

 5  Q.  Did you ever talk to Warden Robert about Mr. Toennies

 6  and what was going on at that time?

 7  A.  No.

 8  Q.  Let me ask you this:  When Betty -- do you remember when

 9  Betty retired?

10  A.  Yes.

11  Q.  When did she retire?

12  A.  I believe it was May of '09.

13  Q.  Could it have been May of '08?

14  A.  It could have been, sir.  I don't know.

15  Q.  I'm not asking you to have a photographic memory.  Let

16  me ask you this:  In May of '08, if she in fact retired in

17  May of '08, would these have been the counselors just before

18  Betty retired?

19  A.  Unless Landreth was still in -- I can't remember if she

20  went before or after Betty Cook.

21  Q.  I want you to -- do you recall Sena Landreth, the other

22  older counselor, retiring in January of '08?

23  A.  That's -- I mean she retired.  I just don't know when.

24  Q.  I think the judge may have already read that to the jury

25  if I recall.

Direct - Feazel

1    A.   Okay.

2    Q.   Assuming that as being true, does that sound about

3    right, that she would have retired in January of '08, that

4    would have been Sena Landreth?

5    A.   If she did, then yes.

6    Q.   Okay.  So at this point in time the counselors -- I've

7    crossed out here Landreth, Sanner, Alemond, Loepker,

8    Ballantini, Keck and Brink had all retired -- or in Brink's

9    case, died?

10   A.   Right, or --

11   Q.   Or been promoted to a different position?

12   A.   Right, yes.

13   Q.   Okay.  Now, do you remember Deb Brink?

14   A.   Yes.

15   Q.   Okay.  She had -- she was older than you, is that

16   correct?

17   A.   Yes.

18   Q.   She was close to 50 years of age?

19   A.   I don't know her age.

20   Q.   Okay.  Well, do you recall her starting -- because it

21   was a contract with the union, she was able to slide in or

22   move in to the counseling department in the year '07?

23            MS. CHOATE:  Objection, foundation.

24            MR. FALB:  I'm just asking her if she recalls.

25            THE COURT:  Yeah.  Overruled.  If you recall,

                         Direct - Feazel

```
 1    that's fine.  If you don't, you can say that.
 2            THE WITNESS:  I don't know when.
 3    Q. (By Mr. Falb)  Okay.  And do you recall that she only worked
 4    for about nine months before she died?
 5    A.  Yes.
 6    Q.  Okay.  And Deb Brink, according to my calculations, when
 7    she was in the counseling department, was 49 years of age
 8    and had 24 years of experience.  Does that sound right?
 9    A.  I don't know.  I don't know her age.
10    Q.  What's your best estimate before she died?
11    A.  That's probably right, but I don't know that for a fact.
12    Q.  And you recall her having over 20 years of experience --
13    A.  Yes.
14    Q.  -- with the department?  So is it safe to say that by
15    May of 2008, all of the older counselors above you had gone?
16            MS. CHOATE:  Objection, leading.
17            THE COURT:  Overruled.  You can go ahead and answer
18    that question.
19            THE WITNESS:  Oh, I'm sorry.  Yes.
20    Q. (By Mr. Falb)  And once Betty Cook left in May of 2008, you
21    were the oldest counselor there, is that correct?
22    A.  Yes.
23    Q.  And at all times when you were a counselor in the
24    counseling department, beginning in February of 2004,
25    through the time Betty retired, the supervisors above you,
```

                          Direct - Feazel

```
 1    corrections case work supervisor and clinical services
 2    supervisor, were never filled?
 3    A.   Right.
 4    Q.   So in those -- because of lack of supervisors, the
 5    assistant warden was your supervisor?
 6    A.   Right, yes.
 7    Q.   When Betty retired, Assistant Warden Bates, is that
 8    correct?
 9    A.   Yes.
10    Q.   And before him it was Flagg, and before him it was
11    Casey?
12    A.   Yes.
13    Q.   And let me ask you this:  Do you recall when Betty was
14    off on sick leave, stress leave?
15    A.   Yes.
16    Q.   In the fall of 2007?
17    A.   Again, I don't know the dates.
18    Q.   Let's assume that's the time period.  Do you recall
19    Brandon Risse coming in as a new counselor?
20    A.   Yes.
21    Q.   And were you training him?
22    A.   Yes.
23    Q.   And Brandon Risse, was he like on probation or what?  He
24    was a Counselor I or Counselor II?
25    A.   He came in as a II, I believe.
```

Direct - Feazel

1   Q.   Okay.  But you had to train him?

2   A.   Sena and I did, yes.

3   Q.   Well, when you trained him did you talk about Betty Cook

4   with him?

5   A.   The fact that she was off?  I mean possibly, yes.  I

6   don't recall our exact conversations.

7   Q.   You only recall you possibly talked to Mr. Risse about

8   Betty?

9   A.   I'm sure she came up at some point in time.

10  Q.   Did you --

11  A.   Who was covering what.

12  Q.   Did you talk about every single discipline that Betty

13  received?

14  A.   No.

15          MS. CHOATE:  Objection, calls for hearsay.

16          THE COURT:  Sustained.

17          MR. FALB:  Your Honor, I'm asking what she said to

18  Mr. Risse.

19          MS. CHOATE:  Same objection.

20          THE COURT:  Sustained.  Still hearsay.

21          MR. FALB:  May I approach the bench?

22          THE COURT:  Sure.

23                    *   *   *   *

24      (Discussion held at sidebar:)

25          MR. FALB:  Judge, it's our position, because she's

                      Direct - Feazel

1    the witness, she can say what she said; therefore, it's not

2    hearsay.

3         MS. CHOATE:   That's an out-of-court statement going

4    to prove the truth of the matter.   It is hearsay and it's

5    improper and should be omitted.

6         MR. FALB:   I think the rule says it's the

7    declarant -- federal rules are different from state law.   If

8    the declarant's on the stand, declarant can testify as to

9    what the declarant said even if it's outside -- under state

10   law she would be correct.   This is federal law.

11        MS. CHOATE:   Under federal law is what I'm talking

12   about.

13        THE COURT:   I think she's right.

14        MR. FALB:   I read the rule last night but maybe I

15   read it wrong.

16        THE COURT:   Maybe she's right.

17        MS. CHOATE:   Says hearsay.   It's a statement other

18   than one made by declarant while testifying at trial or

19   hearing.   He's asking them about statements made, not here,

20   but asking them about statements made outside of any sort of

21   hearing.   Her statement is being asked about something

22   outside of this.

23        MR. FALB:   That wouldn't make sense, that

24   definition then.   She can be cross-examined.   Otherwise,

25   this definition wouldn't make any sense.

                         Direct - Feazel

1          MS. CHOATE:  So -- she's not a party.  So she's

2     making a statement in court, it's not hearsay, but if she's

3     making a statement about another statement that was made

4     outside of court, that's hearsay.

5          MR. FALB:  Be no reason to have this definition

6     defined the way it is.

7          MS. CHOATE:  Statement by witness.

8          MR. FALB:  I mean, you know, otherwise, when would

9     anyone testifying be nonhearsay?  She's testifying right

10    now.  My interpretation of this is federal rule differs from

11    Illinois rule, that when a declarant is testifying a

12    declarant can testify under federal law what that declarant

13    said previously.  It's not hearsay.

14         MS. CHOATE:  These are -- when you talk about the

15    hearsay exceptions, these are not hearsay.  It's if they

16    testify something -- you know, it's inconsistent with

17    something before.  If you're going to impeach them, then you

18    get into this stuff, or omission.  If she was the

19    decision-maker, that might be different then, but what was

20    said by the decision-maker's different.  She's not a

21    decision-maker.

22         MR. FALB:  I also plan on her testifying -- or

23    she'll probably deny this, that she told Brandon Risse that

24    the higher ups were going to hold promotions until they got

25    rid of her.

                              Direct - Feazel

 1              *THE COURT:*  Say that again, that she told

 2    Brandon Risse what?

 3              *MR. FALB:*  That the administration was not going to

 4    post any supervisory positions until Sena Landreth was gone,

 5    and she was already gone two months after this statement,

 6    and then six months later my client's gone.  In other

 7    words -- I'm sorry, she said to Brandon Risse, they, the

 8    administration, are not going to post any new administrative

 9    positions, supervisory positions, until Gina -- or

10    Sena Landreth is gone and until my client's gone.

11              *THE COURT:*  The witness said that?

12              *MR. FALB:*  Uh-huh, yes.

13              *THE COURT:*  And she's in possession of that

14    knowledge how?

15              *MR. FALB:*  By talking to the warden.  She's going

16    to deny it, but Brandon's going to testify right now that's

17    what she said.

18              *MS. CHOATE:*  There's still a hearsay issue.  It's

19    one thing -- he's asking what the management says, if she

20    knows that.  However, what she said to some other person and

21    for him to be asked what Gina said would still be hearsay

22    because it would be like third-hand or second-hand by that

23    time.  Gina said that so-and-so said --

24              *THE COURT:*  That if he asked Gina, that that would

25    be second-hand or third-hand?

                        Direct - Feazel

1          *MS. CHOATE:*  Second-hand certainly if -- if he

2     asked, what did the administration -- did the administration

3     say anything to you about posting, then that would most

4     likely be, you know, an exception because it's party

5     opponent.

6          *THE COURT:*  Right.

7          *MS. CHOATE:*  But what did Gina say to somebody

8     about what somebody else said, that's different.  That's a

9     previous statement that she's made, allegedly.

10          *MR. FALB:*  Still say that's a -- she's the

11    declarant.  You can cross-examine her.  It's not like she's

12    testifying to someone else what they said to her.  When you

13    can't cross-examine that person, that's the purpose for the

14    hearsay rule.

15          *MS. CHOATE:*  As Ms. Gunderson said, that's

16    basically what some unknown person in administration said.

