1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF ILLINOIS

2

3    BETTY D. COOK,                  )
                                     )
4                  Plaintiff,        )
                                     )
5         vs.                        ) No. 09-cv-133-DRH
                                     )
6    ILLINOIS DEPARTMENT OF          )
     CORRECTIONS,                    )
7                                    ) May 24, 2011
                   Defendant.        )

8

9              **TRANSCRIPT OF PROCEEDINGS**
                 **TRIAL DAY/VOLUME #2**
10       **BEFORE THE HONORABLE DAVID R. HERNDON**
          **CHIEF UNITED STATES DISTRICT COURT JUDGE**
11

     **APPEARANCES:**
12

13   For the Plaintiff:        Thomas O. Falb, Esq.
                               Williamson, Webster, et al.
13                             603 Henry Street
                               Alton, IL  62002
14                             (618) 462-1077

15
     For the Defendant:        Joanna Belle Gunderson, Esq.
16                             Kelly R. Choate, Esq.
                               IL Attorney General
17                             500 South Second St.
                               Springfield, IL  62706
18                             (217) 782-1841

19   Court Reporter:           Laura A. Blatz, RPR, CRR, CCR(MO)
                               U.S. District Court
20                             750 Missouri Avenue
                               East St. Louis, IL  62201
21                             (618) 482-9481

22

23

24

25        Proceedings recorded by mechanical stenography;
     transcript produced by computer.

1

## INDEX OF WITNESS EXAMINATION

| | DX | CX | R-DX | R-CX | FR-DX |
|---|---|---|---|---|---|
| Tim Monken | 153 | 167 | 174 | | |
| Bradley Robert | 177 | 229 | 242 | 250 | 251 |
| Bradley Robert | | | | 253 | |
| Brandon Risse | 255 | 292 | 308 | | |
| Alan Sanner | 314 | 320 | 331 | 339 | |
| Sena Landreth | 342 | 350 | 355 | 358 | |
| Terri Loepker | 360 | 370 | 376 | 379 | 381 |
| Doyle Cook | 381 | 387 | | | |

\*    \*    \*    \*

## INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | ID'D | ADMT'D |
|---|---|---|---|
| Plf. 4 | File of Tim Monken | 155 | |
| Deft. 50 | Plaintiff's medical records from Tim Monken | 173 | |
| Plf. 19 | Denial of Request for Information, 12/17/06 | 202 | |
| Deft. 6 | Plaintiff's evaluation for 2/1/04-4/1/04 | 372 | |

```
 1          (Court convened)

 2          (Jury out)

 3              THE COURT:  We have matter to take up before the

 4     jury comes in the courtroom.  Ms. Choate?

 5              MS. CHOATE:  First of all, I wanted to correct the

 6     record, or clarify the record.  Our exhibit that we moved

 7     into evidence, 28, and I cited it as page 7, it is the

 8     seventh page of the exhibit; however, at the top of the

 9     exhibit -- or the bottom right-hand corner there's an 8

10     circled.  I believe this exhibit starts with those circled

11     numbers of two.  I just wanted to make it clear that this

12     document was the offender visiting list of James Golden from

13     Centralia, and that's what the jury saw and that's what we

14     moved in yesterday, but I wanted to clarify the record.

15              THE COURT:  So it's the seventh page of the

16     exhibit, but at the top of the page it says --

17              MS. CHOATE:  At the bottom corner.

18              THE COURT:  It says page 8?

19              MS. CHOATE:  Right.  It's handwritten 8.  That's

20     what I think was confusing.

21              Also, I wanted to raise the issue of yesterday's

22     hearsay ruling.  And I would draw the Court's attention to

23     Tone vs. U.S., 513 U.S. 150, 1995.  And that's one that

24     talks about prior consistent statements.  And I know the

25     Court reversed its ruling yesterday on the hearsay of a
```

1   witness talking about their own prior statement, and it's

2   clear that that would be hearsay.

3          If you look at the rest of the rule that talks

4   about prior statements by a witness, that they have to be

5   prior inconsistent statements and prior consistent

6   statements, the only way those come in are under certain

7   circumstances.  If Mr. Falb's assessment of how the rule is

8   read was true, then there would be no reason to clarify when

9   a consistent or inconsistent statement can come in, and

10  those are when the declarant is available on the stand, and

11  those make it clear that his -- you know, any statement, as

12  long as the person's on the stand, isn't hearsay, doesn't

13  jibe with those 2801(d), and those are the exceptions that

14  they aren't hearsay for those reasons.

15         THE COURT:  What about *U.S. vs. Green*, 258 F.3d

16  683:  *Declarant's prior consistent statement may be*

17  *introduced as nonhearsay as long as declarant is available*

18  *for cross-examination at some point during the trial.*  And

19  of course, you did cross-examine the declarant.

20         MS. CHOATE:  But *Tone* talks about, it has to be --

21  the prior consistent statement, it has to be consistent with

22  his testimony, has to be offered to rebut a charge of recent

23  fabrication, and the statement has to be made prior to the

24  motive to fabricate.  So it can come in when the person's

25  there and able to be cross-examined, but it has to only be

1    there to rebut a charge of recent fabrication.  So they

2    could say, *No, you know, back then I said the same thing.*

3    *You know, I'm not lying.  I didn't fabricate this because I*

4    *said it before.  There was no motive for me to do that.*

5         We have not made any charge of recent fabrication

6    against anybody, and that's exactly what *Tone* talks about.

7    That's consistent with the rule.  That's exactly what's in

8    the rule.  It has to be -- person has to be available,

9    consistent with the declarant's testimony, and be offered to

10   rebut an express or implied charge against recent

11   fabrication or motive or one of identification of a person

12   after perceiving the person.  Then there's admission by a

13   party opponent, which we all agree is okay.

14        *THE COURT:*  Mr. Falb?

15        *MR. FALB:*  Your Honor, I haven't had a chance to

16   see that case.  You know, I don't know what she's talking

17   about.  My only argument was the rule itself like I made it

18   yesterday.  I think that's proper.

19        *THE COURT:*  Were you offering the statement as a

20   prior consistent statement or just -- or what was the

21   purpose of your offering the statement?

22        *MR. FALB:*  It went to both credibility and prior

23   consistent statement, but also the fact that I think I can

24   ask declarant anything that declarant said on a previous

25   occasion because that declarant is open to

 1    cross-examination.

 2         THE COURT:  In the questions leading up to the

 3    question you asked, was there some assertion about some

 4    statement she made inconsistent with the statement that you

 5    then elicited to her about what she said to the other

 6    person?

 7         MR. FALB:  That too.  In other words, I can impeach

 8    my own witness, you know, even as the witness is my witness,

 9    with prior inconsistent statements.

10         THE COURT:  So there was -- what you were asking

11    about was inconsistent with something she prior -- she had

12    said prior to that in her testimony?

13         MR. FALB:  Right.

14         MS. CHOATE:  That wouldn't matter anyway,

15    Your Honor, because if it was a prior inconsistent

16    statement -- for example, he's saying that she denied it on

17    the stand but she said it to Mr. Risse, which is what I

18    think the issue was.  Plus, it was hearsay upon hearsay

19    because it's what someone else told her, first of all.  But

20    a prior inconsistent statement can only be used if it's

21    inconsistent with the declarant's testimony and was given

22    under oath and subject to penalty of perjury at trial,

23    hearing or other proceeding, or in a deposition, which is

24    the impeachment issue.  You can impeach somebody with their

25    deposition testimony.  You can impeach them with prior trial

1   testimony.  You can't impeach them with something some other

2   guy is going to come in and say.

3          THE COURT:  If it was consistent with -- if it was

4   offered to rebut something she previously said, then it

5   makes it a prior consistent statement.

6          MS. CHOATE:  He's offering it because it's

7   inconsistent with what she's saying now is what my

8   understanding was.

9          THE COURT:  No.  You just said it in *Tone*.  It

10  was -- there was a prior inconsistent statement, so then

11  it's consistent with what the point he's trying to make.

12  Read what you just read from *Tone*.

13         MS. CHOATE:  I was talking about -- *Tone* was about

14  a prior consistent statement.

15         THE COURT:  Right.

16         MS. CHOATE:  And *Tone* was if she were to say --

17  like for the plaintiff, if he were to ask Ms. Cook, *What*

18  *about so and so?  What about Ms. Casey?  What did you think*

19  *of her?  Well, and I told her this back then*, or, *I wrote a*

20  *grievance that said*, we would object as hearsay because

21  there's been no --

22         THE COURT:  I didn't ask you all that.  I just

23  asked you to read what you read from *Tone*.

24         MS. CHOATE:  I don't have *Tone* in front of me but

25  it talks about prior consistent statements.

1          *THE COURT:*  What did you just read?

2          *MS. CHOATE:*  From the rule, from 801, directly from

3     the rules, that it's consistent with the declarant's

4     testimony, and so if it's consistent with her testimony and

5     offered to rebut an express or implied charge against the

6     declarant of recent fabrication or improper influence or

7     motive.  There was no such indication.  There was no such

8     charge, so --

9          *THE COURT:*  He's just saying that her testimony up

10    to that statement was something that was inconsistent with

11    what she previously said, and so --

12         *MS. CHOATE:*  So he's claiming it's a prior

13    inconsistent statement, that her statement before is

14    inconsistent with what she testified to up here yesterday,

15    and that can only come in if she made it in a deposition, in

16    a trial, if it was sworn.  So the fact that he's got

17    possibly Mr. Risse to come in and say, *Oh, no, she told me*

18    *that*, whereupon we'll object again, she's not a party; his

19    possible fabrication of any statement she might have made

20    doesn't fit into any of these rules; declarant has to be

21    available, and these other conditions have to be met.

22         *MR. FALB:*  Judge, I would ask you to look at

23    note -- subdivision (d), which is under subparagraph one,

24    prior statement by witness:  *Considerable controversy has*

25    *attended the question whether a prior out-of-court statement*

1    *by a person now available for cross-examination concerning*

2    *it under oath and in the presence of the trier of fact*

3    *should be classed as hearsay.  If the witness admits on the*

4    *stand that he made the statement and that it was true, he*

5    *adopts the statement and there is no hearsay problem.*

6           MS. CHOATE:  That's not what the rule says though.

7           MR. FALB:  That's what the comment says.

8           THE COURT:  The comment seems consistent with what

9    occurred yesterday.  Let me read this *Tone*.

10          What was the -- Mr. Falb, what was the recent

11   fabrication or improper influence or motive, or was it just

12   recent fabrication that you were offering to rebut with the

13   consistent statement or inconsistent statement that was

14   elicited from the witness?

15          MR. FALB:  The fact that she was told by the warden

16   that the jobs, supervisory jobs, were not going to be

17   offered until Betty and the other seniors were gone.

18          THE COURT:  What you elicited from her was what

19   statement?

20          MR. FALB:  She said -- she denied warden ever

21   telling her that.

22          THE COURT:  And you're saying she -- and you

23   elicited a statement from her that she said that to

24   somebody?

25          MR. FALB:  Yeah.

1          MS. CHOATE:  No, that's not correct.

2          MR. FALB:  I'm sorry, I did.

3          MS. CHOATE:  He asked if she talked to

4  Brandon Risse about Betty while Betty was off and she was

5  training Brandon Risse.  She asked if she -- she did admit

6  she probably did.  She was telling him about, you know, how

7  to do things.  He asked her, *Have you talked about each*

8  *specific discipline -- instance of discipline?*  She said no.

9  *Didn't you tell Brandon Risse X?  Didn't you tell*

10 *Brandon Risse Y?*  That was what was elicited.  What he has

11 to prove is that apparently Brandon Risse coming in with

12 hearsay about Gina, which is third-hand hearsay about what

13 the warden said.

14         MR. FALB:  What the warden said is not hearsay;

15 it's an admission.

16         MS. CHOATE:  If it's coming two times past that --

17         MR. FALB:  No, it's not.

18         MS. CHOATE:  Also, he asked about administration.

19 He didn't say who.

20         THE COURT:  What's the statement from the witness

21 that is of controversy here?

22         MR. FALB:  The statements are as follows:

23 Gina Feazel denied making any --

24         THE COURT:  No.  What's the statement from this

25 witness, Feazel, that is in controversy?  What's the

1    consistent or inconsistent statement that is in controversy?

2         MR. FALB:  I don't know what she's -- what

3    statement you're talking about.

4         MS. CHOATE:  I'm talking about the statement where

5    she said that she did not tell Brandon Risse that the warden

6    had ever said that.

7         THE COURT:  So what's the controversy if she denied

8    saying it?

9         MS. CHOATE:  Well, because, first of all, it's

10   Mr. Falb's statement; it wasn't Gina's.  It wasn't elicited

11   by Gina.

12        THE COURT:  His question is not evidence.  What are

13   we arguing about?

14        MS. CHOATE:  Well, the point that if it's not

15   hearsay, then it should come in for the truth of the matter.

16        THE COURT:  She denied it, so what's -- what are we

17   talking about?  Because his statement, his question is not

18   evidence, so -- and she denied saying it, so what's the --

19        MS. CHOATE:  I think what -- I wanted to raise it

20   before we got into more witnesses because I anticipate

21   that's why Mr. Risse is being called partially, to rebut

22   something that Ms. Feazel denied yesterday, and I obviously

23   would object to that testimony.  If he wants to ask

24   Mr. Risse if the warden said something to him, that would

25   obviously be an admission, but not from Gina Feazel.

1          *THE COURT:*  You want to object to him calling a

2    witness for the purpose of impeaching that witness?

3          *MS. CHOATE:*  Yes.

4          *THE COURT:*  Why?

5          *MS. CHOATE:*  Because it's improper for the -- it's

6    improper impeachment, first of all.  It shouldn't have been

7    in the first place because there was no recent fabrication,

8    so he's, you know, trying to impeach somebody else because

9    of someone else's statement.  It wasn't a sworn statement.

10   It's not that own person's sworn statement.  And anything

11   that Gina Feazel said to Brandon Risse would be hearsay,

12   whether it was consistent or inconsistent with what she

13   said.  The jury can believe it or not.  But to have

14   Mr. Risse come in and talk about what someone who's not a

15   party said to him, that's improper.  It's all rumor and

16   innuendo, so and so heard such and such.

17         *MR. FALB:*  It's not rumor or innuendo; it's prior

18   inconsistent statements.  I can impeach her.

19         *MS. CHOATE:*  You can impeach her with a prior

20   inconsistent statement, according to the rules, if it was in

21   her deposition, if it was in sworn testimony, but to have

22   Brandon Risse come in and talk about hearsay within hearsay

23   or within an admission, hearsay trying to get to an

24   admission, that's not proper, and if it's trying to come in

25   for the truth of the matter, then we would object.

1    MR. FALB:  I can always impeach someone with any

2    prior statement.  Doesn't have to be under oath.  I can

3    impeach a police officer with his officer's report.

4    MS. CHOATE:  That's not what the rule says though.

5    I just wanted reconsideration of that, Your Honor.  That's

6    all we want to do.

7    THE COURT:  Okay.  Well, based on the way the rule

8    reads, I'm not going to reconsider my ruling.  And further,

9    based on the comment which interprets the rule, it appears

10   the ruling is correct.  Now, as far as the other is

11   concerned, we'll reach it when we get to it.  So the ruling

12   stands.

13   Okay, Glenn.

14   **(Jury in)**

15   THE COURT:  Sorry for the late start, folks.

16   Judging stuff in here again, so apologize.

17   Call your next witness, please.

18   MR. FALB:  Tim Monken.  Your Honor, at this time

19   I'll be calling Mr. Monken out of order because of his

20   schedule, if that's okay.

21   THE COURT:  Okay.  What he's talking about there,

22   ladies and gentlemen, sometimes in order to accommodate a

23   schedule of a witness it's sometimes necessary to call the

24   witness out of chronological order, so it's not necessarily

25   logical to the sequence of events in a case.  So you ought

Direct - Tim Monken

1    to just keep that in mind as you're listening to this

2    witness's testimony.  May not fall in a logical sequence

3    with other witnesses, but it's just how trials go,

4    unfortunately.

5                **TIM MONKEN, PLAINTIFF'S WITNESS, SWORN**

6                        **DIRECT EXAMINATION**

7                     **QUESTIONS BY MR. FALB:**

8    Q.  State your name, please.

9    A.  Tim Monken.

10   Q.  Mr. Monken, what is your occupation, sir?

11   A.  Psychotherapist.

12   Q.  And tell the ladies and gentlemen of the jury what a

13   psychotherapist is.

14   A.  Psychotherapist helps individuals, families, couples to

15   work through mental health issues typically.  We help to

16   assess the nature of the problem and then we are -- our

17   goals are to help them work through that problem by helping

18   them with giving them like new coping skills, mechanisms to

19   help them work through the situation.

20   Q.  Can you tell the ladies and gentlemen of the jury what

21   your educational background is with respect to

22   psychotherapy.

23   A.  I have a Master's degree from the University of Illinois

24   in Springfield campus, and it's in clinical psychology.

25   Q.  And following getting that degree did you have any

                        Direct - Tim Monken

```
 1    further training, licensing, certifications, that type of

 2    thing?

 3    A.   Yes.  After receiving my degree I became an LCPC, which

 4    is a Licensed Clinical Professional Counselor, which is

 5    pretty much needed to treat anybody for individual therapy.

 6    Q.   Sir, I've called you to testify with respect to your

 7    treatment of Betty Cook, is that correct?

 8    A.   Yes.

 9    Q.   And is this the first -- today's the first day I had a

10    chance to personally meet with you, is that correct?

11    A.   Yes.

12    Q.   And what is the name of your practice?

13    A.   The practice is Stober & Associates Counseling Services.

14    Q.   Where's that located?

15    A.   Centralia, Illinois.

16    Q.   And when did you start private practice?

17    A.   Private practice, started 2005.

18    Q.   Can you tell me what your practice has been since that

19    time?  It's still the same or --

20    A.   Yes.

21    Q.   And just so I understand, do you treat patients with

22    medications or anything like that?

23    A.   Some of my clients are on medication when I see them,

24    some of them are not.

25    Q.   But as far as your profession, you don't treat people --
```

                        Direct - Tim Monken

```
 1   you don't prescribe medications?

 2   A.  I do not prescribe medication, that's correct.

 3   Q.  Is it fair to say your treatment's more talk therapy

 4   counseling?

 5   A.  Yes.

 6   Q.  And have I covered basically all of your education and

 7   experience and licensing?

 8   A.  Just previously before private practice I worked in

 9   community mental health for about eight years, in social

10   services five years as a therapist before starting my

11   private practice.

12   Q.  Can you tell me when you saw Betty Cook for the first

13   time?

14   A.  May of 2007.

15   Q.  Okay.  Have you brought your file?

16   A.  I have not.

17   Q.  Okay.  And to help you, the attorneys have a copy of

18   your file that was produced in discovery.  It's labeled as

19   Plaintiff's Exhibit No. 4.

20           MR. FALB:  Do you have any problem with this?

21           MS. CHOATE:  No.

22           MR. FALB:  May I approach the witness, Your Honor?

23           THE COURT:  Sure.

24   Q. (By Mr. Falb)  Showing you Plaintiff's Exhibit 4, which is a

25   manilla folder.  I believe it's got your records in it.  Can
```

Direct - Tim Monken

1    you take a look at that, identify those as your records?

2    A.   Yes.

3    Q.   And feel free to look at those records as we go through

4    this.

5    A.   Okay.

6    Q.   What were the circumstances of you seeing Betty Cook?

7    A.   I received the referral, and I believe first appointment

8    was -- the date of the intake was May 21st, 2007.

9    Originally she had used EAP Services, which is counseling

10   sessions provided by her union, and she called in with

11   initial complaint of having a lot of difficulty with her

12   supervisor at work.

13   Q.   Okay.   Can you tell me what date the intake was, or

14   maybe what was the first day that you saw her?

15   A.   Looks like the intake came in, it looks like May 21st,

16   and the assessment, when I did the first face-to-face, was

17   May 24th of '07.

18   Q.   When you say "face-to-face", that's you and Betty

19   one-on-one, is that correct?

20   A.   Yes.

21   Q.   Tell me what the history was that you received from her.

22   A.   The history?

23   Q.   Yes.

24   A.   As far as what was going on?

25   Q.   Yes.

                        Direct - Tim Monken

1  *A.  She had -- Betty had told me that she had been a*

2  *counselor for several years and for the most part over the*

3  *years that things had gone very well.*

4  *Q.  Counselor with the Department of Corrections?*

5  *A.  Yes.  With her job, things had been going very well.*

6  *She received good evaluations, that she got along pretty*

7  *well with everyone, and she started running into problems*

8  *with a supervisor who she reported she felt was targeting*

9  *her for things that weren't an issue before, and she was*

10 *under a lot of stress dealing with that particular*

11 *supervisor.*

12 *Q.  And did she mention to you that this was in the early*

13 *part of 2007?*

14 *A.  Yes.*

15 *Q.  Okay.  Did she say anything else about the supervisor as*

16 *far as her retirement?  You can take a look at your chart.*

17 *A.  As far as her retirement?*

18 *Q.  Yes, in the history.*

19 *A.  Okay.  I know that Betty had talked about feeling the*

20 *supervisor was targeting her to take -- to retire early.*

21 *Q.  What else did she say?  You can read it.*

22 *A.  Okay.  What in particular?  What are you --*

23 *Q.  It says, under (a), "Betty reported".*

24 *A.  Okay, got you.  Under -- She had reported having some*

25 *depression.  She said that initially she had some depression*

Direct - Tim Monken

1    *when her mother passed away in '98.  She reported that*

2    *things got much worse in March of 2007.  She reported her*

3    *supervisor started writing her up more.  That's when it*

4    *really got bad.  Her anxiety -- wanted her to retire to*

5    *create a position for somebody that she wanted to get the*

6    *job.  She reported that this had caused her a lot of stress*

7    *and anxiety because she felt that she was being written up*

8    *for things that were -- things that she shouldn't have been*

9    *written up for.*

10   *Q.  Did you do what is known as a review of systems or an*

11   *overall assessment?*

12   *A.  Yeah.  For an assessment, we look at the initial problem*

13   *they're being referred for and then we go through everything*

14   *from substance abuse history to medical issues to just, you*

15   *know, past history as far as family of origin, just to kind*

16   *of get a good -- for that first session, kind of a good*

17   *basis for what's going on in this person's life.*

18   *Q.  Okay.  As far as her family, any substance abuse?  Was*

19   *that all fine?*

20   *A.  Yes.*

21   *Q.  Did she report any symptoms concerning blood pressure or*

22   *migraines due to stress?*

23   *A.  Yes.*

24   *Q.  And did she tell you what medication she was on, under*

25   *paragraph (g)?*

Direct - Tim Monken

1  A.   Yeah.   She was taking Ambien to help her sleep.

2  Q.   What else was she taking?

3  A.   That's the only medication I'm seeing on here, unless

4  I'm missing one.

5  Q.   Let me refer you to the -- maybe I'm looking at a

6  later --

7  A.   Maybe a later note maybe.   Okay.   I got you.   She had

8  stated -- I don't know if she was for sure which particular,

9  but she said she was on medication for her migraines and she

10 was also on a medication for high blood pressure.

11 Q.   Okay.   Is that in your records?

12 A.   Yes, it is.

13 Q.   And on this first visit, May 24th, 2007, tell us what

14 happened.

15 A.   She basically -- the first session was collecting all

16 the information that, you know, I'd spoke about.   We

17 reviewed over the problem, collected information.   First

18 session is mainly to build rapport with the client so they

19 feel comfortable and to collect information to help to

20 decide where the treatment will go.

21 Q.   Okay.   And did you have a recommendation as far as her

22 course of treatment?

23 A.   She was under -- she was having some depression.   I felt

24 that the anxiety was maybe the biggest impact, so I talked

25 with Betty just about some coping skills to help her deal

Direct - Tim Monken

1   with stress.

2   Q.  Did you continue to see her after May 24th, 2007?

3   A.  Yes.

4   Q.  When did you next see her?

5   A.  Looks like June 5th.

6   Q.  Okay.  And tell us what the history was at that time.

7   A.  Reported supervisor had written her up for several

8   things that she reported that she did not do.  Still

9   reporting putting pressure on her to retire.  She was

10  getting more angry about the situation.  She was at that

11  point working with a union rep to join her in staffings.

12  She reported that her blood pressure was pretty high after

13  work.

14  Q.  And when you talked to her, what did you find as far as

15  your assessment?

16  A.  She seemed pretty, you know, distraught by the

17  situation.  She felt that her hands were kind of tied.  I

18  had suggested her to continue to talk with her union

19  president to assess the situation and to help.

20  Q.  And was she still suffering at this time from any

21  diagnosis?

22  A.  She was still reporting anxiety and depression.

23  Q.  And what is that, in layman's language?

24  A.  Anxiety is usually a fear that something bad will

25  happen.  Depression is more of a sense of loss.

Direct - Tim Monken

1   Q.  And what was your course of treatment?

2   A.  Throughout her treatment it focused on helping her to

3   develop the coping skills to deal with the situation at work

4   and also to provide her with support.  She was afraid of

5   what was going to happen next, so basically just to give her

6   a sounding board to help to get her someone who would listen

7   to her, provide her with some feedback.

8   Q.  Did you see her for a third time on June 19th, 2007?

9   A.  Yes.

10  Q.  And what was the report of history at that time?

11  A.  She reported that -- she said she was starting a 3-day

12  suspension next week; reporting supervisor still putting

13  pressure on her to retire.  At that point she was thinking

14  about getting a lawyer, filing charges against, I guess

15  particular supervisor who she felt was targeting her.

16  Q.  Let me ask you this:  When you -- after you received

17  this history -- let me ask you this:  Let's jump to this

18  other line.  Did she report what her evaluations had been

19  prior to this supervisor?

20  A.  She reported that her evaluations had been excellent.

21  Q.  And what was your diagnosis at this time?

22  A.  Adjustment disorder with anxiety and depression.

23  Q.  And that means?

24  A.  Means that due to a major stressor that it had caused

25  her anxiety and depression.

Direct - Tim Monken

1    Q.  And did you form an opinion as to what that major

2    stressor was?

3    A.  Work-related.

4    Q.  And I assume your treatment was essentially talk therapy

5    and giving her some coping mechanisms?

6    A.  Yes.

7    Q.  Did you see her again on June 25th, 2007?

8    A.  Yes.

9    Q.  And what happened at that time?

10   A.  She reported she started serving a 3-day suspension.

11   Reported that she's been taking a little bit better care of

12   herself.  She, guess going into this session, reported that

13   there were no major verbal battles between her and the

14   supervisor.  She was basically -- I had kind of recommended

15   to her to try to, you know, set boundaries but not to get

16   involved in verbal exchanges with this particular

17   supervisor, and she reported that she wasn't allowing that

18   supervisor to push her buttons, and that had helped to lower

19   some of her anxiety.

20   Q.  Did you see her once again on July 24th, 2007?

21   A.  Yes.

22   Q.  And at that time was she doing better?

23   A.  At that point she was feeling better.  The supervisor

24   who was one that I guess was the main one at that point she

25   reported to me who was harrassing her had resigned and taken

Direct - Tim Monken

1    another position.

2    Q.  Did you give more information on stress management this

3    time?

4    A.  Yes.

5    Q.  Essentially did you treat her in the same way as you did

6    previously?

7    A.  Yes.  And also, I think she was -- says here she had

8    taken a vacation, I believe right before this appointment,

9    so I think that had helped her also to kind of recover from

10   some of that stress.  I think she had saved up her time and

11   I think she felt that that was a good time to take it, just

12   to kind of get away from what was going on, and I think she

13   had felt a little bit of a release just being able to have

14   that time away from work.

15   Q.  Did you see her for the last time on August 14th, 2007?

16   A.  Yes.

17   Q.  And how was she doing at that time?

18   A.  She reported that time that things were going a little

19   better at work.  She had received a lot of support from her

20   coworkers.  She read over some material she felt that was

21   helpful.  At that point she had -- you know, she felt that

22   things were going to the point where she was able to make it

23   on her own I guess.

24       We had discussed about the need for further treatment at

25   that last appointment, and I think that with this one

Direct - Tim Monken

 1   supervisor leaving, although there were others that she had

 2   talked about that were causing her stress, but I think at

 3   that point she felt that I'd given her probably enough

 4   coping skills, mechanisms through the previous, you know,

 5   sessions, that she could manage on her own.  I told Betty at

 6   any point if she wanted to return for counseling, she was

 7   always welcome to come back.

 8   Q.  At this point did she report to you that she no longer

 9   wanted to quit?

10   A.  I didn't hear.

11   Q.  At this point did she state to you in your notes that,

12   *Betty reports she no longer wants to quit*?

13   A.  Yes.  It said at that point that she was -- she felt

14   that she could hang in there a little longer.  She had

15   talked about that she could -- she was getting close to I

16   believe where she could retire but it wouldn't be -- I guess

17   it wouldn't be her full pension.  I think she felt that

18   she -- at that point she might be able to hang in there a

19   little longer to be able to make it to that.

20   Q.  This was the last time that you saw her, is that

21   correct?

22   A.  That's correct.

23   Q.  That was August 14th, 2007?

24   A.  Yes.

25   Q.  I don't want to be unfair to you.  Do you know what

Direct - Tim Monken

1   happened to Betty after August 14th, 2007 as far as

2   suspensions, disciplines or anything like that?

3   A.  No, sir.

4   Q.  Did you know anything about her taking a stress leave or

5   seeing her family practice doctor?

6   A.  Just I know you had briefed me a little bit on kind

7   of --

8   Q.  I'm talking about you personally.

9   A.  Personally, no, she had never contacted me.  The only

10  contact I think I had with Betty is she had -- I think I had

11  her to come in to sign a release so that I'd be able to

12  contact you.

13  Q.  Talk to me?

14  A.  Yes.

15  Q.  And your final diagnosis was what, sir?

16  A.  She still had -- at that point she still had some

17  anxiety, depression, although it was not, you know, as

18  severe as what it originally was when I initially took that

19  intake.

20  Q.  When you had initially seen her did you grade her on

21  what is known as the Global Axis Scale?

22  A.  Yes.

23  Q.  Tell the jury what that is.

24  A.  It's kind of an overall function how the person is doing

25  in general.  Zero would be the very lowest; that is somebody

Direct - Tim Monken

1    who's having difficulty just functioning in general.  A
2    hundred is somebody who has absolutely no stress and they're
3    doing great.  And it goes from zero to a hundred.
4    Initially -- let's see.  Looks like there's -- actually,
5    these notes were printed off from -- they have it looks like
6    two numbers here, which there shouldn't be two numbers, so
7    that's an error when they typed that.  It looks like that's
8    supposed to be a 60.  I'm not for sure because that's --
9    like I said, that's -- when they typed that, that's an error
10   for sure.
11   *Q.*  Can you tell us what her rating was or not?
12   *A.*  Let me double check here.
13   *Q.*  Take your time.
14   *A.*  Sure.  Be a 60.
15   *Q.*  Sixty out of 100?
16   *A.*  Yes.
17   *Q.*  And in layman's language what does that mean?
18   *A.*  It means they have -- that they definitely have some
19   stress and depression, but they're not suicidal, they're not
20   at risk to themselves, they're still able to function at
21   that time.
22   *Q.*  On each visit did you make sure you checked for her to
23   make sure she wasn't suicidal?
24   *A.*  Yes.  We would always check as far as, you know, initial
25   assessment, checking with the person as far as -- any time

                    Direct - Tim Monken

```
 1    somebody has depression we always want to assess them for if
 2    they're having any suicidal ideations.  And Betty, even
 3    though she had periods of depression, she reported that she
 4    had no thoughts of wanting to hurt herself.
 5    Q.  And during -- at all visits was Betty cooperative with
 6    you?
 7    A.  Yes, she was very cooperative.
 8    Q.  Did she appear to be honest and forthright?
 9    A.  Yes.
10         MR. FALB:  Thank you.
11                        CROSS-EXAMINATION
12                   QUESTIONS BY MS. CHOATE:
13    Q.  Hello.
14    A.  Hi.
15    Q.  I'm Kelly Choate and I represent the Department of
16    Corrections in this matter.  We haven't met, correct?
17    A.  No, ma'am.
18    Q.  I believe you said that you had been briefed by Mr. Falb
19    prior to your testimony here today?
20    A.  Yes.
21    Q.  What did Mr. Falb discuss with you?
22    A.  He just reported to me that after I had seen Betty that
23    she had had some more difficulties.
24    Q.  And did he explain to you what those difficulties were?
25    A.  I think she had to go on rest for awhile.  She was
```

1    placed on, I think, leave by her doctor.

2    Q.  Now, as a psychologist, when a person comes to your

3    office and they talk to you about what's going on in their

4    life, you don't know if they're actually telling you the

5    truth, do you?

6    A.  First of all, I want to correct, I'm not a psychologist.

7    That would -- I don't have my doctorate.  I'm actually a

8    therapist, or counselor.  I didn't want -- for the record

9    because you have to have a Ph.D. to be a psychologist.  But

10   you had asked if I know if somebody's telling me the truth

11   or not?

12   Q.  Right.

13   A.  I don't know, you know, 100 percent if anybody's telling

14   me the truth.

15   Q.  So you base your diagnoses on what you observe of that

16   person, correct?

17   A.  Yes.

18   Q.  And combined with what they tell you, correct?

19   A.  Correct.

20   Q.  And I think it's safe to say that in Betty's case you

21   didn't go out to the prison and talk to anybody about what

22   she told you, did you?

23   A.  We wouldn't be able to due to confidentiality,

24   obviously.

25   Q.  Right.  So you're stuck with her story of why she's

                        Cross - Tim Monken

1   anxious?

2   A.  Correct.

3   Q.  And isn't it true that a person who is not performing

4   well at work could have that same sort of anxiety?

5   A.  Wasn't performing well?

6   Q.  Correct.

7   A.  If they were not performing well and they were getting,

8   you know, written up, sure.  Any time somebody would, you

9   know, have problems with a supervisor, being written up

10  for -- you know, if they weren't performing, being written

11  up, yes, they would definitely have some anxiety or

12  depression I'm sure.

13  Q.  Right.  So whether they were being targeted unjustly or

14  just being written up for something they did, both of those

15  cause anxiety; would that be your opinion?

16  A.  Yes.

17  Q.  Now, at some point I think you talked about that on

18  6/5/07 when you saw Betty -- let me ask you this first:  Do

19  you recall, without looking at your notes, these specific

20  instances where you talked with Betty?

21  A.  You mean on every day?

22  Q.  Yes.

23  A.  I recall certain -- obviously, certain details.

24  Betty's -- Betty, it's -- I guess the reason I remember some

25  of the details, this is not an everyday case, so certain

Cross - Tim Monken

1    things stood out, and Betty had a very, I don't know,

2    vibrant personality, so I remember some of the things she

3    specifically told me, but I can't -- if you're asking me if

4    I can remember every detail of every session four years ago,

5    that's very difficult to know exactly, you know, every

6    detail of what we talked about four years ago.

