1                   IN THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF ILLINOIS
2

3    BETTY D. COOK,                    )
                                       )
4                      Plaintiff,      )
                                       )
5        vs.                           ) No. 09-cv-133-DRH
                                       )
6    ILLINOIS DEPARTMENT OF            )
     CORRECTIONS,                      )
7                                      ) May 25, 2011
                       Defendant.      )
8

9                    **TRANSCRIPT OF PROCEEDINGS**
                **TRIAL DAY/VOLUME #3 - P.M. SESSION**
10            **BEFORE THE HONORABLE DAVID R. HERNDON**
              **CHIEF UNITED STATES DISTRICT COURT JUDGE**
11

     **APPEARANCES:**
12

13   For the Plaintiff:          Thomas O. Falb, Esq.
                                  Williamson, Webster, et al.
                                  603 Henry Street
14                                Alton, IL  62002
                                  (618) 462-1077
15

     For the Defendant:          Joanna Belle Gunderson, Esq.
16                                Kelly R. Choate, Esq.
                                  IL Attorney General
17                                500 South Second St.
                                  Springfield, IL  62706
18                                (217) 782-1841

19   Court Reporter:             Laura A. Blatz, RPR, CRR, CCR(MO)
                                  U.S. District Court
20                                750 Missouri Avenue
                                  East St. Louis, IL  62201
21                                (618) 482-9481

22

23

24

25        Proceedings recorded by mechanical stenography;
     transcript produced by computer.

<u>**INDEX OF WITNESS EXAMINATION**</u>

| | <u>**DX**</u> | <u>**CX**</u> | <u>**R-DX**</u> | <u>**R-CX**</u> | <u>**FR-DX**</u> |
|---|---|---|---|---|---|
| *Bart Toennies* | *397* | *410* | | | |
| *Betty Cook* | *414* | | | | |

\*   \*   \*   \*

**INDEX OF EXHIBITS**

| <u>**EXHIBIT**</u> | <u>**DESCRIPTION**</u> | <u>**ID'D**</u> | <u>**ADMT'D**</u> |
|---|---|---|---|
| *Plf. 16* | Personnel file of Bart Toennies | *401* | *407* |
| *Plf. 1* | Evaluations of Betty Cook | *440* | |
| *Plf. 18* | E-mail from Ann Casey to Betty Cook dated 10/2/06 | *445* | *446* |
| *Plf. 9* | CHAMPS entry regarding Inmate Cobb | *469* | |
| *Plf. 10* | CHAMPS manual | *475* | *475* |

```
 1        (Court convened)

 2        (Jury out)

 3            THE COURT:  Jury's not in the room.  The issue

 4    we've been discussing is that there's a deposition to be

 5    read which -- is it Ms. Casey's?

 6            MS. GUNDERSON:  Yes.

 7            THE COURT:  Ms. Casey's deposition is to be read.

 8    It's now 9:27.  Counsel for both parties have been going

 9    through the deposition figuring out which parts of the

10    deposition will be read and which parts are to be excluded.

11    The defense counsel had somebody from their office come down

12    to actually be the reader of the deposition.  Mr. Falb had

13    indicated that he would read the deposition at 9:00.  He's

14    now changed his mind, decided to put his client on first and

15    read the deposition afterwards.

16            The request of the Court by defense counsel is that

17    I require Mr. Falb to go back to his original plan.  The

18    fear of defense counsel is that the plaintiff will be a long

19    witness and that it would waste the time of the person here

20    from the Attorney General's office, and the greater concern

21    is that it will be even a long -- such a long wait that we

22    might not even get to Casey's deposition today.

23            Bottom line is, I'm not going to tell the plaintiff

24    what order to call his witnesses.  I understand that there's

25    some concern here, but I just am not going to tell him when
```

 1    to call his witnesses.  So if he chooses to call his

 2    plaintiff now, that's his choice.  And I understand your

 3    concern about the extra time that's to be spent by the

 4    reader, and if you choose to keep her here, that's fine.  If

 5    she feels she can't wait, you want to recruit somebody else

 6    to read, then that's fine as well.  We've got lots of people

 7    around here that can read it.  Be happy to help you recruit

 8    an intern from the building or law clerk or somebody.  We

 9    can accommodate that.  So I won't grant their request.

10         Do we need to take up anything else before we bring

11    the jury in?

12         MR. FALB:  I don't think so.  I've talked to my

13    client and she thinks that she just wants us to go ahead

14    read that deposition.

15         THE COURT:  Okay.  So that issue's now resolved.

16         MR. FALB:  Will the Court explain what --

17         THE COURT:  I'll take care of that.

18         MS. GUNDERSON:  Hold on.  So we are reading

19    Ms. Casey's deposition now?

20         MR. FALB:  Yeah.

21    **(Off the record)**

22              *   *   *   *

23         THE COURT:  So we're going to read the deposition

24    after all.  That issue was moot.  We ready to go?

25         MR. FALB:  Yes, Your Honor.

1          *THE COURT:*  So Glenn, let's have the jury, and

2     maybe they're going to tell us all where to go.

3          **(Jury in)**

4          *THE COURT:*  Sorry for the delay, ladies and

5     gentlemen.  The parties were trying to work on a deposition

6     that they're about to read to you.

7          Now, when was this deposition taken, Mr. Falb?

8          *MR. FALB:*  February 26, 2010.

9          *THE COURT:*  Okay.  So on February 26, 2010, the

10    parties took a deposition of Ann Casey.  Ann Casey lives in

11    New Mexico now, correct?

12         *MR. FALB:*  That's correct.

13         *THE COURT:*  She's in New Mexico, which means she

14    cannot be forced to come to trial.  It's inconvenient for

15    her to be here or there's some other reason why she can't be

16    here, not sure why.  But in any event, when a party is

17    unavailable to come and testify, the standard alternative is

18    to take that person's deposition.  So they have the

19    deposition.  It's on paper.  There's a person that's going

20    to act like she's Ann Casey, is going to sit in the witness

21    stand, and the lawyers will read the questions; this person

22    will read the answers from the deposition.

23         The rule is that you should give the deposition the

24    same consideration as if Ann Casey were actually sitting

25    here in the trial and testifying like any other live walking

                        Direct - Toennies

 1   around witness.  So please give it that same consideration.

 2        But understand that this is a deposition in which

 3   Ann Casey -- or testimony which Ann Casey sat in front of a

 4   court reporter, and the lawyers asked her questions.  She

 5   was under oath just as though -- just as the witnesses are

 6   when they're here in the courtroom.  So this young lady --

 7   what's your -- Amy Romano is with the Attorney General's

 8   office and she's going to pretend like she's Ann Casey.  If

 9   you'll come on up and sit in the witness stand.

10        We're going to go through this deposition as though

11   Ann Casey were here in the courtroom.  And I'm not going to

12   have Laura sit here because we've got the transcript of the

13   deposition so she doesn't need to take it all down.  It's

14   already been taken down.

15        *(The deposition of Ann Casey was read into the record)*

16                  *   *   *   *

17        THE COURT:  Is your next witness going to be your

18   client, Mr. Falb?

19        MR. FALB:  No.  I've got a brief one.

20        THE COURT:  Okay.  That would be great.

21        MR. FALB:  Bart Toennies.

22        THE COURT:  Let's go ahead and do that.

23            **BART TOENNIES, PLAINTIFF'S WITNESS, SWORN**

24                   **DIRECT EXAMINATION**

25                  **QUESTIONS BY MR. FALB:**

                       Direct - Toennies

```
 1    Q.   State your name, please.

 2    A.   Bart Toennies.

 3    Q.   What is your occupation?

 4    A.   Correctional Counselor II.

 5    Q.   Where?

 6    A.   Centralia Correctional Center.

 7    Q.   How long have you been there?

 8    A.   2006, permanently.

 9    Q.   Sir, when did you start with the Illinois Department of

10    Corrections?

11    A.   1994.

12    Q.   And what was your initial job?

13    A.   Correctional officer.

14    Q.   Does that mean you were in charge of prisoners, or one

15    of the guards?

16    A.   Guard.   In other words a guard, yeah.

17    Q.   How long were you a guard?

18    A.   'Til 2001, seven years.

19    Q.   And where were you?

20    A.   Southwestern Correctional Center in East St. Louis.

21    Q.   Here in East St. Louis, is that correct?

22    A.   Yeah.

23    Q.   Where did you go after that?

24    A.   To Lawrence Correctional Center as a Counselor II in

25    July of 2001.
```

Direct - Toennies

 1   Q.   Okay.  And at some point in time you moved to Centralia,
 2   is that correct?
 3   A.   Correct.
 4   Q.   And that's where Warden Robert was, is that correct?
 5   A.   Yes.
 6   Q.   What is your father's occupation?
 7   A.   He's retired.
 8   Q.   What was he before?
 9   A.   He was a truckdriver.  He was a -- cut meat here in
10   East St. Louis at some -- Hunter Packing or something like
11   that.
12   Q.   What else?
13   A.   He was a zoning something for Clinton County, zoning
14   administrator.
15   Q.   What was he?
16   A.   Zoning administrator.
17   Q.   Okay.  How long was he zoning administrator for Clinton
18   County?
19   A.   I don't know.
20   Q.   Okay.  Let me ask you this:  At some point in time you
21   became a permanent employee at Centralia Correctional
22   Center?
23   A.   Yes.
24   Q.   What month, what year was that?
25   A.   Permanently, I believe it was December of 2006.

                          Direct - Toennies

1    Q.   Okay.  And in December of 2006 was Ann Casey your

2    supervisor?

3    A.   Yes.

4    Q.   And was she your supervisor for the next seven or eight

5    months?

6    A.   I assume if she was there that long, yes.

7    Q.   I forgot to ask you, sir:  What is your age?

8    A.   39.

9    Q.   And what is your year of birth?

10   A.   '71.

11   Q.   Okay.  And have you been a Correctional Counselor II

12   since December of '06?

13   A.   No; since July of 2001.

14   Q.   I'm sorry.  At Centralia?

15   A.   Yes.

16   Q.   Okay.  So from December of '06 until present time you've

17   always been a Correctional Counselor II?

18   A.   Yes.

19   Q.   After you became a Correctional Counselor II in December

20   of '06, did an older lady by the name of Deb Brink come in

21   as a counselor?

22   A.   Yes.

23   Q.   And she was close to 50 years of age?

24   A.   I don't know how old she was.

25   Q.   Do you remember any controversy as far as you coming in

Direct - Toennies

1    first as opposed to her?

2    *A.*  No.

3    *Q.*  By the union or by anyone?

4    *A.*  No.

5    *Q.*  Sir, then after you came to Centralia, your evaluations

6    were done by Ann Casey, is that correct?

7    *A.*  Yes.

8    *Q.*  At any time were you disciplined by Ann Casey?

9    *A.*  No.

10   *Q.*  At any time were you counseled by Ann Casey?

11   *A.*  No.

12   *Q.*  At any time were your -- was your vacation unilaterally

13   changed by Ann Casey?

14   *A.*  No.

15   *Q.*  Have you looked through your evaluations prior to coming

16   here?

17   *A.*  No.

18   *Q.*  Showing you what has been marked as Plaintiff's

19   Exhibit 16.  I'm going to represent that to you as a copy of

20   your personnel file that was produced to me by the Attorney

21   General's office.  Does that look to be it?

22   *A.*  I assume so, yeah.

23   *Q.*  Okay.  And I'm going to be very brief with you.  I'm

24   going to ask you to go through some of your evaluations.

25   *A.*  Okay.

Direct - Toennies

1   *Q.*  And there's some Bates stamped pages at the very bottom

2   right.  Do you see those paginated stamps at the very bottom

3   of each page?

4   *A.*  Oh, these?

5   *Q.*  Yes.  They're sometimes hard to read.

6   *A.*  Okay, yeah.

7   *Q.*  And let me ask you first to refer to your earlier

8   evaluations when you first started, and that would be -- I'm

9   going to direct you to the page to help you, page 3162.  Do

10  you see that?

11  *A.*  Yes.

12  *Q.*  And the very next page just behind it, the number

13  doesn't come up very clearly, is that the page where you had

14  received your appraisal of employee performance by your

15  supervisor?

16  *A.*  Yes.

17  *Q.*  Okay.  And just so the jury knows what we're talking

18  about --

19          *THE COURT:*  Any objection to showing the jury?

20          *MS. CHOATE:*  No, not at this time, no.

21          *THE COURT:*  Okay.

22          *MR. FALB:*  Thank you.

23  *Q. (By Mr. Falb)*  I don't know if the jury can see this, but on

24  the -- this area, or the categories, do you see where I'm

25  circling?  Do you see that?

                    Direct - Toennies

1    A.   Yes.   I'm sorry, I thought you were talking to the jury.

2    Q.   And the first one is "Exceeds"?

3    A.   Uh-huh.

4    Q.   Then the next category -- that's the best.   The next

5    category, "Meets"?

6    A.   Yes.

7    Q.   The next below that would be "Needs Improvement", and

8    below that is "Insufficiency", is that correct?

