1               IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF ILLINOIS
2

3   BETTY D. COOK,                    )
                                      )
4                   Plaintiff,        )
                                      )
5        vs.                          ) No. 09-cv-133-DRH
                                      )
6   ILLINOIS DEPARTMENT OF            )
    CORRECTIONS,                      )
7                                     ) May 26, 2011
                    Defendant.        )
8

9                **TRANSCRIPT OF PROCEEDINGS**
             **TRIAL DAY/VOLUME #4 - P.M. SESSION**
10         **BEFORE THE HONORABLE DAVID R. HERNDON**
             **CHIEF UNITED STATES DISTRICT COURT JUDGE**
11

12  **APPEARANCES:**

13  For the Plaintiff:        Thomas O. Falb, Esq.
                              Williamson, Webster, et al.
14                            603 Henry Street
                              Alton, IL  62002
15                            (618) 462-1077

16  For the Defendant:        Joanna Belle Gunderson, Esq.
                              Kelly R. Choate, Esq.
17                            IL Attorney General
                              500 South Second St.
18                            Springfield, IL  62706
                              (217) 782-1841

19  Court Reporter:           Laura A. Blatz, RPR, CRR, CCR(MO)
                              U.S. District Court
20                            750 Missouri Avenue
                              East St. Louis, IL  62201
21                            (618) 482-9481

22

23

24

25       Proceedings recorded by mechanical stenography;
    transcript produced by computer.

1

**INDEX OF EXHIBITS**

2

| EXHIBIT | DESCRIPTION | ID'D | ADMT'D |
|---------|-------------|------|--------|
| *Deft. 17* | ERB documents re Plaintiff's referral in 4/2007 for missing inmate contacts | *581* | *581* |
| *Deft. 20* | ERB documents re Plaintiff's referral in 6/2007 for failure to follow the chain of command | *581* | *581* |
| *Deft. 24* | Grievance documents re Plaintiff's discipline for making a false report, Grievance Nos. 488641 | *581* | *581* |
| *Deft. 15* | ERB documents re Plaintiff's referral in 2/2006 for abandonment of post | *584* | *585* |
| *Deft. 16* | ERB documents re Plaintiff's referral in 4/2007 for inappropriate CHAMPS entry | *586* | *592* |
| *Deft. 22* | Grievance documents re plaintiff's discipline for inappropriate CHAMPS entry | *590* | |
| *Deft. 18* | ERB documents re plaintiff's referral in 5/07 for approval of inmate visitor list | *593* | *599* |
| *Deft. 28* | Grievance documents re no discipline for other counselors | *599* | *604* |
| *Deft. 61* | 5/18/11 CHAMPS report for Inmate Golden | *604* | |
| *Deft. 19* | ERB documents re plaintiff's referral in 5/07 for failure to timely complete tasks | *607* | *610* |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

## INDEX OF EXHIBITS

2

| EXHIBIT | DESCRIPTION | ID'D | ADMT'D |
|---------|-------------|------|--------|
| Deft. 62 | Affidavit of plaintiff | 619 | |
| Deft. 29 | 1/4/07 letter from plaintiff to Ann Casey re job performance | 620 | 622 |
| Deft. 34 | Case assignment memo dated 1/3/07 | 627 | 657 |
| Deft. 35 | Case assignment memo dated 5/17/07 | 628 | 657 |
| Deft. 36 | Case assignment memo dated 6/15/07 | 629 | 657 |
| Deft. 37 | Case assignment memo dated 7/25/07 | 630 | 657 |
| Deft. 38 | Case assignment memo dated 10/12/07 | 631 | 657 |
| Deft. 39 | Case assignment memo dated 11/14/07 | 632 | 657 |
| Deft. 33 | 5/15/08 letter from plaintiff re retirement | 639 | 639 |
| Deft. 30 | EEOC charges | 653 | 653 |
| Deft. 13 | AFSCME contract 7/1/04-6/30/08 | 655 | 657 |
| Deft. 14 | AFSCME contract 9/5/08-6/30/12 | 656 | 657 |
| Deft. 26 | Grievance documents re Warden Flagg's comments to plaintiff | 657 | 657 |
| Deft. 27 | Grievance documents re plaintiff's late arrival at facility | 657 | 658 |
| Deft. 55 | 11/27/07 e-mail from plaintiff to Pat Rensing | 658 | 658 |

# INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | ID'D | ADMT'D |
|---------|-------------|------|--------|
| *Deft. 53* | 9/12/06 e-mail from Ann Casey | *658* | *659* |
| *Deft. 52* | 5/23/07 e-mail from Ann Casey | *659* | *660* |
| *Plf. 17* | 11/29/07 incident report | *661* | |
| *Plf. 10* | CHAMPS manual | *671* | *671* |
| *Plf. 23* | Life Expectancy Table | *695* | *695* |

# INDEX OF WITNESS EXAMINATION

| | DX | CX | R-DX | R-CX | FR-DX |
|---|----|----|------|------|-------|
| *Betty Cook* | | *581* | *660* | *671* | |
| *Ty Bates* | *676* | *680* | *689* | *690* | |
| *Ty Bates* | | | | *693* | |

```
 1        (Court convened)

 2        (Jury in)

 3            THE COURT:  Please proceed.

 4            MS. GUNDERSON:  Your Honor, we would move

 5    Exhibits 17, 20, and 24 into evidence.

 6            THE COURT:  Any objection?

 7            MR. FALB:  No objection, Your Honor.

 8            THE COURT:  Admitted.

 9        (Defendant Exhibit Nos. 17, 20 and 24 admitted)

10                CROSS-EXAMINATION (cont.)

11                QUESTIONS BY MS. GUNDERSON:

12    Q.  Ms. Cook, I want to talk about the rest of your

13    discipline, another couple quick questions about the chain

14    of command.  When you were testifying today you said that

15    you had discussed calling Springfield with other counselors

16    in the office.  Do you remember that testimony?

17    A.  Yes.

18    Q.  Now, you did grieve the discipline you received for

19    going outside the chain of command, correct?

20    A.  Yes.

21    Q.  And you provided a statement to the hearing officer who

22    held that employee review board hearing before you got the

23    discipline, correct?

24    A.  I'm sorry.  Could you repeat that.

25    Q.  It was a bad question.  You had an employee review board
```

Cross - Cook

1  hearing for the chain of command?

2  A.  Correct.

3  Q.  You provided a statement to the hearing officer who, for

4  that hearing, was Mark Beckman?

5  A.  Correct.

6  Q.  And that was a statement regarding your defense on the

7  chain of command, correct?

8  A.  Correct.

9  Q.  Can you look at Exhibit 20 for me, please.

10  A.  Do I have that?

11  Q.  I believe you should.

12  A.  Okay.

13  Q.  If you turn --

14       MR. FALB:  Excuse me, which number?

15       MS. GUNDERSON:  20.

16  Q. (By Ms. Gunderson)  The tenth page in that packet, it

17  actually does not bear a Bates mark, but it starts with

18  Counselor Cook's statement for ERO 7-127.  Nowhere in that

19  statement, ma'am, do you tell -- do you say that you spoke with

20  other counselors before you called Deb Brink or before you

21  called Springfield?

22       MR. FALB:  Objection.  That's improper impeachment.

23       THE COURT:  Overruled.

24  Q. (By Ms. Gunderson)  You want me to repeat the question?

25  A.  Yes, please.

Cross - Cook

1   Q.   Nowhere in your statement that you presented at the

2   Employee Review Board hearing do you say that you spoke with

3   other counselors before you called Springfield?

4   A.   Correct.   Oversight.

5   Q.   You're not aware of Gina calling Springfield to have

6   changes made in CHAMPS, are you, ma'am?

7   A.   I never monitored Gina.

8   Q.   You have no personal knowledge that Gina ever called

9   Springfield to have changes made in CHAMPS, do you?

10   A.   I didn't keep track of what she did.

11   Q.   So you have no personal knowledge that Gina called

12   Springfield to have changes made in CHAMPS, do you?

13   A.   I didn't monitor her.

14   Q.   So the answer's no?

15   A.   Correct.

16   Q.   You have no personal knowledge that Bart called

17   Springfield to have changes made in CHAMPS, do you, ma'am?

18   A.   I didn't monitor him.

19   Q.   So the answer's no?

20   A.   Correct.

21   Q.   You do have personal knowledge that Deb Brink called

22   Springfield to have changes made, don't you, ma'am?

23   A.   Yes.

24   Q.   She was same as age as you, wasn't she?

25   A.   Yes.

Cross - Cook

1    *Q.* She did not receive discipline that you're aware of, did

2    she?

3    *A.* No.  I don't know.

4    *Q.* You also have personal knowledge that Sena called

5    Springfield to have changes made in CHAMPS at Warden Casey's

6    direction, correct?

7    *A.* I don't know that.  I know she called.

8    *Q.* Sena's older than you, isn't she, ma'am?

9    *A.* Yes, I believe so.

10   *Q.* And you're not aware, you don't no personal knowledge

11   that Sena was disciplined for calling Springfield, do you,

12   ma'am?

13   *A.* No.

14   *Q.* I'm going to hand you what has been marked Defendant's

15   Exhibit 15.  This is the Employee Review Board hearing

16   results from your discipline in 2006 for abandoning your

17   post, correct?

18   *A.* Yes.

19   *Q.* At the end of the document there's the results of the

20   grievance that you filed on this discipline, correct?

21   *A.* Yes.

22   *Q.* And it shows that your one-day suspension was reduced to

23   counseling?

24   *A.* Correct.

25   *Q.* That was the decision of the union, correct?

Cross - Cook

1   A.  Correct.

2   Q.  And I believe you said that you actually were not given

3   any discipline whatsoever by the department as a result of

4   this, correct?

5   A.  Correct.

6          MS. GUNDERSON:  Move Exhibit 15 into evidence.

7          THE COURT:  Any objection?

8          MR. FALB:  No objection.

9          THE COURT:  Admitted.

10         **(Defendant's Exhibit No. 15 admitted)**

11  Q. (By Ms. Gunderson)  If you look at the last page of the --

12  last two pages that are marked Page No. 732 and 733 of

13  Exhibit 15.  Oh, wait.  I'm sorry.  I'm thinking of something

14  else.  Never mind.  Scratch that.

15      Let's talk about the alleged inappropriate CHAMPS entry.

16  This was the entry that you talked about regarding

17  Inmate Cobb, correct?

18  A.  Correct.

19  Q.  You stated, I think, in your testimony that you were

20  first approached about that entry when you went -- you were

21  called to Warden Casey's office, right?

22  A.  Correct.

23  Q.  And you had a union representative named Dusty Minor

24  with you, right?

25  A.  Correct.

Cross - Cook

1   Q.  And that you were -- that Warden Casey spoke with you

2   about that particular entry, correct?

3   A.  Correct.

4   Q.  Did you receive papers at that time?

5   A.  She gave Dusty Minor a copy of the memo where she said

6   she was referring Betty Cook -- the memo that she used the

7   next week in the referral packet that I received.  She gave

8   Dusty that.

9   Q.  Okay.  Well, let's look at Exhibit 16.  Now, this is the

10  referral that you're talking about, right, the second one?

11  A.  The -- yes, the second, the actual referral, yes.

12  Q.  This is the actual referral which led to the actual

13  review board hearing that you had, right?

14  A.  Correct.

15  Q.  You never had a review board hearing based on the first

16  memo that you got, correct?

17  A.  The first memo was just like -- it was exactly this

18  without the warden's signature.  In my review packet this is

19  what I got, and this signature block had been added.

20  Q.  Okay.  But everything else had remained the same?

21  A.  Everything else was identical.

22  Q.  You didn't receive any notice that there would be a

23  review board hearing until after you received this

24  particular memo, correct, this one, the one we're talking

25  about here?

Cross - Cook

```
 1   A.   That's when I became aware that I would have an actual
 2   review board hearing.
 3   Q.   Let's talk about the purpose of the review board
 4   hearings.   You have a review board hearing so that you can
 5   present your side of the story before you receive
 6   discipline, correct?
 7   A.   Correct.
 8   Q.   So before receiving any discipline you have to have a
 9   review board hearing, right?
10   A.   I don't think so.
11   Q.   Can you be disciplined without having a hearing?
12   A.   She counseled me with just this memo.
13   Q.   Okay.   So you would consider her giving you the memo
14   before to be counseling?
15   A.   She indicated that in the meeting.
16   Q.   Okay.   And we've agreed earlier that counseling is not
17   necessarily discipline, correct?
18   A.   Right.   It could go either way.
19   Q.   Let's talk a little bit more about this actual entry.   I
20   think you said that Mr. Minor was with you when you first
21   met with Ann Casey.   Was he with you the second time as
22   well?
23   A.   No.   It was a different union steward, and I can't
24   remember his name.   I recall his face very vividly but I
25   don't know his name.   It's been too long.
```

Cross - Cook

Vol.IV, Pg.587

1   Q.  And I think it was Mr. Minor that you quoted as telling

2   Ann Casey that she couldn't be counseling you about this,

3   correct, that she was doing it inappropriately?

4   A.  Correct.

5   Q.  Mr. Minor no longer works for the department, correct?

6   A.  That's correct.

7   Q.  Mr. Minor was fired for socialization with an inmate's

8   girlfriend, correct?

9   A.  I have no idea why he's not there.  We never discussed

10  it.

11  Q.  Let's talk about -- you would agree with me that

12  socialization is a charge for which you could be fired,

13  right?

14  A.  If it's listed in the dischargeable offenses, yes.

15  Q.  Where would that list be?

16          THE COURT:  Hold on a second.  What's your

17  objection?

18          MR. FALB:  Relevance.  What does this have to do

19  with my client?

20          MS. GUNDERSON:  I can withdraw that question.

21          THE COURT:  Okay.

22          MR. FALB:  Move to strike the questions and

23  answers.  Has nothing to do with my client.

24          MS. GUNDERSON:  No objection to that.

25          THE COURT:  Sustained.

Cross - Cook

1    *Q. (By Ms. Gunderson)*  You talked for quite a while about the

2    CHAMPS entry that you made about Inmate Cobb yesterday.  Do you

3    remember that testimony?

4    *A.*  Yes.

5    *Q.*  This is the entry that you made, right?

6    *A.*  Correct.

7    *Q.*  I believe you said you made this entry because you

8    wanted other counselors to be aware of his demeanor, right?

9    *A.*  Correct.

10   *Q.*  That he was transferred to another institution.  You

11   wanted other institutions to be aware of his demeanor,

12   correct?

13   *A.*  Correct.

14   *Q.*  You're aware, when you make entries into the CHAMPS

15   system, that they can be viewed by other counselors, right?

16   *A.*  Yes.

17   *Q.*  They can be viewed at the wardens at your facility,

18   right?

19   *A.*  Yes.

20   *Q.*  And that if an inmate were to transfer, they could be

21   viewed by people at other institutions, correct?

22   *A.*  Correct.

23   *Q.*  And that if an inmate were to file a lawsuit, that

24   information could end up in a public record, correct?

25   *A.*  Correct.

Cross - Cook

1   Q.  I think you said that the reason you wanted this

2   particular entry in there is because you believed that

3   Inmate Cobb had the potential to be a violent inmate, is

4   that correct?

5   A.  Correct.

6   Q.  You could have put simply that Inmate Cobb has the

7   potential to be a violent inmate, couldn't you, ma'am?

8   A.  Yes.

9   Q.  You also said that prior to putting the entry in, that

10  you talked to other people about the entry, right?

11  A.  Yes.

12  Q.  You talked to other counselors and sought the advice of

13  others, correct?

14  A.  I sought the advice of counselors in the office.

15  Q.  Do you agree with discipline?

16  A.  Yes.

17  Q.  You look at Exhibit 22.  I think you have a copy in

18  front of you.  Now, you -- before we get to 22, you had an

19  Employee Review Board hearing for the inappropriate CHAMPS

20  entry, right?

21  A.  Correct.

22  Q.  What witnesses did you call?

23  A.  I don't recall off the top of my head without checking

24  the record.

25  Q.  Okay.  Now, an Employee Review Board hearing usually

Cross - Cook

```
 1    says who's there, correct?

 2    A.  Correct.

 3    Q.  If you turn to page 726 of Exhibit 16, there's a list of

 4    who is present, correct?

 5    A.  Ma'am, I don't have that.

 6    Q.  You don't have Exhibit 16?

 7    A.  Oh, 16.  I'm sorry.

 8    Q.  I started to change gears too quickly.

 9    A.  Thought we were talking about 22.

10    Q.  We're going to.  I got ahead of myself.

11    A.  Could you tell me what page.

12    Q.  726.  It's the first page of the actual memo after the

13    hearing.  Are you there?

14    A.  Yes, I am.

15    Q.  There's a section that says, "Present", doesn't it?

16    A.  Correct.

17    Q.  You would agree with me that you're the only counselor

18    that's listed in that section, correct?

19    A.  Correct.

20         MS. GUNDERSON:  I'm going to move Exhibit 16 into

21    evidence.

22         THE COURT:  Any objection?

23         MR. FALB:  Your Honor, the only objection I would

24    have is that she's only got the two pages from CHAMPS.  She

25    would introduce the entire CHAMPS book, I would have no
```

Cross - Cook

1    objection.

2            MS. GUNDERSON:   That's one of your exhibits, right?

3    I think that is in evidence.

4            MR. FALB:   I don't think it is.   You don't have any

5    problem with it?

6            MS. GUNDERSON:   No.

7            MR. FALB:   No objection, Your Honor.

8            THE COURT:   Admitted.

9        **(Defendant's Exhibit No. 16 admitted)**

10   Q. (By Ms. Gunderson)  Now we'll turn to Exhibit 22, which is

11   in evidence.   Exhibit 22 is the grievance that you filed

12   regarding the inappropriate CHAMPS entry, right?

13   A.   Correct.

14   Q.   And you wrote a statement -- well, I'm sorry.   You

15   worked with your union representative to write a statement

16   for that grievance, correct?

17   A.   Correct.

18   Q.   Nowhere in that statement do you say that you consulted

19   with other counselors or sought the advice of other people

20   prior to making that entry, do you, ma'am?

21   A.   Oversight.

22   Q.   Let's move on to the visitor list.   You were disciplined

23   for approving a visitor list that had a victim on it,

24   correct?

25   A.   An alleged victim.

                                    Cross - Cook

1   Q.  You say "alleged victim" because after that visitor list

2   was approved, the order of protection against the inmate was

3   dismissed, correct?

4   A.  Correct.

5   Q.  I handed you what's been marked Exhibit 18.  That's the

6   referral and Employee Review Board hearing document for the

7   approved visitor list incident, correct?

