1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE SOUTHERN DISTRICT OF ILLINOIS
2

3    BETTY D. COOK,                    )
                                       )
4                    Plaintiff,        )
                                       )
5        vs.                           ) No. 09-cv-133-DRH
                                       )
6    ILLINOIS DEPARTMENT OF            )
     CORRECTIONS,                      )
7                                      ) May 31, 2011
                     Defendant.        )
8

9                    **TRANSCRIPT OF PROCEEDINGS**
                     **TRIAL DAY/VOLUME #6**
10             **BEFORE THE HONORABLE DAVID R. HERNDON**
               **CHIEF UNITED STATES DISTRICT COURT JUDGE**
11
     **APPEARANCES:**
12
     For the Plaintiff:        Thomas O. Falb, Esq.
13                             Williamson, Webster, et al.
                               603 Henry Street
14                             Alton, IL  62002
                               (618) 462-1077
15
     For the Defendant:        Joanna Belle Gunderson, Esq.
16                             Kelly R. Choate, Esq.
                               IL Attorney General
17                             500 South Second St.
                               Springfield, IL  62706
18                             (217) 782-1841

19   Court Reporter:           Laura A. Blatz, RPR, CRR, CCR(MO)
                               U.S. District Court
20                             750 Missouri Avenue
                               East St. Louis, IL  62201
21                             (618) 482-9481

22

23

24

25       Proceedings recorded by mechanical stenography;
     transcript produced by computer.

```
1                        *   *   *   *

2                    INDEX OF EXHIBITS
```

| EXHIBIT | DESCRIPTION | ID'D | ADMT'D |
|---------|------------|------|--------|
| *Deft. 34* | Case assignment memo dated 1/3/07 | *916* | *916* |
| *Deft. 35* | Case assignment memo dated 5/17/07 | *916* | *916* |
| *Deft. 36* | Case assignment memo dated 6/15/07 | *916* | *916* |
| *Deft. 37* | Case assignment memo dated 7/25/07 | *916* | *916* |
| *Deft. 38* | Case assignment memo dated 10/12/07 | *916* | *916* |
| *Deft. 39* | Case assignment memo dated 11/14/07 | *916* | *916* |
| *Deft. 50* | Medical records from Tim Monken | *916* | *916* |
| *Plf. 24* | Offer of proof – deposition of Ann Casey | *916* | |

## MISCELLANEOUS INDEX

|  | PAGE |
|--|------|
| *Jury Instructions* | *917* |
| *Plaintiff's Closing Argument* | *926* |
| *Defendant's Closing Argument* | *947* |
| *Plaintiff's Rebuttal Closing Argument* | *973* |
| *Jury Instructions (cont.)* | *982* |

 1          *(Court convened)*

 2          *(Jury out)*

 3          THE COURT:  The jury is not in the courtroom yet,

 4   and we went over the instructions Friday.  Mr. Falb has come

 5   in this morning with some alternative verdict forms.

 6          So Mr. Falb, if I in looking at the verdict forms

 7   that you bring in, it appears that the difference is you

 8   eliminate the language with respect to the age.  You have a

 9   typo in Verdict Form C, and you eliminate the individual

10   questions as to each alleged issue which goes along with the

11   age discrimination claims.  Is that the essence of the

12   differences?

13          MR. FALB:  Yes, Your Honor.  But also as to Verdict

14   Form A, I tried to make it more clear that there's actually

15   two issues in Verdict Form A.  The first one is just

16   discrimination, and secondly, whether it's a willful

17   violation of the DEA.

18          THE COURT:  The verdict form tendered by the

19   defendant did the same thing, correct?

20          MR. FALB:  It differentiated but it didn't make it

21   clear enough.  I still think it's unclear the way the

22   defendant's form is.

23          THE COURT:  And you're saying you did that by

24   adding the sentence, did the defendant, Illinois Department

25   of Corrections, willfully violate the Age Discrimination in

1    Employment Act?

2         MR. FALB:  Can I see that, Judge?  I put in, "If

3    you find in favor of plaintiff, Betty Cook, then answer the

4    following."

5         THE COURT:  The one tendered by the defendants

6    doesn't give that instruction.  It just simply asks the

7    questions, *Yes, we find the defendant willfully violated*,

8    or, *No, we find defendant did not willfully violate*.

9         MR. FALB:  Correct.

10        THE COURT:  And as between the plaintiff and the

11   defendant, explain to me why one party believes the

12   questions need to be answered as to each of the issues with

13   respect to the age discrimination -- acts of age

14   discrimination, individual acts, and the other does not.

15        Mr. Falb, why do you believe they do not need to be

16   answered?

17        MR. FALB:  I think there's two arguments either

18   way, Judge.  First of all, if she's been discriminated you

19   don't have to go into each issue, period.  You know, you can

20   argue that she's been discriminated, period.  On the other

21   hand, the Court may later on -- for example, if they say

22   "yes" on one or two or three disciplines, they may -- the

23   Court may say, *Well, that goes to damages and this is how I*

24   *have to assess it.*  So I could see both ways.

25        THE COURT:  Okay.  Ms. Gunderson?

1              MS. GUNDERSON:  I think there has to be

2    discrimination based upon the acts that are alleged in the

3    complaint.  And I'm not sure how, if there is a verdict in

4    favor of the plaintiff absent some kind of indication from

5    the jury whether it's all the allegations, whether it's

6    parts of them, whether it's -- that would be very -- that

7    will determine what the damages are.  I think there could

8    be -- I mean I think certainly the jury could find -- the

9    claims are in groupings, so the jury finds that, you know,

10   something isn't proved in one grouping -- for instance,

11   Counselor III I think is a good example.  If they find that

12   the Counselor III charges haven't been proven, that would

13   change the way the damages are assessed because that

14   would -- because if they find that is proven, then we're

15   going to have to deal with her back wages having a raise,

16   we'll have to deal with TA pay -- or temporary assignment

17   pay I should say.  I think it will be helpful, if the jury

18   does return a verdict in favor of the plaintiff, for us to

19   know what damages we have to calculate.  That's why those

20   are included there.

21             THE COURT:  I see.  Okay.

22             MS. GUNDERSON:  I'm not sure what Mr. Falb's new

23   forms look like.  I haven't seen them.

24             THE COURT:  Well, the instructions that provide the

25   obligation of the jury to determine willfullness -- I'm

```
 1    looking for that instruction.  There's an instruction that
 2    reads:  "If you find for plaintiff, you must then decide
 3    whether defendant willfully violated the Age Discrimination
 4    in Employment Act."  Describes how they go about doing that.
 5    Strikes me provides adequate instruction for the verdict,
 6    and so that instruction, together with Verdict Form A
 7    tendered by the defendant, to me provides adequate
 8    instruction.  I think it's appropriate to give the
 9    individual interrogatories.  So the Court will give the
10    verdict forms provided -- or tendered by the defendant, will
11    refuse the verdict forms provided by the plaintiff.
12            When I said a while ago the Verdict Form C tendered
13    by the plaintiff had a typo in it, what I meant to say
14    was -- or what I meant by that was that in this verdict form
15    it should read:  "On plaintiff's age discrimination claim,
16    we, the jury, find in favor of defendant."  It actually
17    says, "find in favor of plaintiff" because it is the verdict
18    form intended to be the defendant verdict form.  It's clear,
19    by the context of all four verdict forms, that Verdict Form
20    C is the defendant verdict form, not the plaintiff verdict
21    form.
22            MR. FALB:  That's my method of getting things done,
23    Judge, have a verdict form for plaintiff.
24            THE COURT:  Subliminal message for me.  I
25    understand.  I've been in trial with you for a week now,
```

 1   Mr. Falb.  I know how your mind works.

 2        *MS. GUNDERSON:*  Your Honor?

 3        *THE COURT:*  Also filed was a motion for judgment as

 4   a matter of law.  This motion was filed in writing

 5   yesterday.  So additional argument on this issue,

 6   Ms. Gunderson?

 7        *MS. GUNDERSON:*  I think that our -- we would stand

 8   on our motion.  I made a brief argument last Friday.  I

 9   don't think I have anything else to add.

10        *THE COURT:*  Okay.  And for the reasons previously

11   indicated by the Court, the motion be denied.

12        Anything else we need to talk about before we bring

13   the jury in?

14        *MS. GUNDERSON:*  We wanted to make sure there was a

15   constructive discharge instruction, and the instructions,

16   the copy we got on Friday was missing it.

17        *THE COURT:*  The instruction is -- let me make sure

18   this is the one that is the one that covers it:  "Plaintiff

19   claims that she quit her job because defendant made her

20   working conditions intolerable.  This is called a

21   constructive discharge.  To succeed on this claim, plaintiff

22   must prove two things by a preponderance of the evidence."

23        Is that the one?

24        *MS. GUNDERSON:*  Yeah.  We didn't get that one but

25   we wanted to make sure you had it.

1      *(Off the record)*

2                          *   *   *   *

3           THE COURT:  Jury's not in the courtroom.  Exhibits

4      we still need to take care of?

5           MS. GUNDERSON:  Yes, Your Honor.  We would move

6      Defendant's Exhibit 34, 35, 36, 37, 38, and 39 into

7      evidence.

8           MR. FALB:  No objection.

9           THE COURT:  Without objection, those will all be

10     admitted.

11     **(Defendant's Exhibit Nos. 34 through 39 admitted)**

12          MS. GUNDERSON:  We would also move Defendant's

13     Exhibit 50 into evidence.  I believe there's an objection.

14          MR. FALB:  That's Mr. Monken's records, and my

15     objection is that he testified, so it would be redundant.

16          MS. GUNDERSON:  Mr. Monken identified the records

17     as his when he was testifying.  I think the foundation for

18     them has been laid.  We would ask that they be admitted.

19          THE COURT:  He was the --

20          MS. GUNDERSON:  The psychotherapist.

21          THE COURT:  Be admitted over objection.

22     **(Defendant's Exhibit No. 50 admitted)**

23          MR. FALB:  Judge, I don't know if the record caught

24     this, but Plaintiff's Exhibit 24 was my offer of proof of

25     Ann Casey's complete deposition.  Obviously this is not

1   going to the jury.

2        *THE COURT:*  Be admitted for the record but not to

3   go back to the jury.

4        *MR. FALB:*  Right.  I'll make that 25, Judge.

5        *MS. GUNDERSON:*  Hold on.  I don't see a six.

6        *MR. FALB:*  I'll make it a 26, Judge.

7        *THE COURT:*  26, or the number after the last

8   number.

9      **(Off the record)**

10                         *   *   *   *

11      **(Jury in)**

12                       **JURY INSTRUCTIONS**

13        *THE COURT:*  Members of the jury, you have seen and

14   heard all the evidence and are about to hear the arguments

15   of the attorneys.  Now I will instruct you on the law.

16        You have two duties as a jury.  Your first duty is

17   to decide the facts from the evidence in the case.  This is

18   your job and yours alone.  Your second duty is to apply the

19   law that I give you to the facts.  You must follow these

20   instructions even if you disagree with them.  Each of the

21   instructions is important and you must follow all of them.

22        Perform these duties fairly and impartially.  Do

23   not allow sympathy to influence you.

24        Nothing I say now and nothing I said or did during

25   the trial is meant to indicate any opinion on my part about

1    the facts -- about what the facts are or about what your

2    verdict should be.

3         The evidence consists of the testimony of the

4    witnesses, the exhibits admitted in evidence, and the

5    stipulations.

6         Certain things are not to be considered as

7    evidence.  I will list them for you:

8         First, if I told you to disregard any testimony

9         or exhibits or struck any testimony or exhibits from

10        the record, such testimony or exhibits are not

11        evidence and must not be considered.

12        Second, anything that you may have seen or heard

13        outside the courtroom is not evidence and must be

14        entirely disregarded.

15        Third, questions and objections or comments by

16        the lawyers are not evidence.  Lawyers have a duty to

17        object when they believe a question is improper.  You

18        should not be influenced by any objection and you

19        should not infer from my rulings that I have any view

20        as to how you should decide the case.

21        Fourth, the lawyers' opening statements and

22        closing arguments to you are not evidence.  Their

23        purpose is to discuss the issues and the evidence.

24        If the evidence as you remember it differs from what

25        the lawyers said, your memory is what counts.

1          You may have heard the phrases "direct evidence"

2     and "circumstantial evidence".  Direct evidence is proof

3     that does not require an inference, such as the testimony of

4     someone who claims to have personal knowledge of a fact.

5     Circumstantial evidence is proof of a fact or a series of

6     facts that tends to show that some other fact is true.

7          As an example, direct evidence that it is raining

8     is testimony from the witness who says, "I was outside a

9     minute ago and I saw it raining."  Circumstantial evidence

10    that it is raining is the observation of someone entering a

11    room carrying a wet umbrella.

12         The law makes no distinction between the weight to

13    be given to either direct or circumstantial evidence.  You

14    should decide how much weight to give to any evidence.  In

15    reaching your verdict you should consider all the evidence

16    in the case, including the circumstantial evidence.

17         You will recall that during the course of this

18    trial I instructed you that I admitted certain evidence for

19    a limited purpose.  You must consider this evidence only for

20    the limited purpose for which it was admitted.

21         You must decide whether the testimony of each of

22    the witnesses is truthful and accurate in part, in whole or

23    not at all.  You also must decide what weight, if any, to

24    give to the testimony of each witness.