17    I mean that's one thing if she knows that somebody in

18    administration said it, but for -- you know, what did you

19    tell him?  I still believe that that's hearsay.

20          *MR. FALB:*  I don't understand how this -- why you

21    would have that rule there if it wasn't for allowing the

22    declarant to say what the declarant said previously.  You

23    wouldn't have that in there.

24          *MS. CHOATE:*  For example, if it was a party saying

25    that they couldn't say what they said previously because

Direct - Feazel

 1   that would be a prior consistent statement.  Betty can't

 2   say, *I told so and so this*.  She can't say that.  That's --

 3          MR. FALB:  You can cross-examine her.

 4          MS. CHOATE:  That's hearsay.  She can't bolster her

 5   own case by saying what she told somebody else.  It's like a

 6   grievance.  Her grievances will all --

 7          THE COURT:  What was the question you asked her?

 8          MR. FALB:  I asked her what she told Brandon Risse

 9   about my client as far as discipline.  Just don't understand

10   why that rule would be there.  You know, I mean if her

11   interpretation of this rule is, well, it's not hearsay for

12   this witness to testify, that doesn't make sense.  That's

13   what you're saying that rule says.

14          MS. CHOATE:  Yes.  I'm saying that a witness can't

15   bolster their own or --

16          MR. FALB:  Interpreting this rule, you're saying a

17   declarant -- it's not hearsay for that declarant to testify

18   in a court hearing.

19          MS. CHOATE:  No; about what they said previously.

20          MR. FALB:  But that's what that rule said, your

21   interpretation of that rule.  That's -- that would be

22   stupid.

23          MS. CHOATE:  Thanks, Tom.

24          MR. FALB:  Not you.  I'm just saying what the

25   rule --

Direct - Feazel

1          *THE COURT:*  Well, I'm going to reverse my ruling,

2     allow the question.

3          ***(End of discussion at sidebar)***

4                              *    *    *    *

5          *THE COURT:*  Objection will be overruled.

6          *MR. FALB:*  Thank you, Your Honor.

7     *Q. (By Mr. Falb)*  Ma'am, you recall training Brandon Risse?

8     *A.*  Yes.

9     *Q.*  During the training of Brandon Risse, you recall talking

10    about my client, Betty Cook, while she was off on sick

11    leave?

12    *A.*  I'm sure I talked to him about Betty, yes.

13    *Q.*  And do you remember talking to Brandon Risse about each

14    and every discipline that my client had received?

15    *A.*  No.

16          *MS. CHOATE:*  Objection to leading.

17          *THE COURT:*  Sustained.

18    *Q. (By Mr. Falb)*  Do you recall talking to my client -- strike

19    that.

20         Do you recall talking to Brandon Risse about discipline?

21    *A.*  No.

22    *Q.*  Do you recall talking about discipline of Betty Cook

23    with Brandon Risse?

24          *MS. CHOATE:*  Objection.  Asked and answered.

25          *THE COURT:*  Overruled.

                         Direct - Feazel

1    Q. *(By Mr. Falb)*  You can answer.

2    A.   Not specific discipline.   I was training him.

3    Q.   What did you talk about with respect to my client's

4    discipline?

5    A.   I don't know that your client's discipline was talked

6    about.   I was training him to do things, and I'm sure I did

7    point out, you know, make sure you don't do this so you

8    don't get in any trouble.

9    Q.   Well, did you mention to him that my client got into

10   trouble?

11   A.   I'm sure I did.

12   Q.   Did you mention to him how many times she got into

13   trouble?

14   A.   No.

15   Q.   Did you only talk about one instance of her being in

16   trouble?

17   A.   I don't recall the specific conversations.

18   Q.   So is it safe to say you could have talked to

19   Brandon Risse about several troubles that my client had?

20   A.   Possibly.

21   Q.   Did you also talk to him about the other senior

22   counselor, Deb Brink?

23   A.   I'm not aware that Deb Brink got in trouble.

24   Q.   No.  Did you talk to Brandon Risse about Deb Brink?

25   A.   I'm sure I did.

Direct - Feazel

Vol.1, Pg.80

1    Q.  Did you -- were you critical of Deb Brink to

2    Brandon Risse?

3    A.  Again, I'm not going to say critical.  I'm going to say

4    I was trying to train him in how to manage because we had a

5    lot of stuff to do.

6    Q.  What do you mean?

7    A.  How to manage it.

8    Q.  Are you saying that you weren't critical but you were

9    just pointing out what Deb Brink did wrong?

10   A.  No.  We had different ways of doing things.

11   Q.  So you were pointing out what Deb Brink would do and

12   what you would do instead?

13   A.  Different ways he could do it, yes.

14   Q.  And the same way with my client?

15   A.  Possibly some things.

16   Q.  And the other senior counselor that was there,

17   Sena Landreth at that time, did you do the same?

18   A.  Yes.

19   Q.  You pointed out to Brandon Risse things that

20   Sena Landreth had done wrong?

21   A.  I didn't say she did them wrong; I said differently.

22   Q.  Well, when Sena Landreth was doing field services, do

23   you remember that?

24   A.  Yes.

25   Q.  Field services was something that -- Sena Landreth, who

Direct - Feazel

1  was age 51, she had been doing field services counseling for

2  over 20 years, is that correct?

3  A.  I don't know how long she had been in there.

4  Q.  What's your best estimate?

5  A.  I didn't start until '99.

6  Q.  I understand that, but when you got to counseling you

7  knew how long Sena had been working?

8  A.  I knew she'd been there a long time but I don't know how

9  long.

10  Q.  And then she had a death to her brother and you took

11  over her job?

12          MS. CHOATE:  Objection.  Leading again.

13          THE WITNESS:  No.

14          THE COURT:  Sustained.

15  Q. (By Mr. Falb)  Were you in field services?

16  A.  At some point in time, yes.

17  Q.  Were you the back-up?

18  A.  Yes.

19  Q.  And when Sena Landreth was off because of a death in the

20  family, did you do field services?

21  A.  I don't know if it was at that time or not.

22  Q.  Well, why would you have been doing field services?

23  A.  Because I used to be the second back-up.

24  Q.  Okay.  And the back-up meant if the regular person doing

25  it was gone, you would take over?

Direct - Feazel

1    *A.*  As second back-up I would be like the third person to do

2    it.

3    *Q.*  So you don't recall?

4    *A.*  I backed up in there but I don't know, recall -- I don't

5    recall if it was at the time that her brother died or not.

6    *Q.*  You don't recall Sena Landreth, when she got back from

7    her leave of -- with her brother being dead, that she was

8    transferred from field services?

9    *A.*  I don't know if it correlated with that same time period

10   or not.

11   *Q.*  Was she transferred?

12   *A.*  Yes.

13   *Q.*  And in fact, when she was transferred, you had just done

14   the field services?

15   *A.*  I don't know.

16   *Q.*  Would you remember telling Ann Casey that Sena Landreth

17   had made a mistake on one of the prison inmates?

18   *A.*  I don't know what you're referring to.

19   *Q.*  Were you ever critical of Sena Landreth to your

20   supervisor, Ann Casey?  In other words, did you tell

21   Ann Casey, *Hey, this is what Sena Landreth did*?

22   *A.*  I had to get permission to stay over one night.

23   *Q.*  Tell us about that.

24   *A.*  Because Sena had left early, which I did not know she

25   left.

Direct - Feazel

1    Q.   That's when she left because her brother died?

2    A.   No.  She tore a contact that particular day or

3    something, but she didn't tell me she was leaving, and

4    shortly before 4 o'clock they were bringing a guy to take

5    him to put on the train and they stopped in there and wanted

6    to know where he was supposed to go, and so I asked them,

7    they need to talk to -- or told them they need to talk to

8    Sena.  They said she's gone for the day.  When I looked up

9    his parole plans, he had none.

10   Q.   Okay.

11   A.   So I had to -- this was like quarter 'til, ten 'til

12   four.  We get off work at four.  So we had to go through the

13   placement resource unit in Chicago and they assigned him a

14   halfway house.  You have to get him an interview on the

15   phone to talk to the people to see if they're going to take

16   him.  It was going to take me a little bit to get that done.

17   Q.   And you did it?

18   A.   Yes, but I --

19   Q.   And you told Ann Casey about it, didn't you?

20   A.   I called Ann Casey to see if it was okay if I could put

21   in for overtime for the day because we were told we could

22   have none.

23   Q.   The very next week Sena Landreth was moved?

24   A.   That, I don't know.

25   Q.   Do you know she was moved out of field services?

Direct - Feazel

 1   *A.  She was.  But Bart Toennies was put in there prior to me*
 2   *being put in there.  I don't know what date.*
 3   *Q.  I'm not even there yet.  I'm not talking about a*
 4   *permanency.  I'm talking about TA or -- strike that -- a*
 5   *back-up.  You were there doing field services as a back-up*
 6   *person before her job, Sena Landreth's job, was re-assigned,*
 7   *isn't that true?*
 8   *A.  Yes.*
 9   *Q.  Okay.  And then after Ann Casey took Sena Landreth, who*
10   *had been doing it for years and years, out of that position,*
11   *she put in Bart Toennies?*
12   *A.  Yes.*
13   *Q.  And that was right after you told Ann Casey about --*
14   *A.  I don't know the period of time.*
15        *MS. CHOATE:  Objection.  Foundation and asked and*
16   *answered.*
17   *Q. (By Mr. Falb)  Does it sound about, right?*
18        *THE COURT:  Overruled.*
19        *THE WITNESS:  I don't know.*
20   *Q. (By Mr. Falb)  Do you know why she was taken out of there?*
21   *A.  I don't know.*
22   *Q.  You're telling this jury you have no idea?*
23        *MS. CHOATE:  Objection, argumentative.*
24        *THE COURT:  Overruled.*
25   *Q. (By Mr. Falb)  You have no idea?*

                      Direct - Feazel

1   *A.*  I don't know.