7    Q.  Right.  That's understandable.  And isn't that why you

8    have -- you take notes in the medical records, correct?

9    A.  Sure.

10   Q.  In your therapist notes, I'm sorry.

11   A.  Yes.

12   Q.  Now, she reported that she feels she doesn't deserve to

13   be rated this way.  She was talking about her supervisor

14   that was rating her; is that your understanding of what her

15   relation -- or what she was relating to?

16   A.  That she was --

17   Q.  That she didn't deserve to be rated the way she was

18   being rated by her supervisor?

19   A.  That's correct.

20   Q.  Was it your understanding that she was talking about one

21   particular supervisor?

22   A.  Multiple people she reported were targeting, but there's

23   one particular supervisor that was the one that was causing

24   her the most trouble.

25   Q.  And the only one that you referenced here, she's not

                         Cross - Tim Monken

1  getting along with her supervisor, which is the June 25th,

2  '07 note, correct?

3  A.   I'd have to -- June 27th?

4  Q.   Uh-huh.  I'm sorry.  June 25th.  I'm sorry.

5  A.   That's okay.

6  Q.   You probably didn't see her on the 27th.

7  A.   I'm thinking that's the, you know, the main supervisor

8  she was having trouble with.  She stated she wasn't getting

9  in as many verbal battles with her.

10  Q.   On the 19th of June, the page right before this, the

11  session right before this, she said she's thinking about

12  filing charges against her.  Is that your -- what you wrote

13  here in your notes?

14  A.   Yes.

15  Q.   So at least as far as these notes, or this note on

16  June 19th, she was talking about a female supervisor,

17  correct?

18  A.   Yes, she was a female.

19  Q.   Now, moving on to 7/24, which is two sessions after, she

20  said that the supervisor who had been harassing her -- so

21  she talked about the supervisor -- has resigned, correct?

22  A.   Correct.

23  Q.   And other people were happy about this supervisor

24  leaving, correct?

25  A.   Yes.

Cross - Tim Monken

1   Q.  And she's feeling much better, correct?

2   A.  Yes.

3   Q.  And she still had anxiety though because she was written

4   up while she was on vacation; is that your understanding as

5   well under "Assessment"?

6   A.  She had reported the person who took the supervisor

7   position, she -- there was still -- I remember her telling

8   me there was tension there.  It wasn't as extreme as this

9   initial supervisor.  And she was kind of concerned, I think,

10  about what was going to happen, were things going to get

11  better, you know.  She knew what she had with the other

12  supervisor and that wasn't good, but she was concerned

13  about, with the new supervisor taking over, some of those

14  same issues occurring.

15  Q.  I think she reported to you at one point that she

16  thought that -- I think it was on your initial intake --

17  that she thought that the supervisor wanted her to take

18  retirement to create a new position for the supervisor's

19  friend.  Is that what Betty told you?

20  A.  She had felt that she was being -- you know, that

21  there -- she was trying to understand why she was being

22  picked on, I think that was one of the reasons; that, as

23  well as, you know, with her political affiliation, I think

24  she felt that that was their thing, that she was the

25  minority out there and the rest -- that came up in the

Cross - Tim Monken

1   conversation frequently as well.

2   *Q.* Again, you don't know that Betty was actually being

3   picked on at work, do you?

4   *A.* Self-report only.

5   *Q.* Self-reported. She believed she was perhaps, is that

6   fair enough?

7   *A.* She definitely believed she was.

8   *Q.* I think Mr. Falb was asking you if these were your

9   records, is that correct?

10  *A.* Yes.

11  *Q.* These are the records of your case -- I'm sorry, that

12  you took with Ms. Cook. I want to show you what we've

13  marked as Defendant's Exhibit 50. And on page 2096, is that

14  the last contact you had regarding Ms. Cook?

15  *A.* I believe there was -- I believe I had her come in

16  because the release signed -- our releases are valid for one

17  year, and I believe I did have her come in and sign another

18  release to her attorney.

19  *Q.* So that is one -- is your note that's in her file in

20  your office, correct?

21  *A.* Yes.

22  *Q.* What does that note say?

23  *A.* That she hired an attorney for how she was treated at

24  work, request that she obtain her counseling records. She

25  was given records. She signed release to her attorney.

                    Cross - Tim Monken

1    *Q.* What date was that?

2    *A.* August 31st, 2009.

3    *Q.* And that document doesn't appear in Plaintiff's 4, does

4    it, the one you were given previously by Mr. Falb?

5    *A.* I do not see it.

6    *Q.* And to your knowledge, after that note in your file, is

7    there anything else about Ms. Cook in your files to your

8    knowledge?

9    *A.* After this one?

10   *Q.* After the one in Defendant's 50?

11   *A.* No.

12            *MS. CHOATE:* I have nothing further.

13            *THE COURT:* Redirect, Mr. Falb?

14            *MR. FALB:* Just briefly, Your Honor.

15                    **REDIRECT EXAMINATION**

16                    **QUESTIONS BY MR. FALB:**

17   *Q.* Mr. Monken, that last note that was referred that Betty

18   had to come in and signed a new release --

19   *A.* Correct.

20   *Q.* -- that had nothing to do with treatment, is that

21   correct?

22   *A.* Correct.

23   *Q.* That was just to get her records?

24   *A.* Correct.

25   *Q.* In fact, when I talked to you, you said you couldn't

                    Redirect - Tim Monken

1    talk to me without having the correct release, is that

2    right?

3    A.   Yes.

4    Q.   And in fact, you were so careful about this, you told me

5    that I couldn't even mail you a subpoena to come here to

6    court; I'd have to have a process server serve you with a

7    subpoena with a subpoena fee?

8    A.   Yeah.  I tried to do things accordingly.

9    Q.   I understand you're trying to protect yourself because

10   this is mental health records.

11   A.   Yes.

12   Q.   That's why you document everything?

13   A.   Correct.

14   Q.   And I appreciate that very much.  And as far as the

15   attorney for the Attorney General's office indicated, that,

16   you know, all what Betty told you, you are listening to, and

17   you don't go out and do your own investigation, do you?

18   A.   No, sir.

19   Q.   You never do that with any of your patients, do you?

20   A.   None come to mind right off, no.

21   Q.   How many patients have you seen over the years?

22   A.   I couldn't even tell you.

23   Q.   Thousands?

24   A.   Probably.

25   Q.   And you know, you get an idea who's exaggerating, who's

Redirect - Tim Monken

1   malingering and that type of thing, don't you, from gut

2   feeling?

3   A.  We do get some gut feelings based upon inaccuracies if

4   someone -- you know, somebody is obviously -- we can't tell

5   100 percent but we get a sense if somebody's telling the

6   truth or not.

7   Q.  Did you ever have a bad sense about what Betty was

8   telling you?  In other words, that she was exaggerating,

9   malingering, not cooperative, anything?

10  A.  No.

11  Q.  Did she at least appear to you to be forthright and

12  honest the whole time?

13  A.  Yes.

14  Q.  Each and every visit?

15  A.  Yes.

16  Q.  Did she appear to you that she was really anxious?

17  A.  Yes.

18  Q.  Depressed?

19  A.  Very anxious, yes.

20  Q.  Obviously you don't know what was going on at work but

21  just what she reports?

22  A.  Yeah, it's what she reports and just demeanor.

23  Q.  Whatever was going on at work was definitely a stressor

24  in her life, wasn't it?

25  A.  Yes.

Redirect - Tim Monken

```
 1              MR. FALB:  Thank you, sir, very much.

 2              THE COURT:  Additional cross?

 3              MS. CHOATE:  Nothing else, Your Honor.

 4              THE COURT:  Ladies and gentlemen of the jury, any

 5    questions?  Okay.  Thanks.  You can step down.  Next

 6    witness.

 7              MR. FALB:  Warden Robert.

 8         BRADLEY ROBERT, PLAINTIFF'S WITNESS, SWORN

 9                      DIRECT EXAMINATION

10                  QUESTIONS BY MR. FALB:

11    Q.  State your name, please.

12    A.  Bradley J. Robert.

13    Q.  What is your occupation?

14    A.  I'm the warden at Centralia Correctional Center.

15    Q.  How long have you been the warden there?

16    A.  Since January '05.

17    Q.  What is Centralia Correctional Center?

18    A.  It's a Level 4, medium security.

19    Q.  Am I correct that you have all types of prisoners there?

20    A.  Yes, sir.

21    Q.  Murderers?

22    A.  Yes.

23    Q.  Rapists?

24    A.  Yes.

25    Q.  Burglars, robbers?
```

1    A.  All kinds, yes.

2    Q.  How many inmates are there?

3    A.  We average around 1530.

4    Q.  How many people do you supervisor as warden?

5    A.  Right now roughly 380.

6    Q.  Can you tell the jury -- strike that.

7        Who are the 380 people?  Are they correctional officers?

8    What are they?

9    A.  All department heads, correctional officers, sergeants,

10   majors, lieutenants, clerical.  All types.

11   Q.  Are you the head of the facility?

12   A.  Yes, I am.

13   Q.  And am I correct that below you are two assistant

14   wardens?

15   A.  Yes.  I have one right now.

16   Q.  But usually you have two assistant wardens?

17   A.  Yes.  Assistant warden operations and assistant warden

18   programs.

19   Q.  So the jury understands, we got the warden at the top

20   over all these people, including 1500 or 1600 inmates, 380

21   employees, right?

22   A.  Yes.

23   Q.  And then you have two assistant wardens, one for

24   operations and one for programs, is that correct?

25   A.  Yes, sir.


                         Direct - Robert

```
 1   Q.  Operations, what does the assistant warden do for
 2   operations?
 3   A.  Oversees the security operation of the facility,
 4   dietary, he's got industries and all security stuff.
 5   Q.  And the assistant warden of programs, they take care of
 6   which of the departments?
 7   A.  All the programs, record office.  You got chaplain's
 8   office, you got school district, you got the counselors
 9   department, clinical services.
10   Q.  Now, you said in January of '05 you were made a warden,
11   is that correct?
12   A.  Yes, sir.
13   Q.  Did Blagojevich make you a warden?
14   A.  It was under Blagojevich.  His staff did, yes, his
15   personnel staff.
16   Q.  Did Blagojevich appoint you as assistant warden the year
17   before?
18   A.  It was October '03.
19   Q.  October of '03.  So which assistant warden were you at
20   that time, operations?
21   A.  Assistant warden operations.
22   Q.  In October of '03, you came into Centralia, is that
23   correct?
24   A.  Yes, sir.
25   Q.  Had you worked in any other prison?
```

Direct - Robert

1    A.   Yes, sir, Centralia.

2    Q.   No; besides Centralia.

3    A.   No, sir.

4    Q.   When was the last time you had worked in Centralia

5    before October of 2003?

6    A.   It would have been probably around '91.

7    Q.   So you hadn't been in a correctional facility for 12

8    years, is that correct?

9    A.   No, sir.

10   Q.   Is that correct?

11   A.   Yes, sir.

12   Q.   And at that time, the last time you had worked in

13   Centralia, you were a correctional officer?

14   A.   Yes, sir.

15   Q.   And what is a correctional officer?

16   A.   Correctional officer, they supervisor the inmates.  All

17   different duties.

18   Q.   Is the correctional officer the lowest rung of the

19   correctional facility?

20   A.   Yes, sir.

21   Q.   How long had you been at this lowest rung?

22   A.   Roughly ten years.

23   Q.   And am I correct that there were people above you?

24   A.   Yes, sir.

25   Q.   What was the next rank above you?

Direct - Robert

 1   A.   Sergeant.

 2   Q.   What was the next rank above sergeant?

 3   A.   Lieutenant.

 4   Q.   Above lieutenant?

 5   A.   Captain.

 6   Q.   Above captain?

 7   A.   Chief of security.

 8   Q.   Chief of security.  Above chief of security?

 9   A.   Would have been assistant wardens.

10   Q.   At any time prior to you being appointed as assistant

11   warden by the Blagojevich administration, had you held a job

12   title of chief of security?

13   A.   In the corrections?

14   Q.   Yes.

15   A.   No, sir.

16   Q.   Captain?

17   A.   No, sir.

18   Q.   Lieutenant?

19   A.   No, sir.

20   Q.   Sergeant?

21   A.   No, sir.

22   Q.   Is it true, for the whole time you were a correctional

23   officer, the only one you took care of as far as supervision

24   were the prisoners?

25   A.   Yes.

                        Direct - Robert

1    Q.   And you had bid or applied or tried to get higher jobs,

2    didn't you?

3    A.   Yes, sir.  I applied for sergeants and lieutenants.

4    Q.   Pardon me?

5    A.   I applied for sergeants and lieutenants.

6    Q.   How many times did you apply for the sergeant's job?

7    A.   I don't recall.

8    Q.   It was more than once?

9    A.   I'm sure.

10   Q.   More than five times?

11   A.   No.

12   Q.   How many times did you apply for the lieutenant's job?

13   A.   Probably two.

14   Q.   Did you ever get those jobs?

15   A.   No, sir.

16   Q.   Were you absent from your job?

17   A.   I was in automobile accident in '91.

18   Q.   So were you absent from the job?

19   A.   Yes.

20   Q.   A lot?

21   A.   I was on a leave for like three years; two or three

22   years, something like that.

23   Q.   You didn't work for two or three years?

24   A.   No, sir.  I was in therapy every day.  I was ejected

25   from the vehicle, rollover.

Direct - Robert

1    Q.  Were you on proof status?

2    A.  No, sir.

3    Q.  So how many years did you actually work as a

4    correctional officer?

5    A.  Roughly ten.

6    Q.  Well, how many times -- I mean how many years did you

7    actually were at the facility?

8    A.  From what times?

9    Q.  Well, you said you were off for two or three years?

10   A.  That was after '91.

11   Q.  Okay.  Let me back up.  When did you start at the

12   facility originally?

13   A.  '81, '82, somewhere in there.

14   Q.  1981?

15   A.  Or '82, somewhere in there.

16   Q.  Did you work as a correctional officer for a period of

17   time?

18   A.  Yes.

19   Q.  And when did you stop working?

20   A.  '91.

21   Q.  Okay.  Is that because of the auto accident?

22   A.  Yes.

23   Q.  And you never came back?

24   A.  No, sir.

25   Q.  But you were off, what, on worker's comp or getting

                        Direct - Robert

1    disability?

2    A.  No; workmen's comp.  I was on nonoccupational

3    disability.

4    Q.  For three or four years?

5    A.  It was roughly three, I believe.

6    Q.  Did you work any place during that time?

7    A.  No.  I was in therapy every day.

8    Q.  Didn't have your bar in Carlyle?

9    A.  No.

10   Q.  When did that happen?

11   A.  That was probably 2000, something like that.

12   Q.  When did you work next?

13   A.  I worked -- when I come off my medical leave I went to

14   Secretary of State's office.

15   Q.  Is that a state?

16   A.  Yes.

17   Q.  How did you get that job?

18   A.  I applied for it.

19   Q.  Did anyone help you get the job?

20   A.  No, sir.

21   Q.  What was your job?

22   A.  At that point I was driver services department.

23   Q.  Try to paint the picture.  Is this where people go to

24   get their license renewed?

25   A.  License, title work, stuff like that.


                        Direct - Robert

1    Q.   I think you told me that you were a security guard
2    there?
3    A.   That was later on.
4    Q.   Well, what were you there initially?
5    A.   Drivers services.
6    Q.   What did you do?
7    A.   Just told you, driver's license and title work.
8    Q.   So you issued driver's license?
9    A.   Yes, sir.
10   Q.   Do title work, is that the type of thing you would do?
11   A.   Yes, sir.
12   Q.   For how many years did you do that?
13   A.   For six.
14   Q.   Did you supervise anybody?
15   A.   No, sir.
16   Q.   Did you wear a gun?
17   A.   No, sir.
18   Q.   And then you went into security?
19   A.   Yes.
20   Q.   What were you doing for security?
21   A.   I overseen the driver's license facility in the southern
22   half of the state.
23   Q.   Who gave you that job?
24   A.   Secretary of State's office.
25   Q.   Who helped you get that job?

                         Direct - Robert

```
 1  A.  No one.

 2  Q.  Got it on your own?

 3  A.  Yes, sir.  Applied for it.

 4  Q.  Prior to being -- let me ask you this:  Is your only

 5  degree a high school degree?

 6  A.  Yes, sir.  Some college.

 7  Q.  Did you ever complete college?

 8  A.  No, sir.

 9  Q.  Did you ever even get a two-year certificate?

10  A.  No, sir.

11  Q.  Why didn't you go back to the correctional facility?

12  A.  Because I was offered this job.

13  Q.  Pardon me?

14  A.  Because I applied for this job and was offered it.

15  Q.  Why did you take that job as opposed to going back to

16  the correctional facility?

17  A.  Basically seniority.  I would have weekends off, same

18  amount of pay.

19  Q.  Am I correct that in the diagram that I showed -- do you

20  see that on your screen?

21  A.  Yes, sir.

22  Q.  Blagojevich administration could appoint anyone they

23  wanted to all these jobs, director of Department of

24  Corrections, the deputy director, you, the warden, and the

25  assistant warden, is that correct?
```

                    Direct - Robert

1    A.   I would say yes.

2    Q.   Pardon me?  I couldn't hear you.

3    A.   I would say so, yes.

4    Q.   Okay.  In other words, whatever administration was in

5    power could appoint these people, is that correct?

6    A.   I would say yes.

7    Q.   And Blagojevich came in in 2003, is that correct?

8    A.   Yes, I believe so.

9    Q.   And that's when you got appointed?

10   A.   It was late '03.

11   Q.   Assistant warden?

12   A.   October '03, yes.

13   Q.   Okay.  Did you interview for that job?

14   A.   Yes, sir.

15   Q.   How many times?

16   A.   Once.

17   Q.   With who?

18   A.   I don't recall.  Someone on the governor's staff.

19   Q.   Pardon me?

20   A.   It was on the governor's staff.

21   Q.   Was it a male or female?

22   A.   I believe it was female.

23   Q.   What was her job?

24   A.   I don't recall.

25   Q.   You don't remember her name?

                        Direct - Robert

```
 1   A.   No, I sure don't.
 2   Q.   How did you get the job?
 3   A.   I applied for it.
 4   Q.   That's it?
 5   A.   Yes.
 6   Q.   Did anyone else apply for it?
 7   A.   I'm sure they did.
 8   Q.   You had one interview, is that correct?
 9   A.   Yes, sir.
10   Q.   And that's it?
11   A.   Yes.
12   Q.   Prior to all this work being -- let's take you back.
13   Prior to being a correctional officer, was your
14   employment -- at some point in time you worked as a laborer
15   on a gang for a railroad?
16   A.   I worked for a railroad for one summer.  I went into --
17   Q.   Pardon me?
18   A.   I worked on the railroad on the section gang for one
19   summer, then I went into the clerical part of it.
20   Q.   How long did you work for the railroad?
21   A.   Roughly a year I would say.
22   Q.   Did you supervise anybody there?
23   A.   I don't recall.
24   Q.   Did you supervise anybody up to the point in time you
25   left the Department of Corrections originally?
```

Direct - Robert

1   A.   Yes, when I was in the Solar Energies.

2   Q.   Pardon me?

3   A.   When I was in the Solar Energy Savers, I did.

4   Q.   How long did you work there?

5   A.   Probably been a couple years.

6   Q.   Then you started working for the Department of

7   Corrections?

8   A.   Yes, sir.

9   Q.   How come?

10  A.   Better job.

11  Q.   Who got you the job?

12  A.   No one.

13  Q.   Okay.  I think I left out -- I assume at one point in

14  time you opened a bar, and you supervised people there,

15  right?

16  A.   Yes, sir.

17  Q.   That was in -- what was it called?

18  A.   Legion Bar and Restaurant.

19  Q.   In Carlyle?

20  A.   Yes.

21  Q.   Is it safe to say that when the Blagojevich

22  administration appointed you as assistant warden in the fall

23  of 2003, you had never supervised one correctional officer,

24  is that correct?

25  A.   Correctional officer, no.

                        Direct - Robert

1    Q.   You never supervised a sergeant, a lieutenant?

2    A.   Correctional sergeant, correctional lieutenant, no.

3    Q.   Captain.  So in the fall of 2003, basically when you

4    went back to the Department of Corrections, you had jumped

5    from the lowest rung on the chain of employees, being a

6    correctional officer; you went above the sergeant, the

7    lieutenant, the captain, the chief, and became assistant

8    warden?

9    A.   If you want to count all correctional time, sure.

10   Q.   Were these guys still there?

11   A.   Some of them, yes.

12   Q.   And then, as assistant warden, you worked there for one

13   year, is that correct?

14   A.   Little over a year, yes.

15   Q.   And then all of a sudden one day, January 1st, 2005, you

16   got something in the computer that said you're a warden?

17   A.   Yes, sir.

18   Q.   At that time you became warden?

19   A.   Yes, sir.

20   Q.   And you had no idea how you became warden?

21   A.   No, sir.  I was just appointed.

22   Q.   No friends, no influential people?

23   A.   No, sir.

24   Q.   Who was the warden before there?

25   A.   Warden Bowen.

                         Direct - Robert

1    *Q.  Was he walked out of the prison?*

2    *A.  I don't think he was walked out.  He was at home at the*

3    *time, I believe.*

4    *Q.  What happened to him?*

5          *MS. GUNDERSON:*  Objection, foundation.

6    *Q. (By Mr. Falb)  Do you know what happened to him?*

7    *A.  No, not really.  He was released but I don't know what*

8    *the circumstances were.*

9    *Q.  Was he a bad warden?*

10          *MS. GUNDERSON:*  Objection.  Foundation,

11   speculation.

12   *Q. (By Mr. Falb)  Did you work with him?*

13   *A.  Yes.*

14   *Q.  Did you get along with him?*

15   *A.  Yes, sir.*

16   *Q.  Have any problems with him?*

17   *A.  No, sir.*

18   *Q.  He was a good warden, wasn't he?*

19   *A.  As far as I know, yes, sir.*

20   *Q.  Now, when you became assistant warden, at that time you*

21   knew Gina Feazel?

22   *A.  At the time, no.  When I was appointed I don't believe I*

23   did.

24   *Q.  You knew -- isn't it true that you knew her for years*

25   before you became assistant warden?

Direct - Robert

1    A.   I can't say I know.

2    Q.   Is it possible?

3    A.   No, I don't believe.

4    Q.   Is it true that you knew her outside of Centralia

5    Correctional Center?

6    A.   I may have seen her but I did not know her.

7    Q.   You never talked to her?

8    A.   No.

9    Q.   Sir, are you telling this jury that you have never

10   talked to Gina Feazel outside that correctional facility?

11        MS. GUNDERSON:  Objection.  Vague as to time.

12        THE COURT:  Sustained.  What timeframe you talking

13   about?

14   Q. (By Mr. Falb)  When you were assistant warden, let's just

15   talk about that.  Is it your testimony that you never talked to

16   Gina Feazel while you were assistant warden?

17   A.   While I was assistant warden, yes.

18   Q.   Okay.  In the facility?

19   A.   Yes.

20   Q.   Did you ever talk to her outside the facility?

21   A.   Yes.

22   Q.   I don't want to get into details, but you talked to her

23   at various functions, is that correct?

24   A.   Yes.

25   Q.   And when you became warden, you talked to her outside

Direct - Robert

 1   the facility?

 2   A.   Yes.

 3   Q.   At various functions?

 4   A.   Yes.   It wasn't that often, but yes.

 5   Q.   Pardon me?

 6   A.   It wasn't that often, but yes.

 7   Q.   So you knew her outside the Department of Corrections,

 8   did you not?

 9   A.   Yes.

10   Q.   And you knew she was a paralegal in the library?

11   A.   Yes.

12   Q.   And you knew she became a correctional counselor, is

13   that right?

14   A.   Yes.

15   Q.   And in fact, when you became assistant warden, you got

16   to know my client at that time, did you not?

17   A.   Yes, sir.

18   Q.   And she was -- what was her job?

19   A.   She was in clerical.

20   Q.   She was the secretary to the --

21   A.   In the operations building.

22   Q.   Okay.   But who?   She was secretary for the major, wasn't

23   she?

24   A.   There was no major at that time, but yes, that's what

25   her job was.

                        Direct - Robert

1    Q.   What was her job?

2    A.   She was clerical for the operations building.

3    Q.   Okay.  And operations meant security, security

4    clearances, things like that?

5    A.   Yes.

6    Q.   Okay.  She knew a lot about security and security

7    clearances, is that right?

8              MS. GUNDERSON:  Objection, foundation.

9              MR. FALB:  If you know.

10             THE COURT:  If you know.  If you don't know, say

11   that.

12             THE WITNESS:  As far as I know, she was working

13   down there -- she was down there for awhile, yes.

14   Q. (By Mr. Falb)  Sir, she had to come over and help you learn

15   your job?

16   A.   She did not help me learn my job, no.

17   Q.   Sir, didn't she help you with all the paperwork?

18   A.   She helped me with clerical support on when timelines

19   were on reports that had to be done, stuff like that.

20   Q.   What was she doing over helping you when she's supposed

21   to be in the security building?

22   A.   She's in the operations building.

23   Q.   Or operations building?

24   A.   She's operations secretary under the assistant warden

25   operations also.


                         Direct - Robert

1    Q.  She was actually working for Major Newkirk?

2    A.  Major Newkirk went to shift commander that time.  She

3    may have come under Major Newkirk when he was chief of

4    security, but they did away with chief of security and put

5    her under the operations building.

6    Q.  Let's just get this straight.  She wasn't assigned to be

7    working under you, was she?

8    A.  At the beginning, no, when was was moved down there, no.

9    Q.  And because you didn't have anyone helping you

10   underneath you as far as clerical work, she had to come over

11   and help you?

12   A.  In the mornings, yes.  I had clerical staff in the

13   afternoon.

14   Q.  And even after she went to counseling, she had to go

15   back and help?

16   A.  No, sir.

17   Q.  You don't recall that?

18   A.  No, sure don't.

19   Q.  Well, what did she do to help you learn your job as

20   assistant warden?

21   A.  She didn't help me learn my job.

22   Q.  Nothing?

23   A.  No.  She helped me on clerical support on timelines on

24   reports that had to be done.

25   Q.  She only helped you with timelines?

Direct - Robert

1   A.   Yes.

2   Q.   That's it?

3   A.   Yes.

4   Q.   That's the only thing she helped you with?

5   A.   Yes, sir.

6   Q.   So did you have her specifically come over just to help

7   you with timelines?

8   A.   It was part of her job.

9   Q.   She helped you.  She didn't do anything else for you?

10  A.   No.

11  Q.   What were timelines?

12  A.   We had reports, safety sanitation reports and different

13  monthly reports that had to be done every month.

14  Q.   And you didn't know about this because you had never

15  been a warden or assistant warden before?

16  A.   I didn't know the timelines, no.

17  Q.   Well, you had never done this work?

18  A.   No.

19  Q.   In fact, you had to be taught by the other assistant

20  warden and by Warden Bowen what to do with your job?

21  A.   Yes.  They helped me, yes.

22  Q.   Because you had never been a supervisor?

23  A.   I've been a supervisor but not in the Department of

24  Corrections.

25  Q.   Now, Bart Toennies, do you know him?

                    Direct - Robert

 1   A.   Excuse me?

 2   Q.   Bart Toennies?

 3   A.   Yes.

 4   Q.   Is that how you pronounce it?

 5   A.   Yes.

 6   Q.   T-O-E-N-N-I-E-S?

 7   A.   Yes, sir.

 8   Q.   Do you know his family?

 9   A.   I know who they are, yes.

10   Q.   Do you know his father?

11   A.   Not that well, no.  I know who he is.

12   Q.   How long have you known his father?

13   A.   I've known who he is for probably five years.

14   Q.   Or more?

15   A.   Not that I know of, no.

16   Q.   How did you get to know his father?

17   A.   I just know of him.  I don't know him that well.  He is

18   the county tax assessor.

19   Q.   Okay.  Do you recall a time when you asked Betty, when

20   she was a correctional officer, if she would move to

21   Lawrence facility so you could move Bart Toennies in to

22   Centralia?

23   A.   When she was correctional officer?

24   Q.   No.  I said, do you remember when -- strike that.

25        Do you remember, when she was a counselor, you asked

                          Direct - Robert

1  Betty if she would move to Lawrence correctional facility so

2  you could move Bart Toennies from Lawrence to Centralia?

3  A.  No, sir, I don't recall that.

4  Q.  Is it possible that could have happened?

5  A.  I don't believe so.

6  Q.  You don't recall telling my client that you needed to

7  have Bart Toennies move over and she could move there to be

8  with her husband, plaintiff's husband, who had now been a

9  correctional officer at Lawrence?

10 A.  No, sir, I don't recall it.

11 Q.  You don't recall Betty telling you that she couldn't do

12 that, that would be improper?

13       MS. GUNDERSON:  Objection to hearsay.

14       THE COURT:  Sustained.

15 Q. (By Mr. Falb)  If you, as assistant warden, attempted to

16 move someone like Bart Toennies in exchange for my client to a

17 different facility -- in other words, my client go to Lawrence,

18 Bart Toennies come to Centralia -- that would be improper,

19 wouldn't it?

20 A.  Yes.  You wouldn't be able to do that.

21 Q.  That would be illegal?

22 A.  Yes.  Under the contract, yes.

23 Q.  And you did eventually get Bart Toennies to the

24 facility, did you not?

25 A.  Did I?  No, I didn't.  Myself, no, I didn't.


                          Direct - Robert

1    Q.   Do you remember him coming as a temporary assignment?

2    A.   He was detailed, and that was through the Deputy

3    Director.  We needed help, tried to get some help for the

4    counseling department, and the Deputy Director was --

5    Q.   That wasn't my question.  Do you remember him being

6    TA'd, temporary assigned?

7    A.   Yes.  He was detailed there, not temporary assigned.

8    Q.   Okay.  He was detailed there, meaning what?

9    A.   He was there for a period of time just on -- just to

10   borrow him to help out.

11   Q.   Okay.  And he was detailed there by the Deputy Director?

12   A.   Yes.

13   Q.   Who was the Deputy Director?

14   A.   That time I believe it was Ron Meek.

15   Q.   And he was another Blagojevich appointee, is that

16   correct?

17   A.   I would say so, yes.

18   Q.   You knew Ron?

19   A.   Yes.

20   Q.   You've known him for years?

21   A.   No, I didn't.

22   Q.   How long have you known Ron?

23   A.   When I was appointed assistant warden.

24   Q.   Well, who was the deputy director before Ron?

25   A.   I could not tell you.


                           Direct - Robert

1   Q.  Who was the director of DOC at the time this took place?

2   A.  I believe it was Roger Walker.

3   Q.  He was another appointee, is that right?

4   A.  I would say.

5   Q.  Who was the director before Roger Walker?

6   A.  I would say Director Snyder.

7   Q.  What happened to him?

8       MS. GUNDERSON:  Objection; foundation, relevance.

9       THE COURT:  Sustained as to relevance.

10  Q. (By Mr. Falb)  Do you know where Mr. Snyder is now?

11      MS. GUNDERSON:  Objection; foundation, relevance.

12      THE COURT:  Sustained as to relevance.

13  Q. (By Mr. Falb)  When did Mr. Snyder leave?

14      MS. GUNDERSON:  Objection; foundation and

15  relevance.

16      THE COURT:  Foundation.  If you know.  If you don't

17  know --

18      THE WITNESS:  I don't know.  It was before I got

19  there.

20  Q. (By Mr. Falb)  So after Bart Toennies was detailed, and that

21  was in the summer of 2007, is that correct?

22  A.  I'm not sure what the dates are.

23  Q.  Okay.  Maybe it's summer of 2006.  Does that sound

24  correct?

25  A.  I couldn't tell you.

                        Direct - Robert

1    Q.  And then a correctional officer -- strike that.

2        A Counselor I and Counselor II position came open in the

3    fall of 2006, is that correct?

4    A.  I would say.  I'm not for sure.

5    Q.  And at that time you moved Toennies in as

6    Correctional -- strike that -- Counselor II, is that

7    correct?

8    A.  Springfield personnel did that.

9    Q.  At your recommendation?

10   A.  No.  I have no say-so on that.

11   Q.  So you had no say-so having Bart Toennies come to your

12   facility at all?

13   A.  No, sir.  When them positions come up they look and

14   see -- they look on the transfer list and see if anybody's

15   got in for a transfer to come to our facility, and they have

16   to take that transfer list first, the most senior on the

17   transfer list, which he was.

18   Q.  So is it your testimony to this jury that you had no

19   input whatsoever with Springfield?

20   A.  No, sir.

21   Q.  You never talked to them?

22   A.  No, sir.

23   Q.  And in fact, Toennies came in in December of 2006 as

24   Correctional Officer II, and it was a big problem with the

25   union because an older employee, Deb Brink, should have been

Direct - Robert

 1   put in there first?

 2          MS. GUNDERSON:  Objection to leading.

 3          THE COURT:  Overruled.

 4   Q. (By Mr. Falb)  Do you recall?

 5   A.  No, sir.

 6          MR. FALB:  May I approach the witness?

 7          THE COURT:  Sure.

 8   Q. (By Mr. Falb)  Showing you Plaintiff's Exhibit No. 19.  Do

 9   you recognize that?

10   A.  Yes.

11   Q.  When did you see it last, sir?

12   A.  It's dated December 17th, 2006.

13   Q.  I asked you, when did you last see this document?

14   A.  I don't recall.

15   Q.  Yesterday?

16   A.  No.

17   Q.  You mean your attorneys didn't show it to you?

18   A.  No, sir.

19   Q.  Sir, does that have to deal with a protest and a

20   grievance by the career employees at Centralia because of

21   Bart Toennies being placed in as a counselor in

22   December 2006 as opposed to Deb Brink?

23          MS. GUNDERSON:  Your Honor, we would object to this

24   document as a hearsay document and any characterization of

25   that document which is being used by Mr. Falb at this point.

                      Direct - Robert

1          MR. FALB:  I'll refresh his recollection.

2          THE COURT:  Are you just using it to refresh his

3    recollection?

4          MS. GUNDERSON:  We would ask that his

5    characterization of it be stricken, that your

6    characterization of what's in the document be stricken.

7          THE COURT:  Yeah.  Be sustained.

8    Q. (By Mr. Falb)  Sir, do you recognize that document?

9    A.  Yes, sir.

10   Q.  And does that help refresh your recollection as to

11   Bart Toennies?

12   A.  What the deal is, we had a local agreement.

13   Q.  I only asked you a question.  Does that help refresh

14   your recollection?

15   A.  Yes.

16   Q.  Does this refresh your recollection that the union, at

17   least according -- that the union protested your -- the

18   movement of Bart Toennies in to Centralia?

19   A.  They protested a Counselor II being posted before a

20   Counselor I.  We have a local agreement that we have to

21   switch off from Counselor I to Counselor II as they're

22   posted.