9    A.   Yes, "Needs Improvement".

10   Q.   Okay.   And this sets forth, in your first year of

11   probation, where you were, is that correct, as far as --

12   A.   Not sure the dates on this.   This is 1995.   Yes.

13   Q.   Okay.   And then I'm going to try not to go through every

14   page.   I'm just going to try to condense this as quickly as

15   possible.   I've gone through this, and if you think I'm

16   reading something incorrectly, you tell me.   If you need to

17   look at something, that's fine also.   But I'm just trying to

18   shorten this up before lunchtime.

19   A.   Okay.

20   Q.   According to my records -- and you correct me if I'm

21   wrong -- that you had no "Exceeds Expectations" until the

22   year 1997.   You had one "Exceed" that year, and that would

23   be on page 3146, if you need to take a look at that.

24   A.   I mean I'd have to look at all these to say you're

25   absolutely correct.   I have no idea.

                        Direct - Toennies

1  *Q.*  I don't want to be unfair to you.  Please.  And I can

2  read these to you.  On page 3146, do you see that?

3  *A.*  Yep.

4  *Q.*  You had no "Exceeds Expectations" whatsoever?

5  *A.*  On 3146 there was one "Exceeds".

6  *Q.*  Okay, one "Exceeds".  I'm sorry.  And the very next year

7  it went down to zero "Exceeds", and this is while you're

8  still at Lawrence, is that correct?  Or East St. Louis?

9  *A.*  1997, I was still at East St. Louis.

10  *Q.*  Okay.  And the next year, which would have been page

11  3140, did you have any "Exceeds"?

12  *A.*  That would be on 3141.

13  *Q.*  Okay.  Did you have any "Exceeds"?

14  *A.*  No.

15  *Q.*  Okay.  So it went down from the year before, your

16  evaluation?

17  *A.*  Yes.

18  *Q.*  Now, and then according to my records, if we -- let's

19  just jump ahead.  In the year -- when did you start as a

20  counselor in the year?  July of 2001?

21  *A.*  Yes.

22  *Q.*  Okay.  And in July of 2001, the first two probationary

23  periods that you were a counselor you had zero "Exceeds",

24  and that's on page 3114?

25  *A.*  That was from 7/1/01 to 9/1/01, the two months, no

Direct - Toennies

1   "Exceeds", yes.

2   Q.  The next time you still had no "Exceeds", is that right?

3   And that would be on page 3108.

4   A.  Correct.

5   Q.  Okay.  And then after your probationary period you did

6   better, is that correct, as far as your evaluations?

7   A.  Yes.  I always try to do better.

8   Q.  Okay.  At this time, when you were Counselor II, you

9   were in -- is it Lawrence?

10  A.  July of '01, yes, Lawrence.

11  Q.  And the last time you were in Lawrence, would that have

12  been from July of '05 until June of '06 before you started

13  doing TA's, or temporary assignments, in Centralia?

14  A.  It was a detail.  I'm not exactly sure the date I went

15  there.  I think it was later than June or July.  I think it

16  was later in 2005.

17  Q.  Let's go to page 3077 of your evaluations.  Do you have

18  that there?

19  A.  1/1/05 -- I'm sorry.  3770.

20  Q.  No; 3077.

21  A.  Yeah, 3077.

22  Q.  Okay.  And was this -- this was an evaluation that was

23  done by Ray, is it "Herson", via telephone?  Is that how you

24  pronounce it?

25  A.  Ray.  That's Randy Stevenson.

                        Direct - Toennies

1    Q.  Okay.  Randy Stevenson.  That was done by telephone, is

2    that right?

3    A.  Yes.

4    Q.  And at that point you had five out of eight "Exceed"

5    evaluations?

6    A.  Yes.

7    Q.  And then on page 3072 -- excuse me, actually the

8    markings on page 3073.

9    A.  Right.

10   Q.  That was the first evaluation done by Ann Casey, is that

11   correct?

12   A.  Yes.

13   Q.  And as far as "Exceeds Expectations", you were perfect?

14   A.  Yes.

15   Q.  And from then on, every single evaluation you had was

16   perfect?

17   A.  Yes, even the one done by Ty Bates.

18   Q.  Even the one done by Ty Bates?

19   A.  Right, Assistant Warden Ty Bates.

20        MR. FALB:  Your Honor, I would move to introduce

21   into evidence this exhibit.

22        THE COURT:  Any objection to the exhibit?

23        MS. CHOATE:  We would object to the entire exhibit

24   as there are pages of this exhibit that are not relevant and

25   were not used with this witness, had nothing to do with his

Direct - Toennies

1    evaluations.

2         THE COURT:  Can we admit Exhibit 16 and then

3    perhaps you can get together and redact parts that are not

4    relevant?

5         MR. FALB:  That would be fine, Your Honor.

6         MS. CHOATE:  Yes.

7         THE COURT:  All right.  Exhibit 16 will be

8    admitted.  Counsel will get together and redact that

9    portions that are not appropriate or not relevant to the

10   testimony.

11   **(Plaintiff's Exhibit No. 16 admitted)**

12   Q. (By Mr. Falb)  Sir, before you came to Centralia, you were a

13   counselor, as you told us, in Lawrence --

14   A.   Yes.

15   Q.   -- is that correct?

16   A.   Yes.

17   Q.   And I think you told us they had 15 counselors there?

18   A.   When they opened in 2001 we had 15.

19   Q.   When you left how many counselors were there?

20   A.   I don't know exact number.

21   Q.   Well, I mean is it safe to say you had a caseload at

22   Lawrence that was only half as much as you got in Centralia?

23   A.   It changed so much at Centralia.  It varied.  I went

24   from 200 to 100 to 400, so I can't -- I mean at Lawrence I

25   had 250 on average.

                          Direct - Toennies

1    Q.   That's what I was going to ask.   When you left Lawrence

2    you had 250 counselors?

3    A.   When I left Lawrence I was field service.

4    Q.   You had 250 inmates, is that right?

5    A.   Yes -- no.   More than that.

6    Q.   And then, in fact, did you have supervisors at Lawrence?

7    A.   Yes.

8    Q.   What were the supervisors?

9    A.   There was five case work supervisors and one assistant

10   warden and then a warden.

11   Q.   So you had five case work supervisors over the

12   counselors?

13   A.   Yes.

14   Q.   And how many counselors were there?

15   A.   Fifteen.

16   Q.   Fifteen.   How many inmates did you have there?

17   A.   We started out with zero because it opened in 2001, and

18   it slowly went up to 2100.

19   Q.   Okay.   And then when you came to Centralia you had what,

20   four or five counselors?

21   A.   Five, I think, yeah.   Well, when I came there, there was

22   only three.

23   Q.   And there were 1600 inmates?

24   A.   Fifteen, 1600.

25   Q.   And you had no supervisors whatsoever, except for the

Direct - Toennies

1    assistant warden?

2    A.   Right.

3    Q.   No case work supervisors, no clinical case work

4    supervisor?

5    A.   No.

6    Q.   And at this time in Lawrence you had not one, but five

7    case work supervisors, didn't you?

8    A.   Yes, but they were only assigned one.  I had one that I

9    worked for that did my evaluations.

10   Q.   I understand.  The other contingent of counselors of 15,

11   which was three times as many counselors in Centralia, you

12   had five supervisors instead of zero in Centralia?

13   A.   When I was in field service at Lawrence I didn't report

14   to a case work supervisor.

15   Q.   I wasn't asking -- I'm talking about the department.

16   The whole department had five supervisors, the counseling

17   department?

18   A.   Yes.

19   Q.   And you had 15 counselors?

20   A.   Yes.

21   Q.   So it was a big, big difference between Lawrence and

22   Centralia?

23   A.   They're all different.

24        *MR. FALB:*  Thank you.

25        *THE COURT:*  Cross?

                    Direct - Toennies

1                        **CROSS-EXAMINATION**

2                   **QUESTIONS BY MS. CHOATE:**

3    Q.  Bart, you were asked about Plaintiff's Exhibit 16, which

4    were your evaluations, correct?

5    A.  Yes.

6    Q.  And you were shown them from 1995 at the time that you

7    began as a correctional officer, right?

8    A.  Right.

9    Q.  And as counsel pointed out with you, during those early

10   days, even your early days as a counselor, you had no

11   "Exceeds Expectations", correct?

12   A.  Correct.

13   Q.  During any of that time did you ever have any "Needs

14   Improvements"?

15   A.  No.

16   Q.  So your entire career has been either "Meets

17   Expectations" or "Exceeds Expectations", is that correct?

18   A.  Yes.

19   Q.  You were asked about the caseload.  I think you

20   mentioned the caseloads at Centralia changed.  Do you know

21   why?

22   A.  People left, people came.  We had details coming from

23   Vandalia, from Menard, different staff come in and out,

24   infield service, outfield service.

25   Q.  Did you have -- you said you had a caseload I think at

                        Cross - Toennies

1    Lawrence of 250 when you left, is that right?

2    A.  When I left I didn't have any caseload.  I was in field

3    service.  But at the most when I was at Lawrence, yeah, you

4    had 250.

5    Q.  Did you have a caseload at Centralia when you were in

6    field services?

7    A.  No.

8    Q.  And you've had -- as far as your evaluations go, you've

9    had more than one supervisor do all these evaluations, is

10   that fair?

11   A.  Yes.

12   Q.  And those are including supervisors at two different

13   prisons, right?

14   A.  Yes.

15        MS. CHOATE:  I have nothing further at this time.

16        THE COURT:  Redirect?

17        MR. FALB:  No.

18        THE COURT:  Ladies and gentlemen of the jury, any

19   questions?  No?  Okay.  You can step down.

20        We're going to be in recess for lunch, 1:15, folks.

21   Same admonishments as before.  1:15.

22   **(Jury out)**

23        THE COURT:  The jury is not in the courtroom.

24   Mr. Falb?

25        MR. FALB:  Your Honor, it has come to my attention

                        Cross - Toennies

 1    that the defendants have copies of certain disciplinary

 2    actions regarding one of my witnesses, Mr. Risse, and I had

 3    requested to obtain copies of those and the defense has

 4    refused to give them to me, and I'm asking the Court to

 5    order that be done.

 6         *THE COURT:*  Respond?

 7         *MS. CHOATE:*  Yes.  We became aware of Mr. Risse

 8    facing discipline, and I believe that Ms. Gunderson asked

 9    him just, *Are you currently facing discipline*, after he had

10    testified that he was a good employee and hadn't been

11    disciplined and all that, if you recall that whole thing

12    yesterday.  And Ms. Gunderson asked him -- Mr. Risse then

13    went off on his tangent about this alleged discipline he's

14    getting in retaliation, yada, yada, but -- and excuse the

15    yada, yada, but the point is, Ms. Gunderson did not use any

16    documents with Mr. Risse, did not ask him about specific

17    documents, did not show specific documents and had no

18    intention of putting those into evidence.  We don't believe

19    that we have any obligation under the federal rules or under

20    any other rule that would require us to produce these

21    documents to counsel for someone who's not even the

22    witness's counsel.

23         *THE COURT:*  The authority to require them to

24    produce the document?

25         *MR. FALB:*  Your Honor, I think they're discoverable

1   under the initial disclosures, and if after the witness has

2   testified, if they still have the documents, I'm entitled to

3   have them.  I may need to use them in the future in this

4   case.  They're relevant, and further, at a minimum, may lead

5   to discoverable information.

6       MS. CHOATE:  We don't believe that there's any

7   obligation under Rule 26 or any other discovery rule to

8   provide documents that we never intend to use in our case in

9   chief.  And again, the document was not used.  So the

10  information that we came across and she asked the witness

11  about and was cross-examined, you know, he was able to be

12  cross-examined about this information.  The documents have

13  nothing to do with it.  There are documents but they are not

14  something that should be discoverable because we were not

15  going to use them in our case in chief and did not use them

16  at all, and there was no discovery request for any documents

17  having to do with the witness, so there was nothing to

18  supplement.

19      THE COURT:  As to the possibility they may lead to

20  relevant evidence, what relevant evidence might they lead

21  to?