8   A.  Correct.

9   Q.  If you turn to the page which is Bates marked 503,

10  that's your -- the statement -- is this -- are these

11  statements that you worked with your union on with respect

12  to two grievances?  I'm sorry, two ERB's?

13  A.  I always did.

14  Q.  So these are statements at page 503 that you would have

15  approved of?

16  A.  What document are we on?

17  Q.  Fair enough.  Exhibit 18.

18  A.  Okay.

19  Q.  If you flip back to -- it's a page that's marked 503

20  it's in the middle.  The pages are not numbered

21  sequentially.

22  A.  Okay.

23  Q.  But at the top it says, "AFSCME Statement".

24  A.  Okay.

25  Q.  These are statements that you worked with your union to

Cross - Cook

1    create for these Employee Review Board hearings?

2    A.   Correct.

3    Q.   These are actually statements for two different

4    referrals, right?

5    A.   Correct.

6    Q.   These are statements that you approved of before they

7    were included with the Employee Review Board hearing?

8    A.   We talked about the information in them, yes.

9    Q.   And you approved them?

10   A.   Yes.

11   Q.   If you turn to the next page, Bates marked 499, it says

12   "Attachment 1" at the top?

13   A.   Okay.

14   Q.   Is this a document -- this is a document you wrote?

15   A.   In conjunction with my union steward, yes.

16   Q.   It was in first person so that's why I asked.  So this

17   is a document you worked with your union again, right?

18   A.   Yes.

19   Q.   And it's a document that you approved of before it was

20   submitted in your ERB, correct?

21   A.   Correct.

22   Q.   The result of this referral was you got a one-day

23   suspension, correct?  As a result of the hearing, you got a

24   one day suspension, right?

25   A.   I believe it was three.

Cross - Cook

1   Q.  Okay.  Let's flip to the back because I could be wrong.

2   And you are right.  It's a three-day suspension, correct?

3   A.  Correct.

4   Q.  I think it was reduced to a one-day suspension, right?

5   A.  No, ma'am.

6   Q.  Let's look at the grievance documents because that will

7   probably help clear things up.  The discipline wasn't

8   expunged, was it?

9   A.  No, ma'am.

10  Q.  I'm sorry?

11  A.  No, ma'am.

12  Q.  So you did -- so obviously you did receive some

13  discipline, correct?

14  A.  I believe I received a three-day suspension.

15  Q.  Okay.  This is one of the ones where the union failed to

16  file a grievance in a timely fashion, right?

17  A.  Yes.

18  Q.  So for that reason you did keep -- the discipline that

19  was given to you at the end of the hearing is what you

20  served correct?

21  A.  Correct.

22  Q.  Now, you believed, at one time at least -- before I get

23  to that, you testified earlier that you had called the

24  record office and that you had requested that they send you

25  information about whether this inmate had any orders of

Cross - Cook

 1    protection, correct?

 2    A.  Yes.

 3    Q.  Can you please look at the two statements that you

 4    approved of and worked with your union to craft with respect

 5    to this particular discipline and tell me where it says that

 6    you called the record office and asked them to send you

 7    anything.

 8    A.  I did.  Oversight.  Getting everything in.  I was doing

 9    so many review hearings that -- oversight.

10    Q.  Okay.  Let's actually turn to the shorter one.  If you

11    look at the fourth paragraph, you do mention the record

12    office, don't you?

13    A.  What page?

14    Q.  Page 498.

15    A.  Okay.

16    Q.  You mentioned the record office in the fourth and fifth

17    paragraphs, right?

18    A.  Uh-huh.

19    Q.  You say they failed to inform you, right?

20    A.  After I had asked --

21        MR. FALB:  Object.  That's not what it says.

22        THE COURT:  Well, overruled.  I'm not suggesting

23    did or did not say that.  The document speaks for itself.

24    There can be cross-examination and the jury can see the

25    document.

Cross - Cook

1    Q. (By Ms. Gunderson)  Nowhere in those paragraph do you say

2    that you called the record office and made any request, do you?

3    A.  It does not say that.  It was an oversight, but because

4    I -- they didn't tell me, indicates to me that I followed

5    the proper procedure and notified them that I needed to know

6    if the paperwork was coming in, if they had called the

7    county to get it.

8    Q.  And in this statement you actually say that it is the

9    responsibility of the record office to insure things are in

10   the master files, right?

11   A.  Correct.

12   Q.  So because they didn't do that, you couldn't do your

13   job, right?

14   A.  I reviewed the file.  It wasn't there.

15   Q.  And it was the record office's fault, wasn't there, per

16   your statement here, right?

17   A.  That's -- I'm not allowed to call the court.

18   Q.  I think you said the first time that you saw the

19   information about the order of protection was in the

20   Employee Review Board packet, right?  The packet you

21   received, the referral?

22   A.  Yes.

23   Q.  Page 515.

24   A.  Okay.

25   Q.  This is one of the documents that was included in the

                              Cross - Cook

1    referral, correct?

2    A.  Correct.

3    Q.  And you can see on that document that there is a

4    victim's name listed, correct?

5    A.  Correct.

6    Q.  And if you actually look down, it talks about the victim

7    coming in bleeding from an arm, and it talks about the

8    altercation that she had with Mr. Williams, correct?

9    A.  Correct.

10   Q.  And Mr. Williams was your inmate whose visitor list that

11   you approved, correct?

12   A.  Correct.

13   Q.  You would agree with me that here that the victim's name

14   is Molly McGlynn, correct?

15   A.  Correct.

16   Q.  You would also agree that this document was faxed on

17   March 21st, 2007, correct?

18   A.  Correct.  Wasn't in his file.

19   Q.  This is the visitor list that you approved, right, the

20   next page?

21   A.  Correct.

22   Q.  And you'll see on there the name of Molly McGlynn does

23   appear, correct?

24   A.  Correct.

25   Q.  And it does show that it was approved visitor, right?

Cross - Cook

```
 1    A.   Correct.

 2    Q.   And at the bottom that's your signature, correct?

 3    A.   Correct.

 4    Q.   It's dated 4/21/2007?

 5    A.   No, ma'am.

 6    Q.   4/24/2007, right?

 7    A.   Yes.

 8    Q.   I'm going to move Exhibit 18 into evidence.

 9             MR. FALB:  No objection.

10             THE COURT:  Admitted.

11        (Defendant's Exhibit No. 18 admitted)

12    Q. (By Ms. Gunderson)  Now let's talk about the grievance that

13    you filed.  Now, at some point you testified that you thought

14    that Gina Feazel had approved a visitors list with an inmate on

15    it, right?

16    A.   Yes.

17    Q.   You filed a grievance to that effect, right?

18    A.   Yes.

19    Q.   I'm going to hand you what's marked as Exhibit 28.

20             THE COURT:  You said a visitors list with an inmate

21    on it.

22             MS. GUNDERSON:   I suppose they would have an inmate

23    on them.  A visitor's list with a victim on it, right?

24             THE WITNESS:  Correct.

25    Q. (By Ms. Gunderson)  Exhibit 28 is the grievance that you
```

Cross - Cook

```
 1   filed, or the union filed on your behalf, which is alleging

 2   that Gina Feazel approved an inmate list and wasn't disciplined

 3   but you were, right?

 4   A.   Correct.

 5   Q.   It's -- was that a "yes"?

 6   A.   Yes.

 7   Q.   It's basically alleging that she did something and

 8   wasn't disciplined and you did the same thing and were and

 9   it's unfair, right?

10   A.   That I was accused of doing the same thing, yes.

11   Q.   If you turn to the second page, there's a statement that

12   you worked with your union rep to create, right?

13   A.   Correct.

14   Q.   And you state in there what you believe the violation

15   is, right?

16   A.   Correct.

17   Q.   And then you've attached documents -- it might not say

18   in here that you attached documents, but you did attach

19   documentation to show that Gina had in fact approved this

20   visitors list, correct?

21   A.   That someone approved a visitor list, and I thought the

22   signature was Gina Feazel.

23   Q.   And you say in this that you actually accuse it of being

24   Gina, correct?

25   A.   Because I believe that's who it was at that time.
```

Cross - Cook

1  Q.  Now, at the time that you discovered the visitors list,

2  you wrote an incident report, correct?

3  A.  Correct.

4  Q.  Now, incident reports can be written at the Department

5  of Corrections for any kind of an incident, right?

6  A.  Yes.

7  Q.  Anything that you want documented, right?

8  A.  Anything you feel needs to be documented.

9  Q.  Okay.  And in this case when you came across this

10  visitors list you felt that it needed to be documented that

11  you'd found this, right?

12  A.  Yes.

13  Q.  And so you did so, right?

14  A.  Correct.

15  Q.  And this was something that you attached to your

16  grievance, right?

17  A.  Correct.

18  Q.  Now, you also attached to your grievance -- that's a

19  memo -- some documents about the particular inmate at issue,

20  right?

21  A.  Yes.

22  Q.  And it shows what his different violations had been,

23  correct?

24  A.  Correct.

25  Q.  And it shows that he has an order of protection, right?

Cross - Cook

1    A.   Correct.

2    Q.   Now, the reason it's important to not have a victim on

3    an order of protection at the prison is because if something

4    were to happen between the two of them and there was an

5    order of protection, the prison could get in trouble, right?

6    A.   That was my belief.  That's what I was told.

7    Q.   And you certainly wouldn't want to -- because sometimes

8    victims of inmates do want to come see them, right?

9    A.   Correct.

10   Q.   So you try and prevent that as a counselor, right?

11   A.   Correct.

12   Q.   Because you don't want there to be a volatile situation

13   in the prison, right?

14   A.   No.

15   Q.   And certainly having an order of protection out there is

16   a reason you would look to see who the order of protection

17   deals with, right?

18   A.   Correct.

19   Q.   Because you wouldn't want anyone listed as a victim or

20   who is the person who got the order of protection to be

21   visiting this particular inmate, right?

22   A.   Correct.

23   Q.   This is why it was a problem when you came across this

24   particular visiting list, right?

25   A.   Right.

Cross - Cook

1    Q.   Now, you also attached to your grievance the visitors

2    list that you came across, right?

3    A.   Correct.

4    Q.   And this is the signature that you believed was

5    Gina Feazel's, right?

6    A.   That's what it appeared to be when I looked at it.

7    Q.   Okay.  And then you also went so far as to attach the

8    actual complaint, correct?

9    A.   Correct.

10   Q.   And this is the victim who appeared on that visitors

11   list, right?

12   A.   Correct.

13   Q.   So that shows that she shouldn't be at the prison

14   visiting him, right?

15   A.   Correct.

16   Q.   And you also attached the parole violation report which

17   shows the Inmate Golden had a domestic battery, right?

18   A.   Yes.

19   Q.   And if you saw a domestic battery when you were

20   reviewing an inmate you would automatically look to see who

21   the victim was, right?

22   A.   Yes.

23   Q.   Because that's the kind of victim inmate relationship

24   where you wouldn't want the victim coming in, correct?

25   A.   Correct.

Cross - Cook

1   Q.  You also attached a booking report as well as sentence

2   calculations for Inmate Golden, correct?

3   A.  Because I had it all available because I was reviewing a

4   work release.  That's the only reason I attached it.

5       MS. GUNDERSON:  Okay.  I'd move Exhibit 28 into

6   evidence.

7       MR. FALB:  No objection.

8       THE COURT:  Admitted.

9       **(Defendant's Exhibit No. 28 admitted)**

10  Q. (By Ms. Gunderson)  Now, you did not attach to that

11  grievance any cumulative counseling summaries, did you?

12  A.  No, I did not.

13  Q.  This is Exhibit 61.  That is already in evidence.  This

14  is a counseling summary report for the same inmate that

15  we've been talking about that you thought Gina had approved

16  the visitors list, correct?

17  A.  Correct.

18  Q.  And you said that you found out about this and that you

19  made -- where is it -- an entry about it, about the visitors

20  list, correct?  That would be this one, right?  Correct?

21  A.  Correct.

22  Q.  That's an entry you made?

23  A.  Correct.

24  Q.  And that was an entry that you made on August 16th of

25  2007, correct?

                        Cross - Cook

1    A.   Correct.

2    Q.   Two entries down from that is an entry by Deb Brink,

3    correct?

4    A.   Correct.

5    Q.   That's an entry made by her that she processed a new

6    visiting list, correct?

7    A.   Correct.

8    Q.   And that she -- it was made on July 2nd, 2007, correct?

9    A.   Correct.

10   Q.   You'd agree with me that's the same date of the

11   signature, wouldn't you?

12   A.   Correct.

13   Q.   You would also agree with me that this grievance process

14   was started on September 11th, 2007, correct?

15   A.   Correct.

16   Q.   That was nearly a month after you had made an entry into

17   Inmate Golden's -- into the CHAMPS system for Inmate Golden,

18   correct?

19   A.   Inmate Golden, yes.

20   Q.   And just so that we're not confusing, because I'm kind

21   of stumbling my words, this is your entry on August 16th,

22   right?

23   A.   When he sent me the kite, yes.

24   Q.   You didn't include this counseling summary in your

25   grievance though, did you, ma'am?

Cross - Cook

1          MR. FALB:  Objection.  Asked and answered.

2          THE COURT:  Overruled.

3          THE WITNESS:  Oversight, I guess.  I mean I

4    checked.

5    Q. (By Ms. Gunderson)  You would agree with me now that it was

6    Deb Brink that made that visitors list, correct?

7    A.  I don't know who made it.  Their signatures were close

8    enough.  I don't know.

9    Q.  You would --

10   A.  Based on that --

11   Q.  At the time that you filed this grievance -- I mean you

12   were confident enough to file this grievance saying it was

13   Gina Feazel, that you believed it was her, right?

14   A.  At the time I did.

15   Q.  As you sit here today you're not sure whose signature

16   that is?

17   A.  It's been so long since I've seen either one of their

18   signatures, I can't honestly say.

19   Q.  You would agree with me that Deb Brink is the same age

20   as you, correct?

21   A.  Yes, she was.  If I'm right, I think she was.

22   Q.  Other than Deb Brink, you're not aware of any other

23   counselor who approved a visitor list with a victim on it,

24   are you, ma'am?

25   A.  Off the top of my head -- I'd have to refresh myself

                         Cross - Cook

 1   with the other documents that were with this that the union

 2   had when they filed it.

 3   Q.  Are you talking about Exhibit 28?

 4   A.  Yes, because I'm thinking that you don't have it all,

 5   but I could be wrong.

 6   Q.  Other than anything that might be in Exhibit 28, is

 7   there any other instance, other than this one involving

 8   Mr. Golden, that you're aware of where a counselor approved

 9   a visitors list with a victim on it?

10   A.  The one I was accused of doing.

11   Q.  Okay.  Other than the one involving Inmate Golden and

12   the one you were accused of doing, are you aware of any

13   other incident where a counselor approved an inmate visitor

14   list with a victim on it?

15   A.  Not off the top of my head.

16   Q.  I'm going to talk to you about the discipline that you

17   were referred for about your receiving counselor duties.

18   Handing you what's been marked as Exhibit 19.  This is the

19   Employee Review Board hearing where you were referred for

20   your job duties as a receiving unit counselor, correct?

21   A.  Correct.

22   Q.  If you turn to the third page of this document, there's

23   an incident report there, correct?

24   A.  Correct.

25   Q.  Incident report signed by Stephanie Wagner, right?

Cross - Cook

1    A.  I believe so.

2    Q.  Who was she?

3    A.  At the time I worked there she was the record office

4    supervisor.

5    Q.  Would that be the time that this was written?

6    A.  Yes.

7    Q.  You turn to the next page, it's an incident report

8    written by Tony Gile.  Who's Tony Gile?

9    A.  She's a correctional officer.

10   Q.  These two people are not counselors correct?

11   A.  Correct.

12   Q.  Or they weren't at the time?

13   A.  Correct.

14   Q.  These are the two incident reports which led to your

15   referral, correct?

16   A.  Correct.

17   Q.  These were given to Ann Casey and then the referral came

18   after that, right?

19   A.  Correct.

20   Q.  What you were alleged of doing is contained in these two

21   incident reports, right?

22   A.  Correct.

23   Q.  I want to turn to the very end, it's page 533, second to

24   last page.  Now, you had an Employee Review Board hearing

25   with Mark Beckman on this alleged discipline, correct?

Cross - Cook

1    A.   Correct.

2    Q.   And Mr. Beckman found that the charges had not been

3    proven, correct?

4    A.   Correct.

5    Q.   I think you said earlier that it was because you had

6    proved you had done the work, correct?   That was your

7    testimony earlier?

8    A.   Yes.

9    Q.   You look at the bottom, Mr. Beckman notes that these had

10   been rescinded, correct?

11   A.   Where are we looking?

12   Q.   It's circled.

13   A.   Okay.   Yes.

14   Q.   Mr. Beckman also notes that you had received good

15   comments about -- he makes note of your -- of comments in

16   your evaluation, correct?

17   A.   Okay.

18   Q.   That's something from your evaluation, right?

19   A.   Yes.

20   Q.   It's a comment by Ann Casey from your evaluation, right?

21   A.   Correct.

22   Q.   Based upon those two things, the hearing officer

23   recommended that the charges be dropped, correct?

24   A.   Correct.

25         MS. GUNDERSON:   Move Exhibit 19 into evidence.

Cross - Cook

1          MR. FALB:  No objection.

2          THE COURT:  Admitted.

3      **(Defendant's Exhibit No. 19 admitted)**

4   Q. (By Ms. Gunderson)  I want to talk to you about attempts to

5   change your vacation that you testified about today.

6   A.  Yes.

7   Q.  Now, the vacation that you had requested was supposed to

8   start was the first two weeks of July, right?

9   A.  Correct.

10  Q.  And that was when your vacation actually occurred,

11  correct?

12  A.  Yes.

13  Q.  There was no change to your vacation, right?

14  A.  No.

15  Q.  Was it a "no"?

16  A.  I said "no".

17  Q.  Okay.  You said that Ann Casey said to you orally that

18  she was going to change your vacation?

19  A.  Yes.

20  Q.  Is that a "yes"?

21  A.  Yes.

22  Q.  And that she told you it was because of operational

23  needs, correct?

24  A.  Correct.

25  Q.  But that change never happened, right?

                          Cross - Cook

 1   A.  Correct.

 2   Q.  You didn't write an incident report when Ann Casey told

 3   you she was going to change your vacation, did you, ma'am?

 4   A.  No.  I went to the union.

 5   Q.  You didn't file a grievance, did you, ma'am?

 6   A.  They said they'd take care of it.

 7   Q.  So you generated no document that Ann Casey had told you

 8   she was going to change your vacation?