25         In evaluating the testimony of any witness,

1    including any party to the case, you may consider, among

2    other things:

3         The ability and opportunity the witness had to

4         see, hear or know the things that the witness

5         testified about;

6         the witness's memory;

7         any interest, bias or prejudice the witness may

8         have;

9         the witness's intelligence;

10        the manner of the witness while testifying;

11        and the reasonableness of the witness's

12        testimony in light of all of the evidence in the

13        case.

14        During the trial certain testimony was presented to

15   you by the reading of a deposition and video of a

16   deposition.  You should give this testimony the same

17   consideration you would give it had the witnesses appeared

18   and testified here in court.

19        You have heard witnesses give opinions about

20   matters requiring special knowledge or skill.  You should

21   judge this testimony in the same way that you judge the

22   testimony of any other witness.  The fact that such person

23   has given an opinion does not mean that you are required to

24   accept it.  Give the testimony whatever weight you think it

25   deserves, considering the reasons given for the opinion, the

1   witness's qualifications, and all of the other evidence in

2   the case.

3        In determining whether any fact has been proved you

4   should consider all of the evidence bearing on the question

5   regardless of who introduced it.

6        You may find the testimony of one witness or a few

7   witnesses more persuasive than the testimony of a larger

8   number.  You need not accept the testimony of the larger

9   number of witnesses.

10       The law does not require any party to call as a

11  witness every person who might have knowledge of the facts

12  related to this trial.  Similarly, the law does not require

13  any party to present as exhibits all papers and things

14  mentioned during this trial.

15       Any notes you have taken during this trial are only

16  aids to your memory.  The notes are not evidence.  If you

17  have not taken notes you should rely on your independent

18  recollection of the evidence and not be unduly influenced by

19  the notes of other jurors.  Notes are not entitled to any

20  greater weight than the recollection or impressions of each

21  juror about the testimony.

22       In this case the defendant is a state agency.  All

23  parties are equal before the law.  A state agency is

24  entitled to the same fair consideration that you would give

25  any individual person.

 1          You should use common sense in weighing the

 2     evidence and consider the evidence in the light of your own

 3     observations in life.

 4          In our lives we often look at one fact and conclude

 5     from it that another fact exists.  In law we call this

 6     "inference".  A jury is allowed to make reasonable

 7     inferences.  Any inference you make must be reasonable and

 8     must be based on the evidence in the case.

 9          The credibility of a witness may be attacked by

10     introducing evidence that on some former occasion the

11     witness made a statement or acted in a manner inconsistent

12     with the testimony of the witness in this case on a matter

13     material to the issues.  Evidence of this kind may be

14     considered by you in connection with all the other facts and

15     circumstances in evidence in deciding the weight to be given

16     to the testimony of that witness.

17          In considering a prior inconsistent statement or

18     conduct, you should consider whether it was simply an

19     innocent error or an intentional falsehood and whether it

20     concerns an important fact or an unimportant detail.

21          It is proper for a lawyer to meet with any witness

22     in preparation for trial.

23          When I say a particular party must prove something

24     by "a preponderance of the evidence", or when I use the

25     expression "if you find" or "if you decide", this is what I

1    mean:  When you have considered all the evidence in the case

2    you must be persuaded that it is more probably true than not

3    true.

4          In this case plaintiff has two claims.  First,

5    plaintiff claims that the defendant discriminated against

6    her because of her age.  Second, plaintiff claims that the

7    defendant constructively discharged her because of her age.

8          In this case plaintiff claims that because of her

9    age she was denied promotion to Correctional Counselor III;

10   denied Correctional Counselor III pay for her work duties;

11   disciplined for her March 19, 2007 CHAMPS entry regarding

12   Inmate Cobb; disciplined for her April 2007 failure to make

13   inmate contacts within 90 days; disciplined for her

14   April 24, 2007 approval of the visitor list for Inmate

15   Williams; disciplined for her June 7, 2007 e-mail from

16   plaintiff to Deb Gordon; and was denied pay during her 2007

17   leave of absence.

18         To succeed on her age discrimination claim

19   plaintiff must prove, by a preponderance of the evidence,

20   that the defendant took at least one of these actions

21   against her because of her age.  To determine that plaintiff

22   was subjected to any of these actions by the department

23   because of her age, you must decide that the defendant would

24   not have taken the actions against plaintiff had she been

25   younger than 40 years of age but everything else had been

1    the same.

2         If you find that plaintiff has proved this by a

3    preponderance of the evidence, then you must find for

4    plaintiff.  However, if you find that plaintiff did not

5    prove this by a preponderance of the evidence, then you must

6    find for defendant.

7         If you find for plaintiff you must then decide

8    whether defendant willfully violated the Age Discrimination

9    in Employment Act.  To show this, plaintiff must prove, by a

10   preponderance of the evidence, that defendant knew that it

11   was violating the Age Discrimination in Employment Act or

12   was indifferent to whether its actions violated the Age

13   Discrimination in Employment Act, and not simply that

14   defendant was aware that it was engaging in age

15   discrimination.

16        In determining whether the defendant acted

17   willfully you should consider only the conduct of the

18   decision-makers.  Here, Ann Casey, Brad Robert and Ty Bates

19   were the decision-makers as that term is defined herein.

20        A decision-maker is someone who has involvement or

21   influence over employment decisions.  Unless an employee is

22   authorized to speak or act for the decision-maker about the

23   employment decision at issue, the statements of a

24   nondecision-maker are not imputed to the decision-maker

25   unless they influence the latter's decision.

```
 1              In deciding plaintiff's claim you should not
 2    concern yourselves with whether defendant's actions were
 3    wise, reasonable or fair.  Rather, your concern is only
 4    whether plaintiff has proved that defendant discriminated
 5    against her because of her age by denying her promotion to
 6    Correctional Counselor III, denying her pay for her work
 7    duties, disciplining her or denying her 2007 leave of
 8    absence pay.
 9              Plaintiff claims that she quit her job because
10    defendant made her working conditions intolerable.  This is
11    called a constructive discharge.  To succeed on this claim
12    plaintiff must prove two things by a preponderance of the
13    evidence:  One, defendant made plaintiff's working
14    conditions so intolerable that a reasonable person in
15    plaintiff's position would have felt compelled to quit, and
16    two, defendant would not have made plaintiff's working
17    conditions so intolerable had plaintiff not been over the
18    age of 40 years but everything else had been the same.
19              If you find that plaintiff has proved this by a
20    preponderance of the evidence, then you must find for
21    plaintiff.  However, if you find that plaintiff did not
22    prove this by a preponderance of the evidence, then you must
23    find for defendant.
24              Ladies and gentlemen, there are some other
25    instructions that I will give you relating directly to your
```

Plaintiff's Closing Argument

1    deliberations, and also I will show you and read to you the

2    verdict forms.  I'll do all those things after the closing

3    arguments.

4        So first, for an initial closing, I'll look to

5    Mr. Falb for that.  He has the burden of persuasion.

6    Mr. Falb?

7                **PLAINTIFF'S CLOSING ARGUMENT**

8        *MR. FALB:*  Thank you, Judge.  Please the Court,

9    Counsel, ladies and gentlemen of the jury.

10        Let me, first of all, apologize to you for reading

11    of a deposition last week.  You know, I know from past

12    experience there's nothing that turns off a jury more than

13    someone reading an hour-and-a-half deposition to you of

14    Ann Casey.  What happens in these cases, we take discovery

15    depositions to find out what witnesses say.  We expect

16    them -- I expected her to be in court.  For some reason she

17    didn't so I was forced to read her deposition.  I'd rather

18    be cross-examining her on the witness stand.  I think you

19    would have loved to have seen her, but I had to read her

20    deposition, and I apologize.

21        The second thing I apologize for is, many times

22    lawyers go over and meet with the judge on the sidebar, and

23    there's nothing more than irks a jury than that thing, but

24    sometimes it has to take place.  Third, I apologize to you

25    if sometimes I was too -- maybe I was too harsh with

                        Plaintiff's Closing Argument

1    witnesses, but I believe in my client.

2         As the judge instructed you, this case really boils

3    down to common sense.  And when you were asked to become

4    jurors in this courtroom you were not asked to leave your

5    common sense out of the courtroom.  Welcome to the State of

6    Illinois, State of Illinois government and its employees and

7    how they treat each other.  You know from your common sense

8    that the State of Illinois appoints -- the governor appoints

9    all the higher people like wardens, assistant wardens.  And

10   you know what?  The people under contract, the career people

11   like Betty, they get moved around too.  They get manipulated

12   because there's favors to pay back.  You scratch my back, I

13   scratch your back.  Move 'em in, move 'em out.  Move people

14   who are about to retire out so we can get our own people in,

15   the younger people in so they can have a basis to be

16   promoted and there will be more spots.

17        Centralia Correctional Center is a microcosm of

18   Springfield and Rod Blagojevich.  It's the same thing.  And

19   the mechanism of moving Betty Cook out of her department was

20   retirement.  There may be underlying motives, friends,

21   paybacks, whatever.  You can all think about that, but the

22   mechanism to get rid of her was through retirement.  What

23   better way to do it?  She's about ready to retire.  And

24   remember in my opening statement I said, and I drew for you

25   that 50.  But for her being that position, approaching the

                    Plaintiff's Closing Argument

age of 50, she would not have been discriminated against.
If she had been 25 or 26 or 30 -- it's hard to get people
out when they're under a contract, when they're career
people, but when she's in a position like this they sure can
make it difficult and sure can make it -- give her an
incentive to get out.  Why not?  You're going to retire.
You got great benefits.  If you're approaching age 50 and
we've got our own fiefdom to get in there, why not Betty?
Why don't you leave?  We don't want you around.
Sena Landreth, why not?  Get out of here.  Mechanism is
retirement.

Now, throughout this case in the instructions the
judge instructs you about age 40.  That's because the Age
Discrimination in Employment Act says you can't take
advantage of this act unless you're over 40.  Okay.  This
act was enacted 20, 30 years ago.  Probably should be
changed now but that's the way it is.  That's the magic
number.  In order for Betty to bring this lawsuit she has to
be over 40 years of age.  Now, that doesn't mean, in
comparing her to the younger people, that the younger people
have to be 20 or 25 or 35.  In fact, they could be 40, 41,
42.  But in order for her to bring this lawsuit she has to
be in this protected class, over 40 years of age, or maybe
it's 40 and over.  Okay.  So I want you to remember that.
But for her approaching the age of 40 -- age of 50, we

Plaintiff's Closing Argument

1  wouldn't be here today.

2       Now, the neat thing about this case is that you're

3  going to be asked to determine some principles -- not money;

4  principles.  You're not going to decide money at all.

5  You're going to decide whether she was discriminated

6  against, whether it was willful and whether she was

7  constructively discharged.  The burden of proof, as the

8  judge has informed you -- I don't know if you can see the

9  scales of justice there on that statue.  But if I have a

10  scale of justice here -- and it's real sensitive in a

11  criminal case.  Remember that case that was in Waterloo with

12  the man who killed his wife and two kids?  You have to prove

13  beyond a reasonable doubt because it's a serious case.  In a

14  civil case, as in civil, any civil case, it's by the greater

15  weight.  That means if I have these scales here and I'm

16  saying all I have to do is show that the scales ever so

17  slightly tip in my favor, or Betty's favor actually.  That's

18  all I have to do because it's a civil case.  All right.  And

19  I ask you to remember that.

20       Now, you have have been instructed as to some

21  things by the judge, and just let me touch them -- touch

22  upon them.  First of all, this instruction, this is the

23  discrimination instruction.  It basically names the various

24  things that happened to Betty, and I only have to prove one

25  of them, that was if it was based upon age discrimination,

Plaintiff's Closing Argument

1    and Betty would win the case.

2              The next instruction is the constructive discharge

3    instruction which the judge has read to you, but just let me

4    make sure -- constructive discharge is a legal terminology

5    that basically says, you know, if you do so much to an

6    employee, and basically a reasonable person says -- would

7    say, *That's enough, I'm getting out of here*, that's

8    constructive discharge.  Okay.

9              And then you were instructed as to circumstantial

10   evidence and inferences and that you can make any inference

11   that's reasonable.  Remember the judge reading this

12   instruction?  It talks about direct evidence is where

13   someone comes in to this courtroom and says it's raining

14   outside, like last week.  Okay.  That's direct evidence.

15   Circumstantial evidence is when that person comes in,

16   doesn't say anything, he or she's got an umbrella and it's

17   wet.  You can deduct from that that, in fact, it's raining

18   outside.  That's circumstantial evidence.  Like a

19   fingerprint in a murder case or like in that Waterloo case,

20   painting on the walls, that type of thing, and you have an

21   expert connect up that that was by him, that type thing.

22   Rarely, rarely, rarely do you have someone like Warden

23   Robert coming in here in front of you saying, *I confess, I*

24   *discriminated against Betty Cook because of her age.*  I

25   never heard of that.  We will probably never see that.  So

                    Plaintiff's Closing Argument

1    that's why we have to rely on circumstantial evidence,

2    although in this case there are several instances where

3    Ann Casey made statements about retirement to my client, and

4    you can interpret those as direct evidence.

5            I think as we all know, use our common sense, it's

6    circumstantial evidence here.  No one in his right mind is

7    going to send out an e-mail that says, because Betty is

8    black we're going to fire her, or because she's a female

9    we're going to fire her, or because of her age we're going

10   to get rid of her.  That never happens, so it's always

11   circumstantial evidence, which to me sometimes is even more

12   reliable than direct evidence.  Direct evidence is he said,

13   she said type thing.

14           Let's talk about this person that comes into this

15   courtroom with an umbrella.  Relat it to our facts.  First

16   of all, we have every single older employee, every single

17   one has gone, has left.  You can interpret that any way you

18   want.  I suggest that might be the pattern, but that's up to

19   you.