2   *Q.*  Never heard a theory in all the years that you were

3   there?

4   *A.*  I don't know.

5   *Q.*  Do you remember telling Mr. Risse, during the time that

6   you were training her, during the time that you were telling

7   Mr. Risse about alternatives to what my client did,

8   Sena Landreth did, Deb Brink did, did you tell him that the

9   administration was waiting for my client and Sena Landreth

10  to leave before they would open up any positions as far as

11  supervisory duties?

12  *A.*  No.

13  *Q.*  That wasn't even discussed?

14  *A.*  No.

15  *Q.*  And in fact, after my client left, postings were made,

16  weren't there, for those job positions?

17  *A.*  There's only been one and that was like a few months

18  ago.

19  *Q.*  Ma'am, were there two postings of a case worker job made

20  after my client left?

21  *A.*  There was one posting that I'm aware of.

22  *Q.*  You're not aware of two?

23  *A.*  I believe a clinical services posting was put up, but

24  taken down or something.  It was never -- I don't know what

25  happened.

                        Direct - Feazel

1   Q.  So as far as these two supervisory positions, they were

2   never posted, they were never filled while my client and

3   Sena Landreth were working there in the counseling

4   department while you were there?

5   A.  That would be correct, yes.

6   Q.  And they were, in fact, posted after my client retired?

7   A.  The case work supervisor was just posted recently.

8   Q.  Is that a yes or no?

9   A.  Yes.

10  Q.  And the clinical supervisor was posted?

11  A.  It was posted and taken down.  I don't remember -- I

12  don't know whatever happened to it.

13  Q.  But as far as when my client -- in May of 2008, when she

14  retired, you were going to be -- well, you were the oldest,

15  is that correct?

16  A.  Yes.

17  Q.  All right.  And at that time the person with most

18  seniority in order to get a case work supervisor job would

19  have been Bart Toennies, is that correct?

20  A.  Is this the order after she retired?

21  Q.  Yes.

22  A.  Stacy Burton had the most time in.

23  Q.  Well, but you know as well as I knew, Stacy Burton had

24  just started there so she couldn't get promoted?

25          MS. CHOATE:  Objection, leading.

Direct - Feazel

1          *THE COURT:*  Sustained.

2   *Q. (By Mr. Falb)*  She was a Correctional Counselor I, Burton

3   was at that time, wasn't she?

4   *A.*  Probably.  I don't know the timeframe again.

5   *Q.*  Well, when you start out, you're usually a Counselor I,

6   at least for people that didn't have a college degree?

7   *A.*  Some were.  Some were II's.

8   *Q.*  She was a Counselor I, right?

9   *A.*  Yes.

10  *Q.*  Which meant she could not even apply for a posting such

11  as case work supervisor while she was a Counselor I?

12          *MS. CHOATE:*  Objection, leading.

13          *THE COURT:*  Sustained.

14  *Q. (By Mr. Falb)*  Do you know what the effect of her being a

15  Counselor I and just starting as a probationary person?

16  *A.*  As long as she was certified in that title she could bid

17  on any job she wanted to.

18  *Q.*  Do you know she couldn't get that job?

19  *A.*  I don't know that personally, no.

20  *Q.*  Ma'am, how many jobs have you applied for in the

21  direct -- in the corrections system since you became a

22  counselor in February 2004?

23  *A.*  Several.

24  *Q.*  Well, tell us.

25  *A.*  I interviewed at Vandalia.

Direct - Feazel

1   Q.   For what?

2   A.   For a case work supervisor.  I interviewed at Centralia

3   for Administrative Assistant I.  I believe those are the

4   only two interviews I've had.  I submitted applications for

5   other postings but they were filled by --

6   Q.   Tell us --

7   A.   -- transfers or whatever.

8   Q.   Tell us what other postings you applied for.

9   A.   Case work supervisor at Southwestern Correctional

10  Center.  Case work supervisor at Centralia Correctional

11  Center.

12  Q.   Anything else?

13  A.   I think that's it.

14  Q.   And is it true that seniority would help you --

15  A.   No.

16  Q.   -- move up?  It wouldn't?

17  A.   Not for a case work supervisor.  It's in a different

18  bargaining unit.

19  Q.   I'm talking about any job.

20  A.   It depends on what bargaining unit it's in.

21  Q.   Okay.  So if you want to be a Counselor III, it would

22  help you?

23  A.   Yes.

24  Q.   But a case work supervisor, your seniority wouldn't help

25  you?

Direct - Feazel

1    *A.*   No.

2    *Q.*   Never?  That wasn't even taken into consideration?

3              *MS. CHOATE:*   Objection, foundation, how she would

4    know what's taken into consideration.

5    *Q. (By Mr. Falb)*  When you applied for these jobs didn't you

6    know what they took into consideration?

7    *A.*   There have been people get those that have not been

8    counselors, so I don't know how they decide.

9    *Q.*   On page 93 of her second deposition, line 15.  You read

10   your deposition, is that correct?

11   *A.*   Yes.

12   *Q.*   All right.  Is this the question asked of you and did

13   you give these answers:

14              *Question:  With regard to like the*

15              *seniority in the counseling department, that goes*

16              *by who's been working for the state the longest?*

17              *Right.*

18          Your answer was "yes"?

19   *A.*   Yes.

20   *Q.*   Question:

21              *For promotions in the counseling*

22              *department, would they always go by seniority?*

23              *Answer:  For the Counselor III position,*

24              *yes.  The case work supervisor or clinical*

25              *services supervisor, if those were ever posted --*

Direct - Feazel

1               *one of them's a different bargaining unit, case*

2               *work supervisor.  The other, clinical services*

3               *supervisor, is a merit count, so it could go to*

4               *whomever.  Doesn't even have to be anyone from*

5               *this facility.*

6          Does that help refresh your recollection?

7     A.   I believe that's what I just said.

8     Q.   Okay.  So you're saying the case work supervisor and not

9     the clinical services supervisor, they don't take into

10    account seniority?

11    A.   No.

12    Q.   So is there any advantage to you having more seniority

13    than Betty Cook?

14    A.   Only if they would post a Counselor III.

15    Q.   Any other jobs?

16    A.   Probably not, but maybe record office supervisor.  Now,

17    that it's in the contract.

18    Q.   Is that another job you applied for?

19    A.   It's not been vacant.

20    Q.   Have you applied for that?

21    A.   It's not been vacant.  I can't apply for it if it's not

22    been posted.

23    Q.   I just asked.  Now, when you were in the counseling

24    department, were you given -- did you have any special

25    tasks?


                          Direct - Feazel

```
 1   A.   I don't know what you mean by "special".
 2   Q.   Did you have supervisory capacity for the CHAMPS system?
 3   A.   I did have at one time.
 4   Q.   Okay.  And that was given to you by Ann Casey, is that
 5   correct?
 6   A.   I believe so, yes.
 7   Q.   And that was in the year 2006, after Al Sanner left?
 8   A.   No.  It was prior to Al Sanner leaving.
 9   Q.   Okay.  And for the jury -- they don't know what the
10   CHAMPS system is.  Is that the computer system where
11   counselors log in entries for their visits with inmates?
12   A.   Yes.
13   Q.   And you, as a supervisor, or having supervisory access
14   to that CHAMPS system, could look over any counselor's work
15   in the CHAMPS system?
16   A.   Anyone could.
17   Q.   Well, so you're saying Betty could look at everybody's?
18   A.   She could look at -- you could put any inmate's number
19   in there and it brings up his whole thing.
20   Q.   So what was your advantage in having that job?
21   A.   To be able to move -- well, obviously you've seen the
22   rotation of people in and out.  So as they would leave or if
23   they were on a sick leave, had a death, whatever, for a
24   certain period of time someone could go in and move that
25   housing unit over to that counselor so they would know to go
```

Direct - Feazel

1   see those guys.

2   Q.  And you could see in that supervisory capacity what

3   inmates were being seen and on what dates?

4   A.  Somewhat, yes.

5   Q.  And you could see what entries were being put in there

6   by other counselors?

7   A.  As anyone could.

8   Q.  Okay.  So it's your testimony that Betty could look at

9   yours and see what entries you were being put in?

10  A.  Yes, she could.

11  Q.  And at some point in time that job was taken from you?

12  A.  Yes.

13  Q.  And was that the time that you and Mr. Risse were having

14  problems?

15  A.  I don't know.

16  Q.  Who took that from you?

17  A.  Ty Bates.

18  Q.  He's your, or was your assistant warden when Betty

19  retired?

20  A.  At the time Betty retired, yes, he was the Assistant

21  Warden.

22  Q.  I forgot to ask you, when Deb Brink died -- which was in

23  the November of 2007?

24  A.  Yes.

25  Q.  Okay.  On the very day she died and you found out about

Direct - Feazel

1   it, you and Bart Toennies went around and took off her

2   nameplate everywhere it appeared in the office, isn't that

3   true?

4   A.   No.

5          MS. CHOATE:  Objection.

6   Q. (By Mr. Falb)  Did you take it off someplace?

7   A.   No.

8   Q.   You gathered up all her things?

9   A.   At some point in time because she had personal pictures

10  and things up there, and I had asked Michelle Taphorn if

11  they wanted those for her family.

12  Q.   So it's your testimony you never took down her name any

13  place?

14  A.   Maybe at some point in time but not the day she died.

15  Q.   The next day?

16  A.   Not the next day.

17  Q.   Was it your job to do that?

18  A.   No.

19  Q.   When my client retired you posted her picture throughout

20  the prison, didn't you?

21          MS. CHOATE:  Objection, leading.

22          THE WITNESS:  No.

23          THE COURT:  Sustained.

24  Q. (By Mr. Falb)  Did you ever post my client's picture any

25  place?