23   Q.  Did I ask you that?

24   A.  You were asking me what that is about.

25   Q.  Well, in fact, the union asked -- on December 7th, 2006,

Direct - Robert

1    requested a list of names of applicants for Correctional I

2    job posting and the Correctional II job posting that was bid

3    in November and December of 2006?

4           MS. GUNDERSON:  Your Honor, we would object to

5    hearsay reading of the document and what the union said.

6           THE COURT:  Well, I'll overrule.  We're talking

7    about an issue of what took place at the time; we're not

8    talking about the document itself.  So overruled.

9           MS. GUNDERSON:  To the extent counsel is reading

10   from the document, I would object to that hearsay.

11          THE COURT:  Overruled.

12   Q. (By Mr. Falb)  Is that true, the union requested the list of

13   names that were considered for Counselor I and Counselor II to

14   you?

15   A.  I don't recall, no.

16   Q.  Showing you this exhibit again.  Does that help refresh

17   your recollection?

18          THE COURT:  Don't read from the document.  Just

19   read the document for the purpose of refreshing your

20   recollection.  Don't testify from the document.

21          THE WITNESS:  Yes, they requested a list.

22   Q. (By Mr. Falb)  Okay.  Did you write something on that

23   request?

24   A.  Yes.

25   Q.  Tell the jury what your writing says.

                         Direct - Robert

1    A.   I didn't write it on there.

2    Q.   Did you sign it?

3    A.   No, I didn't.

4    Q.   What does it say?

5    A.   Says 121169.  Got my initials with my administrative

6    assistant's initials behind mine.

7    Q.   Was that your order?

8    A.   Yes.  The names are classified from Springfield.  We

9    cannot give them out.

10   Q.   Did I ask you that?  I didn't hear you.

11   A.   No, sir.

12   Q.   And there was other correspondence from the union

13   concerning this, wasn't there?

14   A.   I don't recall.

15   Q.   There was a contract grievance against you over this,

16   wasn't there?

17   A.   There could have been.

18   Q.   The end result was that Bart Toennies was placed there

19   before a more -- an older counselor, Deb Brink?

20   A.   Yes.  He come in on transfer.

21   Q.   And is Bart Toennies still there?

22   A.   Yes, sir.

23   Q.   Is he still a counselor?

24   A.   Yes, sir.

25   Q.   And Deb Brink was eventually placed in there because of

Direct - Robert

1   the contract, is that correct?

2   A.  I'm not -- don't recall if it was because of contract.

3   Q.  She was only there not even a year before she died, is

4   that correct?

5   A.  I don't know what the timeline is.

6   Q.  Gina Feazel still there as a counselor?

7   A.  Yes, sir.

8         THE COURT:  Before you get into the next subject

9   line, take our morning break.  15 minutes, folks.  Same

10  admonishments.

11      *(Jury out)*

12      *(Break)*

13                      *   *   *   *

14      *(Jury in)*

15  Q. (By Mr. Falb)  Warden Robert, the people we were talking

16  about -- just so we know, in December of 2006 you were at the

17  top as far as the hierarchy of the workers at Centralia

18  Correctional Center, is that right?

19  A.  Yes, sir.

20  Q.  And then underneath you was assistant wardens Casey and

21  Flagg, is that correct?

22  A.  Yes, sir.

23  Q.  Casey was programs and Flagg was operations?

24  A.  Yes, sir.

25  Q.  And then there were three, or at least two supervisors

                    Direct - Robert

1    in the correctional -- in the counseling department that

2    were not filled, is that correct?

3    A.   Yes, sir.

4    Q.   Clinical, case work supervisor, is that right?

5    A.   Yes, sir.

6    Q.   Then there was a Counselor III position open also?

7    A.   Yes, sir.

8    Q.   And at this time there were four counselors:  Cook,

9    Landreth, Feazel and Toennies, is that correct?

10   A.   Yes, sir.

11   Q.   Feazel and Toennies being the youngest, is that correct?

12   A.   Yes, sir.

13   Q.   And these were the counselors that had left:  Sanner,

14   Alemond, Loepker, Ballantini, and Keck, is that correct?

15   A.   Yes, sir.

16   Q.   And they all left within a six months of each other,

17   right?

18   A.   Yes, sir.

19   Q.   Then I've got Deb Brink down here.  She was -- came in

20   after Toennies, but she's the one -- she was 49 years of

21   age, had 24 years of experience that ultimately died that

22   year, in 2007, is that correct?

23   A.   Yes, sir.

24   Q.   Now, as far as the career people -- I'm talking about

25   people like the counselors -- they weren't subject to a

                         Direct - Robert

```
 1    Governor or a Governor's assistants just to sign, Hey, I
 2    want to remove them and replace someone else in there; they
 3    were career people, had a contract, is that right?
 4    A.   Yes, sir.
 5    Q.   Just like you did at one time?
 6    A.   Yes, sir.
 7    Q.   And it was subject to seniority?
 8    A.   Yes, sir.
 9    Q.   And as I understand it, when you were a correctional
10    officer, you never were able to, for whatever reason, merit
11    a seniority move above correctional officer?
12    A.   Seniority --
13    Q.   Even after ten years?
14    A.   Yes, sir.
15    Q.   Of course, you weren't working or weren't able to work
16    for three years, right?
17    A.   Yes, sir.
18    Q.   Did you have a lawsuit going on?
19    A.   No, sir.
20    Q.   As the warden during this period of time when Betty was
21    a counselor, and even when you were assistant warden, you
22    were trained in the discrimination laws, were you not?
23    A.   Yes, sir.
24    Q.   And as the judge read to the jury before we started --
25    and you were here -- he talked about the ADEA, which is the
```

Direct - Robert

1    Age Discrimination in Employment Act.  You were familiar

2    with that?

3    A.  Yes, sir.

4    Q.  And it was against the law, and you knew this -- it was

5    against the law in any way to discriminate against a person

6    because of his or her age?

7    A.  Yes, sir.

8    Q.  And obviously, if you were to admit doing that in open

9    court today, you would be subject to discipline and being

10   fired?

11   A.  Yes, sir.

12   Q.  And that would be against the law in any event?

13   A.  Yes, sir.

14   Q.  And you knew that's not the right thing to do?

15   A.  Yes.

16   Q.  In fact, you shouldn't discriminate on any basis, race,

17   sex, religion, anything?

18   A.  Yes, sir.

19   Q.  You were well-versed in that?

20   A.  Yes, I was.

21   Q.  Let's talk about Assistant Warden Casey.  She came in in

22   January, February 2005, is that correct?

23   A.  Yes, I believe.

24   Q.  And she -- because of the lack of supervisors in the

25   counseling department, Casey became de facto supervisor over

                              Direct - Robert

1    the counselors?

2    A.  Yes.  She would have been their immediate supervisor.

3    Q.  And you were the one that was responsible for Casey,

4    weren't you?

5    A.  Yes.  She would have been under me.

6    Q.  You would evaluate her, is that correct?

7    A.  Yes.

8    Q.  You would correct her if she needed to be corrected?

9    A.  Yes.

10   Q.  You would tell her what to do if she needed to be told

11   to do something?

12   A.  Yes.

13   Q.  And you knew her outside of the Department of

14   Corrections, didn't you?

15   A.  Before she was hired, no.

16   Q.  Well, after she was hired?

17   A.  Yes.

18   Q.  I mean you would go to events with her and other

19   colleagues?

20   A.  It would have been very few.

21   Q.  You did?

22   A.  Yes.

23   Q.  And did you ever have any complaints by anyone about

24   Casey?

25   A.  Not that I recall, no.

                        Direct - Robert

1   Q.  Do you remember any counselors, a single counselor

2   coming into your office to complain about Casey?

3   A.  Not that I recall, no.

4   Q.  Did Gina Feazel -- you just saw her testify yesterday?

5   A.  Yes.

6   Q.  You don't recall her coming into your office?

7   A.  I don't recall that, no.

8   Q.  Had she ever been into your office?

9   A.  I'm sure she has.

10  Q.  She had free access to your office, did she not?

11  A.  All my employees do.

12  Q.  Did Gina Feazel have free access to your office?

13  A.  Yes.

14  Q.  Did she use that free access?

15  A.  I'm sure if needed to, yes.

16  Q.  Did Bart Toennies have free access to your office?

17  A.  Yes.  All my employees do.

18  Q.  Where did you go to high school?

19  A.  Carlyle High School.

20  Q.  Where did his father go to high school?

21  A.  Whose?

22  Q.  His father, Bart Toennies'.

23  A.  I have no idea.

24  Q.  Was it your impression that Ann Casey was doing a fine

25  job?

Direct - Robert

1    A.   Yes.

2    Q.   You were not aware of any counselors having any problems

3    with Casey, were you?

4    A.   Not that I recall.

5    Q.   You never disciplined Casey?

6    A.   No.

7    Q.   Never counseled her?

8    A.   No, sir.

9    Q.   Never gave her advice?

10   A.   Not that I recall.

11   Q.   Were you aware that she was -- when she became assistant

12   warden she hired on to be a consultant for two different

13   companies, making $2,500 from each company per month?

14   A.   I was not aware of it at the time, no.

15   Q.   Did you become aware of that?

16   A.   Yes.

17   Q.   Did you do something about that?

18   A.   Springfield told her to resign, I think.

19   Q.   When was that?

20   A.   I don't recall.

21   Q.   Were you a consultant too?

22   A.   No.

23   Q.   Ann Casey became assistant warden under you and she was

24   receiving $2,500, not from one company, but from two

25   companies per month for being a consultant while she was

                         Direct - Robert

 1    working for you?

 2            MS. GUNDERSON:  Objection, foundation.

 3    Q. (By Mr. Falb)  Are you aware of that?

 4            THE COURT:  If you're aware of it.

 5            THE WITNESS:  I wasn't.

 6    Q. (By Mr. Falb)  What are you aware of then?

 7    A.  Excuse me?

 8    Q.  What are you aware of concerning that?

 9    A.  Just when Springfield contacted me about it.

10    Q.  What did they say?

11    A.  They said they was going to talk to her.  They come down

12    to talk to her about it.  They recommended she resign from

13    there.

14    Q.  Resign from the correctional facility or just from those

15    companies?

16    A.  From them companies.

17    Q.  So she kept working for you?

18    A.  Yes.

19    Q.  Did you discipline her?

20    A.  No.

21    Q.  Did Springfield tell you she was working for two

22    different consulting companies making $2,500 apiece?

23    A.  No, they did not tell me that.

24    Q.  What did Springfield tell you?

25    A.  She was working for them companies.


                        Direct - Robert

1   Q.  She was what?

2   A.  Lobbying for them companies or something.  I don't

3   recall what it was.

4   Q.  Sir, you don't recall what Springfield told you about

5   your second in command to this jury?

6   A.  No, sure don't.

7   Q.  Why not?  Why don't you recall it?

8   A.  Because Springfield handles all that.  They do

9   discipline on assistant wardens.  I do not do discipline.

10  Q.  Did you see or hear of any discipline to Ann Casey?

11  A.  I did not see any, no.

12  Q.  What did you do about it?

13  A.  It's Springfield's call, not mine.

14  Q.  You had no supervision over Ann Casey?

15  A.  I had no say-so over that, no.

16  Q.  Why is that?

17  A.  Because that's Springfield investigation, whatever they

18  had.

19  Q.  Are you telling the jury that you couldn't have talked

20  to her about it?

21  A.  I could have talked to her about it, but Springfield's

22  the one handling the matter.

23  Q.  You could not have disciplined her about it?

24  A.  No, I couldn't have.

25  Q.  Could you have disciplined her for anything?

Direct - Robert

1   A.  I could have made recommendation.  Springfield would

2   follow up on it.  I could have filed a complaint, and

3   Springfield follow up an investigation on it.

4   Q.  Did you do anything like that?

5   A.  No.  Springfield's aware of it already so nothing for me

6   to do.

7   Q.  Is it safe to say you didn't utter one word to Ann Casey

8   about these two consulting or lobbying jobs?

9   A.  No, sir.

10  Q.  Weren't you curious about it?

11  A.  No, sir.

12  Q.  Why not?

13  A.  When I was made aware of it, she was already out of it.

14  Q.  Are you supposed to be enforcing the laws at that

15  prison?

16  A.  Yes, sir.

17  Q.  Even ethics?

18  A.  Yes.

19  Q.  I mean you've got a detailed -- you've got books and

20  books on ethics at that prison, don't you?

21  A.  Yes, sir.

22  Q.  Did you feel that this was unethical?

23  A.  Yes.  When I was made aware of it -- she was already

24  taken out of the position when I was made aware of it.

25  Q.  So she continued to work for you until she voluntarily

Direct - Robert

 1   resigned to go to New Mexico?

 2   A.   Yes, sir.

 3   Q.   Did you ever talk to her why she was resigning?

 4   A.   No, sir.

 5   Q.   She just left?

 6   A.   Yes.  She gave month notice, whatever, and she left.

 7   Q.   So you didn't utter a word between her and you

 8   concerning why she was leaving?

 9   A.   No.

10   Q.   Did you ever talk to her?

11   A.   Yes.  We had morning meetings.  That's about it.

12   Q.   And you had social meetings outside the prison and

13   talked to her?

14   A.   Maybe a couple while she was there, we did.

15   Q.   Over drinks, dinner?

16   A.   With a golf outing, and we had -- I think maybe one time

17   she come to my bar when we had an event going on.

18   Q.   To your bar?

19   A.   Yes.

20   Q.   You don't remember going to DuQuoin with you and some

21   two other guys and meeting her and Billy Jo Bryan?

22        *MS. GUNDERSON:*  Object to the relevance.  I think

23   this is getting into some of the Motion in Limine issues.

24        *THE COURT:*  Overruled.

25   Q. *(By Mr. Falb)*  Remember that?

                    Direct - Robert

1   A.  I remember her being down there.  Her going down there
2   with me, no.
3   Q.  You followed her?
4   A.  No.
5   Q.  You met her?
6   A.  They showed up at a restaurant that we were at.
7   Q.  Oh, so you were already there and they just happened to
8   show up?
9   A.  Yes, as far as I remember.
10  Q.  Where was this?
11  A.  I believe it was in DuQuoin.
12  Q.  So the four of you just happened to show up in DuQuoin,
13  Illinois?
14  A.  There was a lot of people show up down there.
15  Q.  So you got together the same dinner table and had
16  drinks?
17  A.  I think so, as far as I remember.
18  Q.  After that, that table full of people went to another
19  bar, the Last Time Out or something like that?
20  A.  Not that I remember.
21  Q.  You don't remember going to another bar with her,
22  Billy Jo Bryan?
23  A.  No, I sure don't.
24  Q.  Who is Billy Jo Bryan?
25  A.  She was my Director of Nursing for HPL.

Direct - Robert

1    Q.  Was she there in DuQuoin with Ann Casey?

2    A.  I believe she was.

3    Q.  And in fact, when I asked you about that at your

4    deposition, you denied it, didn't you?

5    A.  I did not go down there with her.

6    Q.  Pardon me?

7    A.  I did not go down there with her.  That's what you

8    asked.

9    Q.  So you made a distinction that you didn't go down there;

10   you just happened to be there with her?

11   A.  They showed up.  They did not go down there with us, no.

12   I went down there with Tom Ashby.

13   Q.  The mayor of Centralia?

14   A.  He's mayor now, yes.

15   Q.  And you just happened to be at the same table with her?

16   A.  They walked in, yes.

17   Q.  And sat at the same table with you?

18   A.  Yes.

19   Q.  Did you talk to her about these ethical problems or

20   anything along that line?

21   A.  No, sir.  I was not aware of them.

22   Q.  So you were on a friendly basis with Ann Casey, were you

23   not?

24   A.  I would say so, yes.

25   Q.  So just make sure I'm clear.  Who is at the table with

Direct - Robert

```
 1  you?
 2  A.  I don't recall.
 3  Q.  Was Ann Casey there?
 4  A.  Yes, Ann was there.
 5  Q.  Were you there?
 6  A.  Yes.
 7  Q.  You sure about that?
 8  A.  Tom Ashby, yes.
 9  Q.  Tom Ashby?
10  A.  Uh-huh.
11  Q.  Okay.  Billy Jo Bryan was there?
12  A.  I believe she was.
13  Q.  Anyone else?
14  A.  Several other people.
15  Q.  Who?
16  A.  Kurt Grandberg was there and maybe some of his friends.
17  Q.  Okay.  And is it -- are you denying that after that
18  episode you then went to another place, establishment, with
19  those -- some of those same people?
20          MS. GUNDERSON:  Objection; asked and answered.
21          THE COURT:  Overruled.
22          THE WITNESS:  I don't recall that, no.
23  Q. (By Mr. Falb)  Is it possible?
24  A.  It could be possible.  I don't recall it.  I would have
25  been with Tom Ashby, but I don't recall us going there.
```

Direct - Robert

 1   Q.   You don't recall following Casey's car?

 2   A.   No, I don't recall it.

 3   Q.   As far as discipline at the prison, you were the

 4   ultimate as far as who gets disciplined or who doesn't, is

 5   that right?

 6   A.   I oversee the review.  The hearing officer, once they

 7   have the hearing on the discipline, I would review it and

 8   either approve it or deny it or make changes.

 9   Q.   Okay.  You had authority to approve, deny, make changes,

10   whatever?

11   A.   Yes, sir.

12   Q.   And so the jury understands, a hearing review board,

13   what's it called?

14   A.   ERB.

15   Q.   What's that stand for?

16   A.   Employee Review.

17   Q.   What would happen is a supervisor like Ann Casey or

18   Warden Flagg could issue a discipline on an employee; that

19   employee would then have to prepare for and have a full

20   mini-trial in front of the board, right?

21   A.   Yes, sir.

22   Q.   Very stressful situation, isn't it?

23   A.   I'm sure it can be, yes.

24   Q.   And then that -- the person that was hearing it didn't

25   come from the outside of the institution, did they?

                         Direct - Robert

1  A.  No, sir.

2  Q.  The person that was hearing this trial was someone that

3  you appointed?

4  A.  Yes, sir.

5  Q.  And after that person would make the decision, you would

6  go over that with them, and sometimes even before the

7  decision?

8  A.  Not -- not before.

9  Q.  And then --

10  A.  After we have a hearing we'd go over it at times.

11  Q.  You'd approve, deny, change things, whatever you wanted?

12  A.  Yes, sir.

13  Q.  In fact, those hearing officers, there's two of them.

14  One was your administrative assistant?

15  A.  Yes, sir.

16  Q.  What's her name?

17  A.  Michelle Taphorn.

18  Q.  So you appointed her to be one of the hearing officers?

19  A.  She was appointed before I got there.

20  Q.  You kept her there?

21  A.  Yes.

22  Q.  And the other one was who?

23  A.  Mark Beckman.

24  Q.  Okay.  And you appointed him?

25  A.  No.  Warden Bowen appointed him.

Direct - Robert

1   Q.   You kept him?

2   A.   I kept him.

3   Q.   And you did evaluations of them?

4   A.   Yes.

5   Q.   Yearly evaluations?

6   A.   Yes, sir.

7   Q.   So they answered to you?

8   A.   Yes, sir.

9   Q.   And if they weren't doing something correctly you could

10  call them on the carpet for it?

11  A.   Yes.

12  Q.   Now, you're aware of Rule 75 as far as retirement?

13  A.   Yes.

14  Q.   And so the jury knows and understands, once again, that

15  means if one of the career people reach the age of 50 and

16  they've got 25 years or more of service, they can retire?

17  A.   Yes.

18  Q.   I forgot to ask:  Would there have been occasions when

19  you have changed and overruled decisions of your hearing

20  officers?  Isn't that true?

21  A.   Yes.

22  Q.   And I forgot to ask you that, in fact, when evaluations

23  are done by supervisors of their own employees, you can

24  change them?

25  A.   Yes.

                    Direct - Robert

1   Q.   You've done that?

2   A.   Yes.

3   Q.   Even though you don't even work in the department?

4   A.   Yes.

5   Q.   In fact, you've changed a counselor's evaluation in the

6   counseling department when you've never even done counseling

7   ever in your life?

8          MS. GUNDERSON:  Objection to relevance.  Vague as

9   to time.

10  Q. (By Mr. Falb)  Is that true?

11         THE COURT:  Well, let's establish the time

12  component.  Overruled as to relevance.

13  Q. (By Mr. Falb)  2007.

14  A.   Yes.

15  Q.   Did you ever supervise the counseling department?

16  A.   When assistant wardens are gone, yes.

17  Q.   I mean do you actually go to the department and watch

18  what they're doing?

19  A.   At times I have, yes.

20  Q.   Did Ann Casey have a problem with absenteeism?

21  A.   She used benefit time.

22  Q.   Was she gone for weeks at a time?

23  A.   Yes, at times.

24  Q.   Did you get after her for that?

25  A.   She had benefit time she had time coming, so --

Direct - Robert

1    Q.   She'd only been there a year-and-a-half.  She already

2    had benefit time coming?

3    A.   She was 17-year employee.

4    Q.   She came from East St. Louis?

5    A.   Yes.

6    Q.   The prison here?

7    A.   Yes, I believe.

8    Q.   Now, you're aware that my client, Betty Cook, was

9    disciplined for something to do with an entry into the

10   computer?

11   A.   Yes.

12   Q.   Did you discipline her for that?

13   A.   Did I?  She had a Review Board hearing.  I approved off

14   on it, yes.

15   Q.   Okay.  I mean did you personally see what happened?  I

16   mean were you a witness or something?

17   A.   No.  I just reviewed the incident reports and the

18   hearing.

19   Q.   They had a review hearing, is that correct?

20   A.   I reviewed the hearing.

21   Q.   In fact, not only did you review the hearing, you made

22   your own phone calls, didn't you?

23   A.   Excuse me?

24   Q.   You made your own phone calls on this, didn't you?

25   A.   I don't know where you're going.

Direct - Robert

 1   Q.  Let me try to refresh your recollection.

 2          MS. GUNDERSON:  I'm going to object as to vague.

 3   I'm not sure --

 4          MR. FALB:  I'll refresh his recollection, be more

 5   specific.

 6          MS. GUNDERSON:  Also object to improper refreshing

 7   of recollection.  That foundation has not yet been laid.

 8          THE COURT:  Sustained.

 9   Q. (By Mr. Falb)  Sir, do you recall her being disciplined for

10   going around the chain of command to have CHAMP dates changed?

11   A.  Yes.

12   Q.  And there was a hearing on that?

13   A.  Yes, there was.

14   Q.  You weren't even in the hearing, were you?

15   A.  No, I wasn't.

16   Q.  But you approved the hearing?

17   A.  Yes.

18   Q.  And you did your own investigation on your own, didn't

19   you?

20   A.  No, I didn't.

21   Q.  Well, did you talk to Springfield about it?

22   A.  Springfield talked to me.

23   Q.  Well, you talked to the people that allegedly she called

24   to have the dates changed, didn't you?

25   A.  Yes.  They called down, wanted to know what was going

                          Direct - Robert

1    on, why she was calling up there to have dates changed.

2    Q.  Springfield called you?

3    A.  Yes.

4    Q.  They didn't call the assistant warden?

5    A.  No.  They called down to me.

6    Q.  Who is Springfield calling?  Tell me the names.

7    A.  I don't recall the names.

8    Q.  What were you doing involved -- was this before the

9    investigation or after the investigation by the hearing

10   officer?

11   A.  It would have been before.

12   Q.  So did you appear at the hearing then?

13   A.  No, I didn't.

14   Q.  Did you get your input?

15   A.  No, I didn't.

16   Q.  But you approved her discipline?

17   A.  Yes.

18   Q.  Did you ever talk to Betty about this?

19   A.  No.

20   Q.  Now, you heard Gina Feazel yesterday testify about her

21   coming into your office, making a complaint about her

22   supervisor, Assistant Warden Casey.  You remember her

23   testifying?

24   A.  Yes.

25   Q.  You had that advantage to hear that?

                    Direct - Robert

1    A.  Yes, I do.

2    Q.  That wasn't the proper thing to do if she in fact did

3    it, was it?

4    A.  Yes, it was.  If she would have -- if she tried to work

5    it out with her assistant warden first, her supervisor, the

6    next chain of command is she could come up to me.

7    Q.  So she would come into your office by herself and talk

8    to you about it and complain about her supervisor?

9    A.  That's the proper chain of command.

10   Q.  So you don't remember that taking place?

11   A.  No, I don't.  I don't remember it taking place, but

12   would have been the proper chain of command.

13   Q.  You don't remember the chain of command being a

14   grievance filed by the union?

15   A.  No, I don't.

16   Q.  Did the union grieve it?

17   A.  I don't recall.  I don't remember.

18   Q.  Is that the proper procedure for a union grievance, that

19   if you have a problem with your supervisor you just go above

20   that supervisor and talk to the boss?

21   A.  Yes, that's proper chain of command, as long as you try

22   to work it out with your immediate supervisor first.

23   Q.  So you must get a lot of people in your office?

24   A.  Yes, I do.

25   Q.  Bart Toennies?

                        Direct - Robert

```
 1   A.  Not that I recall.

 2   Q.  Did you have any input in Gina Feazel getting the

 3   screening team?

 4   A.  No, I didn't.

 5   Q.  She just got it out of the blue?

 6   A.  Warden Bowen appointed her.

 7   Q.  You sure?

 8   A.  Positive.

 9   Q.  Sure you didn't do it?

10   A.  I'm sure.

11   Q.  I forgot to ask you:  Before you became assistant

12   warden, what was your job title?

13   A.  Before assistant warden?

14   Q.  Yes.

15   A.  I worked for Secretary of State, under the Secretary of

16   Police, security for driver's license facilities.

17   Q.  Paint me the picture.  What were you doing, driving a

18   car around?

19   A.  Driving a car around.  I was overseeing the driver's

20   license facilities in Southern Illinois.

21   Q.  Who got you that job?

22   A.  I did.

23   Q.  Anyone assist you?

24   A.  No.

25            MR. FALB:  Just one moment, Your Honor.
```

Direct - Robert

1        *THE COURT:*  Sure.

2        *MR. FALB:*  Nothing further, Your Honor.

3        *THE COURT:*  Clarification?

4                    **CROSS-EXAMINATION**

5              **QUESTIONS BY MS. GUNDERSON:**

6   *Q.*  Good morning, Warden.

7   *A.*  Good morning.

8   *Q.*  Can you describe to me what the chain of command is for

9   a correctional counselor.

10  *A.*  For counselor?  It would have been the assistant warden

11  of programs, then myself.

12  *Q.*  Where does the union play into that, if at all?

13  *A.*  They don't play into it as far as chain of command.

14  *Q.*  I want to talk to you a little bit about the discipline

15  process that you testified about Mr. Falb's questioning.

16  How -- what is your role as far as appointing the hearing

17  officers?

18  *A.*  I just appoint them.

19  *Q.*  Are there standards for who can be appointed as a

20  hearing officer?

21  *A.*  No, there isn't.

22  *Q.*  Can they be in the union?

23  *A.*  Now they can, yes.

24  *Q.*  At the time that Betty Cook was at the institution and

25  was receiving discipline could the hearing officers be in

                    Cross - Robert

```
 1    the union?

 2    A.   No, they couldn't.

 3    Q.   Of the employees at Centralia Correctional Center, are

 4    there more of them in the union than not?

 5    A.   Yes.

 6    Q.   Do you know how many are not in the union?

 7    A.   Right now there's four in the union.

 8    Q.   At the time that Betty received discipline, that was a

 9    requirement to be a hearing officer, correct?

10    A.   Yes.

11    Q.   Who are the employees who aren't in the union right now?

12    A.   Right now it's three assistant wardens and

13    Michelle Taphorn.

14    Q.   And at the time that Ms. Cook was receiving discipline,

15    were there more than that that weren't in the union?

16    A.   Yes.

17    Q.   Who else wasn't in the union?

18    A.   Would have been Mark Beckman, Kim Atchison, Mark Aaron,

19    Cindy Nowlin.

20    Q.   What is your role as far as the hearings are concerned?

21    A.   After the hearing they forward it to me for review, and

22    I concur or not concur with them.

23    Q.   What do you do in order to determine whether you're

24    going to concur or not concur?

25    A.   I just review the hearing and all reports with it.
```

                              Cross - Robert

1  Q.  Have you ever not concurred in the decision of one of

2  the hearing officers?

3  A.  Yes.

4  Q.  Do you know how many times?

5  A.  Probably several.

6  Q.  Do you usually go to the employee review hearing?

7  A.  No, I don't.

8  Q.  Why not?

9  A.  Because we have management rep in there.

10  Q.  So there's someone else on behalf of department that

11  goes?

12  A.  Yes.

13  Q.  Are the procedures for the employee review hearings

14  governed by any kind of directive?

15  A.  Yes, they are.

16  Q.  And what directive is that?

17  A.  It's on the hearings, employee review hearings,

18  Institutional Directive -- there's an AD, Administrative

19  Directive, and Institutional Directive on it.

20  Q.  What are Administrative Directives?

21  A.  They're what Springfield sets as a directive.

22  Q.  And the Institutional Directive, what is that?

23  A.  Kind of mirrors the AD; makes changes that suit our

24  facility.

25  Q.  So do I understand it correctly that there'd been a

Cross - Robert

1   department-wide directive and then one specific to Centralia

2   that would mirror that?

3   A.   Yes.

4   Q.   And that's what governs how the Employee Review Board

5   hearings are done?

6   A.   Yes, it is.

7   Q.   Apologize, I have a lot of notes.  At the time that

8   Bart Toennies was detailed -- you talked a little bit about

9   Bart Toennies being detailed from Lawrence correctional

10  facility and coming over and working at Centralia.  You

11  remember that?

12  A.   Yes.

13  Q.   At the time that he was detailed was he the only one

14  that was detailed?

15  A.   No.  There was counselor out of Vandalia also that was

16  detailed for a period of time.

17  Q.   Do you recall how that detail came about?

18  A.   Yes.  I requested, through my deputy director, needed

19  some help in the counseling department, and he told me to

20  reach out and ask other facilities in our district for help,

21  so we sent an e-mail out to all the -- I think it was like

22  six correctional centers in our district, and we got

23  response back from two of them, two wardens, one was from

24  Lawrence and one was from Vandalia, that they would send

25  somebody for a period of time.

                         Cross - Robert

1    Q.  Prior to Mr. Toennies showing up on the detail, did you
2    know -- well, actually, let me rephrase that.
3        Prior to you knowing someone was coming from Lawrence,
4    did you know that Bart Toennies was going to be the
5    counselor coming?
6    A.  No, sir.
7    Q.  Are you aware of any request made for Bart Toennies
8    specifically to come from Lawrence?
9    A.  Not that I'm aware of, no.
10   Q.  Okay.  You were asked some questions about trying to
11   transfer Betty to Lawrence and -- did you have the power to
12   do that?
13   A.  No, I didn't.
14   Q.  Do you know who would?
15   A.  I don't believe -- I don't know who could do it.
16   Q.  She certainly could have requested it, right?
17   A.  Yes.  The director maybe, but -- been able to do it, but
18   I'm -- I think the union would have stopped it.
19   Q.  And she was never transferred to Lawrence, was she?
20   A.  No, she wasn't.
21   Q.  Since you've been warden, has the director of the
22   Department of Corrections changed?
23   A.  Yes.
24   Q.  How many times?
25   A.  Been twice since I've been there.

                         Cross - Robert

1   Q.   And that would be since 2005, right?

2   A.   Yes.

3   Q.   Have the deputy directors changed?

4   A.   Yes.

5   Q.   Do you know how many times they've changed?

6   A.   Three or four.

7   Q.   You were asked a little bit about when Bart Toennies

8   transferred permanently to Centralia, that there was some

9   kind of a grievance filed by union.  You recall that?

10   A.   Yes.

11   Q.   Do you recall what the result was of that grievance?

12   A.   No, I don't.

13   Q.   At any time was Bart transferred back?

14   A.   Not that I recall, no.

15   Q.   So he's been at Centralia since he transferred in 2006?

16   A.   Yes.

17   Q.   Do you have any knowledge about how that grievance

18   regarding Bart's transfer came about?

19   A.   No, I don't.

20   Q.   You were -- talked about specific positions being vacant

21   at Centralia in 2006.

22   A.   Yes.

23   Q.   You remember that?  I think they were case work

24   supervisor, clinical services supervisor, and Correctional

25   Counselor III, correct?

Cross - Robert

1    A.   Yes.

2    Q.   Do you know why those positions were vacate?

3    A.   Yes.  They weren't on our allocation list.

4    Q.   What's an allocation list?

5    A.   Springfield gives us a certain head count we have to

6    live by, and we have to have an allocation list with that

7    head count, and we have to live by that.

8    Q.   Can you post a position at your facility if it's not

9    allocated?

10   A.   No, we cannot.

11   Q.   Can you promote someone into a position if it's not

12   allocated?

13   A.   No, we cannot.

14   Q.   Were those three positions the only ones at the

15   institution that weren't allocated?

16   A.   No, they weren't.

17   Q.   Do you know how many others weren't?

18   A.   Our last allocation that I had to do our head count was

19   379.  I had to take it down to 341.  So it would have been

20   that many positions that we took off the allocation.

21   Q.   38 positions you had to eliminate?

22   A.   Yes.

23   Q.   And that was in order to meet a head count set by where?

24   A.   Springfield.

25   Q.   When was the last time you did an allocation?

                        Cross - Robert

1   A.   I believe that was the last one we did.

2   Q.   The one in -- do you remember what the year was?

3   A.   It was '05.

4   Q.   Do you recall if that was the -- if that was when the

5   Counselor III position was removed?

6   A.   Yes, it was.

7   Q.   Was there anyone in the Counselor III position at the

8   time that it was removed from the allocation list?

9   A.   Yes, there was.

10   Q.   What happened to that person?

11   A.   He was -- he retired, so position was done away with,

12   attrition.

13   Q.   Did he -- was he retired immediately after the

14   allocation was removed?

15          MR. FALB:   Objection, leading.

16          THE COURT:   Overruled.

17          THE WITNESS:   I'm not sure.   I think he was there.

18   I'm not sure when he retired.   It was for awhile after

19   removed.

20   Q. (By Ms. Gunderson)   I think what I'm trying to figure out

21   is, did he have to leave because there was no allocation for

22   his position?

23   A.   No, he didn't.

24   Q.   Are there people -- I think you said -- well, there's a

25   number of positions that are no longer allocated at the

Cross - Robert

1    prison?

2    A.   Yes.

3    Q.   Are there any people working there in those titles now?

4    A.   Yes, there still is.

5    Q.   Just because positions -- strike that.

6         You talked a little bit about finding out that Ms. Casey

7    had some consulting work going on.  Do you recall that?

8    A.   Yes.

9    Q.   And you said that you got a call from Springfield.  That

10   was someone from the Department of Corrections?

11   A.   I believe it's from legal in Department of Corrections.

12   Q.   Do you have any firsthand knowledge of what

13   investigations were done regarding Ms. Casey's consulting,

14   if there were any?