22      MR. FALB:  He may not be guilty of anything, you

23  know.  They tried to impeach him about being guilty of

24  certain crimes or certain disciplines.  You know, I may have

25  a chance to re-call him once I read these documents or I may

```
 1    call somebody else.

 2            MS. CHOATE:  It's our information that Mr. Risse

 3    would have copies of any documents that we would have seen

 4    because they would have been documents he would have been

 5    served with or created.

 6            MR. FALB:  Question is, I don't have them.

 7            THE COURT:  Yeah, I'll direct the defendants to

 8    provide the documents.  We'll be in recess 'til 1:15.

 9        (Lunch break)

10                            *   *   *   *

11        (Jury in)

12            THE COURT:  Call your next witness, please.

13            MR. FALB:  Betty Cook.

14          BETTY COOK, PLAINTIFF'S WITNESS, SWORN

15                     DIRECT EXAMINATION

16                 QUESTIONS BY MR. FALB:

17    Q.  State your name, please.

18    A.  Betty Cook.

19    Q.  Betty, you are the plaintiff in this case, is that

20    correct?

21    A.  Yes, I am.

22    Q.  Betty, we're here concerning a lawsuit that you filed

23    regarding discriminatory acts on the basis of your age

24    beginning in December of 2006, is that right?

25    A.  That's correct.
```

Direct - Cook

```
1    Q.  Let me, before I get to that, talk about your

2    background.  First of all, what is your age?

3    A.  I'm currently 53 years old.

4    Q.  Betty, what is the date of your birth?

5    A.  August the 25th, 1957.

6    Q.  Okay.  And how far have you gone in school?

7    A.  Sixteen years.

8    Q.  Okay.  So that's a high school?

9    A.  I have a -- no, sir -- a Master's degree, a Bachelor's

10   degree from Eastern Illinois University.

11   Q.  Okay.  And what is that in?

12   A.  It's in business.

13   Q.  Let's talk about, first of all, your family.  You're

14   married to Doyle who testified yesterday, is that correct?

15   A.  Yes, I am.

16   Q.  And you have how many children?

17   A.  I have one child with him.  I have one child from a

18   previous marriage.

19   Q.  Okay.  And where do you reside?

20   A.  Centralia, Illinois.

21   Q.  How long have you lived there?

22   A.  Since 1994.

23   Q.  And your husband, Doyle, he's a -- I think a lieutenant,

24   is that correct?

25   A.  Yes.
```

Direct - Cook

1    Q.  For the Illinois Department of Corrections?

2    A.  Yes.

3    Q.  And did you start working for the State of Illinois at

4    some point in time?

5    A.  I did.  I began my employment at the Pontiac

6    Correctional Center on December the 14th, 1976.

7    Q.  And Pontiac, is that in Pontiac, Illinois?

8    A.  It is.

9    Q.  And why did you start working there?

10   A.  I needed a better job.  I was working in a factory.  I

11   had just stopped going to school because I stupidly got

12   pregnant.  My dad made me get married and I had to get a job

13   and make a living.

14   Q.  Okay.  And I didn't ask for all that information, but

15   that's fine.  I appreciate your honesty.  Why don't you tell

16   me, what was your initial job in 1976?

17   A.  I was hired by School District 428, which is a separate

18   entity of the Illinois Department of Corrections.  I was

19   hired to be their school secretary.

20   Q.  Okay.  Why don't you kind of bring us up-to-date what

21   you did in Pontiac, Illinois.

22   A.  When I began my employment I worked directly for the

23   supervisor of the school, who was called the Director of

24   Education.  He had two assistants and one lead worker.  The

25   two assistants, one handled the vocational programs for the

Direct - Cook

1    inmates, one handled the academic programs for the inmates.

2    The lead worker handled the various special programs such as

3    we had Illinois State University who offered college classes

4    to the inmates at that time and we also had special

5    education and Title 1.  It was set up just like a school

6    district on the street, and we gave services to the inmates

7    in the academic program that were 21 and under and were

8    deficient, needing GED's, etc.  If they completed those,

9    they had the opportunity to go on to the college program

10   and -- or the vocational program.  They had to score at

11   least a 6.0 on the test that they were given in order to go

12   into the college and the vocational programs.

13   *Q.*  Okay.  So just kind of bring me up-to-date the jobs that

14   you had while you were at Pontiac.

15   *A.*  Okay.  While I worked for School District 4028, I

16   handled all of their purchasing of books, all of their

17   accounting ledgers.  I handled inmate attendance, their

18   transcripts when they earned any kind of certificate or

19   diploma or anything like that.  I turned in their daily

20   attendance for inmate payroll because at that time inmates

21   were afforded a certain amount of money every month to buy

22   necessities.  There was different jobs around the

23   institutions, and school's considered a job, so I took care

24   of that.  And I also supervised one clerical, who was the

25   job title directly beneath me, and I was the lead worker to

Direct - Cook

1   the two secretaries who worked in the special program as far

2   as special ed and Title 1.  And then --

3   Q.  Go ahead.

4   A.  And then I had to do direct typing and filing for, not

5   only the Director of Education, but all of his assistants.

6   Q.  Okay.  What was your next job?

7   A.  I transferred from the school district by a lateral

8   transfer into the business office, secretary job, and I only

9   did that because after I married Doyle -- he was an officer

10  there and he had tower duty a lot, which meant he was up to

11  the tower with the weapons, because if you're on the ground

12  you don't have weapons, the employees don't, and so --

13  Q.  How long did you do that?

14  A.  The job in the business office?

15  Q.  Yes.

16  A.  From -- 'til I transferred to Centralia in 1994.  I

17  transferred in 1990 to business office, so four years.

18  Q.  So prior to transferring to Centralia, did you have

19  other job opportunities?

20  A.  Yes, I did.  While I worked at Pontiac I was temporarily

21  assigned as the supervisor of the mailroom.  After that lady

22  retired and when the job was posted, I was interviewed for

23  it and I was offered it, but I was not able to accept it

24  because my husband had transferred the month before down to

25  Centralia, so I was not able to take the promotion at that

Direct - Cook

1    time.

2    *Q.*   Any other jobs?

3    *A.*   Yes.  While I was at Pontiac I served on the

4    accreditation team, which makes sure all the standards of

5    the American Correctional Association is maintained at the

6    facility.  I was on the internal auditing and I also was on

7    the external auditing.  The external audit teams make sure

8    they are meeting their standards prior to the Correctional

9    Association's inspection.

10   *Q.*   Okay.  Anything else that you did prior to moving down

11   to Centralia?

12   *A.*   I have to check my resume to --

13   *Q.*   Is your resume in your personnel file?

14   *A.*   It is.

15   *Q.*   The defense attorneys have a thick personnel file that

16   basically starts you from day one all the way up to the time

17   you retired, is that right?

18   *A.*   I assume they do.  She said, when I did my deposition,

19   she had my personnel file, so I assume everything I've told

20   you is in there.

21   *Q.*   Okay.  You can look at your resume if you need to.

22   *A.*   Thank you.

23   *Q.*   I don't want to take too long with this.  The jury just

24   came back from lunch.

25   *A.*   I understand.


                            Direct - Cook

1    *Q.*  Fall asleep.

2    *A.*  I did forget to mention that in 1989 when I was working

3    for the school district they had a library system there

4    called Cornbelt Library System that was out of Bloomington,

5    Illinois, and the state elected to pick them up as state

6    employees.  And because of my job as the school secretary, I

7    was required to assimilate that into the school.  I did all

8    of their initial set-up.  I set up the accounting ledgers, I

9    ordered and transferred all the books and the equipment, and

10   everything that was in that area became part of the school

11   district property, and I did all the property records on

12   that.  I was nominated that year by my secretary for the

13   Illinois State Board of Education's program, those who

14   excel, and I was awarded the award for school support staff

15   for 1989 for excellence.

16   *Q.*  Okay.  So let's talk about Centralia.  You came down

17   here because your husband obviously was transferred, is that

18   correct?

19   *A.*  Yes.

20   *Q.*  And you came with him?

21   *A.*  Yes.

22   *Q.*  And what did you start doing?  I assume you started

23   working at Centralia Correctional Center?

24   *A.*  I did.  I was -- I bid on the job in the major's office

25   and I transferred down to Centralia as the major's

Direct - Cook

1    secretary.  And the reason I did that, number one, was to be

2    with my husband, and number two, the reason I took the job

3    in the major's office -- because there was a couple other

4    job openings at that time -- is because I had never had any

5    exposure to security type issues with the inmates.  You

6    know, I had the day-to-day contact with the inmates at

7    Pontiac, but this was a whole new area that I had no

8    exposure to, and I wanted to keep learning.  I wanted to be

9    upwardly mobile.  I was in the upward mobility program that

10   had started in 1989 at the facility.

11   Q.  Which means you can get promotion?

12   A.  Right.  It's an agreement between union and management

13   to where you're afforded time off to go to college and they

14   help you with tuition and stuff like that, so I had been

15   accepted into that program and had -- in 1989, and had

16   already started going to school.  So I felt that taking the

17   job in the major's office would afford me access to a whole

18   'nother area.  I'd always done purchasing and business type

19   work, you know, accounting ledgers and stuff like that, so I

20   figured this would give me another area that I didn't know

21   anything about.  So I took the job in the major's office.

22   Q.  And this was the major for security?

23   A.  This was the chief of security.  He was the top security

24   person at the facility and reported directly to the

25   assistant warden of operations, which was the job that

Direct - Cook

1   Warden Bradley came in -- excuse me, Warden Robert at the

2   time.  He was not the assistant warden though.

3   Q.  Okay.  So what kind of job privileges and duties did you

4   have?

5   A.  I had a very high-level security clearance.  I had

6   access to all the records of the security staff.  I typed

7   their yearly employee evaluations.  I typed disciplinary

8   referrals on them.  I did the recapitulation of manpower.  I

9   did the roster management, which is the moving around and

10  assigning of the officers after bumps were processed, and

11  that's the process in the contract where they can change

12  days off and shifts and stuff like that.  So I did all of

13  that work.

14     I did the daily checking of the captains' rosters to

15  insure that they were correct and audit ready.  I did all of

16  their ACA files.  I did all of the -- for security, and all

17  of the roster management work post-analysis,

18  post-descriptions, the yearly sign-offs, the training of the

19  captains to make sure they were on top of roster management,

20  and I was responsible for all that in addition to serving as

21  the unit secretary for the major.

22     He would lots of times be out on the compound and he

23  would just call across on the radio or on the telephone and

24  say, *I need a memo, say blah, blah, blah.  Have it ready*

25  *when I come to the office.  I need this.  I need that.*  I

Direct - Cook

1   did all of that.  I did daily mail, all of his

2   correspondence.  I maintained every piece of paper that came

3   into that office.

4   Q.  How long did you do that job?

5   A.  I did that job for 10 years.  And also in the course of

6   doing that job, because of the location of where it was at,

7   the assistant warden of operations' job was right across the

8   hall and it was on my 201 evaluation.  When his secretary

9   was gone, I did that job also.

10  Q.  Okay.  Jury doesn't know what a 201 evaluation is, and

11  like I didn't know when I first met you.  What is a 201?

12  A.  It's -- the number 201 is just the number of the form.

13  It's the yearly evaluation that each employee is given as to

14  how they are doing their job.

15  Q.  Now, prior to you testifying I told you it's important

16  that you bring out a lot of things about your background,

17  and I know you didn't want to do it, didn't want to be --

18  A.  No, didn't want.

19  Q.  -- act like you're arrogant or anything, but it's

20  important for this jury to know because in the opening

21  statement they acted like you had just been a secretary for

22  all these years.

23  A.  That's true, I had been a secretary, but that was not

24  just a simple, easy -- you can't just say, well, she was a

25  secretary.  I had numerous duties and high-level type

Direct - Cook

1   responsibilities that went with those job descriptions of

2   those jobs that I was responsible for.

3   Q.  Okay.  After the 10 years in that position, did you go

4   into a different field?

5   A.  I did.

6   Q.  What field?

7   A.  I went into counseling.

8   Q.  Okay.  That's what we're here for, the counseling

9   department?

10  A.  Yes.

11  Q.  And why did you do that?

12  A.  In 2002 the governor signed into law an early retirement

13  bill and there were a lot of employees that left and it left

14  a lot of open jobs.  My husband and I sat down and figured

15  out how long we would have to work.  At that time and for

16  several years after that everybody was talking about this

17  early retirement.  Everybody was buzzing about when they

18  could go, when they could retire.  And so we sat down and we

19  figured out what was the earliest that we could go because

20  we wanted to retire at the same time.

21  Q.  Your husband's younger than you?

22  A.  My husband is four years younger than I am, and from the

23  day that I met him it has always been his dream to have a

24  business of his own, and so that was our goal.  We were

25  going to retire together and open our own business and run

Direct - Cook

1    it.

2    Q.  I want to ask one question.  Yesterday when he testified

3    and I asked him what his age was, he said he was age 29.

4    A.  I wish he was.

5    Q.  So that's not the truth?

6    A.  No.  He was born in 1961, so he is 49 years old and will

7    turn 50 later this year.

8    Q.  So what was your goal?

9    A.  Our goal was to at least work until he turned 50 and

10   then we would assess the situation at that time personally,

11   financially, work-wise as to whether we were ready to retire

12   at that point in time or whether we were going to go on.

13   People say that I was planning on retiring earlier.  We

14   never told people our plans.  We've always kept our business

15   close to the vest.  You learn at Pontiac, which is a maximum

16   security facility, you don't put your business out for

17   people to know.  It's dangerous.  You know, you just don't

18   do that.

19   Q.  Okay.

20   A.  So no one knew, except my husband and I, what our

21   retirement plans were.  Everybody speculated, everybody

22   thought they knew.  We did not discuss that.  It was

23   nobody's business.

24   Q.  In fact, today you brought in a piece of paper, this

25   piece of paper, years and years ago you and your husband

Direct - Cook

 1   wrote down the figures?