 9   A.  Not at that time.

10   Q.  And your vacation was never changed?

11   A.  No, because the union president went and talked to her.

12   Q.  And it was while you were on vacation that Ms. Casey

13   left, correct?

14   A.  I believe so.

15   Q.  Towards the end of your testimony you talked a lot about

16   things you believed other people had done.  I'm trying to

17   find it.  I believe you said that you knew that Bart had led

18   a parolee in without putting him into seg?

19   A.  No, ma'am, that's not what I said.

20   Q.  Remind me what you said.

21   A.  I said that a parolee came back in and he failed to put

22   him on the -- to notify the institution to put him on the

23   72-hour watch that they're required to be on when they come

24   back as a parole violator.

25   Q.  You said you observed this because you were in seg at

                        Cross - Cook

1   the time?

2   A.  I was making rounds, yes.

3   Q.  You observed the inmate come in, correct?

4   A.  Yes, I did.

5   Q.  Did you talk to Bart?

6   A.  No, because I'm not his supervisor and I can't tell him

7   to do anything.

8   Q.  So you didn't talk to Bart, right?

9   A.  No.

10  Q.  You weren't in field services, right?

11  A.  No.

12  Q.  You didn't write incident report, right?

13  A.  Nope.

14  Q.  You didn't write a grievance, right?

15  A.  No.

16  Q.  You didn't tell your supervisor either, did you?

17  A.  I reported it to the segregation lieutenant, which I'm

18  required to do.  He's in charge of that area.

19  Q.  You didn't tell Ann Casey though, did you?

20  A.  She wasn't around.

21  Q.  Didn't tell Warden Robert, did you?

22  A.  I notified the seg lieutenant, which is how that

23  assignment was handled.

24  Q.  You didn't tell Warden Robert either, did you?

25  A.  No.

Cross - Cook

1    Q.  You didn't tell anyone in Bart's chain of command that

2    he had failed to do something, did you?

3    A.  No.

4    Q.  You also said that you thought Bart had paroled an

5    inmate without an address, right?

6    A.  Yes.

7    Q.  Did you -- were you involved in that inmate who was

8    paroled?

9    A.  I only know what the officer told me.

10   Q.  So you didn't firsthand observe anything that Bart did

11   with respect to that parolee, did you?

12   A.  No.

13   Q.  You didn't firsthand observe anything with that inmate

14   walking out the door without an address, did you, ma'am?

15   A.  No.

16   Q.  You didn't write an incident report about this, did you?

17   A.  I wouldn't on hearsay.

18   Q.  Okay.  And you didn't write a grievance report on

19   hearsay either, did you, ma'am?

20   A.  No.

21   Q.  And you didn't report that to anyone in Bart's chain of

22   command either, did you, ma'am?

23   A.  No.

24   Q.  Not to Ann Casey?

25   A.  I didn't feel it was my responsibility to.

Cross - Cook

1   Q.  So you didn't, right?

2   A.  Because I wasn't sure if it was true or not.  It was

3   just something the officer said.  It would have been the

4   officer's responsibility to do that.

5   Q.  You said that you believed that Bart had -- while he was

6   typing a CHAMPS entry, might have put profanity in the

7   CHAMPS entry, correct?

8   A.  Yes.

9   Q.  You said you believe this because he said the inmate was

10  an asshole while he was typing, right?

11  A.  Correct.

12  Q.  You weren't standing over his shoulder?

13  A.  No, I was not.

14  Q.  You didn't look up the CHAMPS entry afterwards and

15  verify that it did say "asshole" in it, did you, ma'am?

16  A.  I wouldn't know which inmate he was talking about.

17  Q.  You didn't write an incident report, right?

18  A.  No.

19  Q.  You didn't contact anyone in Bart's chain of command

20  about this, did you, ma'am?

21  A.  No.

22  Q.  There was no grievance, right?

23  A.  No.

24  Q.  And at the time -- and this was something that you

25  were -- you were disciplined for making inappropriate CHAMPS

Cross - Cook

 1   entries, correct?

 2   A.   Correct.

 3   Q.   Let's talk about Gina.  You said that you believed that

 4   Gina had messed up count somehow with an inmate, correct?

 5   A.   Correct.

 6   Q.   And that that was a really big deal, right?

 7   A.   That's how it was handled, yes.

 8   Q.   It was a big deal, right?

 9   A.   Yes.

10   Q.   Did you have firsthand knowledge of Gina -- were you

11   there when she messed up the count?

12   A.   Not in the office that she was in.

13   Q.   You didn't observe firsthand any other work that she was

14   doing?

15   A.   No.

16   Q.   Did you talk to anyone in the records office about what

17   was going on with that particular inmate?

18   A.   I didn't talk to the record office.

19   Q.   You didn't write an incident report about this, did you?

20   A.   Wasn't my responsibility to.

21   Q.   And you didn't file a grievance about this either, did

22   you, ma'am?

23   A.   Not my responsibility to do that.

24   Q.   Let's talk about your 30-year pinning.  Told the jury

25   that there used to be parties when they would hand out the

                          Cross - Cook

```
 1    pins and the awards, right?

 2    A.   There always was some type of a recognition in the past,

 3    yes.

 4    Q.   And that you weren't invited to the party that year,

 5    correct?

 6    A.   Correct.

 7    Q.   Isn't it true that the department stopped having those

 8    parties?

 9    A.   They had them the year before and they had them after,

10    so I don't know.

11    Q.   It was actually at the Christmas party, wasn't it,

12    ma'am?

13    A.   Sometimes it was, sometimes it wasn't.

14    Q.   At the time that you received your pin there was only

15    one other employee receiving a pin at that time that you

16    were aware of, right?

17    A.   I wasn't aware of anybody getting a pin besides me.  I

18    don't keep track of anybody else's seniority but my own.

19    Q.   Okay.  Well, yesterday you said you weren't invited to

20    the party.

21    A.   I assumed there would be a party because they had them

22    every year at a certain time.

23    Q.   And so now you're telling me that you were not aware of

24    anyone else receiving any awards at that time other than

25    you?
```

Cross - Cook

1   A.   Because I don't keep track of it.

2   Q.   So I'm correct, you were not aware of anyone else

3   receiving awards at that time other than you?

4   A.   Correct.

5   Q.   And I'm going to wager that you're not aware that the

6   department handed over the responsibility of giving the

7   awards to the supervisors?

8   A.   I would not be privy to that information.

9   Q.   Would an inmate grievance be considered a department

10  document?

11  A.   It would be.

12  Q.   It would be considered state property, correct?

13  A.   Correct.

14  Q.   And it would be inappropriate for you to remove it from

15  the institution, correct?

16  A.   I didn't remove anything from the institution.  That was

17  an institutional grievance.

18  Q.   So you never had copies of inmate grievances --

19  A.   No.

20  Q.   -- at your house?

21  A.   No.  I have a chart that I kept track of the grievances

22  that I processed.  It's a chart from the computer where I

23  typed up inmate name and number and the date he submitted

24  the grievance and the date I processed it.  That's what it

25  is.  And it was with the stuff I used to put my grievances

Cross - Cook

```
 1    and nothing else.

 2    Q.  At some point in this case do you remember signing an

 3    affidavit?

 4    A.  Yes.

 5    Q.  That was an affidavit that was signed, submitted with

 6    motions in this case, correct?

 7    A.  I'm not sure what it was but I remember signing

 8    something.

 9    Q.  Do you recall on that affidavit --

10            MR. FALB:  Your Honor, may I get a copy of that?

11            MS. GUNDERSON:  Sure.  Hold on.

12    Q. (By Ms. Gunderson)  That was an affidavit that you say that

13    you were personally aware of the facts that were contained in

14    it, correct?  You would have reviewed it, right, before you

15    signed it?

16    A.  If I signed it, I would have reviewed it, correct.

17    Q.  If there was anything incorrect in it you would have

18    changed it, right?

19    A.  Yes, or I would have directed my attorney to change it.

20    Q.  That affidavit, do you recall saying that you had kept

21    copies of inmate grievances?

22    A.  It wasn't copies of grievances that I kept.  He might

23    have misunderstood what I was talking about.  I have just

24    the chart where I processed them.

25    Q.  I'm going to mark this Exhibit 62 for the purpose of
```

Cross - Cook

1    identification.

2          *MR. FALB:*  What number?

3          *MS. GUNDERSON:*  62.

4    *Q. (By Ms. Gunderson)*  Ma'am, I'm handing you Exhibit 62.

5    That's an affidavit signed by you, correct?

6    *A.*  Correct.

7    *Q.*  And at the top of the affidavit it shows this case, the

8    case caption for this case, correct?

9    *A.*  Correct.

10   *Q.*  If you turn to paragraph 9, which is on page 3 --

11   *A.*  Okay.

12   *Q.*  The last sentence of that paragraph says, *I still have*

13   *copies of these grievances and they are stamped "copy".*

14   That's what it says, right?

15   *A.*  I don't have them.  They were at work in my stuff that I

16   left there.  That's what I meant.

17   *Q.*  Turn to the last page of this affidavit, please.

18   *A.*  Okay.

19   *Q.*  This was signed by you and notarized on April 22nd of

20   2010, correct?

21   *A.*  Correct.

22   *Q.*  At that time you had been retired from the department

23   for almost two years, correct?

24   *A.*  Correct.

25   *Q.*  Yesterday you talked a little bit about having the

                              Cross - Cook

1   ability to train Sena or Deb.  I'm sorry, it was Deb.  You

2   said Ann Casey had Gina train Deb.  Do you remember that

3   testimony?

4   A.  Yes.

5   Q.  And I believe you said that you had a conversation with

6   Ms. Casey about that issue, correct?

7   A.  Which issue?

8   Q.  About the fact that Gina was going to be training Deb,

9   correct?

10  A.  Correct.

11  Q.  I believe you said that that conversation occurred in

12  January of 2007, correct?

13  A.  I believe so.

14  Q.  And in fact, on -- you said that you remembered that

15  because on January 4th, 2007 you wrote Ms. Casey a letter

16  about that issue, right?

17  A.  Uh-huh.  I believe it was the 4th.

18  Q.  Hand you --

19  A.  4th or the 7th.

20  Q.  I'm going to hand you what's been marked as Exhibit 29.

21  That's the January 4th, 2007 letter that you wrote, correct?

22  A.  Correct.

23       MS. GUNDERSON:  Tom, do you have a problem with me

24  publishing this?

25       MR. FALB:  No problem.  No objection.

                        Cross - Cook

1   Q. *(By Ms. Gunderson)*  This is a letter that you created,

2   correct?

3   A.  Correct, with my union steward.

4   Q.  Okay.  So this was with the help of your union steward,

5   correct?

6   A.  Correct.

7   Q.  And it was a letter that you sent to Ann Casey on

8   January 4th, 2007, correct?

9   A.  Correct.

10  Q.  And in the first -- I'm sorry, the second paragraph of

11  that letter you said that it was Sena that was training Deb,

12  correct?

13  A.  I meant it's on receiving.  It's talking about the

14  receiving job.  And Sena was supposed to train Gina on the

15  receiving job.

16  Q.  Okay.  And you had trained Sena, right?

17  A.  Yes.  Retrained Sena I guess you could say.

18  Q.  You testified yesterday that -- well, part of the reason

19  that you wrote this letter was because you knew Ms. Casey

20  had concerns with your performance, correct?

21  A.  That she brought up to me that day about receiving.

22  Q.  Okay.  And those concerns are listed in paragraph 3,

23  right?

24  A.  Yes.

25  Q.  And you talk about, you know, what concerns she had

Cross - Cook

 1   discussed with you, right?

 2   A.   Yes.

 3   Q.   And then you go on to explain your concerns about that,

 4   correct?

 5   A.   Correct.

 6        *MS. GUNDERSON:*   I move to admit Exhibit 29 into

 7   evidence.

 8        *MR. FALB:*   No objection.

 9        *THE COURT:*   Admitted.

10   **(Defendant's Exhibit No. 29 admitted)**

11   Q. (By Ms. Gunderson)   This letter was written two months

12   before you started receiving discipline, correct?

13   A.   Roughly.   I think my first one was in April.

14   Q.   When you were getting your assignments as a counselor,

15   you would -- there were different -- there were a lot of

16   different duties a counselor had to do, right?

17   A.   Correct.

18   Q.   Some of the duties included going to specific housing

19   units, correct?

20   A.   Correct.

21   Q.   And when you would divvy up that work -- each housing

22   unit had about a hundred inmates in it, is that correct?

23   A.   That's what a housing unit will hold is a hundred

24   inmates.

25   Q.   Okay.   So that's the maximum number of inmates in a

                        Cross - Cook

1    housing unit, right?

2    A.  Correct.

3    Q.  You would agree with me that as far as receiving is

4    concerned, you usually didn't get -- the maximum number of

5    inmates you would ever get in receiving would be a hundred,

6    right?

7    A.  No.  A hundred at a time, but because of the rotation in

8    and out of receiving --

9    Q.  You might get them several times during the week?

10   A.  Correct.

11   Q.  Okay.  But as far as inmates coming in at one time, the

12   max was a hundred, right?

13   A.  Yes.

14   Q.  Now, you also talked about people have segregation duty,

15   right?

16   A.  On receiving if you had overflow they had other places

17   that you housed them, so you could get over a hundred.

18   Q.  Okay.

19   A.  There was other designated places that if receiving was

20   full that you would put them.

21   Q.  Could it be more than 200?

22   A.  No.

23   Q.  More than 150?

24   A.  No.  Only what seg -- the cells in seg that were

25   designated and the healthcare that was designated, so

Cross - Cook

 1   probably 20, 24 would be the most.

 2   Q.  So if we said 125 was the max, that would be fair,

 3   right?

 4   A.  Yes.

 5   Q.  And seg as a whole can house about 60 guys, right?

 6   A.  Segregation?

 7   Q.  Yeah.

 8   A.  It can house 54 or 56 because there's cells that are

 9   designated as single cells for guys you have to keep

10   separate, and there's, I believe at that time two or three

11   cells that were designated for parole violators, which would

12   be the ones that you would use for seg -- or for receiving

13   overflow.  So they tried to keep the single cells and the

14   parole violator ones empty if they could, but if seg became

15   too full and they had to use them, then they would use them.

16   Q.  Sixty would be a slight overestimate of how many could

17   be in seg?

18   A.  Correct.

19   Q.  The healthcare unit was also something that you said

20   that you would have assigned to you, and that holds I think

21   15 at most, right?

22   A.  Yeah.  There's three wards with four beds in it, and

23   then there's three -- two doors for watch, and I believe a

24   steel door, or maybe it's just two doors and one has a steel

25   door.  15 would be the max.

Cross - Cook

1    Q.  Now, some counselors would just have field services,

2    right?

3    A.  Correct.

4    Q.  Why is that?

5    A.  I have no idea.

6    Q.  Was it possible to do the field services job and have a

7    regular caseload?

8    A.  I have no idea.

9    Q.  You never did field services?

10   A.  I trained in there for two days when I first started as

11   a Counselor I.  I trained with Sena Landreth on two separate

12   occasions.

13   Q.  So you haven't done field services other than in

14   training, correct?

15   A.  Correct.

16   Q.  What about grievances?  Some of the counselors were

17   assigned grievances, right?  And you said you were assigned

18   grievances, right, when you were a TA?

19   A.  When I was temporarily assigned, yes.

20   Q.  What do you have to do with grievances?

21   A.  Do you have time for the whole procedure?

22   Q.  Well, what I'm curious about is, when I look at the

23   assignments for different counselors, sometimes they would

24   be assigned grievances in lieu of having a housing unit.

25   Why would that be?

Cross - Cook

1    A.   I don't know.

2    Q.   Was the work that was done on grievances significant

3    enough that it would be equivalent to a housing unit?

4    A.   When I was doing them as a TA, no.

5    Q.   Okay.   When your caseload was changed -- I think the

6    first time it was changed was in May, correct?

7    A.   No.   I received changes prior to that.

8    Q.   Okay.   Let's start with January 2007, okay?   From

9    January 2007 moving forward, the first change in your

10   caseload was in May 2007, correct?

11   A.   I'd have to look.   I'm really not sure.

12   Q.   Okay.

13   A.   The numbers might not have changed but the actual

14   assignment of designated housing unit might have changed.

15   Q.   All right.   Just so the jury can see.   The first column

16   is Betty.   Then we have Gina and Bart next to you, correct?

17   A.   Correct.

18   Q.   I'm going to move up so we're focused on what we're

19   talking about here.   Okay.   January 2007 you had 354

20   inmates, right?

21   A.   Correct.

22   Q.   The next change in your caseload --

23            MR. FALB:   Object.   Let her finish the answer.

24   Q. (By Ms. Gunderson)   Did you have more to say?   I'm sorry.

25   A.   You said I had 354 inmates, and I said correct, but two

Cross - Cook

```
 1   of those assignments were specialized, so you have to count

 2   that as extra inmates because you see them so often.

 3   Q.  And that's one of the reasons why the counselors who

 4   were assigned to receiving or seg or the healthcare unit

 5   might have fewer other housing units, right?

 6   A.  Correct.

 7   Q.  Because they had more work to do with a lower number,

 8   even though they might have a lower number, would look like

 9   a lower number of inmates, correct?

10   A.  Correct.

11   Q.  Now, the first change was in May of 2007, correct?

12   Start from January moving forward, the next change is in

13   May, correct?

14   A.  Yes.

15   Q.  Do you know what your caseload was in January?

16   A.  Specific housing units?

17   Q.  Yeah.

18   A.  Not off the top of my head, but with a 54 there, that

19   would indicate I had segregation.  And down there,

20   segregation and receiving, and I don't recall off the top of

21   my head what regular caseload housing units I had.

22   Q.  I'm going to hand you what's been marked as Exhibit 34.

23   This is an e-mail printed by Gina Feazel but from Ann Casey

24   to the counseling department, correct?

25   A.  Correct.
```

                            Cross - Cook

1    Q.  And this e-mail says what your counseling load -- what

2    the assignments are, right?

3    A.  Correct.

4    Q.  And you had South 2, South 3.  Those are normal housing

5    units, right?

6    A.  Yes.

7    Q.  Receiving, healthcare and seg, right?

8    A.  Correct.

9    Q.  When your assignment changed in May, you just got rid

10   of -- your whole caseload didn't change, did it?

11   A.  I got -- no.  I did not get a whole caseload assignment

12   change.