20           In fact, if we look at the final result, the final

21   result is this:  At the bottom, these are all the older

22   employees that are gone:  Landreth, Sanner, Alemond,

23   Loepker, Ballantini, Keck, and Cook.  One exception, Keck --

24   or Cagle I think her name now is, was a year younger than

25   Feazel, but all the rest are gone.  Who are we left with in

                    Plaintiff's Closing Argument

1    June of 2008?  It's amazing.  Gina Feazel, Bart Toennies,

2    Burton, Risse.  Those are their ages.  Is that a

3    coincidence?  Is that a coincidence or is that a pattern?  I

4    leave that up to you.

5          So at least you got a person coming into the

6    courtroom and he or she's got an umbrella.  We find out from

7    those older people, well -- and I think there was one --

8    Mrs. Cagle testified, *I felt harrassed.*  Al Sanner, the

9    gray-haired gentleman with neat cropped hair and glasses

10   testified that, *Yeah, I did have a feeling they were trying*

11   *to push us out.*  You had the instance where the one lady

12   came in with a drink and she's disciplined for that.  When

13   she protested that they were going to -- she was going to

14   get disciplined for something else.  Her evaluation was

15   reduced.  You had the one person that went to --

16   Mrs. Loepker went to a seminar and came back.  Criticized

17   for going to a seminar, going out of chain of command.  Now,

18   they were -- in fairness, they were asked, *Do you think this*

19   *was because of age, whatever?*  They didn't think so.  Okay.

20   But maybe they didn't look at the whole pattern.  And I'll

21   leave that up to you.

22          Now, okay, so we got the umbrella.  Comes in, maybe

23   there's a little water on it.  Then you have Gina Feazel.

24   *Were you ever disciplined like this, harrassed?*  No.

25   Bart Toennies.  You know, his evaluation became perfect once

Plaintiff's Closing Argument

 1    he came to Centralia.  So this may be a little more wetness

 2    on that umbrella when this person comes in.  Sena Landreth,

 3    what happened to her?  She was the fragile lady that

 4    testified -- maybe I'm wrong paraphrasing her, but she was

 5    absolutely destroyed when she was taken out of her job that

 6    she had been doing for 20 years.  Deb Brink, you know, she

 7    died, and they say it's easy to testify to what a dead

 8    person was actually doing.  She was stressed out too.  She

 9    was crying during the day like all the other women except

10    for Gina Feazel.  Bart Toennies, the warden tried to get him

11    in early.  Remember that?  When my client first became a

12    counselor, he says, *I can switch you*, and that was actually

13    wrong, illegal.  He couldn't have done that.  But you know

14    what?  This is the State of Illinois.  I'll bet you they do

15    it all the time.  And then when he finally gets in, he gets

16    in a month early and bypasses another lady that's trying to

17    get the job.  So what kind of circumstantial evidence do we

18    have now?  And then we have, during this whole period when

19    my client's there, not a single supervisor's position is

20    posted.  And then after she leaves, it's posted not once but

21    twice and in fact filled.

22          Every other place had supervisors.  In fact,

23    Lawrence not only had one case work supervisor; it had five.

24    And then the other circumstantial evidence is, before Betty

25    got to counseling she worked for 28 years without a single

Plaintiff's Closing Argument

 1    discipline.  How many people work 28 years at the same job?

 2    You know, 10 years without -- five years without discipline

 3    would be miraculous, but 28.  And she didn't have a single

 4    bad evaluation for 28 years.  Can you imagine that?  That's

 5    how old my oldest daughter is, 28 years of age.

 6          And then in opening statement the defendant says as

 7    follows:  They said, well, she struggled.  She struggled as

 8    being a counselor.  But you know what?  When my client went

 9    into counseling, compare to Gina Feazel.  She had no

10    significant TA.  What's that?  Temporary assignment.  In

11    other words, before she became a counselor she was only in

12    there for 90 days doing grievances for the inmates, no other

13    job.  Gina Feazel was -- to the contrary, she was

14    experienced.  When my client was there she had no supervisor

15    to train her, and then she was immediately given a high

16    number of inmates and Gina Feazel wasn't.  And then my

17    client admitted, because during the first two years in a

18    situation where there's low counselors, high inmates, no

19    supervisors, that she struggled.  In fact, when she got in

20    the counseling department she didn't know what the word

21    "mittimus" meant, which means bring forth the inmate.

22          Al Sanner testified, Mr. Risse testified that the

23    first two years -- it takes two years to become competent

24    normally.  Here they were short-staffed, which would have

25    made it worse.  And then Ann Casey, in her first one-year

                    Plaintiff's Closing Argument

 1    evaluation of my client, she gave her a good evaluation.

 2    That's Ann Casey.  Assistant Warden Bates, the bald

 3    gentleman that testified, the young man testified that she

 4    didn't struggle.  He gave her good evaluations.  She was

 5    loyal, she worked hard.  And then you have the October 5,

 6    2005 memo from Casey where she testified in the memo she

 7    indicated that my client -- it was a compliment.  She said,

 8    *Thanks for the information.  I want to command* -- I guess

 9    it's "commend" -- *all of you for working so hard to get the*

10    *transfers complete on such notice.  And thank you, Betty,*

11    *for your extra efforts*.  And this is October 2nd, 2006, two

12    months before the 30-year pinning and things changed.

13          In December of '06 -- so at this point,

14    circumstantial evidence, we have the person coming in, the

15    umbrella, and I think at this point we got water all over

16    the umbrella.  So you might be thinking, you know, maybe

17    this is discrimination.  In December of '06, Ann Casey

18    realizes, almost like a lightbulb going on, *Hey, in August*

19    *you're going to be retiring*.  Betty says, *I didn't say I'd*

20    *retire*.  From that point in time on, Betty is discriminated

21    against; not once, not twice, but over 25 different

22    occasions.

23          Let me back up.  In February of '06 she was

24    disciplined for abandoning a post.  This had to be expunged

25    later on.  But that was before the December '06.  So I

                     Plaintiff's Closing Argument

1   really don't think that was discrimination at that point; I

2   think it was just because Betty had been asked by the union

3   president to go into the warden's office.  And perhaps they

4   were mad at the union president, I don't know.  December of

5   '06, you have the conversation with Casey where you talk

6   about the 30-year pinning and whether she's going to retire

7   or not.  And these, you know, may be little things.

8          In January she brings Betty in and Casey basically

9   reams her in her oral evaluation.  And then there's a radio

10  talk where she's, you know, criticizing Betty over the

11  radio.  Everyone can hear it.  And then Casey, on

12  January 4th, refuses to let Betty train Deb Brink.  Well,

13  you know, maybe that's not a big thing, but I ask you to put

14  everything together.

15         In January of 2007, she starts following Betty, and

16  Warden Flagg starts -- Assistant Warden Flagg starts doing

17  that.  Makes Betty keep a log of what she's doing,

18  everything during the day.  In March, Casey makes another

19  statement about her retirement.  Gina Feazel makes

20  statements.  Now, I couldn't get into what those statements

21  were because that was hearsay.  On March 12th, 2007, Casey

22  violates her promise to promote or pay Betty for the

23  Counselor III duties.  A year ago previous to that she gave

24  Betty Counselor III job duties -- not all of them -- told

25  her that, you know, it will be posted, you'll get the job,

Plaintiff's Closing Argument

 1   you'll get paid.  All of a sudden she reneges on that.  And

 2   then March 27th, Casey insults Betty in the office,

 3   basically, *I'll show you who the boss is*.  And then the

 4   discipline begins.

 5        The CHAMPS entry where Betty is given an oral

 6   reprimand by Casey, which should have been it.  You know,

 7   all these disciplines are all discretionary.  As Al Sanner

 8   said, *We make millions of mistakes*.  As Brandon Risse says,

 9   *We make millions of mistakes*.  What they do in the State of

10   Illinois, if they want to get you, they can pick out

11   anything you do.  And in this CHAMPS system where she talks

12   about what, you know, this guy is -- who do you think he is?

13   He's a hundred pounds wet.  You know, whose ass is he going

14   to kick?  You know, when you counsel these people --

15   murderers, robbers -- you're supposed to get down and talk

16   to them, and the CHAMPS manual says you're supposed to

17   document objectively everything that is said and done.  And

18   she did that.  And you'll note that in her CHAMPS entries

19   like three times as big as every single entry every other

20   counselor made.  It's big.

21        And that defendant, that inmate, he was, in fact,

22   big time punk in the prison and he was being -- because of

23   his big mouth he was being moved to a higher restriction

24   prison; not just a medium, but he was going up because of

25   his mistakes, and she's trying to tell him, cut it out.  And

Plaintiff's Closing Argument

1    she should be talking to him that way and she should be

2    documenting that way because in the next prison they want to

3    know about it, counselors, correctional officers.  And she

4    was dog the right thing.  Maybe she was doing too much of a

5    right thing, doing too much, documenting too much.  Maybe

6    she should have just put a one-liner in like the other

7    counselors.

8          And what do we have after that?  After disciplining

9    her, a week later she disciplines her again for the same

10   CHAMPS entry with a written write-up.  Then she has to have

11   disciplinary hearings.  She's refused one hour preparation

12   time.  A disciplinary hearing is like a trial like this,

13   only smaller.  There's a lot of stress involved.  May 3rd

14   she's given a written reprimand for not seeing -- or not

15   having documented inmates within 90 days.  She's got four,

16   500 inmates she's supposed to see in 90 days, plus her

17   regular jobs.

18         And then the unilateral vacation change.  Casey

19   says, *I'm taking vacation away from you*.  Then on May 17,

20   2007, she's removed from the receiving unit.  May 21st,

21   she's given a one-year evaluation by -- finally by Casey,

22   which is very poor, it's four months late, and because of

23   all the mistakes by Casey, it's finally expunged.  May 22nd,

24   she's disciplined for allowing a victim to come in.  Well,

25   the problem is, she didn't have access to the victim or the

Plaintiff's Closing Argument

1    victim's name in the paperwork that she was given.

2    May 22nd, she's disciplined for not classifying inmates

3    properly.  These are later dropped.  May 24th, Flagg and

4    Casey berate plaintiff about the transfer of an inmate.

5    May 31st, 5-minute late discipline.  May 31st, quarterly

6    leave evaluation done at the wrong time.  June 1st, two

7    employee review hearings take place for not completing

8    paperwork and allowing a crime victim to see an inmate.

9    June 7th, Betty called into the personnel office, given

10   paperwork to sign for a one-day suspension.  June 11th, the

11   one-day suspension.  I could go on and on and on.

12          How does she get her work done?  She's in the

13   office so much -- she's like a student at school, she's in

14   the principal's office so much, she can't study.  Can you

15   imagine the pressure she's on?  And look at all these

16   things.  June 14th, June 19th, she's off for three days,

17   25th.  Then she's written up the day she gets back.  Chain

18   of command falsifying documents, and these all surround that

19   one discipline going back.  And in fact, remember what

20   Michelle Taphorn testified.  She said, with respect to these

21   disciplines, *I don't know why she was trying to get the*

22   *dates fixed when she'd already been disciplined*.  It just

23   doesn't make sense.  Why the heck would you discipline her

24   three times for the same thing?  And that's what they were

25   doing.  And even Michelle Taphorn knew.  How stupid is this?

                    Plaintiff's Closing Argument

1    Why is she doing it?  You know why she's doing it?  Because

2    she's got to correct it for future audits.  She wouldn't be

3    in trouble again.  She shouldn't have done it.  You know,

4    Betty, you should not have even done it.

5           And then you have the other disciplines that take

6    place.  And Betty did file harassment charges against

7    Ann Casey but the Illinois Department of Corrections didn't

8    do a thing with it.  She returns from vacation July 17th,

9    has a whole new assignment.  July 25th, she has to have

10   another trial.  July 27th, Flagg gives her a quarterly

11   review.  August 17th, she's called into Flagg's office,

12   given another five-day suspension.  Finally she's off for

13   five days, and on August 20th her medical provider says,

14   take time off.  While she's off she's given another 10-day

15   suspension.  She can't even leave the place without getting

16   suspended.

17          Returns on November 14th from sick leave, receives

18   a new assignment, and she goes back to her old job that

19   Casey took her away from.  Then on November 29th, management

20   offers to expunge her record if she would voluntarily

21   retire.  And then on May 12th, 2008, they attempt to change

22   Betty's work assignment once again because of problems with

23   younger, less senior counselors Feazel and Risse.  Why is

24   she penalized?  Why aren't they disciplined?  Just, you

25   know, slap them on the wrist.  Do something.

                    Plaintiff's Closing Argument

```
 1            Compare this to Gina Feazel and Bart Toennies, the
 2   younger employees.  They weren't disciplined, they weren't
 3   subject to the tirades, they weren't subjected to bad
 4   evaluations.  In fact, Bart Toennies had a perfect record
 5   when he came over for the first time to Centralia.
 6   Gina Feazel had special treatment, access to the warden's
 7   office, both of them; special jobs, supervisory capacity
 8   where she could catch other people doing something wrong and
 9   report it to people -- to the wardens.  And there's no
10   question they had less inmates, less assignment changes.
11   There's no question.  That's corroborated and it's unrefuted
12   by the defendant.  And the end result, we all know.  When my
13   client's gone, Gina Feazel's left there, Bart Toennies is
14   left there.

15            I want to talk about constructive discharge.  She
16   retired in May of 2008.  I'm sure they're going to say,
17   well, the conditions weren't intolerable at that point.  But
18   can you imagine someone going through what she went through?
19   There's two aspects as to what she went through.  First is
20   the physical:  Increased blood pressure, migraine headaches.
21   If any of you know about migraine headaches, you know it's
22   not like a sinus headache.  They can be debilitating.  High
23   blood pressure.  We're supposed to keep our blood pressure
24   down.  You know why?  Can lead to stroke, heart problems.
25   You know, I'm not saying she could have died but she could
```

Plaintiff's Closing Argument

1   have.  Two or three years ago we went through an economic

2   crisis and we're still going through it.  You hear about

3   people, men in New York City jumping off skyscrapers because

4   of the stress they were going through at work.  That's what

5   the emotional can do to you.  And that's what she had.  You

6   know, the physical -- blood pressure, migraines -- you know,

7   that can hurt you for the rest of your life physically, but

8   the emotional is even worse, depression, anxiety.  I don't

9   know if you've ever known someone that's been depressed.