Direct - Feazel

1    A.  No.

2    Q.  Were you aware my client was disciplined when my client

3    was there working?

4    A.  Yes.

5    Q.  In fact, on at least one occasion you were aware what

6    she was going to get as far as days off before she was

7    disciplined?

8    A.  No.

9    Q.  Have you ever been disciplined?

10   A.  No.

11   Q.  Have you ever been counseled?

12   A.  Yes.

13   Q.  By who?

14   A.  My current supervisor.

15   Q.  Let me ask you this:  When you and Brandon Risse -- did

16   the two of you have a problem?

17   A.  Yes.

18   Q.  And that was just before Betty retired?

19   A.  Yes.

20   Q.  And warden -- who was the assistant warden at that time?

21   A.  Ty Bates.

22   Q.  Ty Bates, he wanted to make some changes with

23   assignments to get the two of you apart?

24   A.  Yes.

25   Q.  And he was going to move Betty?

Direct - Feazel

1   A.  I don't know that Betty got moved at that point in time.

2   Q.  You don't recall that's the reason why Betty --

3   A.  That's not the reason why Betty got moved.

4   Q.  No, that's not my question.  You don't recall that being

5   the reason why Betty retired?

6   A.  No.  Because she -- I believe she was on a leave at that

7   time.

8   Q.  On leave.  What leave?

9   A.  I don't know.  She was gone.

10  Q.  Were you disciplined for this problem you had with

11  Risse?

12  A.  No.

13  Q.  Was Risse disciplined?

14  A.  I don't know.

15  Q.  Have you ever made mistakes being a counselor?

16  A.  I'm sure I have.

17  Q.  Have you ever received a single day off?

18  A.  No.

19  Q.  In fact, at one time you remember putting entries in for

20  good time on an inmate and you put in the wrong number?

21  A.  During the time period that we were being trained, yes,

22  I did.

23  Q.  Were you disciplined for that?

24  A.  No.

25  Q.  Another time you were putting in a transfer for an

Direct - Feazel

1    inmate concerning a Taylorville prison transfer before you

2    even got the memo that indicated he had no gang affiliation,

3    and you were required to put that in, weren't you?

4    A.   Yes.

5    Q.   Were you disciplined for that?

6    A.   No.   That was during my initial training before I was

7    certified.

8    Q.   Do you remember an instance when a prisoner was released

9    from a courthouse, and you recall, concerning paroling him

10   out, you took him out of the count, but he was already

11   counted for being out on a writ, so he was counted out as

12   being twice?

13   A.   Yes.

14   Q.   Were you disciplined for that?

15   A.   No.

16   Q.   Was Ann Casey the warden at that time?

17   A.   Yes, assistant warden.

18   Q.   Assistant warden.   Was Warden Robert the -- was he the

19   warden at that time?

20   A.   Yes.

21   Q.   Did you get along with Ann Casey?

22   A.   I suppose.

23   Q.   Well, were there times -- did she ever criticize you

24   over the radio?

25   A.   Not that I'm aware of, no.

                           Direct - Feazel

1   *Q.*   When you didn't like something happening with Assistant

2   Warden Casey, did you go talk to Warden Robert in his

3   office?

4   *A.*   Not on a routine basis, no.

5   *Q.*   I didn't ask for a routine basis.

6   *A.*   I mean, I don't know what you mean.

7   *Q.*   Did you ever?

8   *A.*   Did I ever do it?

9   *Q.*   Yes.

10  *A.*   Yes, I did it.

11  *Q.*   Why would you do that?

12  *A.*   After -- because she was going to take the grievances

13  from the counselors and give them to clerical people and I

14  couldn't have inmate contact.

15  *Q.*   Let me ask you this:  Was that the proper procedure for

16  you to follow when you disagreed, for you to go above her

17  and go to Warden Robert's office?

18  *A.*   Yes.  After you discuss it with her, which we did --

19  *Q.*   So I guess all the counselors went to Warden Robert's

20  office?

21  *A.*   I talked to him.  I'm not sure if Al Sanner did or not.

22  *Q.*   You were the only one that went there?

23           *MS. CHOATE:*  Objection, leading.

24           *THE WITNESS:*  I don't know that.

25           *THE COURT:*  Sustained.

Direct - Feazel

1           THE WITNESS:   At the time I went there, yes, I was

2    the only one that went there.

3    Q. (By Mr. Falb)   Okay.   Well, was Betty there?

4    A.   No.

5    Q.   Sena Landreth, was she there?

6    A.   I was the only one present at the time I talked to him

7    about that.

8    Q.   You had free access to Warden Robert's office, didn't

9    you?   You could go in any time you wanted?

10   A.   No.

11   Q.   Did you ever go in there besides that one time?

12   A.   I'm sure there have been occasions I have gone in there.

13   Q.   Did you ever get disciplined for going outside the chain

14   of command on that one instance when you went around your

15   supervisor?

16   A.   No.

17   Q.   Did anyone counsel you for that?

18   A.   No.

19   Q.   Was there a grievance filed?

20   A.   Yes.

21   Q.   Was the grievance going through the union?

22   A.   Yes.

23   Q.   The proper procedures?

24   A.   I don't know what point in time they filed it, but yes.

25   Q.   The proper procedures for a grievance like that wasn't

                           Direct - Feazel

1   for someone like you to go above the supervisor and go to

2   Robert's office, was it?

3   A.  I considered it to be proper because we had tried to

4   resolve it with her first.

5   Q.  What was your job?

6   A.  A counselor.

7   Q.  Did you have a job with the union, a steward or

8   something?

9   A.  No.

10  Q.  Wasn't that job the union?

11  A.  Because by the time that got resolved --

12  Q.  Wasn't that the job of the union?

13  A.  Yes.

14  Q.  So it's your testimony, as far as the CHAMPS system, the

15  computer system, you didn't have any more access to that

16  than any other counselor?

17  A.  No.  I did.

18  Q.  What was it?

19  A.  To be able to move the housing units and so that you

20  would know who to see if someone was gone or someone left,

21  transferred, because we didn't have any supervisors.

22  Q.  Were you on the screening team?

23  A.  Yes.

24  Q.  What's the screening team?

25  A.  For officers -- or the screening for applicants who put

Direct - Feazel

```
 1    in to apply to be a correctional officer, training.

 2    Q.  Correctional officer's the prison guard?

 3    A.  Yes.

 4    Q.  Have you ever been a prison guard?

 5    A.  No.

 6    Q.  Ever been a correctional officer?

 7    A.  No.

 8    Q.  Who appointed you as screening team?

 9    A.  I guess the warden did.  I don't know for sure.

10    Q.  Wait a minute.  You don't know who appointed you?

11    A.  I just got a memo that I was supposed to go.

12    Q.  Who did you get the memo from?

13    A.  I don't know if it came directly from Warden Robert or

14    from the central office saying that the screening was this

15    date, I needed to report there.

16    Q.  Are you telling these folks in the jury box

17    Warden Robert didn't have anything to do with that?

18    A.  He probably submitted the memo and gave me time, you

19    know, for me to go down there.  I don't know.  I don't have

20    the documents in front of me to look at to see who they came

21    from.

22    Q.  Is it your testimony you don't recall Warden Robert

23    having a role in selecting you in that position?

24         MS. CHOATE:  Objection.  Asked and answered several

25    times.
```

Direct - Feazel

1              *THE WITNESS:*  Actually, I was appointed to the

2       screening team before Warden Robert started there.  I

3       believe it was under Warden Bowen when I started going to

4       the screenings.

5       *Q. (By Mr. Falb)*  Let me back up.  At that time Warden Robert

6       was assistant warden, wasn't he?

7       *A.*   I don't know if he was or not.

8       *Q.*   Were you a counselor at the time you were appointed

9       screening team?

10      *A.*   Yes.

11      *Q.*   And that was in February 2004?

12      *A.*   I don't know if that's when I was appointed or not.

13      *Q.*   And Robert --

14      *A.*   I mean it was from that time.  I think it might have

15      been prior to that.  I'm not sure.

16      *Q.*   Well, I thought you said there was a memo?

17      *A.*   There is.

18      *Q.*   Okay.  What's the memo say?

19      *A.*   That I was to report to, it was either Marion or DuQuoin

20      on a certain date for the screening.

21      *Q.*   Okay.  And is it your testimony Warden Robert didn't

22      have anything to do with that?

23      *A.*   I didn't say whether he had anything to do with that.  I

24      don't know the time periods, but I do know I was doing the

25      screening when Warden Bowen was there prior to him becoming

                          Direct - Feazel

1   warden.

2   Q.  My question is:  Did Warden Robert -- or Assistant

3   Warden Robert have anything to do with it?

4   A.  I don't know.

5   Q.  Is it possible?

6   A.  It's possible.

7   Q.  In fact, you had talked to him about it?

8   A.  I talked to him about it?

9   Q.  Yes.

10  A.  I'm not aware of that.

11  Q.  You never talked to him about it?

12  A.  Not prior to being -- no.  I don't know what you mean.

13  Q.  So you talked to him after you became a screening team

14  member?

15  A.  I don't know.  I don't have the time periods.  I don't

16  know that he was even there, at the time I was put on there,

17  as assistant warden or warden.

18  Q.  Okay.  Well, let me refresh your recollection.  When

19  Blagojevich became governor in late 2003, do you recall

20  Robert, Brad Robert, becoming assistant warden in January of

21  2004?

22  A.  I'm trying to think of the dates.

23  Q.  Let's just not worry about the dates.  When you became a

24  counselor in February 2004, the first time, Robert was

25  assistant warden?

Direct - Feazel

1    *A.*  Possibly.

2    *Q.*  And the next year he became warden after one year as

3    assistant warden?

4    *A.*  I know when I came back from maternity leave on

5    February 1st of '05, he was the warden.

6    *Q.*  Do you know what his job was before that?