15   A.   No, I sure don't.

16   Q.   Do you have any firsthand knowledge of whether Ms. Casey

17   had sought approval from the department in order to take

18   those consulting jobs?

19   A.   No, I wouldn't.

20   Q.   Let me ask you this:  Is there a process at the

21   department, if you want to have an outside job, to inform

22   the department of that?

23   A.   Yes.

24   Q.   Can you tell me what that process is.

25   A.   You would send it to personnel in Springfield.  I

                              Cross - Robert

 1    believe they would review it and approve it or deny it.

 2    Q.  Do you have any knowledge about whether Ms. Casey would

 3    have done that with regard to her consulting jobs?

 4    A.  I believe she did.

 5    Q.  I want to go back and do a couple things with your --

 6    the lengthy testimony about your prior work history, but

 7    before I do, you gave some testimony about making changes to

 8    an evaluation in the counseling department.  Do you recall

 9    that testimony?

10    A.  Yes, I do.

11    Q.  Do you recall whose evaluation you changed?

12    A.  In the counseling department?

13    Q.  Yes.

14    A.  I believe it was Brandon Risse.

15    Q.  Do you recall when he started as a counselor?

16    A.  It was a year before that, I believe.  I'm not sure what

17    year it was.

18    Q.  Okay.  But it was certainly while he was working at

19    Centralia as a counselor?

20    A.  Yes.

21    Q.  Is he the only person in the institution whose

22    evaluation you've ever changed?

23    A.  No, it isn't.

24    Q.  Do you know how many times you've asked to have an

25    evaluation changed?

                        Cross - Robert

```
 1   A.  I don't recall.  Probably would have been several.
 2   Q.  What was your reasoning for asking that Mr. Risse's
 3   evaluation be changed?
 4   A.  Because at the time he was only in the counseling
 5   department for a year, and he was given all exceed's on his
 6   evaluation, and I felt that give him room to grow into his
 7   position.
 8   Q.  I know we've had some testimony about the evaluations
 9   before, but they can be marked as either "all exceeds",
10   "meets expectations", "needs improvement" or a column that
11   basically says, "I don't know enough", right?
12   A.  Yes.
13   Q.  Do you know anything about the process as far as if you
14   change an evaluation or an employee's evaluation or
15   downgrade it from year to year?
16   A.  Yes.
17   Q.  What is that process?  Are there certain things that are
18   required?
19   A.  You do a quarterly evaluation on them.
20   Q.  Can you downgrade an employee's evaluation if you
21   haven't done a quarterly in the year before?
22   A.  No.
23   Q.  That would be a violation of the union contract?
24   A.  Yes.
25   Q.  And it would be a reason for the evaluation to be
```

                            Cross - Robert

1    expunged, right?

2    A.  Yes.

3    Q.  I have a couple things on your job history to clear up

4    because there were some terms used.  There was a mention of

5    you being on proof status when you were in your automobile

6    accident.  Would that have been 1991?

7    A.  Somewhere around there, yes.

8    Q.  And you said you were off for two to three years?

9    A.  Yes.

10   Q.  What kinds of injuries were you dealing with at that

11   time?

12   A.  Had neck and arm injury.

13   Q.  And what were you doing during those two to three years?

14   A.  Had therapy twice a day every day.

15   Q.  Were you on some kind of -- did you have any approval to

16   be off work?

17   A.  Yes, I did.

18   Q.  From whom?

19   A.  From the Department of Corrections, State of Illinois.

20   Q.  Was there someone who -- like a doctor who would have

21   given that approval?

22   A.  Yes.

23   Q.  You were asked about proof status.  Do you know what

24   proof status is?

25   A.  Yes.

                        Cross - Robert

1    Q.   Can you explain that to the jury, please.

2    A.   It's someone that abuses sick time and they -- if it

3    shows a pattern of them abusing sick time, they can put them

4    on proof.

5    Q.   What do they have to do if they're on proof status?

6    A.   They have to bring in a doctor's slip every time they

7    call off.

8    Q.   Were you ever put on proof status when you were off work

9    in 1991 to 1993 because the automobile accident?

10   A.   No.

11   Q.   When you came in as assistant warden of operations were

12   you familiar with the correctional officer jobs?

13   A.   Yes, I was.

14   Q.   How so?

15   A.   My ten years I worked there before, I worked every

16   assignment out there.

17   Q.   Now, your appointment into the warden positions, are you

18   aware what circumstances you can be removed?

19   A.   From warden?

20   Q.   As a warden or assistant warden?

21   A.   At will of the Governor, they remove you any time.

22   Q.   The Governor?

23   A.   For no reason at all.

24   Q.   Okay.  So it's -- unlike the employees who are under the

25   contract who can then grieve a removal, you don't have that

Cross - Robert

1    right?

2    A.   Yes.   Don't have that right.

3         MS. GUNDERSON:   Your Honor, may I have a moment?

4         THE COURT:   Sure.

5    (Off the record)

6                          *    *    *    *

7         MS. GUNDERSON:   I have no other questions for the

8    warden at this time.

9         THE COURT:   Thank you.   Mr. Falb, any further

10   questions?

11        MR. FALB:   Yes, Your Honor.

12                   REDIRECT EXAMINATION

13                 QUESTIONS BY MR. FALB:

14   Q.   Sir, you just got done telling the jury that you

15   worked -- when you were a correctional officer for ten

16   years, that you worked every assignment?

17   A.   Yes.

18   Q.   In the counseling department?

19   A.   Security.

20   Q.   You were never in the counseling department?

21   A.   No.

22   Q.   Sir, you mentioned that you were off work for -- was it

23   three years?

24   A.   Two or three years.

25   Q.   Two or three years?

                      Redirect - Robert

1    A.   Yes.

2    Q.   Because you were having physical therapy?

3    A.   Yes.

4    Q.   Twice a week?

5    A.   Twice a day.

6    Q.   Twice a day?

7    A.   Yes.

8    Q.   So for almost three years, every single day you had

9    physical therapy, twice a day?

10   A.   Yes, almost.

11   Q.   Is this a chiropractor?

12   A.   No.

13   Q.   Who was the doctor?

14   A.   It was -- I believe it was Dr. Kawishi (sic.), and I had

15   Dr. Nashoor (sic.), neurologist.

16   Q.   And then you got better?

17   A.   Yes.

18   Q.   And you were completely well?

19   A.   I don't know if completely well.

20   Q.   You couldn't be working in the department if you had a

21   problem, right?

22   A.   Yes.

23   Q.   You couldn't be a security guard for the Secretary of

24   State if you had a physical problem?

25   A.   No.

                        Redirect - Robert

1    Q.   So what happened after three years, just all of a sudden

2    the physical therapy worked?

3    A.   Yes.

4    Q.   No limitations whatsoever?

5    A.   No.

6    Q.   Surgery?

7    A.   No.

8    Q.   Broken bones?

9    A.   No.   I didn't have a -- take that back.   Did have

10   surgery on my shoulder.

11   Q.   For what?

12   A.   Cartilage repair.

13   Q.   That didn't keep you off for three years, did it?

14   A.   It was part of it.

15   Q.   So at that time when you were released to go back to

16   work, did you go back to the Department of Corrections?

17   A.   No, I didn't.

18   Q.   Could you have gone back?

19   A.   Yes.

20   Q.   You simply decided not to?

21   A.   Yes.

22   Q.   Now, you mentioned -- she asked you about Brandon Risse.

23   You recall that?

24   A.   Yes.

25   Q.   He was a counselor for you?

                          Redirect - Robert

1    A.   Yes.

2    Q.   One or two years ago, is that correct?

3    A.   Yes, I believe.

4    Q.   And you decided to change his evaluation?

5    A.   Yes, I did.

6    Q.   Now, let me make sure we cover the bases.  For you to

7    discipline someone or change their evaluations because you

8    didn't like them or because of their age or their sex or

9    that they had complained about you, that would be unethical

10   and wrong?

11   A.   Yes.

12   Q.   And you could be fired for that?

13   A.   Yes.

14   Q.   Is it your testimony to this jury that the only reason

15   why you dis-- reduced Brandon Risse's evaluation was because

16   you wanted to let him have room to grow?

17   A.   Yes, it is.

18   Q.   That's the only reason?

19   A.   Yes.

20   Q.   None other?

21   A.   Yes.

22   Q.   This is your chance.

23   A.   He did have some discipline too.  But for one-year

24   employee to have all "exceeds" is uncalled for.

25   Q.   When Brandon Risse came over, he got all "exceeds" his

Redirect - Robert

```
 1    first year by Ann Casey.  Did you know that?

 2    A.  No, I didn't.

 3    Q.  You read his evaluations?

 4    A.  Yes.

 5    Q.  You didn't reduce his, did you?

 6    A.  Not that I remember, no.  It could have slipped by the

 7    first time.

 8            MS. GUNDERSON:  I'll object as to vague.  I think

 9    we might be talking about two different people.

10            THE COURT:  Want to clarify who it is we're talking

11    about.

12    Q. (By Mr. Falb)  Talking about Brand -- excuse me,

13    Bart Toennies.  When he came over -- I'm sorry.

14    A.  I thought you was talking about Brandon Risse.

15    Q.  That's my mistake.  When Bart Toennies came over, are

16    you aware that first evaluation he had was all "exceeds"?

17    A.  Yes.

18    Q.  Did you do anything about that?

19    A.  He was a seven-year -- he was a counselor for seven

20    years, I believe.

21    Q.  You didn't think he needed to have room to grow?

22    A.  He had seven years.

23    Q.  So you didn't think he needed to have room to grow?

24    A.  No.

25    Q.  And you said you were reaching out for counselors to
```

Redirect - Robert

1   come in because you needed help in your district, is that

2   correct?

3   A.   Yes.

4   Q.   Is Lawrence in your district?

5   A.   Yes, it is.  At the time it was.  Still is.

6   Q.   As far as the allocations -- you were talking to

7   Ms. Gunderson about allocations?

8   A.   Yes.

9   Q.   What was your role in the allocations, the numbers?

10  A.   In '05, I'm the one that reduced the numbers.

11  Q.   Okay.  Why not Springfield?

12  A.   Because they directed me to do it.

13  Q.   But you did -- who was going to get the job and who

14  wasn't going to get the job as far as job openings?

15          *MS. GUNDERSON:*  Objection to the characterization.

16          *MR. FALB:*  I'll rephrase it.

17  Q. *(By Mr. Falb)*  What did you do as far as the allocation?

18  A.   I brought the numbers down to what we could live with at

19  the facility and operate the facility with.

20  Q.   And how you did that was to delete certain jobs?

21  A.   Delete certain jobs, yes.

22  Q.   So you could do that?

23  A.   Yes.

24  Q.   Now, isn't it true that there were other prisons that,

25  as far as the counseling department, had a full allocation

Redirect - Robert

```
 1  of counselors, supervisors, like Lawrence?

 2          MS. GUNDERSON:  Objection.

 3          THE WITNESS:  It could be.  It's according to what

 4  their allocation numbers are.

 5  Q. (By Mr. Falb)  In fact, basically Springfield was a

 6  dictatorship to tell you what to do, and each prison, they

 7  could decide?

 8  A.  They decide what our allocation numbers were.

 9  Q.  And Springfield -- for whatever reason, the governor or

10  his people below him could decide which prison would get

11  people or an allocation and which one wouldn't?

12  A.  They'd give you the allocation numbers.

13  Q.  Is that correct?

14  A.  Yes.

15  Q.  And after my client retired, there were two postings of

16  supervisors in her department were there not?

17  A.  Yes.  They'd been very recently.

18  Q.  What were the positions?

19  A.  The position that come open was correctional case work

20  supervisor.  That was filled.  Clinical service supervisor,

21  it was posted and it was pulled back down.  I guess it was

22  taken back off allocation.

23  Q.  Now, you were asked -- when I asked you about Ann Casey

24  and her consulting, you said you didn't know anything about

25  it.
```

Redirect - Robert

1    A.   No.

2    Q.   Then the attorney for the Attorney General's office

3    asked you, well, did Ann Casey have permission or -- with

4    personnel to do this, and you said you believe so?

5    A.   That was after the fact, what the attorney told me, that

6    she was prior approved.

7    Q.   So the attorney did tell you some information about the

8    case?

9    A.   After she was removed.

10   Q.   What did the attorney tell you about her, what she was

11   doing?

12   A.   Just that she was consulting.

13   Q.   That's it?

14   A.   Yes.

15   Q.   And she just happened to tell you that she was approved

16   for it?

17   A.   Prior approval, yeah.

18   Q.   Forcing her to resign?

19   A.   Yes.

20   Q.   You don't know anything else about it?

21   A.   No, I don't.

22           *MR. FALB:*   Thank you.

23           *THE COURT:*   Additional questions, Ms. Gunderson?

24           *MS. GUNDERSON:*   Just a couple.

25                      *   *   *   *

                      Redirect - Robert

1        **RECROSS-EXAMINATION**

2        **QUESTIONS BY MS. GUNDERSON:**

3    *Q.*  You were just talking about an attorney who told you

4    that Ms. Casey had filed this personnel work.  That was an

5    attorney for the department, right?

6    *A.*  Yes, the department.

7    *Q.*  Not me or Kelly?

8    *A.*  No.  It was Chief Huntley from the Department of

9    Corrections.

10   *Q.*  And Mr. Falb mentioned that Ms. Casey was forced to

11   resign.  Was that talking about the consulting job?

12   *A.*  Consulting jobs.

13   *Q.*  Not her Department of Corrections job?

14   *A.*  Yes.

15   *Q.*  When you were making the decision which positions to

16   reduce in order to meet the allocation numbers, what kinds

17   of things did you look at reducing?  What was your thought

18   process?

19   *A.*  Mostly middle management out.  We did away with a

20   business manager, the three jobs, Counselor III's, Supply

21   III's, sergeants.  There was some maintenance craftsmen.  We

22   had to bring it down to where we could still operate the

23   facility, the numbers.

24   *Q.*  Were the decisions about which positions had been

25   removed made public that you're aware of?

Recross - Robert

 1   A.   No.   It's confidential.   Only two people knew what

 2   positions removed.

 3   Q.   As far as you're aware at Centralia today, are the

 4   employees aware of what the allocation is for each position?

 5   A.   No.   That's confidential.

 6   Q.   You mentioned that Mr. Risse had had discipline in that

 7   first year he was there as a counselor?

 8   A.   Yes.

 9   Q.   What was that for?

10   A.   He lost his keys.

11   Q.   What kind of an offense is that as far as being really

12   minor or something else?

13   A.   That's a serious offense when you lose keys.   Inmates

14   would happen to come across the keys and have access to them

15   keys.

16   Q.   Do you know what his discipline was?

17   A.   I don't recall.

18         MS. GUNDERSON:   I have no further questions.

19                 **FURTHER REDIRECT EXAMINATION**

20                 **QUESTIONS BY MR. FALB:**

21   Q.   Sir, in fact, the evaluation that you reduced on

22   Brandon Risse was protested and was reinstated, wasn't it?

23         MS. GUNDERSON:   Objection.   Outside the scope.

24         MR. FALB:   She just asked about that, Your Honor.

25         THE COURT:   Yeah, be overruled.


                   Further Redirect - Robert

1    *Q. (By Mr. Falb)  Sir --*

2    *A.  Was reinstated?*

3    *Q.  Yeah.*

4    *A.  Not that I recall.*

5    *Q.  You don't remember a grievance on that?*

6    *A.  I remember a grievance, but --*

7    *Q.  And the lost keys that you said he was guilty of, in*

8    *fact, that was expunged, wasn't it?*

9    *A.  I don't recall what the resolution was on it.*

10   *Q.  Sir, do you have a problem with -- as far as your*

11   *memory?*

12   *A.  No, sir.*

13   *Q.  It was a serious offense?*

14   *A.  Yes.*

15   *Q.  Did you write him up for that?*

16   *A.  Yes, they did.*

17   *Q.  Who's "they"?*

18   *A.  Probably the assistant warden.  Come out of their*

19   *department.  It would have been through the same process as*

20   *anything else.  He had a hearing and I would have reviewed*

21   *the hearing.*

22   *Q.  So you don't know what happened to that.  Would it*

23   *surprise you that it was expunged?*

24   *A.  No, that wouldn't surprise me.*

25           *MR. FALB:  Thank you.*

                    Further Redirect - Robert

1            **FURTHER RECROSS-EXAMINATION**

2            **QUESTIONS BY MS. GUNDERSON:**

3    *Q.*  Why wouldn't it surprise you?

4    *A.*  Because all the facilities have problems.  Labor

5    Relations, they overturn lots of stuff up there.

6    *Q.*  Overturn a lot of stuff as in what?

7    *A.*  Grievances and stuff.  Discipline.

8            *MS. GUNDERSON:*  Thank you.

9            *THE COURT:*  Ladies and gentlemen of the jury,

10   questions?  No?  Okay.  You can step down.

11           What's the duration your next witness, about?

12   Trying to figure out whether to break now for lunch.

13           *MR. FALB:*  Could be about an hour.

14           *THE COURT:*  We'll be in recess 'til 12:45.  Same

15   admonishments as before.

16       *(Jury out)*

17       *(Lunch break)*

18                        *   *   *   *

19       *(Jury out)*

20           *THE COURT:*  The jury's not back in the courtroom

21   yet.  Ms. Gunderson?

22           *MS. GUNDERSON:*  Yes, Your Honor.  We understand

23   that plaintiff has subpoenaed Billy Jo Bryan to testify

24   tomorrow.  It is our understanding that the scope of her

25   testimony concerns a dinner that was held in DuQuoin at

                    Further Recross - Robert

 1   which Ann Casey, Warden Robert and Kurt Grandberg were at.

 2   It also may concern details of Ms. Casey's relationship,

 3   personal relationship, with Kurt Grandberg that would

 4   relate -- that were relayed to Ms. Bryant by Ann Casey, the

 5   latter of which is obviously subject to the motion in limine

 6   ruling earlier and should be barred.

 7          I'm not aware of anything that Ms. Bryant could

 8   testify to that would be used for any impeaching purpose

 9   with respect to what Warden Robert talked about with the

10   DuQuoin dinner.  I'm questioning what the relevance is of

11   having her subpoenaed, having her come here to testify

12   tomorrow.  She was not a counselor.  I'm not even sure if

13   she knew Betty Cook.  She might have.  I could be wrong.

14   But that is my issue.

15          THE COURT:  Okay.  Mr. Falb?

16          MR. FALB:  Your Honor, I don't think I have to

17   disclose what I'm going to have a witness testify to, but

18   I'm not going to go into anything that's violative of a

19   protective order or motion in limine.

20          THE COURT:  All right.  Okay.  He's right, he

21   doesn't have to disclose what the witness is going to

22   testify about.  I take it Mr. Falb, as an experienced

23   lawyer, won't go into the matters that he's been directed

24   not to go into.

25          MS. GUNDERSON:  Okay.

```
 1            THE COURT:  All right.  So we don't -- as far as we

 2   know, the juror's not back yet?

 3            COURTROOM DEPUTY:  I don't think so.

 4       (Off the record)

 5                        *   *   *   *

 6       (Jury in)

 7            BRANDON RISSE, PLAINTIFF'S WITNESS, SWORN

 8                      DIRECT EXAMINATION

 9                   QUESTIONS BY MR. FALB:

10   Q.  State your name, please.

11   A.  Brandon Risse.

12   Q.  And how do you spell your last name?

13   A.  It's R-I-S-S-E.

14   Q.  If you see some charts with your name misspelled, I

15   apologize.

16   A.  That's quite all right.

17   Q.  What is your occupation or profession?

18   A.  I'm a correctional counselor.

19   Q.  And where do you work?

20   A.  I work at Lawrence Correctional Center.

21   Q.  And where is that?

22   A.  It's approximately 20 minutes -- in Olney, right on the

23   other side of Vincennes, Indiana.

24   Q.  And what type of correctional counselor are you?

25   A.  It's a Correctional Counselor II position.  Correctional
```

                        Direct - Risse

 1    Counselor II positions, you have to have a degree to have

 2    applied for the position, so kind of differentiates between

 3    the I, because that could be gotten through upward mobility,

 4    so just to clarify.

 5    Q.   So there's three Counselors, I, II, and III, is that

 6    correct?

 7    A.   There's I, II and III, that's correct, as far as

 8    counselors.

 9    Q.   Where you are at, do you have supervisors?

10    A.   Yes, we do.

11    Q.   What supervisors do you have?

12    A.   I have case work supervisor and a clinical services

13    supervisor.

14    Q.   Showing you -- if you look at that screen, you see this

15    kind of like an outline of the hierarchy of people above the

16    counselors.   Is that correct?

17    A.   No, that's not correct.

18    Q.   Okay.   What's incorrect about it?

19    A.   There was no correctional case work supervisor.   There

20    was no clinical services supervisor.   I'm sorry.   You have

21    zero next to them, so yes, that's correct.   Our technical

22    boss was the assistant warden of programs, which was

23    Ty Bates.

24    Q.   I haven't gotten to that yet, but this is what it should

25    have been as far as the hierarchy, is that correct?

                         Direct - Risse

1    A.   Typically if all things -- typically in a facility, my

2    understanding is that that would be the way -- some

3    facilities may have a case work supervisor and not a

4    clinical; some may have a clinical and not a case work

5    supervisor, from my understanding, but typically that would

6    be the way that it should work, correct.

7    Q.   Okay.  Where you are right now, what is it?

8    A.   It's like that.  It's like the chart that you displayed

9    is basically the way that our facility is run.  We have

10   counselors and we have a case work supervisor that we report

11   to who reports to a clinical services supervisor, who in

12   turn reports to a warden of programs, and then the warden.

13   Q.   Okay.

14   A.   But currently our programs warden is transferred

15   somewhere else, so --

16   Q.   Let me ask you, how long have you been at Lawrence?

17   A.   I've been at Lawrence for 14 months.

18   Q.   And prior to that you were in Centralia?

19   A.   Yes, sir, I was.

20   Q.   Let me back up.  How far have you gone in school?

21   A.   I have two Bachelor's degrees from Southern Illinois

22   University in Carbondale.

23   Q.   Okay.  And tell us your work background with the

24   Illinois Department of Corrections starting from the very

25   beginning.


                        Direct - Risse

1   A.   Started off as a correctional officer and then I was

2   promoted to a -- the clinical -- I'm sorry, the Correctional

3   Counselor II position, which I interviewed for, and then

4   after that I was not promoted but I laterally transferred to

5   Lawrence.

6   Q.   Okay.  So where were you a correctional officer at?

7   A.   Actually initially started at Tamms Correctional Center,

8   which is a little bit further from home, then I transferred

9   to Menard.

10   Q.   Where is Menard?

11   A.   Menard's in Chester, Illinois.

12   Q.   What type of prison is that?

13   A.   It's a maximum security.

14   Q.   Is that where the worst of the worst inmates go?

15   A.   Typically.  I mean it was definitely a much more

16   volatile place to work.

17   Q.   Okay.  How long were you a correctional officer at

18   Menard?

19   A.   Six years, I believe.

20   Q.   And were you assigned to any special teams while there?

21   A.   I was on the Hostage Negotiation Team and I was part of

22   the Tactical Unit Team, and on the side I taught some

23   defensive tactics to some of the tactical unit members.   I

24   teach martial arts and stuff, so --

25   Q.   And why did you move to a counselor?

Direct - Risse

1    A.   That's pretty much what I went to school for.   And the

2    last few years at Menard I'd seen -- witnessed some murders

3    and saw some suicides, and it was a difficult place to be,

4    and I really wanted to be in a capacity where I could help,

5    so that's what I chose.

6    Q.   Your first counselor job was in Centralia, is that

7    correct?

8    A.   Yes, sir, it was.

9    Q.   Tell me what month and what year you started.

10   A.   I believe it was October of 2007.

11   Q.   Okay.   And I assume you had no contact with an assistant

12   warden by the name of Ann Casey, who left in July of that

13   year?

14   A.   No, I did not.

15   Q.   All right.   And when you came in to become a

16   Correctional Counselor II, who else were the counselors at

17   that time?

18   A.   At that time really the office only had two counselors,

19   which was Sena Landreth and Gina Feazel.   There was one

20   field services rep, which is Bart Toennies, and we had two

21   people on leave of absence.

22   Q.   If we look at this chart, at that time when you came in

23   it was what month?

24   A.   October 2007, I believe.

25   Q.   Okay.   So Betty Cook was on leave of absence?

                        Direct - Risse

1    A.   She was on leave of absence, correct.

2    Q.   Okay.  And then was Sena Landreth working?

3    A.   Sena Landreth was working, yes.

4    Q.   Gina Feazel, was she there?

5    A.   Yes.

6    Q.   And then Bart Toennies?

7    A.   Correct.

8    Q.   And then, obviously, yourself, is that correct?

9    A.   Yes, sir.

10   Q.   And if you look at this chart, on the left-hand column

11   are the ages and the years of service.  Does that correspond

12   to what you know as far as those counselors?

13   A.   You know, it looks correct, but I never asked somebody

14   their age, particularly a woman, so --

15   Q.   Let me ask you this:  When you started -- what was your

16   age when you started with Centralia?

17   A.   33 maybe.  Yeah, somewhere around there.

18   Q.   What is the year of your birth?

19   A.   '74.

20   Q.   And when you came to Centralia, how many years of

21   service with IDOC did you have?

22   A.   I think seven-and-a-half, somewhere right in there.

23   Just speaking off-the-cuff here.

24   Q.   And does years of service translate into seniority?

25   A.   Yes, sir.


Direct - Risse

 1  Q.  Okay.  Is that important in the IDOC?

 2  A.  It is for many positions, yes.

 3  Q.  And even if a position like case worker supervisor

 4  doesn't require a certain number of years, is it still

 5  important?

 6  A.  It is important because during the interview they're

 7  going to ask you what type of experiences you have, just

 8  like with any other job.  Let me say, hypothetically, a

 9  police officer.  If you've been a police officer for two

10  years and you apply for a sergeant position, and then

11  there's a person with ten years, obviously the person with

12  ten years is going to be able to answer the interview

13  questions better, probably have a better presentation and

14  more experience in the realm of the duties of whatever

15  they're doing.  So seniority would play a factor definitely.

16  I don't know about the grading scale or how that occurs, but

17  it just makes sense as far as the interview process itself.

18  Q.  Okay.  Let's start at the beginning when you showed up

19  at Centralia.  Tell the jury what happened.  Were you in

20  training first of all?

21  A.  I really didn't have a training period.  We were so far

22  behind on counselors that our caseloads were enormous, and

23  my basic -- I think I was seeing inmates by my third day

24  there.  Typically people would have several month training

25  period.  I remember talking to people that had opened up the

Direct - Risse

1    prison, Lawrence, where I'm currently at, and they said --

2         *MS. CHOATE:*  Objection, hearsay.

3         *THE COURT:*  Overruled.

4         *MR. FALB:*  Go ahead, you may testify.

5         *THE COURT:*  Don't talk about what people said.  In

6    other words, you can't say, *Well, they said this.*  Just talk

7    about what your observations were.

8         *THE WITNESS:*  Okay.  I had no training period

9    essentially.  That's my -- I guess that's my observation.

10   *Q. (By Mr. Falb)*  All right.  And when you came in you had no

11   supervisors above you except for all the way up to the

12   assistant warden, is that correct?

13   *A.*  Actually, when I came in we didn't even have an

14   assistant warden of programs, so we didn't have a

15   supervisor.  There was assistant warden of operations, and I

16   believe that he would have been our direct supervisor at

17   that time.

18   *Q.*  Was that Warden Flagg?

19   *A.*  That's correct.

20   *Q.*  Was anyone assigned to you to train you?

21   *A.*  Yes.

22   *Q.*  Who was that?

23   *A.*  That was Gina Feazel.

24   *Q.*  And did you work with her for a period of time?

25   *A.*  I worked with her for a period of time, yeah.

Direct - Risse

```
 1    Q.  And did she attempt to train you, is that correct?

 2    A.  She attempted to train me, I suppose.

 3    Q.  Okay.  Let me ask you this:  During the course of that

 4    when you were working with Gina Feazel, you had

 5    Bart Toennies, who was the other counselor, is that correct?

 6    A.  He was in field services, so actually -- field services

 7    typically deals with people that are going home, so like

 8    parole plans.  They would be in contact with the offenders

 9    that are closest to going home to try to get them placement.

10    Q.  Okay.  Then you had Sena Landreth?

11    A.  Yes, sir.

12    Q.  So you only had basically three in the office?

13    A.  Three in the office.  So about 550 case -- 550 offenders

14    on each caseload.

15    Q.  And you had to see them every 90 days?

16    A.  Every 90 days, correct, but that -- it is just, you

17    know, the least of the issues because you're dealing with

18    offenders' families calling in, you're dealing with visiting

19    list issues, dealing with transfers, you're dealing with

20    many other collateral issues that have to deal with

21    offenders and their families.

22    Q.  While we're on the subject, was this a tough job to

23    learn?

24    A.  It's a very tough job to learn, particularly if you

25    don't have a longer training period and particularly if you
```

Direct - Risse

```
 1   don't have a situation where you actually can sit down and

 2   learn the job because I think by the second or third day

 3   they were telling me to go see inmates, and so -- and I

 4   understand their situation because they were swamped.  I

 5   mean it was just a very bad situation to come into.

 6   Q.  How long did it take for you or a regular counselor in

 7   the situation to get beyond struggling and become

 8   proficient?

 9   A.  You know, I don't know if you ever quit struggling being

10   a counselor, but I would say to be proficient and to be

11   someone that's halfway competent as a counselor, two years,

12   I'd say roughly.

13   Q.  Okay.  And how long have you been counseling right now?

14   A.  I've been a counselor for about four years, so --

15   Q.  During the time that Gina Feazel was training you, did

16   she have any discussions with you concerning Betty Cook?

17   A.  Yes, she did.

18   Q.  Did Gina Feazel make any statements to you with respect

19   to criticisms of Betty Cook?

20   A.  Prior to Betty Cook coming back from her medical leave

21   of absence, she on many occasions had stated that --

22        MS. CHOATE:  Objection, hearsay.

23        MR. FALB:  This is impeachment.  Prior inconsistent

24   statement of a witness.

25        THE COURT:  Overruled.

                     Direct - Risse
```

1          *THE WITNESS:*  She's very critical of Betty Cook and

2    she discussed issues of her discipline with me, and she was

3    very critical of her on a personal level as well.

4    *Q. (By Mr. Falb)*  Okay.  And when she would -- did she go

5    through her disciplines with you?

6    *A.*  She briefly discussed them, but I can tell you, coming

7    from a maximum security prison I didn't appreciate it, and

8    it wasn't one of those things where I was intrigued by it

9    because if you've been somewhere and seen one of your

10   friends have a career ending injury, you could care less

11   about the petty gossip of somebody else.  So I was there to

12   learn a job and do a job, so --

13   *Q.*  Did she have any criticisms of a counselor by the name

14   of Deb Brink?

15   *A.*  Yes, she did.

16   *Q.*  What were they?

17   *A.*  She said she was an alcoholic, that she was stupid, that

18   she didn't know her job.

19          *MS. CHOATE:*  Objection.  Again, this is not

20   impeachment.  There was nothing previous about Deb Brink.

21   It's irrelevant.

22          *THE COURT:*  Overruled.

23          *THE WITNESS:*  She said she was stupid and basically

24   had a lot of criticisms of her, and again, it was a

25   situation that the -- Deb was a single mom.  She struggled

Direct - Risse

 1 to learn the job, as I did and as many others did.  It was a

 2 difficult situation under the best of circumstances, and Deb

 3 ended up passing away, and it was a very sad situation in my

 4 opinion.

 5 *Q. (By Mr. Falb)*  When -- and that reminds me, when Deb passed

 6 away did anything unusual occur or anything unusual that

 7 Gina Feazel did with respect to that passing away?

 8 *A.*  Yes.

 9        *MS. CHOATE:*  Objection, relevance.

10        *THE COURT:*  Overruled.

11        *THE WITNESS:*  Gina came in and boxed her stuff up

12 and then tore her name tag off the mailbox.  We had a set of

13 mailboxes that were about 8 feet from us where like incoming

14 mail, whether it's from the mailroom or offenders, or

15 however it arrives to us through other inter-agencies, I

16 mean like the business office or the records office, people

17 would come in there and place mail into our mailboxes, and

18 she basically boxed her stuff up and then they ripped her

19 name tag off.

20 *Q. (By Mr. Falb)*  Did anyone assist her?

21 *A.*  Bart Toennies did.  I don't know who gave them direction

22 to do so but I found it pretty vulgar.  That's just my

23 opinion though.

24 *Q.*  Directing your attention to another supervisor,

25 Sena Landreth.  Did Gina Feazel also have any comments about

                        Direct - Risse

1    Sena Landreth?

2    A.  Yes, she did.

3         MS. CHOATE:  Objection, foundation as to

4    Sena Landreth being a supervisor.

5         MR. FALB:  Did I say that?  If I did --

6         THE COURT:  You said "supervisor".

7    Q. (By Mr. Falb)  Strike that.  That's wrong.

8         Another counselor, Sena Landreth, did she -- Gina Feazel

9    make any comments about Sena Landreth?

10   A.  Yes, she did.

11        MS. CHOATE:  Again, objection, hearsay.

12        MR. FALB:  It's impeachment, Your Honor.

13        THE COURT:  For purposes of impeachment, overruled.

14        THE WITNESS:  Yes, she did.  She claimed that she

15   had been moved out of field services, again, the role that

16   people play when they're trying to find somebody a home

17   site.  She said that she had released a sex offender that

18   didn't have housing and that she was incompetent and, again,

19   that she had stuff all over the office, that she was

20   disorganized, and that she was moved out of the office and

21   replaced by Bart Toennies at the time because she was

22   incompetent.

23   Q. (By Mr. Falb)  Did -- when she, Gina Feazel, would make

24   these statements about these three -- Landreth, Deb Brink and

25   my client, Betty Cook -- what was your response to her?

                    Direct - Risse

 1   *A.*  You know, the thing is, it was -- I was in a bad

 2   situation because I was having to rely upon Sena to train me

 3   and Gina to train me at that time.  Any time that I would

 4   ask Sena a question, it would get Gina mad, so Sena -- when

 5   Gina would leave the room and I would ask her questions, I

 6   would say, *Hey, how do you do this*, or, *How does this*

 7   *process work?*  Essentially I would have to wait for Gina to

 8   leave because she would say, *Brandon, don't put me in*

 9   *conflict.*

10          *MS. CHOATE:*  Objection, hearsay.

11          *THE COURT:*  Sustained.

12   *Q. (By Mr. Falb)*  Let me ask you this:  These discussions with

13   Gina Feazel in the fall of 2007, was the subject matter of the

14   vacancies for the supervisory positions in the counselor's

15   office brought up?

16   *A.*  I asked -- yes.

17   *Q.*  Okay.  And which supervisory positions were mentioned?