 2   A.  Absolutely.

 3   Q.  Are you the type of person like a packrat that keeps

 4   stuff?

 5   A.  To a certain extent anything that I feel is important

 6   that had to do with job, money, medical, anything like that,

 7   things that happened at work that I felt were important,

 8   things I wrote incident reports on, everything.  I have a

 9   massive three-ring binder system at home with all these

10   important papers in it, our house insurance, our car

11   insurance, our everything.  Being a secretary, I am very

12   organized and very meticulous.

13   Q.  Okay.  Let's just jump to this.  One of the witnesses

14   said you looked to be disorganized while a counselor.  Just

15   explain to the jury how someone might have got that

16   perception.

17   A.  Because to look at my desk, that's what it looked like.

18   But I had very organized clutter.  If I was doing a

19   transfer, I would pull out all my information because I

20   wanted to check everything.  People said I didn't know what

21   I was doing.  If I didn't, I went to the manual and found

22   where it said in writing what to do.

23   Q.  Okay.

24   A.  And that's how I worked.  Yeah, my desk might have

25   looked like a cyclone hit it, but I knew what was going on.

                        Direct - Cook

```
 1    Q.   Okay.  Another thing I want to cover real quick, and
 2    we'll get to this later.  There was mention that you talked
 3    about retirement all the time, just dreams and stuff like
 4    that with other people in the counseling department.  Is
 5    that true or wrong or in between or --
 6    A.   There's some truth to that.
 7    Q.   Tell the jury why.
 8    A.   Because after the early retirement bill, number one, it
 9    was a pipe dream.  Everybody would sit around and say, I'm
10    going to go here and I'm going to go there.  After everybody
11    left, meaning Al and Terri and Cindy and Pam and Tony, it
12    wasn't a joking thing any more.  This prison in Centralia is
13    not like the prison at Pontiac.  Pontiac was all about
14    security, camaraderie and protecting each other's back.  The
15    prison in Centralia is all about seniority and who can get
16    out of my way so that I can promoted or get something else.
17    I have never worked at a prison before or -- and never even
18    in auditing all the other prisons that I was sent to, I have
19    never worked in a place where people wanted what you had so
20    badly.  It was just unbelievable.  Everything out there was
21    seniority, seniority, seniority.  How much time do you have,
22    when are you leaving, what about this and what about that?
23    That was --
24    Q.   When someone would die?
25    A.   Uh-huh.  When someone would die they would look to see
```

Direct - Cook

```
 1   where they fell on the seniority list so that they could --
 2   Oh, gee, that will move me up three spots.  I might get a
 3   better job assignment.
 4   Q.  I want to ask you:  The jury may be thinking, is that
 5   really the case in Centralia?
 6   A.  It absolutely is.  I am bound by taking that oath to
 7   tell you the truth.  And that prison in Centralia is a
 8   snakepit.  I have never worked with people in my life who
 9   would look you in the face and stab you in the back at the
10   same time.
11   Q.  When you became counselor, what was -- had Warden Robert
12   become assistant warden?
13   A.  No, he had not.  Or maybe he had -- let me rephrase
14   that.  No.  I became a counselor in 2004.  He became warden
15   in January 2005.  When I went into the counseling office,
16   Bob Bowen, a great boss, was the warden.
17   Q.  Okay.  Let's back up.  When you became a counselor, that
18   was in February 2004?
19   A.  February the 1st, 2004.
20   Q.  And was Mr. Robert -- was he assistant warden at that
21   time?
22   A.  He was.
23   Q.  Okay.  When he became assistant warden when you were
24   doing your previous job did you have to give him any
25   assistance?
```

                          Direct - Cook

1    *A.*  Yes.

2    *Q.*  Tell the jury what you had to do.  According to

3    Warden Robert, you only helped him with a few times or

4    timelines or something like that.

5    *A.*  I was working as the major's secretary, and at that time

6    Major Jefferson, who I had worked with for 10 years, took

7    the early buy-out in September of 2002, so there was a

8    period of time where I didn't have a direct supervisor.  I

9    still had to do the job, and the secretary for the

10   operations office retired, so I did my job and that job.  I

11   covered both areas.

12        Warden Robert started back at the Centralia facility on

13   October the 20th, 2003.  At that time I was told, *You are to*

14   *give him as much help as you possibly can.*  So I showed him

15   every piece of paper, every daily, weekly, monthly, annual,

16   semi-annual report, everything that entailed office work in

17   that office.  The reports and stuff that had to be done to

18   meet the requirements so that we wouldn't get in trouble, I

19   showed him every one of those.

20        After I took my job in counseling on March 4th, 2004, I

21   was sent back to his office for a full day to work with

22   Lanette Ward, who was put there to be his secretary, to show

23   her how to run the paper in that office.  I showed him

24   everything.  I did not show him how to do the security

25   because that was not my cup of tea, that was not what I was

Direct - Cook

1    employed to do, but I showed him everything in regards to

2    running that office as far as the paper and what had to be

3    done.

4    *Q.*  Okay.  So his testimony yesterday or whenever he

5    testified, the day before, that you only showed him some

6    time for timelines, is that correct?

7    *A.*  That's half true.  In the paperwork, of course there

8    were timelines and stuff like that where the stuff had to be

9    done.

10   *Q.*  Let me ask you this:  When he became assistant warden,

11   did he have any idea what he was doing?

12        *MS. GUNDERSON:*  Objection to speculation.

13   *Q. (By Mr. Falb)*  Based upon your observations.  And I don't

14   want to be critical.  Was he totally green on the job?

15        *MS. GUNDERSON:*  Objection as foundation,

16   speculation.

17        *THE COURT:*  Overruled.

18        *THE WITNESS:*  I wouldn't say he was totally green

19   on the job, but he did tell me, *You're going to have to help*

20   *me.  I don't know how this paper works because I haven't*

21   *been in corrections for a while.*  And I said, *I'm obligated*

22   *to give you just as much help as I'm supposed to and I will*

23   *help you just as much as I can because that's my job.*  It's

24   in my 201 evaluation.

25   *Q. (By Mr. Falb)*  And did you do that?

                         Direct - Cook

1    A.  I certainly did.

2    Q.  Was he appreciative of that?

3    A.  Yes.  As a matter of fact, when I went to transfer to go

4    into counseling he told me, *If there's ever anything I can*

5    *do for you, you just let me know.  I appreciate all the help*

6    *you gave me.*  The one and only time that I got any praise

7    from that man.

8    Q.  Let me ask you this:  When you were in the midst of

9    transferring to become a counselor, was your husband -- had

10   he been transferred from Centralia to Lawrence?

11   A.  Yes.  He transferred in 2001 to the Lawrence

12   Correctional Center.

13   Q.  Now, I had specifically asked Warden Robert about this

14   when he testified, and I had asked him if there was an

15   occasion during this time period where you -- where he had

16   come to you and asked you if you wanted to transfer for

17   Bart Toennies and make a swap to Lawrence.  Do you recall

18   that?

19   A.  Yes, I do.

20   Q.  Let's tell the ladies and gentlemen of the jury from

21   beginning to end what happened with this conversation.

22        *MS. GUNDERSON:*  I'm going to object.  Vague as to

23   time.

24        *MR. FALB:*  I'll narrow it down.

25   Q. *(By Mr. Falb)*  When did this conversation start?  When did

Direct - Cook

1    it occur?

2    A.   January of 2005, towards the end of the month.

3    Q.   Okay.  And were you present with Warden Robert?

4    A.   I was.

5    Q.   And do you, in fact, remember where you were?

6    A.   I absolutely do.

7    Q.   Where were you?

8    A.   I was standing in front of the armory by the sign-in

9    sheets where we sign in every day when we came to work.  I

10   was coming from the roll call room with a cup of ice.  And

11   the roll call room is where they hold roll call for the

12   security staff every day because it's a requirement.  It was

13   just a short distance from our office.  I had gone in there

14   to get ice and water, and I don't know where he came from

15   because I did not keep tabs on him.  That was not my job.

16       I came from there and he was standing there.  He stopped

17   me and he asked me if I was interested in going to Lawrence

18   where my husband was, and I said, *Well, yeah, you know, I*

19   *had put in for a counselor job over there but with the*

20   *paperwork and everything it didn't get processed in time.*  I

21   said, *It's neither here nor there at this point*, because

22   back in 2001 when they were trying to staff the prison when

23   it was first opening, I did put in for a transfer over

24   there, but because of a mix-up in my paperwork in

25   Springfield and the timelines and everything, it did not get

                         Direct - Cook

1    processed the way it should have, so therefore, I could not

2    take my -- I could not take the transfer to Lawrence.

3        And I don't know if we had discussed that in the course

4    of working back in his office together during -- I don't

5    remember if we discussed that, but when he became warden in

6    January of '05, towards the end of the month he asked me

7    about that, whether I wanted to go to Lawrence because there

8    was an officer -- excuse me, not an officer, a counselor at

9    Lawrence that lived in Centralia and would like to transfer

10   over here, and I had said that I would like to go to

11   Lawrence where my husband was.  And I said, *Well, you know,*

12   *that would be really nice, but I can't do that.  I'm still*

13   *in my training period for counseling.  I can't change jobs*

14   *yet, and I can't bid on anything,* because when you go into

15   the Counselor I job -- and there's many titles under the

16   upward mobility program, I just happened to be under the

17   counselor job.

18       That first year you lose your seniority bidding rights.

19   It's right in the upward mobility rules handbook that they

20   give you.  So when you take that job, for the first year you

21   have no seniority basically.  I mean you do but you can't

22   exercise it, so I could not do anything except do the job

23   that I had bid into, and that's what I -- I tried to explain

24   to him that, no, I couldn't do anything, and he said, *Well,*

25   *I can make the switch if you want it.*  And I said, *No.  I*

Direct - Cook

1   *will get all of my jobs by the contract.  I'm not violating*

2   *the union contract.  I support the union.  I will just take*

3   *my lumps and transfer when I can basically.*  And I honestly

4   believe that he really was offering me a goodwill gesture.

5   If he could, he would try to help me transfer.  I think his

6   heart was in the right place, but when I told him no, it was

7   like a slap in the face and that's when he decided, screw --

8   I mean, heck with her.

9        *MS. GUNDERSON:*  Object to the foundation.

10       *MR. FALB:*  I move to strike that.

11       *THE COURT:*  Sustained.  The jury will disregard

12   that last part.

13   *Q. (By Mr. Falb)*  So at any rate, that would be an improper

14   move that he suggested?

15   *A.*  Yes.

16   *Q.*  And did you start doing a counselor's job at that point?

17   *A.*  I was doing the Counselor I job, and then on February

18   the 1st of 2005, I was supposed to get my semi -- not my --

19   my inseries advancement to the Correctional Counselor II,

20   but because we had no supervisors, the paperwork did not get

21   processed, and I had to file a grievance to get the

22   paperwork done.  And they were going to make my effective

23   date sometime in March, and warden -- I filed another

24   grievance that that was not correct, and warden moved my

25   date back to February the 1st and gave me the pay that I

Direct - Cook

1   should have gotten in February at the higher salary.  He did

2   do that for me.

3   *Q.*  Okay.  And then you were a Counselor II beginning in the

4   first part of February?

5   *A.*  February the 1st, 2005.

6   *Q.*  And prior to becoming a counselor, had you been offered

7   any supervisory jobs?

8   *A.*  Yes, I had.  The one at Pontiac, of course, but that's

9   irrelevant.  But while I was working in the major's office

10  for 10 years I had interviewed for the business

11  administrator job at Big Muddy River in Mt. Vernon.  My name

12  was on the short list that was sent to Springfield for

13  approval.  I interviewed for the, I believe it was called

14  correctional clerk job up at Vandalia, which was in essence

15  doing the same job that I was doing at the major's office in

16  Centralia but it was at a higher title, and my name was

17  submitted for that.  It was my name and one other guy, and

18  he was at Vandalia, and they elected to go with the officer

19  that was already at Vandalia doing the job, that the job --

20  he was filling in for the job that was posted, excuse me.

21  And then when the women's prison in Decatur opened I was

22  solicited by the director's office in Springfield to submit

23  an application for the chief of security at Decatur.

24  *Q.*  Okay.  Prior to you becoming a counselor what was your

25  work record?

Direct - Cook

1    A.   Excellent.  I had --

2    Q.   Did you have any disciplines?

3    A.   None.

4    Q.   Any counseling?

5    A.   None.

6    Q.   And your evaluations were what?

7    A.   Excellent.

8    Q.   And the defense attorneys have copies of all that?

9    A.   If they have my personnel file, they have access to

10   everything in it.

11   Q.   And when you started out as a counselor were there any

12   supervisors?

13   A.   There was no supervisors other than the assistant warden

14   of programs.

15   Q.   One thing that was brought out yesterday was that prior

16   to you becoming a Counselor I, you did a TA, or a temporary

17   assignment, as a counselor?