13   Q.  It just changed receiving, seg and healthcare unit,

14   correct?  I'm handing you what's what's marked as

15   Exhibit 35.

16   A.  Correct.

17   Q.  Basically what happened was you gave Sena your seg,

18   receiving, healthcare unit, but you kept your housing units,

19   right?  And you can compare those two if you need to.

20   A.  I don't think Sena got seg and healthcare but I could be

21   wrong.  I think I actually continued doing them, but that's

22   neither here nor there.

23   Q.  Well, in any event, the memo says that it went, right?

24   A.  Right.

25   Q.  Okay.  And you got, in return, her three housing units,

Cross - Cook

 1   correct?

 2   A.   I got three of her housing units.

 3   Q.   She had had five before that, right?

 4   A.   Right.

 5   Q.   She had 500 inmates, five housing units?

 6   A.   Correct.

 7   Q.   So you swapped partial duties, correct?

 8   A.   Correct.

 9   Q.   The next change in your duties happened in June,

10   correct?  And this is the one where you and Gina and Deb --

11   your inmates swapped around, right?

12   A.   Correct.

13   Q.   I handed the witness Exhibit 36.  And then, here again,

14   you still had South 2 and South 3.  And actually, those are

15   the two housing units we were talking about earlier, right,

16   South 2 and South 3?

17   A.   Uh-huh.

18   Q.   So actually, from these documents, from January to April

19   you had those housing units that whole time, didn't you?

20   A.   I believe so.

21   Q.   So in June you got rid of the housing units -- the north

22   units that you'd had from Sena, you gave those back to Sena,

23   right?  And you got some of Deb's, right?

24   A.   Correct.

25   Q.   Okay.  The next change was in July, correct?

Cross - Cook

 1   A.   Yes, I believe so.

 2   Q.   And that was when Deb Brink went on a leave, correct?

 3   A.   I don't remember the circumstances because the first

 4   part of July I was on vacation, so I don't know what was

 5   decided or how it was decided or what was going on.  I

 6   honestly don't know.

 7   Q.   Well, I hand you what's been marked as Exhibit 37.  And

 8   this is an e-mail to Warden Flagg where you guys are trying

 9   to figure out what to do with Deb's caseload, correct?

10   A.   Yes.  Sena discussed it with me when I came back from

11   vacation as to this -- Deb's been gone, this is what I'm

12   proposing to Warden Flagg.

13   Q.   And you approved of that, right?  Well, somebody had to

14   do Deb's work, right?

15   A.   Yeah, that was the bottom line.  Work had to be done so

16   it was like, fine, whatever you want to do.

17   Q.   And Sena took receiving, right?

18   A.   Yes, she did.

19   Q.   And you got seg, right?

20   A.   Yes.

21   Q.   And Gina took both the healthcare unit and housing unit,

22   right?

23   A.   No.  That says just housing unit East 5.  Healthcare

24   unit would be HCU.

25   Q.   Deb had the healthcare unit at least as of July 9th,

                              Cross - Cook

1    right, judging from Exhibit 36?  It's on your screen.

2    A.   Receiving and seg and healthcare unit go together, so

3    if -- unless it was -- it wasn't broken out at that time, so

4    if you got seg as your assignment, healthcare went along

5    with it.

6    Q.   Okay.  And that would have been at most 75 inmates,

7    right?

8    A.   Let's see.  54 and 15.

9    Q.   All right.  I'm going to hand you what's been marked

10   Exhibit 38.  Have you ever seen this before?

11   A.   No.  I did not see it until documents started being

12   produced for this because I was gone at that time and I was

13   not given a copy of it.

14   Q.   This is a memo that is basically what the assignments

15   were while you were on your leave of absence, right?

16   A.   It appears to be.

17   Q.   All right.  At least as of October 16th, this is what

18   the assignments were, right?

19   A.   Correct.

20   Q.   Now, you testified that when you came back from your

21   leave of absence you had a whole new caseload, correct?  Was

22   that a "yes"?

23   A.   Well, I guess because I was on leave I didn't have a

24   caseload.  Yes.

25   Q.   Okay.  Now, between the date of this memo, October 12th,

                            Cross - Cook

```
 1    2007, and you coming back from leave in November, Deb Brink

 2    died, didn't she?

 3    A.  Yes, she did.

 4    Q.  She's on here and she has East 4 receiving.  East 4

 5    receiving is healthcare back-up, correct?

 6    A.  Correct.

 7    Q.  When you returned -- I'm handing you Exhibit No. 39 --

 8    you received her caseload, didn't you?

 9    A.  Yes, I did.

10    Q.  And you recognize this exhibit, right?

11    A.  Yes, I do.

12    Q.  You were in receiving from the time you returned in

13    November of 2007 until you retired, correct?

14    A.  I believe so.

15    Q.  You were asked by Mr. Falb about whether your caseload

16    changed at all from November to May, correct?

17    A.  Correct.

18    Q.  The receiving part never changed, right?

19    A.  That's correct.

20    Q.  In January of 2008, Sena Landreth retired, right?

21    A.  I think that's when she retired.

22    Q.  And around the same time you had a new counselor come

23    into the department, Stacey Burton, correct?

24    A.  She actually came -- I think came in before Sena left.

25    Q.  Had she been a TA?
```

Cross - Cook

1    *A.*   I believe so but I'm not 100 percent certain of that.

2    She never TA'd while I was -- or maybe she did.   I don't

3    remember.   I honestly -- there's just too much to remember.

4    *Q.*   Your caseload didn't change from November -- you've told

5    me previously your caseload never changed from November to

6    May, right?

7    *A.*   I don't believe the amount of inmates I had changed.

8    There might have been a change -- I can't remember if they

9    took -- at some point in time Brandon Risse got the seg

10   assignment and I still had receiving or something happened

11   with that that I'm not 100 percent sure, but basically, no,

12   I had the pretty much the same thing.

13   *Q.*   Okay.   So it was pretty much the same from November to

14   May, right?

15   *A.*   Yes.

16   *Q.*   When Sena retired and you had new counselors, you know

17   the counselors have to kind of come up to speed, right?

18   *A.*   When Stacey came in before Sena left, that was the

19   purpose of that.   Sena showed her where she was at with

20   everything because they worked together for like two or

21   three weeks before Sena actually left, and so Stacey had the

22   advantage of being able to, you know, be able to pick up

23   right where Sena left off.

24   *Q.*   She took over for Sena, right?

25   *A.*   Yeah, exactly.

Cross - Cook

1   Q.   That way it didn't affect anyone else, right?

2   A.   Correct.

3   Q.   As you recall now, you don't recall your caseload

4   changing, right?

5   A.   I don't believe it did.

6   Q.   You testified in your direct that you were doing

7   95 percent of the Counselor III duties after Al Sanner

8   retired?

9   A.   That were listed on the jobs thing the way it was broken

10  down.

11  Q.   What duties were you doing?

12  A.   I was doing the Counselor III job.  And Al gave me that

13  before he left, the job description thing.  And the majority

14  of the Counselor III job, as it appeared with what he gave

15  me, all had to do with orientation inmates, with the

16  exception of the lead worker/supervisor.  He serves as a

17  lead worker in training and something about can approve time

18  off or something.  I don't remember, know the exact wording.

19  But all the stuff that was listed on there dealt with

20  receiving, and everything that dealt with receiving I was

21  doing.

22  Q.   Did you do transfers?

23  A.   Yes, I did.

24  Q.   Now, part of what you were doing also, like entering

25  information into CHAMPS, that's something that a Counselor

Cross - Cook

 1   II does as well, correct?

 2   A.   Correct.

 3   Q.   So you'd agree with me that as far as -- you didn't have

 4   any supervisory duties, right?

 5   A.   I did not.

 6   Q.   You didn't have any of the lead worker duties, right?

 7   A.   I did not.

 8   Q.   You filed a grievance about not being promoted, correct?

 9   A.   I believe it was about not getting temporary assignment

10   pay for doing the Correctional Counselor III job.

11   Q.   Because every week that you worked as a counselor after

12   Al Sanner retired, you put in for TA pay, correct?

13   A.   Correct.

14   Q.   And every single week you would do that, and at the end

15   you filed a grievance saying you should get all those

16   approved, correct?

17   A.   I don't think I did them all every week.  I think I

18   might have done them a pay period at a time or maybe couple

19   months at a time or something like that.  The dates are on

20   the bottom.  I don't recall all of that.  I didn't put them

21   in on a regular basis because I simply forgot about it with

22   all the work I was doing.

23   Q.   Every time you put them in, it was denied, right?

24   A.   Correct.

25   Q.   And you never were paid TA pay, correct?

                         Cross - Cook

1    *A.*  Never was.

2    *Q.*  At least not after Al Sanner retired, right?

3    *A.*  Correct.

4    *Q.*  You filed a grievance, correct?

5    *A.*  Correct.

6    *Q.*  And you were never given that pay, correct?

7    *A.*  Correct.

8    *Q.*  The result of that grievance wasn't to have to get that

9    pay, right?

10   *A.*  I lost track of the grievance after it got to the third

11   level and was sent to pre-arbitration.  I lost track of it.

12   I don't honestly, honestly do not know what happened to it.

13   *Q.*  The Counselor III job was never posted while you were

14   there, right?

15   *A.*  That's correct.

16   *Q.*  You're not aware if the Counselor III job has never been

17   posted since Al Sanner left, right?

18   *A.*  Not while I was there.  I have no idea what's happened

19   after I left because I don't keep up with it.

20         *MS. GUNDERSON:*  Your Honor, I need to go over a

21   couple of my notes.  It might be a good time to take a

22   break, or we can wait.

23         *THE COURT:*  Little early for a break.  Can you --

24   I'll give you time to look over your notes.

25         *MS. GUNDERSON:*  Okay.


                         Cross - Cook

1        *(Off the record)*

2                      *   *   *   *

3    *Q. (By Ms. Gunderson)*  You had no problem with Warden Bates

4    until he told you he was going to change your assignment,

5    correct?

6    *A.*  That's correct.

7    *Q.*  You testified he didn't criticize you?

8    *A.*  Did not.

9    *Q.*  Didn't harrass you?

10   *A.*  Did not.

11   *Q.*  Up until that point you had absolutely no issue with

12   him, correct?

13   *A.*  Had no issue with Warden Bates.

14   *Q.*  You told him you thought he was a good supervisor?

15   *A.*  I don't know that I told him that.  I told him I

16   appreciated that he -- we were both giving each other the --

17   he told me he would give me a fair shot from the beginning

18   when he called me in when I came back from leave, and we

19   started out with the slate clean is what he said.

20   *Q.*  And it showed, I appreciate -- you gave him a Boss's Day

21   card at one point, didn't you?

22   *A.*  I sure did.  I always gave my bosses Boss's Day cards,

23   with the exception of Ann Casey.

24        *MR. FALB:*  Strike that from the record.

25        *THE WITNESS:*  Being honest, sir.


                      Cross - Cook

```
 1              MS. GUNDERSON:  Anyway --

 2              THE COURT:  We don't want to strike honesty.

 3  Q. (By Ms. Gunderson)  After you had the conversation with

 4  Warden Bates, your assignment didn't change, did it?

 5  A.  No, because I told him I was retiring so they just

 6  pushed me off in the corner.

 7  Q.  Your assignment never changed after that, right?

 8  A.  No.  No.

 9  Q.  And the person who came in and trained with you was

10  Mr. Risse, correct?  Trained with you for receiving?

11  A.  I'm sorry.  Can you rephrase that.

12  Q.  Sure.  The person who took over receiving from you and

13  who you trained to take over receiving from you was

14  Mr. Risse, correct?

15  A.  I didn't train him.  He was doing receiving when I came

16  back from leave so he already knew how to do it.

17  Q.  He wasn't in receiving with you the last couple weeks?

18  A.  He went with me the last time I went down there so he

19  could see where I was at with certain inmates.  I showed him

20  the stuff that was pending and all that kind of stuff.

21  Q.  That was because you were retiring, correct?

22  A.  Yes.

23  Q.  You submitted your letter for retirement on May 15th,

24  2008, correct?

25  A.  Correct.
```

Cross - Cook

1    *Q.*  I'm going to hand you what's marked as Exhibit No. 33.

2    That's the letter you submitted for retirement, correct?

3    *A.*  Correct.

4         *MS. GUNDERSON:*  I'd move Exhibit 33 into evidence.

5         *THE COURT:*  Objection?

6         *MR. FALB:*  No objection.

7         *THE COURT:*  Admitted.

8    **(Defendant's Exhibit No. 33 admitted)**

9    *Q. (By Ms. Gunderson)*  You testified a little bit about

10   Deb Brink being upset at work.  Do you remember that testimony?

11   *A.*  Yes.

12   *Q.*  Deb Brink had problems at home as well, correct?

13   *A.*  I wasn't privy to all that knowledge.

14   *Q.*  You were aware that she -- you weren't aware that she

15   had a daughter who had a drug problem she was having

16   problems with?

17   *A.*  Deb Brink?

18   *Q.*  Yes.

19   *A.*  She had two sons.

20   *Q.*  A child.  I should have said child that had drug problem

21   that she was having to deal with?

22   *A.*  I was vaguely aware of that, yes.

23   *Q.*  Now, you talked about getting in trouble with Ann Casey

24   because you didn't have your radio on you, right?

25   *A.*  Correct.

Cross - Cook

1   Q.  You said that you didn't take it with you because you

2   can't lay the radio down at or it will go off, right?

3   A.  If it's horizontal too long it beeps in the armory.

4   Q.  And you testified that at some point you actually had

5   that happen where someone came looking for you because your

6   radio was on its sides?

7   A.  Because it was horizontal instead of vertical, yes.

8   Q.  When was that?

9   A.  May 12th.

10  Q.  Of 2008?

11  A.  2008.

12  Q.  Okay.  You have to push a button on the radio to have

13  that distress call go out, don't you?

14  A.  But if it sits too long with it being that way, it will

15  beep.  It will let them know in the armory too something's

16  going on.

17  Q.  Okay.  And part of the reason why that's monitored is

18  that if you were to be in trouble with -- like if an inmate

19  were there, you were attacked or something, you could call

20  on your radio, right?

21  A.  Correct.

22  Q.  And one of the reasons you have to have a radio with you

23  at all times is because if that were to happen you would

24  need to be -- there's no other way for you to get help,

25  right?

Cross - Cook

```
 1    A.   Correct.
 2    Q.   For instance, in the bathrooms -- the inmates clean the
 3    bathrooms, right?
 4    A.   Correct.
 5    Q.   You were testifying about your leave of absence pay and
 6    that it was denied?
 7    A.   Correct.
 8    Q.   The documentation that you received that it was denied
 9    came from the employee retirement system, correct?
10    A.   No, I don't believe so.   I guess you're right.   It's
11    SRS.   I guess that is the -- you're using different
12    terminology.
13    Q.   The state employee retirement system?
14    A.   Yes.
15    Q.   Or SERS?
16    A.   Right.
17    Q.   S-E-R-S?
18    A.   Yes.
19    Q.   That's the state agency that told you your leave of
20    absence pay was denied, correct?
21    A.   Correct.
22    Q.   In fact, the department allowed you to go on a leave,
23    correct?
24    A.   They allowed me to go on a nonpaid leave, correct.
25    Q.   They approved your leave, correct?
```

Cross - Cook

1  A.  Correct.

2  Q.  And once you went on leave you were required to submit

3  paperwork to SERS in order to get pay, correct?

4  A.  Correct.

5  Q.  And it was SERS that denied your leave, correct?

6  A.  That's who the letter came from, yes, but I don't know

7  why it was denied.

8  Q.  Okay.  You weren't put on -- you didn't get docked days,

9  right?

10  A.  I didn't get a paycheck.

11  Q.  You weren't disciplined for not being at work, right?

12  A.  No.

13  Q.  And you actually were allowed to use up any sick or

14  benefit time that you had during that period in order to get

15  paid for part of it, right?

16  A.  If I wanted to go on leave, yeah, they took all of my

17  time from me first, every bit of it that I had accumulated.

18  Q.  That's actually something that had to be done before you

19  could get the money from retirement, right?

20  A.  I don't know if that's to get the money.  I think it was

21  to -- actually for the institution to be able to put you on

22  a leave, you had -- you used the days that you had to cover

23  and then you applied for the leave of absence after that, if

24  my understanding of it is right.  I don't know.  It's been

25  three years.  I'm sorry.

Cross - Cook

1  *Q.*  Well, for at least part of your leave you did receive

2  some pay, correct?

3  *A.*  Just the days I had on the books, yes.

4  *Q.*  And then after that you didn't get paid, correct?

5  *A.*  Correct.

6  *Q.*  And actually it was during your leave of absence that

7  some of your suspension time was served, correct?

8  *A.*  No.  It was during -- no.  It was during the time when

9  they were taking my benefit time before I actually went on

10  leave of absence.  They docked me from the -- if I remember

11  right, from the 6th to the 16th of September, and my leave

12  of absence did not start until October either the 4th or the

13  24th or something like that.

14  *Q.*  So for those days you weren't using benefit time because

15  you were on a suspension, correct?

16  *A.*  Correct.

17  *Q.*  Your leave of absence was not because of your migraines,

18  was it, ma'am?

19  *A.*  Stress and migraines, yes, from what the doctor wrote on

20  the slips.

21  *Q.*  You had migraines before your leave of absence, correct?

22  *A.*  Correct.  They were under control.

23  *Q.*  And you've had them afterwards, right?

24  *A.*  Correct.

25  *Q.*  And you've had them since you've been retired, right?

Cross - Cook

1   A.   Correct.  Not severity as I had at work.

2   Q.   Your testimony here today is that one of the reasons you

3   were on medical leave of absence in 2007 was your migraines?

4   A.   That's what I -- when I saw my doctor that was one of

5   the things I was being treated for.  That's what I told him

6   the problem was.

7   Q.   Okay.  It wasn't just stress and high blood pressure?

8   A.   It was stress, high blood pressure and migraines.

9   Q.   You weren't treated for migraines by Dr. Benning, were

10  you?

11  A.   Yes, I was.

12  Q.   You went to a neurologist as well, correct?

13  A.   Correct.  When they were really severe she would send me

14  to him.

15  Q.   And at that time that's who you were seeing for your

16  migraines, right?

17  A.   I was seeing both of them.

18  Q.   But it was Dr. Benning who approved your leave of

19  absence, correct?

20  A.   That's correct.

21  Q.   You gave a deposition in this case, right?

22  A.   I did.

23  Q.   And that was a deposition that was made under oath, same

24  as you're testifying here today, right?

25  A.   Correct.

Cross - Cook

1    *Q.*  And that was on October 14th of 2009, correct?

2    *A.*  I don't know the exact date without looking but it was

3    in the fall, I know that.