10  It's like when you get up in the morning it's like a wet

11  blanket over you.  You don't want to get up.  You want to

12  stay there in a fetal position.  I mean life is useless.  It

13  would be better to be not living when you're depressed.

14  That's how people commit suicide.  People wonder that.

15  People don't commit suicide normally.  It's because they are

16  depressed and have anxiety, panic attacks, and then when you

17  get the medications.  If you don't have the medications

18  right you can be just as bad out.  You got to get the Paxil,

19  Celexa, whatever, the right mixture, the right cocktail to

20  change your frame of mind.  And people, it is a severe thing

21  in America today, and that's what she was going through.

22          You think I'm exaggerating?  Think about what she

23  went through.  When you go back in the deliberation room,

24  just for five seconds think about what Betty went through,

25  and then four months later she's still on medication, or

Plaintiff's Closing Argument

1   five months later, and they start to do it again.  I don't

2   know why Betty came back to work after that sick leave.  She

3   could have gone on retirement.  I'll tell you why she came

4   back.  This is America and you have a right to work even if

5   you're at retirement age.  And no one, not even Brad Robert,

6   not even the people in Springfield have a right to tell you

7   that you got to retire, that you got to quit.  This is a

8   very neat chance for you to make a decision to do something

9   that's right, that's good.

10          The verdict forms, I want to talk to you about them

11   real quickly.  And I'm sorry to take up so much of your

12   time.  The judge has already read this to you.  It may be a

13   little confusing.  The first -- there are actually two

14   issues.  The first one, first paragraph, if you find that

15   Betty was discriminated based upon her age, approaching 50,

16   becoming 50, you can find for her and against the defendant.

17   Okay.  The second one is if they willfully violated this

18   law.  And willful violation, you're instructed earlier, this

19   doesn't mean you have to intentionally violate it.  It can

20   mean just being indifferent to the law.  I'm going to ask

21   you and suggest to you that you find in favor of Betty on

22   this Verdict Form A and sign this.  And also, not only for

23   this first paragraph, but also check "yes" concerning the

24   willful violation because there's no question Warden Robert,

25   Ann Casey, they've all been taught the federal law on

Plaintiff's Closing Argument

1  discrimination.  That's why they're not stupid to come in

2  here or on e-mail, say anything about age or race or sex or

3  anything like that.

4       And then after this verdict form, you're given --

5  this is a little unusual, but some questions to ask where

6  you're to say yes or no.  These are the various things that

7  she went through.  And you can say yes, no, whatever, but

8  each one's a different subject.  First of all, whether she

9  should have been promoted.  Secondly, whether she should

10  have gotten the pay even if she wasn't promoted to the

11  Counselor III.

12       The next is about the CHAMPS entry.  And you know

13  what?  It's not about whether -- I could argue she was

14  guilty of all of the disciplines, but the question is

15  whether they should have even disciplined her or charged her

16  in the beginning.  That's discrimination.  They can use

17  anything they want to manipulate to pick on someone but I

18  suggest that she wasn't guilty of anything of these things.

19  In fact, most of the charges, if it wasn't for the union

20  failing to grieve timely on them, they would have all been

21  reduced or expunged.  And there's more of them.  And then

22  Verdict Form B -- so I'm asking to you put down "yes" for

23  each one of those.

24       Then Verdict Form B is the constructive discharge.

25  This is where the conditions were so intolerable.  And I

Plaintiff's Closing Argument

1    think and I've stressed that the physical, the mental -- if

2    a reasonable person was gone -- had gone through what she

3    had gone through, and if she's placed in this position to

4    once again -- you know, her nurse practitioner, I know she's

5    not an internist but sometimes nurse practitioners can be

6    just as good as a family doctor.  You know, even she

7    recommended: *Don't go back to work.  Betty, it would have*

8    *been stupid to stay working there.  You know, your health --*

9    *life is short.  Your mental health, your physical health are*

10   *more important than anything.*

11        Credibility, you can judge the people that have

12   testified as to who's telling the truth or who's not telling

13   the truth.  As it says in the New Testament when Christ was

14   talking about -- trust me, I'm not perfect or holy, all

15   that.  This is an example.  Didn't want you taking oaths

16   because back then people were saying stuff, by Zeus or by

17   Apollo or by God, this is hows it is.  People were so

18   flippant with their statements.  They were lying a lot.  And

19   God said, he said, *Let your yes be yes and your no be no.*

20   No matter where you are, tell the truth.  And you don't need

21   to be under oath to do that.

22        Think about this courtroom and all the courtrooms.

23   People testifying and they don't care about the oath.  They

24   could care less.  They will say anything and everything to

25   get their point to you.  I'm suggesting that that man back

Plaintiff's Closing Argument

1   there wasn't truthful, Ann Casey wasn't truthful,

2   Gina Feazel wasn't truthful.  And there was a kid who came

3   in here who had a lot of gumption.  Mr. Risse.  And he was

4   bold and he was -- maybe he was too strong, but you know

5   what, I don't blame him for being mad.  He says he's against

6   these people and he gets disciplined.  He's forced to talk.

7   He doesn't want to be here.  He's forced to come down and

8   talk to these people by his warden.  After he talks to them

9   last week he's faced with four disciplinary hearings on his

10  desk when he gets back.  That's ridiculous.  And they're

11  bogus, for socializing.  He's having social things with

12  inmates or something?  That's a documentary, movie, approved

13  by his higher ups.  How would they know about that?  How

14  would these folks know about that?  That has not even

15  entered his personnel file yet.

16       Let me suggest how they know about it.  Warden

17  Robert and his buddy foreman over at Lawrence correctional

18  facility where Mr. Risse's working.  Word gets around.  Hey,

19  use this in the trial, you know, make him look silly, make

20  Mr. Risse look like a liar, like he's got an ax to grind.

21  Ask her, when she gets up here, Where did you get that?  It

22  wasn't in his personnel file.  Who gave it to you?

23       I would ask that you please consider, and I suggest

24  to you, find in favor of Betty.  Please stand by your

25  convictions.  She did.  Thank you.

Plaintiff's Closing Argument

1      *THE COURT:*  Thanks, Mr. Falb.  Ms. Choate?

2                    **DEFENDANT'S CLOSING ARGUMENT**

3      *MS. CHOATE:*  Get all my paraphernalia set up here.

4           Joanna told you in her opening that you have to

5      keep two questions in mind.  One of those is:  *Could*

6      *Betty Cook perform her duties?*  And the other question she

7      wanted you to keep in mind was:  *What was her intent*

8      *regarding retirement?*  And the reason she asked you to keep

9      those questions in mind is because they go to -- the

10     instructions, or your Bible, if you will, for this case are

11     these instructions, and those questions will help you answer

12     the ultimate question in this case.

13          As Mr. Falb told you, you can have two different

14     ways of proving discrimination.  One is direct and one is

15     indirect.  And he said, *Well, they're not going to come in*

16     *here and tell you that they discriminated against her*

17     *because of age.*  Well, of course not, because that's not

18     what happened, so of course they're not going to come tell

19     you that.  So you have to look at other ways of proving it.

20     And another way is to show that other people who are the

21     same as Betty in every other respect, except not in this

22     class of people 40 and over, that they were treated better.

23     And we would submit to you that Betty cannot prove that.

24     People younger than 40 -- they've been pointing out Bart and

25     Gina -- didn't do the same things.  People over 40 were also

1    disciplined, people under 40 were disciplined.  Look at

2    Cindy Keck, or Cagle.  I messed up her maiden name, which

3    was kind of embarrassing for her.  She was younger than

4    Betty and she was disciplined.  She can find no other

5    person, as we call them, similarly situated to herself who

6    was treated better.

7            Counsel's right about Centralia in 2004.  If you

8    recall the testimony, prior to that, as a cost-saving, they

9    had given folks the opportunity to retire, and a lot of

10   people took advantage of that.  You heard Al Sanner and

11   Terri talk about how that just kind of decimated their

12   counseling department.  People got out when they could.  And

13   DOC has an enhanced retirement, so they get a better level

14   of retirement than other state employees.  Bunch of them

15   could retire in '02, '03, and they did.

16           Betty comes along at a time when they were

17   short-staffed, which is interesting about their theory that

18   we have to move Betty out because we need to make room for

19   people.  They were shorthanded the entire time Betty was

20   there.  They were short-staffed.  They did not need to be

21   moving people out to make room for their cronies, as

22   Mr. Falb wants to allege.  They were short-staffed the whole

23   time.  It hurt them when people left because there were not

24   enough people to do all the work.

25           But Centralia in 2004 through 2008 was a stressful

Defendant's Closing Argument

 1   place.  Everybody said that.  Everybody said they were

 2   overworked, they had big caseloads.  Betty wants you to

 3   believe that she had a bigger caseload than everyone else

 4   while she was there, and that's not true.  You heard the

 5   testimony of the other counselors.  Some of them had more

 6   actual inmates that they were just seeing inmates.  If they

 7   had receiving or healthcare or seg, they might have less of

 8   a regular housing unit amount of inmates, so it evened out.

 9   But they all had big caseloads, no one is disputing that.

10        Centralia, in 2004, and then 2005, 2006, had

11   Ann Casey.  That made it even more stressful for everybody.

12   Nobody here -- perhaps Bart didn't say he had problem with

13   her, but most of the rest of them all did.  Al,

14   Terri Loepker, Cindy Cagle.  Cindy Cagle really had a

15   problem with her, if you recall.  But they all told you --

16   except for Betty, they all told you had nothing to do with

17   age; it's just the way she was.

18        First question we asked, could Betty perform her

19   duties in this environment she was in?  And we would submit

20   to you that she could not, she did not do a good job.

21   Nobody here has said or is trying to claim that Betty wasn't

22   a good secretary for all those years.  We have not brought

23   anyone here to say, oh, she sucked as a secretary, she

24   sucked as a counselor, she just was terrible.  We're not

25   saying she wasn't a good secretary.  Most likely she was.

Defendant's Closing Argument

 1          Interesting that she claims she doesn't know what

 2    an inmate mittimus is after working in Pontiac and doing all

 3    this extra stuff and working in Centralia for the major.

 4    Whatever.  That's her testimony.  Nobody is claiming she was

 5    not a good secretary.  However, when she moved into that

 6    counseling job she could not keep up.  She could not do it.

 7          If you recall from plaintiff's opening, he said --

 8    or Mr. Falb's opening, he said that people who are still

 9    employed would have a reason to lie.  Okay.  Well,

10    Mr. Sanner's not employed there any more.  Mr. Sanner didn't

11    have any great love for the department at the time he left.

12    Remember, he said, *You know, I just had to get out.  My core*

13    *people were leaving.*  He didn't like the way things were

14    going.  He didn't like Ann Casey.  So he retired.  He said,

15    *I wasn't pushed out.*  He chose to retire.

16          The other counselors that had worked with him were

17    his core group, which didn't include Betty, by the way.

18    They all got promoted into parole.  Al Sanner said that

19    Betty struggled in the position.  He said as a counselor she

20    was weak.  He said she was not a part of the core group of

21    good counselors.  And if you recall, I specifically asked

22    him, talked about this core group of counselors that had

23    been doing this job with very little supervision for a long

24    time.  And I said, *Well, was Betty part of that?*  No, she

25    wasn't.

                    Defendant's Closing Argument

1          Terri Loepker, who was also there, had been a

2     longtime person, part of that core group, if you recall, she

3     testified that she did one of Betty's first evaluations as a

4     counselor.  She actually did the comments, and then

5     Al Wisely, who was the assistant warden prior to Ann Casey,

6     signed off on it.  Betty was having problems.  Betty wasn't

7     keeping up.  Terri told you that.  She said she thought she

8     needed more time to certify because she wasn't ready.  And

9     she said she tried to help Betty.  In fact, all the people

10    there in the counseling department helped to try and train

11    Betty, but if you recall Cindy's testimony, you know, we

12    would talk about something in the counseling office, which

13    is just one kind of small room and they all sit around, and

14    then a day or week later she would have no clue that that

15    had ever been said.  She wasn't retaining anything that was

16    being taught to her about the counseling job.

17          Terri said she had a hard time retaining info.

18    Terri said she was not a good counselor, she struggled, she

19    really did.  And neither of those two -- Al, Terri --

20    neither of them worked for warden.  Terri's still a parole

21    agent.  But you judge:  Was she in here under duress?  Did

22    she look to you like she wasn't telling the truth?  They all

23    criticized the department as far as Ann Casey goes.