7    *A.*  He was assistant warden of operations prior to that.

8    *Q.*  And what was -- strike that.

9        The screening team, you would go throughout the state,

10   stay at hotels, interview people?

11   *A.*  No, I never stayed at a hotel.

12   *Q.*  Per diem pay?

13   *A.*  Meals, and there was -- in the beginning there was a

14   little bit of per diem.

15   *Q.*  What were the advantages of you being on the screening

16   team?

17   *A.*  There were none.

18         *MS. CHOATE:*  Objection.  We need to object to the

19   relevance of this testimony about the screening team.

20         *MR. FALB:*  I think it is relevant.

21         *THE COURT:*  Overruled.

22   *Q. (By Mr. Falb)*  Why did you want to be on the screening team?

23   *A.*  I didn't want to be on the screening team.

24   *Q.*  You accepted it?

25   *A.*  I was given a memo to go.


                          Direct - Feazel

1    Q.  You could have declined it?

2    A.  I don't know that I could have.  I guess I could have

3    gone to them and said I didn't want to.

4    Q.  Or you could have put an e-mail or memo that you

5    declined?

6    A.  Well, you're given a memo to go there on a certain date,

7    so that's what I did.

8    Q.  I forgot to ask you this:  In the computer system,

9    Ann Casey -- the CHAMPS system, I think you told us this,

10   that she would have you to make changes in the CHAMPS

11   system?

12   A.  Of the assignments.

13   Q.  Of the assignments?

14   A.  Yes.

15   Q.  She would tell you?

16   A.  Yes.

17   Q.  Okay.  And do you know why you were selected?

18   A.  When they initially set the CHAMPS system up we did not

19   have new supervisors.  They recommended that more than one

20   person have access so that if that person is gone they can,

21   you know, make any changes that they need to make.  So in

22   the very beginning they had Al Sanner and Pam Alemond.  And

23   when Pam left is when Al Sanner, Terri Loepker, and myself

24   were given the access.  And then after Terri and Al left, it

25   was myself and Bart Toennies.

                        Direct - Feazel

1    *Q.*  Okay.

2    *A.*  Until Assistant Warden Bates, and took that away.

3    *Q.*  All right.  So when the senior supervisors, those five

4    that left in October of '05 --

5    *A.*  They weren't supervisors.

6    *Q.*  Strike that.

7       The senior counselors left in October of '05 and March

8    of '06.  You took over at that point, you and Bart Toennies,

9    as supervisor access to CHAMPS?

10    *A.*  Yes.  I had it prior to that point.

11    *Q.*  All right.  And in fact, Casey, Ann Casey, would come to

12    you to make changes to the CHAMPS system because she didn't

13    even know how to use it?

14    *A.*  She would send a memo or an outlook message or something

15    out, yes.

16    *Q.*  Ann Casey would be gone for two weeks at a time, wasn't

17    she?

18    *A.*  Yes.

19    *Q.*  And you had the ability to look at the CHAMPS system,

20    look at the counselors' work and tell Casey what was going

21    on while she was gone?

22    *A.*  As I said, anyone that had access to CHAMPS could look

23    at anybody's thing and see what was going on.

24    *Q.*  So is that "yes"?

25    *A.*  Yes.

Direct - Feazel

1    Q.   Were you also given the job of re-entry program?

2    A.   Yes.

3    Q.   Lifestyle redirection program?

4    A.   Yes.

5    Q.   Parole school?

6    A.   I started it, yes.

7    Q.   Who gave you that assignment?

8    A.   I believe that was Ann Casey.

9    Q.   Who gave you the lifestyle redirection program?

10   A.   I believe that was -- I don't know.

11   Q.   Who gave you the re-entry program?

12   A.   That was Ann Casey.

13   Q.   What is the re-entry program?

14   A.   It's -- the re-entry summit is --

15   Q.   What is the re-entry summit?

16   A.   Where they have speakers come in from Secretary of

17   State's office, and Department of Employment Security,

18   housing places, schools, different -- any agencies that

19   might be able to help these guys when they're out on parole.

20   Q.   What is the lifestyle redirection program?

21   A.   It's supposed to be a four-morning or afternoon class

22   per week.  Because we were short, we were doing it two

23   mornings for 24 weeks, and it covered 12 different topics.

24   Q.   Is it your testimony you had no problems with Betty as

25   far as her abilities as a worker?

                         Direct - Feazel

1    *A.*  I don't -- I'm not sure what you mean.

2    *Q.*  Well, the question is:  Did you have any problems with

3    Betty as far as her abilities as a worker?  Betty Cook.

4    *A.*  Yes.  What do you mean by "her abilities as a worker"?

5    *Q.*  Pardon me?

6    *A.*  I don't know what you mean by "her abilities as a

7    worker".

8    *Q.*  Did you believe that she was a good worker?

9    *A.*  Again, could you tell me what you mean by "good worker".

10   *Q.*  Did you believe she was a hard worker?

11   *A.*  Yes, she was a very hard worker.

12   *Q.*  Did Sena Landreth think that you were trying to get her

13   job?

14            *MS. CHOATE:*  Objection.  Calls for speculation.

15            *MR. FALB:*  I'll rephrase that.

16   *Q. (By Mr. Falb)*  Did Sena Landreth tell you that you were

17   after her job or words to that effect?

18            *MS. CHOATE:*  Objection, hearsay.

19            *THE WITNESS:*  I don't recall Sena Landreth telling

20   me that.

21            *THE COURT:*  Sustained.  Disregard that.

22   *Q. (By Mr. Falb)*  Did you tell Brandon Risse that Betty Cook

23   could no longer do certain work, such as receiving?

24   *A.*  No.

25   *Q.*  Did you tell Brandon Risse that you didn't think

                        Direct - Feazel

 1   Betty Cook was coming back when she was off with her sick
 2   leave?
 3   A.  I may have.  I don't know.
 4   Q.  Did you tell Brandon Risse that you hoped that she was
 5   going to retire?
 6   A.  No.
 7   Q.  When she -- or just before Betty retired do you remember
 8   Betty telling you that she was tired of these reassignments
 9   and, therefore, she was just going to quit?
10   A.  Yes.
11   Q.  Ma'am, did you ever put in unprofessional language in
12   CHAMPS entries?
13   A.  No.
14   Q.  Did you ever put in that so-and-so inmate was a pain in
15   the butt?
16   A.  No.
17   Q.  Or language to that effect?
18   A.  No.
19   Q.  Did you ever cause a lockdown in the prison?
20   A.  No.
21   Q.  Now, as far as your evaluations -- and I've got your
22   whole packet of evaluations.  Let me see if I can make this
23   brief.  Do you recall in the evaluations they have certain
24   check boxes where they put "Exceeds" or "Does not exceed"?
25   Do you remember that?

                        Direct - Feazel

1   A.   Yes.

2   Q.   What were the check boxes possible?

3   A.   When?

4   Q.   When you were evaluated.  I'm not talking about what the

5   results were.  What were the possibilities?

6   A.   I think there were, total, eight.

7   Q.   For example, referring to Plaintiff's Exhibit No. 11,

8   Bates stamped page 1274, just to be brief, the headings up

9   here were the ones done by the supervisor?

10  A.   Yes.

11  Q.   Okay.  And so the possibilities would be, "Exceeds

12  expectations", "Meets expectations", "Needs improvement",

13  and the last one I just put an arrow through, "Insufficient

14  opportunity"?

15  A.   Yes.

16  Q.   Would you agree with me -- and I've gone through this --

17  that your "Exceeds" for the first part of 2004, you had

18  none?  That was your probationary period?

19  A.   That's probably correct.

20  Q.   Okay.  The next probationary evaluation would have been

21  from April to June of 2004, you only had one out of eight,

22  is that correct?  Does that sound right?  If you need to

23  look at this, I'll be happy to --

24  A.   Okay.  Yes, please.

25  Q.   I'll give you the page numbers.  Page 1299 there at the

                          Direct - Feazel

 1   bottom.

 2   A.   Okay.

 3   Q.   You had one "Exceed" out of the eight opportunities, is

 4   that correct?

 5   A.   Yes.

 6   Q.   And then when Ann Casey took over, for her first full

 7   year, which would have been February 1st, 2005 to

 8   February 1st, 2006, you went to seven out of eight

 9   "Exceeds"?

10   A.   What page is that?

11   Q.   That is on page 1288.

12   A.   Yes.

13   Q.   And after that your evaluations stayed about the same,

14   maybe a little bit lower, but stayed about that, is that

15   correct?

16   A.   Yes.

17   Q.   Okay.  And just briefly, you knew about the system of

18   retirement, that once you reach the age of 50 years of age

19   and you had 25 years of experience, you were eligible for

20   retirement?

21   A.   Yes.

22   Q.   And you were aware that Betty was eligible for

23   retirement in August of 2007?

24   A.   I don't know the date, but yes.

25   Q.   Okay.  Well, back then you knew?


                         Direct - Feazel

1   A.   I don't know if I knew that date back then or not.

2   Q.   Well, you asked her when she was going to retire?

3   A.   She brought it up daily.

4   Q.   Didn't you bring it up daily or not?

5   A.   No.

6   Q.   You never did?

7   A.   No.

8   Q.   You just waited for her to bring it up?

9   A.   She did that from the time she came in there.

10  Q.   From the time you came in, did you tell everyone that

11  you wanted to be the supervisor in the counseling

12  department?

13  A.   No.

14  Q.   You never once said that?

15  A.   I probably said I want to move up eventually, yes.

16  Q.   And did you make that known to everyone in the

17  counseling department?

18  A.   No.

19  Q.   Who did you make that known to?

20  A.   I don't know.  It's not like I went around telling

21  everyone.