18   *A.*  I don't think in particular we discussed what particular

19   supervisory positions were open, but I just remember asking

20   why we were so short-staffed, number one.  The second

21   question I asked was, *Why is there no layers of management?*

22   Because where I came from, Menard, there was either one or

23   two case work supervisors and a clinical services

24   supervisor, plus I believe at that time there was 17 or 19

25   counselors, which would have a ratio of maybe one counselor

                      Direct - Risse

1  per 175 inmates versus one counselor for 550 inmates, so --

2  Q.  So you asked Gina Feazel about that?

3  A.  I did.

4  Q.  And what was her response?

5          MS. CHOATE:  Objection, Your Honor.  Could we have

6  a sidebar, please.

7          THE COURT:  No.  What's your objection?

8          MS. CHOATE:  The objection is hearsay.  This was

9  not in Gina Feazel's direct about this issue; it was about

10  the discipline with Betty Cook.  There's all sorts of new

11  issues coming up now that would not be impeachment.

12          MR. FALB:  I asked Gina Feazel about the

13  administration's attitude towards advancement while my

14  client was still working and Sena Landreth was still

15  working.

16          THE COURT:  For purposes of impeachment, overruled.

17          THE WITNESS:  I'm sorry.  Could you repeat the

18  question.

19  Q. (By Mr. Falb)  Did Gina Feazel at any time make any

20  statements to you as far as when the posting or the openings of

21  the supervisory jobs would be made in relation to my client,

22  Betty Cook, or Sena Landreth?

23  A.  She said she felt like both of them would retire before

24  we'd have job postings.

25  Q.  Did Gina Feazel have any special access to the warden's

                        Direct - Risse

1   office?

2   *A.*  She appeared to me, yes.

3   *Q.*  Why did it appear to you?

4   *A.*  Because she went into the warden's office and talked to

5   him and then I would see them talk -- he's not a talkative

6   person but I would see them talk, and -- I'm sorry.

7   *Q.*  Go ahead.  How about Bart Toennies, did he also have

8   access?

9   *A.*  Not in particular.  I mean I know he -- you know, he

10  came and went, but I don't know if he knows him or what his

11  access was to him personally.

12  *Q.*  Did you have any discussions with Gina Feazel about when

13  my client would be coming back from her sick leave?

14  *A.*  She said she'd never come back.

15  *Q.*  When my client -- were you there when my client retired

16  in May of 2008?

17  *A.*  Yes, I was.

18  *Q.*  Did Gina Feazel do anything unusual as far as posting

19  pictures?

20  *A.*  She did.

21  *Q.*  Tell the jury.

22  *A.*  I don't know where she obtained the picture but she

23  found some picture and it was of Betty as a young woman and

24  she posted it on our counselor's room door.  The counselor's

25  room door is made of glass, and she taped it up there; for

Direct - Risse

 1   what purposes, I don't know, because the two were not
 2   particularly close, and I found it odd.
 3   Q.   At some point in time did Betty, in fact, come back?
 4   A.   She did.
 5   Q.   Okay.  And at that point in time was that sometime in
 6   November of 2007?
 7   A.   I can't recall the specific date but that sounds
 8   accurate.
 9   Q.   And did you have occasion to work with her?
10   A.   I did.
11   Q.   And tell the jury about that experience.
12   A.   I actually -- when I was training with Gina, Gina's
13   computer would be about three feet from mine.  We were
14   sitting like really close to one another.  So what I went
15   down and asked was that if I could move to the other side of
16   the room and attempt to be trained by someone else, and I
17   did work with Betty and Sena to try to learn my job.
18   Q.   Okay.  And were you able to -- strike that.
19        How was it working with Betty?
20   A.   Fine.  I got along fine with Betty.
21   Q.   Was she able to teach you?
22   A.   Yes, she was.
23   Q.   How would you characterize her as a worker, as a
24   counselor?
25   A.   She did the best she could, just like the rest of us.

                          Direct - Risse

 1   We had enormous caseloads, I would say two-and-a-half times

 2   to three times the work of an average counselor throughout

 3   the state, so she did the best she could.

 4   Q.   And where you work now at Lawrence, what's the ratio of

 5   inmates to counselors?

 6   A.   I think I might have a caseload of 275.  It might have

 7   just gone up.  We actually -- when I first initially arrived

 8   there it was better, but we had a couple people promote and

 9   now we have another one retiring, and then one has been

10   taken to do administrative duties, so we do have pretty

11   large caseloads, but we work together though too, so --

12   Q.   Okay.  Nothing like the number you were working with at

13   back at Centralia?

14   A.   You know, I think it's maybe approaching closer to what

15   it was, but the whole state -- I don't know if somebody

16   retires now if they replace them.  As people may be aware,

17   we're in a budget crisis, so it's much more challenging to

18   post positions now.

19   Q.   Let me ask you this:  Directing your attention to -- in

20   May of 2008, did you become aware that Betty was retiring?

21   A.   Yes, I did.

22   Q.   Prior to you finding that out did you and Gina Feazel

23   have some sort of disagreement or something going on?

24   A.   From the day one that I arrived I would say -- I mean I

25   think initially, initially we got along for probably five to

Direct - Risse

1    six weeks.  But I was nice to Sena and nice to Betty.  And I

2    basically told her that, *I'm just here to learn a job.  They*

3    *haven't done anything to me and I just want to get along*

4    *with everybody.*  And that's basically when our relationship

5    went downhill.  But prior to that we got along okay.  And

6    then that's when I -- shortly thereafter is where I told the

7    warden that I wanted to move, and I moved across the office

8    and sat next to Betty, and unfortunately in Deb's chair,

9    because she had passed.

10   *Q.*  Okay.  Prior to Betty making the decision to retire, did

11   you become aware that -- strike that.

12       Who was your assistant warden at that time?

13   *A.*  Ty Bates.  Tyler Bates.

14   *Q.*  And as I understand he's about 29 or 30 years of age?

15   *A.*  That's correct.

16   *Q.*  And he had been a correctional officer for about one

17   year before he was appointed?

18   *A.*  Something along those lines, correct.

19   *Q.*  Okay.  And was it your understanding that assistant

20   wardens and wardens are appointed by people in Springfield?

21   *A.*  The people in Springfield or the governor, that's my

22   understanding, because I've never seen a warden's job posted

23   before.

24   *Q.*  That's the only thing I was going to ask you.

25   *A.*  I'm sorry.

Direct - Risse

 1   *Q.   If someone was looking to become an assistant warden or*

 2   *warden, would they be able to go on the internet or read a*

 3   *newspaper or posting that the job's open?*

 4   *A.   I look at jobs all the time on the state website.  I've*

 5   *never seen a warden job posted.  My understanding is it is a*

 6   *political hiring.*

 7   *Q.   Let me ask you this:  Close to when Betty retired did*

 8   *your supervisor, Warden Bates, bring both you and*

 9   *Sena Landreth -- Gina Feazel in because you guys were having*

10   *problems with each other?*

11   *A.   He brought us down there on several occasions, yes.*

12   *Q.   And I don't want to get into what was going on, unless*

13   *the other attorney wants to, but did he basically read you*

14   *the riot act?*

15   *A.   Not me, no.  In my estimation he did not have a problem*

16   *with me in the situation, no.*

17   *Q.   Okay.  Well, was Gina Feazel counseled or reprimanded or*

18   *disciplined for whatever she was doing?*

19         *MS. CHOATE:*  Objection, foundation.

20         *THE COURT:*  Sustained.

21   *Q. (By Mr. Falb)*  In your presence was she given a written

22   *reprimand or disciplined?*

23   *A.   She was -- not in my presence.  He -- can I continue?*

24   *Q.   What did he do?*

25   *A.   Okay.*

Direct - Risse

 1              THE COURT:  Question is, *How do you know what --*

 2              THE WITNESS:  I was there.

 3              THE COURT:  Okay.  It was in your presence?

 4              THE WITNESS:  Yes, sir.  He basically told her, he

 5     said, *Do you want people to succeed?  We have this person*

 6     *here that's trying to learn a job and he's trying to help*

 7     *out, and in my opinion I think we should want somebody to*

 8     *succeed and do well for the benefit of yourself or the*

 9     *facility, for the state, etc.*  And he gave that discussion

10     more than one time.  And basically every monthly meeting he

11     tried to say, can't we all just get along type of thing.

12     And that's certainly what I was there to do.

13     Q. *(By Mr. Falb)*  Okay.  At any time were you disciplined

14     because of what was going on between you and Feazel?

15     A.  No, I was not.

16     Q.  To your knowledge, was she ever disciplined what was

17     going on?

18     A.  To my knowledge, no.

19     Q.  Prior to Betty retiring did you become aware that your

20     supervisor, Ty Bates, was going to be moving the most

21     senior, the oldest person to a different assignment because

22     of what was going on between you and Sena?

23              MS. CHOATE:  Objection, foundation.

24              MR. FALB:  I asked if he was aware.

25              THE COURT:  Yeah, overruled.  Just if you're aware.

                          Direct - Risse

 1          *THE WITNESS:*  I was aware that there was assignment

 2     changes being made, the rationale to which he did not

 3     discuss with me.

 4     *Q. (By Mr. Falb)*  Okay.  And that was not your business, I

 5     assume?

 6     *A.*  I would not make it my business, no.

 7     *Q.*  Did you become aware that Betty was the one being

 8     assigned, reassigned?

 9     *A.*  I did become aware of that.

10     *Q.*  And after that did you become aware that Betty decided

11     to resign?

12     *A.*  She was upset and she said she was going to resign.

13          *MS. CHOATE:*  Objection, hearsay.

14          *THE COURT:*  Sustained.

15     *Q. (By Mr. Falb)*  After the reassignment did you -- I don't

16     want to get into the content, but did Betty make some

17     statements about -- after the reassignment, after she was being

18     reassigned?

19     *A.*  She did.

20     *Q.*  Okay.  And after she made those statements to you, did

21     she, in fact, resign?

22     *A.*  Yes.

23     *Q.*  While you were present with Betty from the fall 2007

24     until May or June of 2008, when she left the department, did

25     you have any criticism of Betty's work?

                              Direct - Risse

1    A.   No.

2    Q.   Did you work right next to her?

3    A.   Yes, I did.

4    Q.   And was she a hard worker all day long?

5    A.   She was a very hard worker, and it was a very hard job

6    with a very, very big caseload.

7    Q.   Okay.

8    A.   And you know, as far as if you're asking is there

9    deficiencies in everyone of us, absolutely.  Made tons of

10   mistakes myself.

11   Q.   That's what I was going to ask you.  During the course

12   of you being a counselor at Centralia have you made

13   mistakes?

14   A.   Tons.  Sure.

15   Q.   Have you made mistakes as far as seeing inmates on a

16   timely basis?

17   A.   At the time I didn't know it was a mistake.

18       MS. CHOATE:  Objection.  Vague as to the time we're

19   talking about.

20   Q. (By Mr. Falb)  I'll rephrase it.  During the time that you

21   were counselor at Centralia, from October or November of 2007

22   until Betty left, just during that period of time had you ever

23   made any mistakes?

24   A.   Yes.

25   Q.   Even after that time did you make mistakes?

Direct - Risse

1    *A.*   I probably made a mistake last week.

2    *Q.*   Is it true for all the counselors that were working

3    there?

4    *A.*   Sure.

5    *Q.*   Was it easy for someone to -- another counselor or

6    supervisor to say, *Hey, you did something wrong*, and bring

7    it to an assistant warden's attention?

8    *A.*   I never did that to anybody.  If you're asking the

9    question, would I go to a supervisor and say, *Hey, look,*

10   *this other person made a mistake*, no, I did not do that to

11   people.

12   *Q.*   Was there a counselor that had supervisory access to the

13   computer system?

14   *A.*   Yes, there was.

15   *Q.*   Who was that?

16   *A.*   That was Gina Feazel.

17   *Q.*   Why did she have supervisory access to that?

18   *A.*   To this day, I don't know.

19        *MS. CHOATE:*   Objection, foundation.

20        *THE COURT:*   Overruled.

21   *Q. (By Mr. Falb)*   Tell the jury what a supervisor over the

22   computer or CHAMPS system -- first of all, what is the CHAMPS

23   system?

24   *A.*   A CHAMP system, if we see an inmate we log what the

25   contact was, the nature of the contact, what we discussed,

Direct - Risse

1   etc.  And basically it goes back, I think to 2005.  And

2   essentially it's -- so like if an inmate transfers, a

3   counselor at another facility may be able to see what types

4   of issues that the previous counselor was dealing with as

5   far as that offender, and plus it has a timeline.  And with

6   inmates there's also litigation issues, so what that has is

7   that is our proof that we saw them, and whatever issue that

8   they were dealing with at the time, that we were aware of

9   it.

10  Q.  Okay.  Was it important for you to log things in so

11  future counselors or future employees at the prison would

12  know the dangers of a particular prisoner?

13  A.  I don't know if that would be a particular thing that I

14  would log, so yeah, I'm not sure about that.

15  Q.  Okay.  What did Gina Feazel have -- did she have

16  different access to that than you did?

17  A.  Yes, she did.

18  Q.  Tell the jury.

19  A.  Typically a counselor would only have access to their

20  caseload.  So if I was to pull up under something called a

21  counseling summary, okay, and then I was to go under the

22  contacts, those are the people that I would have to see in a

23  specific period of time, and it would have a list of inmates

24  there, and it would have 90 days next to it, and before that

25  it would show how many days you have to see that inmate.

Direct - Risse

1          And all the counselors in the office, besides Gina, just

2     had their own counseling issue -- I mean their own

3     counseling summary.  So I could not, for instance, see if

4     Betty had an inmate that she was supposed to see or if she

5     had lagged behind on seeing a particular inmate.  The only

6     thing I could see was my housing units and my offenders.

7     Q.  Now, someone yesterday, a witness, had testified that a

8     person with supervisory access to CHAMPS system -- correct,

9     that a witness yesterday testified that any counselor would

10    have access to look at any other counselor's comments in the

11    CHAMPS system.  Is that true?

12    A.  Comments -- let me differentiate.  I know that the

13    jury's not aware of what counseling and CHAMPS and all that.

14    If you're asking a question to say, can I -- I could type in

15    an offender's number and look under the counseling summaries

16    and see what types of contacts have been made and what the

17    counselor stated about that contact.  If that's the question

18    you're asking, yes, I would be able to get on CHAMPS and

19    look up any offender that's in that facility and find out

20    what their contacts were because sometimes you may run into

21    an inmate on the walk or in the gym or somewhere else and

22    they may ask you a question and you may come back and log

23    that contact and try to attempt to answer their question.

24    Q.  Okay.  Now, but as far as Gina's accessibility, how was

25    that different from yours or Betty's?

Direct - Risse

1   *A.*  Gina's accessibility was different because of the fact

2   that -- what I had previously stated about the fact that we

3   could look and see where we were supposed to see inmates.

4   If I pulled up my counseling summaries I could pull up

5   something that showed a list of all the inmates on my

6   counseling summary.  Secondly, I could pull up a list of all

7   the ones that I was supposed to see in like a 30-day

8   timeframe, so it would show 90 next to it, and then before

9   that it would show how many days I have to see that

10  particular offender.

11      In Gina's case, what she had was access to all of ours,

12  so she could find out if like I was behind seeing an inmate

13  or if Betty was behind seeing an inmate or someone else was

14  behind seeing an inmate.  And my understanding is typically

15  no other counselor has the right to have that type of system

16  to where they can see what other counselors are doing.  And

17  I wouldn't care anyway.  I mean I figure they're doing their

18  job, I'm doing mine, so most of us don't care.  We're just

19  trying to help each other out and we just want to everybody

20  to do well.

21  *Q.*  Sir, did the Centralia -- and I guess every prison --

22  did they have a set of administrative regulations or

23  directives that you had to follow?

24  *A.*  Yes.

25  *Q.*  Okay.  What were they called?  What's the proper name?

Direct - Risse

1   A.  I guess institutional directives or administrative

2   directives.

3   Q.  Okay.  And were these long and involved directives to

4   follow?

5   A.  Typically, yes.  Yes.  I mean, quite frankly, I only

6   read through them on cycle training, which is like our

7   yearly training, so I'm not intimately familiar with them,

8   so --

9   Q.  Sir, do you know Warden Robert?

10  A.  Yes.

11  Q.  And was he the warden when you were working at

12  Centralia?

13  A.  He was.

14  Q.  While you were at Centralia did you have an evaluation

15  that was downgraded by Warden Robert?

16  A.  I did.

17  Q.  Okay.  Now, who was the person that was supposed to be

18  doing your evaluations?

19  A.  Ty Bates did my evaluation, the assistant warden of

20  programs.

21  Q.  So whoever was your immediate supervisor would do that?

22  A.  That's correct.

23  Q.  And when was this evaluation done that was downgraded?

24  A.  You know, it's been a couple back.  I just recall that

25  he didn't like my evaluation and he downgraded it.

<br>

Direct - Risse

1    Q.  Well, was Warden Robert ever in your counseling

2    department to see what you were doing?

3    A.  I wouldn't know that he knows the first thing about

4    counseling.  If he knows anything about it, I'd be

5    surprised.  So no, he was not.  He was never on my case

6    assignments.  He did not know my job.  He was not familiar

7    with my contacts.  He did not follow me around and shadow me

8    or find out what kind of job I was doing.  He didn't ask me

9    questions about it.  He didn't have any opinions as to such,

10   so that's --

11   Q.  Let me back up.  Assistant Warden Bates gave you your

12   evaluation?

13   A.  Yes.

14   Q.  And was it a very good evaluation?

15   A.  He gave me all "exceeds".

16   Q.  Tell the jury what that means.

17   A.  I believe there's either seven or eight portions in the

18   counseling -- on the evaluation.  It's called a 201.  And at

19   the time he felt like I was doing the work of two or three

20   people.  We had also had some people from Springfield come

21   down that were in high-level capacities to our re-entry

22   summits where we were trying to assist offenders getting

23   jobs and healthcare and help for their families and getting

24   assistance to reduce recidivism.  We had had some people

25   that were high-level people that had come down, and there

Direct - Risse

 1   was a radio spot done on it, and there was something done

 2   through the newspaper where they talked about how good of a

 3   job the facility was doing as far as trying to reach out to

 4   offenders and rehabilitate offenders to try to keep them out

 5   of prison.  And so essentially when my evaluation was given,

 6   he thought that, you know --

 7        MS. CHOATE:  Objection; foundation as to what he

 8   thought.

 9        THE COURT:  Sustained.

10   Q. (By Mr. Falb)  What did he state?

11   A.  Okay.  Can I back up to finish?  I was --

12        THE COURT:  The problem is talking about what

13   somebody else thinks and how you know what he was thinking.

14        THE WITNESS:  Okay.  I could tell what he was

15   thinking by what he wrote in my evaluation.

16   Q. (By Mr. Falb)  Talk about Bates.  What was the result of the

17   evaluation?

18   A.  First, I was -- did you want me to complete my statement

19   about why he said he was giving me the good evaluation?

20   Whatever you want me to do.  I'm sorry.

21   Q.  That's fine.

22   A.  I usually came about half an hour to 45 minutes early

23   and stayed late most of the time, or a lot of the time.

24   Q.  Okay.  And what were the results of your evaluation?

25   A.  He gave me all "exceeds".

                        Direct - Risse

1   Q.   Okay.  And that was your Assistant Warden Bates?

2   A.   Yes.

3   Q.   And then at some point in time did you find out that

4   Warden Robert changed that?

5   A.   Yes, I did.

6   Q.   Okay.  Was that a shock to you?

7   A.   It was.

8   Q.   And did you protest that appeal it?

9   A.   I did appeal it and I won my grievance.

10  Q.   Warden Robert said he did this because he wanted to give

11  you room to grow.  Has anyone told you that?

12  A.   No, he did not tell me that.  And as far as I know,

13  Gina Feazel stated that she received all "exceeds" on her

14  evaluations, and she didn't have that much more time in than

15  me, a couple years more as a counselor, so I find that

16  inaccurate.

17  Q.   Okay.  Who appealed your evaluation?

18  A.   The union did.

19  Q.   Okay.  Warden Robert also indicated that part of the

20  reason why he did that was because you lost your keys.

21  A.   That's not true.

22  Q.   Is that even part of the evaluation?

23  A.   First off, it's not part of the evaluation at all.

24  There's no room on the evaluation that says, *Has the*

25  *employee received discipline?*  The aspects of the evaluation

Direct - Risse

1  say job quality, job completeness, ability to get along with

2  people, etc.  So that's why I won my grievance.

3      Secondly, I did not lose keys.  I gave my keys to a LAN

4  administrator, which is a person that has access to all the

5  computers in the facility, and this person was to go and fix

6  my computer in another area of the receiving unit, which was

7  three or four buildings away, and as busy as we were, I gave

8  my keys to her.  I think she had them for three or four

9  hours, so there was a period where I thought that they were

10  missing, but she brought them in and said, *No, I had them*.

11  I did get written up for it, but through the appeal process,

12  they dropped my discipline and expunged it from my record.

13  *Q.*  Prior to these events taking place -- I'm talking about

14  the evaluation that was lowered, these keys, the key

15  incident -- did you have occasion to talk to anyone about

16  this lawsuit?

17  *A.*  Yes, I did.

18  *Q.*  Who did you talk to?

19  *A.*  I talked to Joanna Gunderson.

20  *Q.*  The attorney right there?

21  *A.*  That's right.

22  *Q.*  And were you ordered to talk to her?

23  *A.*  I was ordered to talk to her.

24  *Q.*  And when you talked to her did you tell her your

25  feelings about her side of the case?

Direct - Risse

1    *A.* I told her my feelings about the side of the case and I

2    told her what I felt about the management of the facility at

3    the time, and I went into great detail about it.  And I also

4    mentioned about the fact that Betty Cook had won a lot of

5    her grievances, so a lot of the discipline that she had

6    received was also expunged out of her file, so in my

7    estimation --

8         *MS. CHOATE:*  Objection.  I would argue that there's

9    no foundation for many of these statements.

10        *THE COURT:*  Overruled.

11   *Q. (By Mr. Falb)*  Go ahead.

12   *A.* It was my understanding -- I apologize.  It was my

13   understanding, from the union, that she had won her time

14   back, and so I mentioned that.  And at that time

15   Ms. Gunderson was not aware or she told me she was not aware

16   of the grievances.  She left the room, was gone about ten

17   minutes, came back, and then spoke with me further about the

18   facility and about Betty's claims, and not long after that I

19   get my evaluation dropped.

20   *Q.* Okay.  How long after that?

21   *A.* You know, it's been -- I've tried to move on with my

22   life, as I'm sure Betty has and some of the other people

23   that are going to testify have.  I'm not sure how much

24   longer, but I believe a few months, and he lowered my

25   evaluation.  I went to the union.  They said that's the only

Direct - Risse

 1   evaluation that they were aware of that he had ever lowered.

 2   And I wrote in my grievance -- I didn't just write the

 3   grievance.  As an attachment to the grievance, I mentioned

 4   the conversation that I had with the Attorney General about

 5   not just Betty's case but also about the management of the

 6   facility, and I think we talked about some political issues.

 7   Q.  Were you asked to sign an affidavit by the Attorney

 8   General's office?

 9   A.  I was.

10   Q.  What did you say?

11   A.  I refused.

12   Q.  Was that before you got your discipline?

13   A.  I'm not sure.  I'm not sure the timeline of that.  I

14   think I've been asked by her on a couple of occasions just

15   to say that I've never seen any type of age discrimination,

16   and I just said, *I'm not a lawyer.  I don't know what the*

17   *classical definition of "age discrimination" is.  I'm just*

18   *going to have to be asked questions and then I'll answer the*

19   *questions.*

20   Q.  Did you -- were you ordered again to talk to the

21   Attorney General's office within the last two weeks?

22   A.  Yes, I was.

23   Q.  Who ordered you?

24   A.  I was sent an e-mail.  It's probably been a couple

25   Thursdays ago.  I'm not sure.  It may have been last

Direct - Risse

1    Thursday.  So I wasn't given much notice, and I was just

2    told to appear at Centralia Correctional Center to speak

3    with the Attorney General's office by Michelle Taphorn.

4    Q.  She is who?

5    A.  She's administrative assistant to the warden.

6    Q.  To Warden Robert?

7    A.  That's correct.

8    Q.  Okay.  And what was your response initially?

9    A.  My initial response was, *I don't know I've even been*

10   *subpoenaed in the case*, and you know, *have her call me,*

11   *thank you*, because I really didn't have anything else to

12   talk to her about at the time.

13   Q.  Had I talked to you by the telephone and requested you

14   to appear at this case also?

15   A.  No.  I don't think you did, no.

16   Q.  Let's back up.  Last year when you met with the Attorney

17   General's office did they ask if you had talked to me or

18   Betty Cook concerning this case?

19   A.  Yes, they did.

20   Q.  And what did the attorneys for the Attorney General tell

21   you?

22   A.  They told me I could get into trouble for talking to a

23   plaintiff's counsel.

24   Q.  Are you aware of any basis for that?

25   A.  I wasn't at the time but it sure scared me.


                            Direct - Risse

1          MS. CHOATE:  Objection.  Could we have a sidebar,

2    Your Honor?

3                         *   *   *   *

4         (Discussion held at sidebar:)

5          MS. GUNDERSON:  I guess I'll talk.  Mr. Risse was

6    told that because of attorney-client issues with the

7    Department of Corrections, contacting Ms. Cook when she is

8    represented by counsel, that he should not be contacting her

9    directly.  He was told that if her counsel contacted him it

10   was up to him to talk to him.  But I was never told -- ever

11   told him that it was -- at this point I'm feeling attacked,

12   I guess, and I wanted to make a record that that was not --

13         THE COURT:  Isn't that a subject of

14   cross-examination?  Why are we having a sidebar about it?

15         MS. GUNDERSON:  It may be, but I think there are

16   questions that are being asked insinuating things about my

17   professionalism, which are improper.

18         MS. CHOATE:  And/or would make Ms. Gunderson a

19   witness in this case.  To the extent it's about what

20   Ms. Gunderson told him, they're trying to make her a witness

21   in this case.

22         THE COURT:  Sounds to me like it's just

23   cross-examination.

24        (End of discussion at sidebar)

25                         *   *   *   *


                         Direct - Risse

1    *Q. (By Mr. Falb)*  Sir, do you still feel ill at ease even being

2    here to testify?

3    *A.*  Yes, of course.  I'm a state employee.  But at some

4    point in life you choose to do what's right or you choose to

5    not do what's right.  Even if you're scared, you do what's

6    right.  Not easy.

7    *Q.*  And in fact, the state has told you, because I requested

8    you to be a witness, that you have to be here?

9    *A.*  That's correct.  I was forced to be here.  I would not

10   have shown up on my own, that's for sure.

11   *Q.*  Did you have occasion to meet with the attorneys for the

12   Attorney General this week or last week?

13   *A.*  I did.  And I took a union representative in there this

14   time, since the last time what occurred where they had told

15   me I could get in trouble for talking to you.  And if you

16   recall, I called you about that because I was scared, and

17   this was -- it's not like this is testimony I'm making up.

18   I called you numerous months ago and just said, *Tom, I know*

19   *you had talked to me and I was just told that I could get in*

20   *trouble for talking to you.*  And I wasn't really seeking

21   counsel; I was just trying to find out, you know, if by law

22   that was accurate, and you had told me that, no, that's not

23   true.

24   *Q.*  Were you ever told that you don't represent the

25   department so you shouldn't be talking to me?

Direct - Risse

1   *A.*   I was told I don't represent the department and I should

2   not be talking to you, yes, that's correct.

3        *MR. FALB:*   Just one moment, Your Honor.

4        *THE COURT:*   Sure.

5   **(Off the record)**

6                          *   *   *   *

7        *MS. GUNDERSON:*   Your Honor, I would ask leave to

8   perform the cross-examination since this is within my

9   dealings with Mr. Risse.

10       *THE COURT:*   Are you done?  I thought you were

11  asking for a minute.  I think he was asking for a minute.  I

12  know you're anxious to cross, but --

13       *MR. FALB:*   Thank you, Your Honor.

14       *THE COURT:*   You're welcome.  You can cross.

15                    **CROSS-EXAMINATION**

16                **QUESTIONS BY MS. GUNDERSON:**

17  *Q.*   Good afternoon, Mr. Risse.  We've talked now -- this

18  will be the fourth time, correct?

19  *A.*   I believe so.

20  *Q.*   The first time that we spoke was at Centralia

21  Correctional Center, correct?

22  *A.*   Yes.

23  *Q.*   You're not aware of who else I interviewed that day, are

24  you, sir?

25  *A.*   I don't think so.  I don't know.

                          Cross - Risse

1    Q.  And when I met with you I told you --

2    A.  I think you had met with several counselors that day.

3    Q.  You're aware I met with several, correct?

4    A.  That's correct.

5    Q.  When I met with you I told you that there had been a

6    lawsuit filed, correct?

7    A.  I don't know if you told me that or not.  You may have.

8    Q.  I told you that I was there because Betty Cook had filed

9    a lawsuit, correct?

10   A.  That may be correct.

11   Q.  And we talked about what those allegations were about,

12   the age discrimination, correct?

13   A.  You might have went into that.  I think it was a pretty

14   contentious first meeting.  I can't remember the nature of

15   everything, but I believe you covered the basics, yes.

16   Q.  You didn't tell me that you wanted to leave at any point

17   during that meeting, did you?

18   A.  Would I have the option?

19   Q.  You did not tell me that you wanted to leave?

20   A.  I would not -- I didn't tell you that I wanted to leave

21   because I feel like I would have not had the option.  I was

22   ordered to go in there by the warden, and that's called

23   insubordination if I don't cooperate with you as the

24   Attorney General, so --

25   Q.  I'm not asking you if you were wanting to not cooperate.

                          Cross - Risse

```
 1   What I'm asking you is:  You didn't tell me that you didn't
 2   want to meet with me and that you wanted to leave, did you,
 3   sir?
 4   A.  Why would I do that?
 5   Q.  You didn't do it, did you, sir?
 6   A.  No, I did not.
 7   Q.  Let's talk about what I told you about talking with
 8   Mr. Falb.  When we were talking about that, I told you that
 9   Ms. Cook was the plaintiff in a lawsuit, correct?
10   Q.  And I told you that she was represented by counsel,
11   correct?
12   A.  I don't know if you said that or not.
13   Q.  Well, you told me during that conversation that you had
14   already talked to Mr. Falb, isn't that correct?
15   A.  So you're telling me that you informed me of a lawsuit
16   that I should have already been aware of because I talked to
17   him.  That's kind of inconsistent.
18   Q.  Sir, I'm asking you questions about what we discussed.
19   You told me during our first meeting that you had talked
20   with plaintiff's counsel, didn't you?
21   A.  I don't think so.  I think I think he was there that
22   day, and I -- I don't even think I talked to the guy.
23   Q.  Okay.
24   A.  So no, I mean I don't believe so.  I'm not sure.  But if
25   you're saying I talked to him, then what was your need to
```

Cross - Risse

 1  inform me of the lawsuit if I talked to him?

 2  *Q.*  I told you because Ms. Cook was represented by counsel

 3  that you could not contact her directly because you work for

 4  the Department of Corrections?

 5  *A.*  You told me I could not speak with him because I could

 6  be disciplined because I worked for the state.

 7  *Q.*  I told you that, as a Department of Corrections

 8  employee, if you were to contact Ms. Cook directly, it could

 9  look as if there was inappropriate contact with the

10  represented person, didn't I, sir?

11  *A.*  Or her counsel, which is also what you stated.

12  *Q.*  Now, I also asked you -- we met a week ago too, didn't

13  we?

14  *A.*  Yes, we did.  I brought a union rep in.

15  *Q.*  There was no objection to that union rep?

16  *A.*  I needed one, obviously, because apparently we can't get

17  our conversation straight.

18  *Q.*  There was no objection to that union rep being there,

19  sir, was there?

20  *A.*  No.  And again, you know, I don't know, if you would

21  have kicked him out, if I would have had to stay.  I think

22  so, because my warden gave me a direct order to talk to you.

23  *Q.*  I didn't kick out that union rep?

24  *A.*  No.

25  *Q.*  I didn't ask him to leave at any time?

Cross - Risse

 1   A.  No, but I didn't have one the first time.

 2   Q.  And there was no objection to him being there a week

 3   ago?

 4   A.  No.

 5   Q.  I told you at that time that you were being called as a

 6   witness for the plaintiff in this lawsuit, didn't I, sir?

 7   A.  Yes, you did.

 8   Q.  I told you at that time, when you asked me about the

 9   subpoena, that you weren't being subpoenaed because you were

10   being provided as a witness as a courtesy by the department,

11   didn't I, sir?

12   A.  I asked if there was a subpoena because I didn't want to

13   testify in this court case.

14   Q.  You didn't tell me that you didn't want to testify

15   without a subpoena, did you, sir?

16   A.  I think I did say that.  No one wants to come to court

17   and have their job be at jeopardy because usually when you

18   come to court and you're testifying against an employer it's

19   not going to go well for you, so I think we did talk about

20   that, yes.

21   Q.  You asked me if you needed a subpoena, didn't you?

22   A.  I said I wanted to see the subpoena because, even though

23   I felt like she was done wrong, that doesn't mean that I

24   want to be a part of it because it's not a good position to

25   be in.

                              Cross - Risse

1   Q.  I told you that you didn't have to have a subpoena

2   because you were --

3   A.  You told me the rationale was as to why there was no

4   subpoena with my name on it, that's correct.

5   Q.  I told you you didn't have to take personal time, right?

6   A.  Yes.

7   Q.  You didn't have to take any benefit time; it was just as

8   if you were here for your job?

9   A.  That's what you told me, that's correct.

10  Q.  I told you that you'd get mileage, right, if you had to

11  use anything other than a state vehicle to get here?

12  A.  You may have said that, yes.

13  Q.  You made a request to me that I let your warden know

14  that you cooperated, didn't you?

15  A.  I did ask you to do that, absolutely.

16  Q.  I told you that I would make that --

17  A.  Yeah, and that was because of the nature of the e-mail

18  that was sent where I said that I did not know that I was

19  subpoenaed and I prefer to talk to you over the phone, and

20  then you or someone else forwarded that to my warden and

21  then it made it look like I was being discourteous to you,

22  which is not the case.

23  Q.  Well, you got that e-mail that was forwarded to the

24  warden, right?

25  A.  Oh, yeah, because he called me to his office and I told

Cross - Risse

1    him basically the gist of it.

2    Q.  So you saw that it was forward by the Administrative

3    Assistant at Centralia, right?

4    A.  To you or to the warden, yeah.  Regardless, it was

5    forwarded to the warden.  He gave me a direct order to go,

6    yes.

7    Q.  Okay.  You didn't see any communications from me about

8    your appearance there, did you, sir?

9    A.  I can't recall.  I just remember thinking I didn't want

10   to come see you guys again.