18   A.   That's correct.

19   Q.   I think it was Ms. Loepker that testified that when you

20   did that, you should not have been doing just grievances.

21   Remember her testifying?

22   A.   Yes, I do.

23   Q.   What were you doing?

24   A.   Grievances.

25   Q.   For how many days?

Direct - Cook

1    A.   I TA'd in the counseling office from July 1st through

2    September the 30th of 2003.  My direct lead worker was

3    Al Sanner.  He trained me how to do grievances.  That is how

4    I spent my time.  There was on five occasions that I was

5    taken to the cellhouse -- or excuse me, to the housing unit,

6    one with each one of the counselors and shown how you do the

7    wing walks and the interviews with the inmates, but there

8    was not one piece of paper that I was accountable for or

9    processed or actually even had a lot of knowledge of, other

10   than grievances, during that 90-day period because they were

11   so far behind that that was what he had me doing.

12   Q.   Okay.  By "grievances", you're talking about inmate

13   grievances?

14   A.   Inmate grievances.

15   Q.   In other words, during this temporary assignment, like

16   other counselors before they came on board, you didn't have

17   a chance to be trained at all except for grievances?

18   A.   That's correct.

19   Q.   When you became a counselor, you know, they talked about

20   you struggling.  Recall that?

21   A.   Yes, I do.

22   Q.   When you became a counselor in 2004, was this all new to

23   you?

24   A.   It absolutely was.  When I walked into that counseling

25   office I didn't even know what an inmate file looked like.

Direct - Cook

```
 1   I didn't know what a mit was.  I didn't even know what a
 2   court paper was.
 3   Q.  By "mit", you mean minimus?
 4   A.  Minimus, excuse me, yes.
 5   Q.  For the ladies and gentlemen of the jury, that means
 6   it's a court order to bring the inmate back and forth?
 7   A.  Correct.
 8   Q.  So you did have to start from zero and --
 9   A.  I absolutely did.  The only thing that I knew how to do
10   when I went into that office was grievances and wing walks.
11   That was it.
12   Q.  Okay.  And one of the witnesses said it takes six
13   months, a year to two years to become a competent counselor;
14   is that correct?
15   A.  I remember that.
16   Q.  Is that correct based upon your time as a counselor?
17   A.  For someone who had never been exposed to it, yes.
18   Someone like maybe Gina or Cindy Keck -- because Gina had
19   experience being in the law library so she had seen that so
20   she had a leg up on me there with all the court papers.
21   Cindy had been the secretary in clinical services before she
22   promoted to being a counselor, so she knew all the
23   paperwork, she knew the requirements, so she learned the job
24   faster than I did.  Terri, Cindy, Tony, and Pam all came
25   into the counseling department the same way I did, through
```

Direct - Cook

1   the upward mobility program.  They all had other jobs.  Tony

2   was an officer, Pam was a food supervisor, Terri was the

3   clerical in the business office, and Cindy was the clinical

4   services secretary.  So they all had different backgrounds.

5   And I would wager to bet they all struggled a little bit

6   when they started.

7        MS. GUNDERSON:  Foundation, that part of the

8   answer.

9        THE COURT:  Sustained.  The speculation, folks,

10  just disregard.

11  Q. (By Mr. Falb)  Was there an advantage or disadvantage to you

12  when you came on board as a counselor in the fact that there

13  was no case work supervisor or clinical supervisor?

14  A.  There was a huge disadvantage.  I personally felt, by

15  the way I was treated when I went in there, and the people

16  that were in there, that they did not want me in there

17  because of my seniority.  When I had my two-month mid-point

18  evaluation with Warden Wisely and Terri Loepker in there --

19  because she testified yesterday she was in there -- she

20  turned to me and said --

21        MS. GUNDERSON:  Objection to hearsay.

22        THE COURT:  Sustained.

23  Q. (By Mr. Falb)  Let me ask the question.  And I'm going to

24  try to abbreviate that.  The first evaluations that you had

25  were not good evaluations; you needed to improve?

Direct - Cook

1    *A.*   Correct.

2    *Q.*   Okay.  The defense attorneys, in their opening

3    statement, indicated that you just had a slow learning curve

4    and weren't a very good counselor.  Let me ask you about

5    that.  And I'm going to start backwards.  When you retired,

6    it was in May of 2008, is that correct?

7    *A.*   Correct.

8    *Q.*   And the last assistant warden to give you an evaluation

9    was who?

10   *A.*   Ty Bates.

11   *Q.*   And do you remember what his evaluation showed?

12   *A.*   It was a very good evaluation.

13   *Q.*   And in fact, showing you Plaintiff's Exhibit No. 1,

14   these are all your evaluations from the counseling

15   department, are they not?

16   *A.*   They are.

17   *Q.*   And so moving from last and going backwards in time, the

18   last one was by Ty Bates, is that correct?

19   *A.*   Correct.

20   *Q.*   Can you read to the jury what his comments were?

21   *A.*   *Mrs. Cook has exceeded expectations in the areas of*

22   *productivity, planning and follow-up.  She requires little,*

23   *if any, supervision and is always seeking ways to improve*

24   *the smooth operation of the counseling department.  During*

25   *this reporting period Mrs. Cook's caseload was approximately*

Direct - Cook

1   *550 inmates.  Mrs. Cook also serves as the back-up counselor*
2   *in segregation.*
3   *Q.*  Okay.  And this was your supervisor that took over after
4   Flagg, who took over after Casey, is that correct?
5   *A.*  That's correct.
6   *Q.*  And let's move back even further into time.  After
7   Ann Casey took over, you were still a Counselor II, is that
8   correct?
9   *A.*  That's correct.
10  *Q.*  And she took over in?
11  *A.*  January 2005.
12  *Q.*  Okay.  And she gave -- because she became a
13  Counselor II, she gave you two quick evaluations because you
14  were on the -- I call it a probation.
15  *A.*  Correct.
16  *Q.*  You'd become a Counselor II.  Can you tell us what the
17  results of those two evaluations were?
18  *A.*  They were okay.  They were not detrimental or anything
19  like that.  They were actually good for just changing jobs
20  or however you want to phrase it.  They were okay
21  evaluations.
22  *Q.*  Okay.  Then did Ann Casey give you an evaluation for
23  February 2005 until February 2006?  And this would be the
24  first year she gave you a full-year evaluation?
25  *A.*  Yes, she did.

Direct - Cook

1   *Q.*   Do you have that there?  That's going to be Exhibit 1F.

2   *A.*   Yes.  And it was a good evaluation.

3   *Q.*   Okay.  You had, in fact, three "Exceeds" and then the

4   rest were "Meets Expectations"?

5   *A.*   Correct.

6   *Q.*   Obviously, the jury looks at this, they can see exactly

7   what you've got.  And can you read to the jury what

8   Ann Casey said about you.

9   *A.*   At that time?

10  *Q.*   Yes.

11  *A.   Mrs. Cook has exceeded expectations in the area of*

12  *productivity, planning and follow-up.  During this review*

13  *period Mrs. Cook's caseload has increased due to staff*

14  *shortages.  Despite the increased caseload, she continues to*

15  *prioritize well, insuring that her assignments are completed*

16  *in a timely manner.  Mrs. Cook also serves as back-up*

17  *counseling in segregation and is also a member of the*

18  *internal audit team.*

19  *Q.*   Okay.  I'm going to get to the rest of these.  I don't

20  want to bore the jury to death at this point.  Let me ask

21  you this:  Up to December 6, 2006, she was still your

22  supervisor?

23  *A.*   She was my immediate supervisor, yes.

24  *Q.*   So she was your immediate supervisor from beginning of

25  2005 through about July of 2007?

                          Direct - Cook

1    A.   Correct.

2    Q.   That's when she decided to leave and go to New Mexico,

3    right?

4    A.   I don't know anything about that.  I was on vacation.

5    Q.   All right.  And prior to December -- in December of '06,

6    was that a significant time for you as far as your years of

7    service?

8    A.   It was.  Since I started working for the Department in

9    December of 1976, in December of 2006 I had achieved my

10   30-year milestone, which was big for me.  I mean I was very

11   happy that I had reached 30 years.  It meant, you know, my

12   pension was, you know, going to be there.  You know,

13   everything was locked into place so that everything was in

14   order for my plan as far as what I wanted to do.

15   Q.   Let me stop you here.  And as far as -- I think I told

16   the jury this before, but when you would reach age 50 and

17   you had at least 25 years, that would add up to 75, which

18   gave you time to -- you could, option, leave at that time?

19   A.   That meant I could leave early with a paycheck, my

20   insurance, everything in place.

21   Q.   Okay.  Was that your plan to do that?

22   A.   No, it was not.

23   Q.   And your 50th birthday was going to be seven or eight

24   months after your 30th?

25   A.   Correct.  It would have been August of 2007.

                         Direct - Cook

1    *Q.*   Okay.  Back then what did they normally do as far as

2    when people had some sort of achievement?

3          *MS. GUNDERSON:*   Objection.  Vague as to "they".

4    Which department, which supervisor?

5    *Q. (By Mr. Falb)*  In your department.  Prior to Ann Casey what

6    did they do as far as when people had any kind of achievement?

7    *A.*   There is an institutional directive and administrative

8    directive in place called employee recognition, and it has

9    established a procedure so that every year -- it's not just

10   our department; it's anybody that reaches whatever they're

11   going to be recognized for, and the warden sets the month or

12   whatever the date as to when awards are going to be given

13   out and stuff like that, so it's kind of a special little

14   thing.  Most of the time, not always, they would have cake

15   and punch in the warden's conference room.  You would get

16   your awards, pictures would be taken, and etc.  I was not

17   invited to the awards celebration and I received my award

18   from my supervisor, Ann Casey, as if it were a softball

19   being pitched at me.  She tossed it across the room to me

20   and said, *Here's your 30-year pin*, in that tone.

21   *Q.*   Prior to this -- well, let me ask you this:  When she

22   did that, was there a conversation concerning your

23   retirement?

24   *A.*   There was.

25   *Q.*   Tell the jury what was said.


                         Direct - Cook

1   A.  She tossed the pin to me and I caught it, and there was

2   a certificate, so I had to actually get up out of my chair

3   and walk over because she was standing in the doorway with

4   it half open and half shut.  So I walked over to get my

5   certificate and she said, *Now you can retire when you're 50*,

6   in that same tone of voice, *Here's your 30-year pin*.  And I

7   said, *I haven't made a decision as to when I'm retiring.*

8   Q.  And up to this point in time, had she given you good

9   evaluations?

10  A.  Yes.

11  Q.  In fact, we had a memo here -- showing you Plaintiff's

12  Exhibit No. 18.  Is that an e-mail from Ann Casey?

13  A.  Yes, it is.

14  Q.  And was that -- why don't you just read that to the

15  jury.

16  A.  The whole thing or the top half or the bottom half or --

17  Q.  Top half.

18  A.  Top half.  This memo is from Ann Casey.  It's dated

19  Monday, October the 2nd, 2006, 10:32 a.m.  It was sent to

20  Sena Landreth and cc'd to Cook, Betty, and Brink, Deb:

21  *Thanks for the information.  I want to commend all of you*

22  *for working so hard to get the transfers completed on such*

23  *short notice, and thank you, Betty, for your extra efforts.*

24  *I heard many compliments about the Counseling Department*

25  *when I arrived this morning.*  And it's signed Ann Casey,

Direct - Cook

1    assistant warden of programs, Centralia Correctional Center.

2         *MR. FALB:*  Okay.  Your Honor, I would move to

3    introduce into evidence Plaintiff's Exhibit 18.

4         *MS. GUNDERSON:*  No objection.

5         *THE COURT:*  Admitted.

6         **(Plaintiff's Exhibit No. 18 admitted)**

7    *Q. (By Mr. Falb)*  Just very briefly, what had gone on over this

8    incident?

9    *A.*  We had an incident at the Centralia facility on the

10   night yard.  I don't really know what happened.  I only know

11   that inmates were refusing to do what they were supposed to

12   do, and because I was the segregation counselor -- there

13   were 50 inmates that were determined by internal affairs to

14   have been either instigating or involved in this -- excuse

15   me, in this little episode that took place, and I was

16   required, as the seg counselor, to process transfers on

17   these inmates to a higher level facility.  Centralia's a

18   Level 4, so I had to screen them for transfer to either a 1,

19   2, or a 3, which would be a more secure facility.  This was

20   deemed to be how they were going to handle it.

21        The letter I got from Springfield said, *Screen them for*

22   *a higher* -- you know, or the e-mail I should say that I got

23   said, *Screen them for a higher level facility.*  So there was

24   50 inmates that were marked as the inmates that needed to be

25   screened for the transfer.  I had to process 25 transfers

                        Direct - Cook

1    the first day, and the transfer bus was going to ship them

2    that day, and then the next day I had to have 25 more done

3    and ready to go, and that since I was the segregation

4    counselor, that sole responsibility fell upon me.  And since

5    Ann Casey wasn't there, I called Warden Flagg and got

6    permission to have Sena Landreth and Deb Brink help me with

7    the 50 transfers.  We split the work up three ways, and

8    every one of those inmates, when they got on the transfer

9    bus, their paperwork was finished and with them on the

10   transfer bus.