4    *Q.*  Okay.  Page 208, lines 14 to 19.  You were asked these

5    questions and you gave these answers during your deposition,

6    didn't you, ma'am?

7              *Do you have migraines associated with your*

8         *stress?*

9              *Yes.*

10             *Were those also one of the reasons you were on*

11        *medical leave of absence in 2007?*

12             *Answer:  No.*

13        You were asked those questions and you gave those

14   answers in your deposition, didn't you, ma'am?

15   *A.*  If that's what it says, but I was being treated for

16   migraines at that time.

17   *Q.*  So yes, that's what you said during your deposition,

18   right?

19   *A.*  Yes.

20   *Q.*  Want to talk a little bit about your job as a major

21   secretary.  Now, since you left that position it's now

22   called -- it's now over -- there's no longer any captains,

23   right?

24   *A.*  There haven't been captains for probably since about

25   2003, I think, but I don't know the exact date.  But no,

                    Cross - Cook

1    there are no captains.

2    Q.  Actually what might be better for me to do is, who were

3    you secretary for when you were the major secretary?

4    A.  Major Lawrence Jefferson, who was the chief of security.

5    Q.  Okay.  And since they got -- after you left they changed

6    that position to be an operation -- secretary for all of

7    operations, correct?

8    A.  I don't know what they did with it.  I didn't keep track

9    of it.

10   Q.  You weren't aware that position later was the secretary

11   to six different majors as well as the assistant warden of

12   operations?

13   A.  No, I didn't -- I don't know what they did with the job

14   after I left.  I know that Major Jefferson retired.  Major

15   Newkirk came in for a period of time, and then they did away

16   with the captains, and Major Newkirk went back to the

17   captain's office as the shift supervisor for day shift, so I

18   have no idea how it all shook out.

19   Q.  Okay.  You talked about having put in for a transfer to

20   Lawrence?

21   A.  I did.

22   Q.  And that the paperwork was messed up, right?

23   A.  Correct.

24   Q.  And you couldn't go, right?

25   A.  Correct.

Cross - Cook

1    *Q.*  So it wasn't your fault; it was just a mix-up in

2    paperwork, right?

3    *A.*  I had put in for -- when they were staffing the facility

4    I had an upward mobility grade for a Correctional Counselor

5    I, and on that upward mobility paperwork you have to list

6    your preferences.  You get a first choice and a second

7    choice.  I had my first choice as Clinton County, which

8    Centralia prison is in.  I had my second choice as Lawrence

9    prison.

10        When the job vacancies were posted that they were going

11   to fill the counselors at Lawrence, I requested of

12   Springfield to change my county preferences and make

13   Lawrence prison my first choice, and Clinton County,

14   Centralia prison, whatever, my second choice.  And the

15   prison in Lawrence called for the list of upward mobility

16   candidates before the change was made in the computer, so it

17   still showed Clinton County as my first preference so,

18   therefore, I did not get to go to Lawrence.

19   *Q.*  Okay.  Now, you talked about Warden Robert coming to you

20   and asked you if you would be interested in transferring to

21   Lawrence, correct?

22   *A.*  Correct.

23   *Q.*  It didn't violate the contract for him to ask you if

24   you'd be interested in it, did it?

25   *A.*  Asking me if I wanted to go did not violate the

                        Cross - Cook

1    contract.

2    Q.  You testified that prior to becoming an actual

3    Counselor I, you had never seen an inmate master file,

4    right?

5    A.  I was not allowed to go into -- I could go to the record

6    office.  If I needed something, one of the clericals would

7    help me.  I was not allowed to get into the master files,

8    no.

9    Q.  I think you also testified that you'd never seen

10   contacts, you didn't know how to do contacts, right?

11   A.  That's right.

12   Q.  You did testify while you were the TA you went on wing

13   walks, right?

14   A.  I walked with the other counselors, yeah.

15   Q.  While they were going into the wings, right?

16   A.  Uh-huh.

17   Q.  To meet with the inmates, right?

18   A.  Right, so they could show me how to do that.

19   Q.  That's making the contact, right?

20   A.  Not on my own.

21   Q.  Okay.

22   A.  That's what I meant.  I never made contacts on my own.

23   Q.  You testified that you didn't think they wanted you in

24   there because of your seniority.  By "they", you mean the

25   other counselors?

Cross - Cook

1    A.   Yep.

2    Q.   And that would have been sort of the core nucleus that

3    we talked about, that Al Sanner talked about, so it would

4    have been Al, Terri Loepker, Tony Ballantini, Cindy Keck,

5    Pam Alemond, right?

6    A.   Correct.

7    Q.   You also testified about there being -- you had -- you

8    were aware of a labor complaint regarding Bart Toennies

9    being brought as a Correctional Counselor II before

10   Deb Brink, right?

11   A.   Correct.

12   Q.   Bart Toennies was never forced to leave Centralia,

13   right?

14   A.   Not that I'm aware of.

15   Q.   He's been as a Counselor II ever since December 2006,

16   right?

17   A.   Uh-huh, as far as I know.   I'm assuming he's -- I

18   believe he said just the other day he was still there.

19   Q.   You were involved in the filing of that labor complaint,

20   weren't you, ma'am?

21   A.   I helped the union president get the information for it

22   and helped him do it, yes.

23   Q.   Did you fill out the actual form?

24   A.   I believe he had me do that, yes, but it was on his

25   direction, not mine.

Cross - Cook

1   Q.   You had 31-and-a-half years when you retired, right?

2   A.   Yes.

3   Q.   You're familiar with how the retirement is -- how you

4   get your benefits for retirement, right?

5   A.   I was not prior to retiring.   That's when I found out

6   about it.

7   Q.   You didn't know that for every year you worked at the

8   Department of Corrections, you accrued more percentage

9   towards your retirement?

10   A.   I was aware of that vaguely.   I mean, you know, I wasn't

11   keeping track of it because I knew I wasn't going to be

12   retiring, but I do believe that for every year you put in

13   you get a little higher pension.

14   Q.   The department offers classes on retirement, right?

15   A.   And I went to them, but a while ago.   You know, they

16   say -- they recommended you go to them when you're between

17   like this point and this point, and so it had been a while

18   since I had been to one.

19   Q.   So for -- and every year that you work at the Department

20   of Corrections, you earn two-and-a-half percent towards your

21   retirement, right?

22   A.   I think that's the amount.

23   Q.   So, for instance, to explain, if you've worked there for

24   one year and you retired, which I know you couldn't do, but

25   just for the sake of simplicity, you would get

Cross - Cook

1    two-and-a-half percent of your pay at retirement, right?

2    A.  Right.

3    Q.  That can continue all the way up to if you work for 32

4    years, right?

5    A.  Right.

6    Q.  And that would be 80 percent of your pay, correct?

7    A.  Correct.

8    Q.  That's the maximum amount of percentage of your pay that

9    you can accrue, correct?

10   A.  Yes, I believe so.

11   Q.  Now, also when you receive your retirement pay, you're

12   not paying for insurance, correct?

13   A.  I have dependent insurance that I have to pay for.  I

14   don't pay for myself, no.

15   Q.  Your insurance is free because of your retirement,

16   correct?

17   A.  Correct.

18   Q.  You're also not paying state taxes, correct?

19   A.  Correct.

20   Q.  So as a result of that, your retirement take-home pay is

21   greater than what you were actually -- your take-home pay

22   when you were working, right?

23   A.  Because I went with level income and I pull off $1,327

24   off my Social Security.  Otherwise, if I would have just

25   went straight retirement my take-home pay would have been

                          Cross - Cook

```
 1   less than what I was making working.
 2   Q.  How much more are you making?
 3   A.   Three hundred -- when I retired I was making 4668 a
 4   month, and on retirement I make 39, and my take-home was
 5   $2,800.
 6   Q.  That was your net before you retired, right?
 7   A.  Uh-huh.
 8   Q.  And your net now is what?
 9   A.  I get the 1327 from Social Security, and maybe -- $1,600
10   from actual retirement.
11   Q.  Sixteen -- okay.  So about $3,000, right?
12   A.  Uh-huh.
13   Q.  And you said you get it from Social Security.  You're
14   not actually drawing Social Security right now, are you,
15   ma'am?
16   A.  I don't know how it works, but I -- I don't know if -- I
17   get one check.  I don't know if Social Security comes --
18   goes there, but it's the level income, and I draw -- I was
19   able to draw off of my Social Security benefits early is
20   what it boils down to is what the lady told me at
21   retirement, because I went level income instead of straight
22   retirement, because going straight retirement my paycheck
23   would have been less than what I was bringing home on my
24   paycheck when I was working.
25   Q.  I have a couple more documents I want to show you to get
```

Cross - Cook

1    into for identification purposes, but before that I think

2    you testified yesterday that you have a Bachelor's degree in

3    business, is that right?

4    A.  It's -- I thought it was business.  It actually says, in

5    the paperwork that I have from the school, general studies.

6    Q.  Okay.  That's what you told me in your deposition,

7    right?

8    A.  Yeah.  I'm back in school now and that's what I'm

9    studying.  I'm sorry, it just -- I said I have a Master's.

10   I'm sorry.  It was just stupid.  You forget things.

11   Q.  I'm handing you Defendant's Exhibit 30.  This is the

12   charge of discrimination that you filed with the EEOC,

13   correct?

14   A.  Correct.

15        MS. GUNDERSON:  Move Exhibit 30 into evidence.

16        THE COURT:  Any objection?

17        MR. FALB:  I have no objection to that, except for

18   the clarification of the date.  It says 12/10/07.

19        MS. GUNDERSON:  Yes.

20        THE COURT:  Admitted.

21        **(Defendant's Exhibit No. 30 admitted)**

22        THE COURT:  Let's go ahead and take that break now.

23   Fifteen-minute break, folks.  Same admonishments as before.

24        **(Jury out)**

25        **(Break)**

Cross - Cook

```
 1                              *   *   *   *
 2          (Jury in)
 3    Q. (By Ms. Gunderson)  I get that you don't know all the in's
 4    and out's of your retirement, but you do know that you'll get
 5    cost of living increases once you turn 55, correct?
 6    A.  Correct.
 7    Q.  That's an increase of 3 percent of your yearly
 8    retirement amount each year starting at 55, right?
 9    A.  Correct.
10    Q.  Now, you've asked for -- you've talked a lot about what
11    your damages were and, you know, what you want as a result
12    of this case.  Your retirement benefits, what is your --
13    explain to me what your damages are.
14          MR. FALB:  I'm going to object.  I purposely didn't
15    go into this because of the Court's earlier ruling.
16          MS. GUNDERSON:  I think she may have stated that
17    she would get a huge increase if she had stayed through.
18          THE COURT:  I'm going to overrule the objection.
19          THE WITNESS:  Could you ask the question again,
20    please.
21    Q. (By Ms. Gunderson)  Okay.  Let me ask it this way actually:
22    Your retirement amount is calculated off your last day's pay,
23    correct?
24    A.  Correct.
25    Q.  And what your salary is is governed by the union
```

Cross - Cook

1    contract, right?

2    A.   Right.

3    Q.   I've got two contracts sitting there in front of you.

4    If you could grab the first one, which is marked -- is it

5    13?  The one that was in -- that's the contract that was in

6    place at the time you were working there, correct?

7    A.   Yes.

8    Q.   That says Exhibit 13 on it, right?

9    A.   Correct.

10   Q.   Can you turn page 180, please.

11   A.   Okay.

12   Q.   These are the step rates for various positions under the

13   contract, right?

14   A.   Correct.

15   Q.   And you were in RC-62, right?

16   A.   Correct.

17   Q.   So you actually RC-6217, right?

18   A.   You said 17?  I don't remember.  I have to look.

19   Q.   Check page 179, the third line down from the top.

20   A.   If you say it's 17 -- the print is really little.  I'm

21   sorry.  I don't see it.

22   Q.   We might as well check just to make sure I got it right.

23   Page 169.

24   A.   RC-6217.  Okay.

25   Q.   Now, you were Step 5 when you retired, correct?

                        Cross - Cook

1   A.   Yes, I was.

2   Q.   And under the union contract that meant that your gross

3   pay was 4,682, correct?

4   A.   4682, correct.

5   Q.   And Exhibit 13 is the contract that was in place at the

6   time you were working for the department, right.

7   A.   Correct.

8   Q.   That contract expired after you retired, right?

9   A.   Yes.

10  Q.   So had you stayed on, you would have been under a

11  different union contract, correct?

12  A.   Yes.

13  Q.   Exhibit 14 is that next contract, correct?

14  A.   Correct.

15  Q.   I want you to flip to the back again.  It's page 212.

16  Had you stayed working for the department until you reached

17  Step 8 -- that's the maximum amount, that's the maximum step

18  for Counselor II, right?

19  A.   Correct.

20  Q.   Your gross pay would have been $6,243, right?

21  A.   Correct.

22       MS. GUNDERSON:  I'm going to move Exhibits 13 and

23  14 into evidence.

24       THE COURT:  Objection?

25       MR. FALB:  No objection.

                        Cross - Cook

1        *THE COURT:*  Admitted.

2        **(Defendant's Exhibit Nos. 13 and 14 admitted)**

3            *MS. GUNDERSON:*  I'm also going to move Exhibits 33

4    to 39 into evidence that were referenced earlier.

5            *THE COURT:*  Objection?

6            *MR. FALB:*  These were -- no objection.

7            *THE COURT:*  Admitted.

8        **(Defendant's Exhibit Nos. 34 through 39 admitted)**

9    *Q. (By Ms. Gunderson)*  All right.  I'm handing you a group of

10   documents.  We're going to get through them pretty quickly, I

11   hope.  Exhibit 26 is on top.  You recognize this as the

12   grievance that you filed after you had the conversation with

13   Warden Flagg, correct?

14   *A.*  Correct.

15           *MS. GUNDERSON:*  I move Exhibit 26 into evidence.

16           *MR. FALB:*  No objection.

17           *THE COURT:*  Admitted.

18       **(Defendant's Exhibit No. 26 admitted)**

19   *Q. (By Ms. Gunderson)*  Go to the next one.  Exhibit 27 was a

20   grievance that you filed when you got were counseled for being

21   late to work, correct?

22   *A.*  Correct.

23           *MS. GUNDERSON:*  Move Exhibit 27 into evidence.

24           *THE COURT:*  Any objection?

25           *MR. FALB:*  No objection.

Cross - Cook

```
 1              THE COURT:  Admitted.
 2         (Defendant's Exhibit No. 27 admitted)
 3    Q. (By Ms. Gunderson)  The next one is Exhibit 55.  Do you have
 4    that in front of you?
 5    A.  I do.
 6    Q.  This is an e-mail that you sent to Pat Rensing, correct?
 7    A.  Correct.
 8    Q.  It was sent on November 27, 2007?
 9    A.  Correct.
10              MS. GUNDERSON:  I'd move Exhibit 55 into evidence.
11              THE COURT:  Any objection?
12              MR. FALB:  Just one second, Your Honor.  No
13    objection.
14              THE COURT:  Admitted.
15         (Defendant's Exhibit No. 55 admitted)
16    Q. (By Ms. Gunderson)  The next one is an e-mail from Ann Casey
17    to you and the other counselors on September 12th, 2006, right,
18    Exhibit 53?
19    A.  Correct.
20              MR. FALB:  What exhibit number is this?
21              MS. GUNDERSON:  53.
22              MS. GUNDERSON:  Do you mind if I publish?
23              MR. FALB:  No objection.
24    Q. (By Ms. Gunderson)  This is an e-mail Ann sent to you and
25    the other counselors reminding you that she -- and telling you
```

Cross - Cook

1   she'd spot checked your counseling summaries, correct?

2   A.   That's what it says.

3   Q.   And that she was reminding you that she'd seen a lot of

4   inmates who were approaching their 90-day mark, right?

5           MR. FALB:   Your Honor, I'm going to object.   That's

6   a misstatement.   To all the counselors not to --

7           MS. GUNDERSON:   Right, it's to all the counselors.

8   Q. (By Ms. Gunderson)   She's saying -- Ann is saying there are

9   a number of inmates approaching their 90-day mark, correct?

10  A.   That's what it says, yes.

11  Q.   This is three months before you got your 30-year pin,

12  right?

13  A.   Yes.

14  Q.   And if you could look -- I'd move Exhibit 53 into

15  evidence.

16          MR. FALB:   No objection.

17          THE COURT:   Admitted.

18      **(Defendant's Exhibit No. 53 admitted)**

19  Q. (By Ms. Gunderson)   Look at the next one, which is

20  Exhibit 52.   This is an e-mail from Ann just to you, correct?

21  A.   Correct.

22  Q.   This is regarding inmates on South 2 and South 3, right?

23  A.   Correct.

24          MS. GUNDERSON:   Do you care if I publish?

25          MR. FALB:   No problem.


                    Cross - Cook

1   Q. (By Ms. Gunderson)  And this is an inmate -- I'm sorry, an

2   e-mail from Ann where she says that she had been on South 2 and

3   South 3 and gotten questions and concerns from those inmates,

4   correct?

5   A.  Uh-huh.

6   Q.  And she makes a list there, right?

7   A.  Correct.

8       MS. GUNDERSON:  I'd move Exhibit 52 into evidence.

9       MR. FALB:  No objection.

10      THE COURT:  Admitted.

11      **(Defendant's Exhibit No. 52 admitted)**

12  Q. (By Ms. Gunderson)  Other than your --

13      MS. GUNDERSON:  I have nothing further.

14      THE COURT:  Redirect?

15                    **REDIRECT EXAMINATION**

16                  **QUESTIONS BY MR. FALB:**

17  Q.  Ma'am, this last exhibit that you were asked about,

18  Defendant's 52, was an e-mail from Casey just to you about

19  inmate issues?

20  A.  Correct.

21  Q.  Okay.  And that was on May 23rd, 2007?

22  A.  Correct.

23  Q.  That was already while she was disciplining you for

24  various things, is that correct?

25  A.  Correct.

Redirect - Cook

 1   *Q.*  And you were asked about an e-mail you sent to

 2   Pat Rensing, is that correct?

 3   *A.*  Yes.

 4   *Q.*  And showing you what has been marked as -- showing you

 5   Plaintiff's Exhibit No. 17.  What is that?

 6   *A.*  It's an institutional incident report.

 7   *Q.*  Was that written by you?

 8   *A.*  It was.

 9   *Q.*  And what was that concerning?

10   *A.*  I documented the phone call that I received in regards

11   to my third-level grievances where I was told that --

12        *MS. GUNDERSON:*  Objection to hearsay.

13        *THE COURT:*  Sustained.