24          Sena Landreth.  Now, Sena's interesting because

25    Sena was a friend, held up as someone who was treated

Defendant's Closing Argument

1    terribly just like Betty.  And one thing that Counsel said
2    that was not true during his closing was he said at one
3    point Gina, instead of Betty, was supposed to be training
4    Deb.  On cross Betty admitted that, no, it was Sena who was
5    training Deb Brink, not Gina.  But Sena doing it wouldn't
6    feed too much into their theory that it's all about Gina and
7    all about Bart.  No, they had Sena, who had been a counselor
8    for a matter of time, and then if you recall was in field
9    services for 20 years.  Sena was upset, obviously, because
10   she got taken out of field services because she made a
11   mistake that Gina had to fix because Gina was the only one
12   there to get the call.  So Sena's put back in counseling.
13   Sena's not happy.  But as Sena told you, *I buckled in, tried*
14   *to do the job and tried to prove her wrong*.  And every one
15   of these counselors that came up here said Sena was a good
16   counselor.  No one has said Sena wasn't good, Sena wasn't
17   doing what she could do.  Sena was a good counselor.

18        But when asked if Betty was a good counselor, she
19   said, *Not really*.  She said she was a hard worker, and
20   that's -- no one said Betty's not a hard worker.  She's a
21   hard worker.  But she had a hard time prioritizing,
22   organizing and staying on top of it.  That's what Sena, her
23   friend, said.  Sena didn't feel like she was pushed out
24   because of her age.  Sena doesn't feel like she was
25   discriminated because of age.  I believe Sena's older than

Defendant's Closing Argument

1    Betty.

2            Cindy Cagle, the blond girl who was here, I believe

3    on Thursday or Friday, she was -- on Friday.  She said Betty

4    struggled.  She said she's the one that talked about

5    figuring something out as a group and Betty not remembering

6    it, not being able to retain what had been discussed.  Betty

7    was not performing the job like she should have.  Ann Casey

8    recognized that, Terri Loepker recognized that, all the

9    other counselors recognized that.  And prior to 2007, Betty

10   was given quite a few chances.  She got a memo from Ann

11   talking about, you know, *You need to start seeing your*

12   *people.  You're falling behind*.  Other people had tried to

13   help Betty, but Betty didn't get it.  So in '07, three years

14   after she started this job, she's still not doing it

15   correctly.  So the answer to the first question is, no,

16   Betty wasn't able to handle the job as a counselor.

17            Now, she's talked about specifics, and those are on

18   the jury instructions, and I've kind of marked them up a

19   little, but just so you can see -- instead of me pointing

20   all the time, you can kind of see where I'm going with this.

21   In her case -- and these are the only things she's talked

22   about here that are before you as far as discriminatory

23   acts.  Counsel talked to you also about the case work

24   supervisor jobs, these other jobs that were automatically

25   filled when Betty left.  That's not before you.  And they

Defendant's Closing Argument

     1    weren't automatically filled; they were filled just

     2    recently, not in '08 when she left.  And those jobs wouldn't

     3    have been automatic anyway; they would have had an interview

     4    process, so they didn't need to get Betty out for that.

     5         The Counselor III job though was one that was

     6    raised and one that's before you.  What did you hear about

     7    the Counselor III job?  Well, Al Sanner had it.  He was

     8    Counselor III, and in fact, he took the Counselor III

     9    because he was told, you know, *We may not fill the case work*

    10    *supervisor jobs*, which is the one he wanted, and you know,

    11    to take a sure thing, which would have been an automatic

    12    promotion for him.  He went ahead and said, *Okay, I'm going*

    13    *to take the chance.*  He took the III, which turned out to be

    14    a good thing because the other supervisor positions weren't

    15    filled.  So he did get the Counselor III job, which he

    16    worked in for quite a while.

    17         Prior to Al leaving, you heard Warden Robert talk,

    18    there was no allocation.  They had to get rid of so many

    19    positions, and what they did was they cut out middle

    20    management.  They cut out some of those positions right in

    21    the center.  They cut out some supervisory positions.  They

    22    had to cut down.  He was given a number.  Al was getting

    23    ready to retire.  That was one that once he retired at some

    24    point they wouldn't have to fill it.  They could

    25    automatically have that one as one that's not allocated, and

                         Defendant's Closing Argument

1    it wasn't allocated.  Nothing to do with Betty, nothing to

2    do with age.  It was a position that wasn't absolutely

3    necessary.  So nobody got that job.  To this day nobody has

4    gotten that job because it's never been posted.  Their

5    theory that, *Well, as soon as they got Betty out, we'll just*

6    *fill that job*, never happened.  It never happened.

7         She's also wanting to know why she didn't get the

8    pay.  Must have been because of her age.  *Why didn't I get*

9    *this TA pay?*  You heard Gina talk about when Ann came in and

10   they were trying to figure out what to do with some of these

11   jobs, duties.  Ann said that they did -- they checked to

12   make sure that the duties that they were having people fill

13   for Al were within the Counselor I and II job duties, and

14   they figured out that, yes, they were, so it was okay for

15   these folks in the other ranks to take those duties on.  And

16   they asked -- they said, you know, *Most likely it's not*

17   *going to be posted.  Most likely there's not going to be any*

18   *pay for this.*  Betty said, *Well, I want to go home and talk*

19   *to my husband*, and she came back and said, *Well, I'll do it.*

20   Why did she want to do it?  Maybe she -- as she told you,

21   she didn't expect pay.  She hoped.  Those were her words, *I*

22   *hoped there would be*.  But there never was.  And the fact

23   that she hoped and something didn't come to pass has nothing

24   to do with her age.  Again, the job was not allocated, the

25   money was not allocated for that position.


Defendant's Closing Argument

1          And also prior to this she talked to you -- or

2     Mr. Falb talked to you about abandoning post in '06.

3     Remember that?  He said that it was expunged.  Well, it

4     really wasn't.  She was found guilty, and per the union

5     contract, after so many years it drops off.  So it's not

6     like someone went back and said, *Oh, yeah, we know she*

7     *didn't do it.  Let's expunge this*.  It was an automatic

8     thing through the union and the union contract.  So to an

9     extent that's expunged, it's not on her record any more, but

10    no one ever decided that she wasn't guilty of it.

11         The next discipline you're asked to look at is

12    No. 3, and it is the inappropriate CHAMPS entry.  I'm not

13    going to read that to you.  You guys will have it back

14    there.  You read it.  And you've heard other people say it's

15    not appropriate to put those kind of statements in CHAMPS.

16    CHAMPS is like a chronology of what happened; you know, what

17    was your contact with this person?  She admitted she could

18    have said, yes, he made threatening comments or he was

19    inappropriate.  You don't have to curse specifically when

20    it's what you're doing.  You know, I told him bleep, bleep,

21    bleep, bleep, bleep, bleep.  That is not professional.  That

22    is not the way to put in a document that can be viewed by

23    anybody and that could be used in court.  It's not

24    professional, it's not appropriate.  She was found guilty of

25    that and she was guilty of that.


                    Defendant's Closing Argument

1          Mr. Falb told you to not leave your common sense at

2     home, you need to bring it.  And we agree with that,

3     absolutely.  We also agree and think that you don't have to

4     leave your brains at home.  And we're asking you to use both

5     here.  This is not appropriate.  Her CHAMPS entry was bad.

6     Now, she claimed -- remember, if you recall, she claimed

7     that, *I talked to the other counselors about it*.  Well, if

8     she talked to the other counselors about it, (a) why didn't

9     she put it in her rebuttal to the Employee Review Board?

10    Why didn't she say, *Well, the other counselors said this was*

11    *appropriate*?  But it's not appropriate, and you can see that

12    because the other counselors don't put those kind of entries

13    in there.  She never talked to anybody.  That's just what

14    she told you.  And she said why she didn't put it in her

15    Employee Review Board packet, oversight.  It was an

16    oversight.  She puts everything else in there but not the

17    fact that she consulted with more senior people.  It was an

18    oversight.

19         The 90-day contract -- contacts, she didn't make

20    them.  She couldn't prove she made them.  So whether you

21    believe her when she said, *Oh, yeah, I made them all.  I*

22    *just didn't put it in CHAMPS.  I just didn't sit down for*

23    *that, you know, 15 minutes or 20 minutes at the end of the*

24    *day and said, you know, saw him, problems with distraught*

25    *wife, saw him, wants more* -- whatever.  She didn't do that.

Defendant's Closing Argument

1  She could not prove she did it.  She wants you to take her

2  word, *Oh, I did it.  I did the contacts.*  But if you look at

3  the things -- and the 90-day contacts thing does -- it's the

4  same -- starting of the same behavior with the chain of

5  command issue going to Deb Gordon in Springfield.  The chain

6  of command issue and the falsifying.  And I'm not going over

7  that either because Joanna went over that in detail with

8  Ms. Cook during her cross-examination, and her excuses

9  didn't add up, the dates didn't add up.  When she said, in

10  her Employee Review Board packet, she saw these people

11  because she was in the cellhouse those days, the dates she

12  wanted to change it to didn't add up.  You can look at all

13  that.  You'll have that back there with you.  She didn't

14  make the entries, she didn't see her contacts within 90

15  days, and she was found guilty of that except for with one

16  person.

17      The next one is her visitor list approval of Inmate

18  Williams.  When you get back you can look at Inmate

19  Williams.  She approved the list.  Her excuse for that was

20  the document showing who the victim was wasn't in the file,

21  and she said here to you, under oath, *I asked.  I asked the*

22  *record office to find that.  I asked the record office if*

23  *there was a victim, who that was.*  Go back there and look at

24  her Employee Review Board explanations.  She's blaming the

25  record office.  You know, the record office, it's their job,

Defendant's Closing Argument

 1   their job to have this document in here.  And the document

 2   that shows the victim, if you look, it's faxed.  It was

 3   prior to the time that she approved this list.  She's trying

 4   the claim it wasn't because it was -- it wasn't filed.  Fact

 5   is, she didn't ask anybody.  She didn't say, *Hey, could you*

 6   *guys run through and see if there's something to be filed*

 7   *for this guy, you know, domestic battery, probably there's a*

 8   *victim out there somewhere, somebody in his household.*  She

 9   didn't do that and she never told anybody else that until

10   she got here.  Then she said, *Oops.  It was an oversight*

11   *again*.

12         Going outside the chain of command is when she was

13   trying to fix things.  She wanted to get it fixed to

14   represent it as -- well, what she told you was to represent

15   what she actually did, which doesn't make sense.  If you

16   look at the exhibits regarding that, sometimes she said she

17   saw them a certain day, she went to the cellhouse, but

18   that's not when she's asking them to be changed.  She called

19   Springfield, which is Deb Gordon.  She absolutely did that.

20   She is not disputing that she either called her or e-mailed

21   her, but she got in touch with this lady.  She'd had an

22   in-service just not too long prior to that talking about the

23   chain of command.  You heard why the chain of command is

24   important in a prison.  People get hurt, people can get

25   killed.  You have to know what's going on in that prison.

Defendant's Closing Argument

1   You have to go to your supervisor.  You don't get to decide

2   who you go to.  You don't get to decide, *Well, I don't want*

3   *to get Ann mad at me again,* or, *I don't want to get Warden*

4   *Robert*, or, *I don't want anybody else in my group to know.*

5   *I'm going call Deb and have her do her magic.*  Not how it

6   happens.  The fact that Deb called and told on her shows you

7   that that's not something that she should be doing.  Her

8   excuse was, everyone else did it.  All the CO's had her do

9   it.  You know what, even if that's true, which probably

10  isn't, that's no excuse.  That's no excuse for her going

11  outside the chain of command.  And the fact that she was

12  disciplined for it, it's not because she's over 40,

13  approaching 50, it's because she did it and because it's

14  serious.

15      And the same behavior -- and you heard testimony

16  that you can have different charges with the same paper, but

17  they were written up separately so at some point one of the

18  suspensions was dropped from these incidents.  Still doesn't

19  mean she didn't do it.  In fact, she did it.  She tried to

20  get Deb to falsify.  She wanted to falsify those CHAMPS

21  records.  And look over her excuses, look over what Deb

22  said, look over what she asked Deb, and you will come to

23  that conclusion I believe as well.

24      And again, when Deb -- when Betty was on cross, the

25  whole -- if you recall the whole testimony about

Defendant's Closing Argument

1    January 9th through April 9th was 90 days, and then she

2    tried to tell you, *Yes, that's 90 days, but January 12th*

3    *through April 12th, that's not -- those are different dates.*

4    I'll leave that one alone from there.

5         Now, those are the only things -- oh, and the

6    denied pay.  She was denied leave of absence pay.  You can't

7    impute that to the department because the department didn't

8    do it.  That was submitted to SERS, the State Employee

9    Retirement System.  They denied that leave of absence pay.

10   So while the State of Illinois is a defendant, it's the

11   Department of Corrections, not SERS.  There's absolutely no

12   evidence that the department had anything to do with turning

13   that down.  That was a SERS decision.

14        What other bad things -- she's trying to tell you

15   it was terrible there and it's all because of her age.  Ann

16   criticized her about the radio -- or over the radio, over

17   the whole radio incident.  Mr. Falb just talked to you about

18   that.  What did Betty tell you about the radio?  She said

19   the only reason that she left it in her office was because

20   she was going to the bathroom and at some point get laid on

21   its side and it would make this automatic alarm in the

22   armory.  And the armory is kind of the control center.  She

23   told you that because of the way that work -- because then

24   she took her radio in with her in May of '08, that very

25   thing happened.  And remember, Officer Feed comes banging on

Defendant's Closing Argument

1   the door because there was an alarm that went off?  Well,

2   first of all, you'll see the printout from the day she said.