22          MR. FALB:  Thank you, Your Honor.

23          THE COURT:  Cross?

24                    **CROSS-EXAMINATION**

25                **QUESTIONS BY MS. CHOATE:**


                       Cross - Feazel

1    Q.  We've talked about you being a counselor and Betty being

2    a counselor at Centralia.   Exactly what were the jobs that

3    the counselors at Centralia did?

4    A.  We had, well, the grievances, of course.  We had to see

5    our -- whoever was on your caseload.  It used to be every 60

6    days.  They gave us a variance for every 90 because we were

7    so short of staff.  We did their board orders, their -- what

8    their conditions of parole would be when -- we recommended

9    them.  The prison review board signed them off.  We

10   approved, on behalf of the warden, visiting lists, phone

11   lists.  We submitted transfers.  Their good time work

12   release, they would send out a monthly list of guys to

13   screen for that.  Notify them of deaths.  I don't know.  I'm

14   sure I haven't covered everything, but --

15   Q.  You talked about grievances.  Are those -- we've also

16   talked about union grievances.  Are these grievances

17   different that you --

18   A.  These are inmate grievances, yes.

19   Q.  And how did the inmate grievance process work?

20   A.  They would submit a grievance, which would be answered

21   by their counselor, unless it was a ticket, which then came

22   directly to the grievance officer.  If they weren't happy

23   with the response they got from the counselor they would

24   send it back in for a grievance officer's report.  That was

25   signed off on by the warden and then they could appeal it up

                         Cross - Feazel

1   to Springfield.  They had to go through all those steps

2   before they could file a lawsuit.

3   Q.  Okay.  So that was just part of your job, right?

4   A.  Yes.

5   Q.  Okay.  And did those caseloads change routinely or just

6   whenever somebody was absent or --

7   A.  Routinely.

8   Q.  Do you know why?

9   A.  No.

10  Q.  Now, you were asked about access to CHAMPS, and I think

11  counsel phrased it "supervisory access"?

12  A.  Right.

13  Q.  Did you have any supervisory authority over anyone else

14  in the counseling department?

15  A.  No.

16  Q.  So why did you have the access to CHAMPS that other

17  folks didn't?

18  A.  Because we had no supervisors when they started that.

19  Q.  Okay.  And did you make any changes in caseload on your

20  own?

21  A.  No.

22  Q.  How would you make the changes to someone's caseload?

23  A.  When I received a memo, an outlook message, there may

24  have been a couple times they called and then would follow

25  up with a memo, but I never did it until I was told to

Cross - Feazel

 1    change them.

 2    Q.   Okay.  You were also asked about field services.  What

 3    did field services do?

 4    A.   They made sure everybody that left the place on parole

 5    had an approved address, because sex offenders can't go

 6    certain places.  They can't live 500 feet from a school,

 7    daycare.  So they would submit those addresses depending on

 8    their level of supervision, whether they were approved by a

 9    field services rep or parole agent.  They made sure they

10    signed all their paperwork; if they had a warrant, that they

11    signed those papers; that they were going into custody of

12    someone else.  Birth certificates, Social Security cards, it

13    basically pertained to the things right as they were

14    leaving.

15    Q.   Now, was field services something that was handled by

16    anyone in particular when you first got there?

17    A.   Sena Landreth had it when I started there.

18    Q.   And were there any duties that you, as a Counselor II,

19    would handle that would have been handled by a Counselor III

20    while you were there?

21    A.   No.

22    Q.   Was there a Counselor III there when you got to

23    Centralia?

24    A.   Yes.

25    Q.   Who was that?

Cross - Feazel

1    A.   Al Sanner.

2    Q.   What happened when Al was gone?  Did anybody fill in for

3    him?

4    A.   During the time he was still there, yes.  We would --

5    they did it starting at some point in time with seniority.

6    It went down -- whoever volunteered to do it then would get

7    paid for his job for that day or -- you know, they just went

8    on down the list.

9    Q.   At some point did that getting paid extra go away?

10   A.   Yes, when he left.

11   Q.   Who took over then some of those duties that Al had

12   done?

13   A.   Betty Cook.

14   Q.   And do you recall if you knew at the time that there

15   would or would not be any extra pay for doing those extra

16   duties?

17   A.   Yes, it was very clear there would not be.

18   Q.   And was it clear -- to your knowledge, was it clear also

19   to Ms. Cook?

20   A.   Yes.

21   Q.   Was Ms. Cook ordered to do those duties?

22   A.   No.

23   Q.   You were asked about your opinion of Ms. Cook's work,

24   whether she was a hard worker, correct?

25   A.   Yes.


                        Cross - Feazel

Vol.1, Pg.116

1    Q.   You said she was a hard worker?

2    A.   Yes.

3    Q.   What is your opinion of her as a counselor?

4    A.   She struggled with catching on, keeping up.

5    Q.   What do you mean by "keeping up"?

6    A.   With her, you know, request slips.  She would answer

7    those, and there would be stacks of them and stuff

8    everywhere.  Kind of -- I mean she was always busy.

9    Q.   I think you were asked also about number of inmates you

10   had to see within a certain number of days, is that correct?

11   A.   Yes.

12   Q.   What were those?

13   A.   I'm sorry.  What do you mean?

14   Q.   How many days did you have to see the particular

15   inmates?

16   A.   Oh, you had to see them every 90 days.

17   Q.   And is this contact with the inmates outside of the

18   grievances we talked about earlier?

19   A.   Yes.

20   Q.   What did the contact with the inmates -- how did that

21   go?  How is that usually done by the counselor?

22   A.   Well, you can print out a list of who all you need to

23   see, and it tells like the last time they were seen, and so

24   that's kind of how you manage your caseload.

25   Q.   Did you go to the cellhouses to see the inmates?

Cross - Feazel

 1   *A.*   Yes.

 2   *Q.*   And was there any rule about how long you had to spend

 3   with each one?

 4   *A.*   No.

 5   *Q.*   And you said that Betty would have trouble keeping up

 6   with that as well?

 7   *A.*   Yes.

 8   *Q.*   Was Betty behind in seeing her inmates within a timely

 9   manner?

10   *A.*   I don't know if she was behind.  I know she waited 'til

11   the last minute on a lot of them.

12   *Q.*   If you had to change an entry -- as the counselor, in

13   your own inmate group, if you had to change a CHAMPS entry

14   was there any sort of process that you could follow?

15   *A.*   Yes.  You could go back two weeks prior or two weeks

16   after.  You could -- I mean as far as changing the date on

17   something, you could date it back two weeks if you were

18   changing the date, and any point in time after you made an

19   entry you could change anything to it two weeks after.

20   *Q.*   Would it be appropriate for a counselor who wanted to

21   make a change to go to Springfield or call Springfield to

22   make that change?

23   *A.*   No.

24        *MR. FALB:*  Objection.  Outside the scope.

25        *THE COURT:*  I'm sorry, I couldn't hear you.


                        Cross - Feazel

1          *MR. FALB:*  Outside the scope, no foundation.

2          *THE COURT:*  Overruled.

3  *Q. (By Ms. Choate)*  Your answer was what?

4  *A.*  No.

5  *Q.*  So if another counselor did that, would that be a

6  violation of the rules?

7  *A.*  Yes.

8  *Q.*  You were asked about going outside the chain of command.

9  Would that be considered going outside the chain of command?

10  *A.*  Yes.

11  *Q.*  You were also asked about going to talk to Warden Robert

12  after you had talked with Assistant Warden Casey, correct?

13  *A.*  Yes.

14  *Q.*  Do you consider that going outside the chain of command?

15  *A.*  No.

16  *Q.*  Why not?

17  *A.*  Because I tried to resolve it with her first, or I

18  should say we did.

19  *Q.*  And to your knowledge, is there any rule that would

20  preclude you from doing that?

21  *A.*  No.

22  *Q.*  We talked lot about CHAMPS.

23  *A.*  Yes.

24  *Q.*  Could you just briefly explain what CHAMPS is and how

25  the counselors would use it.

Cross - Feazel

1    *A.*   It replaced -- okay.  There was what -- we used to

2    document everything in what's called a counseling summary,

3    and you had to handwrite it every time you walked -- every

4    time you spoke to a guy, you had to handwrite in there what

5    you talked to him about.  And I think it was 2004, 2005,

6    they replaced that with the CHAMPS history, which basically

7    is an acronym, Case History And Management Program.  So you

8    can sit there on your computer and type in -- you know, you

9    put the guy's number in, it brings up his summary of

10   everything that's ever been done since it was documented in

11   the computer.  So if this counselor talked to him, I could

12   see what they told him.  If, you know, the Warden had

13   documented something in there, I could see what the Warden

14   told him.  And that's how you made your entries.  You could

15   either do it as a personal face-to-face, which then counted

16   as your 90-day contact.  It would move him down to the

17   bottom of the list of guys that would need to be seen.  Or

18   if you were just sending him a note, you would do it

19   collateral, meaning you didn't see him in person but you

20   would put in there like you responded to his request about a

21   transfer or something, and then what you told him.

22   *Q.*   Now, if an inmate had made a quote that contained

23   profanity, if the inmate had said this, would that be okay

24   to put in CHAMPS?

25              *MR. FALB:*  Object.  There's no foundation that she

Cross - Feazel

 1   has any authority as far as CHAMPS.

 2         *MS. CHOATE:*  She was asked about putting things in

 3   CHAMPS and authority to move things into CHAMPS and she just

 4   testified that's how they utilized CHAMPS.

 5         *THE COURT:*  I'll overrule the objection.  You can

 6   go ahead and answer.

 7         *THE WITNESS:*  I would possibly document that, yes.

 8   If an inmate told me -- you know, called me a name or

 9   something, I would put that in there that he called me such

10   and such and I issued him a ticket or, you know, whatever

11   the case would be.

12   *Q. (By Ms. Choate)*  If the counselor used profanity to an

13   inmate, would that be appropriate to put in CHAMPS?

14   *A.*  No.