11   Q.  So it would surprise you to know that I said you could

12   appear by video if --

13   A.  You did say that, but the warden gave me a direct order

14   to come and talk to you.

15   Q.  You talked a little bit about us discussing Ms. Cook's

16   grievances at that very first meeting, didn't you, sir?

17   A.  I believe I did.

18   Q.  Does that refresh your recollection about whether we

19   talked about Ms. Cook at that first meeting?

20   A.  When did I say that we didn't?  Obviously if you called

21   me in there, we probably discussed her, I would assume.

22   Q.  Okay.  So you now agree with me that we did discuss --

23   A.  I don't think I disagreed with you.

24   Q.  Then let's start here.

25   A.  I don't know where we're going with this.  If you called

                        Cross - Risse

1    me into a meeting to discuss a lawsuit that was involving

2    Ms. Cook, I'm sure we discussed Ms. Cook.

3    Q.   Okay.  So during that first meeting when we talked about

4    the lawsuit that was filed by Ms. Cook, you said that you

5    knew a result of her grievances, right?

6    A.   I said I was privy to the fact that some of the union

7    people had mentioned that she had won her discipline back.

8    You stated you were not aware of grievances.  You left the

9    room, you talked to somebody for 15 minutes and came back,

10   and then we discussed further, not just the grievances, but

11   issues surrounding her case.

12   Q.   Around her lawsuit case, right, her age discrimination

13   case, right.  That's what we were talking about, right?

14   A.   Yes.

15   Q.   You weren't outside -- you didn't come outside with me

16   during those 15 minutes, did you, sir?

17   A.   Not that I'm aware of.

18   Q.   You don't know who I was talking with, do you, sir?

19   A.   You went into Michelle Taphorn's office.

20   Q.   You don't know who was in there, do you, sir?

21   A.   No, but when I mentioned the grievances and then you

22   left, any reasonable person would assume, well, they're

23   following up on what was just stated, unless --

24   Q.   So any testimony you have here today, sir, about what I

25   was talking about in those 15 minutes is an assumption,

Cross - Risse

 1   correct?

 2   A.   It is an assumption, absolutely.

 3   Q.   When your keys went missing, you reported them to the

 4   institution as missing, didn't you, sir?

 5   A.   I reported them as I didn't know where they were, but

 6   then Kathy came up and said, *Here they are.*

 7   Q.   You made a formal report to the institution that you

 8   didn't know where your keys were?

 9   A.   I did, but my --

10   Q.   Talk to me about what happens when someone at the

11   institution loses their keys.

12   A.   You know, I'm not a hundred percent sure because the

13   truth is I was -- we were overwhelmed, under-staffed, and I

14   was exhausted.

15   Q.   When did you say you started working for Department of

16   Corrections?

17   A.   '99.

18   Q.   And when did -- you transferred to Centralia in, what,

19   2007?

20   A.   Seven, that's correct.

21   Q.   Did you lose your -- was that the time that you lost

22   your keys?  Was that during when Ms. Cook was there?

23   A.   I don't know if she was there or not.  I just remember

24   it was before I talked to you.

25   Q.   When were your evaluations due?


                         Cross - Risse

1   *A.*  You know, they're done yearly, and all of them I have,

2   all my evaluations are good.

3   *Q.*  What's your date?  You have one date every year that you

4   have your evaluations done, right?  There's like a

5   month-to-month?

6   *A.*  I think it's somewhere around September.  You know,

7   it's -- all these issues are, you know, not really important

8   to me except for when somebody steps in and lowers them

9   that's not my supervisor.

10  *Q.*  So that evaluation probably would have been done

11  September of 2008, correct?

12  *A.*  I would assume somewhere around that time, that's

13  correct.

14  *Q.*  Do you know when Ms. Cook filed her lawsuit?

15  *A.*  No, I don't.

16  *Q.*  Would it surprise you that she filed it in 2009?

17  *A.*  No.  I mean I don't know.

18  *Q.*  Let's talk about the keys.

19  *A.*  Okay.

20  *Q.*  The incident with the keys, that happened prior to your

21  2008 evaluation, right?

22  *A.*  Yes.

23  *Q.*  Okay.  So by that point you had been working for the

24  Department of Corrections since, I think you said 1999?

25  *A.*  Right.

Cross - Risse

 1  *Q.*  So about what is that, nine years?

 2  *A.*  Right.

 3  *Q.*  Are you telling me that you don't know what happens to

 4  an employee at the Department of Corrections when they lose

 5  their keys?

 6  *A.*  I didn't lose my keys.  You keep saying that.

 7  *Q.*  I'm not saying you did.  I'm asking you:  What happens

 8  to an employee of the Department of Corrections when they

 9  lose their keys?

10  *A.*  I wouldn't know because I didn't lose my keys.  My

11  discipline was expunged.

12  *Q.*  You have no knowledge as to whether or not it's okay to

13  lose your keys?

14  *A.*  I'm sure it's not.  In 12 years that was the only

15  discipline I had, and it was expunged.

16  *Q.*  It's your testimony here today that, based upon your

17  experience in the Department of Corrections, you have no

18  idea whether losing your keys is a disciplinary type of

19  offense?

20  *A.*  I'm sure it's a disciplinary type of offense, sure, but

21  why -- they expunged it then because they weren't lost.

22  *Q.*  You would have known that when you made the report,

23  right?

24  *A.*  Well, they expunged the discipline.  We keep going over

25  that again.  So obviously they felt that I didn't lose my

Cross - Risse

```
 1    keys.  Another employee had the keys that had access to the
 2    LAN office; therefore, the grievance committee felt like not
 3    only was that -- by the way, not only was that grievance
 4    expunged, but then also the grievance I won on my
 5    evaluation, so on both points you're wrong.
 6    Q.  When you say they expunged, you mean that it was
 7    expunged pursuant to a grievance resolution, correct?
 8    A.  That's correct.
 9    Q.  The grievance process, the way it works is that if it's
10    not resolved at the institution, it goes to third level,
11    isn't that correct?
12    A.  That's correct, so --
13    Q.  That third level, there is representatives from the
14    department and from the union and they negotiate settlement
15    if that's possible, isn't that correct?
16    A.  Correct.
17    Q.  And you're not present for those meetings, are you, sir?
18    A.  I'm not present for them.
19    Q.  You don't know what's said at those meetings, do you,
20    sir?  You have no firsthand knowledge of what is said?
21    A.  No, I don't.  I just know that they expunged it.  I know
22    that they reduced it and expunged it.
23    Q.  You were -- you did get some training for your job, is
24    that correct?
25    A.  Yeah, I got training for my job.
```

                              Cross - Risse

1    *Q.*  You have any problems with Ty Bates as your supervisor?

2    *A.*  No.

3    *Q.*  Ms. Cook never expressed any dislike for Mr. Bates to

4  you, did she?

5    *A.*  Not that I'm aware of.

6    *Q.*  You never observed Mr. Bates harrass Ms. Cook, did you,

7  sir?

8    *A.*  Not that I'm aware of.

9    *Q.*  You'd be aware of it if you saw it, wouldn't you?

10   *A.*  Not necessarily because what's harassment to one person

11 may or may not be harrassment to another.  For instance, if

12 somebody says a coarse joke, it may offend you but it may

13 not offend me so, therefore, if you're asking me if I could

14 look at someone and discern whether somebody was

15 particularly offended or harrassed in a situation, you're

16 just wrong.

17   *Q.*  You never heard Ty Bates tell Ms. Cook he thought she

18 should retire, did you, sir?

19   *A.*  No.

20   *Q.*  You never heard Ty Bates ask Ms. Cook if she should

21 retire, did you, sir?

22   *A.*  No.

23   *Q.*  You never heard Ty Bates ask Ms. Cook her age, did you,

24 sir?

25   *A.*  He may have.  I'm not sure.

Cross - Risse

1  *Q.  Do you have recollection of Ty Bates ever asking*

2  *Ms. Cook her age?*

3  *A.  I think he might have in relation to when she was going*

4  *to retire or -- people talking about when people are going*

5  *to retire all the time.  I just don't want to be inaccurate*

6  *in it, so --*

7  *Q.  You don't know whether that conversation with Ty Bates*

8  *happened, do you, sir?*

9  *A.  What conversation?*

10 *Q.  The one where you said you think he might have talked to*

11 *her about --*

12 *A.  He came into the office all the time and said -- would*

13 *ask, When are you retiring, Sena or Betty?  I didn't*

14 *consider it harassment, no.*

15 *Q.  Ms. Cook certainly never complained to you about that,*

16 *did she, sir?*

17 *A.  No.  Since you brought it up, when I left your office I*

18 *got back to Lawrence and there was a disciplinary packet*

19 *waiting on me.  And it's of no surprise to me because I*

20 *think I told you, and I think I told you on several*

21 *occasions that I was not going to be a witness for the*

22 *state, and the charges are baseless.  Charges are baseless.*

23 *So my hearing -- and I've already -- I'm going to file*

24 *something against the -- against you with the Office of*

25 *Inspector General, since you brought it up, and I've already*

Cross - Risse

1    filed an emergency grievance based upon that fact.  If you

2    work for the state it's very typical that you may be

3    harrassed or gone after in a situation.

4    *Q.*  I would know.  I do.

5    *A.*  You would know, you do what?

6    *Q.*  I work for the state.

7    *A.*  So you would be aware that people get disciplined or

8    people get harrassed when they're going to give testimony is

9    what you just stated.

10   *Q.*  I was being jovial with you, and I apologize, but my

11   question --

12   *A.*  Your being jubilant with me when you're asking about

13   discipline that is false and baseless, I find in bad taste.

14   That might be something some people would consider to be

15   harassment, exactly what we were just discussing.  It's

16   perception, correct?

17   *Q.*  To get back to my question, you're facing discipline

18   right now, aren't you, sir?

19   *A.*  No.  I have a disciplinary hearing with charges that are

20   baseless, correct.  And it was -- you know when it was

21   delivered to me?  When I got back to the facility after I

22   just got done talking to you, and I was in there with a

23   union rep telling you some things about the case.  And how

24   did you become aware of my discipline?  Since you're an

25   Attorney General, you work for the Attorney General's

Cross - Risse

 1   office, how are you aware of what is happening

 2   inter-departmentally with the Department of Corrections if

 3   you weren't involved?

 4   *Q.*  Your discipline has to do with actions that you

 5   allegedly took while working at the department, correct?

 6   *A.*  Where did you become aware of discipline that I may or

 7   may not receive?

 8        *THE COURT:*  The way this works is, she asks

 9   questions, you answer the questions.

10        *THE WITNESS:*  I'm sorry, sir.

11   *Q. (By Ms. Gunderson)*  Do you need me to repeat the question?

12   *A.*  Sure.

13   *Q.*  The referral that we've been referring to has to do with

14   conduct that you allegedly engaged in while working for the

15   department, correct?

16   *A.*  Not really, no, because you're not aware of -- do you

17   have my disciplinary packet?

18   *Q.*  The conduct that you're alleged to have done has to do

19   with socialization, correct?

20   *A.*  But I have an e-mail from the director's office telling

21   me to contact this person, and that was not included in my

22   packet, by the way.  So the disciplinary packet that you're

23   referring to -- when I received a disciplinary packet it

24   talked about socialization.  Socialization -- what I did was

25   invite somebody to do a documentary.  It was approved, the

                        Cross - Risse

```
 1   director's office, through the chief of media relations, and
 2   it was produced through our warden.  Okay.  So that e-mail
 3   that she is referencing and we're talking about was not
 4   included in my disciplinary packet.  So when the
 5   investigator came to ask me questions about this particular
 6   socialization issue, I gave him the e-mail and he said that
 7   should clear it up.  That was five-and-a-half months ago.
 8   Thursday when I received an e-mail and said I didn't want to
 9   talk to the Attorney General's office --
10          MS. GUNDERSON:  Your Honor, I would object to the
11   witness's nonresponsive, move to strike.
12          THE COURT:  Sustained.  Just answer the question
13   asked, please.
14   Q. (By Ms. Gunderson)  The referral has to do with
15   socialization, doesn't it, sir?
16   A.  It does.
17   Q.  Socialization is a dischargeable offense, is it not?
18   A.  Only when you did it, but I didn't, so it's not.
19          MS. GUNDERSON:  No further questions.
20          THE COURT:  Any redirect?
21          MR. FALB:  Yes, Your Honor.
22                    REDIRECT EXAMINATION
23                  QUESTIONS BY MR. FALB:
24   Q.  So last week and the week before you had communication
25   with the Attorney General's office, did you not?
```

1  *A.*  Yes.

2  *Q.*  And you told them the truth?

3  *A.*  Yes, I did.

4  *Q.*  Okay.

5  *A.*  And I've been -- my testimony's been consistent for 14

6  months from the first contact, maybe 15 months from the

7  first contact I had with the Attorney General's office.

8  This disciplinary action that they're talking about was

9  handed to me on Wednesday, so this testimony I'm giving

10  today is completely consistent with the testimony that I've

11  been giving for 15 months.  If she was to try to say that my

12  testimony had been altered because of the fact that they

13  just handed me this disciplinary packet when I returned home

14  after talking to her saying I wasn't going to cooperate with

15  her, then maybe that charge would have some type of basis in

16  fact.  But for 15 months I've been saying what I've been

17  saying.

18      And again, the union is bringing in an attorney because

19  of the fact that the investigator left out the e-mail where

20  I had permission to talk to this person.  So pretty

21  intriguing, they said they had never seen anything like it,

22  and the e-mail where the chief of media relations, my

23  warden, and the deputy director was on there, several other

24  people said, *Please proceed with this in September*, and so I

25  was given permission to do what I did.  And when they

Redirect - Risse

 1   investigated it, and I gave them the e-mail, he said that

 2   clears that up, left.  And then I get a referral the day

 3   that I leave the Attorney General's office and told them

 4   that I probably wasn't going to be the best witness for

 5   them.

 6       At the same time though I did say I didn't want to

 7   testify on your behalf either.  I didn't want to be involved

 8   in the whole case.  And I do believe that being involved in

 9   telling them what I have been telling them over the previous

10   15 months got my 201 lowered, got my discipline, you know,

11   situation.  So I'll probably be in another situation where I

12   have to get some discipline expunged that's erroneous.

13   *Q.*  Let me ask you this:  The key incident in the lowering

14   of your evaluation, there was talk about being in 2008.

15   Could that have been in 2010?

16   *A.*  What's that, the key?

17   *Q.*  Yeah.

18   *A.*  The key incident was -- no, it wasn't in 2010, I don't

19   think.  I might have my timelines --

20   *Q.*  When did you first talk to me by telephone?

21   *A.*  I can't remember.

22   *Q.*  Okay.  When did you talk to them for the first time?

23   Was it last summer?

24   *A.*  It's -- no.  I've been at Lawrence now for 14 months and

25   I probably talked to her six months before that, so it had

Redirect - Risse

 1   to be, you know, 20 months ago.

 2   Q.  Okay.

 3   A.  And just to -- again, it is very awkward to me that the

 4   Attorney General's office is at all aware of any

 5   disciplinary hearings that are -- I'm not aware of what's

 6   going on with the Attorney General's office, yet she's aware

 7   of what's going on in the Department of Corrections.  That's

 8   just very odd, and it's collusion to me.

 9   Q.  Let me ask you -- this the jury may be wondering:  Is it

10   possible that these things go on with the Illinois

11   Department of Corrections?

12   A.  They go on all the time.

13   Q.  What do you mean?

14   A.  People get disciplined, referred, investigated all the

15   time.  It's a snakepit and it's just the way that it is.

16   And throughout my career I've seen a lot of people's careers

17   destroyed, families destroyed, lives destroyed, just like

18   Betty's, just like they're trying to do to me, just like

19   they've done to several other people.

20       And again, it's very disingenuous for her to get up here

21   and make it appear as if my testimony has changed over the

22   past 15 months because that's just not the case.  And the

23   interesting part about it is the fact that she mentions that

24   I'm up for discipline when she told me that I could get in

25   trouble for talking to you is of no coincidence to me

                         Redirect - Risse

1   because that was told to me about 16 months ago, possibly

2   further.  I don't remember the date, but the date that you

3   did the depositions with Billy Jo Bryan, Mark Beckman and

4   others, that's the date she called me in because she

5   mentioned the fact that she just got done doing depositions

6   with you, and that's when she told me I could get in trouble

7   because she said, *You're providing information to plaintiff*

8   *attorney, you don't represent them, and you could be*

9   *disciplined.*

10  *Q.*  Was it after that that your evaluation went down?

11  *A.*  It was after that my evaluation was down and it was also

12  after that that this discipline that she shouldn't know

13  about, for some reason she knows about, and it's also --

14  it's a charge; it's not pending discipline.  And it's

15  slanderous what you said, those questions, because it's

16  baseless.

17  *Q.*  Socialization, is that fraternization?

18  *A.*  Socialization typically is related to, you run a

19  business with an inmate or you do something along those

20  lines.  What I did was invite an award-winning documentarian

21  in.  As a matter of fact, this documentary that I'm

22  referring to is up for an Academy Award with the director of

23  "Hoop Dreams", and what he wanted to do was a documentary on

24  how the department has changed throughout the years and how

25  we were doing some programs, and in particular, specifically

                        Redirect - Risse

```
 1   how we talked about the programs that I had done.  He wanted
 2   to be involved in a documentary at Lawrence, which was
 3   approved by the warden, it was approved by the deputy
 4   director, it was approved by the chief of media relations.
 5   And like I said, when I was asked about it I provided those
 6   e-mails where it showed that I had approval to do the things
 7   that I did, and when I received my packet after leaving the
 8   Attorney General's office, all those e-mails were left out.
 9   Q.  Throughout the Department of Corrections in the State of
10   Illinois, is the Department of Corrections basically run by
11   whoever's governor?
12   A.  Yes.
13           MR. FALB:  Thank you.
14           THE COURT:  Additional cross?
15           MS. GUNDERSON:  No.  I'm done.
16           THE COURT:  Ladies and gentlemen of the jury, any
17   questions?
18           Thanks, Mr. Risse.  You can step down.  Call your
19   next witness, please.
20           MS. CHOATE:  Your Honor, could we take about a
21   ten-minute break.
22           THE COURT:  Okay.  Go ahead and take a break,
23   folks.  Same admonishments as before.
24       (Jury out)
25       (Break)

                      Redirect - Risse
```

1       *(Jury in)*

2                ALAN SANNER, PLAINTIFF'S WITNESS, SWORN

3                          DIRECT EXAMINATION

4                      QUESTIONS BY MR. FALB:

5   Q.   State your name, please.

6   A.   My name's Alan Sanner.

7   Q.   And Mr. Sanner, where do you live?   Just what town?

8   A.   Centralia, Illinois.

9   Q.   Sir, did you work for the Illinois Department of

10  Corrections at one time?

11  A.   Yes, I did.

12  Q.   And when did you leave the Illinois Department of

13  Corrections?

14  A.   April 1st of 2006.

15  Q.   How old were you at the time?

16  A.   50.

17  Q.   Okay.  And when did you start for the Illinois

18  Department of Corrections?

19  A.   In September of 1980.

20  Q.   And were you a correctional officer initially?

21  A.   Yes, I was.

22  Q.   Can you just tell me very briefly what your career was

23  before going into counseling.

24  A.   I was a correctional officer for 13 years, and then I

25  went back to school and got my -- finished my degree and

                          Direct - Sanner

1    started my -- I was promoted then to Counselor II, and that

2    was in June of '93.

3    Q.   Okay.  And then at some point in time did you become a

4    Counselor III?

5    A.   I did.

6    Q.   When was that?

7    A.   I've not positive on the dates but it was -- Jerry Netzu

8    (sic.) was the Counselor III before me, left in the buy-out

9    of 2002, and it was shortly after that that I was named the

10   Counselor III.

11   Q.   All right.  And when you retired were you a

12   Counselor III?

13   A.   I was.

14   Q.   And just briefly, in 2002 there was a buy-out where lots

15   of counselors left early?

16   A.   Correct.

17   Q.   Okay.  And did that reduce the counseling manpower in

18   your department?

19   A.   Greatly.

20   Q.   From what to what?

21   A.   We had twelve counselors and we had two case work

22   supervisors and then a clinical services supervisor, so 15

23   total in the department.  After the buy-out of 2002, that

24   was reduced to no clinical services supervisor, no case work

25   supervisors, six counselors.

Direct - Sanner

1    Q.   Okay.  And you were --

2    A.   Six counselors total for the department.

3    Q.   Were you sort of like the lead person or not?

4    A.   When it fit the -- I guess because of my Counselor III

5    status, yes.

6    Q.   Mr. Sanner, I apologize, I may have some of these

7    numbers wrong, especially with you.  Is this what it looked

8    like when you retired as far as the counselors?

9    A.   When I retired?

10   Q.   Yes.

11   A.   No.  That's incorrect.

12   Q.   All right.  As I understand it, you're at the top with

13   Counselor III, and your age I have as 51.  I apologize.

14   Should that be 50?

15   A.   I was 50 when I left.

16   Q.   Okay.  My apologies.

17   A.   That's fine.

18   Q.   This is how it appeared in February of 2005.  Does that

19   sound right?

20   A.   Oh, February of 2005.  Let's see.  That is correct for

21   February 2005, yes.

22   Q.   All right.  And then in 2005, in October, two counselors

23   left?

24   A.   Correct.

25   Q.   And that would have been Alemond and Keck?

Direct - Sanner

1   A.   Cindy Keck, correct.

2   Q.   And then when you left, it was in March?

3   A.   March 17th was my -- official retirement date was

4   April 1st.  The last official day at work was March 17th.

5   Q.   So six months after they left, you left?

6   A.   That's correct.

7   Q.   And who left with you at that time?

8   A.   Well, I retired.  Counselor Ballantini and Counselor

9   Loepker left to go take a position with parole.

10  Q.   So that left Cook, Landreth and Feazel?

11  A.   Yes.

12  Q.   All right.  And looks like -- well, let me ask you this:

13  When you retired at that age, was it your plan to retire at

14  age 50?

15  A.   That's a difficult question to answer.  I'll say why.

16  It wasn't my initial plan to retire at that time.  It

17  just -- because of the situation within the department at

18  that particular time it kind of forced my hand to make that

19  decision to leave.

20  Q.   Okay.  Did you have any, call it interaction or

21  conflicts with the Assistant Warden Casey during this period

22  of time?

23  A.   It was a difficult relationship working for Ms. Casey,

24  yes.

25  Q.   And in fact, at one time did you come into the office

Direct - Sanner

1   and your desk was moved to a different spot one morning?

2   A.  Well, you have to understand, when you say "office",

3   there was the correctional office up front, the

4   administration building, which is where all the counselors

5   congregated.  My -- that was our work area.  But as a

6   Counselor III, my job was to do orientation, intake of new

7   inmates, and we had an office set aside to do that work down

8   in the receiving unit, which is a housing unit.  That is the

9   unit that inmates are brought when they're bussed into the

10  institution before they're assessed, and that was my job to

11  do the assessments and determine and work with placement

12  office on where they would be moved out in the general

13  population.  So that is the office of which you're referring

14  to.

15      And yes, I came into work one morning at 7:00 because

16  for Counselor III you had to get started at 7:00 to -- it

17  worked out better with counts to start that process at

18  seven.  The other counselors came in at 8:00.  I went down

19  there to report to start the work day and everything in the

20  office had been removed.

21  Q.  Did anyone warn you that was going to happen?

22  A.  Didn't have -- no, didn't have --

23  Q.  Did you learn Ann Casey had that done?

24  A.  Yes.

25  Q.  And what happened?

Direct - Sanner

A.   Well, I'm not sure what all happened behind the scenes.
I can tell you I had to wait until 8:00 until she got there,
until everybody else got there to find out what was going
on.  I was -- she told me at that point that she wanted me
to do orientation at the chapel, and then once security
found out --
Q.   In the chapel?
A.   In the chapel.  It's a separate building within the
institution.  And once security found out that that was the
plan, they had problems with that because it interfered --
the process you go through in the morning, not only do you
fill out paperwork, but when you're done with the paperwork
in the receiving building then you had to send the inmates
off to get -- to the clothing room, personal property.
Sometimes you had to send them to the healthcare.  We try to
get all of that taken care of before 9:30 count.  And we
could control count as long as we had -- sometimes count
interfered with whatever the inmates were in the clothing
office or, you know, we would count them in clothing office
or in the healthcare unit.
     But the chapel at that time, also we conducted our
prestart program over there, and so it just wasn't going to
work.  And I don't know exactly what happened but I know
that it was nixed pretty quickly.  But I was left to try and
find all of my materials to bring -- and then it was up to

Direct - Sanner

 1    me then to locate everything and bring it back over and get

 2    the office set back up.

 3    Q.   Prior to the change of administrations did you have -- I

 4    know you were working hard, you had a small group.  Did you

 5    have a good nucleus of people working?

 6    A.   Excellent.  I was very proud of the work that we -- our

 7    nucleus from 2002 until through, I was very proud of the

 8    work that we did, yes.

 9    Q.   And by March or April 2006, that nucleus --

10    A.   It started to unravel during 2005.

11    Q.   And was that nucleus gone?

12    A.   Well, the nucleus being, you know, with myself and

13    Tony Ballantini and Sena Landreth, Cindy Keck, Pam Alemond,

14    Terri Loepker.

15    Q.   They were all gone except for Sena Landreth?

16    A.   Yes.  Well, after I left.  After.

17    Q.   That's what I'm talking about.

18    A.   The day that I left and Tony and Terri left, yes.

19            MR. FALB:  Thank you.

20            THE COURT:  Cross?

21                    **CROSS-EXAMINATION**

22                **QUESTIONS BY MS. CHOATE:**

23    Q.   Hello, Mr. Sanner.

24    A.   Yes.

25    Q.   As a Counselor III did you have different duties than

                          Cross - Sanner

1    the other counselors?

2    A.   Well, the way the Counselor III position was set up at

3    Centralia, as well as I think other institutions, they were

4    mainly -- let me try -- before 2002 when everybody left, the

5    Counselor III primarily was the orientation counselor.  Now,

6    after 2002 buy-out, the reduction in staff, then there were

7    duties that were put on the Counselor III position.  I also

8    had to carry a caseload, which was not required prior to

9    that, because 1500 inmates and there's six counselors to try

10   and juggle all that.  You had to have orientation taken care

11   of every day and segregation had to be taken care of every

12   day, you had field service that had to be taken care of

13   every day, so everybody had to -- the duties increased

14   tremendously, yes.

15   Q.   You talked about the buy-out.  Was that -- what year was

16   that?

17   A.   2002.

18   Q.   And how did that work?

19   A.   Well, the state offered an early incentive plan for

20   people to retire, and so there were a number of people that

21   were eligible to take advantage of that, and they --

22   Department of Corrections, it's a difficult job.  It's a

23   very difficult job, and for people who have been in that

24   position for 25, 30 years, and they have the opportunity to

25   leave, do so.


                           Cross - Sanner

1   Q.  Was it your understanding that anyone was forced out by

2   the department during that buy-out?

3   A.  No, not that I -- no.

4   Q.  It was a voluntary thing?

5   A.  It was voluntary, yes.

6   Q.  Just left you in kind of a pickle, right?

7   A.  Yes.  It was difficult to understand during the --

8   particularly after a year or two it was difficult to

9   understand why they would leave our institution in such a

10  situation as to -- why would they reduce our staff from 15

11  to six and not give us any help?  That was difficult for us

12  to understand.

13  Q.  Right.  You were asked about Gina Feazel, if you worked

14  with her?

15  A.  Yes, I did.

16  Q.  What did you think of her work as a counselor?

17          MR. FALB:  Objection, outside the scope.  I didn't

18  ask about that.

19          THE COURT:  I'll overrule.  You can answer.

20          THE WITNESS:  My experience with Gina was that she

21  was a very competent individual.  Now, she had just come

22  into the department shortly before I left.  I'm not sure

23  exactly when she came in as a counselor, but my experience

24  with her was that she was very competent in what she did.

25  Q. (By Ms. Choate)  And as a supervisor you were able to

                        Cross - Sanner

1    observe her work?

2    A.  Yes, to a degree.  Now, when you say "supervisor",

3    that's a little -- because we did not have actual case work

4    supervisors and clinical services supervisors.  And I don't

5    remember all the dates but we used TA's a lot -- temporarily

6    assigned -- and so we rotated that.  And so I know Cindy and

7    Pam and Terri and I rotated the case work supervisor

8    temporarily as a TA.  Now, the duties were different as the

9    TA.  That way you would review the packets and it was the

10   check and balance system to make sure -- minimize mistakes.

11   Q.  And what do you mean by the packets?

12   A.  Transfer packets, funeral packets, furloughs, you had to

13   sign off on those.  Re-classes, anything that was

14   computer-generated you had to review that work and sign off

15   on it.  Then it goes to assistant warden for their signature

16   and ultimately after all the signatures it goes to the

17   warden for his signature.

18   Q.  And you were asked about -- or you also worked with

19   Bart Toennies at this time.  I think you were asked if you

20   worked with him?

21   A.  Yes, I worked with Bart.  Bart was temporarily assigned

22   at the time from Lawrence.

23        MR. FALB:  Object.  I didn't even ask about

24   Bart Toennies.

25        MS. CHOATE:  Counsel listed everyone he worked with

                          Cross - Sanner

```
 1   at the department during the time he was there.
 2              THE COURT:  I'll overrule.
 3              THE WITNESS:  I worked with Bart Toennies.  He was
 4   a TA at that time from Lawrence, and it was after I left
 5   then he was given a transfer.  He's an employee of Centralia
 6   Correctional Center at this time.
 7   Q. (By Ms. Choate)  Did you have an opportunity to observe his
 8   work?
 9   A.   Yes.
10   Q.   And what was your opinion of that?
11   A.   Bart was an excellent employee.
12   Q.   What about -- I think you talked about your core nucleus
13   that you had of people, correct?
14   A.   Yeah.
15   Q.   One of those was Tony Ballantini?
16   A.   Correct.
17   Q.   And you worked with him for quite a few years, is that
18   right?
19   A.   Yeah.
20   Q.   What was your opinion of his work?
21   A.   Tony was very competent.  I mean, very strong
22   personality but very competent.
23   Q.   So he was a good counselor?
24   A.   Yes.
25   Q.   You also said that Cindy Keck, I believe, was in your
```

Cross - Sanner

 1   core nucleus.  Now, her married name is Cagle now, right?

 2   A.  Yes, it is.

 3   Q.  Did you observe her work?

 4   A.  Yes, I did.

 5   Q.  What was your opinion of that?

 6   A.  Excellent.  Excellent employee.

 7   Q.  How about Pam Alemond?

 8   A.  Excellent employee.

 9   Q.  And Terri Loepker?

10   A.  Excellent.

11   Q.  You were also asked about Sena Landreth.  What about

12   her?

13   A.  Yes, excellent.

14   Q.  The one person you didn't list here in your core nucleus

15   was Betty Cook.  Did you have an opportunity to observe

16   Betty Cook's work?

17   A.  Yes, I did.

18   Q.  Did you draw an opinion of her work?

19   A.  Betty struggled.  Now, having said that, Betty was -- I

20   don't really remember exactly when Betty started as a

21   counselor, how much time she had actually had as a counselor

22   before I retired.  I like Betty personally but she struggled

23   in this position.

24   Q.  Would you consider Betty a good counselor at the time

25   you knew her?  And this is difficult.  I mean --

                          Cross - Sanner

1    *A.*  This is very difficult and -- as a counselor she was

2    weak.

3    *Q.*  Okay.  She started about the same time as Gina Feazel,

4    is that correct?

5    *A.*  I'm not -- it sounds about right but I'm not sure the

6    dates.  The reason that it's unclear is because there was so

7    much TA going on during the time that there was this six

8    nucleus counselors after the buy-out.  I'm trying to help

9    you paint a picture here as what was going on.

10        To give us some assistance, there was an agreement

11   between management and union to allow TA's, and so people

12   worked, TA'd into our department to give us assistance.

13   Now, that -- a TA, you would not give them a caseload.  They

14   didn't have the same responsibilities but they assisted us

15   by going and getting files or counting disciplinary reports

16   and reviewing the files and giving us information and that

17   sort of thing, and so there was a lot of TA going on within

18   the department, so Betty rotated through as a TA a couple of

19   times, as well as Gina, and so that's why it is a little

20   unclear to me in my memory as to when the TA ended and when

21   the actual assignment and promotion into counseling

22   occurred.

23   *Q.*  If you had to compare Gina with Betty, which of the two

24   would be the better counselor?

25   *A.*  Well, Gina picked it up rather -- Gina was very

Cross - Sanner

1    competent and she picked it up very quickly.  Counseling is

2    a difficult position.  I'm not saying it's an impossible

3    position.  What I'm saying to you is that I think anyone

4    coming in as a counselor, it is difficult to get a grasp, a

5    comfortable grasp on the job for at least six months

6    probably.  And you probably don't run into everything you're

7    going to run into for probably a year to two years before

8    you actually run into any -- every situation.

9    Q.  You were asked about Ann Casey, and it sounds like

10   you -- she was a difficult person to get along with, is that

11   fair assessment?

12   A.  That's fair.

13   Q.  Did you like her management style?

14   A.  No.

15   Q.  And did you have any indication that any of her actions

16   taken in regards to you or anybody in the counseling

17   department had anything to do with your age?

18   A.  No.  I just think that I'm not -- my assessment of Ann

19   was, I think she was intimidated by -- honestly, to be

20   blunt, I think she was intimidated by the knowledge and by

21   the work ethic that the core counseling group had.  Bear in

22   mind, we worked without any supervisors for three years plus

23   before she got there, and then within a year she just

24   decimated the entire department.

25   Q.  And by "decimating the department", what do you mean by

Cross - Sanner

1    that?

2    A.  We all left.

3    Q.  Do you believe that -- in your opinion, did you -- never

4    mind.  Strike that.

5    A.  Can I add to that?

6    Q.  Sure.

7    A.  Having said that, we all left on our own.  I'm not

8    saying anybody forced us out in any way.  We all came to our

9    conclusions.  The reason -- I'm the only one that retired

10   out of this group.  The other counselors, it was at that

11   time that parole was expanding, and so once that word got

12   out, Pam and Cindy were the ones who initially decided that

13   they just had had enough, and so they initially decided that

14   they were going to pursue that and get a grade and see if

15   they could get a position.

16       I remember in August or early September of '05, it was

17   in that period of time that I went down and had tried to

18   have a heart-to-heart with Assistant Warden Casey, and in

19   that conversation I told her that if she continued in this

20   style and this manner that my fear was that everyone would

21   leave, and the conversation did not -- it didn't go well.

22   Q.  Did you have -- was Warden Robert there when you were

23   there?

24   A.  Yes.

25   Q.  Did you have particular problems with Warden Robert?

Cross - Sanner

1   A.  Not at all.

2   Q.  You were asked about Ann Casey doing away with your

3   office down in the housing unit, right?