11   *Q.*  In December of 2006, on this chart that I have here,

12   were those the counselors:  Cook, Landreth, Feazel and

13   Toennies?

14   *A.*  In 2006?

15   *Q.*  Yes, December 2006.

16   *A.*  That's correct.

17   *Q.*  When you got your 30-year pin?

18   *A.*  That's correct.

19   *Q.*  Okay.  Had Toennies just come in?

20   *A.*  He had just transferred from Lawrence Correctional

21   Center.

22   *Q.*  Okay.  Just briefly, was there a controversy of why

23   Toennies was brought in at this time as compared to

24   Deb Brink who was an older counselor?

25   *A.*  There was.  Deb Brink came in under the upward mobility

                        Direct - Cook

1   program as a Counselor I, just like I had.  Bart was

2   transferring from another facility as a Counselor II.

3   Q.  Were they doing it out of order actually?

4   A.  They were.

5           MS. GUNDERSON:  Objection, foundation.

6   Q. (By Mr. Falb)  Do you have knowledge of what the order

7   should have been?

8   A.  Yes, I do.

9   Q.  What was the order it should have been done?

10          MS. GUNDERSON:  Objection, foundation.  How does

11   she have the knowledge?

12          THE COURT:  That's the order to ask, the basis for

13   her knowledge.

14   Q. (By Mr. Falb)  What is the basis for your knowledge, just

15   briefly, please?

16   A.  I was a union steward and had direct access to the

17   agreement that was signed between the director,

18   Howard Peters at the time, and the union stating that the

19   jobs at Centralia would be filled I, II, I, II, or whatever

20   the last position was that they filled as a counselor,

21   whether it be a I or a II, the next one would be the

22   opposite and then the opposite, and so on and so on and so

23   on.

24   Q.  Okay.  And in fact, what was it supposed -- how was it

25   supposed to happen when Toennies came in?

                        Direct - Cook

1   *A.*  Gina Feazel was the last one who came in as a II, so the
2   next position to be filled should have been a I, which would
3   have been Deb Brink.
4   *Q.*  Okay.  And I asked Warden Robert about this.  Was this,
5   in fact, grieved by the union?
6   *A.*  It certainly was.
7   *Q.*  So at this time these were the counselors:  Cook,
8   Landreth, Feazel and Toennies; is that correct?
9   *A.*  That's correct.
10  *Q.*  You and Sena were the oldest at this point?
11  *A.*  Both in years and seniority, yes.
12  *Q.*  Okay.  And all the others, the nucleus, had gone by this
13  time, Sanner, Alemond, Loepker, Ballantini and Keck; is that
14  correct?
15  *A.*  That's correct.
16  *Q.*  After this incident with your 30-year pin, did you
17  notice any difference?
18  *A.*  I noticed that Ann Casey was becoming very critical of
19  everything I did.  She followed me around the institution.
20  She criticized me on the institutional radio system.  I
21  would go to my housing units and the officers would tease me
22  and laugh and call me can't-find-you-Betty and
23  where-are-you-Betty because those are the kinds of things
24  she would say on the radio, *Where are you?*
25  *Q.*  Ann Casey in her deposition today said, well, she wasn't

                          Direct - Cook

1   disciplining you in the year 2005 or 2006 because she was

2   trying to work with you and counsel you.  First of all, did

3   she even talk to you?

4   A.  No.  And I find that to be an erroneous statement

5   because my evaluations reflect no deficiencies.

6   Q.  Another thing she mentioned was that you had a whole

7   bunch of grievances that you were hiding in your cabinet or

8   something like that.  First of all, when she gave her

9   deposition, it was by telephone, and you were in my office

10  listening to it?

11  A.  That's correct.

12  Q.  Was that the very first time in this case you had ever,

13  ever heard of an allegation that you were hiding grievances?

14  A.  Yes, it was.

15  Q.  And this lawsuit's been going on for years?

16  A.  Yes, it has.

17  Q.  Well, were you guilty of doing anything with grievances?

18  A.  No, I was not.

19  Q.  What were the grievances?

20  A.  As Mrs. Loepker testified yesterday, we all had work

21  areas that were facing the wall.  We had a cabinet above

22  here.  We had a two-drawer file cabinet down here.  My top

23  drawer was set up for letter files for important inmate

24  information.  My bottom drawer was legal, because the

25  grievance forms are legal, and the restoration of lost good

Direct - Cook

```
 1   time that we had to review for inmates when they were
 2   eligible is also on a legal form, so I had those in my
 3   bottom drawer.  In this file drawer I had set up my filing
 4   system for the inmate grievances.
 5       The procedure in place was when an inmate grievance came
 6   in, you read the grievance.  If it was something dealing
 7   with -- they had gotten an inmate ticket, which was a
 8   violation of any of the institutional rules serious enough
 9   to write an incident or a ticket on, those you sent
10   automatically to the Level II grievance officer to process.
11   If it was anything else that the inmates were complaining
12   about, such as medical treatment, food, religious
13   services -- because the prison is like its own little town.
14   Everything that you would have on the street, they have a
15   lot of access to there.  I mean they get medical, they get
16   food, they get clothing, they go to the B of I for pictures
17   and prints just like you.
18       So if they have a complaint for that area, the procedure
19   in place was, there was a cover letter.  You filled it out,
20   you sent it to that department with a copy of the inmate's
21   grievance so that that office could read what the inmate was
22   saying.  They responded on the top sheet and they would send
23   that back to the counselor.  So in this drawer I had my
24   grievances sent to department heads for response, responses
25   received, answers sent to inmates, so that I had a working
```

Direct - Cook

```
 1   file as to what was going on.  And so when she opened -- I
 2   wasn't there when she went through my stuff, but when she
 3   opened the drawer she saw all this grievance paperwork and
 4   assumed, because the file cabinet locked, assumed that, oh,
 5   she's hiding stuff.  I never locked that file cabinet from
 6   the day that I got there.
 7   Q.  So Betty, I warned you about this.  You're an
 8   Encyclopedia Britannica, aren't you?
 9   A.  When it came to my job, yes.
10   Q.  And when we've met over the years, you are -- you have
11   every detail possible, so I'm going to -- the jury's going
12   to be saying, *Tom, why are you asking these questions?*
13   A.  I apologize.
14   Q.  That's okay.
15   A.  I want them to understand.
16   Q.  Well, and we're going to try to abbreviate it, and it's
17   understandable.  Okay.  So you hadn't done anything wrong?
18   A.  No, I did not.
19   Q.  Now, Ann Casey, in her deposition, said when she saw
20   that she counseled you because this was a major thing.  Did
21   she ever mention one word to you about hidden grievances?
22   A.  Never heard it until the deposition.
23   Q.  She said she talked to Warden Robert about this?
24   A.  I don't know.
25   Q.  Did Warden Robert ever say anything about this?
```

Direct - Cook

 1   *A.*  He never said a word to me.

 2   *Q.*  Did anyone take those grievances from you?

 3   *A.*  Never.

 4   *Q.*  In fact, do you have copies of those at home?

 5   *A.*  No.  I have copies of the sheets saying what I did and

 6   stuff like that, and every one -- with my grievances I was

 7   very religious about stamping the copies as copies and

 8   making sure the originals got back to the inmate.

 9   *Q.*  Okay.  Now, I'm going to try to go through some

10   incidents, and try to abbreviate this.

11   *A.*  I'll try.  I'm sorry.  It's just a very personal issue

12   when you're attacked.

13   *Q.*  I understand -- or I don't understand.

14   *A.*  I'm sorry.

15   *Q.*  One thing I forgot to ask you about.  In February of

16   '06, did you receive a discipline by Ann Casey for leaving

17   your post?

18   *A.*  I did.

19   *Q.*  And first of all, was this when the -- tell us what

20   happened, just briefly.

21   *A.*  I was sitting in my office working.  Al Sanner sat right

22   next to me.  And it was almost break time.  I usually -- at

23   that time I was a smoker and I usually took my break

24   somewhere between two and 2:30.  And he came in and he asked

25   me if I had been on break yet.  I said no.  He said, *Well,*

                        Direct - Cook

1   *will you see if you can take your break?  I need you to come*

2   *with me because I have something I need to do.*  And that's

3   how it was presented to me:  *I have something I need to do.*

4   So I turned to Al Sanner and I said, *Al, may I take my*

5   *afternoon break?*  And he looked at the clock and he said

6   yes.

7   *Q.*  So the bottom line is, you took a break, given

8   permission, and because of rules you had to be a witness

9   going into the warden's office with the president of the

10  union?

11  *A.*  The union rules state you never go into the warden's --

12  at that time.  I don't know how it is now -- you do not go

13  into management's office without a witness.

14  *Q.*  And you were disciplined for leaving your post?

15  *A.*  Correct.

16  *Q.*  And that was later on expunged because you had

17  permission from your supervisor?

18  *A.*  Correct.

19  *Q.*  All right.  Let's move on to -- after December of 2006,

20  after you got your pin, you were mentioning some things that

21  started to happen, and you mentioned Casey was starting to

22  follow you?

23  *A.*  Correct.

24  *Q.*  Did at one point in time she tell you you had to keep a

25  diary or a log book of whatever you do?

Direct - Cook

1   *A.*  She told me, *I want you to document how you are spending*

2   *your time every day and send me the information on a weekly*

3   *basis.*

4   *Q.*  Okay.  And then did she, in January of 2006 -- this is

5   soon after your 30-year pin -- did she call you in

6   concerning your training of another counselor?

7   *A.*  She did.

8           *MS. GUNDERSON:*  Objection to leading.

9           *THE COURT:*  Sustained.

10          *MR. FALB:*  Trying to abbreviate this.  I'm sorry.

11          *THE COURT:*  I understand.

12  *Q. (By Mr. Falb)*  In January of 2007, did you have a

13  conversation with Ann Casey concerning training?

14  *A.*  I did.

15  *Q.*  Tell the jury briefly what happened.

16  *A.*  Deb Brink had just started in counseling January 4th or

17  5th, whatever it was, and she came back from a meeting in

18  Ann Casey's office and told me --

19          *MS. GUNDERSON:*  Objection to hearsay.

20          *THE COURT:*  Sustained.

21          *MR. FALB:*  Your Honor, it's -- Ann Casey's the

22  assistant warden, so it's an admission.

23          *THE COURT:*  Oh, I didn't pick up on that.  You're

24  right.  Overruled.

25          *MS. GUNDERSON:*  This is a statement of Ann Casey,

                        Direct - Cook

 1    just so I'm clear?

 2              *MR. FALB:*  Yes.

 3              *MS. GUNDERSON:*  Not a statement of someone else

 4    saying what Ann Casey said.

 5    *Q. (By Mr. Falb)*  Is that what Ann Casey said?

 6    *A.*  It's what Ann Casey told Deb Brink.

 7              *MS. GUNDERSON:*  Then I would renew my objection to

 8    hearsay.

 9    *Q. (By Mr. Falb)*  After that conversation with Deb Brink, did

10    you have a meeting with Ann Casey?

11    *A.*  I did.

12    *Q.*  Tell the jury what Ann Casey told you.

13    *A.*  She told me that I was not allowed to help Deb Brink, I

14    was not allowed to train her, that I did not do my job

15    adequately.  She felt that I was basically inferior and

16    not -- she wanted Deb trained the right way.

17    *Q.*  Okay.  And who did she want to train Deb Brink?

18    *A.*  Gina Feazel is what I was told directly by her.

19    *Q.*  After that did -- had anything like this happened with

20    Ann Casey before?

21    *A.*  No.

22    *Q.*  Did this take you by surprise?

23    *A.*  Yes.

24    *Q.*  Did you write her a letter?

25    *A.*  I did.

                        Direct - Cook

1   *Q.  And we'll get to that later on, but in that letter did*

2   *you basically explain to Ann Casey -- well, what did -- just*

3   *in so many words, what did you explain to her?*

4   *A.  After I had the meeting with her -- because I was just*

5   *wanting clarification.  I didn't want to do something she*

6   *didn't want me to do, and I got -- after I went back to my*

7   *work area I got to thinking about it, and it's like, I*

8   *really am confused, I really don't understand this.  So I*

9   *wrote her a memo asking basically for clarification, what*

10  *did she want me to do?*

11  *Q.  All right.  And you were trying to basically --*

12  *A.  I was trying to -- I don't want to say work with her*

13  *because that's not correct.  I was trying to establish what*

14  *her requirements were of me, what she expected me to do.*

15  *Q.  Okay.  In that same month, January 2007, was that your*

16  *time for -- yearly time for evaluation?*

17  *A.  Yes.  My evaluation should have been done by the 20th of*

18  *January because my promotion date was February the 1st, and*

19  *the AD's and ID's state you're supposed to do your review at*

20  *a certain time.*

21  *Q.  What was the custom for giving you your evaluation?  Was*

22  *there a written evaluation?*

23  *A.  Yes.*

24  *Q.  Was this unusual -- anything unusual that occurred in*

25  *January 2007 with respect to your evaluation?*

Direct - Cook

1   *A.*   Yes.   She called me in.