14        *MR. FALB:*  Your Honor, I believe that this is the

15   declarant so she can testify to it.

16        *THE COURT:*  She said "where I was told".  I don't

17   know who she's talking about.

18        *THE WITNESS:*  I apologize, sir.

19   *Q. (By Mr. Falb)*  Was this a document that you wrote out?

20   *A.*  I wrote this document.

21   *Q.*  Is this true and correct?

22   *A.*  It is.

23        *MR. FALB:*  I would move to introduce this exhibit

24   into evidence.

25        *MS. GUNDERSON:*  I would object because the document

Redirect - Cook

 1    contains hearsay statements.

 2              *MR. FALB:*  What?

 3              *MS. GUNDERSON:*  Contains hearsay statements.

 4    *Q. (By Mr. Falb)*  Ma'am, let me ask you this:  Concerning

 5    Plaintiff's Exhibit 17, is that all of your writing?

 6    *A.*  It is.

 7    *Q.*  Okay.  And without mentioning what other people told

 8    you, did you document -- first of all, what date was that

 9    put down or written on?

10    *A.*  November the 29th, 2007.

11    *Q.*  And was that the date that you found out that the

12    offer -- you could retire and they would expunge all your

13    discipline?

14    *A.*  It is.

15    *Q.*  And you simply documented that?

16    *A.*  I did.

17              *MR. FALB:*  I would move to introduce that into

18    evidence.

19              *MS. GUNDERSON:*  We still object to the hearsay.

20              *THE COURT:*  Sustained.

21    *Q. (By Mr. Falb)*  You were asked about Deb Brink and her

22    daughter, possible drugs or something like that.  Remember

23    that?

24    *A.*  Yes.

25    *Q.*  Does this have any relevance to your claim?

                        Redirect - Cook

1    A.   None whatsoever.

2    Q.   You were asked about the word "socialization", quote,

3    unquote.   Remember that?

4    A.   Vaguely, yes.

5    Q.   Have you ever been charged with socialization?

6    A.   No, sir.

7    Q.   Does that have anything to do with this case?

8    A.   No, sir.

9    Q.   You were asked -- when you retired had you reached your

10   maximum that you could receive from retirement?

11   A.   No, sir.

12   Q.   And if you had stayed on, you would have had step

13   increases further?

14   A.   Yes, sir.

15   Q.   And when you retired did you, in fact, take early your

16   Social Security from when you would be in your mid-sixties?

17   A.   Yes, I did.

18   Q.   So in your mid-sixties your Social Security would go

19   down?

20   A.   Yes, it will.

21   Q.   Ms. Gunderson talked about two-and-a-half percent.

22   Remember that?

23   A.   Yes.

24   Q.   Every year?

25   A.   Yes.

                        Redirect - Cook

1    Q.  And you still had pay -- was it pay steps?

2    A.  Yes, sir.  I had three more steps to go before I topped

3    out at the top pay according to the new contract.

4    Q.  And that would have made a difference for -- permanently

5    as far as your retirement income?

6    A.  I would have retired -- my 80 percent would have been at

7    a higher monthly rate that they would have used to calculate

8    it.

9    Q.  Okay.  You talked about migraines.  When you get stress

10   do you have migraines?

11   A.  Yes, I do.

12   Q.  Is that typical with a person that has migraines?

13   A.  For me it is.

14   Q.  You were asked about certain employee hearings, and the

15   name Michelle Taphorn was mentioned?

16   A.  Yes.

17   Q.  Who is Michelle Taphorn?

18   A.  She is the administrative assistant to Warden Robert.

19   Q.  She was doing your hearings?

20   A.  Correct.  She did one of them, yes.

21   Q.  Was she the same Michelle Taphorn that Casey in her

22   deposition testified that was on the boat with Robert and

23   the rest of them?

24   A.  I believe so.

25   Q.  Ms. Gunderson went through assignments, who you had,

Redirect - Cook

 1   number of assignees or inmates.  Did her questions or any of

 2   her exhibits change the chart that you drew up?

 3   A.  Not to my knowledge.

 4   Q.  You were asked about an affidavit.  During the

 5   litigation I drew up an affidavit for you to sign, and you

 6   were asked about grievances.  Remember that?

 7   A.  Yes.

 8   Q.  At any time did you take grievances from the prison?

 9   A.  The only grievances I have are stuff that was in my

10   union stuff that was filed and ERO paperwork and stuff like

11   that that has been put into the chain back and forth.

12   Q.  No one has ever alleged that you stole paper from the

13   prison, have they?

14   A.  No.

15   Q.  Want to make sure the jury understands.  Remember this

16   exhibit?  It's Bates stamped 485 of Defendant's 20 that was

17   introduced into evidence.

18   A.  Yes.

19   Q.  Ms. Gunderson went over very carefully the inmates

20   listed here, is that right?

21   A.  That's correct.

22   Q.  Just to refresh the jury's recollection, this is an

23   e-mail you sent to Springfield after you had already

24   disciplined for not seeing the inmates within 90 days, is

25   that correct?

                         Redirect - Cook

1   A.   Right.

2   Q.   And whatever you did with this e-mail wasn't going to

3   affect you already discipline that took place?

4   A.   Correct.

5   Q.   And just so the jury understands, as I listen to your

6   testimony, for example, you said some of these inmates --

7   where you asked the dates to be changed from April 16 to

8   April 12th.  Do you see that?

9   A.   Correct.  Yes, I see it.

10  Q.   And you told Ms. Gunderson that the 90 days had ended on

11  April 9th, 2007?

12  A.   That's correct.

13  Q.   I mean if you were trying to do something that was

14  clever, at least you would have done it before April 9th?

15  A.   Correct.

16  Q.   You're still late according to this?

17  A.   Correct.

18  Q.   And I don't believe -- maybe Ms. Gunderson doesn't

19  understand, but tell the jury, what is the procedure to have

20  dates changed in the computer?

21  A.   There's a 14-day time limitation.  I don't know how --

22  14-day time limit.  So these dates that I asked them to be

23  changed to was the dates that I was inputting the

24  information.  I saw the inmates in a timely manner, but

25  because I was 14 days beyond their deadline date, I could

Redirect - Cook

1    not put the correct information in there.  Springfield had

2    to change the date to 14 days back so that I could go in and

3    make the additional comment that I actually saw the inmates

4    on such and such date to make the entries reflect what I

5    have done.  And on some of these -- there were so many

6    inmates that I didn't -- couldn't see all of them on one --

7    in one day's time, so I was seeing them in their housing

8    unit.  I was calling them up to the back door and stuff like

9    that of the administration building so that I could see

10   them, so not necessarily would that reflect when I was down

11   in their housing unit that I saw them on the printout

12   because I would have had to manually change that.

13   Q.  Okay.  It's very confusing, but are there two phases to

14   have something changed?

15   A.  There is.

16   Q.  First --

17   A.  For this instance.

18   Q.  Springfield have to do it?

19   A.  Correct.

20   Q.  Then you would have to do it?

21   A.  Then I would have to do it.

22   Q.  This is what you asked Springfield to do?

23   A.  Yes.

24   Q.  They never even did it, so you were never able to do the

25   second phase?

                          Redirect - Cook

1    A.   No.   And all these 11 inmates -- if they come into audit

2    and they pull up these 11 inmates it's going to show that

3    they were not seen in a timely manner and they will write

4    that down as a finding.

5    Q.   So all this has to do is just with documentation rather

6    than actually face-on-face seeing the inmate?

7    A.   That's correct.   I personally saw every inmate

8    face-to-face by the time they were supposed to be seen.   I

9    was behind on getting my entries into the computer because

10   of all the paperwork and all the responsibilities I had to

11   do.

12   Q.   I mean how many inmates were you seeing at this time?

13   A.   600 a week maybe, and processing paper for all that.

14   600 might be high.   400 to 600 with the amount you see in

15   receiving and the times you have to go to segregation and

16   healthcare and to your normal units, so it could be -- it's

17   a variable.

18   Q.   And I want to show you what has been -- just above that

19   it says, "She seems to be making these requests often".   Do

20   you see that?

21   A.   Yes.

22   Q.   Apparently that's about you?

23   A.   Yes.   I assumed it was.

24   Q.   Okay.   Is this in reference to the other officers asking

25   you to make changes directly to Springfield?

                         Redirect - Cook

1   A.   This is -- I assumed it reflected -- because for some

2   reason people gave me the stuff to correct or do or

3   whatever, that because I had to make a lot of calls up there

4   to take care of business, that they assumed that I was doing

5   it all for me.  I don't know.

6   Q.   Ms. Gunderson also asked you, in Defendant's

7   Exhibit 18 -- she showed you this fax?

8   A.   Yes.

9   Q.   And this had to do with the victim, is that correct?

10  A.   Correct.

11  Q.   Had you ever even seen this fax before you okayed the

12  victim to see the inmate?

13  A.   No.  It was not in his file, and --

14  Q.   Tell the jury, when you go into the records office, what

15  kind of organization they have.

16  A.   Some of the -- they have a filing system, and a lot of

17  the paperwork was up there waiting to be filed, and it was a

18  no-no to mess with that stuff.  If you wanted anything you

19  had to ask the record office supervisor or her assistant,

20  the Correctional Clerk III.

21  Q.   And in fact, in one of your grievances or one of the

22  hearings, instead of saying -- according to Ms. Gunderson,

23  you went and asked, said, *I was informed by the records*

24  *office*?

25  A.   Correct.


                        Redirect - Cook

1  Q.  Okay.  And you had, in fact, checked with the records

2  office?

3  A.  The procedure was, if you needed something, you told

4  them, and then they were to get back to you when it came in

5  so that you would know.

6  Q.  Was there any question by Ms. Gunderson that made --

7  that she brought up any facts that showed that you were

8  wrong in any of the disciplines that you were assessed?

9  A.  The first, the one where she said that I said it was

10  expunged and, in fact, she said it says a counseling

11  session, but I have documentation from the department, or

12  from the correctional center's personnel office,

13  Kim Atchison gave me, and it's written on there -- down

14  there where the discipline thing was it says, "Expunged",

15  and it's circled to draw your attention to it.  So if that's

16  the case then somebody made a decision after the union

17  paperwork came back because I have the paperwork that shows

18  that should be expunged from my record.

19  Q.  And is it your testimony -- it was brought up on her

20  cross that when you went off on sick stress leave, while you

21  were on stress leave they issued another disciplinary action

22  against you for time off?

23  A.  While I was on my leave they took a 10-day suspension

24  out of my paycheck, and I was told -- excuse me.  Let me

25  rephrase that -- that the -- they took all of my paycheck,

                        Redirect - Cook

1    and I know that that in the Federal Wage Protection Act that

2    you're not supposed to take more than 25 percent of a

3    person's salary or three times what the minimum wage is, and

4    they took my whole check to make me not have any money.

5    Q.  And Plaintiff's Exhibit 10, is this the manual for how

6    to do a CHAMPS entry?

7    A.  Yes, it is.

8          MR. FALB:  I'd move to introduce that into

9    evidence.

10          MS. GUNDERSON:  I have no objection.

11          THE COURT:  Admitted.

12        **(Plaintiff's Exhibit No. 10 admitted)**

13   Q. (By Mr. Falb)  You were asked why you didn't do a grievance

14   or protest or something, an incident report concerning

15   Bart Toennies and what he was doing or not doing, is that

16   correct?

17   A.  Correct.

18   Q.  And why didn't you do that?

19   A.  Because I would not write up something on hearsay.

20   Everything that I documented was stuff that I personally

21   knew of.

22          MR. FALB:  Thank you.

23          THE COURT:  Additional cross?

24                **RECROSS-EXAMINATION**

25            **QUESTIONS BY MS. GUNDERSON:**


                    Redirect - Cook

 1   Q.  So it's fair to say that the allegations you made

 2   against Bart in here today you don't have personal knowledge

 3   of, correct?

 4   A.  I only saw the computer thing and assumed, because of

 5   what he was saying and what he was typing, that that's what

 6   he was doing.

 7   Q.  Okay.  So since you didn't write up an incident report

 8   or a grievance.  You didn't feel you had enough personal

 9   knowledge to do that, right?

10   A.  Correct.  I did not know the inmate.  I didn't feel I

11   had enough information to write anything.

12   Q.  You said you thought the department had violated the

13   Federal Wage Protection Act?

14   A.  I believe -- I think so, from what I've read.  I don't

15   know for sure.

16   Q.  You filed no complaints with any agency at all regarding

17   that, have you, ma'am?

18   A.  No.  I was off on leave and didn't have access to anyone

19   or paperwork or anything.

20   Q.  And you haven't filed anything since when you returned

21   from leave, right?

22   A.  I was past the deadline.

23   Q.  You've never filed anything, I guess is my point, right?

24   A.  No.  No.

25   Q.  We talked earlier about counseling.  You understand

                              Recross - Cook

1  that --

2  A.  Counseling department?

3  Q.  Counseling as --

4  A.  Counseling an inmate or personal counseling?

5  Q.  We've established that counseling is not discipline.

6  You being counseled by Ann Casey is not discipline, right?

7  A.  No.

8  Q.  Counseling is expunged from your record at some point,

9  right?

10  A.  I believe so.

11  Q.  Your record's kept with the personnel office, correct,

12  your personnel record?

13  A.  At the time I was employed.  I have no clue where they

14  are now.

15  Q.  Kim Atchison is in charge of that office, correct?

16  A.  She is.

17  Q.  You just testified that you get migraines because you're

18  stressed, correct?

19  A.  Correct.

20  Q.  You get migraines for other reasons as well, right?

21  A.  Sometimes I do, yes.

22  Q.  Like for bariatric pressure?

23  A.  Yes, I do.  Those are the two instances, yes.

24  Q.  And I think, thanks to the weather yesterday, you did

25  have one?

Recross - Cook

1   A.   I certainly did.

2   Q.   You said that you would not be at your max retirement.

3   That's because you hadn't reached 32 years, right?

4   A.   No.

5   Q.   Percentage wise you weren't at 80 percent because you

6   weren't at 32 years, right?

7   A.   Nor was I at the top of my pay scale either.   I

8   considered the two go hand-in-hand.

9   Q.   Let's set the steps aside for a second.   Okay.   After

10  you achieved 32 years -- which you would have gotten in

11  December of 2008, right?

12  A.   Correct.

13  Q.   You don't get any greater percentage of your pay, right?

14  A.   That's correct.

15  Q.   80 percent's the max, right?

16  A.   Correct.

17  Q.   As far as the steps are concerned, that's the 6,000?

18  A.   The yearly annual raises, yes.

19  Q.   So if you're working past December 2008, you would have

20  just gotten the step increases --

21  A.   Correct.

22  Q.   -- to increase your pay, correct?

23  A.   Correct.

24  Q.   All right.   You mentioned that you have 14 days that you

25  can go back into CHAMPS and change things?

Recross - Cook

1   A.   Yes.

2   Q.   That's if you make an entry into CHAMPS, you have 14

3   days, if you made an error, to go back, alter it?

4   A.   Yeah.  That's what it says in the manual.

5   Q.   This is Exhibit 20 that we've looked at quite a lot.

6   Now, you would agree with me that, as of April 24th, you

7   hadn't entered in your contacts for these inmates, correct?

8   A.   That's correct.  It updates overnight.  This is the

9   report that comes in the morning, so any work that I would

10  do during the day would not show up until the next day.

11  Q.   Okay.  So as of April 23rd, you hadn't entered your

12  contacts for those inmates in, correct?

13  A.   Correct.

14  Q.   Ma'am, you filed this lawsuit in 2009, correct?

15  A.   I'm not sure the exact date because I was required to

16  file a complaint with the EEOC, and I don't remember exactly

17  the date that I got the paperwork back from them, but it

18  sounds probably about right.

19  Q.   Okay.  In your complaint you do ask to be made whole,

20  correct?

21  A.   Correct.

22  Q.   You ask for a sum of $500,000, correct?

23       MR. FALB:  Objection, Your Honor.  This is outside

24  the scope, and secondly, outside what we discussed.

25       THE COURT:  Sustained.


                         Recross - Cook

```
 1              MS. GUNDERSON:  I have no further questions.
 2              THE COURT:  Any additional direct?
 3              MR. FALB:  No, Your Honor.
 4              THE COURT:  Ladies and gentlemen of the jury, any
 5    questions?  No?
 6              You can step down.  Want to take that out-of-order
 7    witness?
 8              MS. GUNDERSON:  Yes, please.
 9              THE COURT:  We have a witness, ladies and
10    gentlemen, that should actually be testifying in the defense
11    case, but because of scheduling needs to testify now.
12              So once again, as I explained the other day,
13    scheduling is -- as it is sometimes, it's inconvenient and
14    not chronological as it ought to be, so this witness will be
15    a witness out of order.  It's a defense witness,
16    Warden Bates as I understand it.
17              MS. GUNDERSON:  Warden Ty Bates.
18              TY BATES, DEFENDANT'S WITNESS, SWORN
19                   DIRECT EXAMINATION
20              QUESTIONS BY MS. GUNDERSON:
21    Q.  Good afternoon, Warden Bates.  Can you tell the jury
22    your name, please.
23    A.  Ty J. Bates.
24    Q.  Do you work?
25    A.  Yes.
```

Direct - Bates

1    Q.   Where do you work?

2    A.   Big Muddy River Correctional Center.

3    Q.   What do you do at Big Muddy?

4    A.   I'm the acting warden.

5    Q.   How long have you been there?

6    A.   Approximately 17 months.

7    Q.   Where did you work before there?

8    A.   Centralia Correctional Center.

9    Q.   What was your position at Centralia?

10   A.   I was assistant warden of programs.

11   Q.   Is that the same position -- we've heard some testimony

12   about Ann Casey.  Is that the same position that she once

13   held at Centralia?

14   A.   Yes, it was.

15   Q.   Were you her successor?

16   A.   There was some months in between there, but I did follow

17   her, yes.

18   Q.   When did you start as assistant warden of programs at

19   Centralia?

20   A.   November 1st of 2007.

21   Q.   Do you know the plaintiff, Betty Cook?

22   A.   Yes, I do.

23   Q.   How do you know Betty?

24   A.   She was a counselor.

25   Q.   When did you first come to know her?

                         Direct - Bates

 1    *A.* I knew of her when I was a correctional officer at

 2    Centralia, but I got to know her when I became assistant

 3    warden of programs.

 4    *Q.* And there came a time when you were her supervisor,

 5    right?

 6    *A.* Yes, there was.

 7    *Q.* I want to talk to you a little bit about -- do you

 8    recall Betty retiring?

 9    *A.* Yes, I do.

10    *Q.* How did you come to find out that Betty was going to

11    retire?