3   And Joanna asked her specifically, *What date was that?*

4   May 12th.  You'll see the printout from May 12th.  No alarm

5   ever went off on May 12th.  In fact, as you were told by

6   Michelle Taphorn, they checked the whole month of May just

7   in case she had the date wrong.  The whole month of May,

8   none of those alarms went off.  You'll have the other

9   exhibit we showed you with Michelle Taphorn that shows what

10  happens when an alarm goes off.  Has to be turned off at the

11  source and in the armory.  Okay.  Never happened.

12      And if Ann's upset because she doesn't have a

13  radio, you know what?  There's a reason for that because

14  it's important that you have your radio with you.  If you're

15  calling an employee and they don't answer, she could have

16  been in the housing unit, she could have been in the

17  bathroom being sexually assaulted by an inmate, she could

18  have been anywhere and in trouble.  Betty knows she has to

19  keep her radio with her.  And Ann had a reason to be upset

20  if she was upset.

21      Ann didn't invite her to the pinning ceremony.

22  Every time I hear that -- I used to be a nurse and we had

23  actual pinning ceremony, so I think -- she says there used

24  to be these big celebrations when people reached these

25  milestones, and maybe at one time there were.  I know they

Defendant's Closing Argument

1    did them at the Christmas party at some point, but then they

2    stopped doing that.  Betty can't tell you anyone else at

3    that time who was actually getting her 20-year, 30-year,

4    whatever, pin, just her, because she was upset and it's

5    discriminatory because she didn't get invited to this

6    ceremony and Ann just tossed it at her, if you believe that

7    description.  Nothing to do with her age.

8            She talks about her vacation.  Heard about that in

9    closing as well.  She says that Ann Casey was going to

10   unilaterally stop her vacation in the first part of July,

11   but she never grieved it.  And she grieved everything.  She

12   never grieved it.  Never happened.  She went on her

13   vacation.  She thinks the union must have interceded

14   somehow, but she filed her grievance.  She took her

15   vacation.

16           Let's talk about Ann Casey.  Kind of the villain, I

17   think.  Ann did some good things.  Ann tried to help Betty

18   out.  Ann gave her breaks early on.  And contrary to popular

19   belief, or I think Betty's belief, Ann was not constantly

20   involved in there in that counseling department.  You heard

21   the other counselors say she was absent for long periods of

22   time and she wouldn't come around as much.  Ty Bates would

23   come in there and hang.  Ann wasn't that type.  If something

24   came to Ann's attention that wasn't going right or she

25   wanted to change, she would do that.

                    Defendant's Closing Argument

 1          Al Sanner said she was difficult to get along with.

 2     He didn't like her management style, thought she was

 3     intimidated by the knowledge of the core group.  She came

 4     into this job, really had -- she's assistant warden over

 5     half the prison, not just counseling, and she can't know

 6     everything.  But she's the type that probably couldn't

 7     admit, maybe a lot like our plaintiff here who can't admit

 8     maybe she's over her head with this job, and wanted to be

 9     the boss, was the boss, and made sure they all knew it.

10     That's what it seems that Ann Casey was about.  Al said she

11     decimated the department but he said it wasn't an age thing.

12     She was kind of an equal opportunity evil witch person.

13          Terri Loepker said the same thing.  She said the

14     caseloads were big, there was a lot of tension.  She said --

15     Terri said that Terri was not pushed to leave.  But said Ann

16     didn't understand how much work there was and she tried to

17     change everything.  Remember, Terri was over the age of 40

18     at this time, as was Al.  None of them thought it was an age

19     thing.  Terri said that Ann didn't know the value of her

20     employees.  Seems that from what Terri said right before she

21     left, she told you Ann called her in and said, *I'm sorry*

22     *you're leaving.*  She's probably -- Terri's probably thinking

23     she's in the twilight zone all of a sudden because Ann's

24     being nice to her.  Maybe Ann did realize, *I'm losing the*

25     *counselors, I'm losing the good ones.  I'm toast*, because

                    Defendant's Closing Argument

1  all these folks are leaving.  Maybe Ann had a sense that

2  maybe she had something to do with it.  Terri said it's not

3  an age thing.  Ann just didn't care who left.  She was an

4  equal opportunity bad supervisor.  Nothing to do with the

5  people she supervised or the age of the people she

6  supervised.  She said most everyone had problems with Ann

7  one time or another, not just Betty, not just the older

8  people.

9         Sena, Sena wasn't happy with Ann.  Everyone was

10  stressed out from their caseloads.  She never observed Ann

11  harass Betty or harass the counselors about their age.  And

12  that was Sena, her buddy, said that.  And she thought there

13  might have been something having to do with seniority.

14  Seniority's not age because if you look, people who are

15  younger have a lot more seniority in some cases.  Look at

16  Gina.  Gina is still the least senior person there because

17  they brought in a new person who's more senior right around

18  the same age but way more senior because Gina started in her

19  thirties.  Betty started when she was a very young woman, as

20  did Sena, as did Cindy Cagle.  Cindy Cagle left there when

21  she was in her thirties, about to hit 40.  She had a lot of

22  years.  You'll have an exhibit back there that you can look

23  at their ages and their seniority.  Seniority has nothing to

24  do with this.  But some of them thought maybe it's a

25  seniority thing, and that would tie certainly in with Al's

Defendant's Closing Argument

 1   assumption that the people who actually knew what they were

 2   doing intimidated Ann.

 3           Now, Cindy Keck, she's the interesting one because

 4   she's under 40, and she hated Ann.  Ann treated her like

 5   crap, you know.  Ann yelled at her.  She got -- Cindy got

 6   busted for bringing a Coke in, you know, soda.  Something

 7   you weren't supposed to do but everyone else was doing it.

 8   The major told her it was okay.  She did it.  She got

 9   busted.  She got in trouble.  She got a suspension.  She

10   goes to get a copy of her -- the charges, or her evaluation

11   from the desk, and Ann blew a gasket, basically made

12   Cindy Cagle feel like the worst employee ever to walk the

13   earth.  You saw Cindy, you saw how she testified.  She was

14   not an Ann Casey fan.

15           They called up Bart and Gina as the two younger

16   people who got everything, who were the favorites, who were,

17   you know, the ones who got away with it all.  Did they

18   really?  They're trying to show that these two were equal

19   with Betty in every way, that they were treated better.

20   Well, they weren't equal.  Every person on the stand who

21   talked about Betty's abilities versus Gina and Bart said

22   Gina and Bart were better, Gina and Bart were good

23   counselors.  Al was talking about how awesome Bart was.

24   Bart had been a counselor.  He was a Counselor II.  Now,

25   instead of being happy that someone with a lot of experience

Defendant's Closing Argument

1   was coming in, Betty tried to get him out.  She filed a

2   grievance.  You know, they shouldn't be bringing a

3   Counselor II in; supposed to be a Counselor I.  They needed

4   Bart.  Bart had TA'd there.  Bart hit the ground running.

5   He knew what he was doing.  Gina learned really quick.  Gina

6   started the same time as Betty.  She was on top of it.  She

7   learned what the job was.

8         Even Brandon really didn't say they were bad

9   counselors.  He doesn't like Gina, that's obvious.  That's

10  one thing that Brandon said.  And none of them -- she's

11  never shown anybody that's done the same thing she did,

12  except Deb Brink with the visitor list, but wait.  She

13  accused Gina of that.  Look at that disciplinary packet.

14  Gina didn't -- or Betty, I'm sorry, said that, *Well, wait.*

15  *Gina did that.  It was Inmate Golden.  Gina did that.*  And

16  she put all this documentation in there.  She put the

17  visitor list.  You'll see that with the warden's name.  They

18  sign on top of the warden.

19        One thing Betty didn't put in there though,

20  interestingly enough, was the CHAMPS entry for

21  Inmate Golden, which shows on the same date that the visitor

22  list was done Deb Brink made an entry saying she did the

23  visitors list.  And Betty would have known that because if

24  you look at that, you'll see that Betty made entries after

25  that.  She would have seen that.  She was just trying to get

Defendant's Closing Argument

 1    Gina in trouble.  So Betty has yet to show one person who's

 2    done the exact same things she's done that were treated

 3    better because they're under 40.

 4            Talk about Bart.  Well, Bart did all this stuff;

 5    Bart did X, Y, Z; Bart okayed a victim to live with a

 6    victim.  Did Bart do that?  The CHAMPS entry says no.  Bart

 7    said he's never been disciplined for anything.  And we asked

 8    Betty, *Well, how did you know that?*  Do you recall on cross

 9    or on this final time she testified, *How did you know that?*

10    *Well, I don't know.  It was all hearsay.*  Everything she had

11    about Bart was hearsay.  *I don't deal in hearsay.  I didn't*

12    *write a grievance because it was all hearsay.*  But she sat

13    up here in front of you under oath in federal court and

14    testified to you as if it were God's honest truth that Bart

15    did these things, that Gina did these things.  It's all

16    hearsay.  There's not one shred of evidence that Bart or

17    Gina ever did the same things that Betty Cook did but were

18    not disciplined.

19            She also said she doesn't monitor them.  I thought

20    that was interesting because apparently she does monitor

21    them.  She wrote a grievance about both of them.  There was

22    some monitoring going on.

23            *MR. FALB:*  I object.  She never wrote a grievance

24    on Bart.

25            *THE COURT:*  The jury's heard the testimony.


                        Defendant's Closing Argument

1    They'll have to make that determination.

2         *MS. CHOATE:*  She testified to you that why she

3    didn't was because she doesn't monitor them.

4         Talk about then retirement.  And this goes to the

5    constructive discharge, and the second question that Joanna

6    asked you:  What was her intent to retire?  You heard from

7    Al, you heard from Gina, you heard from Terri.  They all

8    said -- and Cindy -- she talked about retirement all the

9    time.  And who can blame her, you know?  It's awesome to

10   retire some day.  Don't know that I'll get to, but I don't

11   blame them at all, all of them for talking about it.  She

12   brought it up.  She talked about it every day.  Betty tells

13   you they're not going to know my plans because I'm not the

14   type of person who talks about my personal life.  That's not

15   what Cindy said.  She talked about her marriage, she talks

16   about her family, she talks about retirement all the time.

17   In fact, she said the counselor job was her retirement job.

18        And if you look at her -- the testimony of the

19   nurse practitioner, I believe in those records she said

20   something about, *Things are going much better.  I can hang*

21   *on for another couple months.*  You heard Al Sanner talk

22   about what his impression was talking to her every day, that

23   he thought she was going the retire within a year or two.

24   And I asked him, you know, would he be, like right now, like

25   about this far out to retire?  No, no, not at all.  It was a

Defendant's Closing Argument

 1    year or two from the time he knew her in '04, '05.  She said

 2    the reason she wanted to retire now instead of versus when

 3    she turned 50 was because her husband was younger and he was

 4    going to retire.  What she didn't tell you was that during

 5    this period when she's seeing the nurse practitioner, she

 6    apparently was thinking about divorcing her husband, so was

 7    that really something that she was going to rely on at that

 8    point?  No.  It doesn't make sense.  She's not going to wait

 9    for some guy she's probably going to be divorced from to

10    retire from a job that she obviously hated at this point,

11    not because of her age; she just didn't like the job.

12         She talked about Ann talked to her all the time

13    about retirement.  Well, Betty testified that Ann talked to

14    her twice, and one time was just so -- Well, *when do you*

15    *think you're going to retire?*  Common question around there.

16    Everybody's asking that.  And Betty said she joked, it was

17    joking, it was like, *When I'm 50.*  Well, is Ann supposed to

18    know that she's kidding and that she's just trying to -- who

19    knows?

20         The truth here is that nobody forced Betty Cook out

21    of her job.  It was a stressful job.  It certainly wouldn't

22    surprise anyone that they would leave that job as soon as

23    they could, and Betty did, and Betty's being paid more now

24    than she was as a counselor.  She was stressed out, she

25    couldn't handle it, she wanted to retire.  It had nothing to

                    Defendant's Closing Argument

 1     do with her age.  It had nothing to do with the department

 2     trying to push the old people out.  It had nothing to do

 3     with the department trying to get their friends in, you

 4     know, bring our buddies in there.  Who did they get in?

 5     They got in buddies that were more senior than Gina, which

 6     makes -- the whole theory makes no sense.  Betty couldn't

 7     handle the job and she didn't like that because she'd always

 8     been able to handle her jobs before.  She was probably a

 9     good secretary, as we talked about earlier.  She could

10     handle that.  Counseling job was over her head and she

11     couldn't do it and stressed her out, as it stressed everyone

12     else out, but everyone else got their job done, got their

13     contacts seen.  Everyone else managed to do the job.

14           A reasonable person -- as you look at these

15     instructions, a reasonable person in Betty's situation would

16     not believe that anything was going on because of age, would

17     not believe that this job -- that they had made it so

18     terrible that they were forced to retire when they didn't

19     want to.  Nothing here is because of age and there's

20     absolutely no evidence that it was.

21           So you can find that Centralia was a crappy place

22     to work at that time.  You can find that counseling

23     department sucked.  You can find that Ann Casey was heinous.

24     You can find that Warden Robert was hands off.  Who knows?

25     You can find all of that.  But it doesn't mean that, under

                    Defendant's Closing Argument

1    an age discrimination claim, you can find for Betty Cook.

2    It has to be age.  Has to be age, not seniority, not crappy

3    place to work, not bad supervisor.  Has to be age.  And

4    there's absolutely no evidence that it was -- had anything

5    to do with age.