15   *Q.*  Why not?

16   *A.*  Because we were supposed to be professional in what we

17   documented, know enough to document what was done

18   professionally without -- on medical things, like putting

19   too much information because of HIPAA laws.  So during the

20   training sessions they would go over that with you because

21   it can be used in court at some point in time.

22   *Q.*  Were counselors the only ones in the prison that had

23   access to the CHAMPS system?

24   *A.*  No.

25   *Q.*  Could a counselor change or make an entry for another

                          Cross - Feazel

1    counselor into CHAMPS?

2    A.  No.

3    Q.  Did you have some sort of a code or a log-in for your

4    own cases that you would do?

5    A.  Yes.

6    Q.  But I think you testified then that anyone could pull up

7    an inmate and see who?

8    A.  Yes.

9    Q.  Is that right?

10   A.  Yes.

11   Q.  And if you were making an entry into CHAMPS for an

12   inmate, particular inmate, would you then, as you're making

13   that entry, be able to see what entries had already been

14   made by them?

15   A.  Yes.

16   Q.  Do you know why -- and I don't know if you were asked

17   this.  Do you know why you were given the extra access to

18   CHAMPS at the time you were given it?

19   A.  Yes.

20   Q.  What was that?

21   A.  Initially when they started it, it was Al Sanner and

22   Pam Alemond, and neither one of them knew how to grab and

23   drop things into another box, so Al always would call me and

24   do it for him.

25   Q.  So he wasn't real computer savvy?

                         Cross - Feazel

1    *A.*   No.

2    *Q.*   And this was a computer system?

3    *A.*   Yes.

4    *Q.*   How long before Al Sanner retired do you know that

5    CHAMPS actually changed over to the computer system?  Do you

6    know?

7    *A.*   Just a couple years, I believe.

8    *Q.*   Have you ever -- did you ever allow someone -- you

9    talked about visiting lists, right?

10   *A.*   Yes.

11   *Q.*   How would you determine who was proper to be on a

12   visiting list for an inmate?

13   *A.*   On the computer it's a different program.  The Offender

14   Tracking System gives all the information for an inmate as

15   far as like when he came in, what his crime was, how much

16   time he had to do, if he had an order of protection,

17   visitors that had been there in the past.  It logs everybody

18   in if you come in to see somebody because you got to produce

19   your driver's license and things, and it has all in there in

20   the computer.  So if a guy put in a visiting list, which

21   they could update every 30 days, you would check to make

22   sure, if they're a sex offender, that it wasn't a victim of

23   the sex offense or violent crime; if there was an order of

24   protection, that you didn't approve that person to come in

25   because they had an order of protection.

Cross - Feazel

```
 1        Sometimes on their visiting in the actual computer it
 2   would show where there would be a stop order for a visitor
 3   for any number of reasons, maybe because it was a victim,
 4   they could be on a permanent denial for trying to bring
 5   drugs in, just anything like that, you could check in that
 6   system and see if those visitors were -- should be approved
 7   to come in, and you signed it on behalf of the warden.
 8   Q.  Did you, to your knowledge, ever allow a victim to be on
 9   an inmate's visiting list?
10   A.  No.
11   Q.  Do you know of anyone who did?
12   A.  There was something with Betty but I don't know if it
13   was a victim or not.
14   Q.  After Al Sanner left -- and he was the Counselor III,
15   correct?
16   A.  Yes.
17   Q.  Okay.  And after Al left, was there -- did you have an
18   understanding whether or not that Correctional Counselor III
19   position would be filled?
20   A.  We didn't know with a hundred percent certainty but
21   Ann Casey had come in and said that would probably not be
22   filled.
23   Q.  And was this before or after Betty volunteered, I guess,
24   to do some of those duties?
25   A.  That was prior to.  I'm pretty sure it was prior to when
```

Cross - Feazel

1    Al left.

2    Q.   Okay.   To your knowledge has that position ever been

3    filled since?

4    A.   No.

5    Q.   You talked about -- you were asked about Betty's making

6    comments about retirement to you.   When did that begin?

7    A.   From the time she first came in there.

8    Q.   What were some of those comments, if you recall?

9    A.   That she was just a short timer, she was just there to

10   do her time, get her retirement; she'd been there since

11   Christ was a baby; she had more time in than anybody out

12   there.   I mean those were comments she made.

13   Q.   And from those comments was it your understanding that

14   she was going to work long after her 50th birthday?

15   A.   No.

16   Q.   Are you currently the most senior person that's in the

17   counseling department at Centralia?

18   A.   No.

19   Q.   Does seniority at Centralia necessarily have anything to

20   do with age?

21   A.   No.

22   Q.   You were asked about the different, I don't know,

23   duties, things you were asked to do outside of your

24   counseling duties, Lifestyle Redirection and Re-entry

25   Program, those types of things.

Cross - Feazel

Vol.1, Pg.125

```
 1   A.   Yes.

 2   Q.   Do you get any more pay for those?

 3   A.   No.

 4   Q.   Has doing that gotten you a promotion?

 5   A.   No.

 6   Q.   Has doing that gotten you a different job somewhere --

 7   A.   No.

 8   Q.   -- you've applied for?

 9   A.   No.

10   Q.   You were asked about an inmate being on a writ that you

11   put out for parole, is that correct?

12   A.   Yes.

13   Q.   Explain to us how that happened.

14   A.   Very rarely does a guy parole out directly from the

15   court.   I don't know what the circumstance was, but he was

16   released directly from court for some reason, so whenever

17   they -- of course, security counts the inmates numerous

18   times throughout the day, but whenever they leave the

19   facility, whether it be for medical or any purpose, they're

20   taken off the count and it shows them out on a writ.

21        As I recall, the record office supervisor that day was

22   not there, and as part of field services the armory officer

23   would call and say to take so-and-so off of count.   They

24   would do that themselves sometimes and they would do that

25   after hours in those events, but in order to take a guy off
```

Cross - Feazel

1    that paroles, you had to put the location where he was going

2    to.   And they don't always know the code number for the area

3    they're going to, so they call field services, ask you to

4    parole them out.   So they did.   And that's what I did.

5        Because the person in the record office had -- which I

6    believe Joyce Dearhake was in there -- had said the guy was

7    going -- you know, they were going to let him go, so I knew

8    he was going.   What I didn't know, I guess, is no one in the

9    record office put him back in for being on the writ, and so

10   when the armory called and told me to take him out, it took

11   him out again, so he was actually counted out twice.

12   Q.   Can the counselors put someone back from a writ or does

13   that have to be done by someone else?

14   A.   It's done in the record office.   I've never done that.

15   Q.   To your knowledge, was there ever any confusion that

16   this guy was back in the prison or not in the prison?

17   A.   No.

18   Q.   And again, you weren't disciplined for that, were you?

19   A.   No.

20   Q.   You were also asked about parole plans.   I think you had

21   to fill in after Sena had left one day?

22   A.   Yes.

23   Q.   Why is it important that an inmate have somewhere to go

24   when he's paroling out?

25   A.   They have to have an approved address so the parole

Cross - Feazel

1    agent knows where to go meet them.  Again, if they're a sex

2    offender, you know, they have to register, they have to have

3    an address.  And every guy has to have one when he leaves.

4    He can't go out without one.  If he doesn't have one they

5    have to get him a shelter or a halfway house or something if

6    he doesn't have family or someone to go to.

7    Q.  Do you know why you got the call about this guy paroling

8    out?

9    A.  The shift commander walks them out the door.  They stop

10   at the business office as their last stop and get whatever

11   money they have left on the books.  And we were right across

12   the hall, and I'm guessing, but I don't know, that they had

13   been into field services, but Sena was gone, so I was the

14   back-up, so they came to see me.

15   Q.  Was it your understanding they would walk the guy to

16   field services as well to get that information, or how did

17   they get it?

18   A.  Well, yes, or she would go to the back door and see

19   them.

20            *MS. CHOATE:*  Okay.  Just a minute, please.

21            *THE COURT:*  Sure.

22        **(Off the record)**

23                          *   *   *   *

24            *MS. CHOATE:*  May I approach, Your Honor?

25            *THE COURT:*  Sure.


                          Cross - Feazel

 1    *Q. (By Ms. Choate)*  I'm showing you what's marked as

 2    Defendant's Exhibit 61.  Do you recognize this document?

 3    *A.*  Yes.

 4    *Q.*  What is that?

 5    *A.*  This is a CHAMPS printout.  Well, it's the cumulative

 6    counseling summary, but a printout off of the CHAMPS system

 7    for a guy.

 8    *Q.*  Okay.  And is this what you talked about, that if you

 9    pulled up an inmate's number you would get the counseling

10    summary?

11    *A.*  Yes.

12            *MS. CHOATE:*  May I publish this to the jury?

13            *THE COURT:*  Any objection?

14            *MR. FALB:*  No objection.

15            *THE COURT:*  Sure.

16    *Q. (By Ms. Choate)*  So it's titled, "Cumulative Counseling

17    Summary", correct?

18    *A.*  Yes.

19    *Q.*  And I'm going direct your attention down to July 2nd of

20    2007.

21    *A.*  Yes.

22    *Q.*  And what is that entry?

23    *A.*  It's an entry made by Deb Brink that says, *Processed new*

24    *visiting list.*

25    *Q.*  Now I'm showing you what's been marked as Defendant's

                        Cross - Feazel

 1   Exhibit 28.  Do you recognize -- actually, I want you to

 2   turn to Bates page -- there is no Bates page on this one.

 3   Let me count them for you.  Seven from the top.

 4   A.   Okay.

 5   Q.   Do you recognize that document?

 6   A.   Yes.

 7   Q.   What is that?

 8   A.   A visiting list.

 9   Q.   And who is that for?

10   A.   This same guy for the -- that had the CHAMPS entry.

11   Q.   And is this something that the counselors would fill out

12   routinely?