4   A.  I was asked about -- yes.

5   Q.  And you said at some point after apparently security

6   weighed in, the whole --

7   A.  That's my guess.  I don't know exactly what happened.

8   All I know is that I was given permission the following day

9   to get my office back in order.  So I don't know what

10  exactly happened.  My guess is security stepped in.

11  Q.  So somebody must have overruled Ann Casey?

12  A.  Correct.

13  Q.  Did you ever observe Ann Casey with interactions with

14  Betty?

15  A.  Well, Ann would come in the office and have interactions

16  with each of us from time to time, but when there was any

17  real -- as far as confrontations, most of the time she would

18  call -- that individual would go down to the office for

19  those types of confrontations, so I don't remember any ugly

20  confrontations taking place in front of me, no.

21  Q.  Okay.  Did Betty ever talk about retirement when you

22  were there?

23  A.  Yeah, we shared that.  We shared that dream.

24  Q.  The dream.  What did Betty say about retirement?

25  A.  Just looking forward, you know, just general chatter.

Cross - Sanner

```
 1    Talk picked up, you know, six months before I left, you
 2    know, once it became -- started to become a real temptation,
 3    a thought.
 4    Q.  Was it your impression from talking to Betty that she
 5    wanted to retire in four or five years?
 6           MR. FALB:  Objection, you know, impression or
 7    conclusion.
 8           THE COURT:  Well, based on something that she said,
 9    if you have that foundation, please lay the foundation.
10    Q. (By Ms. Choate)  Were you able to form -- from talking with
11    Betty were you able to form an opinion as to when you thought
12    Betty wanted to retire?
13    A.  My impression was that Betty was going to retire within
14    a year or two.
15           THE COURT:  You have to lay the foundation.
16           THE WITNESS:  Pardon me?
17    Q. (By Ms. Choate)  Did Betty talk to you about retirement?
18    A.  Yes.
19    Q.  And at the time Betty talked to you about retirement,
20    did she say when she wanted to retire?
21    A.  She didn't give a specific date, but -- I didn't give a
22    specific date until probably early February of '06.
23    Q.  From Betty's conversation with you, even though it
24    wasn't specific dates, were you able to form an opinion of
25    when you believed Betty intended to?
```

Cross - Sanner

1    A.   Yes.   The indication was that it would be within a year

2    or two.

3              MS. CHOATE:   Could I have just a minute, please?

4              THE COURT:   Sure.

5         **(Off the record)**

6                          *   *   *   *

7              MS. CHOATE:   Have nothing further.   Thank you.

8              THE COURT:   Redirect?

9              MR. FALB:   Thank you, Your Honor.

10                    **REDIRECT EXAMINATION**

11                    **QUESTIONS BY MR. FALB:**

12   Q.   As I understand it, whenever you were in the counseling

13   department, many people talked about retirement?

14   A.   That's true.

15   Q.   I mean everyone's dream to retire?

16   A.   That is correct.

17   Q.   And like you told the jury, you talked about your

18   retirement.   You never specified a certain date?

19   A.   That is correct.   Although I will say that most people

20   targeted -- you know, they did want to get their time in,

21   being 30 years, and that was what my -- that was what my

22   goal was.   And my specific reason for leaving was that

23   seeing the situation with my coworkers and everything

24   deteriorate so rapidly around me, and knowing that Tony and

25   Terri was walking out the door on March 17th -- at that time

                         Redirect - Sanner

1    I did not know if Bart Toennies was going to be permanently

2    assigned to Centralia.  That was up in the air.  So that

3    left, you know, Gina, Sena, and Betty and myself, if I had

4    chosen to stay.  And so I felt the fire around me increase

5    so-to-speak.

6        It had become such a -- my wife noticed my disposition

7    changing.  I had 25 great years in the Department of

8    Corrections.  I am very thankful for the career that the

9    Department of Corrections gave me.  And the last year was

10   simply overwhelming in a lot of ways, and I didn't see -- I

11   saw the situation getting worse after the 17th.  I didn't

12   have any concrete way of knowing that the situation would

13   get any better any time soon, and I had reached the point

14   where I was able to leave with the retirement check, and

15   that's the only reason I left.  I would have gladly, if -- I

16   would have gladly stayed if things had been different.

17   Q.  So as you sit here now, I mean trace yourself or putting

18   yourself back, if things had been different?

19   A.  I would have stayed.

20   Q.  Okay.  You, in fact, would have worked even past your

21   age of 50?

22   A.  Oh, yeah, I would have.  My ideal time to walk out would

23   have been December 31st of last year would have been the

24   ideal time to walk out.

25   Q.  How come?


                          Redirect - Sanner

```
 1  A.  Well, you maxed out your time.
 2  Q.  Okay.  That makes sense.  You were talking about
 3  Ann Casey and -- well, first of all, Warden Robert.  Did you
 4  have much contact with him whatsoever?
 5  A.  Not a lot of contact, but I didn't have -- I mean I --
 6  Warden Robert and I started -- I mean we had worked together
 7  as officers early on in his career and, you know, he came in
 8  and, you know, I only worked under Warden Robert for a year
 9  and four months.
10  Q.  Did you have contact with the previous warden?
11  A.  Yes.
12  Q.  What was the previous warden and assistant warden like?
13  A.  Warden Bowen was fantastic as a warden.  He was a great
14  people person.  He really nurtured his employees and cared
15  about his employees and went around and made a point to go
16  around and stay in touch with people.  And Warden Wisely, I
17  have to say, he maybe not wasn't the best -- as good of a
18  people person, but he was very good administrator and he was
19  very supportive of our staff.
20  Q.  Who was the warden, what was his name, that was so
21  great?
22  A.  Warden Bowen.
23  Q.  How do you know --
24  A.  B-O-W-E-N.
25  Q.  When did he leave?
```

Redirect - Sanner

 1    A.   I believe it was December.  They walked him out

 2    December 31st of 2004.

 3    Q.   What do you mean "they walked him out"?

 4    A.   They told him he was done.

 5    Q.   And was that with the change of administration?

 6    A.   State has a way of being cruel.

 7    Q.   I need to ask you about -- do you remember what job

 8    assignments my client had or Gina Feazel had initially?

 9    A.   Initially?

10    Q.   Yeah.

11    A.   No, I don't.

12    Q.   If you don't, that's fine.

13    A.   No.  I mean Betty was given a caseload so she had

14    housing units.  I don't remember.

15    Q.   Do you remember Gina being just given grievances

16    initially?

17    A.   I know at one point she had grievances.  I don't know if

18    that was initially what her --

19    Q.   You don't have access to all the assignments?

20    A.   No, I don't.  And you're counting on memory here, six,

21    seven years ago.

22    Q.   I understand.

23    A.   But Gina did have grievances at one time, yes.

24    Q.   After you retired, I assume you don't have any knowledge

25    as to what happened within the counseling department?

                          Redirect - Sanner

1   A.  No.  It's a funny thing.  When you leave there the way I

2   left and with the feelings I had, I quite simply tried to

3   forget it, so I really -- I'd run into people from time to

4   time and get caught up, but right now the majority of people

5   that I came through and had my career with have left.

6   Q.  And I think you told us in your deposition at some point

7   you did feel that Ann Casey was trying to run out the older

8   people?

9   A.  Well, I have no proof of that.  I just -- I don't know

10  what my assessment of that -- it felt like that at times,

11  but to say that that was her goal, I don't know.  Again, I

12  think that Ann was intimidated by the quality of staff and I

13  think that Ann wanted to make sure that we all knew that she

14  was boss.

15  Q.  Did she make a lot of derogatory remarks to your fellow

16  employees, including yourself?

17  A.  I think "derogatory" might be a little bit too strong of

18  a word.

19  Q.  What would you use?

20  A.  Ann had a way -- like I say, Ann's directives or the way

21  she changed people, tried to change how you did your job, it

22  was more through her directives than it was through her

23  speech, if that makes sense.  For instance, I gave the

24  example of emptying out my office.  She took Sena --

25  after -- you know, Sena was within a few years of

Redirect - Sanner

 1    retirement.  Sena had been our field services rep for over

 2    20 years and she decided that -- she moved Sena, so Sena had

 3    to re-learn an entire job that she didn't -- field services

 4    has nothing to do with what the other counselors did.

 5    Q.   That's for the parolees?

 6    A.   Yes.  It's release.  That's the release.

 7    Q.   I'm just letting the jury know.

 8    A.   Field services, she takes care of all the housing

 9    set-ups for the release of inmates, notifications to the

10    sheriff's departments about the inmates coming into their

11    area, finding housing for the sex offenders.  It's a

12    difficult job.  And I thought that Sena did that job very

13    well for over 20 years, and to move her I thought was cruel

14    and unfounded myself, but --

15    Q.   Who moved her?

16    A.   Again, I don't have -- Ann Casey was the supervisor, and

17    she was moved.

18    Q.   Okay.  And with the State of Illinois are there a lot of

19    things that are done that you don't know why or --

20    A.   Yeah.  I think you'll find that in any department in the

21    state.

22    Q.   And with the -- you mentioned that you could never

23    figure out why you were never given any supervisors?

24    A.   That was always a question because there were a lot

25    of -- you know, we communicate with other institutions, and

                        Redirect - Sanner

1    other institutions seemed to have a full staff, and why

2    Centralia was left with six counselors for such a long

3    period of time is -- but I think -- again, not to gloat, but

4    I think it was a tribute to us.  I think if someone did some

5    research with the Transfer Coordinator's office there were

6    very well problems that came out of our institution as far

7    we didn't miss good time, we didn't miss transfers, we

8    didn't miss -- you know, periodically they would send down

9    these transfer lists.  There were times when minimum

10   security was cleared out.  There were open beds in minimum

11   security institutions, and we would get these transfer

12   orders, you know, please prepare 50 transfers immediately.

13   Well, we had to drop everything and put 50 packets together.

14   You had to find 50 inmates that qualified to go to -- you

15   know, those kind of things happen all the time, and we did

16   that routinely, and to my knowledge we never -- we performed

17   that for four years without a problem.

18   Q.  With fewer counselors, instead of 15, was it more

19   difficult, if you came in to become a counselor, to become

20   competent as a counselor?

21   A.  I'm not sure I follow.  Say that again.

22   Q.  In other words, if you only had five or six counselors

23   or less and you were a new counselor, was it -- did that

24   make it even more difficult because of the caseload and the

25   fewer people and lack of --

                        Redirect - Sanner

1    A.  It would be my assumption that, yes, because -- from

2    that point of view, yes, because I didn't come in under that

3    situation.  I came in when the staff was fully staffed.

4    Q.  Who were you trained by?

5    A.  Who was I trained by?

6    Q.  Supervisors?

7    A.  My immediate supervisor at the time was Mary Osborne.

8    Mary Osborne and Mike Wilton.

9    Q.  Did Ann Casey cause any of the female counselors to just

10   break down and cry?

11   A.  I know of a couple occasions.

12   Q.  Who?

13   A.  Cindy Keck, Pam Alemond.

14   Q.  Sena Landreth?

15   A.  Yes.  Yeah, because -- yes, that's true too.

16   Q.  Do you remember Betty crying too?

17   A.  There was a lot of crying going on.

18   Q.  How about Gina Feazel, did you ever see her ever --

19   A.  I don't recall Gina, but personalities are -- you know.

20   Q.  Are different?

21   A.  Personalities are different and everybody does their job

22   different.

23        MR. FALB:  Just one moment, Your Honor.

24   *(Off the record)*

25                    *   *   *   *


                       Redirect - Sanner

```
 1            MR. FALB:  Thank you, sir.

 2                     *  *  *  *

 3              RECROSS-EXAMINATION

 4            QUESTIONS BY MS. CHOATE:

 5   Q.  You were asked about there not being supervisors while

 6   you were there.

 7   A.  From 2002, yes.

 8   Q.  After everybody left?

 9   A.  Right, until Ann Casey was --

10   Q.  At the time you retired were you under the impression

11   that your job as a Counselor III was still going to be there

12   or did you know if your job was going to be refilled?

13   A.  When I left?

14   Q.  Yeah.

15   A.  I have no way of knowing because those decisions are

16   made in Springfield, and I know at -- I think even at that

17   time there was institutions that had not had their

18   Counselor III positions filled.  They would post positions

19   routinely and then not fill them.  In fact, when I took the

20   Counselor III job they had -- this case work supervisor's

21   job was open, posted as well, and that's the job I really

22   wanted.

23        Well, we had been through this before where they would

24   post the job and then never fill it.  And so I was called in

25   and I had a conversation with Warden Bowen and with
```

                          Recross - Sanner

1   Assistant Warden Wisely, and -- because if you take the

2   Counselor III, which they were offering me at the time, that

3   would take me out of the -- of being considered for case

4   work supervisor.  I had to stay in that position six months

5   before I would be considered, and so it was a real roll of

6   the dice.  And after my conversation with them, they felt

7   that it was possible that they would close that position and

8   that's -- I took the Counselor III.  That's exactly what

9   happened, they closed the case work supervisor position, did

10  not fill it.

11  Q.  So you were able to stay there until you retired as a

12  Counselor III?

13  A.  Correct.

14  Q.  I think you said that if you had your druthers, you

15  would have retired last year, correct?

16  A.  Yeah.  I would have liked to have stayed, yes.

17  Q.  And had Ann Casey not been there, with the way things

18  were prior to Ann Casey coming, do you think you would have

19  been able to stay in that situation?

20  A.  She was very huge in my decision to leave.

21  Q.  Sounds like she was just kind of heinous in some ways as

22  a supervisor?

23  A.  She was very difficult to work for.

24  Q.  And you didn't get that impression from the other

25  hierarchy at the prison at the time?

Recross - Sanner

1    *A.*  No.  I thought I had a good working relationship with

2    everyone there.  I feel that I'm an easy person to work

3    with.  And again, another large part of that decision was

4    because the core group that I -- that had worked and made

5    clinical services work for four years without the

6    supervisors, I saw them leaving, and I didn't feel that

7    we -- there was no assurance that we were going to get help

8    quickly enough to where it would make the job attractive

9    enough to stay.

10   *Q.*  Were you there when Sena was removed from the field

11   services?

12   *A.*  That happened right after I left.  I knew it was in the

13   works but that happened after I left.

14   *Q.*  Did that happen to your knowledge, or do you know why?

15   *A.*  No, I do not know why.

16   *Q.*  Do you know if Sena had made a mistake of some sort?

17   *A.*  Well, we all make mistakes.  It just -- it's just a

18   matter of if -- you know, you can make issue with any

19   mistake.  I don't know if the mistake she made warranted

20   moving her.  You have to understand that you cannot perform

21   those duties without making mistakes.  You cannot.  I made

22   plenty of them.

23   *Q.*  Okay.  But there is a learning curve to becoming a

24   counselor?

25   *A.*  Yes, there is.

Recross - Sanner

1         MS. CHOATE:  And I don't think I have anything

2    else.  Thank you.

3         MR. FALB:  Nothing further.

4         THE COURT:  Ladies and gentlemen of the jury, any

5    questions?

6              Okay.  You can step down, sir.  Next witness.

7         **SENA LANDRETH, PLAINTIFF'S WITNESS, SWORN**

8                    **DIRECT EXAMINATION**

9                **QUESTIONS BY MR. FALB:**

10   Q.  State your name, please.

11   A.  Sena Landreth.

12   Q.  And are you retired?

13   A.  Yes.

14   Q.  And before retirement where did you work?

15   A.  Centralia Correctional Center.

16   Q.  And Mrs. Landreth, are you nervous?

17   A.  Yes.

18   Q.  Not going to bite you, so just if you don't understand

19   any of my questions, just tell me.  I'll be glad to rephrase

20   it.  I know you told me you don't want to be here, you're

21   nervous and all that.  So things will be fine, okay?

22       Now, when did you start with the Department of

23   Corrections?

24   A.  I started July 1st, 1981.

25   Q.  And when you retired what was the date?


                        Direct - Landreth

1    A.   January 31st, 2008.

2    Q.   Can I ask you what your year of birth was?

3    A.   1955.

4    Q.   And when you retired how old were you?

5    A.   I had just turned 53.

6    Q.   Just tell us generally what was your kind of chronology

7    of what you did for the Illinois Department of Corrections?

8    A.   Started out as a Counselor I, and after the end of the

9    year I was promoted to a Counselor II.

10   Q.   So this was back in 1981 you began in counseling?

11   A.   Uh-huh.  And I don't remember when.  I had a counseling

12   caseload just like everybody else, and then I was put into

13   field services, and was in field services, I don't even know

14   how long, 20 some-odd years I guess, and then in 2006 I was

15   removed from field services and put back into counseling.

16   Q.   Okay.  And just so we are all on the same wavelength,

17   field services is where you take care of the inmates who are

18   leaving the prison and you make sure they go to the proper

19   homes or that type of thing?

20   A.   Right.  Still a Counselor II title.

21   Q.   And you had done that for 27 years?

22   A.   No.  Twenty some-odd years.  I don't know how long.

23   Q.   That's still a long time.  Longer than 20 years?

24   A.   Yes.

25   Q.   And then you were involuntarily removed from that?

Direct - Landreth

1    A.   Yes.

2    Q.   And what month and what year was that?

3    A.   That was July of 2006.

4    Q.   And who removed you from that?

5    A.   Ann Casey.

6    Q.   And was she your supervisor at that time?

7    A.   Yes.

8    Q.   The assistant warden?

9    A.   Yes.

10   Q.   Is that correct?

11   A.   Yes.

12   Q.   And prior to being removed had you been out for a period

13   of time?

14   A.   Yes.

15   Q.   Why were you out?

16   A.   Because my brother was killed in a car wreck.

17   Q.   I assume that you had to be out for bereavement, that

18   type of thing?

19   A.   Yes.

20   Q.   How long had you been out?

21   A.   Just a week.

22   Q.   And I assume when you got back -- and you correct me if

23   I'm wrong -- were you still grieving?

24   A.   Yes.

25   Q.   And during the period of time when you were grieving did

Direct - Landreth

1    you have to -- did you leave early one day?

2    A.  Yes.

3    Q.  And do you remember why you left or not?

4    A.  I do not remember why.

5    Q.  Okay.  Is it safe to say during this period of time you

6    were not yourself because of what you had been through?

7    A.  Yes, but --

8            MS. CHOATE:  Objection.  I would ask to clarify

9    what period of time we're talking about.

10            MR. FALB:  I'll rephrase it then.

11    Q. (By Mr. Falb)  And ma'am, did you make a single mistake?

12    A.  Yes.

13    Q.  Tell the jury what you did.

14    A.  We had a -- I was in charge of paroling the inmates out.

15    You had to have an approved parole plan in the computer

16    system before they could be taken off a count and actually

17    paroled out, physically removed from the institution.  I had

18    to leave early that day, and I don't remember why I had to

19    leave early, but anyway, I did fail to get a regular

20    parolee -- the sex offenders or regular parolees basically

21    is how you divided them, and I didn't get a regular parolee

22    ready to go, I just forgot about him, and so the girl that

23    came in to back me up had to do that.

24    Q.  Who was the girl that came in to back you up?

25    A.  Gina Feazel.

Direct - Landreth

1   Q.   And was it your understanding that -- first of all, did

2   the assistant warden find out about this?

3   A.   Apparently.

4   Q.   Okay.  Did the Assistant Warden Casey at that time

5   remove you because of that or --

6   A.   That was my understanding why I was being removed.

7   Also, I was told that I needed to do cross-training.

8   Q.   What is cross-training?

9   A.   I needed to learn regular counselor duties.

10  Q.   Who had been doing your duties while you were off on

11  bereavement?

12  A.   I assume it was Gina Feazel.

13  Q.   Now, so you had to do some cross-training, huh?

14  A.   Uh-huh.

15  Q.   Did you do any cross-training?

16  A.   No.

17  Q.   Did anyone do any cross-training?

18  A.   No.

19  Q.   At this stage, after 20 years of being in field

20  services, you were removed and given a large caseload of

21  prisoners or inmates?

22  A.   Yes.

23  Q.   Did this emotionally crush you?

24  A.   Yes.

25  Q.   Tell the jury why.

Direct - Landreth

1    A.  I just loved field services.  I thought I was doing a

2    good job.  Anyway, they put me into a caseload.  I hadn't

3    had a caseload for 20 some-odd years, and when I was removed

4    from -- when I went into field services we didn't have

5    computers at the time, so now everything is on computer, and

6    I was handed 450 or 500 inmates and I had to learn

7    everything and just learn the computer.  And they were

8    teaching an old dog new tricks, I guess.  But besides the

9    fact that I just -- I liked my field services job and I

10   thought I was doing a good job.

11   Q.  Who were the counselors at the time you when you were

12   removed from field services?

13   A.  It was me and Gina and Betty.  Yeah.

14   Q.  Just three of you?

15   A.  Uh-huh.

16   Q.  Is that "yes"?

17   A.  Yes.  That's all I remember.

18   Q.  And I think Al Sanner just testified that you had a core

19   of older, more seasoned employees that had left?

20   A.  Yes.

21   Q.  And that was -- in fact, five people had left in about

22   six months, is that correct?

23   A.  Yes.

24   Q.  And was the pressure put on you when you had this 450

25   people?

                        Direct - Landreth

1    A.   Yeah, because I didn't know what I was doing.

2    Q.   Did Betty help train you?

3    A.   Betty and Gina.

4    Q.   Okay.  And did you take it upon yourself to show

5    Ann Casey that you were capable of handling that workload?

6    A.   Made it my goal.

7    Q.   And did you, in fact, fight as hard as you could and

8    obtain that goal?

9    A.   In my mind, as far as I know, I never got in trouble for

10   anything, so --

11   Q.   Why did you retire?

12   A.   Just time to go.  I done my time.

13   Q.   Was there any other reason?

14   A.   My husband retired a month before and I was ready to go

15   when he did.

16   Q.   If you had been the field services person and continued

17   to have that job and didn't have to go through what you had

18   gone through, might you have continued to work?

19   A.   I might have.

20   Q.   Was that a devastating thing for you to go through?

21   A.   It was -- when you think that you've done a good job and

22   then all of a sudden you're told you haven't been doing a

23   good job, yeah.

24   Q.   Besides that one mistake, what did they say?

25   A.   Just I needed to do cross-training.


                         Direct - Landreth

1    *Q.*   And you never did it?

2    *A.*   Well, I did, but there was no cross.

3    *Q.*   Were there occasions when other of the older female

4    counselors, that they were reduced to tears also?

5    *A.*   I was the oldest female counselor.

6    *Q.*   Okay.  I'm talking about like Betty or Deb Brink.

7    *A.*   Oh, yeah.  It was stressful.  We were basically handling

8    1500 inmates.  It was just the three of us.

9    *Q.*   Was Deb Brink subjected to harassment on her job by

10   Casey?

11   *A.*   I don't remember anything specifically with her, other

12   than that she was also the -- I can't remember what it's

13   called, LAN administrator, so she was pulled a lot.

14   *Q.*   Did -- Bart Toennies and Gina Feazel, were they the

15   youngest and had the least seniority in the group while you

16   were working there the last six months?

17   *A.*   Yes.

18   *Q.*   And did you feel that Feazel and Toennies had their own

19   agenda?

20         *MS. CHOATE:*  Objection.  Calls for speculation,

21   foundation.

22         *THE COURT:*  Sustained.

23   *Q. (By Mr. Falb)*  At any time did you feel, based upon what was

24   happening to you, that you were trying to be pushed out of a

25   job?

Direct - Landreth

1    A.   With -- by fellow counselors.

2    Q.   Who?

3    A.   I always felt that that was Gina's agenda, but that was

4    just my feeling.

5            MR. FALB:   Thank you, ma'am.

6            THE COURT:   Cross?

7                        **CROSS-EXAMINATION**

8                    **QUESTIONS BY MS. CHOATE:**

9    Q.   Hi, Sena.

10   A.   Hi.

11   Q.   When you were put back into counseling and to the

12   counseling duties, did that include inmate grievances as

13   part of your duties?

14   A.   Yes.

15   Q.   Were all the counselors supposed to handle grievances?

16   A.   Yes, for your caseload.

17   Q.   For your own inmates, right?

18   A.   Uh-huh.

19   Q.   Okay.   Were they also supposed to handle kites?

20   A.   Yes.

21   Q.   What is a kite?

22   A.   Request, little piece of paper.  There's a form that

23   they can use or they can just write on a piece of paper.  We

24   call them kites.  I don't know why.  That's what they've

25   always been called, where an inmate is trying to get a hold

                         Cross - Landreth

1    of a counselor to ask them whatever they need asked.

2    Q.  You were asked about working with Betty and that Betty

3    trained you, correct?

4    A.  Uh-huh.

5    Q.  At that time then when you came back to counseling from

6    field services, was Betty also supposed to handle those

7    grievances as part of her duties as a counselor?

8    A.  She would have had a caseload, so yes.

9    Q.  And at any point did you observe Betty doing something

10   with the grievances that you might have considered

11   inappropriate?

12   A.  I heard something but I did not observe anything.

13   Q.  So you never saw anything with Betty and the grievances?

14           THE COURT:  What's your answer?  Answer out loud.

15           THE WITNESS:  I don't know what you mean.

16   Q. (By Ms. Choate)  Were you ever aware of Betty just putting

17   grievances in the cupboard in the counselor's office rather

18   than dealing with them?

19   A.  I know that there were grievances up there.  I don't

20   know if they were completed or not completed.

21   Q.  But you thought they were Betty's grievances?

22   A.  Uh-huh.

23   Q.  And sounds like Ann Casey was very difficult to work

24   with?

25   A.  Uh-huh.

Cross - Landreth

1  Q.  Yes or no.  I'm sorry.

2  A.  Yes.

3  Q.  I know it's hard to -- in conversation we do that, but

4  for the court reporter we need to answer yes or no.

5  A.  Yes.

6  Q.  Did you have the same problems with administration prior

7  to Ann Casey?

8  A.  No.

9  Q.  Did you have problems with Warden Robert?

10 A.  No.

11 Q.  You were asked about harassment by Ann Casey.  Did she

12 ever, to your knowledge, harrass you specifically about your

13 age?

14 A.  No.

15 Q.  Did you ever observe her harassing Betty Cook about her

16 age?

17 A.  No.

18 Q.  Did you ever observe her harassing any of the counselors

19 there about their age?

20 A.  No.

21 Q.  Was it your opinion that Ann Casey was just a bad

22 supervisor?

23 A.  Yes.

24 Q.  You were asked questions about Bart and Gina and Betty,

25 correct?

Cross - Landreth

 1   A.   Yes.

 2   Q.   And you worked with all three of those folks?

 3   A.   Yes.

 4   Q.   Were you able to form an opinion, as a co-worker with

 5   Bart Toennies, about his abilities as a counselor?

 6   A.   No.  I never worked in the same office with Bart.

 7   Q.   So when Bart was there, you were still in field

 8   services, or did he go to field services?

 9   A.   After he was actually a counselor or as a TA?

10   Q.   Did you ever work with -- directly with Bart Toennies?

11   A.   I don't think we ever worked in the same -- once I was

12   removed from field services he went into field services.

13   Q.   So he went there directly after you were taken out of

14   there?

15   A.   Right.

16   Q.   Okay.  You were -- you did work as a counselor with

17   Gina Feazel?

18   A.   Yes.

19   Q.   Were you able to form an opinion, as a co-worker, of her

20   abilities as a counselor?

21   A.   She could handle her job.  She was a good counselor.

22   Q.   So you believe she was a good counselor.  Did you not

23   just get along with her otherwise?

24   A.   No -- or yes.  I don't know what the correct answer is.

25   No, I did not get along with her.

                         Cross - Landreth

1   Q.   How about Betty, did you get along with Betty?

2   A.   Yes.

3   Q.   Were you able to form an opinion of her abilities as a

4   counselor?

5   A.   Yes.

6   Q.   And again, this is awkward questioning -- I know Betty's

7   sitting here -- but what were those impressions of Betty as

8   a counselor?

9   A.   Betty was a hard worker but it always seemed to me like

10  there was -- she had trouble organizing the work or

11  prioritizing or staying on top of it.  But she worked, she

12  didn't just sit.

13  Q.   Right.  So is it your opinion that -- you know,

14  counseling's a hard job, correct?

15  A.   Yes.

16  Q.   Some people just aren't as good at it as others, is that

17  fair?

18  A.   Yes.

19  Q.   Between Gina and Betty, who would you consider the

20  better counselor?

21  A.   Gina.

22  Q.   I know that's hard for you to say.  And when you got

23  into being a counselor you did the very best you could to

24  pick back up in that job that you'd been gone for over 20

25  years, correct?

Cross - Landreth

1    *A.*   I tried, yes.

2    *Q.*   And you didn't get any discipline or anything?

3    *A.*   No.

4    *Q.*   Including when Ann Casey was still there, is that right?

5    *A.*   Right.

6    *Q.*   Ann Casey's personality difficulties, I guess is one way

7    to say it, do you think that the way she treated people --

8    or your observations of her, was it your impression it was

9    just because of people's age?

10   *A.*   No.

11   *Q.*   Did you see her treat younger people pretty much the

12   same way too?

13   *A.*   She treated everybody -- that was just her way of

14   dealing with people.

15   *Q.*   Okay.  And it wasn't necessarily a good way, in your

16   opinion, correct?

17   *A.*   Right.

18        *MS. CHOATE:*   Thank you, Sena.  I have nothing

19   further.

20        *THE COURT:*   Redirect?

21              **REDIRECT EXAMINATION**

22              **QUESTIONS BY MR. FALB:**

23   *Q.*   I would be correct in stating that Ann Casey -- first of

24   all, Ann Casey was around 40 years of age, is that correct?

25   *A.*   I guess.  I don't really -- I don't know how old she

Redirect - Landreth

1  was.

2  Q.  Was she an attractive, well-dressed lady?

3  A.  Yes.

4  Q.  And she wasn't stupid, was she?

5  A.  No.

6  Q.  Let me ask you this:  She wasn't as stupid to go around

7  saying, *I'm going to discriminate because you're older than*

8  *me*?  She wouldn't say that?

9  A.  No.

10  Q.  I mean you wouldn't expect anyone in the Department of

11  Corrections above you to go around saying, you know, *I'm*

12  *bias because you're older than me or you've got more years*

13  *in service than me*, is that right?

14  A.  Right.

15  Q.  In fact, you did think, because of your seniority, there

16  was bias against you, didn't you?

17  A.  Not from Ann Casey.

18  Q.  From who?

19  A.  Gina.

20  Q.  And she -- how did you know that?

21  A.  I don't know that for sure.  That was my feeling.

22  Q.  You're fine.  And was I -- am I correct that you

23  testified that when you were removed from field services,

24  Bart Toennies came in and took it over?

25  A.  Right.  The best I remember.

Redirect - Landreth

1    Q.  All right.  I think you're right.  And you were asked

2    about some grievances by Betty in a drawer or something like

3    that.  There's nothing wrong in having copies of filled out

4    grievances in your drawer, is there?

5    A.  No.

6    Q.  Okay.  So you don't know anything that Betty did wrong

7    as far as grievances, do you?

8    A.  No.

9    Q.  As far as Betty's work ethic, was she there before

10   anyone and left after everyone?

11   A.  Just normal work day?

12   Q.  Yeah.

13   A.  I don't really remember what time she got there.  She

14   probably was there before me.  I was like right on the nose

15   every day.

16   Q.  You were asked about, maybe this is just because

17   Ms. Casey was a bad supervisor or something wrong with her.

18   Your other supervisor, Flagg, you had problems with Flagg,

19   didn't you?

20   A.  Well, we all did.

21   Q.  All of you did.  And he's the one -- were you there when

22   he -- I guess you were -- he took over for Casey?

23   A.  Yes.

24   Q.  And as far as why Casey was doing certain things,

25   whether she was getting orders from someone else or not, you

Redirect - Landreth

 1   don't know, do you?

 2   A.   No.

 3   Q.   You have no idea what was going on in her mind or the

 4   warden's mind?

 5   A.   No.

 6   Q.   Did you ever go into the warden's office?

 7   A.   For what?

 8   Q.   For anything.

 9   A.   If I had a question or something, but no, just to sit

10   and talk, no.

11   Q.   Did Gina and Bart have more access to the warden?

12   A.   I heard that.  I do not know if that is true or not.

13          MR. FALB:  Thank you.

14          THE COURT:  Recross?

15                  **RECROSS-EXAMINATION**

16              **QUESTIONS BY MS. CHOATE:**

17   Q.   Where did you hear that Gina and Bart had more access to

18   the warden?

19   A.   I have no idea.  It was --

20   Q.   Just a rumor?

21   A.   Yes.

22   Q.   Did you feel like you could go in to Warden Robert if

23   you had a problem?

24   A.   He didn't appear to be very accessible, but I know I had

25   went in there before when I was in field services, so yes, I

                        Recross - Landreth

Vol.11, Pg.558

1    guess I could.

2    Q.   Okay.  And you were asked about problems with Flagg.

3    What were those problems?

4    A.   I don't remember anything in particular, just attitude,

5    just --

6    Q.   Did you have any feeling from Flagg that he didn't like

7    you because of your age?

8    A.   No.

9    Q.   And you were also asked about seniority, and you thought

10   that Gina might not like you because of seniority; is that

11   what your testimony was?

12   A.   Right.

13   Q.   And it's true that there's not necessarily a correlation

14   between seniority and age, isn't that fair?

15   A.   Yes.

16   Q.   And in fact, somebody who's more senior would tend to

17   get an automatic promotion before the less senior person,

18   right?

19   A.   Yes.

20   Q.   And that's whether or not the person who's more senior

21   is younger, is that fair?

22   A.   Yes.

23   Q.   So it's a years-at-the-department thing as opposed to an

24   age thing, is that right?

25   A.   Yes.

                        Recross - Landreth

```
 1   Q.  And that was just your opinion of Gina, right?

 2   A.  Yes.

 3            MS. CHOATE:  Okay.  Thank you.

 4            THE COURT:  Anything -- further direct?

 5            MR. FALB:  Nothing.

 6            THE COURT:  Ladies and gentlemen of the jury,

 7   questions?

 8            You may step down, ma'am.  Thanks.  Next witness,

 9   please.

10            TERRI LOEPKER, PLAINTIFF'S WITNESS, SWORN

11                     DIRECT EXAMINATION

12                  QUESTIONS BY MR. FALB:

13   Q.  State your full name, please.

14   A.  Terri Loepker.

15   Q.  What is your age?

16   A.  50 years old.

17   Q.  What is the year of your birth?

18   A.  1960.

19   Q.  Are you employed?

20   A.  Yes, I am.

21   Q.  Where do you work?

22   A.  I work for the Illinois Department of Corrections in the

23   southwest parole office here in East St. Louis.

24   Q.  What does that mean?

25   A.  I function as a parole agent, and our office is here in
```

Direct - Loepker

 1    East St. Louis, but we cover an entire district that goes

 2    from one side of the state to the other.  My territory is

 3    Montgomery County primarily.  I do a little bit of Madison

 4    County, but primarily there.

 5    Q.  How long have you been a parole agent?

 6    A.  About five-and-a-half years.

 7    Q.  How long -- strike that.

 8        What year did you start with the Illinois Department of

 9    Corrections?

10    A.  I started with the Department of Corrections in 1981.

11    Q.  And what does a parole agent do, just in a few

12    sentences?