2   *Q.*   "She" meaning Ann Casey?

3   *A.*   Meaning Ann Casey, excuse me, called me in to discuss my

4   evaluation.   It was horrible.   It was the worst evaluation

5   and the worst meeting I ever had in my entire corrections

6   career to that date.

7   *Q.*   And what was -- did she give you the written evaluation

8   at this time?

9   *A.*   She did not because it was just a -- she said it was her

10   working copy.   I was given a copy of page 2 where the

11   employee has to rate themselves and told to have it back to

12   her by the end of the day so that they could type up -- the

13   secretary could type up the evaluation.   That was the only

14   part I was given.   I was not given anything else.   And

15   usually when they would do the evaluations you would get a

16   whole copy of the working copy so that you could --

17   *Q.*   I understand.   Did you do your portion and give it back?

18   *A.*   I did.

19   *Q.*   That day --

20   *A.*   Yes.

21   *Q.*   -- or the next day?   Okay.   Did she ever do your written

22   evaluation?

23   *A.*   That was the last I saw of it for months.

24   *Q.*   Okay.   When did you finally get it?

25   *A.*   May of 2007.


Direct - Cook

1    Q.  Was that after four months basically?

2    A.  Yes.

3    Q.  And it was too late?

4    A.  It was late but she still processed it.

5    Q.  Okay.  And I'm going to ask you some things that took

6    place before she finally gave you a written evaluation.

7    After this verbal meeting you had with Ann Casey, were you

8    receiving comments from various people concerning your

9    retirement?

10   A.  Yes.

11   Q.  Who?

12   A.  Gina brought it up on a daily basis.  Almost every time

13   I turned around she would say, *Boy, if I was you, I'd*

14   *retire.*

15          *MS. GUNDERSON:*  Objection to hearsay.

16          *THE COURT:*  Sustained.

17          *MR. FALB:*  It goes to her state of mind as far as

18   the environment.

19          *MS. GUNDERSON:*  I would object to the relevance,

20   state of mind.

21          *THE COURT:*  I'll still sustain.

22   Q. *(By Mr. Falb)*  Did your supervisor, Ann Casey, bring it up?

23   A.  On two occasions she did.

24   Q.  Tell the jury.

25   A.  I don't even remember the exact date and I don't even

                        Direct - Cook

1   remember how the exact conversation started, but she came to

2   the -- first one that comes to mind is when she came to the

3   counseling office for something.  She was talking to Gina

4   about something.

5        *MS. GUNDERSON:*  Object to the foundation of the

6   statement.

7            *MR. FALB:*  She hasn't said what the statement was.

8            *MS. GUNDERSON:*  She said she doesn't know time,

9   place or anything else.

10  *Q. (By Mr. Falb)*  Was it in the spring of 2000 -- spring of

11  2007?

12  *A.*  It was between January of 2007 and April of 2007 is my

13  best recollection.

14  *Q.*  Okay.  And who was present for this conversation?

15  *A.*  Gina Feazel, Ann Casey, Deb Brink and myself.

16  *Q.*  Okay.  And tell the jury what Ann Casey said.

17  *A.*  She and Gina were talking.  I wasn't paying any

18  attention.  Somehow retirement came up in it and she turned

19  to me and asked me when I was retiring.

20  *Q.*  What did you say to her?

21  *A.*  I said, *When I'm 50*, in that kind of a flippant way,

22  because I was sick of hearing about it.

23  *Q.*  Were you -- did you mention specific ages in response to

24  what people were saying about you and retirement or not?

25  *A.*  My comment always was --

Direct - Cook

1            *MS. GUNDERSON:*  Objection to hearsay.

2            *MR. FALB:*  It's the declarant, Your Honor.

3            *THE COURT:*  Overruled.

4            *THE WITNESS:*  I'm shooting to 50 and get everything

5      locked in and make a decision after that.  I never told

6      anybody anything different than that because they didn't

7      need to know my plans.  That was my business.

8      *Q. (By Mr. Falb)*  Okay.  And was there another time when

9      Ann Casey asked you about retirement?

10     *A.*  There was but I do not remember all the specifics

11     involved in that without refreshing my memory.

12     *Q.*  Is there something that you have there that would help

13     you refresh your memory?

14     *A.*  All of the -- I have a copy of the interrogatories and

15     all the information that's been provided back and forth.

16     *Q.*  You can take a look at it to refresh your recollection.

17     *A.*  I'm not seeing it.  Maybe I put the wrong thing in here.

18     There was another occasion that she did mention retirement

19     to me.  She was very careful about what she said and how she

20     said it.

21     *Q.*  Okay.  And we can take a recess.  In the recess later on

22     maybe you can look at those notes.  After the event that

23     took place in January of 2007 and after she was following

24     you, did anyone else any, other assistant warden, follow

25     you?

                          Direct - Cook

1   *A.*  Flagg did.  Assistant Warden Flagg used to follow me on

2   a regular basis.

3   *Q.*  Okay.  And in March of 2007, specifically March 12th,

4   2007, had you been doing Al Sanner's job or a portion of his

5   job for about a year?

6   *A.*  I began doing 95 percent of Al Sanner's job on

7   March 21st, 2006, after he retired on the 17th of March.

8   *Q.*  Okay.  And he was in receiving?

9   *A.*  He was the orientations counselor in the receiving unit.

10  *Q.*  That's where new inmates came in and got --

11  *A.*  Fresh off the bus, yes.

12  *Q.*  And tell the jury, is this something that Ann Casey

13  assigned to you back before you got your 30-year pin?

14  *A.*  Yes.

15  *Q.*  Okay.  And did she make any affirmations or statements

16  of fact as to what you could do in the future if you

17  undertook this job?

18      *MS. GUNDERSON:*  Objection to foundation.

19      *THE WITNESS:*  Yes.

20      *MS. GUNDERSON:*  Vague as to time.

21  *Q. (By Mr. Falb)*  I'll rephrase it.  Tell the jury all the

22  circumstances and statements by Ann Casey concerning this.

23      *MS. GUNDERSON:*  Objection, foundation.

24      *THE COURT:*  What are you talking about?

25  *Q. (By Mr. Falb)*  When did you talk to Ann Casey about

Direct - Cook

1    Al Sanner's job?

2    A.   Initially?

3    Q.   Yes.

4    A.   March 21st, 2006.

5    Q.   Okay.  Tell the jury what was said.

6    A.   She said, *Al Sanner has elected to retire.  You are the*

7    *most senior person in the department.  We are going to bid*

8    *his job.  You have first choice of whether or not you want*

9    *the job.*  I said, *Does this include payment and the change*

10   *of shift?*  Because his job was a seven-to-three job; mine

11   was eight-to-four.  I shouldn't say just mine.  All the

12   other counselors were eight-to-four.  She said, *No.  You*

13   *would still be working eight-to-four.*  And she said she was

14   going to be requesting temporary assignment payment.  I

15   asked her if down the road she was going to elect to fill

16   that job and she said she was going to try to.  I said, *I*

17   *must discuss this with my husband because we make all of our*

18   *decisions together.*  She said, *Let me know as soon as you*

19   *can.*

20   Q.   And did you do that?

21   A.   I did.

22   Q.   What was said?

23   A.   To my husband or to Ann Casey?

24   Q.   After you talked to your husband.

25   A.   I told Ann Casey that I had discussed it with my husband

                         Direct - Cook

1    and decided that I wanted to try doing that job, and that

2    would she let me know as soon as it was approved or

3    disapproved for temporary assignment.  I asked her if the

4    job would be rotated, meaning would I only be doing it for

5    90 days or for an extended period of time, and was she still

6    going to try to have the job posted?  She said okay, she'd

7    let me know what was going on, and that's how we pretty much

8    left it.

9    Q.  Let's move back to a year later.  After March of 2006,

10   you started doing that job?

11   A.  I did.

12   Q.  Okay.  And then in March of 2007 -- we're roughly three

13   months after your 30-year pinning event -- did you approach

14   her concerning -- did you approach Ann Casey concerning the

15   Counselor III position?

16   A.  I did because it had been a year, and I -- to be quite

17   honest about it, I was getting -- I don't want to say burnt

18   out, but just worn out because the job in

19   orientation/receiving, you have to be down there three days

20   a week.  You process a ton of paper and all -- and then

21   during that timeframe they assigned me to cover segregation,

22   which is you have to be in that housing unit three times a

23   week.  And along with segregation, it's -- the assignment

24   was segregation and healthcare, so I had to visit healthcare

25   every week, I had to visit segregation three times a week, I

Direct - Cook

1   had to visit receiving three times a week, and all that in

2   addition to my regular caseload that I had to see at least

3   once a month because the way it was set up, you see them

4   every 90 days.  You have to go down there at least once a

5   month because there will always be groups to see.

6   Q.  Let me stop you here.  Up to this point in time had

7   Ann Casey -- or before December of 2006 when you got the

8   30-year pin, had she been critical about the time you spent

9   down in receiving?

10  A.  No, she had not.

11  Q.  So what she testified today in the written deposition

12  about you being too long down there, you didn't know

13  anything about that?

14  A.  No.  And I could not clarify because it was set up that

15  I would go to receiving, and when I finished with receiving

16  I went directly over to segregation and did my rounds over

17  there, and again from segregation over to healthcare and

18  made my rounds over there, so it was boom, boom, boom.  And

19  a lot of times by the time I saw all three assignments and

20  got back to my actual work station, it could be 10:30,

21  quarter to 11, 11:00.

22  Q.  So it was a lot of time?

23  A.  So I didn't spend the whole time in receiving.

24  Q.  Tell us what happened in March of 2007 when you

25  approached her about Counselor III position pay, posting,

Direct - Cook

 1    that type of thing.

 2    *A.*  She told me that she was not paying me TA, she was not

 3    posting the job, and if I didn't want to stay in that job, I

 4    knew what I could do.

 5    *Q.*  Was this a surprise to you?

 6    *A.*  It was.

 7    *Q.*  Were you expecting to get paid?

 8    *A.*  I was hoping to get paid.

 9    *Q.*  So after that event what was the next thing that

10    happened to you with respect to Ms. Casey as far as any

11    discipline or evaluations?

12    *A.*  Well, I filed a grievance because she said she wasn't

13    going to pay me and she said she wasn't going to post the

14    job, so I filed a grievance because -- I certainly realize

15    that it's management's call as to what jobs they request

16    Springfield to fill.  I understand that concept.  How could

17    you not, working for the department as long as I did?  But

18    the contract clearly states that I was eligible for

19    temporary assignment pay for doing the job, so I filed a

20    grievance asking to be paid for the extra job duties that I

21    was doing.

22    *Q.*  For a year?

23    *A.*  For 15 months actually by the time everything shook out.

24    But yes, a year that -- when I filed the grievance.  And she

25    went ballistic when I filed the grievance.

                          Direct - Cook

1    *Q.*  Let me ask you --

2    *A.*  She said, *We'll see about this*, in that tone.

3         *MS. GUNDERSON:*  Objection to foundation about when

4    the statement was made.

5    *Q. (By Mr. Falb)*  When was the statement made in relation to

6    the grievance?

7    *A.*  The day it was served to her, and the copy's in the

8    file.  I don't recall the date off the top of my head,

9    but --

10   *Q.*  Was it in March of 2007?

11   *A.*  Correct.

12   *Q.*  Okay.  After that did you have occasion where, on or

13   about March 27th, 2007, that Casey had a conversation in her

14   office concerning her authority?

15   *A.*  I did.

16   *Q.*  Tell the jury what happened.  Well, first of all, who

17   was present?

18   *A.*  Just the two of us.

19   *Q.*  And what took place what was said?  Once again, briefly.

20   *A.*  Well, there's a little bit of a background to how this

21   came about.  She was gone from the facility and there was an

22   inmate by name of Robinson who was in segregation.  And

23   Robinson was basically being an inmate.  He was being

24   written up by the staff down there.  I had processed three

25   transfers on him per the adjustment committee who hears the

Direct - Cook

1   inmate discipline tickets.

2   Q.  To higher institutions?

3   A.  Correct.  So I had processed three transfers on him.  He

4   was scheduled to go on the bus and he was pulled off of the

5   bus and I had no direction as to why he was pulled off the

6   bus.  But the lieutenant over segregation brought me another

7   ticket, another adjustment committee summary to do another

8   higher level transfer on him, plus I had a verbal

9   altercation with the inmate on that day that I wrote him an

10  inmate disciplinary report for, and I had no one to give me

11  any direction as to what to do.  And the seg lieutenant told

12  me, *Well, you better call the transfer coordinator's office*

13  *and find out what's going on.*  And a transfer -- to do a

14  transfer packet on an inmate takes a little bit of time, and

15  I had already processed three and, you know, I could have

16  processed two more on him.  I mean I didn't have any

17  direction.  The warden was with Deputy Director Meek behind

18  closed doors.  I could not get --

19  Q.  Any input?

20  A.  -- any input.  Flagg -- excuse me, Warden Flagg and

21  Warden Casey were both gone off grounds, whatever.  They

22  weren't at the facility.  And I was always trained that a

23  lieutenant is middle management, and if the lieutenant tells

24  you to do something or the captain tells you to do something

25  or the shift -- whatever, that you do it.