12    *A.* She came down to my office and let me know several

13    months beforehand that she didn't know exactly when she was

14    going to retire but she was going to retire within the next

15    few months.

16    *Q.* Okay.  Did there come a time that she actually did

17    retire?

18    *A.* Yes, there was.

19    *Q.* Do you remember when that was?

20    *A.* I do not remember the date.

21    *Q.* What kinds of preparations did you take, if any,

22    anticipating Betty's retirement?

23    *A.* Well, Betty was the receiving counselor, so you had to

24    get people prepared.  You had to get another counselor

25    prepared to take that caseload.  Receiving is a little bit

Direct - Bates

 1   different than other housing units.  You have orientation

 2   and just different paperwork and things that when they come

 3   into receiving that you don't do in the general pop -- that

 4   you don't do with the general population inmates.

 5   Q.  At any time while Betty was working under you did you

 6   take her out of receiving?

 7   A.  I don't recall doing that.

 8   Q.  Do you recall having a conversation with Betty about

 9   needing to split up two other counselors, specifically Gina

10   and Brandon Risse?

11   A.  I don't remember having a conversation with her in

12   particular.  We did have to split those counselors up, but

13   not -- I would not have had that conversation with one given

14   counselor.

15   Q.  Why did you have to split those two up?

16   A.  Personality differences.

17   Q.  Did you have any problems with Betty's work?

18   A.  Absolutely not.

19   Q.  Did she ever express to you any concerns about her job

20   at Centralia?

21   A.  Absolutely not.  She'd actually -- when I got there in

22   November 1st, 2007, probably around January, February, she

23   came to me on several different occasions saying how good

24   things were going, and that's why she didn't know if she was

25   going to retire or not.  She had stated the only reason she

Direct - Bates

1     would retire because she was getting to the -- to her 32

2     years, which would have been her max retirement.

3     Q.  From time to time while you were the supervisor of the

4     counseling unit did the assignments between counselors

5     change?

6     A.  Yes, they did.

7     Q.  I think we've seen some memos from you documenting those

8     already.  I'm just checking to make sure they're all ones I

9     want in evidence.  At any time did Betty report to you that

10    she was having problems with any of the other counselors?

11    A.  No, she didn't.  Betty pretty well got along with

12    everyone.

13         *MS. GUNDERSON:*  I have no further questions for

14    Warden Bates.

15         *THE COURT:*  Cross?

16                    **CROSS-EXAMINATION**

17                 **QUESTIONS BY MR. FALB:**

18    Q.  Sir, is it fair to say that Betty was a very good

19    employee for you?

20    A.  Yes, she was.

21    Q.  Not a single day did she struggle, did she?

22    A.  I do want to say, the counselors in general, they had a

23    very extremely large caseload because of the shortness of

24    staff, but she did not struggle any more than any other

25    counselor on the caseloads did.


                        Cross - Bates

1   Q.  Not once did you discipline her, is that correct?

2   A.  That is correct.

3   Q.  Not once did you counsel her, is that correct?

4   A.  I do not recall ever counseling her, no.

5   Q.  She worked hard?

6   A.  Absolutely.

7   Q.  She was dependable, is that correct?

8   A.  Yes.

9   Q.  She was loyal, is that correct?

10  A.  Yes.

11  Q.  She did everything you asked her to do, didn't she?

12  A.  Yes, she did.

13  Q.  And there was a disagreement between Gina Feazel and

14  Brandon Risse, is that correct?

15  A.  That is correct.

16  Q.  And according to Mr. Risse, you guys -- you called them

17  in on several occasions to talk to them about the problems

18  going on between the two of them?

19  A.  Yes, I did.

20  Q.  Did you ever once discipline Gina Feazel?

21  A.  I do not recall disciplining any of the counselors.

22  Q.  You didn't discipline Mr. "Reese" or "Rissy"?

23  A.  No, I do not recall ever doing that.

24  Q.  Over and over you counseled them over the problems they

25  were having with each other, isn't that true?

Cross - Bates

1    *A.*  I wouldn't consider it a form of counseling.  When you

2    refer to a counseling, that is documented on paper, a

3    counseling.  That is not -- there was not discipline.  There

4    was not anything to discipline them on.  Again, it was

5    personality.

6    *Q.*  There was no reason to discipline or counsel these

7    people?

8    *A.*  No, there wasn't.

9    *Q.*  But there was a reason to move them?

10   *A.*  Again, it was personality conflicts.  There was a lot of

11   times when employees, just out of personalities, can't get

12   along.  That doesn't mean that they're not doing their job.

13   It doesn't mean that they necessarily have to be

14   disciplined.

15   *Q.*  You could have?

16   *A.*  Yes, I could have.

17   *Q.*  And you chose not to?

18   *A.*  There was nothing to discipline them on.

19   *Q.*  And in fact, you gave an excellent evaluation to

20   Brandon Risse, is that correct?

21          *MS. GUNDERSON:*  Objection.  Beyond the scope.

22          *THE COURT:*  Overruled.

23   *Q. (By Mr. Falb)*  Is that correct?

24   *A.*  Yes, I did.

25   *Q.*  Perfect, is that correct?


                         Cross - Bates

```
 1    A.  I can't recall that.
 2    Q.  You don't recall your boss coming in and reducing his
 3    evaluations on his own?
 4    A.  If it was perfect, I don't recall.  When you say
 5    "absolutely perfect", I don't know.
 6    Q.  Do you remember?
 7    A.  I gave him a very good evaluation, yes.
 8    Q.  Do you remember Warden Robert coming in?
 9    A.  Yes, I do.
10    Q.  Unilaterally reducing his evaluation?
11    A.  Yes, I do.
12    Q.  Was that the first time that Warden Robert had ever done
13    that to you?
14    A.  Yes, it was.
15    Q.  Was he even in counseling, Warden Robert?
16    A.  In counseling?
17    Q.  Was he there to see what Risse was doing?
18    A.  He was the warden at the facility, so yes, he was.
19    Q.  You disagreed with the warden, didn't you?
20    A.  I -- you don't go -- as the assistant warden of
21    programs, you don't go to the warden on every evaluation
22    before you do the evaluation.  The warden will then -- the
23    warden can concur with your evaluation.  He signs off on
24    every evaluation that comes through the facility.
25    Q.  Did you ever ask the warden why all of a sudden he
```

Cross - Bates

     1    unilaterally decided to downgrade Brandon Risse?

     2    A.   That's his choice as the warden.

     3    Q.   That wasn't my question.

     4    A.   And his decision.

     5    Q.   Did you ask him, sir?

     6    A.   No, I did not.

     7    Q.   You just let it go?

     8    A.   Yes, I did.

     9    Q.   You didn't protest for your employee?

    10    A.   No, I did not.

    11    Q.   So you had no idea why he came in and reduced it?

    12    A.   That's his choice as the -- again, that's his choice as

    13    the warden.

    14    Q.   Any speculation why he did it?

    15         MS. GUNDERSON:   Objection to speculation.

    16         THE COURT:   Sustained.

    17    Q. (By Mr. Falb)   So as you sit here now in front of this jury

    18    you have no idea why Warden Robert all of a sudden did that to

    19    Brandon Risse?

    20    A.   That's his -- you would have to ask Warden Robert that.

    21    Q.   You didn't have a problem with Brandon Risse, did you?

    22    A.   No, I did not.

    23    Q.   Never have?

    24    A.   No, I have not.

    25    Q.   Excellent, excellent counselor, wasn't he?


                              Cross - Bates

1    A.   Yes, he was.

2    Q.   As shown by the evaluations?

3    A.   Absolutely.

4    Q.   And my client, your evaluations of her were pretty good

5    too, weren't they?

6    A.   Yes, they were.

7    Q.   And you don't remember my client talking to you about

8    why you are moving her and not moving Risse or Feazel?

9    A.   No, I do not.

10   Q.   Was it possible that could have happened?

11   A.   It could be possible.

12   Q.   In fact, after my client retired, Gina Feazel was moved

13   to what?

14   A.   I do not recall.

15   Q.   Was she moved to field services?

16   A.   It's very possible.  She did move to field services.  I

17   don't remember the exact date.  She did move to --

18   Q.   Field service has their own separate location apart from

19   the counselors?

20   A.   Yes, it does.

21   Q.   Do you remember that you were going to move my client if

22   she didn't retire or not?

23   A.   I would have not have moved your client if -- I would

24   not have moved your client if she had not retired.

25   Q.   That never even came up?

Cross - Bates

1    A.   Absolutely not.

2    Q.   So if Mr. Risse said that and my client said that, they

3    wouldn't be telling the truth?

4    A.   No, they would not.

5    Q.   Or is it just you have a memory problem?

6    A.   I did not -- I had no intentions of moving your client.

7    Q.   So who did you end up moving?

8    A.   Sir, that was -- we made several moves in my two years

9    as assistant warden of programs there because of the

10   shortness of staff.  I cannot recall who I have and have not

11   moved.  They should reflect that in the memo.

12   Q.   You were assistant warden at the time?

13   A.   Yes, I was.

14   Q.   What was your age at the time?

15   A.   When I made assistant warden?

16   Q.   Yes.

17   A.   27.

18   Q.   What was your background?

19   A.   I was an officer before.

20   Q.   What kind of officer?  A sergeant, captain, major,

21   lieutenant?

22   A.   Correctional officer.

23   Q.   What's that?

24   A.   It's a correctional officer.

25   Q.   Is that the lowest?

                            Cross - Bates

1    A.   Yes, it is.

2    Q.   Did you ever try to get sergeant?

3    A.   No, I did not.

4    Q.   Lieutenant?

5    A.   No, I did not.

6    Q.   How long were you a correctional officer?

7    A.   From November 3rd -- or November 15th of 2003 to

8    November 1st of 2007.

9    Q.   So you were there for what, three-and-a-half, four years

10   as a jailer, prison guard?

11   A.   Yes.

12   Q.   Before that what was your occupation?

13   A.   I was in college.

14   Q.   How did you get your job as assistant warden?

15   A.   I put in to the director's office.

16   Q.   Is that all had you to do?

17   A.   Absolutely.

18   Q.   Take any tests?

19   A.   No.

20   Q.   Who did you interview with?

21   A.   Director Walker; Chief of Operations Bard; Executive

22   Chief Molina, Sergio Molina; special assistant to the

23   director Shalice Hansboro (sic).

24   Q.   Are they still with Springfield?

25   A.   Some of them are in different capacities.

                         Cross - Bates

1 Q. They were appointed by the governor, is that correct?

2 A. They were -- those people were appointed by Director

3 Walker.

4 Q. Who was appointed by the governor?

5 A. Yes.

6 Q. Now, as far as the discussions about retirement of

7 Betty -- in fact, I think you told us in your deposition --

8 you correct me if I'm wrong -- they were more like passing

9 conversations about retirement?

10 A. They were more like passing conversations, but they

11 were -- it was mentioned to me on several different

12 occasions.

13 Q. Lots of people talked about retiring?

14 A. Absolutely.

15 Q. In fact, when she got back from being on stress leave,

16 people talked about her retiring, right?

17 A. I'm sure there was speculation of retirement because of

18 her years of service.

19 Q. In fact, people were surprised she even came back?

20   MS. GUNDERSON: Objection to speculation.

21 Q. (By Mr. Falb) Isn't that true?

22   THE COURT: Overruled.

23   THE WITNESS: I don't know.

24   MR. FALB: Thank you, Your Honor.

25   THE COURT: Redirect?

        Cross - Bates

```
 1                    REDIRECT EXAMINATION

 2                QUESTIONS BY MS. GUNDERSON:

 3   Q.   Warden Bates, could you have moved either Gina or

 4   Brandon out of their job as counselor?

 5   A.   I could not have done that.  Are you asking if I could

 6   move them to a different position?

 7   Q.   Yeah.

 8   A.   No, I could not do that.

 9   Q.   If you had disciplined them for their personality

10   conflicts could that have been a violation of the contract?

11   A.   Yes, it could have.

12   Q.   Would you have expected a grievance to have expunged

13   that kind of discipline?

14   A.   Absolutely.

15   Q.   You said that you applied to the director's office for

16   the assistant warden of programs position?  Is that a "yes"?

17   A.   Yes.

18   Q.   Why did you put in to the director's office?

19   A.   That is standard protocol for an assistant warden or a

20   warden's job.

21   Q.   Was there an opening?

22   A.   Yes, there was.

23             MS. GUNDERSON:  I have nothing further.

24             THE COURT:  Additional cross?

25                          *   *   *   *


                         Redirect - Bates
```

```
 1                    RECROSS-EXAMINATION

 2                 QUESTIONS BY MR. FALB:

 3   Q.  Sir, is it your testimony that if you -- you can't

 4   discipline someone for their relationship with their

 5   co-employees?

 6   A.  It did not get to the -- it did not get to the level

 7   that -- to discipline.

 8   Q.  So you could if it got to the level?

 9   A.  It depends on what level you're talking about.

10   Q.  Well, you tell the jury.

11   A.  If there's -- if they are fighting as far as physically

12   fighting, punches thrown, things like that, you can

13   discipline.  They were not going over, they were

14   following -- they were doing their job, they were doing it

15   in efficient manner and, therefore, they were not -- there

16   was not anything to discipline them for.  It wasn't yelling,

17   screaming or anything like that.  It was just more what I

18   would call picking at each other.

19   Q.  So you would only discipline them if they were throwing

20   fists at each other?

21   A.  Absolutely not, but that was an example I gave.  If they

22   went and inappropriately -- there's a level of appropriate

23   discipline.  Just picking at this person, okay, pointing out

24   this person's mistakes all the time, that's what a lot of it

25   boiled down to.  Okay.  There was a minor mistake, maybe he
```

1    didn't -- I mean it was so minor on each other, it was more

2    like -- it did not come to the level that needed to be

3    disciplined.

4    Q.  So why move them?

5    A.  There's several reasons why.  As a manager, if you can

6    get more efficiency and they're all in the same office, then

7    you can move somebody.  You have the right, as a manager, to

8    move somebody to make it more tolerable for everybody.

9    Q.  Sir, you know what the 201 evaluations are, don't you?

10   A.  Absolutely.

11   Q.  Why don't you read to the jury paragraph No. 8, the

12   heading.

13   A.  *Human relations:  Establishes and maintains cordial work*

14   *climate, promotes harmony and enthusiasm, displays sincere*

15   *interest in assisting other employees.*

16   Q.  So what did Gina Feazel get under that heading?

17   A.  I don't know.

18   Q.  What did Brandon Risse get under that heading?

19   A.  I don't know.  I'd have to see the 201's.

20   Q.  So those were -- that was a heading that you would

21   evaluate each employee on, and that falls directly into the

22   personality conflict that you just mentioned, is that right?

23   A.  Yes, I did.

24           *MS. GUNDERSON:*  I have nothing further.

25           *THE COURT:*  Ladies and gentlemen of the jury,


                          Recross - Bates

1    questions?

2                            *   *   *   *

3        *(Discussion held at sidebar:)*

4            THE COURT:  Question just asked if he has a college

5    degree, and if so, what in?  Any objection?

6            MR. FALB:  I didn't hear you.

7            THE COURT:  There's a question:  *Does he have a*

8    *college degree, and if so, what in?*

9            MS. GUNDERSON:  No objection.

10       *(End of discussion at sidebar)*

11                           *   *   *   *

12           THE COURT:  Warden Bates, do you have a college

13   degree?

14           THE WITNESS:  Yes, I do.

15           THE COURT:  What is your major?

16           THE WITNESS:  I have an Associate's in

17   administration of justice and then I have about an

18   additional, I'm wanting to say a little over a hundred

19   hours.  I'm close to my Bachelor's.

20           THE COURT:  And what is your major study as you're

21   approaching your Bachelor's?

22           THE WITNESS:  I'm not currently going right now,

23   but I am -- when I hired on with DOC it was in criminology.

24           THE COURT:  Okay.  So that's your concentration?

25           THE WITNESS:  Absolutely.


                          Recross - Bates

```
 1            THE COURT:  Okay.  Any follow-up questions,
 2   Counsel?
 3            MR. FALB:  Just briefly.
 4                FURTHER RECROSS-EXAMINATION
 5               QUESTIONS BY MR. FALB:
 6   Q.  How come you stopped going to school?
 7   A.  Well, I'm -- at the time I'm a diabetic, and when I
 8   reached my 23rd birthday, which would have been
 9   October 13th of September 2003, I would have been without
10   insurance, so therefore, I took the test for corrections and
11   that's when I got on.
12   Q.  So you stopped going to school then?
13   A.  Yes, I did.
14   Q.  You haven't gone to night school?
15   A.  I have not right now.
16            MR. FALB:  Thank you.
17            THE COURT:  No follow-up?
18            MS. GUNDERSON:  No, Your Honor.
19            THE COURT:  Okay.  Thanks.  You can step down,
20   Warden.  Back to plaintiff's case.
21            MR. FALB:  I hesitate to do this, but there is a
22   DVD to be played of Nurse Practitioner Boehning.
23            THE COURT:  Nurse practitioner Boehning?
24            MR. FALB:  Yes.  Do you want me to put it on?
25            THE COURT:  Is it ready to play?
```

Recross - Bates

 1          MR. FALB:  Straight through.

 2          THE COURT:  So when he talks about DVD, ladies and

 3   gentlemen, what he's really talking about is a deposition

 4   that was taken outside of the courtroom.  So once again,

 5   treat it just as though the witness were right here in

 6   court.  The witness was sworn to tell the truth at the time

 7   of the deposition, like a witness is here in court, so treat

 8   the deposition just as you would treat the witness -- just

 9   as the witness were here in court.  I'm trying to figure out

10   which one of these things to flip on.  I guess it's that one

11   right there.  Do we know how long?

12          MR. FALB:  I think it's just an hour.

13          THE COURT:  Okay.  Should be able to see it on the

14   monitors.

15       **(Playing videotaped deposition of Agnes Boehning)**

16       **(Sidebar held off the record)**

17                          *   *   *   *

18          THE COURT:  Mr. Falb, you want to put that exhibit

19   in real quick?

20          MR. FALB:  Your Honor, the one exhibit I was

21   talking about was simply --

22          THE COURT:  Oh, I'm sorry.  You don't have an

23   exhibit with that.  So your request for judicial notice is?

24          MR. FALB:  Right.

25          THE COURT:  What?

1        MR. FALB:  Life table, and that is Plaintiff's

2   Exhibit 23.  Plaintiff's Exhibit 23, life expectancy table.

3        THE COURT:  Plaintiff's Exhibit 23 will be

4   admitted.