6         And we're going to ask, when you go back in the

7    jury room, you look at all this.  Look at all the evidence,

8    because what I say here isn't evidence, what Mr. Falb said

9    isn't evidence, what any of us said in asking questions,

10   it's not evidence.  The evidence is what the testimony was

11   that was allowed in and the documents that you folks are

12   going to take back with you.  We're going to ask, when you

13   have done that, when you've thought about the testimony, you

14   looked at the documents, that you will sign Verdict Form C,

15   which is an age discrimination claim that you will find in

16   favor of the department.  And Verdict Form D on the

17   constructive discharge claim, we ask that you find in favor

18   of the defendant on this claim as well and that you sign

19   this verdict form, and you will have no reason to even mess

20   with the other ones or the special questions that Mr. Falb

21   showed you.

22         Betty Cook has not met her burden that it's more

23   likely than not that any of these things that have been

24   outlined to you happened because of her age.  And because of

25   that, we ask you, as the instructions tell you, not to use

Defendant's Closing Argument

1   sympathy.  You might feel sorry for her.  Tough job.  It was

2   a tough job, but not to use sympathy.  You have to look at

3   the law and you have to follow the law, and we're confident

4   that when you do that you will find in favor of the

5   department and against the plaintiff, Betty Cook.

6        Thank you.

7        THE COURT:  Thanks, Ms. Choate.  Rebuttal argument,

8   Mr. Falb?

9              **PLAINTIFF'S REBUTTAL CLOSING ARGUMENT**

10       MR. FALB:  Throughout closing argument of the

11  defense counsel she mentioned, or perhaps when my client

12  testified, it was an oversight, she didn't put certain

13  things into the disciplinary packet.  I want you to remember

14  that.  Before I get to that, remember, my client on every

15  disciplinary hearing, was not given time to prepare.  Okay?

16       Now let's talk about oversight.  Remember how I

17  asked you to ask defense counsel, *Where did you get*

18  *Mr. Risse's documents that he all of a sudden has these*

19  *unfounded allegations against him last week?*  Did she answer

20  you?  Guess it was an oversight on her part.  Where did she

21  get the information that my client filed a grievance against

22  Bart Toennies?  She didn't.  The whole union did because

23  Bart Toennies was coming in and he was too young.  I guess

24  that's an oversight by defense counsel.

25       And then she said that on one hand Ann Casey was

                    Plaintiff's Rebuttal Closing Argument

 1   just trying to help her, like she was a good supervisor, but

 2   on the other hand, she was an equal opportunity wicked

 3   witch.  Which was it?  Reminds me when I was a prosecutor

 4   the defendant always had, not one, but multiple excuses.

 5   First there was an alibi, you know, he wasn't there.  Then

 6   if that didn't work, you know, he was forced to make a

 7   confession.  If that didn't work, it was he was insane at

 8   the time of the commission of the crime.  Which is it?  Is

 9   it an oversight?

10          She says -- defense counsel indicates, and I know

11   she's an advocate, that everyone thought Ann Casey was not a

12   very good supervisor.  That's not true.  Apparently someone

13   thought she was a good supervisor.  Warden Robert thought

14   she was a good supervisor.  Think about each and every

15   discipline that my client got.  Ann Casey, all of a sudden

16   she gets her job and she's getting $65,000 a year annual

17   salary, and all of a sudden $2,500 per month from one

18   consulting company in Chicago, $2,500 per month from another

19   consulting company from Pennsylvania.  What do they do?

20   They supply stuff to prisons.  She is making $125,000 a year

21   as an assistant warden.

22          *What do you do for these consulting companies?*

23          *I don't remember.*

24          *Did you do anything?*

25          *I don't remember.*

          Plaintiff's Rebuttal Closing Argument

1        That was her testimony that I read you.  I'm sure

2   it's hard for you to remember that.  And when Warden Robert,

3   he says, *Well, I didn't know anything about it until she was*

4   *told not to do it.  Did she have to give the money back?*

5   *No.*  I told you this was a junior microcosm, Centralia is,

6   what's going on in Springfield and Chicago.  Blagojevich is

7   accused of $500,000, selling a senator's seat, and she's

8   making $120,000 a year, and he doesn't do a gosh darn thing

9   about it.  And she's being disciplined because she used the

10  word "shit".  Give me a break.  Welcome to the State of

11  Illinois.

12        *Did you make her give the money back, Warden?*

13        *No.*

14        *Did you even talk to her about this, Warden?*

15        *No.*

16        *Did you discipline her, counsel her, do*

17  *anything?*

18        *No.*

19        Are you -- you got to be joking.  And she says,

20  well, you know, they were short-staffed, why would they want

21  to get rid of her?  Because Ann Casey and that warden care

22  less if they're short-staffed.  They want their people in

23  there.  It's the same old story:  You get in there, get your

24  people in there.  And they did get their people in the end.

25  There's all sorts of new names.  The warden could care less.

Plaintiff's Rebuttal Closing Argument

1   You know, he has a little tight group around his boat in

2   Carlyle or his bar in Carlyle.  And people like that who

3   stand up and people like Brandon Risse who stand up, you

4   know, I wonder what's going to happen to Brandon's job next

5   year.  Can you believe that?  This is sick.  This is

6   corruption.

7          This is your chance to do something about this.

8   I'm not asking you for a dime.  I'm asking you for some

9   principles.  And trust me, that warden right there doesn't

10  have any principles.  It all boils down to selfishness, and

11  they used because they were selfish, and that's ultimate

12  motive, to do what they wanted to do.  And you know what?

13  She could have retired in August of 2007.  They said she

14  talked about it, she could have retired.  This is just about

15  her wanting to retire.  She could have done that.  She

16  didn't have to come back.  You know what?  This is America.

17  You know what?  We have a right to work and to work past

18  retirement age, and people like this guy, Ann Casey,

19  Gina Feazel, Bart Toennies and the other group don't have to

20  push her out.

21          She says, well, there's not a shred of evidence

22  that Bart Toennies and Gina Feazel did the same thing.  You

23  know what?  There's lot of shreads of evidence that they did

24  something wrong; that Mr. Golden, the inmate who was going

25  to be released on parole -- Bart Toennies was the one that

Plaintiff's Rebuttal Closing Argument

 1    was going to release him on parole to see the crime victim,

 2    which is much worse than a victim sitting across the glass

 3    in a prison seeing an inmate.  Gina Feazel was the one that

 4    had a lockdown at the prison.  They were never, ever

 5    counseled or disciplined.

 6              And then in May 2008, Risse and Feazel have to be

 7    counseled several times.  And what happens when Ty Bates,

 8    the assistant warden, the bald man that testified, decides

 9    to move her instead?  It's the same old thing.  And they

10    said my client struggled.  She didn't say -- I guess it's an

11    oversight that Ty Bates testified he didn't have a single

12    problem with her, she was a hard worker, evaluations were

13    good, he never disciplined her, there was no sign of

14    struggle whatsoever.  And that's the last six or seven

15    months that she worked there.  And even Ann Casey, in her

16    report, stated:  "Mrs. Cook has exceeded expectations in

17    areas of productivity, planning and follow-up.  During this

18    review period Mrs. Cook's caseload has increased due to

19    staff shortages.  Despite the increased caseload she

20    continues to prioritize well, insuring that her assignments

21    are completed in a timely manner.  She served as the back-up

22    counsel in segregation and is also a member of the internal

23    audit team."  That's it.  And gave her a good evaluation.

24    And that's Ann Casey, the wicked witch of the west or east

25    or whoever.  She didn't mention that in her closing

                    Plaintiff's Rebuttal Closing Argument

 1  argument.  Is that an oversight?  She's got all the

 2  documents.

 3       She talks about my client, well, maybe she didn't

 4  want to retire because she was maybe having a divorce.

 5  Where is that coming from?  I know there was mention of that

 6  in the videotape, but in August of that year she had family

 7  support.  And I forgot, these people cross-examined the

 8  nurse practitioner alleging, well, maybe the high blood

 9  pressure's due to being obese or smoking or lack of family

10  support.  They will reach to anything to tear my client

11  down.

12       They talked about Al Sanner.  Well, let's talk

13  about the people that criticize my client.  Al Sanner didn't

14  see my client after March of 2006.  Loepker didn't see her

15  after that.  Cagle didn't see her after October 2005.  And

16  then during the year 2005, that's when she got a great

17  evaluation by Ann Casey, the wicked witch.  The only person

18  that saw her after that was Sena Landreth, and she said she

19  appeared to be disorganized.  And remember, Gina Feazel said

20  the same thing about Sena Landreth.  And my client

21  explained, *I have all these things.  This is how I do

22  things*.  Some lawyers are that way.  I'm that way.  Some

23  lawyers are extremely neat, obsessive.  You know, that's

24  just the way it is.  That's the way people do things.

25       She said Ann Casey had a problem with everybody.

Plaintiff's Rebuttal Closing Argument

1    That's not true.  She didn't have a problem with
2    Bart Toennies.  Only once did Gina Feazel have a problem
3    with Ann Casey, and that's when she went to Robert's office
4    and was talking to him about it.  She had free access to his
5    office.  She knew him outside the prison.  We know where she
6    knew him.  And then there was no Counselor III job posted.
7    I want you to remember this.  Who is in charge of allocating
8    the positions?  That man right there.  He makes the
9    allocation.  He makes the determination.  Case work
10   supervisor was added after that.  And then Gina Feazel says,
11   well, my client should have known she wasn't going to get
12   paid if she did these extra duties as Counselor III.  Can
13   you imagine, my client takes this job for free?  Add these
14   extra duties for free.  That's great.  Can you believe that?
15        She talked about my client's leaving the post
16   charge.  Well, it was, in fact, reduced and it was expunged
17   and the documents are there.  The CHAMPS entry where my
18   client uses profanity.  I love it when the hearing officers
19   who are supervised by Warden Robert -- in fact, one's the
20   assistant for Warden Robert, and that's Mrs. Taphorn, who
21   helps him in his research and fighting these lawsuits.
22   She's real impartial.  Mr. Beckman, he's real impartial.  He
23   says -- both of them said, *We usually* -- or they said they
24   rely on the supervisors being truthful or as being correct
25   in the first place, I mean to begin with at some lawsuit, at

Plaintiff's Rebuttal Closing Argument

 1   some trial hearing.  Then they look at the documents, and

 2   they decide to believe the documents as opposed to her and

 3   her documents, she loses.  And Mr. Beckman said, about these

 4   CHAMPS issues, it seemed like when she used that language --

 5   he didn't say anything about professional.  He said it was

 6   belittling the inmate.  Give me a break.  Here's an inmate

 7   that's swearing and talking about how he's going to kick

 8   everybody's ass and she's belittling him by saying, *You*

 9   *can't kick anybody's ass*?  He needs to learn.  You don't

10   talk to inmates, *Let's talk about your language now.  Let's*

11   *be politically correct about this.  Now, when you say "ass"*

12   *you mean rear end*.  Can you imagine trying to counsel

13   someone that way?  They'd be laughing her outside the wing.

14            Fax of the victim.  There is a fax of the victim in

15   that packet, but remember, that's not the packet my client

16   had.  If that was in there, she wouldn't have let that

17   victim in there.  It's that easy.  But she didn't have that

18   when she saw the victim.

19            Denial of pay in August, September, October and

20   first part of November.  Our position is, she was out

21   because she was hurting and they refused to pay her, and

22   even while she was out they tried to get her again by giving

23   her a leave of absence during that time.

24            Oh, she makes a big deal about this party, this

25   retire -- you know, pinning party.  My client could care

                    Plaintiff's Rebuttal Closing Argument

1    less about a party.  That's not discrimination; it's what
2    was said, how Ann Casey conducted herself.  That's just a
3    little piece of evidence, of circumstantial evidence that
4    when you know that person comes in, by the time you've heard
5    all this evidence, this person comes into the courtroom --
6    not only does that person have an umbrella but that
7    umbrella's wet.  She's wearing galoshes that's wet.  She's
8    got mud.  And you know that person was out in the rain and
9    you know, based upon all the circumstantial evidence here,
10   that there was, in fact, discrimination.

11        It doesn't surprise you, does it, that they wanted
12   to get rid of her when she was approaching retirement?  Why
13   not?  Get out of here so we can move people in.  Doesn't
14   that make sense to you?

15        Seniority.  Well, seniority can't be discrimination
16   if it's a proxy for age, but I don't care about that here.
17   We're talking about her approaching the age of 50.  You
18   know, I don't know if Ann Casey was "highness" or heinous or
19   Warden Robert was heinous or "highness".  It doesn't matter.
20   The important thing is that there were some oversights here,
21   and the oversights here were that people do have rights and
22   privileges.

23        And this is your chance.  For the first time in my
24   civil career I get to ask you to bring back a verdict, A and
25   B, mark "yes" on those.  I'm not asking you for a dime, not

Plaintiff's Rebuttal Closing Argument

1    a single penny.  She's asking for her principle.  She had

2    the gall to stand up against the State of Illinois, and what

3    you do here today may mean -- or may send a message

4    throughout the system of the Illinois Department of

5    Corrections, maybe even more important than what goes on in

6    Chicago.  Do your duty for people like Betty, but more

7    importantly, do your duty for everybody in the State of

8    Illinois who's in the same circumstances.  You know what?

9    If you come back with a verdict for Betty, which is just a

10    principle, this is the greatest thing ever.  People at the

11    other, I don't know how many correctional centers,

12    Springfield -- you know what?  They'll know about it.  And

13    they'll think about it next time when they start doing stuff

14    like this.  But I guarantee you -- please don't take this

15    the wrong way.  It's your chance to stop it.  If you don't,

16    it will continue.