13   A.   Yes, as far as circling on the side whether it's

14   approved or denied and then signing on behalf of the warden

15   at the bottom.

16   Q.   Let me ask you:  How does -- how do these names get on

17   these lists?

18   A.   The inmates fill them out.

19          MS. CHOATE:  I'd like to publish this to the jury

20   as well.

21          THE COURT:  Any objection?  No objection?

22          MR. FALB:  No objection.

23          THE COURT:  Okay.

24   Q. (By Ms. Choate)  And you notice at the top there's

25   James Golden.  That's the inmate's name that we showed earlier,

                         Cross - Feazel

1    correct --

2    *A.*   Yes.

3    *Q.*   -- in the CHAMPS entries?

4    *A.*   Yes.

5    *Q.*   And these are folks that he wanted to visit?

6    *A.*   Yes.

7    *Q.*   And I think you talked earlier about the counselors then

8    would sign on behalf of the warden, is that correct?

9    *A.*   Yes.

10   *Q.*   Is that your signature?

11   *A.*   No, it's not.

12   *Q.*   Do you know whose signature that is?

13   *A.*   Looks like Deb Brink's.

14   *Q.*   Would that correlate then to the Cumulative Counseling

15   Summary entry on July 2nd?

16   *A.*   Yes, it would.  It's the same date.

17   *Q.*   And on the Cumulative Counseling Summary, that has

18   Deb Brink's sign-in on this, correct?

19   *A.*   Yes.

20        *MS. CHOATE:*  I'd like to move Defendant's Exhibits

21   28 -- or at least 61 and page 7 of 28.

22        *MR. FALB:*  I have no objection.

23        *THE COURT:*  61 and page 7 of 28 --

24        *MS. CHOATE:*  28 has more.

25        *THE COURT:*  -- are admitted.


                        Cross - Feazel

```
 1        (Defendant's Exhibit Nos. 28 and 61 admitted)

 2            MS. CHOATE:  I have nothing further.

 3            THE COURT:  Any redirect, Mr. Falb?

 4            MR. FALB:  Briefly, Your Honor.

 5                    REDIRECT EXAMINATION

 6                  QUESTIONS BY MR. FALB:

 7   Q.  You were just asked about Defendant's Exhibit 61 --

 8   A.  Yes.

 9   Q.  -- is that correct?

10   A.  Yes.

11   Q.  In fact, just so the jury's clear about this, someone in

12   field services had approved a victim of a crime to live with

13   a parolee.  See where I bracketed right here?

14   A.  Yes.

15   Q.  Which is a big no-no, right?  Not supposed to parole

16   someone with a victim of a crime?

17   A.  Right.

18   Q.  Okay.  Betty Cook had nothing to do with that.  In fact,

19   she wasn't even in field services, was she?

20   A.  No.

21   Q.  In fact, field services was either you or Bart Toennies?

22   A.  I don't know who was in there May of 2007.

23   Q.  Well, whoever did it in May of 2007 did something very

24   very wrong, didn't they?

25   A.  This entry was made by Flora Jane Branch.
```

Redirect - Feazel

1    Q.   She's a secretary for field services?

2    A.   Yes.

3    Q.   She doesn't make the decisions; it's the field services

4    counselor that makes the decision?

5    A.   That's not correct.

6    Q.   Well, who made the decision here?

7    A.   I couldn't tell you without looking in the computer.

8    Q.   It's field services' responsibility to make sure

9    parolees don't live with their victims?

10   A.   Right.

11   Q.   And in fact, if we move up to the entry here, the person

12   that caught this before it happened was Betty Cook, wasn't

13   it?

14   A.   In regards to the visiting, it has been noted that,

15   *Kelly Hamilton is a victim of your crime so that is why she*

16   *was not allowed in to visit.*

17   A.   Yes.

18   Q.   Betty Cook's the one that caught that?

19   A.   Yes.

20   Q.   And that was the proper thing to do?

21   A.   Well, that she wasn't allowed in to visit.

22   Q.   Yeah.  Well, fortunately, Betty caught it before it

23   happened, is that correct?

24   A.   I don't know how it happened.

25   Q.   Well, someone made a mistake before Betty caught it?

Redirect - Feazel

 1   *A.*   Some parole agents approve them, not the field services
 2   reps inside.   I don't know who approved it.
 3   *Q.*   Now, you were asked about, well, the various promotions,
 4   things that -- you know, various jobs that you had.   The
 5   reasons why you wanted those jobs is so you could have it on
 6   your resume?
 7   *A.*   No.
 8   *Q.*   So you didn't place them on your resume, never talked
 9   about it when you applied for other jobs?
10   *A.*   Yes.
11   *Q.*   And it was good to have those?
12   *A.*   No.
13   *Q.*   It wasn't good?
14   *A.*   I mean that's not why I put them down.
15   *Q.*   Why did you put them down?
16   *A.*   So I would get other jobs.
17   *Q.*   Why did you put them down then?
18   *A.*   Because I'm just putting down what I've done.
19   *Q.*   You didn't have to put them down, I guess, but you chose
20   to do that?
21   *A.*   Yes.   It asked your job duties so that's what I put
22   down.
23   *Q.*   And you said that Betty was going to retire at age 50?
24   *A.*   Yes.
25   *Q.*   She didn't retire at age 50, did she?

                          Redirect - Feazel

1    A.  Well, it was afterwards.

2    Q.  You said that when Betty started doing the Counselor III

3    duties?

4    A.  Yes.

5    Q.  Were you there when she was assigned that work by

6    Ann Casey?

7    A.  Yes.

8    Q.  Did you -- were you personally aware of what Ann Casey

9    promised to her?

10   A.  I know what Ann Casey came into the office and told.  I

11   know Sena was there, Betty was there, I was there, and

12   possibly Bart.

13   Q.  Do you remember Ann Casey telling her that, *Think about*

14   *taking this job*, and Betty went out and thought about it,

15   but you don't know what the discussion was between Ann Casey

16   and my client afterwards?

17   A.  Yes, I know Betty told her that she wanted time because

18   she was going to offer it by seniority with the

19   understanding that no one was going to get the Counselor III

20   pay.

21   Q.  Well, did you hear what was said between Betty and Casey

22   later on or not?

23   A.  I believe I was in there when it -- Betty told her she

24   had talked it over with her husband and she was going to try

25   it.

Redirect - Feazel

1   Q.  So you were personally aware of that?

2   A.  I'm -- yeah, I believe she came by the office that day.

3   Q.  One thing I wanted to ask you:  Your supervisory

4   capacity in the computer system, you said everyone had

5   access to it?

6   A.  Anyone could pull up the CHAMPS entries, yes, that had

7   access to CHAMPS.

8   Q.  Aside from Ann Casey, you were the only one that had the

9   privilege of finding out or determining who was seeing the

10  inmates timely or not?

11  A.  No.  There was always more than one person that had it.

12  Q.  No other counselor could do that besides you?

13  A.  That's not true.

14  Q.  Wouldn't you agree with me you were the only person that

15  could tell Ann Casey who was late?

16  A.  No.

17  Q.  Who else was?

18  A.  As I said in the beginning, it was Al, Pam --

19  Q.  I know in the beginning, but after you were assigned to

20  it, you and Bart Toennies?

21  A.  Okay.  And then when Pam left, it was Al, Terri, and

22  myself, and then when those two left, it was me and Bart.

23  Q.  Okay.  At that point in time -- and that was in March of

24  2006 up until 2008 that you and Bart had the capability that

25  no other counselor had to go in to see who was late in their

Redirect - Feazel

1    90-day visits?

2    A.   We could, yes.

3    Q.   And you could report that to the supervisor?

4    A.   I suppose I could, yes.

5    Q.   And in fact, you did that with Betty, didn't you?

6    A.   Not that I'm aware of, no.

7    Q.   Is it possible?

8    A.   I don't recall doing that, no.  She could check it at

9    any time if she wanted to.

10   Q.   Ann Casey didn't know how to use CHAMPS, did she?

11   That's what you told us.

12   A.   She didn't know how to change the assignments in it.

13   Q.   She didn't know a thing about CHAMPS, did she?

14   A.   I don't know.

15   Q.   That's why you were doing it for her?

16   A.   I done it long before Ann Casey ever came there.

17   Q.   Once Ann Casey came there, you did it for her, didn't

18   you?

19   A.   No.

20   Q.   You didn't?

21   A.   I did it before she ever got there.

22   Q.   I know that, but once she got there --

23   A.   I did it up until the time that Ty Bates took it away.

24   Q.   For almost two years?

25   A.   Longer than that.


                        Redirect - Feazel

1  *Q.*  And why did he take it away from you?

2  *A.*  He didn't want anybody to have it but himself.

3  *Q.*  Have you read Ann Casey's deposition?

4  *A.*  No.

5        *MR. FALB:*  Thank you, Your Honor.

6        *THE COURT:*  Any additional?

7        *MS. CHOATE:*  Nothing, Your Honor.

8        *THE COURT:*  Ladies and gentlemen of the jury, any

9  questions?  None?  Okay.

10        Let's go ahead and break for the afternoon.  We'll

11  be in recess 'til tomorrow morning, 9:00.  Same

12  admonishments, folks.

13     *(Jury out)*

14     *(Court adjourned)*

15                      *   *   *   *

1                        **REPORTER'S CERTIFICATE**

2

3          I, Laura A. Blatz, RPR, CRR, CCR(MO), Official Court
   Reporter for the U.S. District Court, Southern District of
4   Illinois, do hereby certify that I reported in shorthand the
   proceedings contained in the foregoing 137 pages, and that
5   the same is a full, true, correct, and complete transcript
   from the record of proceedings in the above-entitled matter.

6          Dated this 24th day of July, 2012.

7

8                             /s/
                             _____
9                             LAURA A. BLATZ, RPR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25