13    A.  Supervise released inmates.  They're still inmates.

14    They're released on parole and supervised by parole agents.

15    You go into their home and visit them, drug test them,

16    transport them if you need to, monitor their -- what they're

17    doing and make sure they're doing their counseling.  If they

18    do something that violates their parole, then write a

19    violation report, request a warrant, and transport them back

20    to the Department of Corrections.

21    Q.  And at one point in time were you a counselor?

22    A.  Yes, I was.

23    Q.  In Centralia?

24    A.  Uh-huh, yes.

25    Q.  Before that what did you do?

                        Direct - Loepker

 1   *A.*   Several different things.   I started as a secretary and

 2   kind of moved my way up.

 3   *Q.*   Okay.   What year did you start as a counselor?

 4   *A.*   1998.

 5   *Q.*   And when did you leave the counseling department?

 6   *A.*   2006.

 7   *Q.*   And was that in March of 2006?

 8   *A.*   Yes, it was.

 9   *Q.*   And did several people leave with you at the same time?

10   *A.*   Yeah.   Tony Ballantini became a parole agent the same

11   time I did.   We started the same day.   And Al Sanner

12   retired.   He had his last day the same day Tony and I left.

13   *Q.*   And can you tell us why you decided to leave in March of

14   2006?

15   *A.*   Well, it was a promotion.   Parole agent itself is not

16   a -- parole agent is not a promotion, it's exactly lateral

17   to a counselor; however, you can be promoted to a parole --

18   senior parole agent, which is then quite a promotion.   And I

19   had the opportunity to do that.   I mean, honestly, a lot of

20   things were going on.   Caseloads were really big at the

21   prison.   There was a lot of stress, a lot of tension that

22   maybe necessarily hadn't always been there, and I just felt

23   like it was time for a change and I needed to move on, and

24   that opportunity came up so I took it.

25   *Q.*   Okay.   And I'm not going to ask you to speculate as to

                              Direct - Loepker

         1    what was going on in persons' minds, but had you had enough

         2    with the environment?

         3    A.  Pretty much, yes.

         4    Q.  Had you had a chance to go into parole six months

         5    earlier?

         6    A.  Yes.  In, I guess probably September I was offered the

         7    position, and that class started in October.  Once you make

         8    the promotional list for that and you have the grade, then

         9    they go by seniority, and obviously I had a lot of seniority

        10    so I was offered the position, but I did turn it down in

        11    September of '05.

        12    Q.  You tried still doing the counseling job?

        13    A.  Yes, I did.

        14    Q.  And after another six months, that was it?

        15    A.  Well, yes.  Two of the other counselors accepted the

        16    position when I declined it, and they left, which left our

        17    caseloads even bigger than they had been before that, and a

        18    lot more work than before that, and they were telling me,

        19    *Hey, you got to do this.  This is a great job.  This is a*

        20    *lot better*, so I decided to take that chance.

        21    Q.  Did you feel that you were older, were being targeted by

        22    upper people?

        23    A.  "Targeted", can you explain that?

        24    Q.  Pushed to leave?

        25    A.  Oh, I don't know that I was pushed to leave at all.  I

                                Direct - Loepker

 1   just -- I don't know that anybody really wanted to us leave.

 2   I wanted to leave.  The situation had just gotten to where I

 3   felt like I had to get out of there.  I don't know that I

 4   felt pushed to get out.  Nobody was saying, *You need to go.*

 5   *You need to go.*

 6   *Q.*  I understand that.

 7   *A.*  But I just felt like I needed to leave.

 8   *Q.*  Okay.  And were there any particular supervisors that

 9   were being, I'll use the word "harsh" on you folks?

10   *A.*  Well, yes.  The situation changed a lot.  We went

11   from -- in 2002 when we had the big retirement we went from

12   like twelve counselors down to like five, something to that

13   effect, and that was really tough, but we were given leeway

14   to kind of run that however we wanted to.  We were given the

15   opportunity to just say, okay, we're going to get the job

16   done, we're going to cut the fat, get rid of the things that

17   don't have to be done.  We're going to just do the bare

18   necessities so that we can keep our head above water and

19   keep the ball rolling, and we were allowed to do that in the

20   way we chose to do that.

21       And then when Assistant Warden Wisely left and Assistant

22   Warden Casey came, she didn't really -- I don't know if she

23   totally understood how much work was there or how much

24   needed to be done or the fact that the five of us that were

25   left really did know what we were doing.  I don't know if

Direct - Loepker

1    she totally understood that, and she tried to change

2    everything we did, and that was really hard to deal with.

3    *Q.*  Did you have the impression that Casey was trying to

4    make people leave?

5    *A.*  No, I didn't really think she was trying to make us

6    leave.  I think that she realized later that she was part of

7    the blame because by the time I left, the last day that I

8    was there I felt like she finally figured out that, *Hey,*

9    *these people -- I run these people off.*

10   *Q.*  When I took your deposition -- I just want to -- have

11   you read your deposition?

12   *A.*  Uh-huh, yes.

13   *Q.*  I just want to ask you -- see if you remember the

14   question and answer being given by you.  The question is on

15   page 23, line 9.  Question:  *Now, when I took Al Sanner's*

16   *deposition, he kind of gave me the impression that he said*

17   *it was almost like Casey was trying to make people leave.*

18   *Did you get that impression too?*  And your answer was:  *Yes.*

19   *A.*  Well --

20   *Q.*  I'm not trying to be unfair.

21   *A.*  I understand that.  You know, when Cindy and Pam left it

22   kind of did feel like that.  Not so much that -- I don't

23   know if it was so much that it felt like she was trying to

24   make us leave.  She really didn't care if we left or stayed.

25   She didn't value us as employees.  So in that way, yes, she

Direct - Loepker

```
 1   was happy or fine with us leaving.  I don't know that I -- I
 2   don't want to say that I didn't feel she wanted us to leave
 3   because at that point I think she did.  She never said to
 4   me -- after I chose not to go, she never came back and said
 5   to me, Wow, thanks for staying.  We really need you.  She
 6   never said to Pam and Cindy, Oh, my gosh, I wish you
 7   wouldn't leave.  We really need you here.  I'm sorry to see
 8   you go.  Instead, it felt like she was happy that they were
 9   leaving.
10       By the time I left five months after that, it was
11   different.  Only at the end, only at the last couple days
12   did she make me feel like she was sorry I was going to go.
13   When she said I was going, she never said, I'm sorry you're
14   going.  The last day she did my departing evaluation, then
15   she said to me, I hate to see you go but I understand why
16   you're going.  I think it was just then that it occurred to
17   her she had just lost everybody that had been there for a
18   while, all the seasoned employees who knew what they were
19   doing, and she finally figured out what she was losing.
20   Q.  Did you have any particular run-ins, I think you told us
21   about in your deposition, with Ann Casey where she told you
22   to go to a seminar?
23   A.  It was actually just a -- I think it was a state-wide
24   record office supervisor meeting, which didn't have a whole
25   lot to do with counselors, but it was held at Centralia
```

 1   Correctional Center, so they had like a number of people

 2   from other institutions there and they were having, I guess

 3   it maybe was a seminar, but it was record office, it really

 4   wasn't counselors.  So she had asked for someone to go to

 5   that.  Well, we were really busy.  We didn't have a person

 6   to spare for the whole entire day, so three of us decided

 7   we'd split the day; you go for a couple hours, then you go

 8   for a couple hours, then you go for a couple hours, and that

 9   way no one would miss their whole day of work.

10       I was assigned to go to the first round and they were

11   totally talking about how to calculate a guy's sentencing,

12   which had nothing to do with our job.  When they took a

13   break I quietly went back to my office and went back to work

14   because I had work to do and I didn't see the need to be

15   there.  So she called me then and said, *Why did you leave?*

16   And I explained, you know, *There's nothing there that*

17   *pertains to us.  Somebody else is going in a couple hours,*

18   *you know.*  Oh, my God, she started screaming, *If you didn't*

19   *understand chain of command now, you're going to understand*

20   *it.  You're going to the review board.  You're in so much*

21   *trouble because you ask me before you do anything.*  I wasn't

22   trying to cause a problem; I just felt like my time was

23   better suited back in the office.  And she was just

24   screaming.  She never did write me up.

25   *Q.*  Were there other instances with other counselors that

Direct - Loepker

1   she did things to that were --

2   A.   There were quite a few.  I mean she was always picking

3   on somebody, harassing somebody about something, like you

4   had your turn and you were the one under the gun or

5   whatever.  The one particular one that I told you about my

6   deposition was where Cindy --

7   Q.  Cindy Keck?

8   A.   Cindy Keck.  We had a rule that -- the institution had a

9   rule that you couldn't bring in a drink from the outside,

10  and the idea was that you could have something in your

11  drink, I guess.  But she was upset because other people were

12  bringing drinks in on other shifts and that was being

13  allowed and we weren't being allowed to do that.  One

14  morning she came in and walked right in with her drink.

15  Q.  Cindy Keck did?

16  A.   Yes, Cindy Keck did.  And so she was written up for

17  violating the rules.  You know, she wasn't allowed to bring

18  the soda in, and it was a rule, and she got suspended for

19  bringing a soda in.

20  Q.  Suspended for bringing a soda in?

21  A.   Yes, she did.  Then after she served her suspension

22  period, as I recall, she got an evaluation.  That was after

23  she'd already been promoted to or advised she was being

24  promoted to the parole agent position.  So she got this

25  evaluation and it was horrible.  She looked like the worst

Direct - Loepker

 1   employee -- she showed it to us -- that ever worked there.

 2   *Q.*  I assume she wasn't?

 3   *A.*  Absolutely not.  She was a very good employee.  And her

 4   other evaluations had always been good.  Only thing she had

 5   was the soda incident, so she brought that -- she came back

 6   to the office just in tears.  She was just hysterically

 7   crying because she couldn't believe that she was getting

 8   this evaluation, and Ann told her that they were going to

 9   send it on to parole and that she might not be promoted, and

10   so she was just hysterical.

11       She came in the office and we told her, *You need to go*

12   *back and get that evaluation and put some comments on it.*

13   So she went back to assistant warden's office to get it

14   back.  It was gone already.  She went to the warden's

15   office, and from what I understand -- I don't know if she

16   asked if she could take the evaluation off the warden's

17   office desk, but she took it, brought it back into the

18   office.  Ann came in there screaming that she was going to

19   fire her because she had taken this evaluation, and it was a

20   state document, and she could falsify the document.  And was

21   just kind of a lot of drama.  Cindy went home sick that day.

22   She was so upset, she left work.  And eventually they just

23   dropped it, but it was a pretty big deal.

24           *MR. FALB:*  Thank you.

25           *THE COURT:*  Cross?


                        Direct - Loepker

1          **CROSS-EXAMINATION**

2          **QUESTIONS BY MS. CHOATE:**

3     *Q.*  How old is Cindy Keck, do you know?

4     *A.*  Very early forties.

5     *Q.*  So she was a lot -- she was younger than Betty?

6     *A.*  She was considerably younger than Betty, yes.

7     *Q.*  And sounds like Ann was just crappy to her too, correct?

8     *A.*  Very much so.

9     *Q.*  So she -- equal opportunity bad supervisor?

10    *A.*  Yeah.  I didn't see anybody that really she didn't do it

11    to once in a while.

12    *Q.*  Did you have any feeling or indication that Ann's

13    problems or the way Ann supervised had anything to do with

14    the age of the people she was supervising?

15    *A.*  Not that I ever noticed.

16    *Q.*  You were talking about working as a counselor and that

17    there were so few people left after the buy-out, and then

18    some of your older workers left, correct?

19    *A.*  Yes.

20    *Q.*  And by "older", I mean more senior.

21    *A.*  Yes.

22    *Q.*  Did you work with Betty during that time before you

23    left?

24    *A.*  Before I left, yes, I did.

25    *Q.*  And did you work with Gina Feazel?

Cross - Loepker

1   A.   Yes, I did.

2   Q.   Did you work with Bart Toennies?

3   A.   Yes, I did.

4   Q.   Were you able to form an opinion of Gina Feazel's work

5   as a counselor?

6   A.   Oh, yes, because I functioned as a temporary case work

7   supervisor during several periods during the time that Gina

8   worked there.

9   Q.   And what was your impression of her work as a counselor?

10   A.   She did very good work.   She was very meticulous.   She

11   did a temporary assignment in there as a counselor

12   originally, and then when they filled the job she got the

13   job, and she caught on really quickly, and she pretty much

14   was up to any task we would give her.   Quicker than a lot of

15   the TA's that we had gotten in there.

16   Q.   What about Bart Toennies, were you able to form an

17   opinion?

18   A.   He was the same way.   He was great.   He came in -- what

19   was great about him, he came from another institution and he

20   was already pretty well trained.   He already knew how to be

21   a counselor.   We just had to teach him the specifics of what

22   happens at Centralia, which, obviously, every institution's

23   going to have a little bit different thing, but he knew how

24   to do almost everything and we could just throw him into it

25   as a TA and he could just do it.   And that was just

Cross - Loepker

1   priceless to us because spending hours and hours training

2   someone takes away from your own time.

3   Q.  Right.  I'll bet that was a relief to have him there

4   during all this upheaval?

5   A.  It was very good to have him there.

6   Q.  Were you able to form an opinion on Betty Cook's work?

7   Were you ever her supervisor as a temporary case work

8   supervisor?

9   A.  I don't want to go so far as to say I was her

10  supervisor.  Technically, as a TA you couldn't really

11  supervise.  You were more of an overseer, trainer type of

12  person.  But yes, I could do that.

13  Q.  Were you ever involved in evaluating Betty's

14  performance?

15  A.  Yes.  I did assist with input to her evaluation.

16  Q.  Just a minute, please.  I'm showing you what's marked as

17  Defendant's Exhibit 6.  Would you just take a minute and

18  take a look at that.

19  A.  I have seen this.

20  Q.  And what is that that you're looking at?

21  A.  This is Betty's employee evaluation for her probationary

22  period.

23  Q.  And were you involved at all in this evaluation?

24  A.  Yes, I was.

25  Q.  What role did you have in this evaluation?

Cross - Loepker

1   *A.*   Assistant Warden Wisely was the supervisor.  I don't

2   know how to say "not legally", but he was on record as

3   supervisor because as a TA, as I said, we weren't really

4   supervising, but more of a lead worker type position.  As a

5   lead worker and working with her every day in the office and

6   Assistant Warden Wisely not being in the office, he asked

7   for input as to how she was doing so that he could do an

8   evaluation what her performance level was.

9   *Q.*   And what was your evaluation of Betty's work at that

10  time?

11  *A.*   I thought that Betty needed a lot more time to become

12  certified.  Four-month period to be certified is not a long

13  time, but she had had also her TA period to learn the job as

14  well.  Everyone only gets four months.  Everyone gets that.

15  But she'd also had the three-month temporary assignment

16  position where she was able to learn a lot of the job at

17  that point, so when she came in for the certification period

18  we pretty much expected her to be able to complete

19  everything that we wanted her to do within the four months,

20  and we just didn't feel like she was meeting all the

21  objectives.

22  *Q.*   Did you ever have occasion to talk with Betty about her

23  work performance?

24  *A.*   Well, I don't know that I specifically sat down and

25  discussed her work performance, but I would go over some

Cross - Loepker

```
 1    things with her that I thought she needed to work on.  If I
 2    saw she wasn't getting her contacts made -- you were
 3    required to see the inmates so often.  If I would see that
 4    she wasn't keeping up with contacts, I would tell her.  If
 5    she was making a mistake on good time entries, that sort of
 6    thing, I would bring it to her and show her what she was
 7    doing wrong.  I remember one time that we had a funeral
 8    furlough that needed to be processed.  It took her like the
 9    whole day.  It should have only taken a half-hour to an
10    hour.  You have the keep things -- to spend a day on one
11    this that sort of thing.
12    Q.  If you need to -- when you're talking about changing an
13    entry, were you talking about in CHAMPS?
14    A.  Yes -- no.  Changing an entry -- wait a minute.  Say
15    that again.
16    Q.  I think you just talked about that she'd had -- there
17    was something that was incorrectly inputted?
18    A.  The MGT.  That was MGT, which is meritorious good time.
19    Q.  Where would that be input?
20    A.  That was done in OTS.  If you were going to review a guy
21    for his good time, the counselor would make the entry and
22    the case work supervisor would put approval on it prior to
23    it being submitted on the computer.
24    Q.  If there wasn't a case work supervisor available who
25    would do that approval?
```

                              Cross - Loepker

1   *A.*  It had to be either one of us or an assistant warden.

2   *Q.*  So whoever was filling in as the case work supervisor or

3   the assistant warden?

4   *A.*  Yes.

5   *Q.*  If you had to make changes on CHAMPS would it be

6   appropriate to call somebody else in Springfield to do that?

7   *A.*  Well, I don't really know you would make a change on

8   CHAMPS.  CHAMPS was where you entered your notes about what

9   you talked to the inmates about during that day.  I don't

10  know that you would make a change.  I think what I would do

11  if I had a change to make, which is similar to what we do in

12  parole now, we make entries every day in our system.  When

13  you see a parolee, you make notes about what happened.  At

14  the end of the day, that's over, that's it, you can't change

15  it.  If I see something I made an error on I would go in the

16  next day, and this would -- I would go in the next day,

17  whenever I caught the error, and say I inadvertently entered

18  that I did a drug test and I forgot to enter it, but it was

19  done on this date.  That sort of thing is what you would do.

20  *Q.*  Was there a certain a time when you could enter things

21  in CHAMPS if you made that error or would you go in at any

22  time and do that?

23  *A.*  I guess you could go in any time and do that.  If you

24  found something that was erroneous, you would want to

25  clarify that, but you couldn't actually change CHAMPS.  Once

Cross - Loepker

1    it was entered, it was kind of there.

2    Q.  I think we talked about how old Cindy Keck was and that

3    she had a lot of problems with Ann Casey as well, right?

4    A.  Yes.

5    Q.  Pretty much everybody had problems with Ann?

6    A.  Mostly everybody, yeah, one time or another.

7           MS. CHOATE:  Just one minute, please.

8                        *   *   *   *

9           MS. CHOATE:  I have nothing else.  Thank you.

10          THE COURT:  Redirect?

11          MR. FALB:  Just one second, Your Honor.

12                  **REDIRECT EXAMINATION**

13                  **QUESTIONS BY MR. FALB:**

14   Q.  Ma'am, as far as the evaluation you did on Betty, that

15   was within her first --

16   A.  It was midpoint.

17   Q.  Midpoint in her probation?

18   A.  In her probation.  Probation is four months.  It was

19   done at two months.

20   Q.  So she had been two months on the job?

21   A.  Right.

22   Q.  You indicated that she had been a TA before?

23   A.  Yes.

24   Q.  Did you know she was only a TA for 90 days in grievances

25   back in --

                     Redirect - Loepker

```
 1   A.  I don't remember anybody having a TA just for
 2   grievances.  We had all the TA's do the -- be exposed to
 3   pretty much all the work.  That might have been her major
 4   thing she did but we had them all exposed.
 5   Q.  If that's all she was doing, simply grievances for only
 6   90 days --
 7   A.  I don't think that that's correct.  I don't recall that
 8   at all.  I don't remember ever having any TA just do
 9   grievances.
10   Q.  If that was the case, that wouldn't give her much
11   training at all?
12   A.  If that was truly the case, then she would not have
13   learned the whole job.
14   Q.  I think when you gave your deposition you indicated when
15   you were evaluating her, she --
16   A.  She had just been there for two months.
17   Q.  And this was?
18   A.  It's a big job to learn in two months.
19   Q.  It's a process for her to learn with this evaluation and
20   to try to improve?
21   A.  Yes, it was.  And that was what we were trying to point
22   out to her, the things she was deficient in, so she would
23   know what she needed to work on.  You don't want to throw
24   that at the end of four months and say, *You didn't meet all*
25   *the objectives*, when they didn't know they were even having
```

Redirect - Loepker

1    a problem.

2    Q.  Just so we know that later on when she had evaluations

3    do you know how Ann Casey evaluated her?

4    A.  I have no idea.  I wasn't privy to that at all.

5    Q.  All right.  But --

6    A.  Once Ann Casey came, we had no more case work

7    supervisors.

8    Q.  It would not -- let me show you what has been marked as

9    Plaintiff's Exhibit 1F, and these are all her evaluations.

10   This is done by Ann Casey and it's for the year 2005.

11   A.  Okay.

12   Q.  Is that correct?

13   A.  Yes.

14   Q.  And just on that sheet where it goes "exceeds" and that

15   type thing, it was a fairly good evaluation?

16   A.  Yes, it is very good.

17   Q.  So that means, at least as far as your role, helping her

18   get better, get certified, you succeed?

19   A.  And that was the goal.

20   Q.  As far as Gina Feazel, do you remember any specific

21   incidents where Ann Casey did something goofy with her?

22   A.  I don't remember anything.

23   Q.  Or Bart Toennies?

24   A.  I don't know how long for sure Bart was there while Ann

25   was there because Bart came again as a TA, so he was there a

Redirect - Loepker

 1   shorter period, but he was there while she was there because

 2   he came when Cindy and Pam left.  He came during that time.

 3   But he was just a TA and he was kind of like on loan from

 4   another institution or whatever.

 5   Q.  My question is --

 6   A.  I don't remember her doing anything to him but I don't

 7   know for sure.

 8          MR. FALB:  Thank you so much.

 9                    **RECROSS-EXAMINATION**

10                **QUESTIONS BY MS. CHOATE:**

11   Q.  You did continue to work with Betty though after this

12   certification period, is that correct?

13   A.  Yes, I did.

14   Q.  And were you able to observe her work after she was

15   certified?

16   A.  Yes.

17   Q.  What was your -- were you able to form an impression of

18   her work as a counselor after she was certified?

19   A.  You know, we sat in this room and it was like a team

20   effort a lot of times.  There was some individual work that

21   had to be done.  There were a lot of things that came up

22   day-to-day that you just didn't know what to do about.  Some

23   of it was things that you forgot how it was supposed to be

24   handled because you hadn't seen it in a long time.

25   Sometimes it was things that had never happened before.


                          Recross - Loepker

 1    There were just a loft things that came up, so we'd always

 2    have a pow-wow.  We all faced the wall, so when somebody

 3    wanted to know how to do something, everyone turned around

 4    and we decided what to do, or if we were trying to decide,

 5    okay, this is a new thing we have to do, who's going to do

 6    it and -- we always do that.  And it seemed like we would go

 7    over something for a long period of time how to do it and

 8    the next day it would be like Betty couldn't remember how to

 9    do it.  *I never seen that before*, is what she would always

10    say.  *I've never seen that before.  Betty, we just showed*

11    *you this yesterday.*  She really had a hard time retaining

12    the information it seemed like.

13    *Q.*  Did Gina have the same problems?

14    *A.*  No.  Like I said before, Gina seemed like she really

15    grasped the whole thing very quickly and learned very

16    quickly.

17    *Q.*  At the time you left the counseling at Centralia to go

18    to parole, at that time would you consider Betty Cook a good

19    counselor?

20    *A.*  I'd have to say no.  She was -- she just really

21    struggled.  She really did.

22    *Q.*  And that was a couple years, approximately, after she

23    started there as counselor?

24    *A.*  I think that would be right.

25              *MS. CHOATE:*  Thank you.  I have nothing further.


                         Recross - Loepker

| | |
|---|---|
| 1 | **FURTHER REDIRECT EXAMINATION** |
| 2 | **QUESTIONS BY MR. FALB:** |
| 3 | Q.  After you left, I assume you don't know how Betty did? |
| 4 | A.  I don't know anything about how Betty did after I left. |
| 5 | MR. FALB:  Thank you very much. |
| 6 | THE COURT:  Any further cross? |
| 7 | MS. CHOATE:  Nothing further, Your Honor. |
| 8 | THE COURT:  Ladies and gentlemen of the jury, any |
| 9 | questions? |
| 10 | You can step down.  Next witness, please. |
| 11 | MR. FALB:  May I approach the bench, please? |
| 12 | THE COURT:  Sure. |
| 13 | **(Sidebar discussion was held off the record)** |
| 14 | *  *  *  * |
| 15 | THE COURT:  This next witness is out of order as |
| 16 | well, folks. |
| 17 | MR. FALB:  Your Honor, once again I'm taking this |
| 18 | witness out of turn because of the time. |
| 19 | THE COURT:  Sure. |
| 20 | **DOYLE COOK, PLAINTIFF'S WITNESS, SWORN** |
| 21 | **DIRECT EXAMINATION** |
| 22 | **QUESTIONS BY MR. FALB:** |
| 23 | Q.  Can you state your full name, please. |
| 24 | A.  Doyle Ray Cook. |
| 25 | Q.  Doyle, you are the husband to Betty Cook, is that |

Direct - D. Cook

1    correct?

2    A.   Correct.

3    Q.   What is your employment?

4    A.   I'm a lieutenant at Lawrence Correctional Center.

5    Q.   How long with have you been with the Lawrence

6    Correctional Center?

7    A.   I started -- I transferred to Lawrence in 2001.

8    Q.   Can you kind of give us an idea from beginning all the

9    way up to the present time what you've been doing with IDOC,

10   or the Illinois Department of Corrections?

11   A.   I started out as an officer at Pontiac Correctional

12   Center, transferred to Centralia in 1994, and 2001 I

13   transferred to Lawrence Correctional Center and promoted

14   there as a lieutenant.

15   Q.   Can you tell me what your job duties were before you

16   became a lieutenant.

17   A.   Correctional officer.  Just basic security, inmate

18   security, tower officer, cellhouse officer, duties like

19   that.

20   Q.   Okay.  And then as a lieutenant what have been your

21   duties?

22   A.   Supervising officers and their duties and reports,

23   things of that nature.

24   Q.   And are you currently working?

25   A.   No, sir.

                         Direct - D. Cook

1    Q.   What's the problem?

2    A.   Inmate violence.  I was restraining an inmate and was

3    injured during that restraint.

4    Q.   Had to have surgery because of that?

5    A.   Yes, sir.

6    Q.   And obviously we're here because of your wife's lawsuit,

7    and you're familiar with the allegations, is that correct?

8    Let me briefly ask you, first of all, when you were at

9    Lawrence did they have a full complement of counseling

10   people, including supervisors?

11   A.   Yes, sir.

12   Q.   How many inmates did they have when you were working

13   there?

14   A.   They probably had approximately half of what our

15   complement would be, which would be approximately 1200

16   inmates at the time.

17   Q.   And how many counselors and supervisors were there?

18   A.   That, I can't recall.

19   Q.   And were there case work supervisors, clinical

20   supervisors there?

21   A.   Yes, sir.

22   Q.   Now, during the time -- and I want to ask you some just

23   brief questions about this.  Betty had some problems before

24   she retired, is that correct, while at work?

25   A.   Before she was -- I'm sorry, hired?

                        Direct - D. Cook

```
 1   Q.  Before she retired.

 2   A.  Oh, retired.  Yes, sir.

 3   Q.  Okay.  And it's our understanding, or my understanding

 4   she retired in May or June of 2008, is that true?

 5   A.  Yes, sir.

 6   Q.  When did you and Betty plan on having Betty retire?

 7   A.  Well, we've talked about after I was eligible to retire,

 8   which would be after this November, probably at the

 9   beginning of next year.

10   Q.  Okay.  Why at the beginning of next year?

11   A.  Because of pay raises and such or, you know, as far as

12   PB days and stuff like that would all add up.  Retire, cash

13   them in and such.

14   Q.  And I assume you're younger than Betty?

15   A.  Yes, sir.

16   Q.  What is your age?

17   A.  I'm 28 -- or I'm 29.  I'm sorry.

18   Q. (By Mr. Falb)  Your age is 29?

19   A.  49.  Forgive me.  I wish I was 29.

20   Q.  How many years of service do you have in?

21   A.  28 years.

22   Q.  Okay.  And let me ask you:  During 2007, do you recall

23   when Betty had occasion to see a therapist and then see her

24   own personal nurse practitioner?  I think that's what she's

25   called.  Do you recall that?
```

Direct - D. Cook

1   A.  Yes, sir.

2   Q.  How, just from your perspective -- and I'll be brief.

3   You know, the jury knows you're the husband, so -- but what

4   was your impression of what Betty was going through?

5        MS. GUNDERSON:  I'll object to the extent there's

6   no foundation.

7        THE COURT:  Overruled.

8        THE WITNESS:  Well, she was going through hell.

9   Q. (By Mr. Falb)  What do you mean?

10  A.  She was extremely stressed, losing her hair, just --

11  only thing I could think of, just going through hell.  She

12  just wasn't herself.

13  Q.  Okay.  And was there a period of time that she was at

14  home on a stress leave?

15  A.  She was very sick.

16  Q.  What do you mean?  Describe her for the jury because

17  they weren't there.

18  A.  Migraines, extremes migraines where she couldn't see.

19  She couldn't deal with noise, light, anything like that.

20  Just periods where you couldn't even touch her.

21  Q.  Now, was there a period of time when she actually was

22  bedridden?

23  A.  Yes.

24  Q.  And I know Betty in the past has had symptoms of

25  migraines or high blood pressure, is that true?

Direct - D. Cook

1    *A.*  Yes, sir.

2    *Q.*  Okay.  Was she doing well with respect to those things

3    before this?

4    *A.*  Yes, sir.

5    *Q.*  It came about that in the spring of 2008 that -- strike

6    that.

7        She did go back to work, is that correct?

8    *A.*  Yes, sir.

9    *Q.*  And she could have retired in August of 2007.  That was

10   her 50th birthday, is that correct?

11   *A.*  Yes, sir.

12   *Q.*  You do remember that, don't you?

13   *A.*  Yes, sir.

14   *Q.*  And -- but she returned to work anyway?

15   *A.*  Yes, sir.

16   *Q.*  And then she retired in May of 2008?

17   *A.*  Yes, sir.

18   *Q.*  You recall when that happened?

19   *A.*  Very, very well.

20   *Q.*  What happened?

21   *A.*  She went to work.  When she went back to work she

22   actually started to get better, started relaxing more, and

23   then few days before she retired she had an incident at work

24   where it brought back everything that she had went through

25   before and --

Direct - D. Cook

1          MS. GUNDERSON:  Object to foundation.  Move to

2    strike the last part of that answer.

3    Q. (By Mr. Falb)  Let me ask it this way:  Did she make a phone

4    call to you?

5          THE COURT:  Motion to strike is overruled.

6    Q. (By Mr. Falb)  Did she make a phone call to you that day?

7    A.  Yes, sir.

8    Q.  And describe her -- you don't have to tell me what was

9    said, but describe for me, as you listened to her, her state

10   of mind.

11         MS. GUNDERSON:  Objection to foundation.

12         THE COURT:  Overruled.

13         THE WITNESS:  Panic, stress, disorientation.

14   Q. (By Mr. Falb)  And were you upset, what happened?

15   A.  I was very much upset.

16         MR. FALB:  Thank you, sir.

17         THE COURT:  Cross?

18                    **CROSS-EXAMINATION**

19              **QUESTIONS BY MS. GUNDERSON:**

20   Q.  Mr. Cook, I'm sure you said this, and sorry -- good

21   afternoon.  I'm Joanna Gunderson.  I represent the

22   department in this case.

23      I'm sure you said this, but when did you start with the

24   Department of Corrections?

25   A.  It was back in '84.


                        Cross - D. Cook

1   Q.  So from 1984 until 2001 you were a correctional officer,

2   right?

3   A.  Correct.

4   Q.  And the promotion to lieutenant then happened in 2001,

5   right?

6   A.  Yes, ma'am.

7   Q.  That was at Lawrence correctional facility?

8   A.  Correct.

9   Q.  And you've been there since that time, right?

10  A.  Correct.

11  Q.  So you haven't worked at Centralia since 2001, right?

12  A.  Correct.

13  Q.  You haven't worked with your wife since 2001, right?

14  A.  At the facility, correct.

15  Q.  So of course you weren't present in Centralia when any

16  of the things happened to her at work, right?

17  A.  No, ma'am.

18  Q.  Your information about that came from your wife, of

19  course, right?

20  A.  Correct.

21  Q.  And you've been on leave from Lawrence since -- was it

22  2006?  Is that right?

23  A.  '04.

24  Q.  Okay.  So you've been on the medical leave since 2004?

25  A.  Correct.

Cross - D. Cook

1   Q.  And I think you said that's a result of an inmate

2   encounter, correct?

3   A.  Correct.

4   Q.  So that's a work-related leave, right?

5   A.  Correct.

6   Q.  Or work-related injury that led to a leave, right?

7   A.  Correct.

8   Q.  You talked about Betty having migraines.  She did have

9   migraines prior to 2007, right?

10   A.  Yes, ma'am.

11   Q.  And she still has migraines now, right?

12   A.  It's been -- after her retirement they've subsided

13   substantially.

14   Q.  They subsided since retirement?

15   A.  Yes.

16   Q.  She does have one today though, right?

17   A.  Today?  I don't know about migraine.

18   Q.  Okay.  And you might not know, you haven't been -- been

19   waiting patiently.  You talked about getting a phone call

20   from Betty?

21   A.  Yes.

22   Q.  And I believe I heard your testimony, that was just a

23   few days before she actually retired?

24   A.  Yes, ma'am.

25   Q.  And she retired on May 31st of 2008, right?

                        Cross - D. Cook

1   A.   I believe it was.

2            MS. GUNDERSON:   Your Honor, may I have a moment?

3            THE COURT:   Sure.

4            MS. GUNDERSON:   I have no further questions for

5   Mr. Cook.

6            THE COURT:   Anything further?   That's it.

7            Ladies and gentlemen of the jury, any questions?

8   None?   You can step down, sir.

9            Folks, we're going to go ahead and recess for the

10  day.   We'll be in recess 'til tomorrow morning, 9:00.   Same

11  admonishments.   Please keep an open mind.   Don't arrive at

12  any conclusions, don't talk to anybody about the case.

13  Leave your notebooks on the chairs, please.

14       **(Jury out)**

15       **(Court adjourned)**

16                         *   *   *   *

17

18

19

20

21

22

23

24

25

1                          **REPORTER'S CERTIFICATE**

2

3          I, Laura A. Blatz, RPR, CRR, CCR(MO), Official Court
   Reporter for the U.S. District Court, Southern District of
   Illinois, do hereby certify that I reported in shorthand the
4  proceedings contained in the foregoing 251 pages, and that
   the same is a full, true, correct, and complete transcript
5  from the record of proceedings in the above-entitled matter.

6          Dated this 13th day of August, 2012.

7

8                              /s/
                               _____
9                              LAURA A. BLATZ, RPR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25