Direct - Cook

1    Q.   Did you do it?

2    A.   I did it.

3    Q.   Did Casey get after you?

4    A.   She certainly did.

5    Q.   Tell the jury what was said.

6    A.   She told me she was going to show me who the boss was

7    because it was not my responsibility to call transfer

8    coordinator's office to find out about transfer, that I

9    would be given information on a need-to-know basis, and she

10   decided I was not someone who needed to know.

11   Q.   After that, directing your attention to April 11th,

12   2007, did you have occasion to get in trouble over a CHAMPS

13   entry?

14   A.   I did.

15   Q.   And the jury I think knows this, but a CHAMPS entry is

16   wording into a computer about inmates?

17   A.   About the contacts that you have with inmates, yes.

18   Q.   You're supposed to do that every 90 days, is that

19   correct?

20   A.   Well, you're supposed to do it any time you talk to an

21   inmate.  You're supposed to record what you talk about or

22   what they ask about, what you discuss, whatever.

23   Q.   And briefly, Plaintiff's Exhibit 9, is this the entry

24   that you put in for Inmate Cobb?

25   A.   Yes.

Direct - Cook

```
 1   Q.  C-O-B-B?
 2   A.  Yes.
 3   Q.  Is that a true and accurate copy of that ledger sheet
 4   or --
 5   A.  Inmate summary, counseling summary.  Yes.
 6   Q.  Do you have an extra copy of that?
 7   A.  I don't have a copy.
 8           MR. FALB:  Do you have any problem with me
 9   publicizing this?
10           MS. GUNDERSON:  You could move it if you want.
11   Q. (By Mr. Falb)  All these are entries that we're looking at
12   on the TV screen, Plaintiff's Exhibit 9, is that correct?
13   A.  That's correct.
14   Q.  The large entry that we see here, is that the one that's
15   in question?
16   A.  It is.
17   Q.  Okay.  And all the ones above and below are entries
18   counselors would make?
19   A.  Correct.
20   Q.  So obviously you took some time to formulate and
21   document this entry, is that right?
22   A.  I did.  And I wasn't sure if I should put this entry in
23   even to begin with.  And I was in the counseling office and
24   discussed it with Sena Landreth and Deb Brink.  I was making
25   segregation rounds on this date and this inmate had been
```

Direct - Cook

1    brought to segregation, and he was very agitated.  I mean he

2    was just -- and this was the conversation that took place;

3    however, I did omit, by accident, but -- because you get so

4    busy in the day, you get phone calls and everything.  He

5    said to me first before I put in there, before I asked him

6    whose ass he was going to kick, he said to me, *I'll just*

7    *kick their asses.  I'll kick all their asses.*  And it's

8    like, *Whose ass you going to kick?*  I mean Cobb was the kind

9    of inmate that, if that's how he acted with you -- and he

10   was on my caseload 95 percent of his stay at Centralia, so I

11   got to know Inmate Cobb very well, and I found that working

12   with Cobb, if you start out acting -- or not acting, but

13   responding the same way, he would eventually calm down and

14   have a normal conversation.

15   *Q.*  And so the jury remembers, this prison has all sorts of

16   offenders?

17   *A.*  Yes.

18   *Q.*  And Cobb, was he being -- about to be sent to a higher

19   institution because of his conduct?

20   *A.*  He was.  He had just received his third or fourth ticket

21   in 90 days for violation of the rules.  And the way the

22   rules are set up, if you get that many IDR's, Inmate

23   Disciplinary Reports, in that amount of time, the committee

24   recommends that they get screened for a higher level

25   security prison because obviously they can't function in the

Direct - Cook

1   medium facility that they're in.

2   Q.  In other words, you want to avoid, at this particular

3   facility, fights, gangs?

4   A.  Correct.

5   Q.  That type of thing.  Okay.  When you talk to an inmate,

6   any inmate, I mean do you talk about sugar and cookies or do

7   you get down and talk their language?

8   A.  I tried to talk to them the same way that they talked to

9   me so they would feel comfortable with me.  Not all the

10  counselors did that.  That's on them.  My personal style

11  was, I'm not going to give them quarter and 50-cent words if

12  they're talking to me in nickel and dime words.  So when he

13  said what he said, I responded in a manner that he could

14  relate to.

15  Q.  Okay.  And tell us what was -- I guess we can read it,

16  but basically he told you that he had gone to the committee,

17  they were going to ship him, is that what was going to

18  happen, to a higher institution?

19  A.  Yes.

20  Q.  Like Menard or something like that?

21  A.  Yes.

22  Q.  Which is a big deal for prisoners, isn't it?

23  A.  Yes.

24  Q.  Because he could -- whatever could happen down in a big

25  prison like that?

Direct - Cook

1    *A.   In a higher level security prison you don't have the*
2    *amount of freedom, and that may not be the right word, but*
3    *you don't have some of the luxuries that you have at a*
4    *medium camp.*
5    *Q.   He went on to say that you told him, you warned him*
6    *continually he needed to moderate his behavior and try to*
7    *learn to live in prison.   He said, Yeah, well, I'm nobody's*
8    *punk.   Told them he was barely 5-foot and 100 pounds soaking*
9    *wet.   Was he kind of a small Napoleon type guy?*
10   *A.   He was a little bit shorter than I was, and not heavy*
11   *but wiry.   He was a -- you know, he'd lived on the street*
12   *for quite a while before he came into prison, and he was*
13   *kind of spunky actually.*
14   *Q.   That's why you said, whose ass you think he's going to*
15   *kick, because of his small stature?*
16   *A.   Correct.*
17   *Q.   Was he the kind of guy to talk big to impress others?*
18   *A.   He carried himself like he was 6-foot tall and*
19   *300 pounds and could kick anybody's rear end.   That's how he*
20   *was.*
21   *Q.   He told you he was going to kick all their rear ends?*
22   *A.   He did.*
23   *Q.   I told him he needed to get his shit together or he*
24   *would be spending the rest of his life in prison or would be*
25   *dead.   He said, Oh, well, in a cocky manner.   Was that*

Direct - Cook

1   typical of him?

2   A.  That was typical of him.

3   Q.  *Then asked me if I could call the next prison he was*

4   *being shipped to, tell them he needed special things.*

5   A.  Right.

6   Q.  Did you think there was anything improper about what you

7   did?

8   A.  No, I really didn't.  I struggled with this instance and

9   this entry and sought advice of other people and finally

10  decided that it was all about the security issue.  Did I

11  want him to go to another facility and go off on somebody

12  and have them get hurt?  With my husband being in security

13  and working at Pontiac and having security, security,

14  security drummed in my head, I felt that it was important to

15  document exactly what happened so that the next counselor,

16  warden, whatever, whoever read this could see that this

17  inmate, though when you look at him you wouldn't think so,

18  but he could be a -- potential to be a violent inmate.

19      On the other side of the coin, because I had worked with

20  Cobb for so long, you know, he asked me, *Will you take care*

21  *of -- basically take care of my business, tell the other*

22  *prison what I need.*  During this whole incident when he was

23  mouthing off down there in segregation and this whole thing

24  took place, underneath his breath he was saying, *Sorry,*

25  *Ms. Cook, sorry, Ms. Cook, help me out,* you know, stuff like

                        Direct - Cook

1    that.

2        So I understand an inmate his size has to act tough so

3    that he doesn't get preyed on by the bigger inmates.  I

4    understand that concept.  That's why I did not write him an

5    IDR for his verbal abuse, and I figured he was going to a

6    higher level prison, he was in for a big rude awakening when

7    he got to a higher level prison because he wasn't going to

8    be able to act like this.

9    Q.  And there is a CHAMPS manual that I'm going to introduce

10   later that tells you what to put in?

11   A.  Correct.

12   Q.  In essence does that say, be as objective and put all

13   the facts in with a conference with an inmate?

14        MS. GUNDERSON:  Objection to hearsay.

15        MR. FALB:  I'll introduce the manual then.

16   Q. (By Mr. Falb)  Showing you Plaintiff's Exhibit No. 10, Case

17   History and Management Program.  Is that the manual?

18   A.  That is.

19        MR. FALB:  Move to introduce the exhibit.  Move to

20   introduce into evidence that exhibit.

21        THE COURT:  Any objection?

22        MS. GUNDERSON:  No objection.

23        THE COURT:  Admitted.

24        **(Plaintiff's Exhibit No. 10 admitted)**

25   Q. (By Mr. Falb)  It sets forth what you were supposed to be

Direct - Cook

1    putting into these entries, is that correct?

2    A.  That's correct.

3    Q.  And at no time did you mean to -- at any time did you

4    mean to offend Ann Casey about this?

5    A.  I did not intend to offend anybody.

6    Q.  Did how did Ann Casey find out about this?

7         MS. GUNDERSON:  Objection to foundation,

8    speculation.

9         MR. FALB:  If you know.

10        THE WITNESS:  I'm not sure.

11        THE COURT:  Overruled.

12        THE WITNESS:  I can't say.

13   Q. (By Mr. Falb)  Okay.  At this time, these entries, were they

14   supervised by one Gina Feazel?

15   A.  She had supervisory access, yes.

16   Q.  Okay.  And are there times when people, during your

17   experience, would put entries into the CHAMPS system where

18   they made changes afterwards at suggestions of supervisors?

19        MS. GUNDERSON:  Objection; vague, foundation.

20        MR. FALB:  Strike that.  I'll withdraw that.

21   Q. (By Mr. Falb)  Ann Casey called you in for this entry?

22   A.  She did.

23   Q.  Okay.  And instead of just asking to you simply change

24   the entry, what did she do?

25   A.  She was -- from the moment I walked into her office she

                      Direct - Cook

1   was literally in my face about it.  *Why did you do this?*

2   *What's this all about?  You know this is improper.*  I didn't

3   even get a chance to discuss the situation with her as to

4   why.  She's right, I had never put an entry in this long

5   before.  I had never put this much information in before.  I

6   was not even allowed to discuss it with her.  No -- nothing.

7   Just in my face and blah, blah, blah, blah, blah.  *Why did*

8   *you do this?  You know that's improper.  You're not doing*

9   *your job right.*  Just -- *I could write you up for this*, and

10  just --

11  *Q.*  Were you represented by a union person there?

12  *A.*  I was.  Dusty Minor.

13  *Q.*  And did he make any statements to Ann Casey in your

14  presence?

15          *MS. GUNDERSON:*  Objection, hearsay.

16          *MR. FALB:*  It's in the presence of the --

17          *THE COURT:*  Overruled.

18          *THE WITNESS:*  He did.

19  *Q. (By Mr. Falb)*  What did he tell her?

20  *A.*  On two separate occasions he told her, *You're not*

21  *handling this correct.  This needs to stop.  We need to go*

22  *no farther with this.*  And she told him, *I'll do what I want*

23  *to do.  I'm the supervisor.*

24  *Q.*  And she did, didn't she?

25  *A.*  And she did.

                        Direct - Cook

1    *Q.* Had you ever received a reprimand for this before, oral

2    or written?

3    *A.* Never.

4    *Q.* About a week later did she reprimand you again for the

5    same entry?

6    *A.* She did.

7    *Q.* Tell the jury what happened.

8    *A.* I was again called to her office and I was presented

9    with a formal employee review hearing packet with the same

10   documents and the same memo that we were given at this

11   meeting on 4/11, and the union told her, *This is duplicity*,

12   that she's -- *you already gave her a counseling session on*

13   *this.*

14   *Q.* What was her response?

15   *A.* That she was the supervisor, she would do it.

16       *MR. FALB:* Your Honor, is this a good time to take

17   a quick break?

18       *THE COURT:* It is. Fifteen minutes, folks. Same

19   admonishments.

20       **(Jury out)**

21       **(Break)**

22                          *   *   *   *

23       **(Jury out)**

24       *THE COURT:* Let the record reflect that during this

25   break I determined that there's -- according to the weather

1    alerts, there's tornadic activity west and north of

2    St. Louis, so with the lawyers' consent I went in and

3    excused the jury for the day and we're going to recess until

4    tomorrow morning at 9:00.

5         *(Court adjourned)*

6                              *   *   *   *

1                          REPORTER'S CERTIFICATE

2

3          I, Laura A. Blatz, RPR, Official Court Reporter for the
    U.S. District Court, Southern District of Illinois, do
    hereby certify that I reported in shorthand the proceedings
4   contained in the foregoing 88 pages, and that the same is a
    full, true, correct, and complete transcript from the record
5   of proceedings in the above-entitled matter.

6          Dated this 17th day of August, 2012.

7

8                            /s/
                             _____
9                            LAURA A. BLATZ, RPR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25