5        **(Plaintiff's Exhibit No. 23 admitted)**

6        THE COURT:  Any additional evidence for the

7   plaintiff?

8        MR. FALB:  No, Your Honor.

9        THE COURT:  Okay.  Folks, we're not going to start

10  the defendant's case now, but let me alert you to the fact

11  that this case has gone slower than we thought, and

12  defendants have, it looks like five or six witnesses, so

13  it's quite possible, if not likely, that this case will not

14  finish this week, which means we'll have to come back

15  Tuesday.

16       So I tell you that now so you can make whatever

17  phone calls you have to make tonight or tomorrow as far as

18  your work is concerned.  If that creates a hardship for

19  anybody, you need to let us know sometime tomorrow about

20  that fact so I can discuss that with counsel.

21       So same admonishments as before.  Keep an open

22  mind.  Don't talk to anybody about the case.  We'll see you

23  tomorrow.

24       **(Jury out)**

25       THE COURT:  Jury's not in the courtroom.

1          *MS. GUNDERSON:*  Your Honor, the defendants would

2     make a motion, pursuant to Rule 50, for a directed verdict

3     at this time.

4          *THE COURT:*  Any argument associated with that?

5          *MS. GUNDERSON:*  There is.  The standard for Rule 50

6     motion is whether any fair-minded jury could enter a verdict

7     in favor of plaintiff.  Based upon that standard, in order

8     to prove the plaintiff's discrimination, plaintiff has to

9     prove that the discrimination -- the conduct that's alleged

10    was done because of her age.

11         With respect to direct evidence, there's been no

12    direct evidence tying any of the disciplines to plaintiff's

13    age.  There's been no direct evidence tying any of the

14    issues with the Correctional Counselor III position directly

15    to age.  The only direct evidence plaintiff has from anyone

16    that has to do with her age or retirement are two

17    isolated -- or two statement made by Warden Casey asking,

18    *When are you going to retire?*  Two statements made about

19    retirement without more is not pervasive enough to show that

20    all the other actions that Ms. Casey was taking were because

21    of plaintiff's age.

22         Moreover, the state -- in addition, the statement

23    made by Warden Flagg where he asked plaintiff about, you

24    know, that she had to go see her inmate, that had nothing to

25    do with age either.  So there's no evidence of -- no direct

1    evidence of age.  So what that means is that plaintiff has

2    to prove by indirect evidence that age was actually the real

3    cause.  She doesn't meet that burden either.

4         Starting with the Correctional Counselor III

5    position, there's no evidence that anyone got that position

6    or that it was even available.  There was no allocation for

7    it.  As far as the TA pay is concerned, there was testimony

8    that -- well, there's no evidence that anybody else got TA

9    pay.  Under the indirect standard, plaintiff has to prove

10   that somebody else was treated more favorably and that

11   person was outside the class, and so therefore, there's some

12   sort of inference that the real reason plaintiff was treated

13   differently was because of her age.

14        With respect to the Correctional Counselor III

15   promotion and the Correctional Counselor III TA pay, there

16   is no similar situated person.  No one got that job, and

17   that job isn't even allocated at Centralia any more, so for

18   that reason we would ask for judgment in our favor on those

19   two parts of plaintiff's discrimination case.

20        With respect to the discipline, there's a couple of

21   overarching issues that I think plaintiff fails to meet on

22   the discipline, the first being whether she was meeting the

23   legitimate expectations of her employer.  There was a lot of

24   testimony from almost all the counselors that there was a

25   lot -- plaintiff had a lot of struggles in her job.

1    Moreover, there was testimony from Ann Casey, who was the

2    supervisor who was giving the discipline, that she had

3    concerns about plaintiff's job from a long time back.  There

4    were a couple e-mails put into evidence.  There was one that

5    was -- at least parts of it were read where Ann Casey was

6    going through and talking about inmates who had complained

7    to her or going back into checking the counseling summaries.

8              *COURT REPORTER:*  Could you please slow down.

9              *MS. GUNDERSON:*  Yes, I could.  Sorry.

10             With respect to the e-mail where she had gone,

11   checked the counseling summaries and found that some people

12   were getting close to their date, that was three months

13   before the pinning ceremony that plaintiff has claimed as

14   being the start of the discrimination.  Overall, the -- I

15   think that no reasonable jury could find that plaintiff was

16   meeting the reasonable expectations of her employer such

17   that the discipline had to be because of some sort of

18   prohibited reason.  Moreover than that, plaintiff cannot

19   show that any of that discipline was because of her age.

20   There's no similarly situated person for any of the

21   discipline.

22             With respect to the inappropriate CHAMPS entry,

23   there was no similarly situated person that plaintiff has

24   identified that she had personal knowledge of who made an

25   inappropriate entry.  Moreover, she admits she made that

1    entry, and I would argue that it's objectively

2    unprofessional.  And moreover than that, Casey testified

3    that it was, in fact, inappropriate.  So with respect to

4    that discipline we would argue that plaintiff has not met

5    her burden of proving that that discipline was because of

6    her age.

7         With respect to her missing her contacts, again, no

8    evidence of any similarly situated person who also missed

9    contact and wasn't disciplined by Ann Casey.  The documents

10   that were in the hearing show that the contacts had been

11   missed, and they were printed off several days after the

12   contacts had been due.

13        Moreover, there was -- you look back to the 2006

14   e-mail from Ann Casey, there was already some concern about

15   getting to the end of the contact period and not having --

16   you know, getting it done in time.  So for that reason

17   plaintiff hasn't shown there's any similarly situated person

18   treat more favorably nor has plaintiff shown that there was

19   any direct evidence that the contacts -- missing the

20   contacts discipline was because of plaintiff's age.

21        With respect to the visitor list, the inmate

22   visitor list that had a victim on it, the only similarly

23   situated person that's been identified is Deb Brink and

24   she's the same age as plaintiff.  In order for the person to

25   be similarly situated they have to be outside the protected

1    class.  Deb Brink was the same age as plaintiff.  She was in

2    the class.  She's not similarly situated.  For that reason,

3    plaintiff can't prove that her age was the motivating -- was

4    the real reason for the discipline with respect to the

5    victim list.

6         The same is pretty much true for the other

7    discipline, the chain of command, the falsifying records.

8    At least with respect to the chain of command, plaintiff did

9    testify that both Deb Brink and Sena Landreth had called

10   Springfield and not been disciplined, but they're both

11   within the protected class, same age.  Sena's older.  So

12   they're not similarly situated.  And there was no similarly

13   situated person identified with respect to the falsification

14   of records.

15        Moreover, plaintiff did send the e-mail to

16   Springfield.  She did skip her supervisor.  The e-mail

17   itself -- the person that she e-mailed says in there, you

18   know, this has to go through a supervisor.  And she was

19   attempting to change a document that was -- you know,

20   official document of the institution.  For that reason, I

21   think that plaintiff has not shown that her discipline for

22   either the going outside the chain of command or the

23   falsification of records was because of her age.

24        With respect to the constructive discharge,

25   plaintiff has to prove that her working conditions were so

 1   intolerable that -- well, actually, let me back up and
 2   finish the age discrimination.  For all of those reasons, we
 3   would say that plaintiff has not met her burden of showing
 4   that any of -- either the Counselor III or her discipline
 5   was because of her age, and that we would ask that because
 6   no reasonable jury could enter a verdict in favor of
 7   plaintiff in light of the evidence, that the judgment be
 8   entered in favor of the defendant.
 9          With respect to the leave of absence pay issue, the
10   only testimony on the leave of absence pay issue is that
11   plaintiff was not paid while she was on leave of absence.
12   Plaintiff testified that that notification came from the
13   State Employee Retirement System.  Per the Motion in Limine
14   order, that is a separate state agency.  It's not defendant
15   in this case.  So we would argue that, to the extent a
16   decision was made by SERS, that it can't be implicated here
17   to the defendant.  Without some evidence that the defendant
18   caused that decision to be made, there's no basis for any
19   award, discrimination claim with respect to the leave of
20   absence.  So for those reasons we would argue that plaintiff
21   has not proven any case of discrimination, that judgment
22   is -- judgment should be in favor of the defendant.
23          With respect to the constructive discharge claim,
24   plaintiff must prove that the working conditions at
25   Centralia were so intolerable because of her age, and it

 1   must -- it has to be an objective standard.  A reasonable

 2   person had to have found that the working conditions were

 3   intolerable and that it would not have been intolerable if

 4   plaintiff had been, you know, under the -- outside the

 5   protected class, which in this case is under the age of 40.

 6        Plaintiff testified that she had no issues with her

 7   supervisor, no issues with her job from the time she

 8   returned from leave until 10 months later when she decided

 9   to retire -- I'm sorry, six months later when she decided to

10   retire.  The only problem she had with Warden Bates at all

11   was a single conversation she had with him where he

12   allegedly -- and per this motion, you know, we can say that

13   he -- you know, we can even accept that as true that he did

14   the conversation for the purpose of this motion, because

15   that one conversation alone is not enough to make her

16   working environment so intolerable that a reasonable person

17   would be compelled to retire.  There's no change in her job

18   assignments.  She had no problems with Warden Bates after

19   that or before that, at any point in time.

20        Moreover, the conduct of Ann Casey shouldn't be

21   imputed to her decision to retire because Ann Casey had left

22   10 months earlier.  Any issues that Ann Casey had caused,

23   any problems she had with her, any stress that she felt

24   because of the way Ann Casey was running that department,

25   while I don't think there's any evidence that Ann Casey's

 1   motives were because of age, there was 10 months after

 2   Ann Casey left until plaintiff retired.  That's simply too

 3   long of a time period to link the two things together.

 4   Moreover, there's no testimony that anything that Ty Bates

 5   did was related to any motives Ann Casey might have had 10

 6   months prior.

 7        So for that reason we would -- plaintiff -- no

 8   reasonable jury could find that plaintiff was subjected to

 9   such an intolerable working environment because of her age

10   that she was forced to retire.  And we would ask that a

11   directed verdict be entered at this time in favor of the

12   defendant.

13        *THE COURT:*  Mr. Falb?

14        *MR. FALB:*  Obviously we disagree with the motion.

15   A reasonable jury could find in favor of the plaintiff on

16   all the issues, and we think these are questions of fact

17   that a jury has to resolve.

18        First of all, with respect to whether or not she

19   was meeting the expectations of her employer, let's -- first

20   of all, there is direct evidence if you talk about the

21   statements of the supervisor about retiring, there's two at

22   least two examples of that.  With respect to the indirect

23   evidence, I think there's facts on both sides.

24        The question concerning Counselor III, getting that

25   job, I don't even have to discuss.  It's whether or not she

 1   should have gotten that pay.  She was given that job.  She

 2   asked for the TA pay for the Counselor III job.  She was

 3   refused that pay in the midst of Ann Casey getting after her

 4   in the spring of 2007.  I think, as my client has discussed,

 5   everything went downhill as soon as her 30th pin ceremony

 6   did or did not occur, and she started getting abused after

 7   that.  There's not going to be any evidence that someone

 8   says, *Hey, because you're so old I'm not going to give you*

 9   *the pay or I'm not going to give you the job.*  That will

10   never take place.  It's all circumstantial.

11        Concerning the investigations for the disciplines,

12   my client says she wasn't guilty on any of the disciplines,

13   and all the disciplines basically are baseless.  The actions

14   of Ann Casey towards the other senior counselors or the

15   older counselors corroborate this.  There's a pattern going

16   on.  Other people, their desks were moved, they got

17   disciplined for bringing a drink in, almost couldn't get

18   promoted to another job.  And Gina Feazel, Bart Toennies,

19   the younger people, never got counseled, never got

20   disciplined despite the fact that, one, Gina Feazel, caused

21   a lockdown; two, Bart Toennies, with inmate Mr. Golden,

22   approved him to go out when he was released as a parolee to

23   live with the victim of his crime, which was a no-no.

24        The question of leave of absence, we're not -- I

25   didn't even raise the fact that she was refused the leave of

1    absence pay because of her disability because there's a

2    Motion in Limine on that.  Leave of absence is the same

3    thing as constructive discharge.  She was forced to take a

4    leave of absence because the environment, the hostile work

5    environment, that was so hostile, so intolerable.

6           Gina mentions -- or Joanna mentions the test for

7    constructive discharge is a reasonable man standard as well

8    as a subjective man standard.  We just heard the testimony

9    of the doctor -- or the nurse practitioner who indicated

10   that it was her recommendation that she not go back to work,

11   that she should retire.  And you know, I'm not trying to

12   link up Ann Casey as being the wicked witch of the west.

13   You know, I don't have to do that.  The fact is that

14   Assistant Warden Bates, when he decided to move my client

15   instead of the other two, and not disciplining the other two

16   who are being -- younger individuals, when he could have and

17   should have, that is a basis for discrimination based upon

18   age.  The fact that this was one single act doesn't make a

19   difference.  We have to look at this with the background

20   what she went through.  This lady went through hell, and

21   losing her hair, throwing up, having diarrhea, getting on

22   all sorts of medications, and she wants to do this again?

23   Any reasonable person wouldn't want to continue working in

24   that situation.

25           She asked Assistant Warden Bates, *Why are you doing*

1    *this?  Why not move them?  Why not discipline them?*  His

2    answer to her was, *I can't tell you.  I can't do it.*  And to

3    me, all this, all the circumstantial evidence shows from

4    beginning to end, starting with the other senior employees,

5    that this was a pattern.  And even if you don't go by what

6    those senior employees, my client, once she turned 30 years

7    seniority and Ann Casey and everyone else and this warden

8    saw, hey, she can retire at age 50 in August of 2007, let's

9    get her out.  So the basis for all this, all the way up to

10   when she turned age 50, forcing her to go on a leave of

11   absence was because of age 50.  And even they bring up the

12   point, *Hey, you're going to make as much money.  Why not*

13   *retire?*  Even in the spring, in the summer of 2008.  And she

14   doesn't have to retire.  That's the whole point, she does

15   not have to retire just because she's eligible to retire.

16          And all the circumstantial evidence shows that a

17   reasonable jury could find in favor of the plaintiff and

18   against the defendant on all the elements.  Thank you.

19          *THE COURT:*  Rebuttal?

20          *MS. GUNDERSON:*  Yes.

21          With respect to the leave of absence pay, you know,

22   the constructive discharge claim in the final pretrial I

23   think is clear.  That is under the normal discrimination

24   section of that so we would argue the discrimination

25   standard should apply and that that hasn't been met.

 1          With respect to the seniority of the counselors,

 2   there's no reasonable jury that can find that the seniority

 3   of the counselors had something to do with age, and you can

 4   take the example of the counselor who came in with the

 5   drink.  When she left she had, I think -- and there's a

 6   chart at some point.  She had like 20 years of seniority.

 7   She was pretty senior within the counselors.  She was only

 8   36 or 37.  She was not within the class of age.  In order to

 9   show that something is a proxy for age there has to be a

10   correlation between the two and it can't be -- what's the

11   word?  There has to be a correlation between the two.

12   Seniority has to do with when you started at the department.

13   It doesn't necessarily have anything to do with age.  The

14   reason Gina Feazel is so far down on the seniority list, the

15   reason she had such a small amount of seniority is because

16   she didn't start at the department until she was 32.

17   Someone like Cindy Keck, by the time she was 32, would have

18   had 14 years of seniority when Gina had zero.  There's just

19   no correlation between age and seniority and so there cannot

20   be -- just because -- that isn't proof of age discrimination

21   for that reason.  And Cynthia Keck, who was a younger person

22   and who was not within the class, is a good example of that.

23          There was a lot of testimony that Ann Casey went

24   after her, that she was disciplined for this drink, that she

25   was almost not promoted to parole.  She was only 37, by

 1   plaintiff's charts, when she promoted out to parole.  So for

 2   that reason I would argue that none of Ann Casey's --

 3   Ann Casey's motivations had nothing to do with age, and that

 4   directed verdict is warranted in favor of the defendant on

 5   that reason.

 6        In addition, with respect to everything happening

 7   after this 30-year pinning in December of 2006, plaintiff

 8   had been disciplined earlier in the year in 2006 for

 9   abandonment of post.  You can look at the September 2006

10   e-mail from Ann Casey where she's e-mailing all the

11   counselors saying, *Hey, you guys are getting close, I'm*

12   *checking this.*

13        *COURT REPORTER:*  Could you please slow down.

14        *MS. GUNDERSON:*  September 2006 e-mail, I think

15   that's the same place where I got real fast last time --

16   where she said that, check your -- get your inmates done.

17        Moreover, a lot of these counselors had left in

18   2006 and 2005.  Ann Casey's conduct was consistent

19   throughout the time she was there.  It had nothing to do

20   with age.  I'm not even sure it had anything to do with

21   anyone in particular.  It just was the way she was.  For

22   that reason, no reasonable jury could find that plaintiff

23   has proven her claims of age discrimination or constructive

24   discharge.

25        Thank you.

 1            *THE COURT:*  Well, I'm going deny the motion, let it

 2     go forward.  I think there's some issues of fact for the

 3     jury to decide.  Motion denied.

 4            I'm a little concerned about the jury instructions,

 5     so at some point, whether it's tonight or tomorrow after we

 6     finish, I want counsel to get together and try to work out

 7     an agreement on these instructions.  I'm going to restrict

 8     it to the issues in the pretrial order.  But looks to me

 9     like there's a lot of work needs to be done on those

10     instructions.  We've got the weekend, but I'm afraid if you

11     get away on the weekend then we'll be -- we'll have a

12     problem getting here Tuesday morning.

13            *MR. FALB:*  Judge, I volunteer to come in on

14     Saturday.

15            *THE COURT:*  Atta-boy.  As long as you don't take

16     off for Springfield.  I mean that's fine, but I just want to

17     make sure that we're not -- the jury's not sitting around

18     half a day on Tuesday while we work on instructions, we end

19     up not getting to close until late in the day on Tuesday,

20     and then we got another problem.  So you can tell the jury's

21     kind of fed up with the way this trial's been going along.

22     So let's just make sure we don't have the jury sitting

23     around Tuesday morning.  Be ready to go Tuesday morning.

24         **(Court adjourned)**

25                         *   *   *   *

1                          REPORTER'S CERTIFICATE

2

3          I, Laura A. Blatz, RPR, Official Court Reporter for the
      U.S. District Court, Southern District of Illinois, do
      hereby certify that I reported in shorthand the proceedings
4     contained in the foregoing 133 pages, and that the same is a
      full, true, correct, and complete transcript from the record
5     of proceedings in the above-entitled matter.

6          Dated this 27th day of August, 2012.

7

8                            /s/
                            _____
9                            LAURA A. BLATZ, RPR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25