17          And I want to thank you so much for all your time.

18    Your time is precious.  I've got a son-in-law who I'm very

19    proud of.  Every time he comes back from Afghanistan, he

20    walks through airport and people thank him.  That's just

21    great because he knows he's done a job, a duty.  When I was

22    growing up in Viet Nam, no one thanked the army coming back.

23    They didn't have a sense of accomplishment.  Here you got a

24    chance, big chance.  Thanks very much.

25                 **JURY INSTRUCTIONS (cont.)**

                    Plaintiff's Rebuttal Closing Argument

1                *THE COURT:*  Thanks, Mr. Falb.

2           Upon retiring to the jury room you must select a

3    presiding juror.  The presiding juror will preside over your

4    deliberations and will be your representative here in court.

5           Forms of verdict have been prepared for you.  Take

6    these forms to the jury room and when you have reached

7    unanimous agreement on the verdict your presiding juror will

8    fill in and date the appropriate form and all of you will

9    sign it.

10           I do not anticipate that you will need to

11   communicate with me.  If you do need to communicate with me,

12   the only proper way is in writing.  The writing must be

13   signed by the presiding juror, or, if he or she is unwilling

14   to do so, by some other juror.  The writing should then be

15   given to the marshal who will give it -- the writing should

16   be given to the marshal who will give it to me.  I will

17   respond either in writing or by having you return to the

18   courtroom so that I can respond orally.

19           If you do communicate with me you should not

20   indicate on your note what your numerical division is, if

21   any.

22           The verdicts must represent the considered judgment

23   of each juror.  Your verdicts, whether for or against the

24   parties, must be unanimous.

25           You should make every reasonable effort to reach a

Vol.VI, Pg.984

 1   verdict.  In doing so, you should consult with one another,

 2   express your own views, and listen to the opinions of your

 3   fellow jurors.  Discuss your differences with an open mind.

 4   Do not hesitate to re-examine your own views and change your

 5   opinion if you come to believe it is wrong, but you should

 6   not surrender your honest beliefs about the weight or effect

 7   of evidence solely because of the opinions of your -- of

 8   other jurors or for the purpose of returning a unanimous

 9   verdict.

10        All of you should give fair and equal consideration

11   to all the evidence and deliberate with the goal of reaching

12   an agreement that is consistent with the individual judgment

13   of each juror.  You are impartial judges of the facts.

14        The first verdict form is on the monitor before you

15   and reads as follows:  The United States District Court,

16   Southern District of Illinois, Betty D. Cook, Plaintiff vs.

17   IDOC, 09-CC-133-DRH.

18        Verdict Form A:  On plaintiff's age

19        discrimination claim we, the jury, find in favor of

20        plaintiff, Betty Cook, and find that the defendant,

21        the IDOC, discriminated against plaintiff because of

22        plaintiff's age of over 40 years.

23        The foreperson -- or the presiding juror, rather,

24   will mark the appropriate blank, either "yes", we find

25   defendant willfully violated the age discrimination

1    employment act, or "no", we find the defendant did not

2    willfully violate the Age Discrimination in Employment Act.

3    Then there's a space there for all jurors to sign.  The

4    foreperson or presiding juror will sign on the first blank

5    in the upper left and the balance of the jurors on those

6    other blanks.  So Verdict Form A is if you find for the

7    plaintiff on age discrimination case.

8          Verdict Form B is now on the monitor before you, or

9    will be shortly.  Verdict Form B will be refused if you find

10   in favor of the plaintiff on the constructive discharge

11   claim.  This one reads:  In the United States District

12   Court, Southern District of Illinois, Betty D. Cook,

13   Plaintiff vs. IDOC, Defendant, 09-CV-133-DRH.

14          Verdict Form B:  On plaintiff's constructive

15          discharge claim we, the jury, find in favor of

16          plaintiff, Betty Cook, and find that, because of her

17          age of over 40 years, the defendant, the Illinois

18          Department of Corrections, made plaintiff's working

19          conditions so intolerable that plaintiff had no

20          choice to retire.

21          Then there's a space for all the jurors to sign.

22   Once again, the presiding juror, or the foreperson, to sign

23   on the first blank on the left side.

24          Verdict Form C -- I'm sorry.  There's -- I

25   apologize.  I meant to read the -- before Verdict Form B, I

1    should have read this set of interrogatories.  These relate
2    to the age discrimination case:
3            These are the questions as to each of the
4        individual claims.  These, again, relate to the age
5        discrimination case, and these are to be answered if
6        you find in favor of the plaintiff on her age
7        discrimination case.  If you find in favor of the
8        plaintiff on her age discrimination, then answer the
9        following questions.  If, however, you find in favor
10       of the defendant on the plaintiff's age
11       discrimination claim, there's no need to consider
12       these questions.
13           So the first issue is, yes, we, the jury, find
14       that because of her age, the defendant denied
15       plaintiff a promotion to Correctional Counselor; or
16       no, we, the jury, find the defendant did not deny her
17       promotion to a Correctional Counselor III because of
18       age.
19           So the foreperson will either mark whatever the
20   unanimous finding of the jury is, either yes, the defendant
21   did deny her promotion to Correctional Counselor III because
22   of her age, or did not.  Either yes or no, whatever the
23   unanimous finding of the jury is.
24           The second issue then to consider, again, based on
25   her age:

1              Either yes, we, the jury, find that because of

2         her age defendant denied Correctional Counselor III

3         pay for her work duties, or, no, we, the jury, find

4         the defendant did not deny plaintiff Correction

5         Counselor III pay for her work duties because of her

6         age.  And again, that has to be the unanimous finding

7         of the jury.

8         The next issue on the age discrimination case is --

9    and once again, the foreperson will mark, based on the

10   unanimous finding of the jury:

11             Yes, we, the jury, find the defendant

12        disciplined plaintiff for her CHAMPS entry regarding

13        Inmate Cobb; or, no, we, the jury, find the defendant

14        did not discipline plaintiff for her March 19, 2007

15        CHAMPS entry regarding Inmate Cobb because of her

16        age.  And those -- that finding, either yes or no,

17        has to be unanimous regarding the CHAMPS entry issue.

18        And then the next issue on this is -- this is the

19   bottom of the first page and the top of the second page.  So

20   the issue is:

21             Yes, we, the jury, find that the defendant

22        disciplined plaintiff for her April 2007 failure to

23        make inmate contacts within 90 days because of her

24        age; or no, we, the jury, find the defendant did not

25        discipline plaintiff for her -- discipline for her

 1          April 2007 failure to make inmate contacts within 90

 2          days of her age.  Once again, this finding on inmate

 3          contacts has to be unanimous, either yes or no, based

 4          on the age discrimination.

 5              The next issue then is, once again, yes or no:

 6                  Yes, we, the jury, find the defendant

 7          disciplined plaintiff for her April 24, 2000 approval

 8          of the visitor list for Inmate Williams because of

 9          her age; or no, we, the jury, find that defendant did

10          not discipline plaintiff for her April 24, 2007

11          approval of the visitor list for Inmate Williams

12          because of her age.  Again, has to be unanimous

13          finding of the jury, yes or no on this issue.  And

14          the foreperson will check the appropriate line.

15              The next issue then on this age discrimination case

16     is:

17                  Yes, we, the jury, find that the defendant

18          disciplined plaintiff for her June 7, 2007 e-mail

19          from plaintiff to Deb Gordon from Springfield because

20          of her age; or no, we, the jury, find that defendant

21          did not discipline plaintiff for her -- disciplined

22          for her June 7, 2007 e-mail from plaintiff to

23          Deb Gordon from Springfield because of her age.

24              There's kind of a redundancy typed into those, as

25     you can see, but the issue is -- as you can see, it's got to

1    be a finding yes or no on this issue in the age

2    discrimination case.

3         This next issue, again, in the age discrimination

4    case, is a finding by the jury, either yes or no on this

5    issue as well:

6         Yes, we, the jury, find that, because of her

7         age, the defendant denied plaintiff pay during her

8         2007 leave of absence; or no, we, the jury, find that

9         defendant did not deny plaintiff pay during her 2007

10        leave of absence.  Again, this finding has to be

11        unanimous by the jury on this issue under the age

12        discrimination case.

13        So the next in order would be Verdict Form B, which

14    I've just read to you, which is the constructive discharge

15    claim.  And if you find for the plaintiff on that, then you

16    would sign this form.  I've already read it to you.

17        So the next form then is Verdict Form C.  This a

18    form to be used if you find for the defendant on the age

19    discrimination case.  It reads:  In the United States

20    District Court, Southern District of Illinois, Betty D.

21    Cook, Plaintiff vs. IDOC, Defendant, 09-CV-133-DRH.

22        Verdict Form C:  On plaintiff's age

23        discrimination claim, we, the jury, on the allegation

24        that it subjected plaintiff to discrimination because

25        of plaintiff's age of over 40 years, find in favor of

1          the defendant, the Illinois Department of

2          Corrections, and against plaintiff, Betty Cook.  And

3          then once again, everybody would sign with the

4          foreperson in the upper left.

5               The next form, which is Verdict Form C, again would

6     be a defendant's verdict form on the constructive discharge

7     claim.  So you can see the pattern here is verdict forms for

8     the plaintiff, A and B; verdict forms for the defendant, C

9     and D.  So this one reads:  United States District Court,

10    Southern District of Illinois, Betty D. Cook, Plaintiff vs.

11    IDOC, Defendant, 09-CV-133-DRH.

12               Verdict Form D:  On plaintiff's constructive

13          discharge claim, we, the jury, on the allegation that

14          because of her age of over 40 years, the defendant,

15          the IDOC, made plaintiff's working conditions so

16          intolerable that plaintiff had no choice but to

17          retire, find in favor of the defendant, the IDOC, and

18          against plaintiff, Betty Cook.  Then a place for

19          everybody to sign, the foreperson, or the presiding

20          juror, in the upper left.

21               That concludes the reading of the instructions and

22    the verdict form.  Glenn, if you'll step forward and be

23    sworn as the monitor.

24     *(Court Security Officer sworn)*

25               THE COURT:  So what we'll do, folks, if you'll take

 1    your notebooks with you this time, we're going to gather

 2    together the exhibits that have been admitted into evidence

 3    and are to be considered by you during your deliberations.

 4    Together with those, we will provide you with your own

 5    copies of the jury instructions, plus an original.

 6         Now, on your own copies you can write on them, mark

 7    on them, do whatever you want.  On the originals, the only

 8    markings you should make on the originals would be on the

 9    actual verdict forms themselves.  So you'll have the

10    originals, your own copies of the instructions, verdict

11    forms, and then you'll have the exhibits that can be

12    considered by you that have been admitted in evidence.

13         And if you'll go now with Glenn, we'll send back

14    those other things.

15        *(Jury out)*

16        *(Break)*

17                          *   *   *   *

18        *(Jury in)*

19        *THE COURT:*  Presiding juror, has the jury reached

20    unanimous verdicts?

21        *JUROR:*  We have.

22        *THE COURT:*  Would you hand the verdict forms to

23    Katie, please.

24        *THE COURT:*  I have two verdict forms here they're

25    signed by all jurors.  They are Verdict Forms C and D.  They

1   read:

2          On plaintiff's age discrimination claim, we, the

3          jury, on the allegation that it subjected plaintiff

4          discrimination because of plaintiff's age over 40

5          years, find in favor of the defendant, Illinois

6          Department of Corrections, and against plaintiff,

7          Betty Cook.

8          That was Verdict Form C.  Verdict Form D reads:

9          On plaintiff's constructive discharge claim, we,

10         the jury, on the allegation that because of her age

11         of over 40 years, the defendant, the Illinois

12         Department of Corrections, made plaintiff's working

13         conditions so intolerable that plaintiff had no

14         choice but to retire, find in favor of defendant, the

15         Illinois Department of Corrections, and against the

16         plaintiff, Betty Cook.

17         And both forms, as I said, are signed by all 12

18   jurors.  Is there anything else required of the jury at this

19   point?  Any polling of the jury required by either party?

20         Apparently not.  So verdict forms, being in proper

21   form, the Court accepts the verdicts of the jury.

22         Thank you very much, ladies and gentlemen, for your

23   service.  I say that on behalf of both parties.  Sandy and I

24   will both be back momentarily with your work slips and do an

25   exit interview.  With that, if everybody will please rise,

1  go with the Glenn back to the jury room.

2       *(Jury out)*

3            THE COURT:  So Verdict Forms C and D, having been

4  rendered by the jury, the Court having accepted the verdicts

5  of the jury, judgment will be entered on behalf of the

6  defendant accordingly on all claims of the plaintiff

7  forthwith.  The case against Department of Corrections will

8  be dismissed.

9            Can't think of anything else I need to take care

10  of.  Mr. Falb, anything further from the plaintiff?

11            MR. FALB:  No, Your Honor.

12            THE COURT:  And Ms. Gunderson, on behalf of

13  defendant?

14            MS. GUNDERSON:  No, Your Honor.

15            THE COURT:  Very well.  This case, we stand

16  adjourned.  Thank you, folks.

17       *(Court adjourned)*

18                         *  *  *  *

19

20

21

22

23

24

25

1                           REPORTER'S CERTIFICATE

2

3          I, Laura A. Blatz, RPR, Official Court Reporter for the
    U.S. District Court, Southern District of Illinois, do
    hereby certify that I reported in shorthand the proceedings
4   contained in the foregoing 83 pages, and that the same is a
    full, true, correct, and complete transcript from the record
5   of proceedings in the above-entitled matter.

6          Dated this 31st day of August, 2012.

7

8                              /s/
                              _____
9                              LAURA A. BLATZ, RPR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25